## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ELOISE T. WORMLEY,<br>                    Plaintiff,<br><br>v.<br><br>THE UNITED STATES OF AMERICA,<br>et al. | )<br>)<br>)<br>)<br>)  **OPPOSITION TO MOTION TO**<br>)  **DISMISS**<br>)<br>)  **CASE NO. 1:08-cv-00449 (CKK)**<br>)<br>) |

### OPPOSITION TO MOTION TO DISMISS OF DEFENDANTS
### CORRECTIONS CORPORATION OF AMERICA AND OFFICER TUTWILER

Pursuant to LCivR 7(a), and for the reasons stated in the attached Memorandum of Points and Authorities, Plaintiff Eloise T. Wormley submits this Opposition to the Motion to Dismiss of Defendants Corrections Corporation of America and Officer Tutwiler.

Pursuant to LCivR 7(f), Plaintiff respectfully requests an oral hearing on this motion and opposition.

June 27, 2008

   /s/ Robin E. Jacobsohn
Robin E. Jacobsohn (D.C. Bar no. 417307)
Christopher R. Hart (D.C. Bar no. 486577)
Mathew J. Peed (D.C. Bar no. 503328)
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, D.C. 20005
(202) 434-5000

*Attorneys for Plaintiff*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ELOISE T. WORMLEY, ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | **OPPOSITION TO MOTION TO** |
| ) | **DISMISS** |
| THE UNITED STATES OF AMERICA, ) | |
| et al. ) | **CASE NO. 1:08-cv-00449 (CKK)** |
| ) | |
| ) | |

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF OPPOSITION TO MOTION TO DISMISS OF DEFENDANTS CORRECTIONS CORPORATION OF AMERICA AND OFFICER TUTWILER

### INTRODUCTION

Plaintiff Eloise Wormley was unlawfully detained for five months in the Correctional Treatment Facility ("CTF"), operated by Defendant Corrections Corporation of America ("CCA") under contract with the District of Columbia Department of Corrections ("DOC"). Ms. Wormley brings this suit against CCA because it and its employees, Officer Tutwiler ("Tutwiler") and John or Jane Does 2–10, failed to investigate Ms. Wormley's status as an inmate, to inform Ms. Wormley of the reasons for her detention despite her repeated requests for information, and to facilitate or ensure her release. Even after CCA and Tutwiler were on notice that Ms. Wormley believed she should have been released on October 22, 2006, they did nearly nothing. As a consequence, Ms. Wormley remained in prison, unnecessarily and unjustifiably, for five months—she never saw a judge, was never informed of the reasons for her imprisonment, and was never told when she could expect to leave. Ms. Wormley now brings

this action for damages against CCA and Tutwiler for negligence, false imprisonment, and for civil rights violations under 42 U.S.C. § 1983.[1]

Defendants' only argument in their motion to dismiss is that a provision in the D.C. Code pertaining to inmate transfers prevents holding them liable for negligence or for false imprisonment.  But this provision is completely silent as to Defendants' affirmative obligations toward the inmates entrusted to their care—specifically, the obligation to investigate CTF inmate status, to respond to CTF inmate inquiries regarding their status, and to facilitate or ensure a CTF inmate's release when an inmate is being erroneously confined.  CCA and Tutwiler had a duty to Ms. Wormley under the common law and under CCA's contract with DOC (and independent of the District of Columbia's duties[2]) (1) to investigate and to inform Ms. Wormley of the reasons for her imprisonment (in particular, after Ms. Wormley requested such information directly from Defendant Tutwiler, Complaint ¶¶ 53, 58, and put Defendants on notice through those communications and through the grievance process, Complaint ¶¶ 56, 57, that her detention was unlawful), and (2) to take the steps to inform DOC that Ms. Wormley was being unjustifiably detained.  CCA and its employees—who have immediate, daily, direct contact with the inmates under their care—may not wash their hands of their responsibilities toward their inmates by simply pointing the finger at others.

---

[1] Defendants erroneously state that Ms. Wormley has brought no federal claims against them. See Mot. to Dismiss at 5 n.1.  This is discussed further on pages 11–12.

[2] Because the District of Columbia also had duties toward Ms. Wormley and violated both those duties and Ms. Wormley's civil rights, it and relevant officers have also been named as defendants.

## **BACKGROUND**

Eloise Wormley was held unlawfully for one hundred and forty-seven days at CTF in the District of Columbia.  Complaint ¶ 25.  This period of unlawful detention began on October 22, 2006, when Ms. Wormley expected to be released from CTF but remained imprisoned there, never being informed of the reasons for her incarceration.

CTF is owned and operated by CCA, which in turn employed Officer Tutwiler, Ms. Wormley's case manager at the facility, and John or Jane Does 2–10.[3]  Ms. Wormley asked Tutwiler on multiple occasions why she was being held at the facility even though she expected to be released.  Complaint ¶ 53.  Tutwiler never correctly informed Ms. Wormley of the actual reasons for her detention, telling Ms. Wormley—erroneously—that she was being held in CTF because of a probation violation.  Id.

Only once, on December 6, 2006 (weeks after Ms. Wormley first requested information from Tutwiler), did CCA, through one of its employees, inform the United States Marshals Service (USMS)—and not DOC—that Ms. Wormley's sentence had been completed.  Complaint ¶ 54.  After this point, Ms. Wormley continued to approach Tutwiler for information about her detention.  As late as March 2007—the month Ms. Wormley was finally released— Tutwiler responded to yet another request for information from Ms. Wormley by stating only that she was "looking into" her status.  Complaint ¶ 58.  Tutwiler repeatedly failed to inform her superiors at CCA of Ms. Wormley's request and failed to investigate Ms. Wormley's detention on her own.  Throughout the five-month period of Ms. Wormley's unlawful incarceration, CCA,

---

[3] These defendants are other CCA employees who had or should have had knowledge of Ms. Wormley's unlawful incarceration.  Their identities are currently unknown.

through Tutwiler and other employees, did almost nothing despite Ms. Wormley's repeated requests and despite having actual knowledge that Ms. Wormley was unlawfully detained.

Ms. Wormley now brings claims of negligence (Complaint ¶¶ 136–41) and false imprisonment (Complaint ¶¶ 142–44) against CCA, Tutwiler, and John or Jane Does 2–10. Ms. Wormley brings additional claims under 42 U.S.C. § 1983 against Tutwiler (Complaint ¶¶ 168–73) and CCA (Complaint ¶¶ 180–88) for violations of her constitutional rights.

**STANDARD OF REVIEW**

On a Fed. R. Civ. P. 12(b)(6) motion to dismiss a complaint, "the Court must construe the complaint in the light most favorable to plaintiff and must accept as true all reasonable factual inferences drawn from well-pleaded factual allegations." In re United Mine Workers of America Employee Ben. Plans Litigation, 854 F.Supp. 914, 915 (D.D.C. 1994). A court may dismiss a complaint "only when it appears beyond doubt that the plaintiff can prove no set of facts in support of his claims that would entitle him to relief in this court." Id.; Schuler v. United States, 617 F.2d 605, 608 (D.C. Cir. 1979) ("The complaint must be 'liberally construed in favor of the plaintiff,' who must be granted the benefit of all inferences that can be derived from the facts alleged.").

## ARGUMENT

## I.  DEFENDANTS ARE LIABLE TO MS. WORMLEY FOR BOTH NEGLIGENCE AND FALSE IMPRISONMENT.

### A.  Defendants Owed Ms. Wormley a Duty of Care.

Ms. Wormley alleges that CCA and Tutwiler breached their duties of care by failing to take appropriate steps to investigate her status and to facilitate or ensure her release from CTF.  Complaint ¶¶ 138–40.  Although Defendants deny that they had any duty to Ms. Wormley, this is false:  Ms. Wormley was under the custody and control of CCA and its employees during almost her entire unlawful incarceration—from October 22, 2006 until March 16, 2007.[4]  This alone is sufficient to establish that CCA, Tutwiler, and John and Jane Does 2–10 owed a duty to Ms. Wormley to investigate her status, to ensure that they would respond adequately to requests for information regarding her incarceration, and to take appropriate steps to have Ms. Wormley released.  See, e.g., Restatement (Second) of Torts § 314A(4) ("One who is required by law to take or voluntarily takes the custody of another under circumstances such as to deprive the other of his normal opportunities for protection is under a similar duty [to take reasonable action to protect them against unreasonable risk of physical harm] to the other."); id. § 323 ("One who undertakes . . . to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if (a) his failure to exercise such care increases the risk of such harm, or (b) the harm is suffered because of the other's reliance upon the undertaking.").

---

[4] Ms. Wormley was also unlawfully detained from March 17–19, 2007, but at the Central Detention Facility, which is owned and operated by the D.C. Department of Corrections.

Further, the existence of a duty is established by various provisions of the Operations and Management Agreement ("Agreement") between CCA's and the District of Columbia:

- CCA is required to develop an "inmate record and report system and a grievance procedure for inmates." Ex. 1 at 20 ¶ 5.5.1. This requirement acknowledges that CCA had responsibility for keeping track of inmates, reporting the status of inmates to DOC, and notifying DOC in the event that CCA employees are put on notice of questions or problems surrounding an inmate's confinement.

- CCA has the "sole right to supervise, manage, operate, control, and direct the performance of its duties" under the contract. Ex. 1 at 29 ¶ 8.1. This requirement acknowledges that CCA and its employees have sole custody and control over inmates at CTF.

- CCA expressly agreed to "use the same degree of care and skill in the performance of its duties . . . as a prudent person would exercise or use under the circumstances in the conduct of his or her affairs." Ex. 1 at 29 ¶ 8.4. This provision explicitly acknowledges that CCA and its employees had a duty of care to Ms. Wormley; a reasonable CCA employee should have both given Ms. Wormley correct information regarding her status and reported those questions (and knowledge of her erroneous detention) to DOC.

Under these circumstances, the Agreement creates a direct relationship between inmates and CCA on which inmates rely; and both CCA and DOC expect that CCA will exercise a duty of care toward inmates, as defined by the Agreement.

Existence of a duty is also established by Defendant Tutwiler's representations to Ms. Wormley, including her statement that she was "looking into" Ms. Wormley's inquiry regarding her court date. Complaint ¶ 58. This representation alone would have led Ms. Wormley to believe that no other efforts on her part were necessary to have her released; Tutwiler (and her employer, CCA) thereby assumed a duty to follow through per her representation (even if none had previously existed). See Restatement (Second) of Torts, § 324 ("One who, being under no duty to do so, takes charge of another who is helpless adequately to aid or protect himself is subject to liability to the other for any bodily harm caused to him by (a) the failure of the actor to exercise reasonable care to secure the safety of the other while within the actor's charge, or (b) the actor's discontinuing his aid or protection, if by so doing he leaves the other in a worse position than when the actor took charge of him.").

Attempting to avoid these duties to Ms. Wormley, Defendants misread the statute by incorrectly arguing that, because only DOC has the "authority to transfer or assign inmates into or out of the CTF," it must logically follow that CCA had no duty whatsoever to Ms. Wormley to respond adequately to her repeated requests for information and to inform DOC of her mistaken detention once they were put on notice (if not before).

This is a non sequitur. Regardless of which entity has the authority to physically transfer an inmate, the CTFA is silent on whether CCA and its employees had a duty to Ms. Wormley to (1) inform Ms. Wormley of the reasons for her incarceration pursuant to Ms. Wormley's requests for this information, and (2) inform those with authority (i.e., the DOC) that Ms. Wormley must be released (or at least that the reasons for her incarceration were unclear). Defendants cite no authority for interpreting the statute to affirmatively eliminate Defendants' obligations—both as entities under contract with the DOC and as state actors responsible for the

7

welfare of individuals incarcerated in their facility—to respond to Ms. Wormley's requests for information regarding her confinement and to act diligently once put on notice of her mistaken incarceration. The statute is irrelevant to the question of Defendants' negligence in this case.

CCA employees are the only ones who interact with inmates on a day-to-day basis. As the D.C. Court of Appeals has recognized, "the DOC has no day-to-day involvement in the operation of the CTF or of other prison facilities operated by the CCA." Moore v. Gaither, 767 A.2d 278, 284 (D.C. 2001). Defendants thus cannot merely point to DOC's authority to transfer inmates as a way of escaping their own responsibility to inform DOC as soon as they were put on notice of questions surrounding Ms. Wormley's status.[5]

The Agreement itself contemplates that Defendants will have day-to-day interactions with inmates and inform DOC of inmate status. Although Defendants exclusively rely on the statute for the proposition that "CCA and its employees . . . have no authority to release, screen or question inmate detentions," Mot. to Dismiss at 6, the Agreement demonstrates that the CTFA does not in any way preclude CCA or its employees from alerting DOC that an inmate is being erroneously confined. The Agreement reads, in pertinent part:

> The Operator [CCA] may not refuse to accept the assignment of any inmate to the CTF, but if the Operator believes that an inmate has been erroneously assigned to the CTF or warrants transfer, it may request his or her transfer in accordance with DOC policies and practice.

---

[5] None of this is inconsistent with Ms. Wormley's allegations against the District of Columbia. DOC also had a duty to monitor Ms. Wormley's status. Although D.C.'s and CCA's duties might overlap, their duties are separate and independent and they must be held jointly liable for Ms. Wormley's wrongful detention.

Ex. 1 at 14, ¶ 5.4.3 ("Transfer and Assignment of Inmates").[6]  In other words, nothing in the CTFA prevented CCA personnel from informing DOC that there was no reason to continue holding Ms. Wormley.  Although the Agreement does not go so far as to impose an affirmative duty to request a <u>transfer</u> to another facility, that is not the issue here; Ms. Wormley should have been <u>released</u> once her wrongful detention had been confirmed.  Moreover, nothing in the statute or Agreement overrides the common law duty of care to inmates in the custody of CCA.  CCA and Tutwiler owed a duty of care to Ms. Wormley, and the CTFA does nothing to eliminate that duty.

There can be no dispute that CCA and Tutwiler owed Ms. Wormley a duty of care, that they breached that duty by failing to investigate Ms. Wormley's status, give her correct information regarding her status, or inform DOC of her status and ensure her release.  Nor can there be any dispute that these failures were a direct and proximate cause of her injuries—her erroneous, unlawful confinement and deprivation of her constitutional rights.

**B.    The Statute Is Irrelevant to the Question of False Imprisonment.**

The CTFA is also irrelevant to the question of whether Defendants are liable for false imprisonment.  Defendants do not contend that their actions in confining Ms. Wormley do not meet the elements of false imprisonment under D.C. law.[7]  Rather, they argue that the CTFA

---

[6] This contract, a public document, is referenced in the Complaint at ¶¶ 8, 137, 143, and 182. The Court may consider facts alleged in the Complaint, documents incorporated by reference in the Complaint, and matters of which the court may take judicial notice, and matters of public record.  *See EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624 (D.C. Cir. 1997).

[7] Under D.C. Law, false imprisonment is "the restraint by one person of the physical liberty of another without consent or legal justification. . . . The essential elements of the tort are (1) the detention or restraint of one against his will, within boundaries fixed by the defendant, and (2) the unlawfulness of the restraint."  <u>Faniel v. Chesapeake & Potomac Tel. Co. of Md.</u>, 404 A.2d 147, 150 (D.C. App. 1979); <u>see also</u> <u>Restatement (Second) of Torts</u> § 35 ("An actor is subject to liability to another for false imprisonment if (a) he acts intending to confine the other or a third

exonerates them from any liability for falsely imprisoning Ms. Wormley, pointing to D.C.'s authority (and thus to D.C.'s liability for false imprisonment).

