# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ELOISE T. WORMLEY,<br><br>        Plaintiff,<br><br>    v.<br><br>THE UNITED STATES OF AMERICA,<br> et al. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)         Civil Action No. 08-00449-CKK |

## DISTRICT DEFENDANTS' MOTION TO DISMISS, OR IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT

Pursuant to Fed. R. Civ. P. 12(b)(6) and 56, and for the reasons set forth in the accompanying memorandum of points and authorities, District Defendants, the District of Columbia (hereinafter "the District") and Devon Brown (hereinafter "Director Brown") (collectively "the District Defendants"), by and through undersigned counsel, move this court for an order dismissing the above-captioned complaint with prejudice for failure to state a claim upon which relief may be granted. In the alternative, District Defendants move this Court to grant judgment in their favor as a matter of law.

Plaintiff assert common law negligence and false imprisonment claims against Director Brown and several unnamed John or Jane Does 11-20, alleging that she was "unlawfully detained" (Count XI), and that the District Defendants "owed a duty of care to Ms. Wormley to assure that she was accurately informed of the reasons for her detention, and to assure that Ms. Wormley was not incorrectly detained at CTF [Correctional Treatment Facility] (Count XII)." Furthermore, Plaintiff asserts common law vicarious liability against the District of Columbia

1

under a theory of *respondeat superior* for the mistakes of D.C. employees in failing to release her and falsely imprisoning her. (Count XII).

Plaintiff also asserts a claim under 42 U.S.C. § 1983 against the District of Columbia for overdetention, unlawful search and seizure, and deliberate indifference, alleged to be supported by the Fourth, Fifth, and Eighth Amendment to the U.S. Constitution (see Count XVI). In Count XVI, Plaintiff also alleges that the District was deliberately indifferent to the lack of proper training or supervision of its officers and employees, and the officers and employees of its agent, Defendant, Corrections Corporation of America (CCA).

Plaintiff contends that the District wrongfully detained her for two reasons: First, she was initially released late based upon an invalid June 16, 2006 United States Probation detainer for the period beginning October 22, 2006 through March 16, 2007; and, secondly, plaintiff alleged that after the invalidity of the warrant was established on or about March 16, 2007, the District continued to detain her for an additional three (3) days until March 19, 2008. This Court should deny Plaintiff's claims as a matter of law for the following reasons.

From the District Defendants' perspective, this is a case of justifiable reliance upon a warrant of commitment, which was valid on its face, and the District was obliged to honor its facial validity until lifted by the issuing authority. For this reason, Plaintiff's alleged overdetention from October 22, 2007 through March 16, 2007 is not the fault of the District Defendants who are immune from liability and suit on this claim as it arises in Plaintiff's common law and constitutional claim contexts.

The District, through its Department of Corrections ("DOC"), administers correctional facilities and inmates in the District. Plaintiff was incarcerated on District of Columbia charges when the U.S. Marshal Service (USMS) lodged a Federal Parole Violation Warrant on Plaintiff

issued by the United States Parole Commission.   The detainer required the District to notify the USMS shortly before the end of plaintiff's incarceration for the D.C. charge, which the District did on October 18, 2006, as admitted by the Plaintiff. (Compl. ¶ 48-48; Kathy Souverain Dec. ¶ 9) (hereinafter "Souverain Dec."). On October 19, 2006, in response to the notice of impending release, the USMS sent DOC a "transit hold, which required DOC to hold plaintiff until further notified. (*Id.* ¶10).

It was not until March 16, 2007 that USMS sent notice to the Correctional Treatment Facility (CTF) that the USMS detainer dated June 16, 2006 had been lifted. (*Id.* at ¶ 11). The District did not receive notice from the USMS until March 19, 2007 at 2:41 P.M. that the detainer had been lifted. (*Id.* at ¶ 13; Exhibit "B"). Ms. Wormley was immediately released on March 19, 2007.

The District was reasonably justified to hold Plaintiff on the facially valid detainer until the issuing authority lifted the detainer.  This Court should not imply a duty, where none exists, to investigate allegations of wrongful incarceration in the face of a seemingly valid detainer issued by appropriate authorities.

With respect to the three day delay in releasing Plaintiff, the second allegation of overdetention, the District Defendants aver that they are permitted by law to utilize a reasonable period for outprocessing inmates.  After the March 16, 2007 notice to CTF that the USMS detainer was lifted, the District was still required to outprocess plaintiff for the escape from custody that appeared of record in DOC's own files. (Souverain Dec. at ¶ 12). As a matter of law, the District is not liable to plaintiff in damages for the three days that she was detained based upon the need to assure that her records were appropriately cleared and that she had no other outstanding charges.

Director Brown, a District official sued in his official and individual capacity, moves this Court for an order dismissing this complaint against him on the grounds that he is entitled to qualified immunity and all claims against him should be dismissed for failure to state a claim. Nothing in the complaint supports an allegation that Director Brown acted outside of his official capacity or outside of his official authority, hence the claims against him in his individual capacity should be construed as if they were brought against him solely in his official capacity. As such, the personal capacity claims against Director Brown should also be dismissed.

Plaintiff failed to file for relief under applicable habeas corpus statutes, which would have provided her a hearing on her alleged unlawful warrant hold. She likewise failed to avail herself of the inmate grievance procedures of which she was apprised upon incarceration; thus, she failed to exhaust her administrative remedies prior to bringing this suit pursuant to 42 § 1983. She seeks this Court's assistance to excuse her failure to avail herself of these legislated inmate protections. She seeks to make new law by asking this Court to establish a duty upon the District Defendants to investigate each court order, warrant, and detainer that it receives on thousands of inmates to determine their validity, notwithstanding the enormous administrative burden.

The District Defendants urge this Court to follow established precedent which provides a presumption of validity in orders, warrants, and detainers. To hold otherwise would cause each and every penological institution to verify such orders daily to determine continuing validity. The result would have adverse impact on the entire judicial system.

For these reasons, and those set forth more fully in the memorandum of points and authorities, and the statement of material facts, the relief sought by Plaintiff should be denied.

Proposed orders are attached for this Court's convenience.

Respectfully submitted:

PETER NICKLES
Acting Attorney General for the District of Columbia

GEORGE C. VALENTINE
Deputy Attorney General
Civil Litigation Division

ELLEN EFROS [250746]
Chief, Equity Section I

/s/ Denise J. Baker
Denise J. Baker
D.C. Bar No. 493414
Assistant Attorney General
441 4th Street, Northwest, 6th Floor South
Washington, D.C. 20001
202-442-9887 (Telephone)
202-727-0431 (Facsimile)
Denise.baker@dc.gov

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| ELOISE T. WORMLEY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | Civil Action No. 08-00449-CKK |
| THE UNITED STATES OF AMERICA, | ) | |
| et al. | ) | |
| | ) | |

## DISTRICT DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPPORT OF MOTION TO DISMISS, OR IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT

Pursuant to Fed. R. Civ. P. 12(b)(6) and 56, District Defendants, the District of Columbia (hereinafter "the District") and Devon Brown (hereinafter "Director Brown") (collectively "the District Defendants"), by and through undersigned counsel, move this Court for an order dismissing the above-captioned complaint with prejudice, for failure to state a claim upon which relief may be granted. In the alternative, District Defendants move this Court to grant judgment in their favor as a matter of law.

## I.    SUMMARY OF ARGUMENT

This is a case of justifiable reliance upon a warrant of commitment, which was valid on its face. The District Defendants were obligated to honor its facial validity until lifted by the issuing authority. For this reason, Plaintiff's alleged overdetention from October 22, 2007 through March 16, 2007 is not the fault of the District Defendants, who are immune from liability and suit on this claim, in the common law and constitutional claim contexts.

With respect to the three day delay in releasing Plaintiff, the second allegation of overdetention, the District Defendants aver that they are permitted by law to utilize a reasonable

1

period for outprocessing inmates. It was not until March 16, 2007 that USMS sent notice to the Correctional Treatment Facility (CTF) that the USMS detainer dated June 16, 2006 had been lifted. (*Id.* at ¶ 11). The District did not receive notice from the USMS until March 19, 2007 at 2:41 P.M. that the detainer had been lifted. (*Id.* at ¶ 13; Exhibit "B"). Ms. Wormley was immediately released on March 19, 2007. As a matter of law, the District Defendants are not liable to Plaintiff in damages for the three days that she was detained, based upon the need to assure that her records were appropriately cleared and that she had no other outstanding charges.

Plaintiff failed to file for relief under applicable habeas corpus statutes, which would have provided her a hearing on her alleged unlawful warrant hold. Likewise, she failed to avail herself of the inmate grievance procedures of which she was apprised upon incarceration; thus, she failed to exhaust her administrative remedies prior to bringing this suit pursuant to 42 § 1983. She seeks this Court's assistance to excuse her failure to avail herself of these legislated inmate protections. She seeks to make new law by asking this Court to establish a duty upon the District Defendants to investigate each court order, warrant, and detainer that it receives on thousands of inmates to determine their validity, notwithstanding the enormous administrative burden.

Director Brown, a District official sued in his official and individual capacity, moves this Court for an order dismissing this complaint against him on the grounds that he is entitled to qualified immunity, and all claims against him should be dismissed for failure to state a claim. Nothing in the complaint supports an allegation that Director Brown acted outside of his official capacity or outside of his official authority; hence the claims against him in his individual capacity should be construed as if they were brought against Director Brown solely in his official capacity. As such, the individual capacity claims against Director Brown should be dismissed. Claims against Director Brown are also barred based upon the doctrine of qualified immunity.

Common law claims alleging false imprisonment brought against Director Brown and unnamed District Defendants fail to state a claim since the District was legally justified in holding Plaintiff pursuant to a facially valid detainer based upon a Federal Parole Commission

2

Warrant lodged by the USMS. Common law claims alleging negligence brought against Director Brown and unnamed District Defendants likewise fail because there is no District of Columbia legal duty to ferret out Ms. Wormley's entitlement to release, given the facial validity of the detainer.

## II.    FACTUAL BACKGROUND

Plaintiff contends that the District wrongfully detained her for two reasons: First, she was initially released late based upon an invalid June 16, 2006 United States Probation detainer for the period beginning October 22, 2006 through March 16, 2007; and, secondly, plaintiff alleged that after the invalidity of the warrant was established on or about March 16, 2007, the District continued to detain her for an additional three (3) days until March 19, 2008.

The District, through its Department of Corrections ("DOC"), administers correctional facilities and inmates in the District of Columbia. Plaintiff was incarcerated on District of Columbia charges when the U.S. Marshal Service lodged a Federal Parole Violation Warrant on Plaintiff issued by the United States Parole Commission.

The District Defendants followed the requirements of the detainer. (A true and correct copy of the detainer is attached hereto as Exhibit "C" and made a part hereof.) The detainer required the District to notify the USMS shortly before the end of Plaintiff's incarceration for the D.C. charge, which the District did on October 18, 2006, as admitted by the Plaintiff. (Compl. ¶ 48-48; Souverain Dec. ¶ 9). On October 19, 2006, in response to the notice of impending release, the USMS sent DOC a "transit hold, which required DOC to hold plaintiff until further notified. (*Id.* ¶ 10). The District Defendants followed those instructions issued by the USMS. It was not until March 16, 2007 that USMS sent notice to lift the USMS detainer issued the previous June 16, 2006. (*Id.* at ¶ 11). Thus, the District held plaintiff on the facially valid detainer until the issuing authority lifted the detainer.

There is no evidence that Plaintiff used the inmate grievance procedure to notify the District Defendants of her claims of overdetention. (Affidavit of Joyce Allen ¶¶ 1-13). (hereinafter "Allen Aff."). Upon arrival at the detention facility Wormley, similar to all inmates, received an Inmate Handbook, which contained a summary of the facility grievance policies and procedures. (*Id.* at ¶ 6). Additionally, Wormley had access to the complete grievance policy at the detention facility's law library or through facility staff. (*Id.*).

There is no factual evidence that Plaintiff attempted to obtain a habeas corpus order.

For these reasons, and those set forth more fully in the memorandum of points and authorities, the relief sought by plaintiff should be denied.

## III.    LEGAL STANDARD

### A. MOTION TO DISMISS STANDARD

To avoid dismissal a complaint must include, "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955, 1965 (2007). In deciding a Rule 12 (b) (6) motion, the factual allegations are liberally construed in favor of the non-moving party. *EEOC v. St. Francis Xavier ParochialSch.*, 117 F.3d 621, 625 (D.C. Cir. 1997). These factual allegations "must be enough to raise a right to relief above the speculative level . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Twombly*, 127 S. Ct. at 1965 (internal citations omitted).

Although the non-moving party enjoys the benefit of all inferences that reasonably can be drawn from the allegations in the complaint, bare conclusions of law—or sweeping and unwarranted averments of fact—will not be deemed admitted for purposes of a motion under Rule 12(b)(6). *Haynesworth v. Miller*, 820 F.2d 1245, 1254 (1987).

4

## B. SUMMARY JUDGMENT STANDARD

A motion for summary judgment should be granted if the moving party demonstrates that there are no genuine issues of material fact and that it is entitled to judgment as a matter of law. *Musa v. Continental Insurance Co.*, 644 A.2d 999, 1001-1002 (D.C. 1994); Rule 56(c), Fed. R. Civ. P.; *see Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986)*; Tao v. Freeh*, 185, 27 F.3d 635, 638 (D.C. Cir. 1994). In considering whether there is a triable issue of fact, the court must draw all reasonable inferences in favor of the non-moving party. *Anderson v. Liberty Lobby*, 477 U.S. 242, 255 (1986). The party opposing a motion for summary judgment, however, "may not rest upon the mere allegations or denials of his pleading, but ... must set forth specific facts showing that there is a genuine issue for trial." *Id.* at 248. The nonmoving party must do more than simply "show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574 (1986). Moreover, "any factual assertions in the movant's affidavits will be accepted as being true unless [the opposing party] submits his own affidavits or other documentary evidence contradicting the assertion." *Neal v. Kelly*, 295 U.S. App. D.C. 350, 963 F.2d 453, 456 (D.C. Cir. 1992) (quoting *Lewis v. Faulkner*, 689 F.2d 100, 102 (7th Cir. 1982)).

The mere existence of a factual dispute by itself is not enough to bar summary judgment. The party opposing the motion must show that there is a genuine issue of *material* fact. *See Anderson v. Liberty Lobby*, 477 U.S. at 247-48. To be material, the fact must be capable of affecting the outcome of the litigation; to be genuine, the issue must be supported by admissible evidence sufficient for a reasonable trier-of-fact to find in favor of the nonmoving party. *See, id., Laningham v. United States Navy*, 813 F.2d 1236, 1242-43 (D.C. Cir. 1987).

5

## IV.    LEGAL ARGUMENT

### A.  OFFICIAL CAPACITY IMMUNITY BARS PLAINTIFF'S CLAIMS AGAINST DIRECTOR BROWN

All claims against Director Brown in his official capacity should be treated as if they were brought against the District of Columbia itself.  *See, e.g., Kentucky v. Graham*, 473 U.S. 159, 165-66 (1985) ("[a]s long as the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity"); *Atchinson v. District of Columbia*, 73 F.3d 418, 424 (D.C. Cir. 1996) ("A section 1983 suit for damages against municipal officials in their official capacities is . . . equivalent to a suit against the municipality itself.").  Official capacity suits "generally represent only another way of pleading an action against an entity of which as officer is an agent." *Monell v. New York City Dept. of Social Services*, 436 U.S. 658, 690, n 55 (1978).  "It is not a suit against the official personally, for the real party in interest is the entity."  *Kentucky v. Graham,* 473 U.S. at 166 (citations omitted).  Since the District of Columbia is named as a defendant in the above-caption suit, Director Brown is not a proper party in interest and should be dismissed from suit.

### B.  PLAINTIFF FAILS TO STATE A CLAIM AGAINST DIRECTOR BROWN IN HIS INDIVIDUAL CAPACITY

"As a general rule, government officials may be sued in their individual capacities for constitutional violations only if they are directly responsible for the alleged violations." *Caldwell v. Hammonds*, 53 F. Supp. 2d 1, 9 (D.D.C. 1999); *see Arnold v. Moore*, 980 F. Supp. 28, 33-34 (D.D.C. 1997); *Price v. Kelly*, 847 F. Supp. 163, 169 (D.D.C. 1994), *aff'd*, 56 F.3d 1531 (D.C. Cir. 1995). Director Brown seeks dismissal of the complaint him in his individual capacity because the pleading fails to allege any specific unconstitutional or improper act/conduct

6

committed by him, and incorporates by reference herein Director Brown's declaration, attached

hereto as Exhibit "E," and made a part hereof.

Plaintiff does not allege that Director Brown had any personal involvement in the alleged

failure to timely release her. Personal participation is an essential allegation in a 42 U.S.C. §

1983 action. *See Bennett v. Passic,* 545 F.2d 1260, 1262-63 (10th Cir.1976). Here, allegations

setting forth any personal participation by Director Brown are wholly absent. To the contrary,

Director Brown declares under penalty of perjury that he had no such personal knowledge of her

incarceration. (Director Brown Dec. ¶ 3-6.)

Finally, exposing Director Brown to personal liability in these circumstances would be at

odds with the policies underlying the doctrine of qualified immunity. *See Harlow v. Fitzgerald,*

457 U.S. 800 (1982). The risk of personal liability would make it virtually impossible for

governments to fill positions such as those occupied by these individual defendants, as few

qualified persons would be willing to assume this responsibility with the accompanying risks of

liability.

### C. DIRECTOR BROWN IS ENTITLED TO QUALIFIED IMMUNITY AND ALL CLAIMS AGAINST HIM SHOULD BE DISMISSED

"[G]overnment officials performing discretionary functions generally are shielded from

liability for civil damages insofar as their conduct does not violate clearly established statutory

or constitutional rights of which a reasonable person would have known." *Harlow, supra at* 818;

*see Anderson v. Creighton,* 483 U.S. 635, 638 (1987) (noting that qualified immunity shields

government officials from liability for civil damages, "as long as their actions could reasonably

have been consistent with the rights they are alleged to have violated"); *Barham v. Ramsey,* 434

F.3d 565, 572 (D.C. Cir. 2006). "[W]hether an official protected by qualified immunity may be

held personally liable for an allegedly unlawful official action generally turns on the 'objective

7

reasonableness' of the action." *Anderson*, 483 U.S. at 639 (quoting *Harlow*, 457 U.S. at 819). The official's subjective good faith is not relevant in a qualified immunity analysis. *See Harlow*, 457 U.S. at 818.

An official protected by qualified immunity enjoys "*immunity from suit* rather than a mere defense to liability," which is "effectively lost if a case is erroneously permitted to go to trial." *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985) (emphasis in original). Thus, questions of immunity are matters of law for the Court to decide as early in the proceedings as possible. *See Saucier v. Katz*, 533 U.S. 194, 200-01 (2001); *Hunter v. Bryant*, 502 U.S. 224, 228 (1991) (per curiam).