This argument fails:  there is no question, based on the allegations of the Complaint and on the legal relationship between D.C. and Ms. Wormley, that D.C. falsely imprisoned Ms. Wormley by failing to release her until March 19, 2007.  But there can also be no question that, as the Agreement illustrates, CCA chose to assist DOC in confining inmates and chose to embrace a panoply of responsibilities toward them.  Regardless of who has the legal authority to transfer an inmate, CCA owns and operates the CTF facility, had custody and control of Ms. Wormley, and is jointly liable with other defendants for falsely imprisoning Ms. Wormley; Defendants confined Ms. Wormley in their facility and prevented Ms. Wormley from being released by failing to inform DOC—and Ms. Wormley herself—that her sentence was already completed and that she should be released (as they had, on December 6, 2006, notified USMS); and by falsely informing Ms. Wormley—on multiple occasions—both of her status as an inmate and that they were "looking into" that status.  See Edwards v. Okie Dokie, Inc., 473 F.Supp.2d 31, 44 (D.D.C.  2007) (quoting Smith v. Dist. of Columbia, 399 A.2d 213, 218 (D.C.1979)) ("Liability is incurred for the procuring of a false arrest and imprisonment if by acts or words, one directs, requests, invites or encourages the unlawful detention of another."); see also David v. District of Columbia, 436 F.Supp.2d 83, 88 (D.D.C.,2006) (quoting Weishapl v. Sowers, 771 A.2d 1014, 1020 (D.C.2001)) ("The unlawful detention of a person without a warrant for any length of time whereby he is deprived of his personal liberty or freedom of locomotion . . . by actual force, or by fear of force, or even by words constitutes false

---

person within boundaries fixed by the actor, and (b) his act directly or indirectly results in such a confinement of the other, and (c) the other is conscious of the confinement or is harmed by it.").

imprisonment.").  As a result, Ms. Wormley languished in CTF for five months.  A prima facie case of false imprisonment is met in this case, and the CTFA does not suggest otherwise. Defendants' motion to dismiss must be denied.

## II.    FEDERAL CLAIMS AGAINST DEFENDANTS CCA AND TUTWILER ARE PERMISSIBLE.

Defendants erroneously state that "Plaintiff does not assert any Federal claims against CCA."  Mot. to Dismiss at 5 n.1.  This is false:  Count XV brings claims under 42 U.S.C. § 1983 against Tutwiler for overdetention and due process violations, Complaint ¶¶ 168–73; and Count XVII of the Complaint brings claims under § 1983 against CCA for overdetention, unlawful search and seizure, and deliberate indifference,  Complaint ¶¶ 180–88.

Because Defendants have not moved to dismiss the claims brought against them under § 1983, no action by this court on those counts is necessary.  Nevertheless, Ms. Wormley is not precluded from making such claims against CCA or Tutwiler, and Defendants' arguments to the contrary are without merit.

### A.    *Correctional Services Corp. v. Malesko* **Is Inapplicable.**

Defendants state that Ms. Wormley is "precluded from pursuing a Federal claim against CCA pursuant to <u>Correctional Servs. Corp. v. Malesko</u>, 122 S. Ct. 515 (2001)."  Mot. to Dismiss at 5 n.1.  <u>Malesko</u> does not stand for so broad a proposition; rather, the Supreme Court there held only that a plaintiff may not bring a *Bivens* suit against corporate officers.  The Court did not hold that all federal claims, such as claims under 42 U.S.C. § 1983, are prohibited.   On the contrary:  the Court in <u>Malesko</u> pointed to claims under § 1983 being available in suits against corporations such as CCA.  534 U.S. 61, 72 n.5 (pointing to cases in which a "private facility . . . housed state prisoners . . . who already enjoy a right of action against private

corrections providers under 42 U.S.C. § 1983").  Defendants' reliance on <u>Malesko</u> is misplaced, and claims against CCA under § 1983 are permissible.

### B.     The Prison Litigation Reform Act's Exhaustion Requirement Is Inapplicable.

Defendants argue in passing that the Prison Litigation Reform Act's ("PLRA") exhaustion requirement, 42 U.S.C. § 1997e(a), prevents Ms. Wormley from recovering under 42 U.S.C. § 1983.  Mot. to Dismiss at 5 n.1.  The statute provides:

> (a) Applicability of administrative remedies
>
> No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, <u>by a prisoner confined</u> in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. § 1997e(a) (emphasis added).

The PLRA is inapplicable and does not bar Ms. Wormley's § 1983 claims.  The statute only applies to an action brought "by a prisoner confined in any . . . correctional facility." A "prisoner" for purposes of the statute is "any person <u>incarcerated or detained</u> in any facility . . . ."  42 U.S.C. § 1997e(h) (emphasis added).  Ms. Wormley was no longer "incarcerated or detained" in a correctional facility when she brought this action; the statute is inapplicable to her and does not bar her bringing a § 1983 claim against Defendants.  <u>See, e.g.</u>, <u>In re Smith</u>, 114 F.3d 1247, 1251 (D.C. Cir. 1997) (noting that the PLRA applies "[i]f a litigant is a prisoner on the day he files a civil action"); <u>Doe by and Through Doe v. Washington County</u>, 150 F.3d 920, 921 (8th Cir. 1998) (noting that the "policy behind the PLRA was to deter suits by inmates," and holding that "[t]he PLRA unambiguously applies only to those suits filed by prisoners.").

## **CONCLUSION**

For the foregoing reasons, Plaintiff respectfully requests that Defendants' Motion to Dismiss be denied.

Respectfully submitted,

June 27, 2008    _/s/ Robin E. Jacobsohn_____

Robin E. Jacobsohn (D.C. Bar no. 417307)
Christopher R. Hart (D.C. Bar no. 486577)
Mathew J. Peed (D.C. Bar no. 503328)
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, D.C. 20005
(202) 434-5000

*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that on June 27, 2008, I caused a true and correct copy of the foregoing Opposition to Motion to Dismiss of Defendants Corrections Corporation of America and Officer Tutwiler, Memorandum of Points and Authority and attendant exhibit, and proposed Order, to be delivered via first-class mail, postage prepaid, to:

| | |
|---|---|
| The United States of America<br>United States Attorney's Office<br>555 4th St., NW<br>Washington, DC 20530<br><br>*Defendant* | Daniel P. Struck<br>Jennifer L. Holsman<br>JONES, SKELTON & HOCHULI<br>2901 North Central Avenue<br>Suite 800<br>Phoenix, AZ 85012<br>(602) 263-1700<br>Fax: (602) 263-1784<br>Email: dstruck@jshfirm.com<br><br>*Attorneys for Defendants Corrections*<br>*Corporation of America*<br>*and Officer Tutwiler* |
| Denise J. Baker<br>OFFICE OF THE ATTORNEY GENERAL<br>FOR THE DISTRICT OF COLUMBIA<br>441 4th Street, NW<br>Room 6S028<br>Washington, DC 20001<br>202-442-9887<br>Fax: 202-727-0431<br>Email: denise.baker@dc.gov<br><br>*Attorney for Defendants District of Columbia*<br>*and Devon Brown* | Valerie L. Tetro<br>Jeffrey C. Seaman<br>WHITEFORD, TAYLOR & PRESTON, LLP<br>1025 Connecticut Avenue, NW<br>Suite 400<br>Washington, DC 20036<br>(202) 659-6781<br>Fax: (202) 331-0573<br>Email: vtetro@wtplaw.com<br><br>*Attorneys for Defendant Reynolds &*<br>*Associates, Inc.* |
| Harley G. Lappin<br>Federal Bureau of Prisons<br>Office of the General Counsel<br>Central Office<br>320 First St., NW<br>Washington, DC 20534<br><br>*Defendant* | Randal White<br>Federal Bureau of Prisons<br>Office of the General Counsel<br>Central Office<br>320 First St., NW<br>Washington, DC 20534<br><br>*Defendant* |

| | |
|---|---|
| Sean McLeod<br>United States Marshals Service<br>Office of the General Counsel<br>12th Floor<br>Washington, DC 20530-1000<br><br>*Defendant* | David Baldwin<br>United States Marshals Service<br>Office of the General Counsel<br>12th Floor<br>Washington, DC 20530-1000<br><br>*Defendant* |
| Donna Scott<br>United States Marshals Service<br>Office of the General Counsel<br>12th Floor<br>Washington, DC 20530-1000<br><br>*Defendant* | |

/s/ Christopher R. Hart
_____
Christopher R. Hart

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| ELOISE T. WORMLEY,       Plaintiff, )<br><br>v. )<br><br>THE UNITED STATES OF AMERICA,<br>et al. | **OPPOSITION TO MOTION TO DISMISS**<br><br>**CASE NO. 1:08-cv-00449 (CKK)** |

ELOISE T. WORMLEY,

        Plaintiff,

v.

THE UNITED STATES OF AMERICA,
et al.

**OPPOSITION TO MOTION TO
DISMISS**

**CASE NO. 1:08-cv-00449 (CKK)**

## <u>ORDER</u>

UPON CONSIDERATION of Plaintiff Eloise Wormley's Opposition to Motion to

Dismiss of Defendants Corrections Corporation of America and Officer Tutwiler, it is hereby

ORDERED that the Motion is DENIED.

ENTERED this _____ day of _____, 2008.

_____
Judge Colleen Kollar-Kotelly
U.S. District Court for the District of
Columbia

**Copies of Order to be delivered to:**

| | |
|---|---|
| The United States of America<br>United States Attorney's Office<br>555 4th St., NW<br>Washington, DC 20530<br><br>*Defendant* | Daniel P. Struck<br>Jennifer L. Holsman<br>JONES, SKELTON & HOCHULI<br>2901 North Central Avenue<br>Suite 800<br>Phoeniz, AZ 85012<br>(602) 263-1700<br>Fax: (602) 263-1784<br>Email: dstruck@jshfirm.com<br><br>*Attorneys for Defendants Corrections<br>Corporation of America<br>and Officer Tutwiler* |
| Denise J. Baker<br>OFFICE OF THE ATTORNEY GENERAL<br>FOR THE DISTRICT OF COLUMBIA<br>441 4th Street, NW<br>Room 6S028<br>Washington, DC 20001<br>202-442-9887<br>Fax: 202-727-0431<br>Email: denise.baker@dc.gov<br><br>*Attorney for Defendants District of Columbia<br>and Devon Brown* | Valerie L. Tetro<br>Jeffrey C. Seaman<br>WHITEFORD, TAYLOR & PRESTON, LLP<br>1025 Connecticut Avenue, NW<br>Suite 400<br>Washington, DC 20036<br>(202) 659-6781<br>Fax: (202) 331-0573<br>Email: vtetro@wtplaw.com<br><br>*Attorneys for Defendant Reynolds &<br>Associates, Inc.* |
| Harley G. Lappin<br>Federal Bureau of Prisons<br>Office of the General Counsel<br>Central Office<br>320 First St., NW<br>Washington, DC 20534<br><br>*Defendant* | Randal White<br>Federal Bureau of Prisons<br>Office of the General Counsel<br>Central Office<br>320 First St., NW<br>Washington, DC 20534<br><br>*Defendant* |

| | |
|---|---|
| Sean McLeod<br>United States Marshals Service<br>Office of the General Counsel<br>12th Floor<br>Washington, DC 20530-1000<br><br>*Defendant* | David Baldwin<br>United States Marshals Service<br>Office of the General Counsel<br>12th Floor<br>Washington, DC 20530-1000<br><br>*Defendant* |
| Donna Scott<br>United States Marshals Service<br>Office of the General Counsel<br>12th Floor<br>Washington, DC 20530-1000<br><br>*Defendant* | Robin E. Jacobsohn<br>Christopher R. Hart<br>WILLIAMS & CONNOLLY LLP<br>725 Twelfth Street, N.W.<br>Washington, D.C. 20005<br>(202) 434-5000<br><br>*Attorneys for Plaintiff* |

# EXHIBIT 1

# OPERATIONS AND MANAGEMENT AGREEMENT

by and between

## THE DISTRICT OF COLUMBIA

and

## CORRECTIONS CORPORATION OF AMERICA

\45196\011\OPERATING.018

# TABLE OF CONTENTS

Page No.

ARTICLE 1   DEFINITIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2
    1.1   Definitions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2
    1.2   Interpretation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  5

ARTICLE 2   REPRESENTATIONS AND WARRANTIES . . . . . . . . . . . . . . . .  6
    2.1   Representations of the District . . . . . . . . . . . . . . . . . . . . .  6
    2.2   Representations of Operator . . . . . . . . . . . . . . . . . . . . . .  6
    2.3   Continuing Representations . . . . . . . . . . . . . . . . . . . . . .  9
    2.4   Survival of Representations . . . . . . . . . . . . . . . . . . . . . .  9

ARTICLE 3   TERM . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  9
    3.1   Term . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  9

ARTICLE 4   FACILITY AND EQUIPMENT . . . . . . . . . . . . . . . . . . . . . . . 10
    4.1   Use of the CTF . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
    4.2   Additional Property . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
    4.3   Office Space . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

ARTICLE 5   SCOPE OF SERVICES . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
    5.1   General Duties and Obligations; Operating Standards and DOC Policies . . 10
    5.2   Transition . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
    5.3   Repairs and Improvements to the CTF . . . . . . . . . . . . . . . 13
    5.4   Operation of CTF . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
    5.5   Operator Policies and Procedures . . . . . . . . . . . . . . . . . . 20
    5.6   Out-of-State Inmates . . . . . . . . . . . . . . . . . . . . . . . . . . 22

ARTICLE 6   MAINTENANCE, CAPITAL IMPROVEMENTS, AND
              CONDEMNATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
    6.1   Maintenance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
    6.2   Capital Improvements . . . . . . . . . . . . . . . . . . . . . . . . . . 22
    6.3   Damage, Destruction and Condemnation . . . . . . . . . . . . . . 22
    6.4   Maintenance Letter of Credit . . . . . . . . . . . . . . . . . . . . . 23
    6.5   Restrictions Regarding Hazardous Substances . . . . . . . . . . . 23
    6.6   Compliance with Hazardous Substance Handling Laws . . . . . . 23
    6.7   Operator's Indemnification of the District . . . . . . . . . . . . . . 24
    6.8   Remedial Action . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
    6.9   Discovery of Hazardous Substances . . . . . . . . . . . . . . . . . 25

ARTICLE 7   COMPENSATION AND OTHER PAYMENTS . . . . . . . . . . . . . 25
    7.1   Daily Service Fee . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

7.2     Billing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28
7.3     Nonappropriation . . . . . . . . . . . . . . . . . . . . . . . . . . 29
7.4     Operating Expenses . . . . . . . . . . . . . . . . . . . . . . . . . 29
7.5     Taxes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29
7.6     Termination for Convenience . . . . . . . . . . . . . . . . . . . . 29

ARTICLE 8  EMPLOYEES . . . . . . . . . . . . . . . . . . . . . . . . . . 29
8.1     Independent Contractor . . . . . . . . . . . . . . . . . . . . . . . 29
8.2     Subcontractors . . . . . . . . . . . . . . . . . . . . . . . . . . . 30
8.3     Employee Training and Background Investigation . . . . . . . . . . 30
8.4     Performance of Duties . . . . . . . . . . . . . . . . . . . . . . . 30

ARTICLE 9  DEFAULT AND TERMINATION . . . . . . . . . . . . . . . . . 30
9.1     Default by Operator . . . . . . . . . . . . . . . . . . . . . . . . 30
9.2     Default by the District . . . . . . . . . . . . . . . . . . . . . . . 32
9.3     Further Opportunity to Cure . . . . . . . . . . . . . . . . . . . . 32
9.4     Cancellation of Cure Period . . . . . . . . . . . . . . . . . . . . 32
9.5     Remedies . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32
9.6     Termination Due to Third Party Action . . . . . . . . . . . . . . . 33
9.7     Delay; Notice . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33
9.8     No Remedy Exclusive . . . . . . . . . . . . . . . . . . . . . . . . 33
9.9     Agreement to Pay Attorney's Fees and Expenses . . . . . . . . . . . 33
9.10    No Additional Waiver Implied by One Waiver . . . . . . . . . . . . 33
9.11    Transfer of Information . . . . . . . . . . . . . . . . . . . . . . . 33

ARTICLE 10  INDEMNIFICATION, INSURANCE AND DEFENSE OF CLAIMS . . . 34
10.1    Indemnification . . . . . . . . . . . . . . . . . . . . . . . . . . . 34
10.2    Books and Records . . . . . . . . . . . . . . . . . . . . . . . . . 35
10.3    Maintenance of Corporate Existence and Business . . . . . . . . . . 35
10.4    Non-Discrimination . . . . . . . . . . . . . . . . . . . . . . . . . 35
10.5    Liability Insurance . . . . . . . . . . . . . . . . . . . . . . . . . 36
10.6    Other Insurance Requirements . . . . . . . . . . . . . . . . . . . . 36

ARTICLE 11  CONTRACT MONITOR/PERFORMANCE EVALUATION . . . . . . . 37
11.1    Contract Monitor . . . . . . . . . . . . . . . . . . . . . . . . . . 37
11.2    Access to Facilities . . . . . . . . . . . . . . . . . . . . . . . . . 38
11.3    Right to Audit . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39
11.4    Monitoring of Performance by the District . . . . . . . . . . . . . 39

ARTICLE 12  CERTAIN PROHIBITIONS . . . . . . . . . . . . . . . . . . . 39
12.1    Certain Prohibitions . . . . . . . . . . . . . . . . . . . . . . . . 39

ARTICLE 13  MISCELLANEOUS PROVISIONS . . . . . . . . . . . . . . . . . 39
13.1    Binding Nature . . . . . . . . . . . . . . . . . . . . . . . . . . . 39
13.2    Invalidity and Severability . . . . . . . . . . . . . . . . . . . . . 40

13.3  Defense/Immunity . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40
13.4  Notice of Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40
13.5  Prohibition Against Assignment . . . . . . . . . . . . . . . . . . . . . . . . . . . 40
13.6  Third Party Beneficiary . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40
13.7  Governing Law  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40
13.8  Notices  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40
13.9  Entire Agreement  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41
13.10 Amendment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41
13.11 Headings  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41
13.12 Counterparts  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

EXHIBITS:

Exhibit A     -     DOC Policies
Exhibit B     -     Staffing Plan

# OPERATIONS AND MANAGEMENT AGREEMENT

by and between

## THE DISTRICT OF COLUMBIA

and

## CORRECTIONS CORPORATION OF AMERICA

THIS OPERATIONS AND MANAGEMENT AGREEMENT (the "Agreement") is made and entered into as of January 30, 1997 by and between THE DISTRICT OF COLUMBIA, a municipal corporation (the "District") and CORRECTIONS CORPORATION OF AMERICA, a corporation duly organized and existing under the laws of Delaware (the "Operator" or "CCA").