To determine whether a party is entitled to qualified immunity, the Court must first determine whether, "[t]aken in the light most favorable to the party asserting the injury, [ ] the facts alleged show the officer's conduct violated a constitutional right." *Saucier*, 533 U.S. at 201. The "contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson*, 483 U.S. at 640. "At the first stage of the inquiry, 'courts must not define the relevant constitutional right in overly general terms, lest they strip the qualified immunity defense of all meaning.'" *Int'l Action Ctr. v. United States*, 365 F.3d 20, 25 (D.C. Cir. 2004) (quoting *Butera v. District of Columbia*, 235 F.3d 637, 646 (D.C. Cir. 2001)). The right must be defined, "to a degree that would allow officials reasonably to anticipate when their conduct may give rise to liability for damages." *Id.* (internal quotation marks, brackets, and citations omitted). Next, the Court must determine "whether the right was clearly established." *Saucier*, 533 U.S. at 201. "The Court should dismiss a claim against an individual official where he was not on notice that his conduct was unlawful." *Abdullah v. Washington*, 437 F. Supp. 2d 137, 141 (D.D.C. 2006) (citing *Briscoe v. Potter*, 355

8

F. Supp. 2d 30, 47 (D.D.C. 2004)).

The facts, as alleged, do not place Director Brown or any District Defendant on notice that the complained of conduct was unlawful. Plaintiff was held on a detainer based upon a Federal Parole Violation. "A detainer is a request filed by a criminal justice agency with the institution in which a prisoner is incarcerated, asking the institution either to hold the prisoner for the agency or to notify the agency when release of the prisoner is imminent. Detainers generally are based on outstanding criminal charges, outstanding parole- or probation-violation charges, or additional sentences already imposed against the prisoner." *Carchman v. Nash*, 473 U.S. 716, 719 (1985) (citations omitted).

This detainer at issue asked that the District of Columbia notify the agency when release of the prisoner was imminent. (See Exhibit "C"). The District carried out that ministerial duty.

Plaintiff admits that the detainer based upon a Federal Parole Violation Warrant and issued by the U.S. Parole Commission was presented to DOC by the U.S. Marshal Service on or about June 16, 2006. This Court may take judicial notice of the fact that the United States Parole Commission is authorized to issue such warrants. F.R.E. 201. The detainer was valid on its face, and issued by an authorized governmental entity. *See*, 28 CFR § 247 (a) ("When a parolee is serving a new sentence in a federal, state or local institution, a parole violation warrant may be placed against him as a detainer.")

Even assuming *arguendo* Director Brown knew of Wormley's detention, which he did not, he is still immune from suit on the reasonable belief that her continued detention was lawfully based upon a facially valid warrant. *See Gales v. District of Columbia,* 47 F. Supp. 2d 43, 47 (D.D.C. 1999) (Police officers who execute a search or arrest warrant that is later found to be defective have qualified immunity because they reasonably believed it to be a facially valid

warrant obtained by fellow officers) (citing *Salmon v. Schwarz*, 948 F.2d 1131, 1140-41 (10th Cir.1991)); *U.S. v. Jones*, 451 F. Supp. 2d, 71, 78 (D.D.C. 2006) (presumption of validity with respect to affidavits in support of search warrants) (citing *Franks v. Delaware*, 438 U.S. 154, 171 (1978)); *Green v. D.C.*, 710 F.2d 876, 878 (D.C. Cir. 1983) (arrest pursuant to presumptively valid ordinance was lawful even if ordinance later held to be invalid). Likewise, the reasonable belief that the warrant was valid blankets Director Brown with qualified immunity.

### D. COUNT XI OF THE COMPLAINT ALLEGING FALSE IMPRISONMENT FAILS TO STATE A CLAIM AGAINST DEVON BROWN AND JOHN OR JANE DOES 11-20

By definition, Plaintiff cannot sustain her claim alleging false imprisonment. As such, Count XI must be dismissed with prejudice.

In this jurisdiction, false imprisonment is defined as the restraint by one person of the physical liberty of another without consent or **legal justification**. *Faniel v. Chesapeake and Potomac Tel. Co. of Maryland*, 404 A.2d 147, 150 (D.C. 1979) (emphasis added); *Tocker v Great Atlantic & Pacific Tea Company*, 190 A.2d. 822, 824 (D.C. 1963) (false imprisonment is defined as unlawful detention **without a warrant**) (emphasis added); *Magwood v. Giddings*, 672 A.2d 1083, 1086 (D.C. 1996) (Where the District detains another with authority of law, it cannot be liable in tort for reasonable exercise of that authority.).

A facially valid warrant supported Plaintiff's detention, although Plaintiff alleges that it was procedurally flawed. (Complaint ¶ 27). Nevertheless, so long as a detainer is lodged against an inmate, the District cannot release that inmate. (Souverain Dec. ¶ 6). Director Brown, through the staff of DOC, was legally justified in continuing to hold Plaintiff until the warrant underlying the detainer was lifted.

10

### E. COUNT XII OF THE COMPLAINT ALLEGING NEGLIGENCE FAILS TO STATE A CLAIM AGAINST DEVON BROWN AND JOHN OR JANE DOES 11-20

Plaintiff artfully seeks to create a duty of care to support a claim for negligence; however, no recognized legal duty exists to assure that Plaintiff was accurately informed of the reasons for her detention or to assure that she was not incorrectly detained at CTF given the facially valid detainer based upon the federal warrant. (See Compl. ¶ 154, which incorrectly states such a duty was owed.)

Thus, Plaintiff fails to state a valid claim sounding in negligence. Neither District law nor the Restatement (Second) of Torts supports such a duty to discover or correct errors in facially valid detainers, sentencing orders, or warrants in the face of a facially legal justification for continued detention. See *McAllister v District of Columbia*, 653 A.2d 849, 852 (D.C. 1995) (No specific duty exists in D.C. law to discovery or correct sentencing order error). This federal court should not create a state law duty of care arising from these pendent state claims.

### F. PLAINTIFF'S DISTRICT OF COLUMBIA COMMON LAW CLAIMS IN COUNTS XI, XII, AND XIII ARE BARRED BY THE DOCTRINE OF SOVEREIGN IMMUNITY

The doctrine of sovereign immunity is well established in the District. Under the common law, "a municipality is immune from suit for decisions made pursuant to the exercise of discretion, but not for acts which are ministerial."[1] *Aguehounde v. District of Columbia*, 666 A.2d 443, 447 (D.C. 1995); *see District of Columbia v. Pace*, 498 A.2d 226, 228 (D.C. 1985);

---

[1]. Originally, the common law terms distinguishing actions which were immune from liability from those which were subject to liability were "governmental" and "proprietary." Over time, however, the terminology has evolved to the "discretionary" versus "ministerial" formulation. *Aguehounde v. District of Columbia*, 666 A.2d 443, 447 n. 6 (D.C. 1995).

*Wade v. District of Columbia*, 310 A.2d 857, 860 (D.C. 1973) (*en banc*). Whether a function is discretionary or ministerial, "is a question going to the subject matter jurisdiction of the trial court." *Aguehounde*, 666 A.2d at 447 (citing *District of Columbia v. North Wash. Neighbors, Inc.*, 367 A.2d 143, 148 n. 7 (D.C. 1976).

While "'characterizing an act as discretionary or ministerial is not always an easy task,' discretionary acts are generally defined as those acts involving the *formulation* of policy while ministerial acts are defined as those relating to the *execution* of policy." *Aguehounde*, 666 A.2d at 447 (*quoting McKethean v. WMATA*, 588 A.2d 708, 715 (D.C. 1991)) (emphasis added). Courts have held that discretionary functions must be immune from negligence actions, because policy decisions must be free from jury speculation. "In other words, allowing a court or jury to '[invade] the legitimate sphere of [a] municipality's policymaking processes' would infringe upon the powers properly vested in a coequal branch of government." *Id.* Actions that fall under the discretionary function exception "typically affect large numbers of people and 'call for a delicate balancing of competing considerations.'" *Pace*, 498 A.2d at 229 (*quoting Owen v. Independence*, 445 U.S. 622, 648 (1980)). Policy decisions are unlikely to benefit the public as a whole if they are tainted by the threat of individual lawsuits.

In 1995, the D.C. Court of Appeals set forth a two-prong test to determine whether a municipal act was discretionary and therefore immune from suit. *Aguehounde*, 666 A.2d at 447-48. The Court wrote, "[W]e first determine whether it is the kind of action 'that the discretionary function exception was designed to shield;' that is, whether the action involves 'the permissible exercise of policy judgment.'" *Id.* at 448 (*quoting Berkovitz v. United States*, 486 U.S. 531, 536-37 (1988)).

If the action did *not* involve the permissible exercise of policy judgment, it cannot be a discretionary function. However, the *Aguehounde* court wrote:

> If that answer to this first inquiry is yes, then the action is immune from suit, unless the government has adopted a "statute, regulation or policy [that] specifically prescribes a course of action for an employee to follow." If such a specific directive exists which removes the otherwise unfettered discretion of the government employee, the action is ministerial, opening the government to suit if not performed correctly. *Aguehounde*, 666 A.2d at 448.

Thus, under the *Aguehounde* test, a discretionary function is one that involves the permissible exercise of policy judgment that is not controlled by statutory or regulatory requirements. *Id.; Pace*, 498 A.2d at 229; *Chandler v. District of Columbia*, 404 A.2d 964, 966 (D.C. 1979).

Decisions to release convicts fall squarely within the crosshairs of the *Aguehounde* test. 666 A.2d at 448. First, incarceration or release for criminal acts is the type of function intended to be shielded by the discretionary immunity doctrine. Competing policy decisions involve balancing several competing public interests, including citizen safety, the inmate's good behavior or earned "good time" credits, prison inmate population caps, recidivism, and prisoner rehabilitation, to name a few. Such decisions are intended to benefit the public as a whole.

Plaintiff fails to point to any specific directive exists which removes the otherwise unfettered discretion of the District Defendants. *Aguehounde*, 666 A.2d at 448. Thus, the discretionary act or omission of retaining Wormley in jail until notification that the warrant was cleared was a protected discretionary function, for which the District Defendants are immune.

Assuming *arguendo* such a specific directive exists which "removes the otherwise unfettered discretion" of the District Defendants; such authority derives from the face of the detainer holding Ms. Wormley. The facially valid warrant commanded a ministerial act of the District Defendants. That act was to affirmatively hold a criminal. Failure to hold her would

13

open the District government to suit, if not performed. The District Defendants complied with the ministerial duty imposed by the detainer on its face. To do otherwise, could jeopardize its law abiding citizens to further crimes of the released offender prior to rehabilitation.

### G. PLAINTIFF'S DISTRICT OF COLUMBIA COMMON LAW CLAIM ALLEGING THE DISTRICT'S VICARIOUS LIABILITY ON THE BASIS OF RESPONDEAT SUPERIOR IN COUNT XIII IS BARRED

It is hornbook law that *respondeat superior* is the legal principle that an employer is generally responsible for the mistakes of his or her employees. The doctrine involves holding one person or entity responsible for the actions of another because of the relationship between the two, otherwise known as vicarious liability. *Morehouse v. D.C.*, 747 A.2d 138, 146, (D.C. 2000). As a factual matter, however, no D.C. employee made a mistake by holding Plaintiff pursuant to a facially valid detainer based upon a federal warrant. No D.C. employee failed in their duty to accurately inform Plaintiff of the reasons for her detention since no such duty exists. Lastly, if Ms. Wormley was incorrectly detained at CTF, she also was informed of procedural safeguards to vet her complaints, such as the Inmate Grievance Procedure. Nowhere does she allege that she used this procedure or demanded a writ of habeas corpus. Thus, no cause of action for vicarious liability may be sustained against the District.

Additionally, District Defendants repeat their factual contentions and defenses set forth in Sections IV.A through F of this memorandum of points and authority, which grant them immunity from suit, and obviate vicarious liability claims against the District of Columbia.

### H. PLAINTIFF'S CONSTITUTIONAL CLAIMS ALLEGING OVERDETENTION, UNLAWFUL SEARCH AND SEIZURE AND DELIBERATE INDIFFERENCE AGAINST THE DISTRICT OF COLUMBIA FAIL TO STATE A CLAIM

Plaintiff asserts a claim under 42 U.S.C. § 1983 against the District of Columbia for overdetention, unlawful search and seizure, and deliberate indifference, alleged to be secured by

14

the Fourth, Fifth, and Eighth Amendment to the U.S. Constitution (see Count XVI). In Count XVI, Plaintiff also alleges that the District was deliberately indifferent to the lack of proper training or supervision of its officers and employees, and the officers and employees of its agent, Defendant, Corrections Corporation of America (CCA). For the reasons set forth more fully below, these claims should be dismissed with prejudice.

### 1.    *Plaintiff Fails to State a Viable § 1983 Claim*

To state a claim under 42 U.S.C. § 1983, the complaint must allege facts sufficient to show that the conduct of which plaintiff complains (1) was committed by a person acting under color of state law, and (2) deprived plaintiff of a right secured by the Constitution and laws of the United States. *See, e.g., West v. Atkins*, 487 U.S. 42, 48 (1988). "[A] municipality can be found liable under § 1983 only where the municipality *itself* causes the constitutional violation at issue." *City of Canton v. Harris*, 489 U.S. 378, 385 (1989) (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978)) (emphasis in original). "[A] municipality's liability under section 1983 . . . cannot rest on a *respondeat superior* theory," *id.* at 420, such that a municipality "cannot be held liable *solely* because it employs a tortfeasor." *Monell*, 436 U.S. at 691.

In defense, the District Defendants aver that neither the District of Columbia government nor the individual District Defendants caused the constitutional violation at issue, assuming a constitutional violation occurred. There is no constitutional right "in accurately notifying inmates of the reasons for their incarceration, [or] the length of their incarceration." (Compl. ¶ 175), for which the District is alleged to have failed to train its employees and agents. The District Defendants notify inmates of their rights to due process in the Inmate Handbook, publishing policies, and granting access to the law library (Allen Dec. ¶ 7).

15

Director Brown had no actual or constructive knowledge that Wormley was a prisoner or the terms of her continued incarceration. (Brown Dec ¶ 3-6). Thus, he is immune from these constitutional claims.

There is no common law or constitutional duty, custom or policy to inquire beyond the face of the order, warrant or detainer, and no such duty, custom or policy should be implied or required by this Court.

### 2. The District of Columbia Defendants Were Not Deliberately Indifferent to Plaintiff's Late Release Based on a Facially Valid Warrant

District Defendants were neither deliberately indifferent with respect to the period of time that Ms. Wormley was incarcerated based upon the facially valid detainer nor the brief period of time related to her outprocessing of any related detainers, orders, holds or warrants. In fact, the District released Ms. Wormley on the same date that it received clearance of the federal detainer.

In *Daniels v. Williams*, 474 U.S. 327, 331 (1986) the Supreme Court recognized that "[H]istorically, [the] guarantee of due process has been applied to the *deliberate* decisions of government officials to deprive a person of life, liberty, or property." (citations omitted.) (emphasis in original). Deliberate indifference has been described as possession of "actual knowledge of impending harm, easily preventable, so that a conscious, culpable refusal to prevent harm could be inferred from [a] failure to prevent it." *Young v. Quinlan*, 960 F.2d 351, 360 n. 22 (*quoting Henderson v. DeRobertis,* 940 F.2d 1055, 1060 (7th Cir. 1991). In *Farmer v. Brennan*, 511 U.S. 825, 834 (1994), the Supreme Court defined the meaning of deliberate indifference, and held that a prison official, "must both be aware of facts from which the inference could be drawn that a substantial risk of harm exists, and he must also draw the inference."

16

The facts as alleged in the complaint show no deliberateness of the District preventing Ms. Wormley's exercise of due process rights or failure to supervise or train employees. The crux of Plaintiff's claim would have the District's DOC and all other penological institutions performing a daily check to ensure each inmate's claim of innocence or overdetention was validated by extant orders, warrants, holds, or detainers. To obviate this administrative burden, jails and prisons across this country instituted inmate grievance procedures for an orderly disposition of claim validity. F.R.E. 201. For extreme instances of wrongful incarceration, there are habeas corpus hearings before state or federal judges on a daily basis. It is not the "deliberativeness" of the District Defendants' policies or failure to train employees that is at the root of Plaintiff's alleged injuries, if any.

### 3. The District of Columbia Defendants Were Not Deliberately Indifferent to Plaintiff for the Three Day Period beginning March 16, 2008 because the District is Lawfully Permitted a Reasonable Period to Outprocess Inmates

The legal standard for municipal liability under § 1983 for analyzing Plaintiff's three day overdetention claim is deliberate indifference. Case law analyzing overdetention claims recognize that a period of time to clear warrants, detainers, and holds of other jurisdictions is reasonable. *Brass v. County of Los Angeles*, 328 F.3d 1192 (9th Cir. 2003); *Berry v. Baca*, 379 F.3d 764 (9th Cir. 2004).

In *Berry*, plaintiff prisoners alleged a policy of deliberate indifference to their constitutional rights that resulted in unlawful periods of detention in jail after a court had authorized release. The periods of detention ranged from twenty-six to twenty-nine hours after court-ordered release from jail. The District Court, following the prior decision in *Brass*, found that the County's challenged policies did not result in a violation of plaintiffs' constitutional rights.

17

The Ninth Circuit reversed and remanded the District Court in *Berry*; however, on remand, the District Court ultimately granted summary judgment for the sheriff. *Mortimer v. Baca*, 478 F. Supp.2d 1171 (C.D. Ca. 2007). In so finding, the court noted that, "evidence of deliberate indifference as a custom must be shown by 'practices of sufficient duration, frequency, and consistency that the conduct has become a traditional method of carrying out policy.'" *Id.* at 1178. In granting summary judgment for the defendant, the court took into consideration that defendant processed tens of thousands of detainees every year, the total number (51,000) of individuals released during the class period, and the fact that each has court-related and administrative paperwork that must be processed in order to ensure that the release was proper. It also took into consideration that steps had been taken to reduce the number of potential over-detentions and the fact that the number had dramatically decreased. Of the 51,000 releases during the class period, 43 potential over-detentions were deemed reasonable and did not constitute a *Monell, supra,* deliberate indifference claim. *Id.*

In *Brass*, the plaintiff was held for thirty-nine hours after the court ordered his release. 328 F.3d at 1194. Brass' primary claim focused on the County's policy of releasing prisoners pursuant to court order only after the completion of processing for all inmates scheduled for release that day. *Id.* at 1198. Brass also challenged the County's practice of beginning the processing of releases only after all information relating to prisoners scheduled for release on a particular day had been received and entered into the computer system. *Id.*

In *Brass*, the Ninth Circuit affirmed the district court's grant of summary judgment in favor of the County, although acknowledging that over-detention after court-ordered release has the potential to violate constitutional rights. *Id.* at 1200 ("Brass may have had a due process right to be released within a reasonable time after the reason for his detention ended." *Id.* at

1200). Under the facts presented in *Brass*, however, the Ninth Circuit found that the specific contested policies could not have caused deprivation of constitutional rights. As to the first policy, the court held that Brass "did not have a constitutional right to have his release papers processed in any particular order * * *." *Id.* As to the second challenged policy, the Ninth Circuit held that the County's release program -- its policy of not starting to process a particular day's releases until it had received all information, including wants and holds, relating to prisoners scheduled for release -- did not violate Brass' constitutional rights and was reasonable and justified in light of the County's responsibilities and problems in processing the large number of prisoner releases it handles. *Id.* at 1201.

The Ninth Circuit, in *Brass*, noted that delays are inevitable while the County copes with the everyday problems of processing the release of a large number of prisoners. *Id.* at 1202; *see, County of Riverside v. McLaughlin*, 500 U.S. 44 (1991) (the United States Supreme Court sanctioned a 48-hour delay between a warrantless arrest and a probable-cause hearing). The Ninth Circuit noted, however, that "[i]t is unclear * * * whether the 48-hour period applied to probable cause determination is appropriate for effectuating the release of prisoners whose basis for confinement has ended. One might conclude that when a court orders a prisoner released -- or when, for example, a prisoner's sentence has been completed -- the outer bounds for releasing the prisoner should be less than 48 hours." *Brass* at 1202.