## W I T N E S S E T H:

WHEREAS, the District wishes to provide the public with prison services that are cost efficient and effective with respect to the purposes and goals of incarceration;

WHEREAS, the District wishes to provide inmates with proper care, custody, treatment, rehabilitation and reformation;

WHEREAS, the District wishes to provide the public and inmates with prison services that meet the requirements of the Court Orders (hereinafter defined), the standards of the American Correctional Association and other standards that may be promulgated by the District;

WHEREAS, the District's Correctional Treatment Facility (the "CTF") is currently a medium security facility which houses a reception and diagnostic program, a female offenders program, a substance abuse program, and units designated for general population and special management inmates. The CTF also contains an infirmary providing medical, dental and mental health services to inmates in the entire prison system;

WHEREAS, the Operator has submitted a proposal, including a best and final offer, to operate and maintain the CTF for a period of twenty (20) years;

WHEREAS, the District wants the Operator, and the Operator has agreed, to operate and maintain the CTF;

WHEREAS, the District's Department of Corrections shall administer this Agreement on behalf of the District;

\45196\011\OPERATNG.018

WHEREAS, this Agreement is being entered into pursuant to the proposal, as amended, submitted by the Operator.

NOW, THEREFORE, for and in consideration of the foregoing and the promises and mutual covenants hereinafter contained, and subject to the conditions herein set forth, the District and the Operator hereby covenant, agree, and bind themselves as follows:

## ARTICLE 1
## DEFINITIONS

1.1    Definitions. Unless the context otherwise requires, the following terms shall have the meanings set forth below:

"ACA Standards" means the American Correctional Association Standards for the Adult Correctional Institutions (Third Edition), together with any future amendments or additions.

"Agreement" means this Operations and Management Agreement by and between the District and the Operator.

"American Correctional Association" means the American Correctional Association, a non-profit corporation with the corporate headquarters in Lanham, Maryland or if the American Correctional Association ceases to exist, to issue accreditation standards for correctional facilities or to offer accreditation services for correctional facilities, another organization designated by the District that provides such services.

"Business Day" means any day other than a Saturday, Sunday or legal holiday in the District as specified in the District of Columbia Code.

"Change in Mission" means any decision by the District to make a material modification to the services required to be provided to inmates at the CTF, or to how the CTF functions within the District's prison system.

"Change of Law" means an amendment or addition to the ACA Standards, a final order of a court of competent jurisdiction affecting the CTF or an amendment to or adoption of laws or regulations of the United States government or the District affecting the CTF, which become effective after October 1, 1996 and which individually or in the aggregate have the effect of increasing the cost of operating the CTF.

"Contract Monitor" shall have the meaning given in Section 11.1.

"Court Orders" means Women Prisoners of the District of Columbia Department of Corrections v. District of Columbia, 877 F. Supp. 634 (D.D.C. 1994) as modified by Women Prisoners of the District of Columbia Department of Corrections v. District of Columbia, No.

95-7041 (D.C. Cir. Aug. 30, 1996); Twelve John Does v. District of Columbia, C.A. No. 80-2136 (June L. Green, J.), Consent Decree Amending Final Settlement Agreement and Consent Decree of April 28, 1982, the Amended Decree of August 18, 1983 and the Amended Decree of March 4, 1985, filed December 17, 1990; and Campbell v. McGruder, C.A. No. 1462-71 (WBB) and Inmates of D.C. Jail v. Jackson, C.A. No. 75-1668 (cases consolidated before Judge William B. Bryant) and any other Court Order made applicable to the Facility during the term of the Agreement.

"Critical Positions" means the following job categories identified in the Staffing Plan: Correctional officers, physicians and physician assistants, nurses, and diagnostic personnel.

"CTF" means the District's Correctional Treatment Facility and the tangible personal property therein at the time of its transfer to the Operator, as more particularly described in Exhibit A to the Lease.

"Daily Service Fee" shall have the meaning given such term in Article 7 hereof.

"DCGH" means the D.C. General Hospital in Washington, D.C.

"Deed" means that certain quitclaim deed from the District as grantor conveying certain interests in and to the CTF to the Operator.

"District" means the District of Columbia, a municipal corporation.

"District Representative" shall be the executive deputy director of the DOC, or his or her designee.

"DOC" means the Department of Corrections, a department of the District, and its successors.

"DOC Policies" means those operating policies of DOC which are listed on Exhibit A and incorporated herein by reference.

"Event of Default" means an event of default set forth in Article 9 hereof.

"Event of Nonappropriation" means the failure of the Congress of the United States to appropriate in any Fiscal Year funds sufficient to pay the Daily Service Fee or other amounts due during the succeeding Fiscal Year.

"Fiscal Year" means the fiscal year of the District which is currently the period commencing October 1 and ending the succeeding September 30, as such period may be changed from time to time.

"Hazardous Substance Laws" shall have the meaning given such term in Section 6.5 hereof.

"Indemnified Parties" shall have the meaning given such term in Section 6.7 hereof.

"Inmate General Welfare Fund" means that fund supporting the morale and welfare of the inmates as described in Section 5.4.12 hereof.

"Lease" means that certain Lease Agreement by and between Operator as lessor and the District as lessee relating to the Lease of the CTF.

"Midnight Census Report" means the Operator's report of the number of inmates housed at the CTF at 12:01 a.m. each day during the Term of this Agreement.

"Operating Standards" means the standards for operating the CTF listed in Section 5.1 hereof.

"Operational Positions" mean the job categories identified in the Staffing Plan other than those job categories considered Critical Positions.

"Operations Manual" means the manual prepared by the Operator pursuant to Section 5.2 hereof.

"Operator" means Correction Corporation of America, its successors and permitted assigns.

"Operator's Persons" shall have the meaning given such term in Section 6.5 hereof.

"Operator's Proposal" means collectively Volumes I, I-A and II dated August 8, 1996, the Best and Final Offer dated August 20, 1996, and the letter to Wanda Moorman of the Department of Administrative Services dated August 29, 1996 from Linda A. Staley, regarding the Correctional Treatment Facility Privatization Program, Clarification - Best and Final Offer, all submitted by the Operator with respect to the privatization of the operations of the CTF, as amended and supplemented in writing during the negotiation of this Agreement.

"Operator Representative" shall be the Operator's vice president of operations, or his or her designee.

"Party" means the District or the Operator as the context may require. References to "Parties" mean collectively the DOC and the Operator.

"Per Diem Fee" means the daily fee per prisoner payable by the District to the Operator for the services it provides hereunder.

"Quality Assurance Plan" means the Quality Assurance Plan portion of the Solicitation.

"Requirements" means the Requirements section of the Solicitation.

"Service Commencement Date" means the date on which the Operator shall begin providing operation and management services at the CTF in accordance with the terms of this Agreement.

"Solicitation" means the information distributed to the Operator prior to preparation of the Operator's Proposal, together with Amendment No. 1 thereto. The distributed information consisted of the following: Instructions to Offerors, Requirements, Project Terms and Conditions and the Quality Assurance Plan.

"Staffing Plan" means the Staff Deployment Plan attached hereto as Exhibit B.

"Term" shall have the meaning provided in Article 3 hereof.

"Vacancy Deficiency" shall have the meaning given such term in Section 5.4.2 hereof.

1.2    Interpretation.

1.2.1    Titles and headings are included for convenience only and shall not be used for the purposes of construing or interpreting this Agreement.

1.2.2    Words denoting the singular only also include the plural, and vice versa, where the context requires. Words denoting natural persons or parties shall include firms and corporations and any organization having legal capacity. Any reference to a particular gender shall include the other gender.

1.2.3    The word "include" and "including" shall be deemed to be followed by the words "without limitation."

1.2.4    All references contained herein to contracts or other documents shall be deemed to mean such contracts or documents, as the same may be modified, supplemented or amended from time to time.

1.2.5    References to any recitals, clauses or exhibits are, unless the context otherwise clearly requires, references to the recitals, clauses of, and exhibits to, this Agreement. References in this Agreement containing terms such as "hereof," "hereto," "hereby," "hereinafter," and other terms of like import are not limited in

applicability to the specific provision within which such references are set forth but instead refer to this Agreement taken as a whole.

1.2.6     Any provision requiring that the District or the Operator obtain the approval, consent, or concurrence of the other shall be deemed to include a requirement that the approval, consent or concurrence of the other shall not be unreasonably withheld or delayed, unless such approval, consent or concurrence is stated to be within the sole discretion of a Party.

## ARTICLE 2
## REPRESENTATIONS AND WARRANTIES

2.1     Representations of the District.  The District represents and warrants to and for the benefit of the Operator with the intent that the Operator shall rely thereon for purposes of entering into this Agreement as follows:

2.1.1     Authorization.  Pursuant to the laws of the District of Columbia, the District has the requisite power to enter into this Agreement and perform its obligations hereunder and by proper action has duly authorized the execution, delivery, and performance of this Agreement.

2.1.2     No Violation of Agreements.   The consummation of the transactions contemplated by this Agreement and the fulfillment of the terms hereof do not conflict with, nor will they result in a breach of any of the terms and provision of, or constitute a default under any other agreement or instrument to which the District is a party or by which its properties are bound, except for any conflict, breach, or default which would not materially and adversely affect the District's ability to perform its obligations under this Agreement.

2.1.3     No Litigation.   There is not now pending any action, suit or proceeding to which the District is a party, before or by any court or governmental agency or body, which challenges the right or the authority of the District to enter into this Agreement or to perform its obligations hereunder.

2.2     Representations of Operator.  The Operator represents and warrants to and for the benefit of the District, with the intent that the District shall rely thereon for purposes of entering into this Agreement, as follows:

2.2.1    <u>Organization and Qualification</u>.  The Operator has been duly incorporated and is validly existing as a corporation in good standing under the laws of the State of Delaware with power and authority to own or lease its properties and conduct its business as presently conducted.  The Operator is duly qualified to do business as a foreign corporation in good standing in the District of Columbia.

2.2.2    <u>Authorization</u>.  This Agreement has been duly authorized, executed, and delivered by the Operator and, assuming due execution and delivery by the District, constitutes a legal, valid, and binding agreement enforceable against the Operator in accordance with its terms.

2.2.3    <u>No Violation of Agreements, Articles of Incorporation or Bylaws</u>. The consummation of the transactions contemplated by this Agreement and the fulfillment of the terms hereof do not conflict with, nor will they result in a breach of any of the terms and provisions of, or constitute a default under any indenture, mortgage, deed of trust, lease, loan agreement, license, security agreement, contract, governmental license or permit, or other agreement or instrument to which the Operator is a party or by which its properties are bound, or any order, rule, or regulation of any court or any regulatory body, administrative agency, or department, except for any such conflict, breach, or default which would not materially and adversely affect the Operator's ability to perform its obligations under this Agreement, and do not conflict with, nor will they result in a breach of any of the terms and provisions of, or constitute a default under, the Articles of Incorporation (or other corresponding charter document) or Bylaws of the Operator.

2.2.4    <u>No Defaults Under Agreements</u>.  The Operator is not in default, nor is there any event in existence which, with notice or the passage of time or both, would constitute a default by the Operator, under any indenture, mortgage, deed of trust, lease, loan agreement, license, security agreement, contract, governmental license or permit, or other agreement or instrument to which it is a party or by which any of its properties are bound and a default under which would materially and adversely affect the Operator's ability to perform its obligations under this Agreement.

2.2.5    <u>Compliance with Laws</u>.  Neither the Operator nor its officers or directors purporting to act on behalf of the Operator have been advised, and have no reason to believe, that the Operator or such

officers and directors have not been conducting business in compliance with all applicable laws, rules, and regulations of the jurisdictions in which the Operator is conducting business including all safety laws and laws with respect to discrimination in hiring, promotion or pay of employees or other laws affecting employees generally, except where failure to be so in compliance would not materially and adversely affect the Operator's ability to perform its obligations under this Agreement.

2.2.6    <u>No Litigation</u>. There is not now pending or, to the knowledge of the Operator, threatened, any action, suit, or proceeding to which the Operator is a party, before or by any court or governmental agency or body, which might result in any material adverse change in the Operator's ability to perform its obligations under this Agreement, or any such action, suit, or proceeding related to environmental or civil rights matters; and no labor disturbance by the employees of the Operator exists or is imminent which might be expected to materially and adversely affect the Operator's ability to perform its obligations under this Agreement.

2.2.7    <u>Court Orders</u>. The Operator has reviewed and is familiar with the Court Orders.

2.2.8    <u>Taxes</u>. The Operator has filed all necessary federal, state, and foreign income and franchise tax returns and has paid all taxes as shown to be due thereon; and the Operator has no knowledge of any tax deficiency which has been or might be asserted against the Operator which would materially and adversely affect the Operator's ability to perform its obligations under this Agreement.

2:2.9    <u>Financial Statements</u>. The Operator has delivered to the District copies of the following 10-K Reports filed with the Securities and Exchange Commission and audited financial statements contained in its annual reports, with appended notes and summary of significant accounting policies which are an integral part of the statements at December 31, 1991, 1992, 1993, 1994 and 1995, statements of income, shareholders' equity, and changes in financial position of the Operator for the years ending December 31, 1991, 1992, 1993, 1994 and 1995. Such financial statements fairly present the financial position of the Operator at the dates shown and the results of its operations for the periods covered, and have been prepared in conformity with generally accepted accounting principles applied on a consistent basis, except as discussed in the notes to the financial statements.

2.2.10    <u>No Adverse Change</u>.  Since the date of the Operator's most recent balance sheet provided to the District, there has not been any material adverse change in the Operator's business or condition, nor has there been any change in the assets or liabilities or financial condition of the Operator from that reflected in such balance sheet which is material to the Operator's ability to perform its obligations under this Agreement and which was not disclosed in its 10-Q filed with the Securities and Exchange Commission for the Operator's Quarterly Period ended June 30, 1996 and furnished to the District.

2.2.11    <u>Disclosure</u>.  There is no material fact which materially and adversely affects, or in the future, which could (so far as the Operator can now reasonably foresee) materially and adversely affect the Operator's ability to perform its obligations under this Agreement which has not been accurately set forth in this Agreement or otherwise accurately disclosed in writing to the District by the Operator prior to the date hereof.