The Court in *Riverside* stated: "In *Gerstein v. Pugh*, 420 U.S. 103 (1975), this Court held that the Fourth Amendment requires a prompt judicial determination of probable cause as a prerequisite to an extended pretrial detention following a warrantless arrest. This case requires us to define what is 'prompt' under Gerstein." *Id.* at 47. The Court then recognized that "some delays are inevitable" where jurisdictions "incorporate probable cause determinations into other

pretrial procedures ….[T]here will be delays caused by the paperwork and logistical problems. Records will have to be reviewed, charging documents drafted, appearance of counsel arranged, and appropriate bail determined." *Id.* at 55.  The Court concluded that a jurisdiction that provides judicial determinations of probable cause within 48 hours of arrest will, as a general matter, comply with the promptness requirement of *Gerstein* and such jurisdictions will be immune from systemic challenges. *Id.* at 56.

Proceeding from this backdrop, Ms. Wormley fails to state a claim for overdetention. There was an escaped prisoner charge still on her records at the time the District received notice that the Federal Detainer was lifted. (Souverain Dec. ¶ 12-13). The District cannot release an escaped prisoner without clearing all warrants, holds, and detainers. (*Id.* at ¶ 6). The District received a facsimile from the U.S. Marshal, which advised the District that the warrant was cleared. A true and correct copy of the facsimile cover sheet is attached hereto as Exhibit "B" and made a part hereof. ). The cover sheet enclosed "[t]he Sentry Computation, which states that inmate Wormley DC # 226-899 released from her escape charge on 6/21/06, the day she came into DC Jail for a Superior Court matter, violation of a protection order.") (*Id.*) The date and time stamped on the facsimile cover sheet is March 19, 2007 14:41 P.M., the date that the District released Ms. Wormley. Release on the same date that warrants are cleared is not deliberative indifference.

Plaintiff's constitutional argument fails also on the basis that her release was not based on any policy or lack thereof; notwithstanding her artful attempt to create a tort duty of care. Plaintiff's release date was delayed based solely on a facially valid warrant. Plaintiff fails to state a valid claim for overdetention as a matter of law.

### 4.   The District of Columbia Defendants Violated no Clearly Established Law, Custom or Policy

The District of Columbia is subject to liability under § 1983 only "when an official policy or custom causes the complainant to suffer a deprivation of a constitutional right." *Carter v. District of Columbia*, 795 F.2d 116, 122 (D.C. Cir. 1986). The policy or custom itself must be the moving force behind the constitutional violation. *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 817 (1985) (plaintiff must show course deliberately pursued by city establishing affirmative link between city's policy and alleged constitutional violation).

Admittedly, the District has a policy or custom to detain inmates if a facially valid court order, warrant, or detainer is lodged. (Souverain Dec. ¶ 6, "So long as a detainer is lodged against an inmate, the District cannot release the inmate."). Admittedly, the District trains its employees not to release inmates into the community in the face of such an order, detainer or warrant.

Neither the District nor its employees, however, are responsible for validating all warrants, detainers or court orders served daily on DOC. The District has no affirmative constitutional duty to confirm the validity of facially valid orders, detainers or warrants. This Court, moreover, should not impose such a constitutional duty to affirmatively check each and every facially valid warrant, detainer or order for validity for good reason. Such a holding will have a pervasive effect on all penological and law enforcement agencies by creating a duty that does not now exist, and wreaking administrative havoc by the additional burden of paperwork, computer checks, and interagency communications.

21

### 5. *Plaintiff Fails to State a Viable § 1983 Claim Pursuant to the Fourth Amendment to the U.S. Constitution*

The District Defendants' reasonable belief that her continued detention was lawfully based upon a facially valid warrant bars Plaintiff's claims under the Fourth Amendment. *See Gales v. District of Columbia*, 47 F. Supp. 2d 43, 47 (D.D.C. 1999) (Police officers who execute a search or arrest warrant that is later found to be defective have qualified immunity because they reasonably believed it to be a facially valid warrant obtained by fellow officers) (citing *Salmon v. Schwarz*, 948 F.2d 1131, 1140-41 (10th Cir.1991)); *U.S. v Jones*, 451 F. Supp. 2d, 71, 78 (D.D.C. 2006) (Presumption of validity with respect to affidavits in support of search warrants) (citing *Franks v. Delaware*, 438 U.S. 154, 171 (1978)); *Green v. D.C.*, 710 F.2d 876, 878 (D.C. Cir. 1983) (arrest pursuant to presumptively valid ordinance was lawful even if ordinance later held to be invalid).

### 6. *Plaintiff Fails to State a Viable § 1983 Claim Pursuant to the Eighth Amendment to the U.S. Constitution*

Not every alleged action by state actors rises to the level of a constitutional violation. The Eighth Amendment prohibits punishments that involve the unnecessary and wanton infliction of pain, or punishment, which is grossly disproportional to the severity of the crime for which an inmate is imprisoned, or which is totally without penological justification. *See Rhodes v. Chapman,* 452 U.S. 337, 346 (1981). Not every governmental action affecting the interests of a prisoner is subject to Eighth Amendment scrutiny. *See, Whitley v. Alberts*, 475 U.S. 312, 319 (1986). "It is obduracy and wantonness . . . that characterize the conduct prohibited by the Cruel and Unusual Punishment Clause . . ." *Id.* at 319.

Moreover, the Supreme Court has cautioned federal and state courts against enlarging the "commodious contours of section 1983 of the Fourteenth Amendment so as to displace state

law." *See, e.g., Daniels v. Williams*, 474 U.S. 547 (1981), *Paul v. Davis*, 424 U.S. 693, 701

(1976).   Thus, the mere fact that the alleged conduct was performed by a state actor does not

support its characterization as a constitutional wrong. *See Daniels*, 474 U.S. at 530-532.   Rather,

it is grievous and flagrant governmental abuse which demands a constitutional response. *See*

*Davis v. Butcher*, 853 F.2d 718, 721 (9th Cir. 1988).

The District had a "penological justification" to detain Ms. Wormley. *See Rhodes v.*

*Chapman, supra.*   No facts alleged by Plaintiff rise to the level of obdurancy or wantonness

prohibited by the Eighth Amendment's proscriptions.

## I.   THERE IS A PRESUMPTION OF VALIDITY IN COURT ORDERS, WARRANTS, AND DETAINERS

This Court should find that there is a presumption of validity in the detainer that was

lodged against Ms. Wormley, and that Plaintiff has not, and cannot, sufficiently overcome or

rebutted that presumption.   In fact, this Court should hold that all District Defendants are

immune from suit on Plaintiff's § 1983 false imprisonment claim, based upon exercise of their

discretionary capacity.

Established law holds that a jailer cannot be held liable for errors in a warrant of

commitment fair and valid on its face. *U.S. ex rel. Bailey v O'D. Askew*, 486 F.2d 134, 135 (5th

Cir. 1973); *Peacock v Mayor and City Council of Baltimore*, 199 F. Supp. 2d 306, 305 (2002)

("A jailor cannot be held liable for an error in an order of commitment which is patently proper,"

citing, *Whirl v. Kern*, 407 F.2d 781, 791 *cert. denied*, 396 U.S. 901 (5th Cir. 1969); *Francis v.*

*Lyman*, 216 F.2d 583 (1 Cir. 1954).

23

### J.  PLAINTIFF'S FAILURE TO EXHAUST HER ADMINISTRATIVE REMEDIES BARS RELIEF IN THIS ACTION

Plaintiff cannot prevail since she failed to exhaust his administrative remedies as required

by the Prison Litigation Reform Act, 42 U.S.C. § 1997e (a) ("PLRA").  Thus, as a matter of law,

these claims must be dismissed.  The PLRA requires inmates to exhaust administrative remedies

before bringing a lawsuit under 42 U.S.C. § 1997e(a):

> No action shall be brought with respect to prison conditions  under § 1979
> of the revised Statutes of the United States (42 U.S.C. § 1983), or any other
> Federal law, by a prisoner confined in any jail, prison, or other correctional
> facility until such administrative remedies as are available are exhausted.

The exhaustion requirement promotes important interests, which include:

> deference to Congress' decision that independent administrative tribunals,
> not courts, should serve as the initial forum for dispute resolution; (2)
> respect for administrative autonomy by minimizing unnecessary judicial
> intervention; and (3) judicial economy by resolving complaints or setting
> forth findings of fact.[2]

The exhaustion requirement applies to all inmate suits about prison life, whether they

involve general circumstances or particular episodes, or whether they allege excessive force or

some other wrong."[3]  The United States Supreme Court clarified that even inmates seeking only

monetary relief must properly complete a prison administrative process that could provide some

sort of relief, even if not monetary, before filing a § 1983 claim.  *Woodford v. Ngo*, 126 S. Ct.

2378, 2380 (2006); *see also Booth v Churner*, 532 U.S. 731 (2001) (dismissing the claims of an

inmate who failed to exhaust all available administrative remedies.).

Inmates are advised of the grievance process immediately upon commitment in the

Inmate Handbook, which each inmate receives.  A true and correct copy of the Inmate Handbook

---

[2] *See Terrell v. Brewer*, 935 F.2d 1015, 1019 (9th Cir. 1991)
[3] *See Jeanes v. United Stated Dep't of Justice*, 231 F. Supp. 2d 48, 50-51 (D.D.C. 2002)

is attached hereto as Exhibit "F" and made a part hereof. The Handbook advises the inmate of the Inmate Grievance Procedure, a copy of which is appended to the Joyce Allen affidavit, Exhibit "D").

Plaintiff was housed at CTF, a correctional facility administered by contract with CCA. The DOC Inmate Grievance Procedure recognizes the CCA policy regarding exhaustion by stating:

> Inmates housed in contract prison facilities shall use the contractor's grievance process, noting the contractor to be responsible for day-to-day operations within the affected facility. Inmates housed in contract prison facilities shall only file a grievance with the DOC when grievance appeal steps within the contractor's grievance process have been exhausted.

*(Id.* at ¶ 3.b.).

A CCA employee with personal knowledge has sworn under oath that Wormley failed to exhaust her administrative remedies while incarcerated at CTF. (*See* Affidavit of Joyce Allen ¶¶ 1-13, attached hereto as Exhibit "D" and made a part hereof.). Ms. Allen specifically reviewed the Inmate Grievance Log Book, and reports that it, "does not reflect that inmate Wormley submitted any grievance during her commitment at this facility [CTF]." (*Id.* at ¶ 13). Plaintiff failed to exhaust her statutorily required process, and for that, this Court has no recourse but to dismiss the claims.

### K. PLAINTIFF'S FAILURE TO SEEK THE EXTRAORDINARY WRIT OF HABEAS CORPUS BARS RELIEF IN THIS ACTION

Established law provides that, "an error in [ ] sentence should be corrected by habeas corpus proceedings in the state courts." *U.S. ex rel. Bailey v O'D. Askew, supra* (citing *Preiser v. Rodriguez,* 411 U.S. 475 (1973)). Yet Plaintiff Wormley failed to avail herself of this legislatively created judicial remedy. She should not now be heard to complain.

### L.  NON-CONSTITUTIONAL PENDENT CLAIMS BASED UPON D.C. LAW SHOULD BE DISMISSED

Absent continued viability of constitutional or federal statutory claims, this Court may decline to exercise supplemental jurisdiction over the common law claims asserted by the Plaintiff. *See* 28 U.S.C. § 1368(c)(3). Furthermore, the Supreme Court has written that, once federal claims have been dismissed, a District Court *should* dismiss pendent state law claims. *United Mine Workers of America v. Gibbs*, 383 U.S. at 726; *see also Gaubert v. Gray*, 747 F. Supp. 40, 50 (D.C. Cir. 1990).

In *Gaubert*, the D.C. District Court dismissed the plaintiff's constitutional claims on the grounds of qualified immunity. *Id.* Noting that "pendent jurisdiction is a doctrine of discretion, not of plaintiff's right," the court also dismissed the plaintiff's four common law claims. *Id.* Citing the Supreme Court's decision in *United Mine Workers of America v. Gibbs*, 383 U.S. at 726, the District Court wrote:

> Needless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law. Certainly, if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well.

*Gaubert*, 747 F. Supp. at 50. Here, the Plaintiff's claims do not rise to the level of a constitutional violation. As such, the Plaintiff's common law claims should be dismissed.

### M. DEFENDANTS JOHN OR JANE DOES 11-20 SHOULD BE DISMISSED FROM SUIT ON COUNTS XI, XII, AND XIV

Plaintiff fails to properly identify "Defendants John or Jane Does 11-20" as responsible for false imprisonment (Count XI), Negligence (Count XII) or constitutional claims (Count XIV). Thus, these unnamed Defendants should be dismissed. Federal Rule of Civil Procedure

4(m) provides that defendants shall be served "within 120 days after the filing of the complaint," and, if such service has not been timely effected, the Court "shall dismiss the action without prejudice as to the defendant or direct that service be effected within a specified time."

Federal Rules of Civil Procedure 12(b)(4) and 4(m) require dismissal of unidentified "John or Jane Doe" defendants since service of process is lacking and this Court lacks personal jurisdiction. *Olanyi v District of Columbia,* 416 F. Supp. 2d 43, 50 (D.D.C. 2006); *M.K. v. Tenet*, 99 F. Supp. 2d 12, 17 (D.D.C. 2000).

### N.  SUMMARY JUDGMENT SHOULD BE GRANTED IN FAVOR OF THE DISTRICT DEFENDANTS ON PLAINTIFF'S CLAIM FOR PUNITIVE DAMAGES

Plaintiff asserts a claim for punitive damages. (Compl., Prayer for Relief ¶ 190). District Defendants seek summary judgment on this issue.

As a matter of law, a plaintiff cannot recover punitive damages against the District on a § 1983 claim. *Feirson v. Dist. of Columbia*, 315 F.Supp.2d 52, 57 (D.D.C. 2004); *see also* City of *Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 271 (1981) (punitive damages are not available against a municipality absent an express statutory provision). Thus, the punitive damage claim against the District government should be dismissed.

Plaintiff also seeks punitive damages against Director Brown and Defendants John or Jane Does 11-20. (Compl., Prayer for Relief ¶ 190).   However, Plaintiff alleges no facts against the individual defendants supporting the required conduct "motivated by evil motive or intent, or [ ] involve[ing] reckless or callous indifference to the federally protected rights of others." *Smith v. Wade*, 461 U.S. 30, 56 (1983).   Named District Defendant, Director Devon Brown, never had contact with Eloise Wormley while she was incarcerated or at any other time. (Brown Dec. ¶¶ 3-

6). He had no specific familiarity with Ms. Wormley, and did not specifically give orders with respect to her incarceration or release from incarceration. (*Id.*). Furthermore, he had no specific knowledge of her sentence, terms of incarceration, judgments or commitment orders, or release orders from court until he received a copy of the above-captioned complaint. (Director Brown *Id.*). He was not present when Ms. Wormley was imprisoned, held, or released from incarceration. He did not order her release, and he was not involved in the release process. (*Id.*). Lastly, Director Brown does not have, nor has he ever had any personal animus or subjective intent to harm Ms. Wormley. (*Id.*). On these facts, Director Brown should be granted summary judgment on any claims for punitive damages.

Plaintiff has prayed generally for punitive damages; however, District of Columbia law does not allow punitive damages for negligence claims. *Oliver v. Mustafa*, 929 A.2d 873, 878 (D.C.2007) (noting that punitive damages are allowed only for intentional torts and only if plaintiff shows, by clear and convincing evidence, that the tort was aggravated by egregious conduct and a state of mind that justifies punitive damages). Again, plaintiff's pleadings and the declarations submitted to this Court obviate the ability to sustain any "state of mind" of the District Defendants which would justify imposition of punitive damages. Accordingly, to the extent that the plaintiff prayed for punitive damages in conjunction with her claim for negligence or the intentional tort of false imprisonment, that relief should be denied.

## V.    CONCLUSION

For all the reasons set forth above, Plaintiff's complaint should be dismissed with prejudice. In the alternative, District Defendants should be granted summary judgment on all claims alleged by Plaintiff.

Respectfully submitted:

PETER NICKLES
Acting Attorney General for the District of Columbia

GEORGE C. VALENTINE
Deputy Attorney General
Civil Litigation Division

ELLEN EFROS [250746]
Chief, Equity Section I

/s/ Denise J. Baker
Denise J. Baker
D.C. Bar No. 493414
Assistant Attorney General
441 4th Street, Northwest, 6th Floor South
Washington, D.C. 20001
202-442-9887 (Telephone)
202-727-0431 (Facsimile)
Denise.baker@dc.gov

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| ELOISE T. WORMLEY,<br><br>      Plaintiff,<br><br>      v.<br><br>THE UNITED STATES OF AMERICA,<br> et al. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)     Civil Action No. 08-00449-CKK |

## DISTRICT DEFENDANTS' STATEMENT OF MATERIAL FACTS TO WHICH THERE IS NO GENUINE ISSUE OF DISPUTE

Pursuant to Federal Rule of Civil Procedure, District Defendants, by and through undersigned counsel, hereby respectfully submit this Statement of Material Facts ("DSMF") as to which there is no Genuine Dispute in the above-captioned case.

1.      Ms. Wormley claimed that she was over-detained at the Correctional Treatment Facility (CTF) managed by Correctional Corporation of America (CCA) from October 19, 2006 to March 16, 2007, and wrongfully detained at the Central Detention Facility (CDF), a jail run by the District government, from March 16, 2007 to March 19, 2007.

2.      Kathy Souverain, a District of Columbia Correctional Program Administrator at the D.C. Department of Corrections reviewed Ms. Wormley's inmate records. Ms. Wormley's record reference number is DCDC 226-899. (Kathy Souverain Dec. ¶2-3)

3.      Ms. Wormley's inmate records indicate that she was committed to DC custody on June 15, 2006 in criminal case 2005 DVM 000846, and held without bond. (Souverain Dec. ¶ 5).

4.      On June 16, 2006, the Records Office received a United States Probation Violation (USPV) detainer from the United States Marshal Service (USM). So long as a detainer is lodged against an inmate, the District cannot release the inmate. (Souverain Dec. ¶ 6).

5.      On June 21, 2006, inmate Wormley appeared in D.C. Superior Court and returned with a Judgment and Commitment Order (J&C) in criminal case 2005 DVM 000846 sentencing her to a period of one hundred thirty-five (135) days consecutively. Also, Wormley's probation was revoked. (Souverain Dec. ¶ 7).

6.      On July 26, 2006, a sentence computation was prepared for inmate Wormley, and Records Office staff arrived at a projected release date of October 21, 2006. (Souverain Dec. ¶ 8).

7.      Even though the sentence computation for criminal case 2005 DVM 000846 projected a release date of October 21, 2006, on expiration of that sentence, Wormley was still subject to the parole detainer lodged against her in June 2006 by the U.S. Marshal Service in execution of a parole violation warrant. (Souverain Dec. ¶ 6).

8.      The detainer, based on federal parole violation warrant, and filed against Ms. Wormley, required that, "[P]rior to the subject's release from your custody, please notify this office at once so that we may assume custody of the subject if necessary.") (Exhibit "C," Federal Detainer).

9.      Three days prior to expiration of Ms. Wormley's sentence for criminal case 2005 DVM 000846, the District notified the U.S. Marshall Service of Ms. Wormley's impending sentence termination. On October 18, 2006, the D.C. Department of Corrections Records Office sent a fax to the United States Marshal Service to inform them that inmate Wormley's sentence will expire on October 21, 2006, and her detainer needed to be executed by submitting a "come up" for October 19, 2006. (Souverain Dec. ¶ 9).