2.3    <u>Continuing Representations</u>.  On or before January 1 of each year during the Term, the Operator shall deliver to the District Representative a certificate that the representations, warranties and covenants of the Operator were true when made and are true as of the date of the certificate.

2.4    <u>Survival of Representations</u>.  The representations, warranties and covenants of the District and the Operator made pursuant to the terms of this Agreement shall survive the termination of this Agreement.

**ARTICLE 3**
**TERM**

3.1    <u>Term</u>.  This Agreement shall become effective on the date first written above. The term of this Agreement shall commence on the Service Commencement Date and shall continue in full force and effect until midnight of the last day of the 240th calendar month following the Service Commencement Date, unless earlier terminated upon the occurrence of one of the following events:

(a)    the end of the Fiscal Year in which an Event of Nonappropriation occurs or, if the Congress of the United States has not adopted at the end of a Fiscal Year a budget for the District for the succeeding Fiscal Year, the end of the period for which funds have been appropriated and are available for payment of amounts due hereunder;

(b)     the occurrence of an Event of Default and the District elects to terminate this Agreement pursuant to Section 9.1 hereof; or

(c)     the District's exercise of its option to terminate this Agreement pursuant to Section 7.6 hereof.

## ARTICLE 4
## FACILITY AND EQUIPMENT

4.1     Use of the CTF.  On the Service Commencement Date, the District shall grant the Operator the use, possession and control of the CTF, subject to the District's rights to enter and inspect the CTF, as provided herein.  The District makes no representation as to the condition of, or its title to, the CTF, except as provided herein or in the Deed.  The District shall assign to the Operator any warranties related to the CTF, to the extent permitted by the terms of such warranties, from construction contractors or subcontractors or from manufacturers or suppliers of items used in the CTF.  The District hereby appoints, to the extent permitted by law, the Operator to prosecute any claims in the District's behalf with respect to warranties that cannot be assigned to the Operator.

4.2     Additional Property.  From time to time during the Term of this Agreement, the Operator, at its cost and expense, may place additional property at the CTF.  Upon the expiration of the Term of this Agreement, such additional property shall become the property of the District.

4.3     Office Space.  The Operator shall permit the District to continue using, at no cost, the office space currently assigned to DOC's human resources, case management and inmate finance department at the CTF, and shall provide adequate office space, in the CTF, at no cost to the District, for the District Representative, the Contract Monitor and a staff of four (4) person(s).  The Operator shall permit these employees to use its office equipment and telecommunications equipment except DOC shall be liable for payment of long distance charges. The offices provided to DOC staff shall be sufficiently close to the offices of the Operator's administrative staff so as to permit reasonable access to and communication with the administrative staff of the Operator assigned to the CTF.

## ARTICLE 5
## SCOPE OF SERVICES

5.1     General Duties and Obligations; Operating Standards and DOC Policies.  The Operator shall operate, maintain and manage the CTF in compliance with this Agreement and all applicable provisions of the Constitution and laws of the United States and the District, the ACA Standards, Court Orders, the Requirements, the Solicitation, the Operator's Proposal and DOC Policies (collectively, the "Operating Standards"), which provisions are effective as of the Service Commencement Date or become effective during the Term of this Agreement.  The terms of the Solicitation and the Operator's Proposal are incorporated herein and made a part

of this Agreement by reference. The services provided by the Operator shall, at a minimum, provide the level of prison services and protection to the inmates and the public that are currently being offered as of the date of this Agreement. The Operator will not accept more than 898 inmates, including inmates assigned to the infirmary and the special management unit, for incarceration at the CTF.

The accreditation and/or reaccreditation of the CTF's operations by the American Correctional Association shall be determinative of the Operator's compliance with ACA Standards with respect to the operation of the CTF. The CTF is not currently accredited by the American Correctional Association. The Operator shall obtain such accreditation of the CTF not later than two years after the Commencement Date. In addition, beginning not later than six months after the Commencement Date, the Operator shall cause the CTF to be operated and maintained in accordance with the standards required by the Court Orders.

5.1.1    Priority of Standards for Operation. If there is a conflict regarding the standards for operation among the terms of this Agreement, the Solicitation, the Operator's Proposal, the Requirements, the Court Orders, the Standards and DOC Policies, the conflict shall be resolved by compliance with the most stringent terms of the various standards, as determined by DOC. Notwithstanding the foregoing, if there is a conflict between the Requirements and this Agreement, the terms of this Agreement shall control.

If the Operator concludes that a waiver of or a deviation from a term of this Agreement, the Requirements, the Standards and/or DOC Policies is appropriate, the Operator shall request in writing the District's approval of the waiver or deviation. No such waiver or deviation shall be permitted until approved by the District in writing.

5.1.2    Meetings of DOC and Operator's Representative. The District Representative shall be responsible for the day-to-day activities of the District with respect to this Agreement and the Operator's Representative shall be responsible for the Operator's day-to-day activities under this Agreement. The DOC and the Operator's Representatives shall meet regularly, but no less often than weekly, to review the operation of the CTF and in particular to identify and address any issues with respect to the Operator's performance under this Agreement. All notices with respect to the Operator's discharge of its duties, including those performed by its subcontractors, shall be delivered to the Operator's Representative.

5.2    Transition. DOC and the Operator shall consult in the development of a transition plan providing for the orderly transfer of the operation of the CTF to the Operator. The parties shall use their best efforts to complete the transition plan by December 5, 1996. If DOC has

not accepted a transition plan by January 1, 1997, the District, at its option, may extend the Service Commencement Date or may terminate this Agreement. The Operator shall confer with such agencies and departments of the District and the United States government, as the District may request from time to time, regarding its operation of the CTF and the procedures for effecting the transfer of the CTF to private operation.

5.2.1    Operations Manual. The Operator shall prepare a manual (the "Operations Manual") providing detailed instructions to its personnel regarding the operation of the CTF. The Operations Manual shall be in form and substance satisfactory to the District. The Operator shall deliver a draft of the Operations Manual to the District by December 5, 1996. The District shall furnish the Operator its comments within thirty (30) days after its receipt of the draft of the Operations Manual. The District and the Operator shall use their respective best efforts to complete the negotiation of the Operations Manual by January 15, 1997. If the District has not approved the Operations Manual and the Operator's policies and procedures not contained in the Operations Manual by January 15, 1997, the District, at its option, may extend the Service Commencement Date or may terminate this Agreement.

5.2.2    Staffing Plan. In connection with the development of the transition plan, the District and the Operator shall cooperate in reformatting the Staffing Plan so that the Vacancy Deficiencies provided for in Section 5.4.2 of this Agreement can be determined by reference to the Staffing Plan.

5.2.3    Employment of Current Employees. The Operator shall make a bona fide offer of employment, as an employee of the Operator, on a right of first refusal basis to each DOC employee coded to and assigned to the CTF. Additionally, any DOC employee impacted by an agency-wide reduction-in-force (RIF) as a result of the implementation of this Agreement shall be treated as a CTF employee, and therefore shall also be granted first-right-of-refusal status with the Operator. The only condition for employment shall be passing a drug test and a criminal background investigation. All such CTF employees hired by the Operator shall be offered positions at their respective current salaries and with comparable benefits. Any CTF employee accepting a position with the Operator shall be credited with his or her accrued District government sick leave up to a maximum of forty (40) hours.

5.2.4    Collective Bargaining. The Operator recognizes the right of employees at the CTF to organize and join labor unions and shall

recognize any properly constituted and duly elected bargaining unit of its employees at the CTF.

5.2.5    <u>DOC Policies</u>. At or prior to the time the District delivers its comments on the initial draft of the Operations Manual pursuant to Section 5.2.1 hereof, the District shall notify the Operator of what additional District policies and procedures, if any, it believes should be included as part of the DOC Policies. The Operator shall promptly advise the District if it agrees to the addition of those District policies and procedures to the DOC Policies and the adjustment, if any, to the Per Diem Rate required by the amendment to the DOC Policies. A copy of each of the DOC Policies shall be included in the Operations Manual.

5.3    <u>Repairs and Improvements to the CTF</u>. The Operator shall arrange for the repairs and improvements to the CTF described in Exhibit B of the Lease.

5.4    <u>Operation of CTF</u>. The Operator shall assume responsibility for operation of the CTF on the Service Commencement Date, which will be no later than 90 days after execution of this Agreement by the District. The Operator shall provide the services specified in this Agreement and the Solicitation, including the Requirements and Quality Assurance Plan, and the Operator's Proposal and shall deliver these services in accordance with the Operating Standards. The Operator shall be obligated to provide at its own expense all equipment and furnishings, supplies and personnel necessary to discharge its obligations hereunder (except that the initial items of equipment and furnishings listed in Exhibit A of the Lease shall be made available to the Operator by the District, but shall be replaced when necessary at Operator's expense). By way of explication and not limitation, the Operator's duties and obligations hereunder shall include, but are not limited to, each of the following:

5.4.1    <u>Staffing</u>. At all times during the Term, the Operator shall provide adequate staffing for the CTF. At a minimum, the Operator shall provide staffing for the CTF in accordance with the terms of the Staffing Plan. The Operator shall not amend or modify the Staffing Plan without the prior written consent of DOC.

5.4.2    <u>Staff Vacancies</u>. If at any time during the Term, the vacancy rate in any of the job categories identified in the Staffing Plan is more than five percent (5%) of the designated staffing level for that category of job, a Vacancy Deficiency shall be deemed to exist with respect to such job category. The Operator shall use its best efforts to eliminate the Vacancy Deficiency by filling those positions with full time employees as soon as possible but no later than sixty (60) days after the Vacancy Deficiency occurs with respect to Critical Positions and no later than ninety (90) days after the Vacancy Deficiency occurs with respect to Operational

Positions. During the applicable cure period, the Operator may use temporary employees or transfer employees from other assignments to fill the positions creating the Vacancy Deficiency provided that the employees utilized for these purposes are qualified for the job assignment and their transfer does not adversely affect the Operator's ability to provide the services to be delivered by the unit from which the employees are transferred. The Operator shall use its best efforts to minimize the use of employee overtime to meet staffing needs created by staff vacancies. In addition to any other rights or remedies the District may have hereunder, and except where the District has consented to an extension of time following a written request for an extension submitted by the Operator, the Operator shall pay the District $100 per day for each vacant position in any job category for which there is a Vacancy Deficiency for more than sixty (60) days with respect to Critical Positions and for more than ninety (90) days with respect to Operational Positions. For purposes of determining the Operator's liability for the $100 per day penalty only, the use of temporary or transferred personnel as permitted by this Section 5.4.2 during the applicable cure period shall be considered as personnel staffing the vacant positions.

5.4.3    <u>Transfer/Assignment of Inmates</u>. The Operator shall have no authority to transfer and/or assign inmates into or out of the CTF, whether or not such inmates are or are not inmates in the custody of DOC. DOC shall transfer inmates into and out of the CTF in accordance with DOC's practices and policies in effect at the time of each transfer. DOC will assign only medium security and minimum security inmates to the CTF general population. DOC may assign maximum security inmates to the CTF special management unit. DOC may assign inmates of any classification to the system-wide infirmary at the CTF. The Operator may not refuse to accept the assignment of any inmate to the CTF, but if the Operator believes that an inmate has been erroneously assigned to the CTF or warrants transfer, it may request his or her transfer in accordance with DOC policies and practices. DOC will use its best efforts, consistent with the requirements of the entire prison system, to transfer to facilities other than the CTF inmates who are not classified as medium security prisoners as soon as the reason for their assignment to the CTF has been satisfied.

5.4.4    <u>Religious Services</u>. The Operator shall provide separate physical space for, and shall offer, religious programs for all recognized faith groups at the CTF in accordance with applicable Operating Standards.

5.4.5    <u>Medical Services</u>.  In providing the medical services required by this Agreement, the Operator shall adhere to a system of delivery in accordance with the Operations Manual and guidelines established by the American Correctional Association and the National Commission on Correctional Health Care.

Services shall include the following:

1.    Diagnostic/intake services, including inter-institutional transfers;
2.    Primary care services, including sick call to general and lock-down populations;
3.    Medical and surgical specialty clinics;
4.    Emergency care;
5.    System-wide infirmary services;
6.    Dental services;
7.    Pharmacy services;
8.    Special medical and dental diets;
9.    Reproductive and pregnancy-related care;
10.   Vision services;
11.   Laboratory services;
12.   Radiology services;
13.   Physical medicine and physical therapy services;
14.   Medical records;
15.   Quality assurance/quality improvements;
16.   Mortality and peer review;
17.   Biohazardous waste collection and disposal;
18.   Infection control;
19.   Management information system;
20.   Staff development and training;
21.   Chronic illness care;
22.   Treatment, management, and control of TB, HIV/AIDS and other infectious diseases;
23.   Mental health services;

The primary care patient management program shall be under the guidance of a health care administrator, supported by a physician medical director who in conjunction with the appropriate care provider shall have final responsibility for clinical decisions.

To provide for cost-effective inmate care, Operator shall be responsible for (a) all outpatient costs except for outpatient services delivered at DCGH, and (b) all costs for inpatient care delivered at DCGH which is not in conformity with Medicare utilization review guidelines.  Operator shall establish a system of on-site

specialty clinics which minimizes the need for off-site medical services. For outpatient care at DCGH and for DCGH inpatient care provided in conformity with Medicare Utilization Review guidelines, Operator will verify all billings and forward such to the District for direct payment to the service provider. Operator will cooperate fully and completely with any concurrent and/or retrospective DOC utilization review program, and shall complete and provide to DOC monthly utilization reports for all off-site services.

If there is a disagreement as to whether medical services were provided in accordance with Medicare utilization review guidelines and otherwise in accordance with this Agreement, the dispute resolution process shall determine whether the District or the Operator shall pay the costs for such care.

The Operations Manual shall contain complete policies and procedures to address all components of the health care delivery system. The policies and procedures for the delivery of medical and mental health services shall be modelled on, and contain provisions of similar content and detail as, the policies for Metro-Davidson County submitted as part of Operator's Proposal. On-site medical facilities shall be adequately equipped and staffed to meet the guidelines of the American Correctional Association and the National Commission on Correctional Health Care and to fulfill the current mission of the facility.

All health care personnel shall comply with District and Federal regulations regarding all aspects of professional practice. All practitioners shall provide care only within the legal scope of their licensure, and all non-physician/non-dentist providers will practice under applicable protocols.

The Operator, designated DOC personnel, the Medical Receiver of the Central Detention Facility, and other parties involved in the direct delivery of clinical care to DOC inmates shall develop admission and discharge criteria for the system-wide infirmary to ensure continuity of care. These criteria shall be submitted to the Director of DOC for review and approval at least 60 days before the Service Commencement Date.

5.4.6    <u>Food Service</u>. The Operator shall provide food services for all inmates in compliance with applicable Operating Standards. The menu of meals for inmates on regular diets will be prepared so as to provide a minimum of 3000 calories per day. The Operator

shall provide supplemental diets, as prescribed by physicians or dieticians, to inmates with HIV/AIDS, to pregnant inmates and to inmates with other medical conditions requiring supplements to the regular diet. Food shall not be withheld for disciplinary reasons. Restricted or special diets, prescribed by recognized medical or religious authority, will be provided as required. Food service personnel will be responsible for knife, key and tool control, safety standards and sanitation procedures. A professional pest control company shall also be retained to provide fumigation and extermination services on at least a monthly basis.

5.4.7    Inmate Furnishings and Laundry. The Operator shall ensure that, at a minimum, each inmate room shall have a bed, mattress, pillow, study desk, supply of bed linen, chair, adequate lighting, ventilation and closet or locker space. The Operator shall provide full inmate laundry services and inmate clothing in compliance with applicable Operating Standards.

5.4.8    Transportation and Off-Site Security. The District shall provide, at its expense, full transportation and security services with respect to all inmates transported to and from the CTF in connection with transfers to and from other facilities in the District prison system and to and from other correctional facilities. The Operator, at its expense, shall arrange for or directly provide transportation and security services for inmates assigned to the CTF with respect to travel outside of the CTF, including transfers to and from courts, medical service providers located outside the CTF and visitations at locations other than the CTF; such transportation services shall be provided within a fifty mile radius of the District of Columbia.