10.    In response to the District's notice of impending termination of the criminal case 2005

DVM 000846 sentence, the USMS sent, and the D.C. Department of Corrections Records Office

received, a USM-41 form, dated October 19, 2006, to place inmate Wormley "IN TRANSIT

HOLD PENDING FEDERAL DESIGNATION." So long as the "transit hold" was lodged

against inmate Wormley, the District DOC Records Office had no authority to release inmate

Wormley. (Souverain Dec. ¶ 10).

11.    On March 16, 2007, the Correctional Treatment Facility Records Office received a faxed

USM-41 form dated March 15, 2007 from the USM to "LIFT USMS DETAINER DATED 06-

16-2006." (Souverain Dec. ¶ 11).

12.    However, during the interim between the October 19, 2006 "in transit hold" and the

March 16, 2007 "lift USMS detainer" inmate Wormley, reportedly, escaped from custody. On

June 2, 2006, inmate Wormley escaped from Fairview Community Center. As a result of her

escape, release documents were needed to effectuate her sentence computation and release.

(Souverain Dec. ¶ 12).

13.    It was not until March 19, 2007 that the D.C. DOC Record's Office received release

documents from the U.S. Marshal Service clearing Wormley's outstanding charges. (Souverain

Dec. 13; Exhibit "B," facsimile from the U.S. Marshal Service).

14.    Once the Records Office received inmate Wormley's sentence computation reflecting

that she was released from her escape charge from USMS, inmate Wormley was immediately

released from DOC custody on March 19, 2007. (Souverain Dec. ¶ 13).

15.    A Facility Grievance Officer at the Correctional Treatment Facility ("CTF") operated by

the Corrections Corporation of America ("CCA") reviewed Ms. Wormley's inmate file for the

period in which she was held at CTF. (Joyce Allen Affidavit ¶¶ 1 and 3).

16.    The CTF Facility Grievance Officer's review of Ms. Wormley's file indicates that at no time did Ms. Wormley request an inmate grievance.    (Allen Affidavit ¶¶ 5 and 13).

17.    The inmate grievance procedure contained in CCA Policy 14-5 (attached to the Joyce Allen Declaration was in effect at the time of Eloise Wormley's detention at CTF.  (Allen Affidavit ¶ 6; Exhibit "E," Inmate Grievance Procedure).

18.    Upon detainee or inmate arrival at the CTF facility, CCA provides an Inmate Handbook, which contains a summary of the facility grievance policies and procedures.  Additionally, inmates have access to the complete grievance policy at the CTF Law Library or through facility staff.  (Allen Affidavit ¶ 7).

19.    In order for an inmate or detainee to exhaust his or her administrative remedies, she should follow the facility grievance procedures and carry the grievance through to its finish. Prior to pursuing the formal grievance process, inmates and detainees should first avail themselves of the Informal Resolution Process by submitting an Inmate Request Slip or speaking with any staff member concerning the issue.  If the complainant is dissatisfied with that result, only then may the formal process be initiated.  At CTF, the formal grievance process contains four (4) steps:

    a.  Inmates must send an initial grievance requests on the CCA Inmate/Resident Grievance Form (Form 14-5A) to the Grievance Officer within seven (7) days of the alleged incident.  The time for filing begins from the date the problem or incident became known to the inmate/resident. (Step One)

    b.  If the inmate finds the response unsatisfactory, he or she may appeal to the Warden within five (5) days of receipt of the Facility Grievance Officer's decision

by completing the Request for Warden/Administrator Review portion of the Grievance Form. (Step Two).

    c. If the inmate is unsatisfied with the Warden's response, he or she may appeal to the District of Columbia Department of Corrections Contract Monitor within five (5) days of receipt of the Warden's response. (Step Three).

    d. The inmate may then appeal the Contract Monitor's determination directly to the Director of the District of Columbia Department of Corrections within five (5) days of receipt of the Contract Monitor's decision. (Step Four).

(Allen Affidavit ¶ 8).

20.    If an inmate fails to follow this procedure or omits any part of it, he or she has not exhausted the administrative remedies available. If an inmate or detainee fails to cooperate with the investigation process, he or she has failed to carry the grievance through to its finish, and has thus failed to exhaust the administrative remedies available. (Allen Affidavit ¶ 9).

21.    The Grievance Policy includes procedures for inmates/residents to file Emergency Grievances. Grievances may be considered Emergency Grievances if the subject matter of the grievance is such that compliance with the regular time guidelines would subject the grievant to risk of personal injury. If the grievant asks that the grievance be considered an emergency and details the basis for needing an immediate response, the Facility Grievance Officer, will within twenty-four (24) hours review the grievance to determine if an emergency exists. If an emergency exists, the Facility Grievance Officer will take initial action to resolve the grievance within twenty-four (24) hours of receipt. After initial action has been taken and within seventy-two (72) hours of receipt of the emergency grievance, the Facility Grievance Officer will prepare and issue a written decision to the grievant. (Allen Affidavit ¶ 10).

22.    Joyce Allen, the CTF Facilities Grievance Officer, reviewed the grievance log for

calendar year 2006-2007.  (Allen Dec. ¶ 12).  A review of the Inmate Grievance Log Book(s)

did not reflect that inmate Wormley submitted any grievances during her commitment at CTF.

(Allen Affidavit ¶ 13).

23.    Devon Brown is the Director of the District of Columbia Department of Corrections.

(Declaration of Devon Brown ¶ 2).

24.    Director Devon Brown never had contact with Eloise Wormley while she was

incarcerated or at any other time.  I have no specific familiarity with Ms. Wormley, and did not

specifically give orders with respect to her incarceration or release from incarceration.  (Director

Brown Dec. ¶ 3).

25.    Director Brown had no specific knowledge of her sentence, terms of incarceration,

judgments or commitment orders, or release orders from court until he received a copy of the

above-captioned complaint.  (Director Brown Dec. ¶ 4).

26.    Director Brown was not present when Ms. Wormley was imprisoned, held, or released

from incarceration.  Director Brown did not order her release, and he was not involved in the

release process.  (Director Brown Dec. ¶ 5).

27.    Director Brown does not have, nor has he ever had any personal animus or subjective

intent to harm Ms. Wormley.  (Director Brown Dec. ¶ 6).

28.    There are no written or informal policies, customs or practices of DOC that would

preclude timely release of Ms. Wormley from incarceration.  (Director Brown Dec. ¶ 7).

29.    During Director Brown's tenure, he caused staff to reorganize the Records Office, hired a

new Chief, added and trained new staff members, and implemented computerized sentence

calculation and other quality control mechanisms related to the release of inmates.  (Director

Brown Dec. ¶ 8).

Respectfully submitted:

PETER NICKLES
Acting Attorney General for the District of Columbia

GEORGE C. VALENTINE
Deputy Attorney General
Civil Litigation Division

ELLEN EFROS [250746]
Chief, Equity Section I

/s/ Denise J. Baker
Denise J. Baker
D.C. Bar No. 493414
Assistant Attorney General
441 4th Street, Northwest, 6th Floor South
Washington, D.C. 20001
202-442-9887 (Telephone)
202-727-0431 (Facsimile)
Denise.baker@dc.gov

# Exhibit A
# Kathy Souverain
# Declaration

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ELOISE T. WORMLEY, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| THE UNITED STATES OF AMERICA, | ) |
| et al. | ) |
| | ) |

Civil Action No. 08-00449-CKK

### DECLARATION OF KATHY SOUVERAIN

I, Kathy Souverain, declare and state as follows:

1.    I am over the age of eighteen (18) years, competent to testify to the matters contained herein, and testify based on my personal knowledge and information.

2.    I have been the Correctional Program Administrator at the Records Office of the D.C. Department of Corrections (DOC) since March, 2007.  My duties include inmate sentence computations and calculations based upon review of court orders, warrants, terms and conditions of confinement, and review of inmate records to determine appropriate release dates.

3.    In May 2008, I was requested to review Ms. Wormley's inmate records as a result of a lawsuit being filed.  Her record reference number is DCDC 226-899.

4.    In the lawsuit, Ms. Wormley claimed that she was over- detained at the Correctional Treatment Facility (CTF) managed by Correctional Corporation of America (CCA) from October 19, 2006 to March 16, 2007 and wrongfully detained at the Central Detention Facility (CDF), a jail run by the District government, from March 16, 2007 to March 19, 2007.

5.    My review of the records indicates that Eloise Theresa Wormley was committed to DC custody on June 15, 2006 in criminal case 2005 DVM 000846, and held without bond.

6.      On June 16, 2006, the Records Office received a United States Probation Violation (USPV) detainer from the United States Marshal Service (USM). So long as a detainer is lodged against an inmate, the District cannot release the inmate.

7.      On June 21, 2006, inmate Wormley appeared in D.C. Superior Court and returned with a Judgment and Commitment Order (J&C) in criminal case 2005 DVM 000846 sentencing her to a period of one hundred thirty-five (135) days consecutively. Also, Wormley's probation was revoked.

8.      On July 26, 2006, a sentence computation was prepared for inmate Wormley, and Records Office staff arrived at a projected release date of October 21, 2006. Even though the sentence computation for criminal case 2005 DVM 000846 projected a release date of October 21, 2006, on expiration of that sentence expired Wormley was still subject to the parole detainer lodged against her in June 2006 as more fully described in ¶ 6 above.

9.      On October 18, 2006, the D.C. Department of Corrections Records Office sent a fax to the United States Marshal Service to inform them that inmate Wormley's sentence will expire on October 21, 2006, and her detainer needed to be executed by submitting a "come up" for October 19, 2006.

10.     In response, the USM sent and the D.C. DOC Records Office received a USM-41 form, dated October 19, 2006, to place inmate Wormley "IN TRANSIT HOLD PENDING FEDERAL DESIGNATION." So long as the "transit hold" was lodged against inmate Wormley, the District DOC Records Office had no authority to release inmate Wormley.

11.     On March 16, 2007, CTF Records Office received a faxed USM-41 form dated March 15, 2007 from the USM to "LIFT USMS DETAINER DATED 06-16-2006."

12.     However, during the interim between the October 19, 2006 "in transit hold" and the March 16, 2007 "lift USMS detainer" inmate Wormley escape from custody.  On June 2, 2006, inmate Wormley escaped from Fairview Community Center.  As a result of her escape, release documents were needed to effectuate her sentence computation and release.

13.     Release documents were received in the Records Office on March 19, 2007.  Once the Records Office received inmate Wormley's sentence computation reflecting that she was released from her escape charge from USMS, inmate Wormley was immediately released from DOC custody on March 19, 2007.


KATHY SOUVERAIN

7/14/08
DATE

# Exhibit B
# March 19, 2007
# Facsimile from U.S.
# Marshal Service to D.C.



# UNITED STATES MARSHALS SERVICE
## District of Columbia (D/DC)

## Prisoner Coordination & Logistics

### United States Courthouse
### 333 Constitution Ave., N.W.
### Washington, DC  20001

OFFICE TELEPHONE: (202) 353-0653    FAX: (202) 353-0723

TO: Ms. Warner, DC Jail Records

FAX NO.  202-698-5744

FROM:  Rosheda McCray, Criminal Program Specialist

DATE: 03/19/07    Number of Pages:    2    Including Cover Page

### COMMENTS:

Hello,

Here is the Sentry Computation, which states that inmate Wormley DC# 226-899 released from her escape charge on 6/21/06, the day she came into DC Jail custody for a Superior Court matter, violation of a protection order.

WARNING: Information attached to this cover sheet is U.S. Government property.  If you are not the intended recipient of this information, disclosure, distribution, or use of this information is prohibited (18 USC 641). Please notify the originator or local USMS office immediately to arrange for proper disposition.
**NOTE: THIS FAX COVER PAGE SHOULD NOT BE USED TO FAX CLASSIFIED INFORMATION.**

PRECEDENCE:    ☐ IMMEDIATE    ☐ PRIORITY    ☐ ROUTINE

CLASSIFICATION:    ☐ SENSITIVE    ☐ NON-SENSITIVE

Form USM-324
Rev. 08/04

DOC 000146

PAGE 001                                                                    15:38:37
          37096-007                    REG
REGNO: 37096-007              FUNCTION: DIS  DOB/AGE.: 02-04-1954 / 53
NAME.: WORMLEY, ELOISE THERESA              R/S/ETH.: B/F/O
RSP..: CDC-DIST OF COLUMBIA CCM             MILEAGE.: 16 MILES
PHONE: 301-317-3142    FAX: 301-317-3138
ARS ASSIGNMENT..: EXPIRATION OF SPLIT SENTENCE    FBI NO..: 989916AA1
ARS DATE/TIME...: 06-21-2006/1202           INS NO..:
PROJ REL METHOD: UNKNOWN                    SSN.....: 577740459
PROJ REL DATE..: UNKNOWN        PSYCH: NO   DETAINER: NO      CMC..: NO
     - - - - - - - - - RELEASE DESTINATION - - - - - - - - -
          AGENCY...............:
          DST ASSIGNMENT.......:
          ADDRESS..............: C/O DC DOC
                                 WASHINGTON, DC 20001
OFFN/CHG RMKS: F-4347-05;ATT DIST COCAINAE - 12MO,ESS ALL BUT 6MOS
OFFN/CHG RMKS: (ESCAPED FROM CDC 2AG 06-02-06,REL DATE WAS 06-12-06)


G0002      MORE PAGES TO FOLLOW . . .

# Exhibit C
# Detainer dated
# June 16, 2006

U.S. Department of Justice
United States Marshals Service





# DETAINER
## BASED ON FEDERAL PAROLE VIOLATION WARRANT
### United States Marshal

*(District)*
### DISTRICT OF COLUMBIA



*Please type or print neatly:*                    *(Return Address and Phone)*

TO: CDF

DATE: 06-16-06

SUBJECT: WORMLEY, ELOISE

AKA: ADAMS, THERESA

DOB/SSN: 02-04-54 // 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

REF. # DCDC: 226899

USMS #: 37096-007

CR #: PDID: 335255

*JUN 16 PM 4:02*

Please accept this Detainer against the above-named subject who is currently in your custody. The United States Parole Commission has issued a Federal parole violation warrant against the subject. Prior to the subject's release from your custody, please notify this office at once so that we may assume custody of the subject if necessary. If the subject is transferred from your custody to another detention facility, we request that you forward our Detainer to said facility at the time of transfer and advise this office as soon as possible. The notice and speedy trial requirements of the Interstate Agreement on Detainers; Act do NOT apply to this Detainer, which is based on a Federal parole violation warrant In accordance with U.S. Parole Commission regulations, please read or show the following to the subject:

"YOU ARE HEREBY ADVISED THAT A DETAINER HAS BEEN FILED AGAINST YOU ON THE BASIS OF A WARRANT ISSUED BY THE U.S. PAROLE COMMISSION. IF YOU ARE SERVING A NEW SENTENCE OF CONFINEMENT FOR A CRIME COMMITTED WHILE ON PAROLE, YOU MAY SUBMIT TO THE U.S. PAROLE COMMISSION ANY INFORMATION YOU WOULD LIKE CONSIDERED BY THE PAROLE COMMISSION IN DISPOSING OF THE WARRANT. UPON RECEIPT OF SUCH INFORMATION, YOUR CASE WILL BE REVIEWED ON THE RECORD BY THE PAROLE COMMISSION."

After reading or showing the above language to the subject, please execute the following:
The foregoing was read to or by the subject and a copy of the Detainer and the charges upon which it is based was delivered to him on _____
                                            *(date)*

Please acknowledge receipt of this Detainer. Please provide one copy of this Detainer to the subject and FAX one copy to this office at _____
                            *FAX No.*

Signed: _____

Title: _____

| RECEIPT | |
|---|---|
| Date: 6/16/06 | |
| Signed: Scherly Ct-Stphn | |
| By: Record Clerk | |
| Title: Court Clerk | |

Very truly yours,

_____
*(Signature)*

GEORGE WALSH
U.S. Marshal

Requested by: SEAN MCLEOD

**ETW 0063**

Form USM-16C
Rev. 04/05

** TOTAL PAGE.01 **

# Exhibit D
# Affidavit of Joyce Allen
### (with Inmate Grievance Procedure attached)

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

ELOISE T. WORMLEY,         )
                           )
       Plaintiff,        )
                           )
       v.          )    **Civil Action No. 08-00449-CKK**
                           )
THE UNITED STATES OF AMERICA,  )
 et al.               )
                           )

## AFFIDAVIT OF JOYCE ALLEN

I, Joyce Allen, pursuant to 28 U.S.C. § 1746, declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief:

1.     I am employed by the Corrections Corporation of America ("CCA"). I currently am the Facility Grievance Officer at the Correctional Treatment Facility ("CTF") operated by CCA in Washington, D.C.

2.     CCA provides privately-managed corrections facilities operations for federal, state and local governments with whom it has contracts. CTF is managed by CCA under contract with the District of Columbia, Department of Corrections (DOC).

3.     I have reviewed the allegations contained in Plaintiff's complaint and the inmate record of Eloise Wormley, DCDC# 226-899, who has been an inmate in CTF during the time period referenced in the above-captioned civil action.

4.     I have personal knowledge that the matters in this Affidavit are true and accurate, and submit this Affidavit in support of Defendants' District of Columbia and Devon Brown's Motion to Dismiss.

1934104.1

5.     As Facility Grievance Officer, I am familiar with the CCA grievance policies and procedures regarding the available remedies for inmates and detainees. My responsibilities include overall coordination of the grievance procedure at CTF, assigning a number to each grievance, coordinating the investigation of grievances, completing the Grievance Officer's Report utilizing form 14-5A, and maintaining all grievance records and documents, including the permanent grievance log.

6.     The inmate grievance procedure contained in CCA Policy 14-5 (attached hereto as Attachment A) was in effect at the time of Eloise Wormley's detention at CTF.

7.     Upon detainee or inmate arrival at the CTF facility, CCA provides an Inmate Handbook, which contains a summary of the facility grievance policies and procedures. Additionally, inmates have access to the complete grievance policy at the CTF Law Library or through facility staff.

8.     In order for an inmate or detainee to exhaust his or her administrative remedies, he should follow the facility grievance procedures and carry the grievance through to its finish. Prior to pursuing the formal grievance process, inmates and detainees should first avail themselves of the Informal Resolution Process by submitting an Inmate Request Slip or speaking with any staff member concerning the issue. If the complainant is dissatisfied with that result, only then may the formal process be initiated. At CTF, the formal grievance process contains four (4) steps:

    a.  Inmates must send an initial grievance requests on the CCA Inmate/Resident Grievance Form (Form 14-5A) to the Grievance Officer within seven (7) days of the alleged incident. The time for filing begins from the date the problem or incident became known to the inmate/resident. (Step One)

    b.  If the inmate finds the response unsatisfactory, he or she may appeal to the Warden within five (5) days of receipt of the Facility Grievance Officer's decision by completing the Request for Warden/Administrator Review portion of the Grievance Form.  (Step Two).

    c.  If the inmate is unsatisfied with the Warden's response, he or she may appeal to the District of Columbia Department of Corrections Contract Monitor within five (5) days of receipt of the Warden's response.  (Step Three).

    d.  The inmate may then appeal the Contract Monitor's determination directly to the Director of the District of Columbia Department of Corrections within five (5) days of receipt of the Contract Monitor's decision.  (Step Four).

9.     If an inmate fails to follow this procedure or omits any part of it, he or she has not exhausted the administrative remedies available.  If an inmate or detainee fails to cooperate with the investigation process, he or she has failed to carry the grievance through to its finish, and has thus failed to exhaust the administrative remedies available.