5.4.9    Reports. The Operator shall furnish the District Representative monthly reports regarding the operational and financial aspects of the CTF. The Operator shall also provide DOC a report describing any repairs or capital improvements planned for or undertaken at the CTF during the month. The operational report shall call for disclosure of any difficulties experienced by the Operator in satisfying the requirements of this Agreement or any difficulties or defaults encountered by the Operator in its dealings with a subcontractor. Each report shall be delivered to the District Representative within thirty (30) days after the end of the month for which the report has been prepared. The report shall be in a form acceptable to the District Representative and the operational report shall at a minimum summarize the information currently contained in the DOC's executive management summary report in

addition to other information requested by DOC to be included in such reports.

5.4.10    Library.    The Operator shall provide a library consisting of literary, legal, educational and reference materials which is in compliance with the applicable Operating Standards.    The legal materials in the library together with any attorneys and paralegals made available to inmates at the Operator's expense shall be sufficient to provide inmates with adequate access to the courts. The Operator shall also provide adequate paper, pens, typewriters, postage and envelopes to those inmates who are indigent and shall provide adequate facilities for the visually and hearing impaired.

5.4.11    Visitation.    The Operator shall provide adequate space, furniture, equipment and the supervision necessary to implement a visitation program.    The Operator shall maintain a non-contact visitation program for inmates in the special management unit of the CTF, inmates undergoing evaluation in the reception and diagnostic unit and special handling inmates assigned to the CTF infirmary.  The Operator shall also maintain a contact visitation program for other inmates.  The visitation programs shall be operated in accordance with the applicable Operating Standards.

5.4.12    Inmate Finance and Canteen Services.    The inmate finance and canteen services to be provided by the Operator shall include the operation of a commissary for the inmates and the establishment and maintenance of a system to account for inmate funds as provided for in the Operating Standards.    Only commercially prepared and purchased items shall be offered for sale in the commissary.  No contraband items, homemade items or donated items shall be sold.  The Operator shall charge prices for goods that are consistent with the prices charged for similar goods in other commissaries within the DOC prison system.  Any profits, which shall be considered to be gross revenues minus expenses, realized from the operation of the commissary shall be deposited in the Inmate General Welfare Fund which fund shall be dedicated to providing for the morale and welfare of the inmates and which cannot be used to pay expenses for which the Operator is liable under this Agreement.

5.4.13    Inmate Work, Training and Substance Abuse Programs.    The Operator shall have sufficient programming to allow every general population prisoner to participate in meaningful educational, vocational, drug treatment or work programs complying with the ACA Standards and the Operating Standards.  The Operator will

give priority to women in the selection of participants for training programs and in the placement in jobs within the CTF. In recognition of the CTF's role as the principal prison for women inmates in the District prison system, the Operator shall continue the DOC's practice of providing programs focused on the needs of women inmates, including intensive vocational and educational programs, substance abuse programs, services for pregnant inmates and other programs required by the Court Orders. The Operator shall develop, in consultation with DOC, a substance abuse program that is satisfactory to DOC. Portions of the program requiring services outside of the CTF, such as half-way house counseling services, shall be administered by DOC.

5.4.14    Discipline.    The Operator will adopt DOC's policies and procedures with respect to discipline.

5.4.15    Cooperation. The Operator shall cooperate with the District and third party service providers, in connection with the management of the entire prison system. The Operator shall cooperate with the District and replacement operators for the CTF upon the termination of this Agreement.

5.4.16    KRONOS System. The Operator shall purchase the KRONOS automated time and attendance system installed at the CTF at a price to be agreed upon between the Parties.

5.4.17    Use of Force.

(a)    The Operator's employees shall be authorized to carry and use weapons only:

1.    While patrolling the perimeter grounds of the CTF;
2.    While transporting inmates;
3.    While pursuing escapees from the CTF; and
4.    While CTF is in a state of emergency.

and then only in accordance with the Operating Standards and the Operations Manual.

(b)    The Operator's employees shall be authorized to use non-deadly force as the circumstances require and then only in the following situations:

1.    To prevent the commission of a felony or misdemeanor, including escape;

2.    To defend themselves or others against physical assault;

3.    To prevent serious damage to property;

4.    To enforce institutional regulations and orders; and

5.    To prevent or quell a riot.

(c)    The Operator's employees shall use deadly force in accordance with federal law, the laws of the District and the Operating Standards.  Deadly force is to be used only as a last resort and then only in the following situations: to prevent escape from inside the perimeter of the CTF, or to prevent the loss of life or serious bodily harm.

Employees of the Operator shall be authorized to carry and use firearms in the course of their employment only after completion of a training program with a score that would qualify the employee under DOC policies to serve as a correctional officer able to transport inmates.   The training program shall be comparable to DOC's firearm training program and is in accordance with regulations and procedures of the Operator which DOC has reviewed and approved.

5.5    Operator Policies and Procedures.

5.5.1    The Operator shall develop and submit to the District Representative for its review and approval pursuant to Section 5.2.1 hereof, as soon as each is available, but not later than thirty (30) days prior to the Service Commencement Date, all policies and procedures related to the operation and management of the CTF in addition to those contained in the Operations Manual. Such policies and procedures shall include, if not adequately addressed in the Operations Manual, a training plan, an emergency response plan, an inmate record and report system and a grievance procedure for inmates.  Amendments and revisions to such policies and procedures shall be submitted to the District Representative as soon as each is available but no later than forty-five (45) days prior to the proposed effective date of the amendment or revision. No amendment or revision shall become effective if prior to its effective date the District Representative advises the Operator that DOC does not accept the proposed amendment or revision.   If DOC and the Operator cannot agree on the terms of the proposed amendment or revision within thirty (30) days of its scheduled effective date, either DOC or the Operator may invoke the dispute resolution provisions of Article 11 hereof.

The Operator shall implement and strictly adhere to the policies set forth in the Operations Manual. The failure to do so shall constitute a material breach of this Agreement.

The Operations Manual shall contain, at a minimum, policies and procedures that govern:

(a)    the delivery of medical, mental health and dental services (theses policies shall include, but not be limited to, each element of the policies and procedures for health services contained in the Operator's Proposal, appropriately revised to accommodate the specific conditions at the CTF);

(b)    the delivery of educational, vocational and rehabilitative programs to prisoners;

(c)    the operation of the inpatient, intensive drug treatment program; and

(d)    reception and diagnostic services.

5.5.2    DOC shall furnish the Operator a Quality Assurance Plan at least fifteen (15) days prior to the Service Commencement Date revised to reflect the negotiations between the Parties subsequent to the issuance of the Solicitation. The Quality Assurance Plan shall set forth some, but not all, of the criteria to be considered in the evaluation of the Operator's performance. Amendments and revisions to the Quality Assurance Plan shall be deemed mandatory if the amendments and revisions are made in response to Changes of Law. Amendments and revisions to the Quality Assurance Plan which are not mandatory shall be delivered to the Operator thirty (30) days prior to their respective effective dates and the Operator shall provide DOC with its comments, if any, on the amendment or revision no later than ten (10) days prior to the effective date of the amendment or revision as stated in such amendment or revision.

5.5.3    The Operator shall audit at least annually, using personnel other than employees assigned to the CTF, its compliance with the terms of this Agreement and the Operating Standards. A written report of the results of the audit shall be prepared within thirty (30) days of the completion of the audit. The Operator shall furnish DOC a copy of the audit results within fifteen (15) days of completion of the audit report.

5.6   Out-of-State Inmates.  DOC shall have the right to place appropriately classified, out-of-state inmates at the CTF consistent with the District's witness protection program and interstate agreements.  DOC shall pay the Operator for the housing of such inmates as if they were inmates of DOC.

## ARTICLE 6
## MAINTENANCE, CAPITAL IMPROVEMENTS, AND CONDEMNATION

6.1   Maintenance.  Throughout the Term of this Agreement, the Operator shall, at its own expense, maintain the physical structure of the CTF and all tangible personal property contained therein in accordance with the Operating Standards, and shall, in so doing, maintain, preserve and keep the CTF in good repair, working order and condition, subject to normal wear and tear.  The Operator shall, from time to time, make, or cause to be made, all repairs and replacements necessary for the CTF and the tangible personal property therein to be maintained in accordance with applicable Operating Standards.

6.2   Capital Improvements.  During the Term of this Agreement renovations and capital improvements to the CTF in addition to the repairs and improvements referred to in Section 5.3 hereof, will be required in order for the CTF to meet the Operating Standards and the accreditation requirements of the American Correctional Association.  Although the specific, additional renovations and capital improvements to be made cannot be identified at the time this Agreement is executed, the Operator acknowledges that such renovations and capital improvements will be required and agrees that it, at its own expense, shall make the necessary renovations and capital improvements for the CTF and the tangible personal property therein to satisfy the conditions set forth in the Operating Standards and for the CTF to maintain its accreditation by the American Correctional Association.

6.3   Damage, Destruction and Condemnation.  The Operator shall promptly notify the District Representative of any damage to or loss of the CTF that materially affects the continued operation of the CTF.  The Operator shall repair, rebuild or replace the CTF to restore it to its condition prior to such damage or loss.  The District shall make available to the Operator the proceeds of any property insurance it receives in connection with the damage to or loss of the CTF.  The District shall have the right to approve all plans for the repair, rebuilding or replacement of the CTF prior to the commencement of any repair or construction and shall have the right to inspect the CTF during any period of such repair or construction and upon completion thereof.  Upon completion of the repair or construction, the Operator shall obtain the appropriate reaccreditation, if any, of the CTF.  The Operator, at its sole cost and expense, shall immediately arrange for the incarceration of the inmates assigned to the CTF during any period of repair or construction of the facility.  If the federal government condemns the CTF in an exercise of its eminent domain powers, the taking shall be deemed a termination of this Agreement for cause.  Any payment received by the Operator in connection with the taking shall be paid to the District.

6.4    Maintenance Letter of Credit.  On or before the Service Commencement Date, the Operator shall post a letter of credit in the face amount of $250,000 issued by First Union National Bank of Tennessee, or other bank acceptable to the District, for the benefit of the District.  The letter of credit shall be in a form acceptable to the District.  The letter of credit shall provide for the immediate payment to the District of an amount up to $250,000 no later than two (2) Business Days after receipt of a notification executed by the Mayor, the City Administrator for the District or the District Representative that the Operator has failed to meet its obligations with respect to the repair and maintenance of the CTF in accordance with the terms of this Agreement, to maintain letter(s) of credit in favor of the District in the amount of $250,000 as required by this Agreement or to deliver to the District a satisfactory replacement letter of credit thirty (30) days prior to the expiration of the then outstanding letter of credit. If there is a draw on the letter of credit, the Operator shall deliver to the District a new or additional letter of credit within thirty (30) days of such draw so that upon the expiration of such thirty (30) day period, letter(s) of credit in the aggregate amount of $250,000 shall have been issued for the benefit of the District.  The Operator shall deliver to the District thirty (30) days prior to the expiration of the letter of credit then outstanding, a replacement letter of credit in form satisfactory, and issued by a bank acceptable, to the District.

6.5    Restrictions Regarding Hazardous Substances.   The Operator, its agents, employees, contractors, affiliates, subtenants, licensees or invitees (collectively, "Operator's Persons") shall not generate, manufacture, store, dispose of or otherwise use or hold on or under or about the CTF or transport to, from or across the CTF any Hazardous Substances (as defined below in this Section 6.5) without the prior written consent of the District.  The Operator and the Operator's Persons shall at no time permit, suffer or acquiesce in any other person undertaking the foregoing without the District's written consent.  For purposes of this Article 6 and to the extent permitted by law, any acts or omissions of the Operator, the Operator's Persons or others acting for or on behalf of the Operator or the Operator's Persons (whether or not they are negligent, intentional, willful or unlawful) shall be strictly attributable to the Operator.  The Operator shall give the District at least thirty (30) days written notice of the Operator's or the Operator's Persons' intention to generate, manufacture, store, use, dispose of or transport any Hazardous Substance.  The District shall have ten (10) days in which to approve or disapprove such actions in writing.  If the Operator receives notice from any local, state or federal governmental agency of any proposed action against the Operator under or in violation of any Hazardous Substance Law pertaining to the CTF, the Operator shall promptly provide the District with a copy of such notice.  As used herein, "Hazardous Substances" means any oil, flammable explosives, asbestos, radioactive materials or wastes, medical waste, or other hazardous, toxic, contaminated or polluting materials, substances or wastes including, without limitation, any "hazardous" or "toxic" substances, wastes, or materials under any federal, state, or local law, ordinance or regulation relating to industrial hygiene, environmental protection, or the use, analysis, generation, manufacture, storage or transportation of such substances (collectively, "Hazardous Substance Law(s)").

6.6    Compliance with Hazardous Substance Handling Laws.  The Operator shall, at its own expense, comply and cause the Operator's Persons to comply with all Hazardous Substance Laws, including, without limitation, those controlling the discharge of (appropriately

treated) materials or wastes into or through any sanitary sewer serving the CTF. Except as discharged into the sanitary sewer in strict accordance and conformity with all applicable Hazardous Substance Laws, the Operator, at its sole cost and expense, shall cause any and all Hazardous Substances removed from the CTF to be removed and transported solely by duly licensed haulers to duly licensed facilities for final disposal of such materials and wastes. If the Operator fails to comply with the terms of this Section 6.6, the Operator shall, at its sole cost and expense, cause all contamination to be cleaned up, or all Hazardous Substances to be removed from the CTF and transported for use, storage or disposal, in accordance and compliance with all Hazardous Substance Laws.

6.7    Operator's Indemnification of the District. The Operator hereby indemnifies the District, its employees, contractors, agents, heirs, successors, personal and legal representatives and assigns (collectively, the "Indemnified Parties") and agrees to defend (with counsel previously approved by the District in writing) and hold the Indemnified Parties harmless from and against any and all claims, demands, suits, court or administrative proceedings, losses, costs, damages, liabilities, deficiencies, fines, penalties, forfeitures, punitive damages or expenses (including, without limitation, attorneys' fees), or deaths of or injuries to (including without limitation sickness or disease, or fear of sickness or disease) any person or tangible or intangible damage to any real or personal property, whatsoever, incurred by, arising out of, or based upon or resulting from (a) the Operator or the Operator's Persons' failure to perform or observe any of its obligations or agreements under this Article 6; (b) the presence, release, threatened release, use, analysis, generation, discharge, storage, disposal or transportation of any Hazardous Substance under, in or about, to or from the CTF occurring during the Term of this Agreement (and not directly resulting from any negligent or intentional acts of the Indemnified Parties seeking indemnity or conditions in existence as of the Service Commencement Date); and (c) the Operator's or the Operator's Persons' failure to comply with any Hazardous Substance Law. The Operator's obligations hereunder shall include, without limitation, and whether or not foreseeable, liability for compensation for lost wages, business income, profits, or other economic loss, damage to the natural resources or the environment (including, without limitation, damage to the soil, groundwater or other water supplies), nuisance, pollution, contamination, leak, spill, release or any and all other adverse effects on the environment, and all costs of any remedial action, closure, repair, cleanup or detoxification or decontamination of the CTF (including, without limitation, restoration of water supplies), as determined necessary by the District in its sole discretion. The foregoing indemnification shall survive the expiration or earlier termination of this Agreement.

6.8    Remedial Action. Notwithstanding the foregoing, the District may, at its sole option (but without any obligation to do so), (a) undertake any remedial action to remove any Hazardous Substance from the CTF or clean-up any contamination resulting from the Operator's or the Operator's Persons' use of the CTF, and/or (b) participate in any proceeding under any Hazardous Substance Law against the Operator or relating to the CTF arising from the Operator's or the Operator's Persons' use of the CTF. Such actions or proceedings by the District shall be at the Operator's sole cost and expense unless such actions or proceedings directly result from any negligent or intentional acts of any Indemnified Party or conditions in existence as of the Service Commencement Date.

6.9    Discovery of Hazardous Substances. If the Operator determines or has reasonable cause to believe that any Hazardous Substance is located on or beneath the CTF, then upon such discovery or suspicion of the presence of the Hazardous Substance the Operator shall immediately give written notice of that condition to the District.