10.    Additionally, the Grievance Policy includes procedures for inmates/residents to file Emergency Grievances.  Grievances may be considered Emergency Grievances if the subject matter of the grievance is such that compliance with the regular time guidelines would subject the grievant to risk of personal injury.  If the grievant asks that the grievance be considered an emergency and details the basis for needing an immediate response, the Facility Grievance Officer, will within twenty-four (24) hours review the grievance to determine if an emergency exists.  If an emergency exists, the Facility Grievance Officer will take initial action to resolve the grievance within twenty-four (24) hours of receipt.  After initial action has been taken and

within seventy-two (72) hours of receipt of the emergency grievance, the Facility Grievance Officer will prepare and issue a written decision to the grievant.

11.    Inmate Eloise Wormley was committed to CCA/CTF on July 26, 2006.

12.    I have reviewed the grievance log for calendar year 2006-2007.

13.    A review of the Inmate Grievance Log Book(s) does not reflect that inmate Wormley submitted any grievances during her commitment at this facility.

14.    Inmate Wormley was transferred to the D.C. Jail on March 16, 2007.

FURTHER AFFIANT SAYETH NAUGHT.


_____
JOYCE ALLEN

WASHINGTON                )
                          ) ss.
DISTRICT OF COLUMBIA )

    SUBSCRIBED AND SWORN before me this 2nd day of July, 2008 by Joyce Allen.


_____
Notary Public

My Commission Expires:    PHOENIX C. ISHMON
                          NOTARY PUBLIC DISTRICT OF COLUMBIA
                          My Commission Expires July 31, 2011

1934104.1

| CCA — CORRECTIONS CORPORATION OF AMERICA | Inmate/Resident Grievance Procedures | | |
|---|---|---|---|
| | **CHAPTER** 14 | **POLICY NUMBER** 14-5 | Page 1 of 12 |
| | **EFFECTIVE DATE** MARCH 14, 2007 | **SUPERSEDES DATE** DECEMBER 1, 2002 | |
| SIGNATURE ON FILE AT FACILITY SUPPORT CENTER Richard P. Seiter Executive Vice President/Chief Corrections Officer | | | |
| SIGNATURE ON FILE AT FACILITY SUPPORT CENTER G.A. Puryear, IV Executive Vice President/General Counsel | FACILITY APPROVAL | FACILITY SUPERSEDES DATE | |

## 14-5.1 POLICY:

CCA will provide a means for all inmates/residents to address complaints regarding facility conditions, treatment, and policies and procedures. Many matters can and should be resolved directly and promptly between the inmate/resident and institutional staff.

All inmates/residents will have access to an informal resolution process to resolve their complaints. At any time the informal resolution process has not provided successful resolution of the complaint or in the event of an emergency grievance, inmates/residents may use the formal grievance process. All complaints should be assessed in a fair and impartial manner. Resolution in the best interest of the inmate/resident and the facility should be the primary goal.

## 14-5.2 AUTHORITY:

CCA Company Policy

## 14-5.3 DEFINITION:

Emergency Grievance – A grievance in which the potential for personal injury or irreparable harm exists.

Grievance Officer – Facility staff member responsible for tracking and management of the grievance process. This includes coordination of investigations and ensuring that resolution is reached.

Grievance – A written complaint concerning the facility conditions, treatment, policies, and/or procedures which is believed to personally affect the inmate/resident in a negative manner.

Inmate/Resident – Any adult or juvenile, male or female, housed in a CCA facility. Inmates/residents may also be referred to as detainees, prisoners, or offenders depending on classification and in accordance with facility management contracts.

Reasonable Suspicion – A suspicion which is based upon documentable, articulable facts which, together with the employee's knowledge and experience, lead him/her to believe that an unauthorized situation or violation of rules exists.

Reprisal – Any action or threat of action against any inmate/resident for the good faith use of or good faith participation in the informal resolution process or grievance procedure.

## 14-5.4 PROCEDURES:

### PROCEDURES INDEX

| SECTION | SUBJECT |
|---|---|
| A | Availability of Information |
| B | Training |
| C | Grievance Availability |
| D | Confidentiality |
| E | Protection from Reprisal |

Proprietary Information – Not For Distribution – Copyrighted          Property of Corrections Corporation of America

| Page 2 of 12 | MARCH 14, 2007 | 14-5 |
|---|---|---|

| F | Grievable Matters |
|---|---|
| G | Non-Grievable Matters |
| H | Excessive Filing of Grievances |
| I | Grievance Extensions |
| J | Grievance Officer |
| K | Informal Resolutions |
| L | Emergency Grievances |
| M | Formal Grievances |
| N | Grievances Against Contracting Agency |
| O | Remedies |
| P | Appeal Process |
| Q | Transfers/Releases |
| R | Records |
| S | Reporting |
| T | ATF Section |

A.    AVAILABILITY OF INFORMATION

   1.    Employees

     A copy of this policy will be available to all employees.

   2.    Inmates/Residents

     a.    New inmates/residents will be informed of the informal resolution process and grievance procedures upon arrival.

     b.    A summary of procedures outlined in this policy will be included in the Inmate/Resident Handbook.

     c.    A copy of this policy will be available in the inmate/resident library. A copy will also be available for inmates/residents that do not have the opportunity to visit the library (i.e. segregated inmates/residents).

     **NOTE:** In the event an inmate/resident has difficulty in understanding the procedures outlined in this policy, employees must ensure that the information is effectively communicated on an individual basis. Auxiliary aids which are reasonable, effective, and appropriate to the needs of the inmate/resident shall be provided when simple written or oral communication is not effective.

B.    TRAINING

   All employees will receive training on this policy in pre-service and in-service training. Training will be documented in accordance with CCA Policy 4-2, Maintenance of Training Records.

C.    GRIEVANCE AVAILABILITY

   1.    Inmates/residents can invoke the grievance procedure regardless of disciplinary, classification, or other administrative decisions to which the inmate/resident may be subject.

   2.    An inmate/resident may not submit a grievance on behalf of another inmate/resident; however, assistance from a staff member or inmate/resident may be provided when necessary to communicate the problem on the grievance form.

D.    CONFIDENTIALITY

Proprietary Information – Not For Distribution – Copyrighted     Property of Corrections Corporation of America

Grievances are considered special correspondence. If a sealed envelope is labeled "Grievance" and addressed to the Grievance Officer, it will not be opened for inspection unless there is reasonable suspicion that the sealed envelope contains contraband. If reasonable suspicion exists and the Warden/Administrator or designee's approval has been obtained, the envelope may be opened and inspected for contraband only.

E.    PROTECTION FROM REPRISAL

Inmates/residents shall not be subject to retaliation, reprisal, harassment, or discipline for use or participation in the informal resolution process or grievance process. Any allegations of this nature will be thoroughly investigated by the Warden/Administrator and reviewed by the appropriate Divisional Managing Director, Facility Operations. The Divisional Managing Director, Facility Operations will notify the appropriate Vice President, Facility Operations of any allegations that are found to be credible.

F.    GRIEVABLE MATTERS

Inmates/residents may grieve the following matters through the grievance process:

1.    Violation of state and federal laws, regulations, or court decisions, to include but not limited to violations of the Americans with Disabilities Act, constitutional rights, etc.

2.    Application of rules, policies, and/or procedures towards inmates/residents over which CCA has control;

3.    Individual staff and inmate/resident actions, including any denial of access to the informal resolution or grievance processes;

4.    Reprisals against inmates/residents for utilizing the informal resolution or grievance processes; and

5.    Any other matter relating to the conditions of care and supervision within the authority of CCA.

**AT THIS FACILITY, ADDITIONAL CONTRACTUAL INFORMATION REGARDING GRIEVABLE MATTERS IS:**

G.    NON-GRIEVABLE MATTERS

The following matters are <u>not</u> grievable by inmates/residents through these grievance procedures:

1.    State and Federal court decisions;

2.    State and Federal laws and regulations;

3.    Final decisions on grievances;

4.    Contracting agency (BOP, ICE, state department of corrections, etc.) policies, procedures, decisions, or matters (i.e., institutional transfers, parole and probation decisions, etc.);

     **NOTE:** Contracting agency policies, procedures, decisions, or matters shall be grieved in accordance with the regulations of the applicable contracting agency.

5.    Disciplinary actions (all disciplinary action must be addressed in accordance with disciplinary procedures in place at the facility):

6. Property Issues (all property issues must be addressed in accordance with property procedures in place at the facility); and

7. Classification status (all classification status must be addressed in accordance with classification procedures in place at the facility).

**AT THIS FACILITY, ADDITIONAL CONTRACTUAL INFORMATION REGARDING NON-GRIEVABLE MATTERS IS:**

H. EXCESSIVE FILING OF GRIEVANCES

If it is determined by the Warden/Administrator that an inmate/resident is deliberately abusing the grievance system through excessive filing of grievances and/or repeated refusal to follow procedures, the Warden/Administrator may suspend the filing of additional grievances until all pending grievances have been resolved. The Warden/Administrator will provide the inmate/resident with written documentation of the suspension.

**AT THIS FACILITY, ADDITIONAL CONTRACTUAL PROCEDURES REGARDING EXCESSIVE FILING OF GRIEVANCES ARE:**

I. GRIEVANCE EXTENSIONS

In certain instances it may be necessary to extend response deadlines to allow for a more complete investigation of the claim(s). Justification for the extension must be provided to the inmate/resident on the 14-5C Grievance Extension Notice. The time extension will be determined by the Warden/Administrator and will not exceed fifteen (15) calendar days.

J. GRIEVANCE OFFICER

The Warden/Administrator will designate an individual(s) as Grievance Officer(s) who will coordinate the grievance process to include:

1. Reviewing all formal grievances received to ensure all necessary information is included;

**NOTE:** Grievances that are prematurely appealed to the Warden/Administrator or designee will be returned without review.

2. Ensuring informal resolution has been attempted (excluding emergency grievances);

3. Assigning a number to all formal grievances;

4. Logging all grievances received;

5. Forwarding formal grievances to the appropriate department head for response;

6. Coordinating the timely investigation and response of formal grievances;

7. Ensuring that, when a grievance decision specifies that an action is to be taken, a date is included for completing the action;

8. Ensuring the inmate/resident receives a copy of the completed grievance and ensuring that the inmate/resident's signature is acquired at the time a response is provided;

9. Ensuring all remedies/required actions are fulfilled by the imposed deadline; and

Proprietary Information – Not For Distribution – Copyrighted          Property of Corrections Corporation of America

| Page 5 of 12 | MARCH 14, 2007 | 14-5 |

10. Maintaining all grievance records and documents as outlined in 14-5.4.R.

**AT THIS FACILITY, THE POSITION DESIGNATED AS THE GRIEVANCE OFFICER IS:**

K  INFORMAL RESOLUTIONS

With the exception of emergency grievances, inmates/residents are required to utilize the informal resolution process concerning questions, disputes, or complaints prior to the submission of a formal grievance. If an inmate/resident is not satisfied with the results of the informal resolution process, the inmate/resident may file a formal grievance.

1.  Filing

a.  The 14-5A Informal Resolution form must be utilized to initiate the informal resolution process.

b.  All 14-5A's related to medical care and treatment must be submitted to qualified health services staff through facility mail.

c.  With the exception of grievances related to medical care and treatment, inmates/residents are required to submit 14-5A's through facility mail, or in person, to the appropriate unit staff. In the absence of unit management, the Warden/Administrator will designate a staff member to receive informal resolution forms.

**AT THIS FACILITY INFORMAL RESOLUTION FORMS WILL BE SUBMITTED TO:**

**NOTE:** Only qualified health services staff are authorized to provide responses to any questions, disputes, or complaints regarding medical care and treatment

2.  Resolution

The staff member assigned to complete the informal resolution process will be responsible for:

a.  Conducting an initial meeting with the inmate/resident to discuss the issue;

b.  Meeting with all staff members involved with the issue;

c.  Researching necessary information to determine if a remedy is possible;

d.  Developing a response to present to the inmate/resident in an attempt to resolve the issue informally;

e.  Ensuring the inmate/resident receives a copy of the completed 14-5A at the time the response is provided; and

f.  Ensuring any remedies agreed upon are completed.

3.  Time Guidelines

The total time for the informal resolution process will be no more than fifteen (15) calendar days from the date the 14-5A was submitted through the date the response was presented to the inmate/resident, unless unusual circumstances are present. In

Proprietary Information – Not For Distribution – Copyrighted          Property of Corrections Corporation of America

the event unusual circumstances (e.g. inability to contact a critical staff member for the investigation process, facility on lock down status, etc.) prohibit the ability to meet time guidelines, the assigned staff member will provide the inmate/resident with written documentation extending the response deadline.

    a.    The inmate/resident must submit the 14-5A within seven (7) calendar days of the alleged incident.

    b.    The time for filing begins from the date the problem or incident became known to the inmate/resident.

    c.    In the event the inmate/resident is not satisfied with the response, the inmate/resident will have five (5) calendar days to submit a formal grievance to the Grievance Officer. In the event the inmate/resident pursues a formal grievance, the inmate/resident will be required to attach a copy of the 14-5A to the formal grievance form.

4.    Documentation

The original 14-5A will be maintained by the facility with a copy presented to the inmate/resident at the time the response was presented.

**AT THIS FACILITY, ORIGINAL 14-5A FORMS WILL BE MAINTAINED IN THE FOLLOWING LOCATION(S):**

L.    EMERGENCY GRIEVANCES

If the subject matter of the grievance is such that compliance with the regular time guidelines would subject the inmate/resident to risk of personal injury, the inmate/resident may request that the grievance be considered an emergency grievance. The emergency grievance must detail the basis for requiring an immediate response. When the grievance is of an emergency nature, utilization of the informal resolution process is not required.

1.    Filing

    a.    The 14-5B Inmate/Resident Grievance form must be utilized to file an emergency grievance. The inmate/resident will complete Page 1 of the 14-5B and place it in a sealed envelope marked "Emergency Grievance". Sealed envelopes may be placed in the grievance mail box. If a grievance mail box is not used, the emergency grievance will be forwarded to the Grievance Officer.

**AT THIS FACILITY, THE PROCEDURE FOR FORWARDING THE GRIEVANCE TO THE GRIEVANCE OFFICER IS:**

    b.    The Grievance Officer will check the grievance mail boxes daily, excluding weekends and holidays. If a grievance mailbox is not used, grievances are to be forwarded daily, excluding weekends and holidays, to the Grievance Officer in accordance with the procedures listed above.

    c.    In the event it is necessary to file the emergency grievance on weekends or holidays, the sealed envelope will be given to the Shift Supervisor. The Shift

Proprietary Information – Not For Distribution – Copyrighted          Property of Corrections Corporation of America

Case 1:08-cv-00449-RCL   Document 38   Filed 07/18/2008   Page 62 of 88

| Page 7 of 12 | MARCH 14, 2007 | 14-5 |
|---|---|---|

Supervisor will ensure the Administrative Duty Officer is notified upon receipt of the emergency grievance.

2.   Resolution

a.   Emergency grievances received through the grievance mail box or alternative means, as identified above, will be reviewed by the Grievance Officer to determine if the grievance is of an emergency nature. If the grievance is determined to be of an emergency nature, the Grievance Officer will assign a number to the emergency grievance, document the grievance on the 14-5D Facility Grievance Log or via the current approved FSC/CCA electronic database, and immediately forward to an individual authorized to serve as Administrative Duty Officer below the rank of Warden/Administrator for a response.

b.   Emergency grievances received on weekends and holidays will be reviewed by an individual authorized to serve as Administrative Duty Officer below the rank of Warden/Administrator to determine if the grievance is of an emergency nature and will respond accordingly.

c.   The response must be documented on Page 2 of the 14-5B and submitted to the inmate/resident for signature at the time of presenting the response in person. The inmate/resident will receive a complete copy of the emergency grievance and any corresponding attachments at the time of presenting the response.

3.   Time Guidelines

An individual authorized to serve as Administrative Duty Officer (below the rank of Warden/Administrator) shall take action to resolve the grievance within one (1) calendar day of receipt of the grievance and provide a written response to the inmate/resident.

4.   Documentation

The individual authorized to respond to the emergency grievance will ensure that the Grievance Officer receives a copy of the emergency grievance and corresponding attachments to ensure that the emergency grievance is appropriately logged and filed.

M.   FORMAL GRIEVANCES

1.   Filing

a.   The inmate/resident must file the grievance within five (5) calendar days of the response date listed on the 14-5A Informal Resolution form.

b.   The 14-5B Inmate/Resident Grievance form must be utilized to file a formal grievance. The inmate/resident will complete Page 1 of the 14-5B and place it in a sealed envelope marked "Grievance". Sealed envelopes may be placed in the grievance mail box. If a grievance mail box is not used, the formal grievance will be forwarded to the Grievance Officer.

**AT THIS FACILITY, THE PROCEDURE FOR FORWARDING THE GRIEVANCE TO THE GRIEVANCE OFFICER IS:**

c.   The Grievance Officer will check the grievance mail boxes daily, excluding weekends and holidays. If a grievance mailbox is not used, grievances are to

| Page 8 of 12 | MARCH 14, 2007 | 14-5 |
|---|---|---|

be forwarded daily, excluding weekends and holidays, to the Grievance Officer in accordance with the procedures listed above.

2    Resolution

    a.    Formal grievances received through the grievance mail box or alternative means as identified above will be reviewed by the Grievance Officer to ensure the formal grievance is correctly submitted and required documentation attached.

    b.    The Grievance Officer will assign a number to the formal grievance, document the grievance on the 14-5D Facility Grievance Log or via the current approved FSC/CCA electronic database and forward the formal grievance to the appropriate staff member for a response.

    c.    Formal grievance resolution should be determined by the appropriate department head in relation to the formal grievance unless the grievance pertain to the department head, in which case a different department head will be designated. For example, grievances related to medical care and treatment would be forwarded to the Health Services Administrator, grievances related to education would be forwarded to the principal, grievances related to classification would be forwarded to unit staff, etc.

    d.    Each formal grievance will be responded to by including a written explanation for approval/disapproval. The response must be documented on Page 2 of the 14-5B and given to the inmate/resident, in person, for signature. Responses may be given to the inmate/resident, in person, by the responder or the Grievance Officer. The inmate/resident will receive a complete copy of the formal grievance and any corresponding attachments at the time of presenting the response.

3    Time Guidelines

    a.    Unless a time extension has been granted, the inmate/resident will receive a response to the formal grievance within fifteen (15) calendar days of submission.

    b.    The total time for the formal grievance process will be no more than fifty (50) days from filing to a final appeal decision, unless unusual circumstances are present.

4    Documentation

The designated department head responding to the formal grievance will ensure that the Grievance Officer receives a copy of the formal grievance response and corresponding attachments to ensure that the formal grievance is appropriately logged and filed.

5.    **AT THIS FACILITY, ADDITIONAL CONTRACTUAL PROCEDURES ARE:**

N.    GRIEVANCES AGAINST CONTRACTING AGENCY

**AT THIS FACILITY, PROCEDURES FOR FILING A GRIEVANCE AGAINST THE CONTRACTING AGENCY ARE AS FOLLOWS:**

Proprietary Information – Not For Distribution – Copyrighted    Property of Corrections Corporation of America

O.   **REMEDIES**

The informal resolution process and formal grievance process shall afford the inmate/resident the opportunity for meaningful remedy. Remedies shall cover a broad range of reasonable and effective resolutions. Remedies may include the following:

1.   Change of procedures or practices appropriately related to the complaint or conditions;

2.   Correction of records; or

3.   Other remedies, as appropriate.

P.   **APPEAL PROCESS**

1   Filing

If an inmate/resident is not satisfied with the decision of a formal or emergency grievance, the inmate/resident may complete the appeal section of the 14-5B and resubmit the grievance. Inmates/residents are entitled to appeal all adverse decisions, even those made on a purely procedural basis including but not limited to the expiration of a time limit. The inmate/resident must file the appeal within five (5) calendar days of the response date listed on the 14-5B Inmate/Resident Grievance form.