# ARTICLE 7
## COMPENSATION AND OTHER PAYMENTS

7.1    Daily Service Fee. The District shall pay the Operator a fee (the "Daily Service Fee"), during the Term of this Agreement, beginning on the Service Commencement Date.

7.1.1    Computation of Daily Service Fee. The Daily Service Fee for each day shall be equal to the product of the Per Diem Rate multiplied by the number of inmates recorded on the Midnight Census Report for such day. A copy of each Midnight Census Report shall be sent to the Contract Monitor within twenty-four (24) hours of its preparation. The Per Diem Rate for the period between the Service Commencement Date and December 31, 1997, shall be $70.40.

7.1.2    Annual Adjustment to Per Diem Rate. The Per Diem Rate shall be adjusted annually on each January 1 commencing January 1, 1998 by an amount equal to three percent (3%) of the Per Diem Rate in effect on the prior December 31.

7.1.3    Change of Law.

7.1.3.1    Increase in Per Diem Rate. Upon the occurrence of a Change of Law, the Operator shall use its best efforts to continue to operate the CTF for the existing Per Diem Rate. The Operator shall be entitled to an equitable adjustment to the Per Diem Rate if the Change(s) in Law individually or in the aggregate has the effect of materially increasing the cost to the Operator of discharging its obligations hereunder. The adjustment to the Per Diem Rate shall be an amount sufficient to compensate the Operator for the increased costs it incurs in complying with the Change of Law. The Operator shall submit to the District a proposed schedule of increases to the Per Diem Rate and documentation identifying the Change of Law, the Operator's suggestions for complying with the Change of Law, alternatives available for complying with the

Change of Law and the amount of the Operator's increased costs. The District shall advise the Operator if it accepts the Operator's proposed increases to the Per Diem Rate within thirty (30) days of receipt of the schedule of rate increases. In lieu of accepting an increase to the Per Diem Rate, the District has the option of: (i) terminating this Agreement with the termination being considered at termination for cause for purposes of the Lease; or (ii) modifying the Operator's scope of work hereunder in order to permit it to continue operating or assisting in the operation of the CTF at the then current Per Diem Rate. If the District and the Operator have not agreed on the amount of the increase, if any, to the Per Diem Rate because of a Change of Law within sixty (60) days after receipt of the schedule of proposed increases to the Per Diem Rate, either Party may invoke the dispute resolution provisions of Article 11 hereof. If the effect of the Change(s) of Law, individually or cumulatively, is sufficient to require under applicable law a new procurement of the services being provided hereunder, this Agreement shall be terminated upon the transfer of the operation of the CTF at the District's option to either the District or to a successor operator, and such a termination shall be considered a termination for cause for purposes of the Lease.

7.1.3.2    <u>Decrease in Per Diem Rate</u>. The District shall be entitled to an equitable adjustment to the Per Diem Rate if the Change(s) in Law individually or in the aggregate has the effect of materially decreasing the cost to the Operator of discharging its obligations hereunder. The reduced Per Diem Rate shall be an amount sufficient to compensate the Operator for the services to be performed hereunder. The District shall identify for the Operator the Change of Law, the perceived reductions in Operator costs and a proposed Per Diem Rate. The Operator shall advise the District if it accepts the District's proposed decreases to the Per Diem Rate within thirty (30) days of receipt of the schedule of rate decreases. If the District and the Operator have not agreed on the amount of the decrease to the Per

Diem Rate because of a Change of Law within sixty (60) days after receipt of the schedule of proposed decreases to the Per Diem Rate, either Party may invoke the dispute resolution provisions of Article 11 hereof.

7.1.4    Changes in Mission.

7.1.4.1    Increases in Per Diem Rate. Upon the occurrence of a Change in Mission, the Operator shall use its best efforts to continue to operate the CTF for the existing Per Diem Rate. The Operator shall be entitled to an equitable adjustment to the Per Diem Rate if the Change(s) in Mission, individually or in the aggregate has the effect of materially increasing the cost to the Operator of discharging its obligations hereunder. The adjustment to the Per Diem Rate shall be an amount sufficient to compensate the Operator for the increased costs it incurs in complying with the Change in Mission. The Operator shall submit to the District a proposed schedule of increases to the Per Diem Rate and documentation identifying the Change in Mission, the Operator's suggestions for complying with the Change in Mission, alternatives available for complying with the Change in Mission and the amount of the Operator's increased costs. The District shall advise the Operator if it accepts the Operator's proposed increases to the Per Diem Rate within thirty (30) days of receipt of the schedule of rate increases. In lieu of accepting an increase to the Per Diem Rate, the District has the option of: (i) terminating this Agreement with the termination being considered at termination for cause for purposes of the Lease; or (ii) modifying the Operator's scope of work hereunder in order to permit it to continue operating or assisting in the operation of the CTF at the then current Per Diem Rate. If the District and the Operator have not agreed on the amount of the increase, if any, to the Per Diem Rate because of a Change in Mission within sixty (60) days after receipt of the schedule of proposed increases to the Per Diem Rate, either Party may invoke the dispute resolution provisions of Article 11 hereof. If the effect of the Change(s)

in Mission, individually or cumulatively, is sufficient to require under applicable law a new procurement of the services being provided hereunder, this Agreement shall be terminated upon the transfer of the operation of the CTF at the District's option to either the District or to a successor operator, and such a termination shall be considered a termination for cause for purposes of the Lease.

7.1.4.2    <u>Decrease in Per Diem Rate</u>.  The District shall be entitled to an equitable adjustment to the Per Diem Rate if the Change(s) in Mission individually or in the aggregate has the effect of materially decreasing the cost to the Operator of discharging its obligations hereunder.  The adjustment to the Per Diem Rate shall be an amount sufficient to compensate the Operator for the services to be performed hereunder.  The District shall identify for the Operator the Change in Mission, the perceived reductions in costs to the Operator and a proposed Per Diem Rate.  The Operator shall advise the District if it accepts the District's proposed decreases to the Per Diem Rate within thirty (30) days of receipt of the schedule of rate decreases.  If the District and the Operator have not agreed on the amount of the decrease to the Per Diem Rate because of a Change in Mission within sixty (60) days after receipt of the schedule of proposed decreases to the Per Diem Rate, either Party to this Agreement may invoke the dispute resolution provisions of Article 11 hereof.

7.1.5    <u>Limitation on Adjustments</u>.  The Per Diem Rate shall not be adjusted except as provided in Sections 7.1.2, 7.1.3 and 7.1.4 hereof.

7.2    <u>Billing</u>.  The Operator shall bill the District monthly in arrears for the Daily Service Fees due under Section 7.1.  Each invoice shall be a certified statement identifying the number of inmates included in each day's Daily Service Fee.  Invoices shall be delivered to the District Representative.  Payment by DOC shall be due forty five (45) days after its receipt of a properly documented invoice.  The Operator shall provide to the District, upon request, information sufficient to enable the District to audit the Daily Service Fees submitted for payment.

7.3    Nonappropriation.  Upon the occurrence of an Event of Nonappropriation, this Agreement shall terminate and be cancelled upon the exhaustion of the funding authorized for the current Fiscal Year and the District shall have no further obligation to pay a Daily Service Fee to the Operator upon the exhaustion of such funding; provided, however, this Agreement shall remain in full force and effect for so long as the Congress of the United States has failed to approve a budget for the District for such Fiscal Year, and funds are lawfully available to the District for the payment of the Daily Service Fee and any other amounts coming due hereunder during such period.  The District shall provide the Operator with written notice of such nonappropriation as soon as possible after the Event of Nonappropriation occurs.

7.4    Operating Expenses.  The Operator shall be responsible for payment of all costs and expenses, other than taxes as provided in Section 7.5 hereof, incurred in connection with the operation of the CTF.

7.5    Taxes.  The Operator shall pay all taxes assessed in connection with the operation and use of the CTF during the Term of this Agreement except for those taxes for which the District is liable under the terms of the Lease.

7.6    Termination for Convenience.  DOC may terminate this Agreement for convenience without cause by giving written notice to the Operator, at least ninety (90) days prior to the effective date of such termination.  Upon a termination for convenience, the Operator shall be entitled to receive, and shall be limited to, just and equitable compensation for any satisfactory authorized work completed as of the date of termination.

## ARTICLE 8
## EMPLOYEES

8.1    Independent Contractor.  The Operator is associated with the District only for the purposes of and to the extent set forth in this Agreement.  In respect to the delivery of the services provided for in this Agreement, the Operator is and shall remain an independent contractor and, subject to the terms of this Agreement, shall have the sole right to supervise, manage, operate, control, and direct the performance of its duties under this Agreement. Nothing contained in this Agreement shall be deemed or construed to create a partnership or joint venture, to create the relationships of an employer-employee or principal-agent, or to otherwise create any liability for the District whatsoever with respect to the indebtedness, liabilities, and obligations of the Operator, its subcontractors, or any other party.  The Operator shall be solely responsible for, and the District shall have no obligation with respect to, payment of all Federal income, F.I.C.A., and other taxes owed or claimed to be owed by the Operator, arising out of the Operator's association with the District pursuant to this Agreement.  The Operator shall indemnify and hold the District harmless from and against, and shall defend the District against any and all losses, damages, claims, costs, penalties, liabilities, and expenses howsoever arising or incurred because of, incident to, or otherwise with respect to any such taxes. The Operator, its agents and employees shall not, as a result of this Agreement, accrue

leave, retirement, insurance, bonding, the right to use of District vehicles, or any other benefits afforded to employees of the District.

8.2    Subcontractors.  The Operator shall not subcontract any of its material obligations and responsibilities hereunder without the prior written consent of the District.  If the District agrees to the Operator subcontracting some of the services or work to be performed under this Agreement, the Operator hereby guarantees that any subcontractor shall comply with the terms of this Agreement, including the delivery of its services or the performance of its work in accordance with the Operating Standards.  The Operator shall remain responsible for the delivery of all services and the performance of all work in accordance with the terms of this Agreement, regardless of whether some or all of such services or work are subcontracted.  A subcontractor's failure to comply with the terms of this Agreement shall be deemed a failure by the Operator to comply with the terms of this Agreement.  No contractual relationship shall exist between the District and any subcontractor and the District shall accept no responsibility whatsoever for the conduct, actions, or commissions of any subcontractor selected by the Operator.  The Operator shall deliver to the District a copy of each contract with a subcontractor within thirty (30) days after its execution of such contract.   In connection with its entering into contracts with subcontractors, the Operator shall cause the representations, warranties and covenants of the subcontractor in each such contract to be assigned to the District.

8.3    Employee Training and Background Investigation.  The Operator shall provide at a minimum the training described in the Requirements and the Operator's Proposal.  The Operator shall perform a background investigation and drug testing for each employee it hires for the CTF as set forth in the Requirements and the Operator's Proposal.  The Operator shall not assign any employee to the CTF who does not pass the background investigation and drug test.  The Operator shall include in each monthly operational report to be provided pursuant to Section 5.4.9 hereof the termination report for each employee terminated during the prior month.  The Operator will present joint training sessions with DOC on topics selected by DOC or will incorporate DOC's curriculum with respect to these topics in its own training sessions.   In connection with the training of correctional officers for the CTF, DOC shall make available to the Operator its firing range and weapons qualification facilities at a price to be agreed upon by the parties.

8.4    Performance of Duties.  The Operator shall use the same degree of care and skill in the performance of its duties hereunder as a prudent person would exercise or use under the circumstances in the conduct of his or her affairs.

## ARTICLE 9
## DEFAULT AND TERMINATION

9.1    Default by Operator.  Each of the following shall constitute an Event of Default on the part of the Operator:

9.1.1        A failure to keep, observe, perform, meet or comply with any covenant, agreement, term, or provision of this Agreement to be kept, observed, met, performed, or complied with by the Operator hereunder, which failure individually or in the aggregate is material and which failure continues for a period of thirty (30) days after the Operator has received a written notice of deficiency from the District, including a failure to obtain American Correctional Association accreditation of the CTF within the twenty-four (24) months after the Service Commencement Date or to thereafter maintain such accreditation.

9.1.2        A material failure of the Operator to meet or comply with any applicable federal or state and local requirement or law, which failure continues for a period of thirty (30) days after the Operator has received a written notice of deficiency from the District.

9.1.3        A material failure of the Operator to comply with any of the Operating Standards for which the Operator has not received a prior written waiver from the District, which failure continues for a period of thirty (30) days after the Operator has received a written notice of deficiency from the District.

9.1.4        A default by the lessor under the Lease.

9.1.5        If the Operator:

(a)        admits in writing its inability to pay its debts;

(b)        makes a general assignment for the benefit of creditors;

(c)        suffers a decree or order appointing a receiver or trustee for it or substantially all of its property to be entered and, if entered without its consent, not to be stayed or discharged within sixty (60) days;

(d)        suffers a proceeding under any law relating to bankruptcy, insolvency, or the reorganization or relief of debtors to be instituted by or against it and if contested by it, not to be dismissed or stayed within sixty (60) days; or

(e)        suffers any judgment, writ of attachment or execution, or any similar process to be issued or levied against a substantial part of its property.

9.1.6    The discovery by the District that any statement, representation or warranty in any writing submitted is false, misleading, or erroneous in any material respect.

9.2    Default by the District. Each of the following shall constitute an Event of Default on the part of the District:

9.2.1    Failure by the District to pay any undisputed Daily Service Fee due hereunder within thirty (30) days after written notice such payment is due and unpaid.

9.2.2    Failure by the District to observe and perform any material covenant, condition, or agreement on its part to be observed or performed, or its failure or refusal to substantially fulfill any of its material obligations hereunder which failure continues for a period of thirty (30) days after the District has received written notice of deficiency from the Operator.

9.3    Further Opportunity to Cure. If an Event of Default of the type specified in Section 9.1 or 9.2 hereof has occurred, and the defaulting party reasonably believes: (a) that such Event of Default cannot be cured within the time, if any, allowed to cure such Event of Default in Section 9.1 or 9.2 hereof, and (b) that such Event of Default can be cured, through a diligent, continuing and conscientious effort on the part of the defaulting party, within a reasonable period not to exceed ninety (90) days, then the defaulting party may, within the thirty (30) day cure period, submit to the non-defaulting party a plan for curing the Event of Default. The plan shall show in detail by what means the defaulting party proposes to cure the Event of Default. Upon receipt of any such plan, the non-defaulting party shall promptly review the plan and in its sole discretion, determine if it shall grant the defaulting party the additional time to pursue its plan of cure. If the non-defaulting party permits the defaulting party to pursue its plan for curing the Event of Default, it agrees that it shall not exercise its remedies hereunder with respect to such Event of Default for so long as the defaulting party diligently, conscientiously, and timely undertakes to cure the Event of Default in accordance with the approved plan. If the non-defaulting party does not grant the defaulting party an extension of the cure period, the thirty (30) day cure period shall be tolled during the period the proposed plan of cure is pending before the non-defaulting party.

9.4    Cancellation of Cure Period. Notwithstanding anything to the contrary in this Agreement if any action, or failure to act, by the Operator results in any risk to the safety or welfare of the inmates assigned to the CTF, the staff of the CTF or the general public, the District may immediately initiate the action it deems appropriate to eliminate or reduce such risk, including assumption of the operation of the CTF.

9.5    Remedies. Upon the occurrence of an Event of Default pursuant to Section 9.1 or 9.2 hereof by one party, the other party shall have the right to pursue any remedy it may have at law or in equity, including: (a) seeking specific performance, (b) reducing its claim to

judgment, (c) taking action to cure the Event of Default, (d) terminating this Agreement and, if the Event of Default is a default of the Operator, replacing the Operator with DOC personnel or the personnel of a substitute operator, and (e) in the case of an Event of Default by the Operator, offsetting against payments due the Operator under this Agreement or the Lease amounts expended by the District to cure the Event of Default or amounts expended as a result of the Event of Default. A termination of this Agreement pursuant to this Section 9.5 shall be considered a termination for cause for purposes of this Agreement and the Lease.