2.   Resolution

a.   The Grievance Officer will forward all grievance appeals to the Warden/Administrator for review and a final response.

b.   Each appeal will be responded to by including a written explanation for approval/disapproval. The response must be documented on Page 2 of the 14-5B and given to the inmate/resident, in person, for signature. Responses may be given to the inmate/resident, in person, by the Warden/Administrator or the Grievance Officer. The inmate/resident will receive a complete copy of the appeal response and any corresponding attachments at the time of presenting the response.

c.   The Warden/Administrator's decision is final unless otherwise specified in the facility management contract.

3.   Time Guidelines

Barring extraordinary circumstances, a grievance will be considered settled if the decision at any step is not appealed by the inmate/resident within the given time limit.

a.   Emergency Grievances

The inmate/resident will receive a response to the appeal within seven (7) calendar days of submission.

b.   Formal Grievances

The inmate/resident will receive a response to the appeal within fifteen (15) calendar days of submission.

4.   Documentation

If the response is presented to the inmate/resident by the Warden/Administrator, the Warden/Administrator will ensure that the Grievance Officer receives a copy of the

Proprietary Information – Not For Distribution – Copyrighted          Property of Corrections Corporation of America

| Page 10 of 12 | MARCH 14, 2007 | 14-5 |
| --- | --- | --- |

appeal response and corresponding attachments to ensure the appeal is appropriately logged and maintained on file.

5. **AT THIS FACILITY, ADDITIONAL CONTRACTUAL APPEAL PROCEDURES ARE AS FOLLOWS:**

Q. TRANSFERS/RELEASES

If a grievance is submitted for review and the inmate/resident is transferred or released from custody, efforts to resolve the grievance will normally continue. It is the inmate/resident's responsibility to notify the Grievance Officer of the pending transfer or release and to provide a forwarding address and any other pertinent information.

R. RECORDS

1. All grievances will be systematically maintained by the Grievance Officer. All grievances (formal and emergency) and corresponding attachments will indicate the assigned grievance number and be date stamped upon receipt.

2. The Grievance Officer will maintain a log of all grievances received utilizing the 14-5D Facility Grievance Log or via the current approved FSC/CCA electronic database. The log shall include the following information:

    a. Grievance number;

    b. Date received;

    c. Inmate/resident name;

    d. Inmate/resident number;

    e. Informal attempt;

    f. Grievance category;

    g. Disposition date;

    h. Disposition code;

    i. Date appeal received, if applicable;

    j. Appeal disposition date; if applicable: and

    k. Appeal disposition code, if applicable.

3. All grievance documentation will be maintained in accordance with CCA Policy 1-15, Retention of Records.

4. Copies of grievances shall **not** be placed in an inmate/resident's file, unless it is a contractual requirement to do so.

    **AT THIS FACILITY, CONTRACTUAL REQUIREMENTS REGARDING LOCATION OF GRIEVANCE COPIES ARE:**

5. Records regarding the participation of an individual in the informal resolution process or grievance procedure will not be available to other inmates/residents.

Proprietary Information – Not For Distribution – Copyrighted      Property of Corrections Corporation of America

| Page 11 of 12 | MARCH 14, 2007 | 14-5 |

6.    With the exception of employees involved in the grievance process or clerical processing, records regarding the participation of an individual in the informal resolution process or grievance procedures will not be available for review.

7.    Employees participating in the disposition of an informal resolution process or grievance procedure shall have access to the essential records necessary to respond appropriately.

S.    REPORTING

The 14-5E Grievance Report will be completed by the fifteenth day of each month and forwarded to the FSC Quality Assurance Department, unless a current approved FSC/CCA electronic database has been established.

T.    **AT THIS FACILITY, ADDITIONAL CONTRACTUAL PROCEDURES ARE:**

**14-5.5  REVIEW:**

This policy will be reviewed by the Chief Corrections Officer or designee on an annual basis.

**14-5.6  APPLICABILITY:**

All CCA Facilities (Provided contractual requirements do not mandate otherwise)

**14-5.7  APPENDICES:**

None

**14-5.8  ATTACHMENTS:**

14-5A    Informal Resolution

14-5B    Inmate/Resident Grievance

14-5C    Grievance Extension Notice

14-5D    Facility Grievance Log

14-5E    Quarterly Grievance Report

**AT THIS FACILITY, ADDITIONAL FORM REQUIREMENTS ARE:**

**14-5.9  REFERENCES:**

CCA Policy 1-15

CCA Policy 4-2

CCA Policy 15-1

CCA Policy 15-2

CCA Policy 14-6

CCA Policy 18-1

**Proprietary Information – Not For Distribution – Copyrighted**    Property of Corrections Corporation of America

| Page 12 of 12 | MARCH 14, 2007 | 14-5 |
|---|---|---|

ACA Standards:

4-4284/4-ALDF-3E-11/3-JTS-3D-09

4-4394

4-4446/4-ALDF-5B-18

4-4492/4-ALDF-5B-09/3-JTS-5H-04

Proprietary Information – Not For Distribution – Copyrighted      Property of Corrections Corporation of America

# Exhibit E
# Declaration of
# Director Devon Brown

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **ELOISE T. WORMLEY,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **Civil Action No. 08-00449-CKK** |
| ) | |
| **THE UNITED STATES OF AMERICA,** ) | |
| **et al.** ) | |
| ) | |

## DECLARATION OF DEVON BROWN

I, Devon Brown, declare and state as follows:

1.    I am over the age of eighteen (18) years, competent to testify to the matters contained herein, and testify based on my personal knowledge and information.

2.    I have been the Director of the D.C. Department of Corrections (DOC) since January 10, 2006.

3.    To my knowledge, I have never had contact with Eloise Wormley while she was incarcerated or at any other time.  I have no specific familiarity with Ms. Wormley, and did not specifically give orders with respect to her incarceration or release from incarceration.

4.    I had no specific knowledge of her sentence, terms of incarceration, judgments or commitment orders, or release orders from court until I received a copy of the above-captioned complaint.

5.    I was not present when Ms. Wormley was imprisoned, held, or released from incarceration.  I did not order her release, and I was not involved in the release process.

6.    I do not have, nor have I ever had any personal animus or subjective intent to harm Ms. Wormley.

7.     There are no written or informal policies, customs or practices of DOC that would preclude timely release of Ms. Wormley from incarceration.

8.     During my tenure, I have caused staff to reorganize the Records Office, hire a new Chief, added and trained new staff members, and implemented computerized sentence calculation and other quality control mechanisms related to the release of inmates.


DEVON BROWN


July 16, 2008
DATE

# Exhibit F
# Inmate Handbook



# INMATE
# HANDBOOK

## TABLE OF CONTENTS

Introduction ......................................................................................... 2
Inmate Rights ...................................................................................... 2
Admission and Orientation ................................................................. 3
Personal Property .............................................................................. 3
Housing Unit Rules ............................................................................ 5
Personal Hygiene, Laundry and Grooming ....................................... 6
Smoke Free Facility ........................................................................... 6
Inspections-Search, Counts, Lockdown, Sanitation, Emergency Drills,
Warden ............................................................................................... 6
Staff Contact ...................................................................................... 7
Movement, Escorted Trips ................................................................. 7
Emergency Procedures ...................................................................... 7
Use of Force ....................................................................................... 8
Separations ........................................................................................ 8
Meals .................................................................................................. 8
Medical Service .................................................................................. 8
Drug Testing and K-9 Drug Surveillance
Inmate Finance-Receiving and Releasing Money from Inmate
Accounts ............................................................................................ 9
Canteen .............................................................................................. 9
Legal Access – Attorney Visits, Legal Mail, Law Library .................. 9
Inmate Grievance Program (IGP) ...................................................... 10
Media Access ..................................................................................... 11
Telephone, Visiting, Mail ................................................................... 11
Inmate Records .................................................................................. 11
Programs-Case Mgmt., Recreation, Work, Education, Religious,
Substance Abuse, Reentry, Release ................................................. 13
Prevention and Elimination of Sexual Abuse .................................... 14
PM 5300.1 Inmate Disciplinary and Administrative Hearing
Procedures
Inmate Disciplinary Code of Offenses .............................................. 16
Prehearing Detention, Criminal Prosecution .................................... 26
Disciplinary Report, Investigation ..................................................... 26
Informal Resolution – Class III and Class IV offenses ..................... 27
Disciplinary Hearings ........................................................................ 27
Representation, Hearing Board/Officer ............................................. 28
Procedures ......................................................................................... 28
Appeals and Dismissals .................................................................... 28
Disciplinary Detention Restrictions ................................................... 29
Administrative Segregation ............................................................... 29
Housing Board Hearings .................................................................... 29
Appeals .............................................................................................. 29
Housing Board Re-hearings .............................................................. 29
Administrative Segregation Privileges ............................................... 30

## INTRODUCTION

The DC Department of Corrections (DOC) Central Detention Facility (CDF also popularly called the DC Jail) is a multi-custody level facility located at 1901 D Street SE, Washington, DC 20003. CDF is the point of entry after arraignment and commitment by DC Superior Court, U.S. District Court or US Marshal detainment. CDF houses pretrial detainees, misdemeanants, unsentenced felons, as well as convicted and sentenced felons pending transfer to another facility, jurisdiction or release.

It is DOC policy to provide a safe, secure and orderly environment for employees, inmates and the surrounding community.

This handbook explains facility rules, regulations and procedures that you must follow. Security and safety are in place for everyone's protection and will not be compromised.

DOC will post policy or rule changes that might affect you, on housing unit bulletin boards, make them available in the library and otherwise communicate them to you via housing unit staff.

If you have questions concerning any matter, ask the employee stationed in your housing unit, your case manager or send an Inmate Request slip to the department that is responsible for your particular concern.

**INMATE RIGHTS.** It is DOC policy to ensure that you are treated fairly and your legal rights are respected. You have the following rights:
(1) To access legal assistance (courts, attorney, law materials, diplomatic representation, grievance procedures);
(2) To be protected from personal abuse, corporal punishment, personal injury, disease, property damage or harassment;
(3) To be protected from other inmates having power over you;
(4) Freedom in personal grooming as outlined in DOC policy;
(5) Access to health care;
(6) Adequate food/nutrition;
(7) Freedom from discrimination based on race, religion, national origin, gender, sexual orientation, disability and any prohibited discrimination provided in DC law when determining housing and program participation;
(8) Access to uniform procedures at disciplinary and housing hearings;
(9) Access to programs, services and activities (except when participation presents a threat to the security, safety, or orderly operation of the facility). If you cannot attend a program because of administrative reasons, DOC will attempt to make reasonable accommodations. You cannot participate in programs while you are in disciplinary segregation.

## ADMISSION AND ORIENTATION

### Receiving and Discharge (R&D)

While in R&D you will be asked basic personal information; you must submit to a strip search; shower and change into a CDF issued uniform; be fingerprinted and photographed; and a wristband ID will be placed on you. You must surrender all unauthorized personal belongings (See "Personal Property" section). You will sign a property receipt of items taken and items you were allowed to keep. DOC will store your ID (ex: Drivers license) until you are released. CDF will allow family to pick up your personal property within 15 days. Personal property (except jewelry) is destroyed after 15 days.

### Medical Screening

You will receive a medical, dental and mental health screening. Health care providers will discuss any applicable treatment plan with you. They will advise you on important health precautions and how to access health care services.

### Medical Hold

To protect you and others from communicable diseases, you may be held in restricted housing if you do not submit to medical screening.

### Communications Assistance

Translators or the AT&T Language Line will help if you do not speak English. DOC provides signing or related communications devices to assist if you have a hearing impairment.

### Intake Unit

You will be placed in an intake unit or other appropriate housing. You may be housed in Intake for several days during which time your case manager will interview you. Initial classification will be held to determine your custody and where you will be housed. You will receive information about the facility to include programs, services and activities, rules, housing and discipline procedures.

## PERSONAL PROPERTY

*You may keep the following items when you are admitted:*
One plain wedding band (no stones, gems) valued at $50 or less
Prescribed medical devices: (prescription glasses, dentures, medical alert bracelet/necklace, hearing aids, artificial limbs, brace, etc)
One religious medallion or rosary valued at $50 or less. It must not be a size or shape that can be used a s a potential weapon or escape device
One watch valued at $50 or less
One approved religious headgear
Tennis shoes that you wore into the facility (value limit of $50)
Legal documents about your current case

## HOUSING UNIT RULES

CDF has single and double cell housing.

All inmates are expected to respect others when sharing common equipment such as telephones, television, chairs, tables, recreational games and equipment and all inmates must respect others property.

Television is for everyone's use. Only staff shall control programs that are viewed.

Inmates shall not be verbally or physically abusive to staff or each other. No shouting, running, horse playing or other loud or disorderly behavior.

You shall not bang on windows, cell bars/doors or tables.

You shall not loiter or stand around the cell of any inmate who is on lockdown.

You cannot loiter on the tiers or stairs between the upper and lower tiers. You shall not crowd around the control bubble or exit doors. You must stay at least 5 ft away from exit doors.

You shall not loiter around program offices unless authorized when awaiting services.

You shall not deface, tamper with or destroy DOC issued property.

You shall help keep common areas clean when assigned.

You shall place trash in provided trashcans. You shall not stand or sit on trashcans.

You are responsible for damage to DOC property issued to you and when you deliberately damage your cell. The Officer in Charge (OIC) or other correctional staff will inspect your cell before you are placed in it.

You must report any broken items to the OIC with 24 hours,

Only a supervisor or the Compliance Officer can change your cell or bed assignment.

You must ensure that staff secures your cell when you exit.

You must keep your cell area clean and your property neatly stored in your locker. You will be issued cleaning supplies for this purpose.

You shall not sleep in the nude or on the floor.

You shall make your bed by 8 am and it must remain made until 10 pm.

You shall not hang clothes or covers on cell doors or the tier and you shall not cover windows.

You shall not cover vents, light fixtures, cell doors or cell bars. You shall not clog toilets and sinks.

You shall be fully clothed when exiting your cell to include going to and returning from the shower area.

You shall not attempt to hang photographs or other items on cell walls.

You can not bring your pillow, blanket, wash cloth/ towel into the dayrooms, dining area or gym.

You shall eat in the dining area unless you are on restricted status.

---

**CDF will issue the following items to you.** You must sign for and are responsible for proper care of all items that CDF issues to you.

A bedroll containing one blanket, 1 towel, 2 sheets and a hygiene kit.

**Males:** 2 pairs of under shorts, 2 pairs of socks, 2 undershirts, and 2 jumpsuits (clean, properly fitted and in good condition). 1 pr. of thermal underwear—issued October 15-March 30 upon your written request.

**Females:** 2 pairs of underpants, 2 bras, 2 undershirts, 2 pairs of socks and 2 jumpsuits (clean, properly fitted and in good condition). 1 pr. of thermal underwear—issued Oct 15-March 30 upon your written request.

You will be able to exchange your soiled clothing and linen including towels for clean items at least once a week. You may request replacement underclothing using the Inmate Request Slip every 60 days. Hygiene kits are available to inmates who have no money to purchase them.

You may purchase underclothing and hygiene items from canteen. You are limited to the number of clothing articles as listed below.

### Personal Clothing Limits

**Males:** 1 pr. tennis; 1 pr. shower shoes; 1 religious headgear; 7 pr. each of socks, under-shorts and T-shirts.

**Females:** 1 pr. tennis; 1 pr. shower shoes; 1 religious headgear; 7 pr each socks, bras and panties.

### Other Approved Items:

Toiletries (1 each), pens/pencils, writing paper, stamps, legal papers, 10 photos (no nudity, swimsuits or exotic poses), and prayer rug.

You must be able to store all items, including legal materials, in your locker. You may store books and toiletries on your desk. You can only store your shoes and prayer rug on the floor.

You cannot sell, give or trade your personal property. You are subject to discipline if you do or if another inmate's property is found in your possession. DOC shall seize unauthorized/excess property and either release it to someone you designate or destroy it.

### Claims for Lost/Stolen Property

You may file an Inmate Grievance (IGP) regarding property that is lost, stolen or damaged through no negligence of your own. You will not be compensated property loss when you do not have a property receipt.

### Release of Property to Law Enforcement Officials

While in custody, your personal effects and clothing may be turned over to law enforcement officials with or without a warrant or subpoena.

You cannot take uneaten food to your cell except for 2 pieces of fruit which you must eat the same day.

You must tightly cover and store canteen food items so they will not attract pests.

## PERSONAL HYGIENE/LAUNDRY AND GROOMING SERVICES

You must maintain an acceptable level of personal hygiene. Showers, laundry, linen & clothing exchange, barber and shaving are regularly made available. You are subject to discipline for failure to keep yourself and your cell clean and sanitary.

**SMOKE FREE FACILITY.** No one can smoke in the CDF. Tobacco products, matches and cigarette lighters are contraband.

## INSPECTIONS

### Searches

DOC shall search inmates, inmate housing units, individual cells, program and work areas. Most searches (shakedowns) are randomly conducted. Narcotics detection dogs are also used during searches. You do not have the right to be present during the search. If you are present during the inspection, you must cooperate with staff. Staff will confiscate contraband and excess property during searches.

You are subject to regular and random pat searches.

You are subject to a strip search when (1) there is reason to believe that you are concealing contraband on your person; (2) before placing you in a special housing unit; (3) before and after contact visits, escorted trips, or when returning from a community status; and (4) when you are first admitted. Only medical staff are authorized to conduct inspections of body cavities. Generally you will be placed in a dry cell for detection and release of concealed contraband.

### Counts

Inmates must return to their housing unit and individual cell for counts. You will not be released from your cell, housing unit or the facility until the count has cleared. TV's and radios shall be turned off. You must remain in plain view, in full uniform and you must be prepared to display your armband to staff. You must be silent and shall not attempt to talk to or distract staff who are conducting the count.

### Lockdown

You shall be locked in your cell at night, during counts and at other times as authorized. When lockdown is announced, you must immediately return to your cell and doors will be secured.
Emergency lockdowns may be ordered at any time.

### Sanitation

Each morning or afternoon the Housing Unit supervisor will conduct an inspection to make sure everything is clean and orderly. Your bed must be made, you must be in full uniform and standing by your bunk. You or the inspector will check plumbing, lights, vents and your general living area. The Zone Lieutenant may also regularly inspect housing units.

### Emergency Drill Inspections

You may be required to participate in mock lockdown and evacuation drills. You must move quickly and quietly and obey officer and Fire Safety staff's orders.

### Warden's Inspection

The Warden, Deputy Wardens, correctional supervisors and other managers shall regularly inspect the facility and conduct other mass inspections. Generally, managers will allot time to your address general issues during the inspection period.

## STAFF CONTACT

Your case manager and housing unit staff are your primary contacts to address issues. You may obtain a request slip from the housing unit officer to request assistance from the Chaplain, Chief C&P, law library, Records Officer, Deputy Wardens or the Warden.

## MOVEMENT

Inmates move through the facility to authorized areas with passes or correctional escort. You must move quickly and quietly and go directly to your approved destination. You must obey instructions from staff along the way. You are subject to searches before, during and after movement.

## ESCORTED TRIPS

DOC provides armed transports for court appearances; outside medical care and institutional transfers. You may be considered for escorted local trips to private viewing of a deceased relative, to visit a dying immediate family member and for community work programs.