9.6    Termination Due to Third Party Action.  In the event that any final court order is issued enjoining the use of the CTF for the incarceration of inmates, this Agreement shall terminate, without penalty to the District or the Operator, effective as of the date that such injunction becomes effective and such termination shall be considered a termination for cause for purposes of the Lease. In such event, the Operator shall be entitled to the Daily Service Fee and payment of other amounts due for each day to and including the termination date.

9.7    Delay; Notice.  No delay or omission to exercise any right or power accruing upon any Event of Default shall impair any such right or power or shall be construed to be a waiver thereof, but any such right and power may be exercised from time to time and as often as may be deemed expedient. In order to entitle any party to exercise any remedy reserved to it in this Agreement, it shall not be necessary to give any notice other than such notice as may be required herein.

9.8    No Remedy Exclusive.  No remedy herein conferred upon the Parties in this Article 9 is intended to be exclusive, and every such remedy shall be cumulative and shall be in addition to every other remedy given under this Agreement or now or hereafter existing at law or in equity.

9.9    Agreement to Pay Attorney's Fees and Expenses.  In the event either party to this Agreement should default under any of the provisions hereof and the non-defaulting party should employ attorneys or incur other expenses for the collection of funds or the enforcement or performance or observance of any obligation or agreement on the part of the defaulting party, the defaulting party agrees that it will on demand, in the case of the District to the extent funds are appropriated or are otherwise legally available, pay to the non-defaulting party the reasonable fee of such attorneys and such other expenses so incurred by the non-defaulting party.

9.10    No Additional Waiver Implied by One Waiver.  In the event any agreement contained in this Agreement should be breached by either party and thereafter waived by the other party, such waiver shall be limited to the particular breach so waived and shall not be deemed to waive any other breach hereunder.

9.11    Transfer of Information.  Upon a termination of this Agreement for any reason, all data on the Operator's computer and information systems related to the CTF, its operation and maintenance and inmates who have been or are currently housed at the CTF shall be transferred to information systems designated by the District in a manner that such information is immediately accessible and usable on the systems to which the data has been transferred.

## ARTICLE 10
## INDEMNIFICATION, INSURANCE AND DEFENSE OF CLAIMS

10.1    Indemnification.   The Operator shall protect, defend, indemnify, save and hold harmless the District, its officers, agents, servants, employees and volunteers from and against any and all claims, demands, expenses and liability arising out of acts or omissions of the Operator, its agents, servants, subcontractors and employees in the performance of this Agreement regardless of whether any damage resulting from the Operator's act, omission or default is caused in part by the District, and any and all costs, expenses and attorneys' fees incurred as a result of any such claim, demand or cause of action including, but not limited to, any and all claims arising from:

> (a)    any breach or default on the part of the Operator in the performance of its duties and obligations under this Agreement;

> (b)    any claims or losses arising from or related to services rendered by the Operator, by any person or firm performing or supplying services, materials or supplies in connection with the performance of this Agreement;

> (c)    any claims or losses by any person or firm injured or damaged by the Operator, its officers, agents, or employees by the publication, translation, reproduction, delivery, performance, use, or disposition of any data processed under this Agreement in a manner not authorized by this Agreement, or by federal, state, or local statutes or regulations; and

> (d)    any failure of the Operator, its officers, agents, or employees to observe the laws of the United States and the District of Columbia, including but not limited to labor laws and minimum wage laws.

The Operator shall also pay to the District, in addition to any other amounts due hereunder, six hundred dollars ($600) per day, per incident for incidents which are a breach of the Operator's duties under this Agreement but do not constitute an Event of Default and one thousand two hundred dollars ($1,200) per day, per incident for incidents which, individually or collectively, constitute an Event of Default.  If the Operator disputes the District's claim that it is liable to DOC for the daily payments provided for in this Section 10.1 and the District and the Operator cannot resolve the dispute within thirty (30) days after DOC requests payment from the Operator, either party may submit the matter to the dispute resolution procedures provided for in Article 11 hereof.

This indemnification provision shall not be applicable to injury, death or damage to property arising exclusively from the negligent or intentional acts of the District, its officers, agents, servants or independent contractors (other than the Operator and its subcontractors) who are directly responsible to the District and incur such liability in the performance of duties for the District.  The Operator shall not waive, release, or otherwise forfeit any possible defense

the District may have regarding claims arising from or made in connection with the operation of the CTF by the Operator without the consent of the District. The Operator shall preserve all such available defenses and cooperate with the District to make such defenses available to the maximum extent allowed by law.

In case any action or proceeding is brought against the District by reason of any such claim, the Operator, upon written notice from the District, shall defend against such action by counsel satisfactory to the District, unless such action or proceeding is defended against by counsel for any carrier of liability insurance provided for herein.

The Operator's obligation to defend any claim or action provided for by this Section 10.1 shall not be affected by a claim that negligence of the District or any other indemnitee hereunder, caused or contributed to such claim or cause of action.

      10.1.1      Compliance with the insurance requirements of this Agreement shall not relieve the Operator from any liability under the indemnity provision of Sections 6.7 and 10.1 hereof.

   10.2   <u>Books and Records</u>. The Operator shall keep proper and complete books, records, and accounts with respect to the operation of the CTF and shall permit the District to inspect the same and make and take away copies thereof. The Operator shall maintain all records in accordance with the Operating Standards.

      10.2.1      Operator shall establish appropriate safeguards to protect the confidentiality of inmate records and minimize the possibility of their theft, loss, or destruction. Any and all records delivered by the District to the CTF or any employee or subcontractor of the Operator are deemed confidential and privileged information.

   10.3   <u>Maintenance of Corporate Existence and Business</u>. The Operator shall at all time maintain its corporate existence and authority to transact business and remain in good standing in its jurisdiction of incorporation and in the District of Columbia. The Operator shall maintain all licenses, permits, and franchises necessary for its businesses where the failure to so maintain might have a material adverse affect on the Operator's ability to perform its obligations under this Agreement.

   10.4   <u>Non-Discrimination</u>. The Operator shall at all times provide its services hereunder in compliance with all laws with respect to discrimination in hiring, promotion or pay of employees. No person shall be subjected to discrimination on the grounds of race, color, religion, national origin, sex, age, marital status, personal appearance, sexual orientation, family responsibilities, physical handicap, matriculation or political affiliation. Upon request, the Operator shall show proof of such non-discrimination, and shall post in a conspicuous place, available to employees and job applicants, notice of such non-discrimination. The Operator shall provide the District with information at least annually with respect to its compliance with the

representations in the Operator's Proposal regarding use of small businesses and local and disadvantaged businesses.

10.5   Liability Insurance.  The Operator shall continuously maintain and pay for such insurance as will protect the Operator and the District as a named insured, from:

(a)   all claims, including death and claims based on violations of civil rights, arising from the services performed under this Agreement;

(b)   all claims arising from the services performed under this Agreement by the Operator; and

(c)   actions by a third party against the Operator as a result of this Agreement.

10.6   Other Insurance Requirements.  This Agreement shall not be enforceable against the District unless insurance policies evidencing the insurance coverages required by this Agreement are received prior to the Service Commencement Date in a form satisfactory to the District.  At all times during the term of this Agreement, the Operator shall carry, at its own cost and expense:

(a)   A comprehensive general liability insurance policy with minimum limits of $5,000,000 for personal injury or death and $500,000 and $1 million aggregate for property damage; and

(b)   A comprehensive fire and extended coverage insurance policy for the full replacement value of the CTF (including coverage for sprinkler damage) on the building, all improvements, and all furniture, fixtures and equipment furnished to or placed by the Operator within the CTF.

The proceeds collected upon any and all comprehensive fire and extended coverage insurance policies shall be used to repair and/or replace the building, improvements, furniture, fixtures and equipment so damaged or destroyed, and such repairs or replacements shall be executed promptly by the Operator with such insurance funds pursuant to Section 6.3 of this Agreement. Such policies shall include appropriate clauses waiving all rights of subrogation against the District with respect to losses payable under such policies.

All insurance policies required under this Agreement must provide no less than thirty (30) days advance notice to the District of any contemplated cancellation.  The District shall have the right, but not the obligation, to advance money to prevent the insurance required herein from lapsing for nonpayment of premiums.  If the District advances such amount, then the Operator shall be obligated to repay the District the amount of any advances plus interest thereon at the lesser of 18% per annum or the legal maximum rate.  The District shall be entitled to set off and deduct such amount from any amounts owed the Operator pursuant to this Agreement or the Lease.  No election by the District to advance money to pay insurance

premiums shall be deemed to cure the default by the Operator of its obligation to provide insurance. All insurance policies shall name the District as an additional insured or joint loss payee as its interest may appear.

## ARTICLE 11
## CONTRACT MONITOR/PERFORMANCE EVALUATION

11.1    Contract Monitor.  The District shall appoint a representative (the "Contract Monitor") for this Agreement who shall work for and be paid by the District.  The Contract Monitor or other person(s) designated by the District shall be the official representative of the District with respect to matters related to the Operator's compliance with the terms of this Agreement and the delivery of the services required by this Agreement.  The review of the delivery of medical services required by this Agreement may be performed by the Contract Monitor or by a separate DOC Health Monitor retained and paid by the District and any such DOC Health Monitor shall have the all of the powers and duties of the Contract Monitor with respect to matters within the scope of the DOC Health Monitor's assignment.  The DOC Health Monitor shall have the right to consult with the Medical Society of the District of Columbia and other medical professional organizations to develop and implement an annual medical services review process and for such other assistance as the DOC Health Monitor may require.  Such assistance may include review of medical records and facilities at the CTF.

11.1.1      Contract Monitor.  If the Contract Monitor determines that the CTF is not being operated in compliance with the Requirements, the Quality Assurance Plan or other portions of the Operating Standards, it shall notify the Operator in writing of the non-compliance.  The notification to the Operator shall identify the provisions of this Agreement, the Requirements, the Quality Assurance Plan or the other portions of the Operating Standards which the Operator is failing to meet and, if possible, shall specify the nature of the deficiencies in operation.  If the deficiencies do not constitute an Event of Default hereunder and so long as the District elects, the District and the Operator shall utilize the procedures specified in Section 11.1.1 hereof for the resolution of the Contract Monitor's determination of deficiency.  Within fifteen (15) days after receipt of the notification of the deficiencies in operation, the Operator shall notify the Contract Monitor in writing that the deficiency has been cured or shall propose a plan for correcting the deficiency.  If the Contract Monitor and the Operator cannot agree on the nature of the deficiency or the method for correcting the deficiency, either the District or the Operator may refer the matter for resolution by management as provided in Section 11.1.2 hereof.

11.1.2    <u>Management Resolution</u>. The DOC's executive deputy director and the Operator's vice president for operations shall be responsible for administering the management resolution procedures regarding claims with respect to a failure to comply with this Agreement, the Requirements, the Quality Assurance Plan or other portions of the Operating Requirements. The DOC's executive deputy director and the Operator's vice president for operations shall attempt to settle such claim. If they are unable to resolve the claim within thirty (30) days after either party notifies the other that the claim has been referred for management resolution, either party may declare that an impasse has been reached. Upon the declaration of an impasse, each party shall appoint a mediator within five (5) Business Days of the declaration of the impasse  The mediators appointed by the District and the Operator shall select a third mediator. If one of the Parties fails or refuses to appoint a mediator, the mediator appointed by the other party shall resolve the issue of the claimed deficiency.

11.1.3    <u>Mediation Process</u>. In the absence of an agreement to the contrary by the District and the Operator, the mediation process shall be conducted in accordance with the Center for Public Resources Model Mediation Procedure of Business Disputes. The mediators shall conduct all hearings and meeting in Washington, D.C. and within thirty (30) days of their appointment the mediators shall notify the District and the Operator in writing of their decision stating separately findings of fact and determinations of law. The decision of the mediators can be appealed to a court of competent jurisdiction within the District of Columbia as to decisions of law but not as to findings of fact.

11.1.4    <u>Indemnification Payments</u>. If the mediators determine there are deficiencies in the Operator's operation of the CTF pursuant to Section 11.1.3, the Operator shall be liable, at the District's option, for the indemnification payments provided for by Section 10.1 hereof in addition to any other amounts due hereunder.

11.1.5    <u>Continuation of Performance</u>. The Operator shall continue to discharge its obligations, and the District shall pay the Daily Service Fee, in accordance with the terms of this Agreement, during the pendency of the mediation process.

11.2    <u>Access to Facilities</u>. The District Representative and the Contract Monitor shall have unrestricted access to the CTF at all times.

11.3   Right to Audit. The District shall, subject to limitations provided by law with respect to rights of privacy, have the right to examine records of the Operator and its subcontractors, related to the CTF, including without limitation, financial books and records, maintenance records, employee records, and inmate records generated by the Operator, its subcontractors or any other related parties in connection with performance of this Agreement. Any contract between the Operator and a subcontractor shall grant the District the right to audit the subcontractor's books and records under the same terms and conditions the District may audit the Operator's books and records. The provisions of this Section 11.3 shall not apply to a subcontractor for any year that the subcontractor receives payments of less than $500,000 for material and services provided in connection with this Agreement.

11.4   Monitoring of Performance by the District. The District shall utilize the Quality Assurance Plan included in the Solicitation in connection with its monitoring of the quality of Operator's performance under this Agreement and the Operator shall cooperate fully with the District in obtaining the requisite information needed to complete the Quality Assurance Plan and to assess the quality of the Operator's performance. Such monitoring by the District shall not relieve the Operator of any of its obligations under this Agreement.

## ARTICLE 12
## CERTAIN PROHIBITIONS

12.1   Certain Prohibitions. Notwithstanding any other section of this Agreement, nothing contained herein shall be interpreted to grant to Operator the authority to, and Operator shall not have any final authority to:

12.1.1      Approve inmate release and parole eligibility dates;

12.1.2      Award good conduct time to applicable inmates; or

12.1.3      Approve inmates for work training, medical transfers, temporary furloughs, or for pre-parole transfers outside of the CTF.

DOC shall make a recommendation with respect to the parole of each inmate eligible for parole. The Operator shall prepare and assemble all evaluations, reports and other information as required by the Parole Board of the District of Columbia and forward such information to DOC's case management unit within a timeframe sufficient to permit the unit to form a basis for its recommendation as to parole for inmates at the CTF.

## ARTICLE 13
## MISCELLANEOUS PROVISIONS

13.1   Binding Nature. This Agreement shall not be binding upon the Parties until it is approved and executed by both Parties. This Agreement shall inure to the benefit of the District

and Operator and shall be binding upon the District and Operator and their respective successors and assigns, subject to the limitations set forth in Section 13.5 and elsewhere in this Agreement.

13.2   Invalidity and Severability.  In the event that any provision of this Agreement shall be null and void, the validity of the remaining provisions of the Agreement shall not in any way be affected thereby.

13.3   Defense/Immunity.  By entering into this Agreement, neither the District nor the Operator waives any immunity defenses which may be extended to either of them by operation of law, including limitations on the amount of damages which may be awarded or paid.

13.4   Notice of Claims.  Within ten (10) days after receipt of a summons in any action against the District or the Operator, or of any agent, employee or officer thereof, or within ten (10) days of receipt of notice of claim against the District or the Operator or of any agent, employee or officer thereof, the Party receiving such summons or claim shall notify the other Party in writing of such summons or notice of claim.  If any of the insurance described herein or any portion thereof becomes commercially unavailable, the District, at its option, may terminate this Agreement upon thirty (30) days prior written notice.

13.5   Prohibition Against Assignment.  It is hereby agreed by the Parties that the Operator may not assign or transfer all or any part of its interest or contractual rights hereunder.

13.6   Third Party Beneficiary.  Except as specifically provided in this Agreement, the provisions of this Agreement are for the sole benefit of the Parties hereto and shall not be construed as conferring any rights on any other person.

13.7   Governing Law.   The Agreement shall be governed by and construed in accordance with the laws of the District of Columbia.

13.8   Notices.  All notices called for or contemplated hereunder shall be in writing and shall be deemed to have been duly given when personally delivered or forty-eight (48) hours after mailed to the address below by personal delivery or by certified mail, return receipt requested, postage prepaid.