## EMERGENCY PROCEDURES

You must immediately report any signs of fire or smoke to staff. In emergencies, staff may direct you to move to another area in the unit, take cover in your cell or evacuate the unit/facility. Evacuation routes are posted in your housing unit and throughout the facility.

Should a riot or disturbance occur, inmates not involved will be given a chance to leave the area of trouble. You must follow staff instructions.

## USE OF FORCE

Correctional Officers will use force and apply restraints when necessary to protect a person from injury, to prevent property damage, prevent escapes or to enforce rules and regulations. Force will be just enough to maintain control of the situation.

## SEPARATIONS

You may be separated from another inmate(s) when needed. The court may order your separation from the entire population. You may request protective custody (PC) or DOC may place you in involuntary PC when there is evidence of safety or security issues. You will receive regular reviews to determine if it is appropriate to remove the separations.

## MEALS

DOC serves 3 nutritionally balanced meals daily. Pork and pork by-products are not used. A physician may place you on a medical diet. You may request a religious diet through the Chaplain. General population inmates eat in the dayroom; segregated inmates eat in their cell. You will receive a bag lunch when you are at Court or are out of the facility for medical care.

## MEDICAL SERVICES

DOC does not charge inmates a co-pay fee for medical treatment.

*At Medical Screening and Orientation*, you will learn how to access health care and basic health precautions you should follow.

*Medical Records.* Your medical records are confidential. Information is only shared with appropriate staff on a need-to-know basis.

*Types of Medical Care:* Health screening and assessment; medical clearance for work details; sick call to receive medication or routine, chronic and emergency care and hospitalization; detoxification; eye glasses; dental; pharmacy; specialty clinics and OB-GYN (females).

*Refusing Medical Care.* You may refuse medical, dental and mental health care services. Your refusal must be in writing. When you refuse, medical staff may explain the importance of the care they recommend.

*Sick Call.* You should be seen within one day (Monday-Friday) of submitting a sick call request.

*Interpreters* (staff or via telephone) shall help you to communicate with medical staff when your English is limited.

*Condoms* may be obtained during medical intake, sick call, medical visits, discharge planning interviews and at release. DOC prohibits

---

sexual activity between inmates but is obligated to provide the added health precaution.

## DRUG TESTING

You are subject to random testing and targeted testing when there is reason to believe you have used or are under the influence of illegal drugs. Drug dogs are used inside/outside CDF to detect narcotics.

## INMATE FINANCE ACCOUNTS

*Receiving Money in Your Account*

Inmate Finance shall deposit money you had at admission; from work detail; and postal money orders, bank and cashiers checks mailed by family and friends. The check/money order must be payable to you and include your full name and DCDC#. Inmate Finance will issue you a receipt. Posting to your account for spending takes 10 business days. Contact your case manager if you have problems with your account.

*Releasing Money from Your Account*

You may authorize DOC to release funds from your account to an attorney, bail bondsman, family member or friend. DOC will issue cash from the Inmate Finance Office 1901 D St SE Tues-Fri 1pm-2pm. The person must have positive photo identification. Mailing your funds to someone takes 15 business days.

Inmate Finance will deduct a percentage of your funds each month when restitution is court ordered.

When transferred to another institution, Inmate Finance will send your funds by check or money order within 30 days.

When released from custody you may claim your funds in person at the Inmate Finance Office, Tues-Fri 1pm-2pm.

## CANTEEN

You may spend $75 a month. There is a limit on the number/amount of some products you can buy. Special management inmates may not be able to purchase everything canteen sells. Inmate Finance will determine if you have enough money in your account. If not, you may receive a partial order. Your purchase will be directly delivered to you.

## LEGAL ACCESS

*Legal Visits*

Your attorney of record, your attorney's agents/investigators and practicing legal interns can visit you 24 hours per day 7 days a week. You can refuse a legal visit. You must sign consent to allow the legal visitor to take photographs, video or audio recordings. You may be escorted or sent by pass to the visiting hall. You are subject to pat search when leaving the housing unit and before the visit. You

will be strip searched after the visit. The visitor cannot give you any items (including legal documents to keep after the visit). You will remain partially hand-cuffed during the visit if under special status.

**Legal Mail**

**Incoming.** Legal mail shall be opened in your presence only to inspect for contraband. Staff cannot read your legal mail. You must sign a receipt when you receive legal mail.

**Outgoing.** You can seal mail that is addressed to the courts, attorneys and public officials. It will not be read, censored or copied.

**LAW LIBRARY**

General population inmates may visit the law library. See your housing officer for the schedule. Both inmates in segregation and general population may send a request slip for legal materials.

**INMATE GRIEVANCE PROCEDURES (IGP)**

You should try to resolve matters by sending a request slip or discussing the complaint with the staff member or a supervisor. If this does not work, you may file an IGP within 15 days of the incident. You cannot file a IGP about any of the following issues.

a. Parole Commission decisions,
b. Decisions of the Adjustment or Housing Boards
c. Classification Committee decisions,
d. Requests under Freedom of Information Act,
e. Inmate Accident Claims, Tort Claims,
f. Complaints filed on behalf of other inmates, and
g. Group complaints.

Your IGP must be about one (1) specific incident or complaint. Do not file more than one copy of the same complaint. You may obtain the IGP (Blue form) from the housing unit staff. You can use plain paper too. Include your name, DCDC #, tell what happened, when it happened and what you think will settle the matter. Sign your name.
Place the IGP in the locked box marked "Grievances".
The IGP Coordinator or designee collects IGPs Monday–Friday.
A supervisor or manager shall investigate your complaint and respond to your issue with 3 weeks.
The Warden shall review the supervisor's recommendation and make a decision.
You will receive the written decision with reasons for the action taken.
**First Appeal.** You may file an appeal to the Deputy Director within 5 days of receipt of the Warden's decision. Attach a copy of the

Warden's decision. The Deputy Director will respond in writing in 21 days
**Final Appeal.** You may appeal the Deputy Director's decision to the Director, DOC within 5 days of receipt of the Deputy Director's report. Include a copy of the Warden's and the Deputy Director's decision. You should receive a response within 21 calendar days.
**Emergency IGP.** If you are in harm's way and the matter is an emergency or very sensitive, you may send your IGP straight to the Director. Write "Emergency IGP" on the sealed envelope and send it through regular institutional mail or place it in the IGP locked box. The Director will respond in 3 days of receipt.

**MEDIA ACCESS**

DOC may allow the media to interview you by phone for 30 minutes with your written consent. DOC does not permit interviews for entertainment magazines or entertainment television.

**TELEPHONE CALLS**

Case managers will assist with *emergency and program related calls.*
*Social Calls.* Telephones are in each housing unit. Use your Personal Identification Number (PIN) to make the collect call. Three-way calling is not permitted. You can only make one call at a time. The call may be for up to 10 minutes. No matter how short your call is, you must move to the end of the line before you can make another call. You shall not shout or curse when talking on the phone. DOC records/monitors phone conversations for security reasons.

**SOCIAL VISITING**

*Eligible:* All inmates except those on disciplinary detention
Visits are *Non contact*

*Hrs:* Mon-Fri 12 noon – 7pm  Length: Two (2) 30-minute visits a week
Visitors must arrive at visitor's control by 6pm
*# Visitors:* Up to two (2) adults and three (3) minors (18 & under)
*Visitor ID:* 18yrs and older – valid DC/State issued photo ID
Former inmates/Probation/Parole require the Warden's permission to visit (see your case manager).
DOC employees need the Warden's permission to visit inmate who is an immediate relative.

*Emergency Visits.* Contact your case manager
You may refuse a visit.
The Warden may temporarily suspend or modify the visiting schedule.
*There is a Notice Posted at Visitors Control telling visitors* that searches are required; about items they can bring; possible arrest for illegal

items; the dress code; and reasons visits can be denied/terminated.

Inmate Dress Code: Jumpsuits buttoned/zippered, white t-shirts under jumpsuit

You will be searched before and after visits

*Long Term Visitor Suspension.* Visitors may be suspended as followed. You or your visitor can appeal to the Deputy Director.

Minor contraband – 30 days to 1 year suspension

Major Contraband – 1 year to permanent and criminal prosecution

Disorderly Conduct – 30 days to 1 year

Refusing Search – 30 days to 1 year

Minor Incidents – 30 days to 1 year

Major Incidents – 1 year to permanent termination

## MAIL

You can mail three (3) regular size letters free of charge each week if you do not have funds in your account.

You may purchase writing paper and postage stamps via canteen.

Staff picks up outgoing mail from the unit mailbox and incoming mail is delivered to you Mon-Fri.

*Magazines, Books and Newspapers:* You may only purchase magazines and newspapers mailed directly from the publishing company. You cannot receive pornographic magazines.

## INMATE RECORDS

The Records Office has your official file with commitment papers, face sheet, classification etc. The Federal Bureau of Prisons computes sentences for felons. Send your case manager or Records Office staff a request slip when you have questions about sentence computation. Your institution records are confidential and you must sign consent to release information except when it is a matter of public record.

*Public Records:* Upon written request, DOC will issue information about you without your consent such as your name, DCDC number, full description (e.g., sex, race, height, weight, complexion, hair color, eye color, build, and any identifying marks), criminal charges, sentence, date of sentence(s), mandatory release date, full term date, dates of jail credits, earned good time, detainers, judgment & commitment order, date of birth. Your institutional photograph ("mug shot") shall only be released upon your consent or the Director's approval.

*Records Review:* You may review your institutional record and obtain copies of documents by writing a request to the Records Administrator. Records will contact your case manager to further assist in this process. DOC will not show you reports prepared by other agencies (ex: Pretrial Services or MPD). You must mail a request to that agency's Freedom of Information Officer. For more information ask your case manager or request a copy of PM 1300.1 FOIA from the law library.

## PROGRAMS

### Case Management

A case manager will interview you at intake. Case Managers have offices on each housing unit and will meet with you within 72 hours of assignment to a housing unit. Case Managers shall assist you with orientation, classification, employment and program participation, and release planning.

### Indoor/Outdoor Recreation

Schedules for outdoor recreation are posted on each housing unit. Indoor recreation includes board games, gym, general & educational TV.

### Inmate Work Programs/ Details

Sentenced inmates are required to work. Pre-trial inmates can volunteer to work. CDF has a variety of jobs. Pay varies by job type and the length of time in the position. Some jobs require a medical clearance.

### Education

*Youth:* DC law requires you to attend school until your 18th birthday. DC Public Schools (DCPS) conducts classes at CDF.

*Special Education:* If you were in special education or it is determined that you need services, DCPS will provide services until you turn 22 years old.

*Adult Education:* CDF provides Adult Basic Education and GED classes. Send a request to the Academic Program or contact your case manager.

*Educational Good Time:* Sentenced inmates who maintain good conduct and who complete educational programs may receive good time credits to reduce the time served.

### Chaplain and Religious Services

Inmates have the right to attend or practice the faith of choice. Religious service schedules are posted in your unit. Submit a request slip to the Chaplain for additional help. Chaplains give religious counseling. Chaplains also recommend approval/denial of inmate marriage requests.

## Substance Abuse Programs

The courts or your case manager may refer you or you may request it.

## Reentry

You may receive release preparation and counseling. Prior to release you may be referred for community based health care, family and child services, housing, employment and educational assistance.

**Release:** *(This section does not include transfers to other facilities or state/federal jurisdiction).*

Inmates are released from CDF by court order or sentence expiration. You will be released by 10pm with your personal property, a DOC issued photo ID card (good for 60 days), community resources manual and a public transportation token or fare card.

## PREVENTION AND ELIMINATION OF SEXUAL ABUSE

### Sexual Assault

DOC prohibits sexual assault and shall seek criminal prosecution of staff and inmates who violate the law. Sexual assault is forced sexual contact through violence or intimidation.

### Sexual Abuse

Even if you consent, the law requires and DOC strictly enforces the rule that employees who engage in sexual acts or sexual contact with you will be disciplined, terminated or referred for criminal prosecution.

**Sexual Acts** is penetration of your vulva or anus using the penis, mouth, finger or an object. (This does not include when a health care provider uses their hands or fingers or medical devices while investigating sexual abuse/assault or appropriate medical treatment unrelated to sexual abuse/assault; or when performing body cavity searches for security and safety within the facility consistent with constitutional requirements).

**Sexual Contact** is fondling your body (clothed or unclothed).

**Sexual Misconduct.** You are also protected from:

*Sexual harassment.* Sexual harassment is when (1) staff makes obscene or sexually offensive advances, gestures and comments; (2) makes promises in return for sexual acts/contact or threatens you for refusing sexual acts/contact or (3) for making a complaint of sexual misconduct. Promises include, among other things, Influence over your safety, custody, privacy, privileges, work detail or program status. *Invasion of Privacy:* When staff watches or attempts to watch you for their sexual pleasure.

## Inmate Discipline for Sexual Assault and Sexual Contact

Inmates who engage in the sexual assault of another individual shall be referred for criminal prosecution. DOC shall take appropriate administrative actions to ensure that the predator is segregated.

Inmates who engage in sexual contact with another inmate shall be disciplined in accordance with PM 5300.1C.

Inmates will be disciplined for knowingly and deliberately making false reports or complaint of sexual abuse/assault or sexual misconduct.

### What to Do When You Have Been Sexually Assaulted, Abused or Subjected to Sexual Misconduct

Tell a staff member. They will confidentially report information directly to the Warden or the highest official on duty.

Call the Confidential Sexual Misconduct Hotline at **(202) 671-2851** from any inmate telephone. The Office of Internal Affairs monitors the hotline. DO NOT CALL THIS NUMBER UNLESS REPORTING A COMPLAINT OF SEXUAL ASSAULT, SEXUAL ABUSE OR SEXUAL MISCONDUCT.

If you have been sexually assaulted by an employee or another inmate or if you have had sexual contact with an employee, it is very important that you immediately report it so you can receive medical attention, protection and local law enforcement can be notified. Follow all instructions because there may be evidence on your body or clothing that can help in the investigation.

### Internal Investigation Procedures

The Office of Internal Affairs shall interview you and take action.

DOC may transfer the employee away from where you are housed and forbid the employee from further contacting you. Both you and the employee are not allowed to discuss this matter with each other.

DOC will try not to disrupt your housing or programming during the investigation, but when appropriate you may be placed in Administrative Segregation or transferred to another unit or institution.

DOC will notify you of scheduled interviews in advance and allow you to contact your attorney. Your attorney cannot testify at the interview but you can consult with him/her before answering questions. The investigator may tape-record all testimony and shall draft a statement detailing testimony from each person who is interviewed.

DOC will notify you in writing of investigation findings and appeal procedures.

(b) The carnal knowledge, oral sodomy, sexual assault with an object or sexual fondling of a person not forcibly or against the person's will where the victim is incapable of giving consent because of his/her youth or temporary or permanent mental or physical incapacity; or

(c) The carnal knowledge, oral sodomy, sexual assault with an object or sexual fondling of a person achieved through the exploitation of the fear or threat of physical violence or bodily injury.

- Carnal Knowledge – Contact between the penis and the vulva or the penis and the anus, including penetration, however slight.

- Oral Sodomy – Contact between the mouth and the penis, the mouth and the vulva or the mouth and the anus.

- Sexual Assault with an Object – The use of any hand, finger, object or other instrument to penetrate, however slightly, the genital or anal opening of the body of another person.

- Sexual Contact – The touching of the private body parts of an inmate (including the genitalia, anus, groin, breast, inner thigh or buttocks) for the purpose of sexual gratification.

110   Escape includes:

(a) Breach of the perimeter of a secure facility, or

(b) Attempted Escape - The attempted breach of the perimeter of a secure facility or tampering with and/or damaging any part of the perimeter including but not limited to windows, bars, and cell doors;

(c) Instigating and/or assisting the perimeter breach or attempted perimeter breach by another inmate; or

(d) Escape From Outside of a Secure DOC Facility – When in the custody of the DOC and while under the supervision of DOC personnel or its agents, escapes from supervision while outside of the secure perimeter (including from a work detail, medical or court visit or while being transported);

Page 17

---

PM 5300.1C INMATE DISCIPLINARYCODE OF OFFENSES

1.  CLASS I MAJOR OFFENSES

a.  Referral for Criminal Prosecution. Any of the following Class I offenses alleged to have been committed in the institution may be referred for prosecution.

b.  Referral for prosecution does not restrict DOC from imposing administrative discipline with corresponding penalties, outlined in this Chapter, Section 3 "Penalties for Class I Major Offenses."

101   Murder/Homicide

102   Manslaughter

103   Any Act of Terrorism - use, dissemination, or detonation of a weapon of mass destruction, manufacture or possession of a weapon of mass destruction"

104   Kidnapping

105   Burglary – First degree

106   Armed Robbery

107   Assault with Serious Injury is when the victim sustains serious injury that requires urgent and immediate medical treatment and restricts the victim's usual activity. Medical treatment is more extensive than first aid such as the application of bandages to wounds. Medical treatment might include stitches, setting broken bones, treatment of concussion, etc.

(a) Willfully or forcefully causing serious bodily injury to another inmate, a correctional employee, volunteer, contract worker or visitor; or

(b) Willfully or forcefully causing serious bodily injury with a weapon or by any means to any person; or

(c) Physically assaulting, resisting, opposing, impeding or interfering with any person.

108   Assault by Throwing Substances such as liquids, blood, waste, chemicals, urine, etc.

109   Sexual Abuse Inmate-Upon-Inmate

(a) The carnal knowledge, oral sodomy, sexual assault with an object or sexual fondling of a person, forcibly or against that person's will;

Page 16

(e) Willfully failing to return to the facility by the time designated on a community release activity pass.

111 **Possession of Major Contraband.** Major Contraband is any item in an inmate's possession or control (to include within his or her cell, clothing or immediate surroundings) that is illegal by law or expressly prohibited by those legally charged with the administration and operation of the facility. Items of Major Contraband include but are not limited to:

(a) A knife; blackjack; gun; sharp, blunt or pointed objects; other articles used as dangerous weapons; tool; rope; civilian clothing; uniform; toxic or flammable fluids or substance or syringe.

(b) Unauthorized locking device, key, lock, pick or other device capable of destroying, altering, interfering with or damaging any security equipment.

(c) Illegal drug, marijuana, a controlled substance or a narcotic unless a doctor has authorized its use to include possession, having control of, using, making or being under the influence. Possessing a another inmate's prescription medication that contains a narcotic or controlled substance.

2. The following offenses may incur the maximum penalties outlined in this Chapter under Section 3 "Penalties for Class I Major Offenses."

112 **Assault Without Serious Injury**

113 **Restraint** is willfully constraining another person under circumstances which expose the other person to a risk of bodily injury.

114 **Arson** is willfully starting a fire or causing an explosion, which damages personal or institutional property.

115 **Tampering With a Witness or Informant** is:

(a) Attempting to induce, inducing, or otherwise causing a witness or informant to testify or inform falsely or to withhold any testimony or information or other evidence; or

(b) Retaliating or attempting to retaliate for anything done by another person in his or her capacity as a

witness or informant.

116 **Bribery** is willfully, directly or indirectly, giving, offering, or promising anything of value to another inmate, employee, volunteer or other authorized visitor with the intent:

(a) To influence any official act or any act within the official responsibility of any person;

(b) To induce any person to do or omit doing any act in violation of his or her duty; or

(c) To induce any person to introduce contraband into the facility.

117 **Inciting to Riot.** A riot is a wild or violent disorder, confusion or disturbance. Inciting to riot is purposefully:

(a) Urging a group of two or more other inmates to engage in a current or impending disturbance or disruptive event; or

(b) Giving direction to a group of two or more inmates to cause, continue, or enlarge a violent or tumultuous disturbance or disruptive event.