All notices to DOC shall be addressed to the District Representative at the following address:

> Department of Corrections
> 1923 Vermont Avenue, N.W.
> Washington, D.C. 20001
> Attention: Executive Deputy Director

With a copy delivered to the Contract Monitor at the following address:

> Office of Contract Monitor
> Correctional Treatment Facility
> 1901 E Street, S.E.
> Washington, D.C. 20003
> Attention: Regina Gilmore

All notices to the Operator shall be addressed to the Operator's Representative at the following address:

> Corrections Corporation of America
> 102 Woodmont Boulevard, Suite 800
> Nashville, TN 37205
> Attention: Vice President, Legal Affairs

13.9    Entire Agreement.  This Agreement incorporates all the agreements, covenants, and understandings between the Parties hereto concerning the subject matter hereof, and all such covenants, agreements and understandings have been merged into this Agreement.  No other prior agreement or understandings, verbal or otherwise, of the Parties or their agents shall be valid or enforceable unless embodied in this Agreement.

13.10    Amendment.  No changes to this Agreement shall be made except upon written agreement of both Parties.

13.11    Headings.  The headings used herein are for convenience of reference only and shall not constitute a part hereof or effect the construction or interpretation of this Agreement.

13.12    Counterparts.  This Agreement may be executed in any number of and by the different Parties hereto on separate counterparts, each of which when so executed shall be deemed to be an original, and such counterparts shall together constitute but one and the same instrument.

**IN WITNESS WHEREOF**, the Parties hereto have executed this Agreement as of the date first above written.

**THE DISTRICT OF COLUMBIA**
**("District")**

BY: _Wanda L. Moorman_

TITLE: _Contracting Officer_

**CORRECTIONS CORPORATION OF AMERICA**
**("Operator")**

BY: _[signature]_

TITLE: _Chairman & CEO_

42.

# EXHIBIT A

## D.C. DEPARTMENT OF CORRECTIONS POLICIES

| SUBJECT NUMBER | | EFFECTIVE DATE |
|---|---|---|
| N/A | Lorton Regulation Approval Act of 1982 | 02/18/81 |
| 1230.2 | Pick-up and Delivery of Sensitive, Urgent, and Special Department and Intradepartmental Mail | 02/01/74 |
| 1260.1B | Official Communications | 01/05/95 |
| 1290.1A | Lorton Public Information Alert Phone System | 05/04/93 |
| 1311.1A | Screening and Control for Non-Departmental Research | 09/04/92 |
| 1320.1A | Inquiries & Requests from Governmental Officials & Agencies | 08/31/90 |
| 1340.2A | Relationship with the Media | 09/07/89 |
| 1340.3 | Media Emergencies | 10/14/91 |
| 3310.4C | Sexual Harassment of Employees | 12/14/94 |
| 3800.2 | Section 504 Handicap/American with Disabilities Act Accommodations | 08/10/92 |
| 4030.1D | Inmate Grievance Procedure | 05/04/92 |
| 4060.1 | Standard Inmate Forms and Records | 02/22/73 |
| 4060.2 | Inmate Institutional Files | 12/10/90 |
| 4090.3 | Department Classification Operations Manual | 07/15/87 |
| 4160.6 | Inmate Marriages | 12/10/90 |
| 4161.1 | Recording Legally Changed Names | 03/15/79 |
| 4311.2A | Youth Diagnostic Evaluations | 02/26/90 |
| 4311.3 | Female Youth Rehabilitation Act Programs and Operations | 04/15/74 |
| 4354.3 | Programming of Youth Act Commitments and Adult Sentences | 04/15/74 |
| 4354.4B | Classification and Institutional Assignment of Youth Act Offenders | 12/07/84 |
| 4370.1A | Prison Overcrowding EPA | 10/01/93 |
| 4920.2 | Furlough Policy for Youth Institutions | 02/06/74 |

| SUBJECT NUMBER | | EFFECTIVE DATE |
|---|---|---|
| 4920.3C | Work Training Furlough Program | 01/20/94 |
| 4920.4A | Resocialization Emergency Furloughs | 09/01/77 |
| 5140.1A | Washington Area Law Enforcement System (WALES) | 03/27/81 |
| 6010.1A | D.C. Mental Health Information Act of 1978 (MHIA) | 07/26/93 |
| 6011.2A | Notification of Next of Kin or Designee | 11/06/95 |
| 6012.2 | Reporting AIDS Cases | 03/12/84 |
| 6050.4 | Mandatory Employee Drug and Alcohol Drug Test (MEDAT) | 06/14/96 |
| 8011.1 | Medical and Geriatric Parole Act of 1992 | 07/30/93 |

-------------------------------------------------------------------------------

### Policies To Be Developed

1.  Transportation of inmates to and from Correctional Treatment Facility by Department of Corrections and the Contractor

2.  Admissions criteria and transfer procedures to and from Correctional Treatment Facility

EXHIBIT B

**STAFFING PLAN**

*Subject to furt[her] revision during Transition*

# WASHINGTON, D.C
## CORRECTIONAL TREATMENT FACILITY
### STAFF DEPLOYMENT BY SHIFT AND POSITION

| | |
|---|---|
| MANAGEMENT/SUPPORT | 18.00 |
| SECURITY/OPERATIONS | 91.00 |
| SECURITY/HOUSING | 200.00 |
| SUPPORT SERVICES | 33.00 |
| CLASSIFICATION | 52.00 |
| MEDICAL | 38.00 |
| EDUCATION | 11.00 |
| TOTAL | 443.00 |

| MANAGEMENT/SUPPORT | 1st Shift | 2nd Shift | 3rd Shift | Days Covered | Relief Factor | Total Staff |
|---|---|---|---|---|---|---|
| Warden | 1 | 0 | 0 | 5 | 1.00 | 1.00 |
| Asst Warden (Security) | 1 | 0 | 0 | 5 | 1.00 | 1.00 |
| Asst. Warden (Treatment) | 1 | 0 | 0 | 5 | 1.00 | 1.00 |
| Compliance/Grievance Coord. | 1 | 0 | 0 | 5 | 1.00 | 1.00 |
| Business Manager | 1 | 0 | 0 | 5 | 1.00 | 1.00 |
| Bookkeeper | 1 | 0 | 0 | 5 | 1.00 | 1.00 |
| Personnel Coordinator | 1 | 0 | 0 | 5 | 1.00 | 1.00 |
| Training Manager | 1 | 0 | 0 | 5 | 1.00 | 1.00 |
| Secretary | 1 | 0 | 0 | 5 | 1.00 | 1.00 |
| Administrative Clerk | 2 | 0 | 0 | 5 | 1.00 | 2.00 |
| Records Supervisor | 1 | 0 | 0 | 5 | 1.00 | 1.00 |
| Records Clerk | 2 | 0 | 0 | 5 | 1.00 | 2.00 |
| Mail Clerks | 2 | 0 | 0 | 5 | 1.00 | 2.00 |
| Safety Manager | 1 | 0 | 0 | 5 | 1.00 | 1.00 |
| Chaplain | 1 | 0 | 0 | 5 | 1.00 | 1.00 |
| Total | | | | | | 18.00 |

| SECURITY/OPERATIONS | 1st Shift | 2nd Shift | 3rd Shift | Days Covered | Relief Factor | Total Staff |
|---|---|---|---|---|---|---|
| Chief of Security | 1 | 0 | 0 | 5 | 1.00 | 1.00 |
| Shift Supervisor | 1 | 1 | 1 | 7 | 2.00 | 6.00 |
| Asst. Shift Supervisor | 1 | 1 | 1 | 7 | 1.72 | 5.00 |
| Central Control C/O | 2 | 2 | 1 | 7 | 1.72 | 9.00 |
| Count Room ( Command Center) | 1 | 1 | 1 | 7 | 1.72 | 5.00 |
| Pedestrian Checkpoint | 1 | 1 | 1 | 7 | 1.72 | 5.00 |
| Visitation C/O | 4 | 0 | 0 | 7 | 1.72 | 7.00 |
| Utility/Search/Escort C/O | 4 | 4 | 3 | 7 | 1.72 | 19.00 |
| Armory/Key Control C/O | 1 | 0 | 0 | 5 | 1.00 | 1.00 |

| | 1st | 2nd | 3rd | Days | Relief | Total |
|---|---|---|---|---|---|---|
| Kitchen C/O | 1 | 1 | 1 | 7 | 1.72 | 5.00 |
| Medical | 1 | 1 | 1 | 7 | 1.72 | 5.00 |
| Intake/Orientation C/O | 1 | 1 | 0 | 7 | 1.72 | 3.00 |
| Property C/O | 1 | 0 | 0 | 5 | 1.00 | 1.00 |
| Program/Education C/O | 1 | 1 | 0 | 5 | 1.00 | 2.00 |
| Transportation C/O | 4 | 2 | 0 | 5 | 1.00 | 6.00 |
| C/O Behavior Management | 2 | 2 | 2 | 7 | 1.72 | 10.00 |
| Adm.Clerk | 1 | 0 | 0 | 5 | 1.00 | 1.00 |
| **Total** | | | | | | **91.00** |

| SECURITY/HOUSING | 1st Shift | 2nd Shift | 3rd Shift | Days Covered | Relief Factor | Total Staff |
|---|---|---|---|---|---|---|
| **GENERAL HOUSING** | | | | | | |
| Unit Manager | 3 | 0 | 0 | 5 | 1.00 | 3.00 |
| Counselor | 3 | 0 | 0 | 5 | 1.00 | 3.00 |
| Recreation Coordinator | 1 | 1 | 0 | 7 | 1.72 | 3.00 |
| Roving Officer | 3 | 3 | 1 | 7 | 1.72 | 12.00 |
| Housing Officer | 7 | 7 | 7 | 7 | 1.72 | 36.00 |
| **SUBSTANCE ABUSE PROGRAM** | | | | | | |
| Program Manager | 1 | 0 | 0 | 5 | 1.00 | 1.00 |
| Unit Manager | 4 | 0 | 0 | 5 | 1.00 | 4.00 |
| Substance Abuse Counselor | 3 | 0 | 0 | 5 | 1.00 | 3.00 |
| Aftercare Coordinator | 2 | 0 | 0 | 5 | 1.00 | 2.00 |
| Recreation Coordinator | 1 | 1 | 0 | 7 | 1.72 | 3.00 |
| Roving Officer | 1 | 1 | 1 | 7 | 1.72 | 5.00 |
| Housing Officer | 8 | 16 | 8 | 7 | 1.72 | 55.00 |
| Secretary | 1 | 0 | 0 | 5 | 1.00 | 1.00 |
| Administrative Clerk | 4 | 0 | 0 | 5 | 1.00 | 4.00 |
| **FEMALE PROGRAM** | | | | | | |
| Program Manager | 1 | 0 | 0 | 5 | 1.00 | 1.00 |
| Clinical Social Worker | 1 | 0 | 0 | 5 | 1.00 | 1.00 |
| Unit Manager | 2 | 0 | 0 | 5 | 1.00 | 2.00 |
| Counselor | 3 | 0 | 0 | 5 | 1.00 | 3.00 |
| Recreation Coordinator | 0 | 1 | 0 | 7 | 1.72 | 2.00 |
| Housing Officer | 12 | 12 | 8 | 7 | 1.72 | 55.00 |
| Administrative Clerk | 1 | 0 | 0 | 5 | 1.00 | 1.00 |
| **Total** | | | | | | **200.00** |

| SUPPORT SERVICES | 1st Shift | 2nd Shift | 3rd Shift | Days Covered | Relief Factor | Total Staff |
|---|---|---|---|---|---|---|
| Warehouse/Commisary Supv | 1 | 0 | 0 | 5 | 1.00 | 1.00 |
| Warehouse/Commisary Workers | 2 | 1 | 0 | 5 | 1.00 | 3.00 |
| Food Service Manager | 1 | 0 | 0 | 5 | 1.00 | 1.00 |
| Food Service Supervisor | 1 | 1 | 0 | 5 | 1.00 | 2.00 |

| SUPPORT SERVICES | 1st Shift | 2nd Shift | 3rd Shift | Days Covered | Relief Factor | Total Staff |
|---|---|---|---|---|---|---|
| Food Service Worker | 4 | 4 | 0 | 7 | 1.72 | 14.00 |
| Maintenance Supervisor | 1 | 0 | 0 | 5 | 1.00 | 1.00 |
| Asst. Maintenance Supervisor | 0 | 1 | 0 | 5 | 1.00 | 1.00 |
| HVAC Mechanic | 2 | 1 | 0 | 5 | 1.00 | 3.00 |
| Electrician | 1 | 0 | 0 | 5 | 1.00 | 1.00 |
| Plumber | 1 | 1 | 0 | 5 | 1.00 | 2.00 |
| Mechanic | 1 | 1 | 0 | 5 | 1.00 | 2.00 |
| Locksmith/Tool Control | 1 | 0 | 0 | 5 | 1.00 | 1.00 |
| Administrative Clerk | 1 | 0 | 0 | 5 | 1.00 | 1.00 |
| **Total** | | | | | | **33.00** |

| Diagnostic Unit | 1st Shift | 2nd Shift | 3rd Shift | Days Covered | Relief Factor | Total Staff |
|---|---|---|---|---|---|---|
| Unit Manager | 1 | 0 | 0 | 5 | 1.00 | 1.00 |
| Classification Supervisor | 1 | 0 | 0 | 5 | 1.00 | 1.00 |
| Classification Counselors | 4 | 0 | 0 | 5 | 1.00 | 4.00 |
| Social Worker | 4 | 0 | 0 | 5 | 1.00 | 4.00 |
| Psychologists | 3 | 0 | 0 | 5 | 1.00 | 3.00 |
| Correctional Officer | 7 | 7 | 7 | 7 | 1.72 | 36.00 |
| Administrative Clerk | 3 | 0 | 0 | 5 | 1.00 | 3.00 |
| Total | | | | | | 52.00 |

| Medical | 1st Shift | 2nd Shift | 3rd Shift | Days Covered | Relief Factor | Total Staff |
|---|---|---|---|---|---|---|
| Medical Services Supervisor | 1 | 0 | 0 | 5 | 1.00 | 1.00 |
| RN | 2 | 1 | 1 | 7 | 1.72 | 7.00 |
| LPN | 3 | 3 | 3 | 7 | 1.72 | 15.00 |
| Nursing Asst. | 1 | 1 | 1 | 7 | 1.72 | 5.00 |
| Medical Records Clerk | 2 | 1 | 0 | 7 | 1.72 | 5.00 |
| Mental Health Specialist | 1 | 0 | 0 | 5 | 1.00 | 1.00 |
| Dental Hygienist | 1 | 0 | 0 | 5 | 1.00 | 1.00 |
| Physician Assistant ( OB-GYN ) | 2 | 0 | 0 | 5 | 1.00 | 1.00 |
| Physical Therapist | 1 | 0 | 0 | 5 | 1.00 | 1.00 |

| | | | | | | |
|---|---|---|---|---|---|---|
| Health Educator | ** | PRN/CONTRACT | | | | |
| Gynecologist | ** | PRN/CONTRACT | | | | |
| Psychiatrist | ** | PRN/CONTRACT | | | | |
| Dentist | ** | PRN/CONTRACT | | | | |
| Physician | ** | PRN/CONTRACT | | | | |
| X-ray Technician | ** | PRN/CONTRACT | | | | |
| Laboratory Technician | ** | PRN/CONTRACT | | | | |
| Total | | | | | | 38.00 |

| Education | 1st Shift | 2nd Shift | 3rd Shift | Days Covered | Relief Factor | Total Staff |
|---|---|---|---|---|---|---|
| Principal | 1 | 0 | 0 | 5 | 1.00 | 1.00 |
| Vocational Counselor | 1 | 0 | 0 | 5 | 1.00 | 1.00 |
| Academic Instructor | 4 | 0 | 0 | 5 | 1.00 | 4.00 |
| Vocational Instructor | 2 | 0 | 0 | 5 | 1.00 | 2.00 |
| Secretary | 1 | 0 | 0 | 5 | 1.00 | 1.00 |
| Library Aide | 1 | 1 | 0 | 5 | 1.00 | 2.00 |
| Librarian ** | PRN/CONTRACT | | | | | |
| Diagnostic ** | PRN/CONTRACT | | | | | |
| Total | | | | | | 12.00 |