118 **Engaging in a Disruptive Event.** A disruptive event is an incident brought on by the inmate's action that resulted in serious injury to staff or other inmates and/or loss of control of the facility or a portion of the facility and required extraordinary measures to regain control. Loss of control of the facility is defined as a situation in which inmates are acting in concert to disrupt facility operation and refuse to comply with lock down orders. They may take hostages or appear to be prepared for physical conflict. Hostile Intent is apparent and threats are noted. Extraordinary measures are required to regain control such as sending in a significant number of ERT, firing shots.

3. **PENALTIES FOR CLASS I MAJOR OFFENSES.** The accused, if found guilty at the disciplinary hearing, shall be subject to one or more of the following:

a. Disciplinary Detention may be for up to the remainder of your sentence or release from custody. Only the Warden shall approve continuous disciplinary detention for more than 30 days.

b. Referral to Classification for consideration in a change in custody status that may also result in a change in an inmate's housing assignment;

c.  Loss of privileges for up to ninety (90) days (privileges are defined in this Chapter, Section 10 "Restrictions While In Disciplinary Detention"); or Loss of work assignment.

d.  Repetition of a Class II Offense.  If found guilty, an inmate who is found to have three (3) or more repeated violations of a particular Class II offense during the current period of incarceration, may receive allowable penalties of a Class I offense.

## 4.  CLASS II – SERIOUS OFFENSES

201  **Class II Assault.** Willfully subjecting an employee of the DOC to offensive bodily contact

202  **Extortion, blackmail protection** is demanding or receiving money or anything of value in return for protection against others, to avoid bodily harm, or under threat of informing.

203  **Threatening conduct** is

(a)  Communicating intent to injure another person or commit a crime of violence or an unlawful act dangerous to human life that:

(1)  Places another person in fear of serious bodily injury;

(2)  Causes evacuation of a building; or

(3)  Causes serious disruption or alarm.

(b)  Willfully compelling or inducing another person to engage in conduct from which the latter has a legal right to abstain or prohibiting conduct in which he/she has a legal right to engage, by means of instilling in that person a fear that non-compliance with the demand will result in one of the following:

(1)  Cause bodily injury to someone;

(2)  Cause significant damage to property;

(3)  Accuse someone of an offense or cause charges to be instituted against someone.

Page 20

204  **Possession of Serious Contraband.  Serious Contraband** is any item in an inmate's possession or control (to include within his or her cell, clothing or immediate surroundings) that is expressly prohibited by those legally charged with the administration and operation of the facility.  Items of Serious Contraband include but are not limited to:

(a)  Any intoxicating beverage to include possession, having control of, making, using or being under the influence.

(b)  Smoking materials and tobacco products.

(c)  Currency or coins.

(d)  Cell phones and accessories.

205  **Creating a Minor Disturbance** is willfully causing a non-violent disorder that disrupts the orderly operation of the facility.

206  **Sexual Activity** is consensual activity between two inmates or an inmate and a family member or another during a social visit  as follows:

(a)  Homosexual Activity – physical contact with the genital parts, oral or anus of another person of the same sex.

(b)  Heterosexual Activity – physical contact of the breasts, genitalia, oral or anus of a person of the opposite sex.

(c)  Sexual Contact – The intentional touching or fondling, either directly or through clothing, of the private body parts of another (including genitalia, anus, groin, breast, inner thigh or buttocks) for the purpose of sexual gratification.

207  **Indecent Exposure** is the intentional exposure of genital parts to any person.

208  **Theft** is willfully taking or withholding the property of another person or entity without permission, authorization or authority.

209  **Damage or destruction of property** occurs when an inmate destroys property belonging to the institution or to any person or does damage to property of the District of Columbia or any individual.

210  **Possession of Stolen Property** is having the property of

Page 21

218 **Impeding an Employee in the Performance of Duties** is intentionally obstructing, interfering, opposing or resisting any employee in an investigation or the performance of any duties.

219 **Giving a False Alarm** is communicating an untrue report concerning a fire, explosion, or the present commission of an assault, forcible sexual assault or kidnapping, or other catastrophe or emergency where the report is likely to cause the evacuation of a building or to cause the staff to respond to an alarm.

220 **Out of Bounds** includes:

(a) Failure to report to an appointed place of duty or assignment or any other place to which directed by a valid order of an employee or regulations;

(b) Leaving any place where directed to remain by an employee or institutional regulations; or

(c) Being in an unauthorized area.

221 **Tampering with a locking device** to include but not be limited to cell doors, bars, grills, handcuffs, leg irons.

5. **PENALTIES FOR CLASS II OFFENSES.** If, after a hearing pursuant to Disciplinary Board procedures, the accused is found to have committed a Class II Serious Offense, the inmate is subject to any one or more of the following:

a. Disciplinary segregation for up to thirty (30) days. When an inmate is found guilty of multiple Class II offenses, the maximum sanction may be increased to up to sixty (60) days for the combined violations that arose out of the one incident;

b. Loss of social visits, telephone or canteen purchase privileges for up to ninety (90) days;

c. Extra duty; or

d. Loss of work assignment.

e. Execution of the imposed sanction may be suspended upon conditions of the inmate maintaining clear conduct for a specified time period;

f. Repetition of Class III Offenses. If found guilty, an inmate who is found to have three (3) or more repeated violations of a particular Class III offense during the current period of incarceration, may receive allowable penalties of a Class II offense.

6. **CLASS III – MODERATE OFFENSES**

Page 23

---

another without written authorization of relinquishment that the owner has submitted to the CDF property officer.

211 **Disrespect** is making any profane, obscene, or abusive remark to, about, or in the presence of any employee, volunteer or visitor.

212 **Lack of Cooperation** is:

(a) Wilfully disobeying a valid order of a correctional employee; or

(b) Failing to respond to any question or direction of any employee of the Department or other custodial official.

213 **Fighting** is when two or more inmates engage in a physical altercation leading to the exchange of blows or bodily contact.

214 **Illegal Enterprise** is running a store or stockpiling canteen in excess of authorized limits for the purpose of profit or personal gain or providing unauthorized services for payment.

215 **Falsifying Physical Evidence** is:

(a) Altering, destroying, concealing, or removing anything, with intent to impair its authenticity or availability in any official investigation or proceeding; or

(b) Presenting or using anything that is known to be false with intent to deceive an employee or anyone who is or will be involved in the proceeding or investigation.

216 **Forgery or Tampering** is the fraudulent reproduction or alteration of a document or other written item.

217 **Lying** is:

(a) Making a willful, malicious and false report or statement about an employee;

(b) Making a false statement with intent to avoid disciplinary action for violation of an institutional regulation or to aid another inmate in such an endeavor; or

(c) Knowingly making a false statement about another inmate with the intent of affecting the inmate's housing or program status.

Page 22

**301 Minor Contraband** is:

(a) Possession of any article other than those defined as major or serious contraband, which is not issued by the institution, not purchased from the canteen, or not specifically authorized by the Warden or designee; or

(b) The use of any article in a manner contrary to the intent or provisions of issuance, purchase, or authorization.

**302 Interference with the Orderly Operation of the Facility** is:

Engaging in loud or boisterous talk, laughter, whistling, or other vocal expression, if such is, or may tend to be, disruptive of order or a disturbance to others; or

(c) Wilfully failing to proceed from place to place within the institution in a prompt and orderly way; or

(d) Approaching or speaking to any visitor, unless first authorized to do so by a correctional employee.

**303 Gambling** is:

(a) Playing any game for money or other things of value, including, but not limited to cards or dice;

(b) Betting by those observing a game in person or while listening to the radio or looking at television; or

(c) Organizing any game of chance, lottery, betting pool, or other means of gambling.

**304 Misuse of Authorized Medication** is hoarding or giving personally prescribed medication to another inmate.

**305 An Inmate Detail Worker's Refusal to Work, Failure to Perform Work as Instructed by the Supervisor/Other Authorized Employee or Unexcused Absence from Work or any Assignment.**

7. **PENALTIES FOR CLASS III OFFENSES.** If, after a hearing pursuant to disciplinary procedures or through informal resolution pursuant to this directive, the accused is found to have committed a Class III Moderate Offense, the inmate is subject to any one or more of the following. Execution of the imposed sanction may be suspended upon conditions of the inmate maintaining clear conduct;

a. Loss of social visits, telephone or canteen purchase privileges for up to sixty (60) days;

b. Extra duty;

c. Loss of work assignment; or

d. If after a hearing and a finding of guilt, the imposition of disciplinary segregation status that does not exceed ten days

e. Execution of the imposed sanction may be suspended upon conditions of the inmate maintaining clear conduct for a specified time period;

8. Repetition of Class III Offenses. If found guilty, an inmate who is found to have three (3) or more repeated violations of a particular Class III offense during the current period of incarceration, may receive allowable penalties of a Class II offense.

9. **CLASS IV – MINOR OFFENSES**

**401 Disorderly Appearance** is an inmate's failure to keep his or her clothing and person reasonably clean and orderly; or

**402 Creating a Health, Safety, or Fire Hazard** includes any activities, which may cause a fire or creates a danger to health and safety.

**403 Abuse of Privileges** is violating any institution regulation dealing with a privilege such as telephone use or removing food from the culinary area.

**404 Abuse of Living Quarters** is an inmate's:

(a) Failure to make his or her own bed neatly each day;

(b) Failure to keep his or her own living quarters clean and orderly; or

(c) Failure to keep articles issued by the institution or purchased from the canteen neatly in an approved place.

**405 Unauthorized Use of Property** is taking, exercising control over, or otherwise using property without consent or authorization.

10. **PENALTIES.** If, after a hearing pursuant to disciplinary procedures or through informal resolution pursuant to this directive, the accused is found to have committed a Class IV Moderate Offense, the inmate is subject to any one or more of the following.

a. Loss of social visits, telephone or canteen purchase privileges for up to 30 days;

b. Reprimand and Warning;
c. Confiscation of the item;
d. Extra duty; or
e. If after a hearing and a finding of guilt, the imposition of disciplinary segregation status that does not exceed seven (7) days.
f. Execution of the imposed sanction may be suspended upon conditions of the inmate maintaining clear conduct for a specified time period;
g. Repetition of Class IV Offenses.  If found guilty, an inmate who is found to have three (3) or more repeated violations of a particular Class IV offense during the current period of incarceration, may receive allowable penalties of a Class III offense.

## PREHEARING DETENTION

A Lieutenant or a higher authority can place you in prehearing detention pending the disciplinary hearing when there is evidence that you pose a clear and present danger to yourself, others or to the security of the facility. The Shift Commander will review placement within 24 hours to determine if you should remain in segregation. The Warden will conduct further review with 72 hours.

## DISCIPLINARY REPORT (DR)

The DR shall include your name, DCDC #, Housing Unit, Cell # and the squad when the incident occurred at your work site; the charges against you including; (1) the specific rule(s) violated [example: Assault with Serious Injury] and (2) the Code Reference [example: Class I, Section 106 (a)], (3) witnesses to the alleged offense; (4) a formal statement of the charge to include who was involved, what happened and the time and location of the incident, (5) any unusual behavior; (6) any physical evidence and its disposition, (7) confidential information and any other reports, memoranda, or records concerning an alleged offense shall be attached to the investigative report, (8) any immediate action taken, including the use of force, and (9) the reporting staff member's signature and date and time of the report.

**Filing.** The writer shall file the DR with the Shift Supervisor before completion of the tour of duty on the day of the incident. With the Shift Supervisor's approval the DR may be submitted within 48 hours.

## Investigation

Completed by the Investigating Officer within 72 hours of the DR being

filed. The Investigating Officer shall review the DR for accuracy (correct charge(s), misspelled words, etc). The Investigating Officer will interview and obtain statements from you and witnesses. The Investigating Officer can (1) reject the DR when charges are not supported, (2) reduce the charges, (3) with your cooperation, informally resolve a Class III or Class IV offense or (4) refer the DR for a Hearing.

## Informal Resolution Determination of Class III and Class IV Offenses

The Investigating Officer may accept your admission of guilt and impose discipline like loss of privileges. *Informal resolution does not include disciplinary detention. Disciplinary detention requires a formal hearing.* You must sign paperwork that you agree with the informal resolution. Any offers at informal resolution are not binding in any way on a Hearing Officer or the Disciplinary Board in a formal hearing on the charges. Admissions you made during informal resolution discussions can not be used in a formal hearing on the charges if at the hearing you deny previous statements, plead not guilty or decline to make a statement.

## Notice of Formal Disciplinary Action and Procedures

The Investigating Officer will advise (1) you that discipline is pending, (2) of your right to remain silent and that what you say can and may be used against you at this and any subsequent proceedings.
The Investigating Officer will write down your statement or note when you did not want to make a statement.
The Investigating Officer will give you a copy of the DR.
You have the option of:
(1) a single Hearing Officer or a 3 member Disciplinary Board and
(2) a Public Defender Service representation for Class I offenses or a DOC staff representative for Class II offenses.
You have a right to present evidence at the hearing and you should advise the Investigating Officer of witnesses you want to call.
You will be asked to sign the Investigation Report to show you received it. This is not admitting guilt.

## DISCIPLINARY BOARD HEARINGS

Hearings are held Monday through Friday, except holidays.
You should have a hearing within 7 days (not including weekends and holidays) of the alleged offense. The Hearing Officer will let you know 24 hours in advance of the hearing.
You may request a 3 business day continuance if your representative or an important witness is not available or further investigation is needed.

## RESTRICTIONS WHILE IN DISCIPLINARY DETENTION

No visits and phone calls for social reasons

30 minutes to shower and shave

No program participation (unless school is mandatory by law)

*NOTE: Inmates placed in pre-detention are not subject to the following restrictions.*

## ADMINISTRATIVE SEGREGATION (AS)

A Lieutenant or higher official may place you on AS because of (1) a court order; (2) for voluntary or involuntary protective custody when there are identified enemies and/or threats; (3) when evidence supports that you are a serious threat to others; (4) when evidence supports that you are a definite escape risk because of actual or attempted escapes or you are found with escape instruments; or (5) you are pending prosecution for a crime you committed while incarcerated.

The Warden or designee shall review your status within 72 hours.

You will have a formal hearing within 7 business days of placement unless facility emergency circumstances delay the hearing.

You can request a staff representative to assist you at the hearing.

## HOUSING BOARD HEARING

Hearings are tape recorded or detailed notes are taken.

The reasons for AS placement and evidence used shall be read to you.

You or your representative may make a statement and present evidence

The Board will consider testimony, documents, witnesses and evidence

You will be verbally informed of the decision.

## APPEAL

You must submit the appeal within 3 business days stating why you feel the decision should be reversed. The Warden will issue a written decision to your appeal within 3 business days of receipt of your appeal.

## ADMINISTRATIVE REVIEW REHEARINGS

The Housing Board will review your status every 7 days for the first two months to determine if you can be placed in less restrictive status. You can send evidence on your behalf. You will only attend the hearing every 30 days during the first sixty days of AS.

After the first two months, the Housing Board will review your status every 30 days and you will appear in person every 90 days. You will be able to send evidence every 30 days.

When the Board determines there is no longer a risk, you may be released to general population.

## INMATE REPRESENTATION

The legal representative or staff representative will (1) interview you prior to the hearing, (2) talk to witnesses, (3) review statements and charges, (4) make a statement and present evidence at the hearing and (5) help you to present your defense.

## HEARING BOARD/OFFICER

Individuals selected to hear your case are staff who did not participate in the incident in any way and must provide an impartial hearing.

## HEARING PROCEDURES

You are required to attend the hearing unless you waive this in writing.

DOC may remove you from the hearing if your conduct dictates.

You will be informed of your rights.

The hearing will be taped or detailed notes will be taken. All reports and evidence will be read to you.

You are allowed to make a statement/present evidence or remain silent.

You may hear witness testimony but only your representative or the Board/ Officer can question witnesses. The number of witnesses will be limited to those who can provide testimony to the incident without everyone repeating the same testimony or when bringing the witness poses a security problem.

The Board/Officer will decide and advise you of the finding of guilt or innocence; if the finding is guilt, you or your representative can make a final statement on your behalf.

The Board/Officer may review your institution record for past disciplinary reports or your behavior to help determine appropriate discipline.

The Board/Officer will tell you its decision.

Within 5 business days, the Warden/designee will either (1) approve the action, (2) dismiss the case, (3) reduce disciplinary detention time or (4) send your case back for more review when the Board/Officer failed to consider relevant evidence.

## APPEAL

You or your representative may send a written appeal to the Warden within 3 business days based upon challenge to the evidence of the amount of punishment.

The Warden will provide you with a written decision within 5 business days of receipt of your appeal.

## DISMISSAL

The Disciplinary Officer shall remove the DR and evidence from your record when you are found not guilty of the entire DR.

## ADMINISTRATIVE SEGREGATION – GENERAL PRIVILEGES

Medical care, medication and access to basic personal care
Shower three times per week, hair care
Laundry exchange like general population
Books, visits, mail and telephone calls; religious counseling, canteen
Five (5) hours per week out-of-cell recreation
Special education and related services for eligible youthful offenders.

## POLICIES AVAILABLE THROUGH THE LAW LIBRARY

| | |
|---|---|
| 1270.1 | Victims Information & Notification Everyday (VINE) |
| 1300.1 | Freedom of Information FOIA |
| 1300.2 | Consent to Release of Information |
| 1340.2 | Media Relations |
| 3350.2 | Prison Rape Elimination Act |
| 3350. | Employee Code of Ethics |
| 4020.1 | Admissions and Orientation Program, Inmates |
| 4030.1 | Inmate Grievance Process (IGP) |
| 4050.1 | Inmate Property |
| 4070.1 | Telephone Access, Inmate |
| 4070.4 | Inmate Correspondence |
| 4080.1 | Inmate Visiting Regulations |
| 4090.3 | Classification and Reclassification |
| 4110.7 | Educational Programs |
| 4151.1 | Inmate Recreation Program |
| 4157 | Canteen |
| 4160.3 | Attorney Client Relationship |
| 4160.4 | Law Library |
| 4160.6 | Inmate Marriages |
| 4161.1 | Recording Legally Changed Name |
| 4210.2 | Non-Industrial Pay System |
| 4220.1 | Release Gratuities |
| 4340.2 | Educational Good Time Credits |
| 4350.1 | Sex Offender Registration |
| 4353.3 | Separation Cases |
| 4410.1 | Religious Program |
| 4740.1 | Culinary Workers Exam & Daily Workers Inspection |
| 4923.1 | Work Release Program |
| 4923. 6 | Mandatory Release to Supervision |
| 5300.1 | Inmate Disciplinary and Administrative Hearings |
| 6060.1 | Smoke Free Workplace |

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
                                        )
**ELOISE T. WORMLEY,**                  )
                                        )
         **Plaintiff,**                 )
                                        )
         **v.**                         )
                                        )     **Civil Action No. 08-00449-CKK**
**THE UNITED STATES OF AMERICA,**       )
 **et al.**                             )
_____ )

## ORDER

Upon consideration of the District Defendants Motion to Dismiss Plaintiff's Complaint, the memorandum of points and authorities filed in support thereof, any opposition thereto, and the entire record herein, it is by the Court this ___ day of _____, 2008:

ORDERED, that the Defendants' motion shall be and the same is hereby granted; and it is further,

ORDERED, that judgment against Plaintiff and in favor of the Defendants is granted as a matter of law.


                              _____
                              UNITED STATES DISTRICT
                              COURT JUDGE