## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ELOISE T. WORMLEY, | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) **OPPOSITION TO MOTION TO** |
| | ) **DISMISS** |
| THE UNITED STATES OF AMERICA, | ) |
| et al. | ) **CASE NO. 1:08-cv-00449 (CKK)** |
| | ) |
| | ) |

## OPPOSITION TO DISTRICT DEFENDANTS' MOTION TO DISMISS

Pursuant to LCivR 7(a), and for the reasons stated in the attached Memorandum of Points and Authorities, Plaintiff Eloise T. Wormley submits this Opposition to District Defendants' Motion to Dismiss.

Pursuant to LCivR 7(f), Plaintiff respectfully requests an oral hearing on this motion and opposition.

August 8, 2008

   /s/ Christopher R. Hart

Robin E. Jacobsohn (D.C. Bar no. 417307)
Christopher R. Hart (D.C. Bar no. 486577)
Mathew J. Peed (D.C. Bar no. 503328)
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, D.C. 20005
(202) 434-5000

Ivy A. Lange  (D.C. Bar No. 488147)
Washington Lawyers' Committee for Civil Rights &
Urban Affairs
11 Dupont  Circle, N.W., Suite 400
Washington, D.C.  20036
Tel 202-319-1000
Fax 202-319-1010

*Attorneys for Plaintiff*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| ELOISE T. WORMLEY, <br>               Plaintiff, <br><br> v. <br><br> THE UNITED STATES OF AMERICA, <br> et al. | ) <br> ) <br> ) <br> ) <br> )   **OPPOSITION TO MOTION TO** <br> )   **DISMISS** <br> ) <br> )   **Case No. 1:08-cv-00449 (CKK)** <br> ) |

### MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION
### TO DISTRICT DEFENDANTS MOTION TO DISMISS

In accordance with LCvR 7(b), Plaintiff Eloise T. Wormley hereby submits the

following Memorandum of Points and Authorities in Opposition to District Defendants' Motion

to Dismiss.

Respectfully submitted,

August 8, 2008

   /s/ Christopher R. Hart
Robin Jacobsohn (D.C. Bar no. 417407)
Christopher R. Hart (D.C. Bar no. 486577)
Mathew J. Peed (D.C. Bar no. 503328)

WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, D.C. 20005
(202) 434-5000 (tel)
(202) 434-5029 (fax)

Ivy A. Lange  (D.C. Bar No. 488147)
Washington Lawyers' Committee for Civil Rights &
Urban Affairs
11 Dupont  Circle, N.W., Suite 400
Washington, D.C.  20036
Tel 202-319-1000
Fax 202-319-1010

*Attorneys for Plaintiff*

## TABLE OF CONTENTS

I.    THE DISTRICT DEFENDANTS' RELIANCE ON THE USMS DETAINER
IS MISPLACED, AND THEY MAY NOT RELY ON IT AS AN
INSTRUMENT AUTHORIZING MS. WORMLEY'S INDEFINITE
DETENTION. ...................................................................................................... 8

A.    The Detainer Was Facially Invalid. ........................................................ 9

B.    Nothing On the Face of the Detainer Required or Allowed the District
Defendants to Continue Detaining Ms. Wormley After October 21,
2006.......................................................................................................... 11

II.   MS. WORMLEY HAS STATED A CLAIM AGAINST DEVON BROWN,
WHO IS APPROPRIATELY NAMED IN HIS INDIVIDUAL CAPACITY
AND DOES NOT ENJOY QUALIFIED IMMUNITY. .................................... 15

A.    Ms. Wormley Has Alleged Facts Sufficient for a Claim Against Devon
Brown in His Individual Capacity. .......................................................... 15

B.    Devon Brown is Not Entitled to Qualified Immunity............................. 17

III.  MS. WORMLEY HAS STATED A CLAIM AGAINST DEFENDANTS
BROWN AND JOHN OR JANE DOES 11–20 FOR FALSE
IMPRISONMENT AND NEGLIGENCE. ...................................................... 19

A.    Ms. Wormley Has Stated a Claim Against the Defendants Brown and
John or Jane Does 11–20 for Negligence. .............................................. 19

B.    Ms. Wormley Has Stated a Claim Against the Defendants Brown and
John or Jane Does 11-20 for False Imprisonment. ................................. 22

IV.   SOVERIEGN IMMUNITY DOES NOT BAR THIS ACTION. .................... 24

V.    THE DISTRICT IS LIABLE UNDER RESPONDEAT SUPERIOR FOR
THE ACTIONS OF ITS EMPLOYEES.......................................................... 25

VI.   MS. WORMLEY HAS STATED A CLAIM AGAINST THE DISTRICT
DEFENDANTS UNDER 42 U.S.C. § 1983.................................................... 26

A.    The Complaint Alleges Facts Sufficient to State a § 1983 Claim
Against the District Defendants. ............................................................. 26

1.    Ms. Wormley Has Sufficiently Alleged Constitutional
Violations of Her Fourth and Eighth Amendment Rights. ...... 26

2.    Ms. Wormley Has Sufficiently Alleged That a District of
Columbia Policy or Custom Caused the Constitutional
Violations................................................................................... 28

B.    Ms. Wormley Has Sufficiently Alleged Deliberate Indifference, and
the District Defendants May Not Rely on the USMS Detainer to
Escape § 1983 Liability. ......................................................................... 29

       C.     The District Defendant Cannot Justify Ms. Wormley's Additional Three-Day Detention at CDF By Claiming That They Were Merely "Outprocessing" Ms. Wormley ............................................................ 31

VII.    DOCTRINES REGARDING FAILURE TO EXHAUST ADMINISTRATIVE REMEDIES ARE INAPPLICABLE AND MERITLESS .................................................................................................... 33

       A.     Ms. Wormley Was Not Required to Bring a Habeas Petition. ........................... 33

       B.     The PLRA Is Inapplicable Because Ms. Wormley Was Not Imprisoned When She Filed This Lawsuit. ............................................................... 34

VIII.   THIS COURT SHOULD CONTINUE TO EXERCISE SUPPLEMENTAL JURISDICTION SHOULD FEDERAL CLAIMS AGAINST THE DISTRICT DEFENDANTS BE DISMISSED. .................................................................... 35

IX.    DISMISSING THE UNIDENTIFIED DEFENDANTS IS IMPROPER AT THIS STAGE. .................................................................................................... 35

X.     SUMMARY JUDGMENT REGARDING PUNITIVE DAMAGES IS IMPROPER ........................................................................................................ 36

XI.    IN THE ALTERNATIVE, THE MOTION FOR SUMMARY JUDGMENT SHOULD BE DENIED TO ALLOW MS. WORMLEY A MEANINGFUL OPPORTUNITY FOR DISCOVERY. ............................................................... 39

# TABLE OF AUTHORITIES

## FEDERAL CASES

*A.E. Staley Mfg. Co. v. Sec'y of Labor*, 295 F.3d 1341 (D.C. Cir. 2002) .......................................30

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) .................................................................7

*Baker v. District of Columbia*, 326 F.3d 1302 (D.C. Cir. 2003) .................................26, 28, 29, 30

*Banks v. York*, 515 F. Supp. 2d 89 (D.D.C. 2007) .........................................................7, 16, 17, 18

*Barnes v. District of Columbia*, 242 F.R.D. 113 (D.D.C. 2007).   ....................................26, 27, 31

*Butera v. District of Columbia*, 235 F.3d 637 (2001)) ..................................................................37

*Bynum, et al. v. District of Columbia*, No. 02-0956 (D.D.C.) ........................................................16

*Caldwell v. Hammonds*, 53 F. Supp. 2d 1 (D.D.C. 1999) ..............................................................16

*County of Riverside v. McLaughlin*, 500 U.S. 44 (1991) ...............................................................32

*Daskalea v. District of Columbia*, 227 F.3d 433 (D.C. Cir. 2000) .................................................30

*Doe by and Through Doe v. Washington County*, 150 F.3d 920 (8th Cir. 1998) ...........................34

*EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621 (D.C. Cir. 1997) ..................................7

*Feirson v. District of Columbia*, 315 F. Supp. 2d 52 (D.D.C. 2004) .............................................37

*Harlow v. Fitzgerald*, 457 U.S. 800 (1982) .................................................................................17

*In re Smith*, 114 F.3d 1247 (D.C. Cir. 1997) ...............................................................................34

*Krieger v. Fadely*, 211 F.3d 134 (D.C. Cir. 2000) .........................................................................7

*Laningham v. United States Navy*, 813 F.2d 1236  (D.C. Cir. 1987) ..............................................7

*M.K. v. Tenet*, 99 F. Supp. 2d 12 (D.D.C. 2000) .........................................................................36

*Parker v. District of Columbia*, 850 F.2d 708 (D.C. Cir. 1988) ....................................................30

*Preiser v. Rodriguez*, 411 U.S. 475 (1973) ..................................................................................33

*Saffron v. Wilson*, 70 F.R.D. 51 (D.D.C. 1975) ...........................................................................36

*Sample v. Diecks*, 885 F.2d 1099 (3d Cir.1989) ........................................................28

*Saucier v. Katz*, 533 U.S. 194, 201 (2001) ...............................................................17

*Smith v. Wade*, 461 U.S. 30 (1983)..........................................................................39

*Tao v. Freeh*, 27 F.3d 635 (D.C. Cir. 1994) ...............................................................7

*U.S. ex rel. Bailey v. O'D. Askew*, 486 F.2d 134 (5th Cir. 1973) .................................33

*Wardlaw v. Pickett*, 1 F.3d 1297 (D.C. Cir. 1993) .....................................................17

*Warren v. District of Columbia*, 353 F.3d 36 (D.C. Cir. 2004)...............................29, 30

## STATE CASES

*Aguehounde v. District of Columbia*, 666 A.2d 443 (D.C. 1995).................................24

*District of Columbia v. Chinn*, 839 A.2d 701 (D.C. 2003)..........................................25

*Faniel v. Chesapeake & Potomac Tel. Co. of Md.*, 404 A.2d 147 (D.C. App. 1979) .................22

*Herbert v. District of Columbia*, 716 A.2d 196 (1998) ...............................................19

*Lockhart v. Cade*, 728 A.2d 65 (D.C.,1999).............................................................25

*McAllister v. District of Columbia*, 653 A.2d 849 (1995) ...........................................21

*Woodward v. District of Columbia*,  387 A.2d 726 (D.C. 1978)..............................14, 22

## RULES AND STATUTES

28 U.S.C. § 1367..................................................................................................35

42 U.S.C. § 1983...................................................................................... *passim*

42 U.S.C. § 1997e.................................................................................................34

D.C. Code § 24-211.02 .....................................................................................19, 20

Fed. R. Civ. P. 12.................................................................................................7

Fed. R. Civ. P. 56.....................................................................................7, 36, 39, 40

**MISCELLANEOUS**

Restatement (Second) of Torts, § 35.................................................................................15

Restatement (Second) of Torts, § 314A(4).......................................................................21

Restatement (Second) of Torts, § 323................................................................................21

Restatement (Second) of Torts, § 324................................................................................21

# INTRODUCTION

Plaintiff, Eloise T. Wormley, was unlawfully detained for 150 days while in the custody of the District of Columbia, in facilities either directly operated by the District or operated through agents of the District.  There was no justification for her detention, which was a direct result of the deliberate and negligent actions and omissions of a variety of individuals and entities.  Ms. Wormley brings this suit specifically against the District of Columbia, the Director of the Department of Corrections ("DOC"), Devon Brown, and unidentified DOC and District officers (John or Jane Does 11–20), seeking to recover damages for false imprisonment, negligence, and violations of her Fourth, Fifth, and Eighth Amendment rights under the United States Constitution.

The District of Columbia and Devon Brown ("District Defendants") have filed a Motion to Dismiss/Motion for Summary Judgment, bringing forth a host of arguments—some of which are clearly frivolous—in the hopes of hiding the fact that they violated their own clearly-stated mandates regarding inmate intake; ignored Ms. Wormley's repeated requests for information regarding why she was being detained, when she would have a court hearing, and when she would be released; waited months before taking any action to resolve Ms. Wormley's status even though they were repeatedly put on notice that they had no reason to continue detaining Ms. Wormley; and created an environment in which inmates like Ms. Wormley were at an unjustifiable risk of unlawful detention.

This court should deny the District Defendants' motion for three reasons:  first, their arguments, as explained below, are legally infirm and the District Defendants may not prevail on either a motion to dismiss or for summary judgment; second, where the District Defendants present a motion for summary judgment, disputed issues of material facts prevent

this Court from granting the motion; and third, dismissing certain claims or defendants would be inappropriate, at this stage, before Ms. Wormley has had the opportunity to conduct discovery.

## FACTS

Ms. Wormley is a fifty-four year-old Army veteran living in Suitland, Maryland. She was unlawfully incarcerated at the Correctional Treatment Facility (CTF) from October 21, 2006 until March 16, 2007. CTF is operated and managed by Defendant Correctional Corporation of America ("CCA"), under contract with the DOC. Although released from CTF on March 16, 2007, she was then transferred to the Central Detention Facility ("CDF," or D.C. Jail, which is owned and operated by the DOC) where she remained until March 19, 2007, when she was finally released. Ms. Wormley was not imprisoned for that 150-day period because she had committed a crime. She was imprisoned for five months because a number of individuals and entities—including the District of Columbia, Devon Brown, and John or Jane Does 11-20— either took deliberate steps to keep Ms. Wormley detained, recklessly disregarded the fact that there was no reason for her detention, or negligently allowed her to languish despite the lack of any justification whatsoever for her detention. For the 150-day period in question, Ms. Wormley never saw a judge, was never told when she could expect to be released, and was never accurately informed why she was imprisoned during this period, despite her repeated requests for the reasons for her detention and for her release date.

The story of the District Defendants' involvement in Ms. Wormley's unlawful detention begins on June 14, 2006. On that date, Ms. Wormley turned herself in to D.C. Metropolitan Police (she had been wrongfully ejected from the Fairview Halfway House on June 2, 2006). Complaint ¶ 33. She was escorted by the police to CDF, where she remained pending a June 21, 2006 hearing before Judge Iscoe regarding a probation violation related to a prior offense. Complaint ¶¶ 24, 33, 45.

2

Ms. Wormley's wrongful eviction from the Fairview Halfway House led to the issuance of an invalid detainer by the United States Marshals Service ("USMS") on June 16, 2006—while Ms. Wormley was in CDF awaiting a hearing before Judge Iscoe.  Complaint ¶ 34. On its face, the USMS detainer stated that it was issued "to CDF," and that it was issued "pursuant to a Federal Parole Violator Warrant."  Ex. 1 (USMS Detainer).  Ms. Wormley was never on parole, Complaint ¶ 36, and the United States Parole Commission has no file on Ms. Wormley,  Ex. 2 (September 5, 2007 e-mail from Jordana Randall, U.S. Parole Commission).

The District Defendants, through the DOC, maintains a series of mandates called "Program Statements," the purpose of which is "to administer and manage the DC Department of Corrections (DOC) and the Central Detention Facility (CDF) in a professional and responsible manner consistent with legal requirements of the District of Columbia Government."  Ex. 3 (PS 1010.1C).  When Ms. Wormley was brought in to CDF, the Program Statements required DOC personnel to take the following steps:

- "[P]roperly examine and interpret" documents listed by the Program Statement that purport to authorize the inmate's detention.  Ex. 4 (PS 4020.2) at 4;

- In the event that an inmate is accompanied by a U.S. parole violator warrant and/or Escape report, personnel must "research[ ]" those documents "to ensure legality of confinement by telephoning the [Supervisory Legal Instruments Examiner (SLIE)] at the Record Office at the CDF to assure that the warrant is current."  *Id.*

- The Legal Instruments Examiner ("LIE") assigned to an intake unit is required to "receive and thoroughly review for completeness all related commitment documents of inmates who are committed into the CDF."  *Id.*

According to these Program Statements, when Ms. Wormley was taken to CDF (or shortly thereafter when the USMS detainer was delivered to CDF), DOC personnel did or should have examined, researched, and interpreted the detainer for validity and should have reviewed it for completeness.  Since no federal parole violator warrant existed, DOC was on notice—as early as June 16, 2006—that the USMS detainer was invalid.

Instead, on October 18, 2006, a DOC LIE notified USMS that Ms. Wormley's sentence would expire on October 21, 2006.  DOC was or should have been on notice as early as June that the detainer was invalid, and DOC—having knowledge of this—should have informed USMS of this fact, but the LIE (and other DOC personnel) did not.  USMS processed Ms. Wormley on October 19, 2006.  Two days later, expecting to be released, she instead remained in prison.

DOC's wrongful actions and omissions did not end there.  On October 19, 2006, USMS issued a Form 41 to CDF, requesting that it "Place [Ms. Wormley] in transit hold pending federal designation."  Ex. 7 (USMS Form 41, 10/19/06); Complaint ¶ 51.  A Form 41 is a specific form issued by USMS to "detain intransit inmates for safekeeping or for other jurisdictions pending further transfer."  Ex. 4 (PS 4020.2) at 2.  Detention of such "intransit" inmates is inherently limited.  As defined by the Program Statements, an "intransit" inmate is

> [a]n inmate committed by a Deputy U.S. Marshal from any jurisdiction other than the District of Columbia *for overnight housing or for less than one working day*.  In some cases, an intransit inmate may stay over a weekend and/or a holiday.

*Id.* at 3 (emphasis added).  At most, since October 21, 2006 was a Saturday, Ms. Wormley could have been detained by the DOC until the following Monday, October 23, 2006.  Instead, Ms. Wormley was kept incarcerated at CTF, where her repeated requests for information about her status were ignored or were met with incorrect information.  Complaint ¶¶ 53, 56, 57.

4

There is no doubt that DOC personnel had actual knowledge that Ms. Wormley should not have been detained at CTF. This is evidenced not only by the October 18, 2006 fax sent to USMS, but also three other faxes: a December 6, 2006 fax sent by CCA to USMS, Ex. 9, and by two January 11, 2007 faxes sent by USMS, Exs. 7, 8. The December 6, 2006 fax states "This inmate's sentence expired on 10/21/06. Please execute her detainer." Ex. 9. The January 11, 2007 faxes include information making clear that the USMS detainer was not based on a U.S. parole violation warrant, but was instead related to an escape charge (stemming from her wrongful eviction from the Fairview Halfway House), and included the same October 19, 2006 Form 41, effectively reminding DOC personnel that Ms. Wormley had been kept "intransit" far longer than legally permitted. Exs. 7, 8; Complaint ¶ 55. Despite this, Ms. Wormley remained in CTF another three days, until March 16, 2007.

Unfortunately, the story of the District Defendants' wrongdoing does not end there. With no help from the District Defendants, Ms. Wormley was able to contact an attorney and secure her release. On March 16, 2007, after being contracted by the attorney, USMS faxed to CTF a form stating "LIFT USMS DETAINER DATED 06-16-2006." Ex. 6 (USMS Form 41 03/16/07). This document, in other words, specifically allowed DOC personnel to release Ms. Wormley. But rather than release Ms. Wormley immediately, the District Defendants erroneously transferred her from CTF to CDF. Ms. Wormley was not released by the District Defendants until March 19, 2007, when the DOC received a sentence computation stating that Ms. Wormley was released from her escape charge, even though the March 16, 2007 USMS fax already clarified that very issue. The District Defendants, in other words, compounded their several errors and continued to hold Ms. Wormley unnecessarily well after it was made clear— on multiple occasions—that there was no reason to continue holding her.

The person responsible for "overall leadership" of the DOC, and for "formulat[ing] measurable goals and objectives to carry out the mission and philosophy of the DOC," Ex. 3 (PS at 1010.1C), is Defendant Devon Brown, who was Director of the Department of Corrections for the entire time that Ms. Wormley was wrongfully incarcerated (and well before). In the declaration Defendant Brown submitted for purposes of the District Defendants' Motion, Defendant Brown admits that had direct, supervisory responsibility for training, organization, and quality control regarding the release of inmates. Opp. Ex. E (Brown Decl. at ¶ 8). Defendant Brown knew or should have known that inmates like Ms. Wormley were at an extreme risk of overdetention, given past well-publicized incidents of overdetention for which the District was responsible, Complaint ¶ 59. As such, Defendant Brown is responsible, in his individual capacity, for Ms. Wormley's harms, as are unidentified District personnel (John or Jane Does 11-20) who were involved in or aware of Ms. Wormley's detention and either deliberately, recklessly, or negligently caused her unlawful imprisonment and her concomitant constitutional violations.

Because the District Defendants were directly responsible for Ms. Wormley's overdetention, Ms. Wormley has brought this suit against them. For the reasons stated below, the District Defendants' arguments are without merit and their motion should be denied.

## STANDARD OF REVIEW

For purposes of a 12(b)(6) motion to dismiss, "[a] complaint need not set forth detailed factual allegations." *Banks v. York*, 515 F. Supp. 2d 89, 100 (D.D.C. 2007) (citing *Krieger v. Fadely*, 211 F.3d 134, 136 (D.C. Cir. 2000)).  In deciding such a motion, "the Court presumes the truth of the factual allegations of plaintiff's complaint and liberally construes these allegations in plaintiff's favor." *Id.* (citing *EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 625 (D.C. Cir. 1997)).

If, on a motion to dismiss under Rule 12(b)(6), matters outside the pleadings are considered by the court, the motion must be treated as one for summary judgment under Rule 56, and all parties must be given a reasonable opportunity to present all material pertinent to the motion. Fed. R. Civ. P. 12(d).  Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law.  Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  In determining whether a genuine issue of material fact exists, the Court must view all facts and reasonable inferences in the light most favorable to the non-moving party.  *Tao v. Freeh*, 27 F.3d 635, 638 (D.C. Cir. 1994).  To be "material" and "genuine," a factual dispute must be capable of affecting the substantive outcome of the case.  *Anderson*, 477 U.S. at 247–48, 106 S.Ct. 2505; *Laningham v. United States Navy*, 813 F.2d 1236, 1242–43 (D.C. Cir. 1987).  If summary judgment is not rendered on the whole action, a court should issue an order specifying those facts that are not genuinely at issue.  Fed. R. Civ. P. 56(d)(1).  The facts so specified by the court must be treated as established in the action.  *Id*.

## ARGUMENT

I.    **THE DISTRICT DEFENDANTS' RELIANCE ON THE USMS DETAINER IS MISPLACED, AND THEY MAY NOT RELY ON IT AS AN INSTRUMENT AUTHORIZING MS. WORMLEY'S INDEFINITE DETENTION.**

Distilling the arguments in their Motion to their essence, the District Defendants make a single, astonishing claim:  that an instrument, narrow in scope and created by a non-judicial government agency, by itself and without the oversight or imprimatur of a court, may be relied on to justify and perpetuate an inmate's *indefinite detention*.  This argument is not only absurd; it violates core principles of fundamental fairness underlying the due process clause, as well as principles of reasonableness at the heart of the Fourth Amendment's protections.

Throughout their Motion, the District Defendants rely, almost exclusively, on the supposed validity of the USMS detainer as a justification for holding Ms. Wormley indefinitely. They rely on the detainer to argue that (1) Defendant Brown enjoys qualified immunity (Opp. at 9–10), (2) a claim of false imprisonment cannot lie against Defendant Brown or John or Jane Does 11-20 (Opp. at 10), (3) a claim of negligence cannot lie against Defendant Brown or John or Jane Does 11–20 (Opp. at 11), (4) the District enjoys sovereign immunity (Opp. at 13–14), (5) the District cannot be vicariously liable for the acts of its employees (Opp. at 14), (6) the District Defendants did not violate a clearly established custom or policy (Opp. at 21), (7) the District Defendants are not liable for a Fourth Amendment violation (Opp. at 22), and (8) the District Defendants were justified in their actions because of the detainer's presumptive validity (Opp. at 23).

This reliance is misplaced, for two critical reasons:  first, the detainer was facially *invalid*; and second, the detainer did not authorize the District Defendants to hold Ms. Wormley indefinitely after October 21, 2006.

8

## A.    The Detainer Was Facially Invalid.

Contending that the District was merely required to carry out the "ministerial duty" of informing USMS when Ms. Wormley's release was imminent, the District Defendants argue, confusingly and incorrectly, that Ms. Wormley "admits" that the detainer was "issued by the U.S. Parole Commission," and that the Ms. Wormley's detention was based on a "facially valid warrant." Opp. at 9. In fact, Ms. Wormley has admitted no such thing; no parole violator warrant ever existed for Ms. Wormley, and Ms. Wormley was never on parole. Complaint ¶ 36; Ex. 2 (e-mail from Jordana Randall). The District Defendants thus cannot rely on the "facial valid[ity]" of the *warrant*—because no warrant ever existed.

The District Defendants compound their error by purporting to rest on the facial validity of the detainer as a reason for continuing to detain Ms. Wormley. But they cannot do so, because the detainer was itself facially invalid. The face of the detainer reads,

> After reading or showing the above language to the subject, please execute the following:
>
> The foregoing was read to or by the subject and a copy of the Detainer and the charges upon which it is based was delivered to him on _____.
>
> (*date*)
>
> Please acknowledge receipt of this Detainer. Please provide one copy of this Detainer ot the subject and FAX one copy to this office at _____.
>
> *FAX no.*
>
> Signed: _____

None of these blank spaces was ever signed, Ex. 1 (USMS detainer) (*see also* Complaint ¶ 39), indicating both that CDF officials never carried out their "ministerial" duty to inform Ms. Wormley of the detainer. Therefore, reliance on the detainer in October 2006 was misplaced

because the detainer was facially invalid, having never been shown to Ms. Wormley or signed by CDF personnel.[1]

In addition, the detainer clearly indicates that Ms. Wormley was to receive not only a copy of the detainer but also a copy of "the charges upon which [the Detainer] is based"—here, a parole violation warrant. But no such warrant ever existed, and Ms. Wormley was never on parole. CDF either knew or should have known that no such warrant existed because, according to the detainer, CDF personnel were *required* to locate "the charges upon which [the Detainer] is based" and show them to Ms. Wormley. If no such warrant ever existed, then the District Defendants would not be able to rely on the detainer as a valid instrument to detain Ms. Wormley.

The District Defendants rely heavily throughout their brief on the argument that they had no choice but to follow the dictates of the detainer, claiming erroneously that they "complied with the ministerial duty imposed by the detainer on its face." Opp. at 14. As discussed above, this is clearly false, as the face of the detainer demonstrates. It also renders absurd their reliance on the argument that "[f]ailure to hold [Ms. Wormley] would open the District government to suit, if not performed." Opp. at 13–14. The District Defendants offer no justification for why they were bound to follow one of the detainer's ostensible demands, but not the other.

---

[1] This failure directly affected Ms. Wormley's unlawful detention. By not taking the simple and required steps to locate the charges on which the detainer was based, and to notify Ms. Wormley per the detainer's instructions, the District Defendants failed to uncover the absence of a valid basis for the detainer, and Ms. Wormley was kept in the dark about the purposes for the detainer (and was thus unable to effectively challenge the reasons for her detention past October 21, 2006). Ms. Wormley could have immediately cleared up this mistake by informing CDF personnel that she was not a parolee.

The District Defendants' duty, spelled out plainly on the face of the detainer, echoes DOC's own stated mandates. According to DOC Program Statements, DOC personnel were required to research a U.S. parole violator warrant "for validity to ensure legality of confinement." Ex. 4 (PS 4020.2). DOC personnel were also required, at Ms. Wormley's intake in June 2006, to "receive *and thoroughly review for completeness* all related commitment documents of inmates who are committed into the CDF." *Id.* The District Defendants thus cannot rely on the warrant (because none existed), nor can it claim that it was in no position to question the detainer (because by its own policies it was required to research the validity of the documents purporting to authorize Ms. Wormley's detention). Their arguments regarding the "facial validity" of the detainer are accordingly meritless, and the District Defendants may not rely on the detainer to justify Ms. Wormley's indefinite detention.

**B.    Nothing On the Face of the Detainer Required or Allowed the District Defendants to Continue Detaining Ms. Wormley After October 21, 2006.**

More fundamentally, pointing to the detainer as a reason to hold Ms. Wormley after October 21, 2006 is itself factually unsupportable, making the entire issue regarding the whether the detainer was "valid" a red herring. This is true even assuming the detainer was facially valid (and it was not). Although a detainer might be issued based on a commitment order, contrary to the District Defendants' characterization, it is not itself a "commitment order." A detainer is

> [a] written request from one law enforcement or correctional agency (the requesting agency) to another having custody of a prisoner (the holding agency), requesting the holding agency detain the prisoner for surrender to the requesting agency, upon the release of the prisoner by the holding agency.

Ex. 11 (USMS Directive 8.2). In other words, the detainer issued here was a request by USMS to detain Ms. Wormley merely for purposes of notifying USMS of an upcoming release date,

11

thereby allowing USMS to assume custody over her; it did not authorize the District Defendants

to hold her beyond her legitimate period of confinement.  Commitment orders, by contrast, are

> Legal documents issued by D.C. Superior Court and U.S. District
> Court setting forth the case number, charge, the bond amount (if
> set), the Judge's, Commissioner's or Magistrate's signature and
> court seal.  U.S. District Court commitments may contain the
> signature of the Clerk or Deputy Clerk.

*Id.*  A commitment order comes from a court and bears the court seal, authorizing an agency to

detain the inmate based on the charge listed in the commitment order.  The District Defendants

throughout their brief either implicitly or explicitly rely on the detainer as equivalent to a

commitment order.  *See, e.g.*, Opp. at 23 (arguing that a "jailer cannot be held liable for errors in

a warrant of commitment fair and valid on its face").  This reliance is unwarranted, and the

District Defendants may not mischaracterize a detainer by equating it with a commitment order.

Moreover, by October 21, 2006 the District Defendants had carried out the

detainer's instructions regarding notifying USMS prior to her release.[2]  The District Defendants

carried out their duty to notify USMS by sending a fax on October 18, 2006, asking the USMS to

do a "come up" and assume custody of Ms. Wormley.  Ex. 10.  This "come up" was performed

on October 19, 2006, when USMS officers took custody of Ms. Wormley and processed her at

the United States District Court in the District of Columbia.  Complaint ¶ 50.

After USMS assumed custody of Ms. Wormley, the detainer ceased to function as

an operative document of any kind.  Nothing on the face of the detainer designates it as an

instrument to maintain custody over an inmate.  The District Defendants thus cannot rely on the

---

[2] At no time did the District Defendants perform the other action required by the detainer:  to
notify Ms. Wormley of the charges and to provide her a copy of both the detainer and the
underlying warrant.

detainer, as they do throughout their brief, as a valid instrument for detaining Ms. Wormley indefinitely.

If the District Defendants can rely on anything for holding Ms. Wormley after USMS assumed custody, it would be on the Form 41 that was delivered to CDF on October 19, 2006, concomitant with Ms. Wormley's return to CTF. That Form 41 stated that DOC personnel were to "[p]lace Ms. Wormley in transit hold pending federal designation." Ex. 7 (USMS Form 41 10/19/06). But even here, the District Defendants' reliance on the Form 41 to hold Ms. Wormley indefinitely would be misplaced. A Form 41 is a remand order for "intransit" inmates. Ex. 4 (PS 4020.2). An "intransit" inmate is defined as "[a]n inmate committed by a Deputy U.S. Marshal . . . for overnight housing or for *less than one working day*. In some cases, an intransit inmate may stay over a weekend and/or a holiday." *Id.* (emphasis added). The District Defendants, however, pretend that an "intransit" inmate is one who may remain housed by the DOC *indefinitely*. This proposition is unsupported by the documents and absurd on its face.

After this brief period had passed, the District Defendants were on immediate notice that the Form 41 was facially invalid as an instrument for continued commitment. Moreover, CCA, the District Defendants' agent, demonstrated actual knowledge that Ms. Wormley should no longer have been detained at CTF when it delivered a fax to USMS on December 6, 2006, requesting that Ms. Wormley's detainer be executed. *See* Ex. 9. This actual knowledge is further evidenced by the January 11, 2007 fax from USMS that forwarded the exact same Form 41 that was issued on October 19, 2006, placing DOC personnel on notice that they were detaining Ms. Wormley far longer than permissible. *See* Ex. 7. By this point, the Form 41 was four months old; no reasonable person could rely on a four-month-old Form 41 as a basis to detain a person when that Form is used only for very short-term transit holds.

13

In an analogous case, the District of Columbia Court of Appeals determined that reliance by arresting officers on an otherwise valid warrant that was eighteen months old (and thus past its expiration date) was unreasonable. The court held that "[t]he officers, who had been on the warrant service assignment for several years, knew then, or reasonably should have known, that the warrant referred to on the printout sheet was invalid as a matter of law." *Woodward v. District of Columbia*, 387 A.2d 726, 728 (D.C. 1978). The officers were thus "as a matter of law, charged with notice of the invalidity," and "[a]t a minimum, [they] were required at that point to investigate in order to determine the status of the warrant itself before going further. Beyond this, the warrant had been satisfied long since and no basis existed for the arrest." *Id.* As in *Woodward*, DOC personnel and its agents here were on notice of the invalidity of the Form 41 that had been issued three months prior, and could not use that as a basis for detention when Ms. Wormley should have been allowed to stay in DOC facilities no more than a single night. And the BOP Notice of Escape, which was also faxed on January 11, 2007, should have alerted the District Defendants that the original parole violator detainer was fundamentally flawed. *See* Ex. 8.

Accordingly, any arguments that the District Defendants make regarding the facial validity of the detainer or the use of the detainer as a justification for an indefinite detention of Ms. Wormley are without merit. To the extent the District Defendants rely on this argument as a basis for their motion, their motion should be denied.

II.    **MS. WORMLEY HAS STATED A CLAIM AGAINST DEVON BROWN, WHO IS APPROPRIATELY NAMED IN HIS INDIVIDUAL CAPACITY AND DOES NOT ENJOY QUALIFIED IMMUNITY.**

    A.    **Ms. Wormley Has Alleged Facts Sufficient for a Claim Against Devon Brown in His Individual Capacity.**

Devon Brown is the Director of the D.C. Department of Corrections, a position he held position during the entire time that Ms. Wormley was unlawfully detained at CTF. Complaint ¶ 15; Opp. Ex. E (Decl. of Devon Brown ¶ 2). Ms. Wormley has named Devon Brown as a defendant in both his official and individual capacities because, in his position as Director of the Department of Corrections, he had direct responsibility for the policies implemented at the Department of Corrections for the treatment of inmates and inmate records, and for the contract between the Department of Corrections and the Corrections Corporation of America. The District claims that, because the Complaint does not allege any specific improper *act* by Defendant Brown, and because he did not have any personal involvement in Ms. Wormley's detention, this action against him in his personal capacity must be dismissed. Opp. at 6–7. Defendant Brown's assertions that he did not personally know of or direct actions specifically regarding Ms. Wormley are irrelevant, and this argument lacks merit.[3]

It is not necessary, in a personal capacity suit alleging constitutional violations, to allege that the individual officer committed a specific act against the plaintiff or had direct knowledge of the plaintiff or her injury. "[A] failure to supervise and involvement with a practice or policy pursuant to which subordinates violate the rights of a Plaintiff [can] provide

---

[3] The District Defendants' argument regarding the personal capacity suit against Defendant Brown centers around the § 1983 claims against Defendant and essentially ignores the negligence claim against him, *see* Complaint ¶¶ 153–56, and the false imprisonment claims against him, *see* Complaint ¶¶ 150–52.

adequate bases for constitutional claims against supervisory personnel." *Caldwell v. Hammonds*, 53 F. Supp. 2d 1, 9 (D.D.C. 1999).

Here, the Complaint alleges, among other things, that Devon Brown "recklessly disregarded Ms. Wormley's excessive risk of unlawful detention." ¶ 165. Knowledge of this risk comes from a "backdrop of widespread publicity of the problem of unlawful imprisonment of inmates at CDF and CTF through news stories, government reports, and the widely-reported multi-million dollar class action settlement in *Bynum, et al. v. District of Columbia*, No. 02-0956 (D.D.C.), providing all Defendants with actual and constructive knowledge that inmates at CDF and CTF were at an extreme risk of overdetention." ¶ 59.

This more than suffices at this stage. "[A] supervisory official may be personally liable in damages for the unconstitutional acts of his subordinates where the plaintiff shows the official 'was responsible for supervising the wrongdoer; that a duty to instruct the subordinate to prevent constitutional harm arose from surrounding circumstances; and that, as a result of the official's failure to instruct, the plaintiff was harmed in the manner threatened." *Banks v. York*, 515 F. Supp. 2d 89, 114 (D.D.C. 2007). As Director of the DOC, Defendant Brown is a supervisory official who had "actual and constructive notice" that inmates such as Ms. Wormley were at an extreme risk of overdetention. He had the power, as he admits in his declaration, to implement policies regarding DOC personnel training, inmate record-keeping, and "quality control." Opp. Ex. E (Decl. of Devon Brown at ¶ 8). Ms. Wormley's unlawful detention was a direct result of supervisory decisions or inactions by Defendant Brown before and during Ms. Wormley's confinement. Under the standard set in *Caldwell* and *Haynesworth*, the Complaint has alleged facts sufficient to state a claim against Defendant Brown in his individual capacity, and the District Defendants' motion to dismiss such claims should be denied.

**B.    Devon Brown is Not Entitled to Qualified Immunity.**

Under certain circumstances, qualified immunity will extend "to government officials performing discretionary functions . . . insofar as their conduct does not violate clearly established . . . rights of which a reasonable person would have known."  *Wardlaw v. Pickett*, 1 F.3d 1297, 1303 (D.C. Cir. 1993) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). apply.  The District Defendants argue that Defendant Brown was not on notice that the conduct at issue here—"unlawfully detaining Ms. Wormley at CTF even though they knew or should have known that there was no justification for Ms. Wormley's detention," Complaint ¶ 164, and "recklessly disregarding Ms. Wormley's excessive risk of unlawful detention," Complaint ¶ 165—was unlawful, resting their argument almost entirely on the validity of the detainer.  The District Defendants' argument is without merit.

First, although the District Defendants discuss in great detail the standards for qualified immunity, they never actually dispute that the heart of Ms. Wormley's complaint against Defendant Brown's is that his conduct violated her constitutional rights; this is the first step in any qualified immunity inquiry.  *See Saucier v. Katz*, 533 U.S. 194, 201 (2001) ("Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right? This must be the initial inquiry.").  Here, Ms. Wormley has alleged that Defendant Brown (and John and Jane Does 11–20) "violated [her] Fourth, Fifth, and Eighth Amendment rights by unlawfully detaining Ms. Wormley at CTF."  Complaint ¶ 164. Nor do they dispute that those constitutional rights are "clearly established."  *See Saucier*, 533 U.S. at 201.  There can be no dispute:  "the law regarding overdetention and Section 1983 liability based on supervisory inaction was clearly established by early 2006."  *Banks*, 515 F. Supp.2d at 115 (pointing to a "substantial body of law recognizing that overdetention violates the

17

Constitution" (internal citations omitted)).  The District Defendants have not argued to the contrary, nor could they.

Second, the District Defendants' exclusive reliance on the validity of the federal detainer is misplaced for reasons already stated above (*see supra*, Part I).  The District may not claim that Ms. Wormley's detainer was "issued by the U.S. Parole Commission," Opp. at 9, because no such warrant exists.  Complaint ¶ 36; Ex. 2 (e-mail from Jordana Randall).  Nor may the District Defendants rest on the validity of the detainer alone as a reason for continuing to detain Ms. Wormley, because it was facially invalid and because it was never an operative instrument for detaining Ms. Wormley (certainly not after October 21, 2006).  Further should the District Defendants choose to rely on the Form 41, the validity of that Form expired days—not months—after it was issued.

Third, to the extent the District Defendants are relying on Defendant Browns' actions being "discretionary," allowing the District to claim that the indefinite detention of an inmate is "discretion" would be absurd, giving the District Defendants unfettered power to violate inmates' constitutional rights.  There is simply no analogy between early release for a legally detained inmate and delayed release for an illegally detained inmate.

Finally, this court has already recognized, in a similar case, that Defendant Brown cannot successfully claim qualified immunity on a motion to dismiss.  Considering the issue, this court in *Banks* held that "the plaintiff has alleged the existence of a past practice of overdetention by the DOC that Brown was or should have been aware of and that was likely to continue absent supervisory action.  The Court therefore finds plaintiff's allegations to be sufficient at this juncture to defeat Brown's assertion of qualified immunity."  *Banks*, 515 F. Supp. 2d at 115.  As

in *Banks*, the Court here should deny the District Defendants' motion to dismiss Defendant

Brown on the basis of qualified immunity.

### III.   MS. WORMLEY HAS STATED A CLAIM AGAINST DEFENDANTS BROWN AND JOHN OR JANE DOES 11–20 FOR FALSE IMPRISONMENT AND NEGLIGENCE.[4]

#### A.   Ms. Wormley Has Stated a Claim Against the Defendants Brown and John or Jane Does 11–20 for Negligence.

The District asserts that there is "no recognized legal duty . . . to assure that

Plaintiff was accurately informed of the reasons for her detention or to assure that she was not

incorrectly detained" for five months at CTF.  Opp. at 2.  The District misreads the Complaint

when it proffers this as the asserted duty, and its argument is accordingly meritless.

The District Defendants are incorrect for two reasons.  First, the District of

Columbia, "its agents and employees are subject to ordinary negligence standards requiring them

to exercise reasonable care in the protection and safekeeping of inmates in its correctional

facilities."  *Herbert v. District of Columbia*, 716 A.2d 196, 203 (1998).  As the court in *Herbert*

indicated, the duties are codified by statute:  D.C. Code § 24-211.02 states that DOC is

"responsible for the safekeeping, care, protection, instruction, and discipline of all persons

committed to [its] institutions."  *See also Herbert*, 716 A.2d at 203 (quoting an earlier version of

the statute with identical language and applying the provision to the D.C. Jail).  "Reasonable

care" in this case includes DOC personnel following the mandates of documents purporting to

require that the District detain certain inmates—here, the USMS detainer that clearly stated that

Ms. Wormley was to be read the relevant language on the detainer, and that she was to be given

a copy of the detainer and the underlying warrant. Ex. 1 (USMS detainer).  This was never done,

---

[4] The District Defendants do not challenge the negligence or false imprisonment claims made against the District itself except on grounds of respondeat superior liability.

and District Defendants breached their duties by failing to follow the instruction on the detainer. Because Ms. Wormley was an inmate, and among the class of persons to whom these duties were owed, this was negligence *per se*.

Second, the District Defendants further breached their duties by failing to follow the mandates set forth in the Program Statements, cited above, that require DOC personnel to investigate the documents purporting to authorize an inmate's detention for both validity and completeness—something DOC personnel never did. [5]  These Program Statements are promulgated under the authority of the same statute—D.C. Code § 24-211.02—that the District of Columbia Court of Appeals in *Herbert* noted create duties in tort for DOC personnel.  The Program Statements themselves recognize this, stating at the outset that they are promulgated "to administer and manage the [DOC] and [CDF] in a professional and responsible manner consistent with the *legal requirements* of the District of Columbia Government."  Ex. 3 (PS 1010.1C).  Each of these Program Statements create duties in tort.  DOC personnel breached these duties when they failed to investigate the completeness and validity of the documents purporting to authorize Ms. Wormley's confinement, proximately causing her unlawful detention and concomitant constitutional violations.  Because Ms. Wormley was an inmate, and among the class of persons to whom these duties were owed, this was also negligence *per se*.

---

[5] In addition to the Program Statements noted above, additional Program Statements statements mandate the kind of actions the District Defendants were required to take in the ordinary course. Statement 4353.1B states "Prior to accepting custody of an inmate, staff determines that the inmate is legally committed to the facility."  Ex. 5.  At intake, DOC personnel must "review all commitment documents to ensure the inmate is being legally committed," including specifically both U.S. Marshal Forms and U.S. Parole Violator warrants.  *Id.*  These mandates requires the District Defendants to review the reasons for Ms. Wormley's detention and to ensure that she was not being unlawfully detained.  Accordingly, the District Defendants' argument that a parade of policy horribles will ensue if such duties are forced on them is baseless.

Third, the Complaint alleges (and the District Defendants ignore) that Ms. Wormley asked "[o]n multiple occasions . . . why she was being held," "why the detainer, which she had endeavored on her own to obtain through the CTF system, said she had a parole violation," Complaint ¶ 53, and "what the status of her court hearing was," Complaint ¶ 58. She was never correctly told the reasons for her detention despite these repeated questions about the reasons for her detention, her release date, and her court date. As the Complaint alleges, no one ever answered Ms. Wormley's questions, despite the District Defendants' knowledge that she should no longer have been incarcerated. Because the District had legal custody of Ms. Wormley (which the District Defendants do not dispute), the District is directly responsible to Ms. Wormley as its custodian and caretaker. *See Restatement (Second) of Torts*, §§ 314A(4), 323, 324. Thus, the District Defendants err when they argue, in a vacuum, that they owed no duty to Ms. Wormley; in the context of her repeated notifications, the District Defendants had a clear duty of care to Ms. Wormley to, at the very least, either give her accurate answers, or investigate her claims, or both.

The District Defendants rely heavily on *McAllister v. District of Columbia*, 653 A.2d 849 (1995). There, the plaintiff sought to maintain a negligence claim against the Legal Assistance Bureau of the DOC, claiming that DOC personnel had a duty to investigate and correct an error in a commitment order—specifically, a sentencing order. *McAllister,* 653 A.2d at 852. But there was no commitment order in Ms. Wormley's case; rather, the issue here is whether, once the dictates of the detainer were carried out and the Form 41 was issued, placing Ms. Wormley in "instransit" status, DOC knew or should have known that she should have been transferred from CTF absent a new commitment order. Given that detention was only to occur for, at most, a weekend after Ms. Wormley was placed on "intransit" status, but that USMS

21

never followed up to take Ms. Wormley into their custody, DOC knew or should have known

shortly after October 21, 2006 that some error had taken place.  But DOC did nothing, despite

Ms. Wormley's pleas.  Even when DOC was placed on notice on January 11, 2007—when

USMS sent the exact same Form 41, indicating that Ms. Wormley was still detained for far

longer than she should have been—DOC personnel continued to do nothing.  *See Woodward*,

A.2d at 728 (D.C. 1978).  Again, unlike *McAllister*, there was never any operative commitment

order issued from a court, and the District cannot rely on the detainer or Form 41 as if it were a

commitment order.  The District Defendants' reliance on the detainer is baseless, and their

argument that no duty applied to them is without merit.

> **B.    Ms. Wormley Has Stated a Claim Against the Defendants Brown and John or Jane Does 11-20 for False Imprisonment.**

Under D.C. Law, false imprisonment is "the restraint by one person of the

physical liberty of another without consent or legal justification. . . . The essential elements of

the tort are (1) the detention or restraint of one against his will, within boundaries fixed by the

defendant, and (2) the unlawfulness of the restraint."  *Faniel v. Chesapeake & Potomac Tel. Co.

of Md.*, 404 A.2d 147, 150 (D.C. App. 1979); *see also Restatement (Second) of Torts* § 35 ("An

actor is subject to liability to another for false imprisonment if (a) he acts intending to confine

the other or a third person within boundaries fixed by the actor, and (b) his act directly or

indirectly results in such a confinement of the other, and (c) the other is conscious of the

confinement or is harmed by it.").

Here, there is no dispute that Ms. Wormley was detained against her will.  The

District Defendants instead dispute that Ms. Wormley was held "without legal justification,"

relying, again, on the USMS detainer.  The District Defendants falsely state that "a facially valid

warrant supported Plaintiff's detention," Opp. at 10, when in fact no warrant existed.  Ex. 2 (e-

mail from Jordana Randall). The District Defendants then conflate the (nonexistent) warrant with the (invalid) detainer, stating that "so long as a detainer is lodged against an inmate, the District cannot release that inmate." Opp. at 10. Tellingly, they cite not to any legal authority for this proposition, but instead to a declaration by a DOC employee. This is a legal conclusion, not a fact in evidence, and this court should not rely on the Defendants' *ipse dixit* as a source for legal authority. It might be that the District Defendants falsely believed that the detainer is equivalent to a commitment order, and that they falsely believed the detainer allowed them to keep Ms. Wormley detained indefinitely; but this false belief is not the same as the "legal justification" required to escape liability for false imprisonment. Moreover, this false belief should have been undermined either (1) on June 16, 2006, when DOC received the detainer and should have looked for the U.S. parole violator warrant, which did not exist, (2) also on June 16, 2006, when DOC should have informed Ms. Wormley of the charges against her, at which point she could have corrected the mistake and informed DOC that she was not on parole and not subject to the jurisdiction of the United States Parole Commission, (3) shortly after October 21, 2006, when USMS failed to either arrive to physically transfer Ms. Wormley or failed to issue request for DOC to take some further action, (4) on or shortly after January 11, 2007, when, in response to a request to take action, USMS faxed the exact same Form 41 that it had issued months before, notifying DOC that Ms. Wormley had been detained "overnight" for months, or (5) each time Ms. Wormley put DOC on notice through her oral requests to her case manager or her written requests in which she asked why she was still being detained and when she could expect to be released. In light of each of these facts, the District Defendants' continued reliance on a facially invalid detainer is beyond credulity.

## IV.     SOVEREIGN IMMUNITY DOES NOT BAR THIS ACTION.

The District Defendants claim that their actions in detaining Ms. Wormley when there was legal authority to do so were "discretionary" because they involve policy issues regarding the "release [of a] convict[ ]." Opp. at 13. This claim, which would effectively allow the District to detain Ms. Wormley indefinitely on its own whim with impunity, is outrageous on its face and should be rejected outright. It is also directly undermined by the existence of Program Statements adopted by the District.

Under *Aguehounde v. District of Columbia*, 666 A.2d 443 (D.C. 1995), the District of Columbia Court of Appeals considered when the District can be immune from suit. Distinguishing between "discretionary" actions and "ministerial" actions, the court there held that "a municipality is immune from suit for decisions made pursuant to the exercise of discretion, but not for actions which are ministerial." *Aguehounde*, 666 A.2d at 447. The core inquiry, then, is whether a particular act is "discretionary" in nature.

A "discretionary" act is one that involves "the permissible exercise of policy judgment." *Id.* at 448. If such an act does involve such judgment, nevertheless the act will not be held to be discretionary if "the government has adopted a statute, regulation or policy [that] specifically prescribes a course of action for an employee to follow." *Id.* Although the District Defendants fail to call this court's attention to the numerous Program Statements noted above, the existence of these Program Statements "removes the otherwise unfettered discretion of the government employee," making "the action . . . ministerial, opening the government to suit if not performed correctly." *Id.*

The Program Statements identified above required DOC employees to (1) investigate the detainer and ostensible underlying parole violator warrant, (2) research the

validity of the documents purporting to authorize Ms. Wormley's detention, and (3) ensure that Ms. Wormley would not be kept longer than, at most, a weekend once she was placed on "intransit" status.  Exs. 4 (PS 4020.2), 5 (PS 4353.1B).  The District Defendants' arguments that they enjoy sovereign immunity because their acts were "discretionary" cannot withstand the duties created by these Program Statements.

Tacitly acknowledging this, the District Defendants fall back, yet again, on the validity of the detainer.  Again, for the reasons noted above (*see supra* Part I), the detainer was invalid and could not be relied on as a basis for holding Ms. Wormley.

## V.    THE DISTRICT IS LIABLE UNDER RESPONDEAT SUPERIOR FOR THE ACTIONS OF ITS EMPLOYEES.

It is well-settled that the District of Columbia may be liable for the negligence or intentional torts of its employees.  *District of Columbia v. Chinn*, 839 A.2d 701, 706 (D.C. 2003) ("[T]he District is vicariously liable, under the doctrine of respondeat superior, for negligence by its officers who are acting within the scope of their employment."); *Lockhart v. Cade*, 728 A.2d 65, 66 -67 (D.C.,1999) ("The District of Columbia can be held liable under the doctrine of respondeat superior for the intentional torts of its employees (specifically MPD personnel) acting within the scope of their employment.").  The District does not dispute this, implicitly acknowledging that it may be held liable for the torts of its employees.

The District Defendants' rest their argument against respondeat superior liability on the sole assertion that District employees acted appropriately.  Opp. at 14.  This argument has nothing to do with respondeat superior liability; it is merely a redundant assertion that the District Defendants did nothing wrong.  But for the reasons stated at length above (*see supra*

Parts I–IV), this is incorrect.   The District Defendants' argument is frivolous and their motion to dismiss should be denied.

## VI.    MS. WORMLEY HAS STATED A CLAIM AGAINST THE DISTRICT DEFENDANTS UNDER 42 U.S.C. § 1983.

### A.    The Complaint Alleges Facts Sufficient to State a § 1983 Claim Against the District Defendants.

#### 1.    Ms. Wormley Has Sufficiently Alleged Constitutional Violations of Her Fourth and Eighth Amendment Rights.

"[I]n considering whether a plaintiff has stated a claim for municipal liability [under § 1983], the district court must conduct a two-step inquiry.   First, [it] must determine whether the complaint states a claim for a predicate constitutional violation.   Second, if so, then [it] must determine whether the complaint states a claim that a custom or policy of the municipality caused the violation."   *Baker v. District of Columbia*, 326 F.3d 1302, 1306 (D.C. Cir. 2003).   Both conditions have been met here.

On the first part of the test—whether a predicate constitutional violation has been pled—Ms. Wormley need only allege that she suffered a constitutional violation.   It does not matter how the constitutional violation occurred and "neither District of Columbia policy makers nor employees need be implicated."   *Baker*, 326 F.3d at 1306.   Ms. Wormley must allege that "there [was] some constitutional harm suffered [by her], not whether the municipality is liable for that harm."   *Id*.   Here, Ms. Wormley has clearly alleged violations of her Fourth, Fifth, and Eighth Amendment rights.   Complaint ¶¶ 167–67, 174–79.   Moreover, "[t]here is a substantial body of law in support of the proposition that a plaintiff who alleges overdetention, sometimes even for a very short period, states a claim for constitutional violations."   *Barnes v. District of Columbia*, 242 F.R.D. 113, 117 (D.D.C. 2007).   "[T]he great weight of precedent suggests that release must occur within a matter of hours after the right to it accrues, and that after some

period of hours—not days—a presumption of unreasonableness, and thus unconstitutionality, will set in." *Id.*

The District Defendants claim that Ms. Wormley has not stated claims, for various reasons, of Fourth or Eighth Amendment violations. Arguing that the District Defendants cannot be liable for any Fourth Amendment violation, they argue that Ms. Wormley's "continued detention was lawfully based upon a facially valid warrant." Again, there was no "facially valid warrant," there was only a facially invalid detainer and the Form 41 that DOC mistakenly relied on, even though it gives no authority whatsoever for indefinite detention. Regardless, "[o]bviously, one in respondent's position could not be detained indefinitely in the face of repeated protests of innocence even though the warrant under which he was arrested and detained met the standards of the Fourth Amendment." *Baker v. McCollan*, 443 U.S. 137 (1979); *see also Barnes*, 242 F.R.D. at 118 ( "[Plaintiff] alleged that, despite being entitled to release, they were taken back into custody and transported to D.C. Jail or CTF. On the face of the complaint, they allege that they essentially were re-arrested or re-seized. These allegations of Fourth Amendment violations are sufficient to survive a motion to dismiss, and further development of the record should disclose whether the seizures were reasonable.") Here, Ms. Wormley repeatedly asked why she was being detained, why she was listed as a parolee, and when she could expect to be released, and when her court date would be, Complaint ¶¶ 53, 56, 57, 58, placing DOC on notice that there was no reason for her detention—a fact of which DOC, in any event, was already aware or should have been aware.

Arguing that Ms. Wormley has not made out an Eighth Amendment violation, the District Defendants argue that "[n]o facts alleged by Plaintiff rise to the level of obduracy or wantonness prohibited by the Eighth Amendment's proscriptions," and states conclusorily that

the District had a "penological justification" for Ms. Wormley's unlawful detention.  Opp. at 23.

But Ms. Wormley has alleged facts sufficient to make out an Eighth Amendment claim, and the

District cannot claim through *ipse dixit* that a penological justification exists.  As the Third

Circuit has held,

> [T]o establish § 1983 liability for incarceration without penological
> justification, a plaintiff must demonstrate three elements. First, a
> plaintiff must demonstrate that a prison official had knowledge of
> the prisoner's problem and thus of the risk that unwarranted
> punishment was being, or would be, inflicted. Second, the plaintiff
> must show that the official either failed to act or took only
> ineffectual action under the circumstances, indicating that his
> response to the problem was a product of deliberate indifference to
> the prisoner's plight. Finally, the plaintiff must show a casual
> connection between the official's response to the problem and the
> unjustified detention.

*Sample v. Diecks*, 885 F.2d 1099, 1110 (3d Cir.1989).   These elements have been met here:  as

the Complaint alleges, Officer Tuttwiler—an employee of CCA and an agent of the DOC—had

knowledge of Ms. Wormley's unlawful detention, as did DOC personnel as stated by DOC

policy.  As the Complaint alleges, neither DOC's agent, CCA, nor DOC itself took any actions to

end Ms. Wormley's unlawful detention, proximately causing Ms. Wormely's constitutional

violations.  These allegations are sufficient to make out an Eighth Amendment violation.

### 2.     Ms. Wormley Has Sufficiently Alleged That a District of Columbia Policy or Custom Caused the Constitutional Violations.

On the second part of the test—whether the Complaint states a claim that a D.C.

custom or policy caused the violation—Ms. Wormley has alleged sufficient facts.  To defeat a

motion to dismiss the complaint must "state[ ] a claim that a policy or custom of the District of

Columbia caused the constitutional violation alleged" by the complaint.  *Baker*, 326 F.3d at

1306.  The plaintiff must allege "an affirmative link such that a municipal policy was the moving

force behind the constitutional violation."  *Id.* (quotations and citations removed).

A policy can be established by "the failure of the government to respond to a need (for example, training of employees) in such a manner as to show 'deliberate indifference' to the risk that not addressing the need will result in violations." *Id.* "Deliberate indifference" is an objective standard and "is determined by analyzing whether the municipality knew or should have known of the risk of constitutional violations." *Id.* at 1307. The deliberate indifference standard "does *not* require the city to take reasonable care to discover and prevent constitutional violations. It simply means that, faced with actual or constructive knowledge that its agents will probably violate constitutional rights, the city may not adopt a policy of inaction." *Warren v. District of Columbia*, 353 F.3d 36, 39 (D.C. Cir. 2004). Ms. Wormley has alleged facts sufficient to establish deliberate indifference by noting that the District was aware that inmates were at an extreme risk of overdetention, Complaint ¶ 59, and recklessly disregarded this fact, Complaint ¶ 165.

At the motion to dismiss stage, Ms. Wormley need not plead facts sufficient to establish knowledge or constructive knowledge. *See id.* Ms. Wormley's simple "allegation[s] of actual or constructive knowledge on the part of the District" can be conclusory. *Id.* The District Defendants' arguments are accordingly without merit.

**B.    Ms. Wormley Has Sufficiently Alleged Deliberate Indifference, and the District Defendants May Not Rely on the USMS Detainer to Escape § 1983 Liability.**

The District Defendants are liable under Section 1983 because they "failed to respond to a need . . . in such a manner as to show 'deliberate indifference' to the risk that not addressing the need will result in constitutional violations." *Baker*, 326 F.3d at 1306. Here, the Complaint alleges that the District Defendants were aware that inmates were at an "extreme risk of overdetention," Complaint ¶ 59. Because Defendant Brown and John or Jane Does 11–20 "recklessly disregarded" this extreme risk. The District of Columbia, moreover, "failed to

29

supervise and properly train its employees and officers, and the employees and officers of its

agent, Defendant CCA, in the proper oversight of inmates."  Complaint ¶ 175; *see also Baker,*

326 F.3d at 1306.  The District also failed "to supervise and properly train its employees and

officer, and the employees and officers of it agent, Defendant CCA," such that their failure to do

so "rose to the level of custom or policy."  Complaint ¶ 176; *see also Parker v. District of*

*Columbia*, 850 F.2d 708, 712 (D.C. Cir. 1988), *cert. denied*, 489 U.S. 1065 (1989).  These

allegations are sufficient to establish a claim of deliberate indifference against the District.

        Deliberate indifference is demonstrated when a defendant "knew or should have

known of the risk of constitutional violations" yet did nothing.  *Baker*, 326 F.3d at 1307.  This is

an objective standard.  *Id.*  The District of Columbia, "faced with actual or constructive

knowledge that its agents will probably violate constitutional rights, . . . may not adopt a policy

inaction."  Warren, 353 F.3d at 39 (holding prisoner's Section 1983 claim was improperly

dismissed).  Deliberate indifference can therefore be proved "by evidence that the District had

been on notice of prior incidents against other prisoners, that similar incidents nonetheless

continued, and that the District failed to train or supervise its officers adequately."  *A.E. Staley*

*Mfg. Co. v. Sec'y of Labor*, 295 F.3d 1341, 1352 (D.C. Cir. 2002) (citing *Daskalea v. District of*

*Columbia*, 227 F.3d 433, 441-43 (D.C. Cir. 2000)).

        Because of the numerous instances of overdetention known to the District, the

obvious risk that future illegal detentions would occur, and the failure of the District to address

this pressing issue through the proper training and supervision of its employees, the District of

Columbia was deliberately indifferent to the constitutional violations suffered by Ms. Wormley.

The District of Columbia is therefore liable to Ms. Wormley under Section 1983 for her

overdetention, and its motion to dismiss on this claim should be denied.

The District attempts to shield itself from liability by relying on the detainer; but again, this argument is without merit for the reasons stated above (*see supra*, Part I.)

C.   **The District Defendant Cannot Justify Ms. Wormley's Additional Three-Day Detention at CDF By Claiming That They Were Merely "Outprocessing" Ms. Wormley.**

On March 15, 2007, after Ms. Wormley had been detained in CTF for 146 days, USMS issued a Form 41 stating "Please Lift USMS Detainer Dated 06-16-2006." Ex. 6 (USMS Form 41, 3/16/06).  This should have immediately ended Ms. Wormley's incarceration, and she should have been dismissed "within a matter of hours." *Barnes*, 242 F.R.D. at 117.  Instead, she was transferred to CDF and waited, for no reason, until March 19, 2007 to be released.

The District attempts to justify the unjustifiable by claiming that there was still an escaped prisoner charge on her record.  Opp. at 20.  Citing no authority other than themselves, the District Defendants claim that "[t]he District cannot release an escaped prisoner without clearing all warrants, holds, and detainers."  Opp. at 20. [6]  But this statement relies on a fundamental factual error that the District admits to making through its declaration, and that is likely evidence of a mistake it made while Ms. Wormley was detained.  Citing to a June 2, 2002 escape charge, the District states, through the Declaration of Kathy Souverain and in its Statement of Undisputed Facts, that "during the interim between the October 19, 2006 'in transit hold' and the March 16, 2007 'lift USMS detainer' inmate Wormley escape[d] from custody." Opp. Ex. A (Souverain Decl. at ¶ 12).  This is patently false, as the next sentence demonstrates: "On June 2, 2006, inmate Wormley escaped from Fairview Community Center." *Id.*  The second sentence obviously contradicts the first, yet the District relies on this statement for its argument

---

[6] The District Defendants may not point to statements in their own affidavits for factual evidence when those statements are instead incorrect statements of law.  As such, this conclusory and self-serving statement is irrelevant.

that it had to detain Ms. Wormley for an extra few days until it could clear the escape charge. Opp. at 20.

The District was well aware of Ms. Wormley's escape charge when it received a fax on January 11, 2007, transmitting the Notice of Escape from BOP. Ex. 8. It knew or should have known that the original detainer issued by USMS was related to that Notice of Escape rather than to the non-existent U.S. Parole Commission violator warrant, or at the very least, that the Form 41, pursuant to which she was being held, pertained to the escape. But even if neither of these facts were true, the District offers no reason why, after USMS had explicitly instructed it to "Lift USMS dated 06-16-2006," that Ms. Wormley should have remained in custody one second longer: the only entity with a possible interest in taking custody of Ms. Wormley at that point was the federal government, but the federal government had already notified the District Defendants that it did not intend to take her into custody. Moreoever, the internally contradictory statement by Ms. Souverain offers illustrative evidence that the District was, and continues to be, confused about even the simplist of matters.

The District thus cannot rely on having to "outprocess" Ms. Wormley as a justification for continuing to detain her for anything more than a few hours. In *Barnes v. District of Columbia*, the court considered the District's assertion that it is allowed "a 48-hour - hour window in which to tend to administrative matters." The court noted that ample caselaw disproved the argument, and that "the point at which overdetention becomes presumptively unreasonable is likely to fall well short of the 48-hour window" noted in the case relied on by the District, *County of Riverside v. McLaughlin*, 500 U.S. 44 (1991). *Id.* at 118. As the court stated, the District has made this argument before, and "continue[d] to mistakenly rely on" inapposite caselaw. For authority, the court cited to caselaw stemming as far back as 1988. The court

32

noted that "the great weight of precedent suggests that the release must occur within a matter of *hours* after the right to [release from a post-release detention] accrues." *Id.* at 17. Despite this recent precedent, the District here *continues* to rely on the very caselaw that the *Barnes* court determined was inapposite.

In short, the District offers proof to this Court that it incapable of correctly processing Ms. Wormley's papers and misinforms the Court of when the escape charge occurred, fails to offer any authority other than its own say-so that it could not release Ms. Wormley after it received a clear directive from USMS to lift the very detainer that the District continually relies on as justification for detaining Ms. Wormley indefinitely, and offers the same arguments that that this Court has already discredited. The District Defendants' arguments are without merit and its motion must be denied.

## VII.  DOCTRINES REGARDING FAILURE TO EXHAUST ADMINISTRATIVE REMEDIES ARE INAPPLICABLE AND MERITLESS.

### A.  Ms. Wormley Was Not Required to Bring a Habeas Petition.

The District Defendants are incorrect in claiming that Ms. Wormley cannot bring this suit because she failed to file a habeas petition. As the Supreme Court has stated, in a case where a plaintiff seeks damages and not equitable relief, "he is seeking something other than immediate or more speedy release-the traditional purpose of habeas corpus. In the case of a damages claim, *habeas corpus is not an appropriate or available federal remedy.*" *Preiser v. Rodriguez*, 411 U.S. 475, 493-94 (1973) (emphasis added). The District Defendants' reliance on *U.S. ex rel. Bailey v. O'D. Askew*, 486 F.2d 134, 135 (5th Cir. 1973) is misplaced; that case concerned an inmate challenging his incarceration in federal court before exhausting his state law habeas remedies. The District Defendants' argument is frivolous.

**B.    The PLRA Is Inapplicable Because Ms. Wormley Was Not Imprisoned When She Filed This Lawsuit.**

The District Defendants also inappropriately rely on the Prison Litigation Reform Act, 42 U.S.C. § 1997e(a) ("PLRA") for their argument that Ms. Wormley failed to exhaust her administrative remedies and thus is barred from bringing suit.  The District Defendants fail to mention that the PLRA only applies to *inmates* who seek to file claims in court.  The statute provides:

> (a) Applicability of administrative remedies
>
> No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, *by a prisoner confined* in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. § 1997e(a) (emphasis added).

The PLRA is inapplicable and does not bar Ms. Wormley's § 1983 claims.  The statute only applies to an action brought "by a prisoner confined in any . . . correctional facility." A "prisoner" for purposes of the statute is "any person *incarcerated or detained* in any facility . . . ."  42 U.S.C. § 1997e(h) (emphasis added).  Ms. Wormley was no longer "incarcerated or detained" in a correctional facility when she brought this action; the statute is inapplicable to her and does not bar her bringing a § 1983 claim against Defendants.  *See, e.g., In re Smith*, 114 F.3d 1247, 1251 (D.C. Cir. 1997) (noting that the PLRA applies "[i]f a litigant is a prisoner on the day he files a civil action"); *Doe by and Through Doe v. Washington County*, 150 F.3d 920, 921 (8th Cir. 1998) (noting that the "policy behind the PLRA was to deter suits by inmates," and holding that "[t]he PLRA unambiguously applies only to those suits filed by prisoners.").  The PLRA

accordingly does not apply, and the District Defendants' argument is frivolous and without merit.[7]

## VIII. THIS COURT SHOULD CONTINUE TO EXERCISE SUPPLEMENTAL JURISDICTION SHOULD FEDERAL CLAIMS AGAINST THE DISTRICT DEFENDANTS BE DISMISSED.

The District Defendants argue that, if all § 1983 claims are dismissed against them, this court should decline to exercise supplemental jurisdiction over the remaining state-law claims. Under 28 U.S.C. § 1367, a court may continue to exercise supplemental jurisdiction over the remaining state law claims even though federal claims might be dismissed. In this case, even if this court dismisses the federal claims against the District Defendants, assuming that federal statutory or constitutional claims remain against any of the remaining defendants, it would be inappropriate to dismiss the District Defendants since the claims against all parties are part of the "same case or controversy." 28 U.S.C. § 1367(a). In this case, because different parties likely acted in such ways that they influenced, affected, or otherwise overlapped with the actions of other parties, it would make little sense to dismiss the District Defendants while other defendants remained under this court's jurisdiction.

## IX. DISMISSING THE UNIDENTIFIED DEFENDANTS IS IMPROPER AT THIS STAGE.

Federal Rule of Civil Procedure 4(m) provides in part that the 120-day limit for serving a summons on a party may be extended for "good cause." The D.C. District Court has

---

[7] This argument is frivolous for yet another reason: the extensive inmate grievance procedures they include in the exhibits has nothing to do with challenges to the *fact* of imprisonment. They relate only to the *conditions* of imprisonment and do not create a mechanism for challenging wrongful detention. Indeed, "classification status" is explicitly "*non-grievable*."

allowed extensions for service of process precisely in this circumstance, where the identities of

certain defendants are unknown and cannot be known until discovery.  The court has permitted

the parties to engage in discovery to allow the plaintiff to identify John and Jane Does and serve

them with process.  *See M.K. v. Tenet*, 99 F. Supp. 2d 12, 17-18 (D.D.C. 2000) (giving

defendants thirty extra days to identify and serve unidentified defendants); *Saffron v. Wilson*, 70

F.R.D. 51, 56 (D.D.C. 1975) ("[A]t this time, before plaintiff has had an opportunity to engage in

discovery which could disclose the exact identity of the officers whom plaintiff presently is able

to partially identify . . . . the Court discerns no purpose in dismissal of the 'John Doe'

defendants. Accordingly, defendants' motion, to the extent that it suggests dismissal of the 'John

Doe' defendants, is denied without prejudice to its renewal at a later date.).

At this stage, before discovery has occurred, the District Defendants' motion for

summary should be dismissed.  In the alternative, the motion for summary judgment should be

stayed, and Ms. Wormley should be allowed to engage in discovery to allow her to identify the

John or Jane Doe defendants and serve process on them.  *See* Rule 56(f) Affidavit of Christopher

R. Hart).


## X.    SUMMARY JUDGMENT REGARDING PUNITIVE DAMAGES IS IMPROPER.

The District Defendants argue that Ms. Wormley is barred from seeking punitive

damages against the District, Devon Brown, and John or Jane Does 11-20.  Ms. Wormley has

alleged facts sufficient to claim punitive damages, and the District Defendants' arguments should

be dismissed.  In the alternative, Ms. Wormley should be allowed an opportunity for discovery

before punitive damages can be addressed.  *See* Fed. R. Civ. P. 56(f); Rule 56(f) Affidavit of

Christopher R. Hart.

First, the District Defendants argue that Ms. Wormley's claim for punitive damages stemming from § 1983 causes of action are barred by statute and caselaw. But the very authority they cite notes an exception: punitive damages, although not awarded against the District for § 1983 claims in the ordinary course, are permitted in "extraordinary circumstances." *Feirson v. District of Columbia*, 315 F. Supp. 2d 52, 57 (D.D.C. 2004). Acknowledging that punitive damages under § 1983 are normally barred because the District is a municipal corporation, the court in *Feirson*—citing District authority—noted that "Illustrative instances of 'extraordinary circumstances' where punitive damages might be warranted against a municipality . . . include circumstances 'where a jurisdiction's taxpayers are directly responsible for perpetrating the policies that caused the plaintiff's injuries' or 'where a municipality or its policymakers have intentionally adopted the unconstitutional policy that caused the damages in question.'" *Id.* (citing *Butera v. District of Columbia*, 235 F.3d 637, 658 (2001)).

There may very well be extraordinary circumstances here that will only be known through the process of discovery. The Complaint alleges that the District Defendants unlawfully detained Ms. Wormley, despite her repeated requests for information regarding her incarceration, even though the District Defendants were "on actual and constructive notice that inmates at CDF and CTF were at an extreme risk of overdetention." Complaint ¶ 59. It is currently unknown what, if any, efforts the District took in light of *Bynum* (or before) to mitigate the dangers of overdetention, or whether policies were implemented or perpetuated by officers (including Defendant Brown) that created or increased the risk that Ms. Wormley would be unlawfully detained (as she ultimately was, for 150 days).[8]

---

[8] There is reason to believe that the District has specifically *not* learned from its mistakes, but continues to "intentionally adopt[ ] the unconstitutional policy" that caused Ms. Wormley's unlawful detention and concomitant constitutional violations. The same actions the District

The District Defendants attempt to cut off the necessary process of discovery by providing only a declaration from Devon Brown, specifically stating that he lacked personal knowledge of Ms. Wormley's case and that he took various, vaguely-identified actions at unspecified points during his tenure.  *See* Opp. Ex. E.  As the attached Affidavit notes, this declaration does not end the punitive damages inquiry for any of the District Defendants.  It answers nothing for Defendant Brown to state, vaguely, that he has "caused staff to reorganize the Records Office, hire a new Chief, add[ ] and train[ ] new staff members, and implement[ ] computerized sentence calculations and other quality control mechanisms related to the release of inmates."  Opp. Ex. E. at ¶ 8.  Aside from the lack of specifics—such as when these respective actions were taken and whether they had anything at all to do with specific, publicized problems that increased Ms. Wormley's and others' risk of unlawful detention, not to mention leaving out altogether any actions that he and others might have taken before and during the period Ms. Wormley was incarcerated that would have affirmatively aggravated her unlawful imprisonment, and thus her constitutional injuries—it also only provides vague information as to Defendant Brown, and not to any other District Defendant.  Even if Defendant Brown's affidavit ended the punitive damages inquiry as to him, it would do so *only* as to Defendant Brown, and not as to any other District Defendant.

Second, the District Defendants state that punitive damages cannot be recovered against Defendants Brown and John or Jane Does 11-20 because no facts are alleged that support the required conduct.  Opp. at 27–28.  The Complaint sufficiently alleges facts necessary to maintain a punitive damages claim, were one to be required:  the Complaint alleges both that *all*

Defendants attempt to defend have been already been cited as unacceptable.  *See supra*, Part VI.C (discussing *Barnes*).

Defendants had "actual and constructive knowledge that inmates at CDF and CTF were at an extreme risk of overdetention" because they were privy to the "widespread publicity of the problem of unlawful imprisonment of inmates at CDF and CTF through news stories, government reports, and the widely-reported multi-million dollar class action settlement of *Bynum, et al. v. District of Columbia*." ¶ 59. Based on this allegation in the Complaint, other allegations in the Complaint regarding the District Defendants' actions (*see* ¶¶ 39, 55), and the allegation that the District Defendants "recklessly disregard[ed] Ms. Wormley's excessive risk of unlawful detention." Ms. Wormley has sufficiently stated facts to support a claim of punitive damages against the District Defendants.[9]

Third, under Rule 56(f), Ms. Wormley avers that she does not have facts sufficient to answer the statements contained in Defendant Brown's affidavit or to prove the facts sufficient to sustain her claim for punitive damages, and does not have facts sufficient to identify the John or Jane Does named in the Complaint. Accordingly, summary judgment on this issue is inappropriate, and the motion should be denied. In the alternative, discovery is necessary under Rule 56(f) in order for the Court to rule on the motion.

## XI. IN THE ALTERNATIVE, THE MOTION FOR SUMMARY JUDGMENT SHOULD BE DENIED TO ALLOW MS. WORMLEY A MEANINGFUL OPPORTUNITY FOR DISCOVERY.

Federal Rule of Civil Procedure 56(f) provides that a summary judgment motion be denied, or other appropriate action taken, "[i]f a party opposing the motion shows by affidavit that, for specified reasons, it cannot present facts essential to justify its opposition." Fed. R. Civ.

---

[9] Defendants cite to *Smith v. Wade*, 461 U.S. 30, 56 (1983) to support its assertion that *specific* facts need to be alleged in a Complaint in order for a punitive damages claim to survive. Opp. at 27. But *Smith* concerned "the correct legal standard in instructing the jury that it might award punitive damages under 42 U.S.C. § 1983." Although *Smith's* holding is inapposite at this stage of the case, Ms. Wormley has met the District Defendants' higher, though inappropriate, suggested pleading requirements.

P. 56(f).  Although Ms. Wormley has provided ample reasons why the District Defendants'

arguments are legally infirm, to the extent those arguments rest on facts that Ms. Wormley

cannot dispute, she requests that the District Defendants' motion for summary judgment be

denied to allow her a meaningful opportunity for discovery.  *See* Rule 56(f) Affidavit of

Christopher R. Hart.


## **CONCLUSION**

For the foregoing reasons, Plaintiff Eloise T. Wormley respectfully requests that the

District Defendant's Motion to Dismiss/Motion for Summary Judgment be denied.


Respectfully submitted,


August 8, 2008                           _/s/ Christopher R. Hart_____

Robin Jacobsohn (D.C. Bar no. 417407)
Christopher R. Hart (D.C. Bar no. 486577)
Mathew J. Peed (D.C. Bar no. 503328)

WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, D.C. 20005
(202) 434-5000 (tel)
(202) 434-5029 (fax)


Ivy A. Lange  (D.C. Bar No. 488147)
Washington Lawyers' Committee for Civil Rights
& Urban Affairs
11 Dupont  Circle, N.W., Suite 400
Washington, D.C.  20036
Tel 202-319-1000
Fax 202-319-1010


*Attorneys for Plaintiff*

40

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| ELOISE T. WORMLEY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | **56(f) AFFIDAVIT OF** |
| v. | ) | **CHRISTOPHER R. HART** |
| | ) | |
| THE UNITED STATES OF AMERICA, et al., | ) | **Case No. 08 CV 0449 (CKK)** |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |

## AFFIDAVIT OF CHRISTOPHER R. HART PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 56(f)

Comes now the Affiant, Christopher R. Hart, and states as follows:

1.     I am an adult over the age of eighteen, with personal knowledge of the following facts.

2.     I am an attorney at Williams & Connolly, LLP and counsel to the Plaintiff, Eloise Wormley.  I have reviewed and am familiar with the District Defendants' Motion to Dismiss or, in the Alternative, for Summary Judgment, the accompanying Memorandum of Points and Authorities in support thereof, and in particular the Statement of Material Facts as To Which There Is No Genuine Issue.

3.     Plaintiff has separately submitted an Opposition to the District Defendants' Motion to Dismiss ("Opposition").  As demonstrated in Plaintiff's Opposition, Ms. Wormley has stated claims against each of the District Defendants and the District Defendants have not offered any reason for this court to grant its motion to dismiss, in whole or in part.  And, as demonstrated

in Plaintiff's Opposition, the District Defendants have not offered any reason for this court to

grant its alternative motion for summary judgment, in whole or in part.

4.    However, in the alternative, should the Court be inclined otherwise, Plaintiff

requests, pursuant to Federal Rule of Civil Procedure 56(f), the opportunity to take discovery in

order to develop facts that will demonstrate the District Defendants are not entitled to summary

judgment on any issue.  Plaintiff believes that through discovery she will ascertain facts that can

reasonably be expected to demonstrate the existence of genuine issues of material fact as to the

District Defendants' defenses that preclude the entry of summary judgment that they seek.

5.    Plaintiff has had no opportunity to conduct any discovery in this action, including

on the very issues that Defendants contend are undisputed.  Accordingly, Plaintiff seeks discrete

discovery related to specific Statements of Undisputed Facts.

6.    Plaintiff requires discovery regarding the following facts that the District

Defendants claim are undisputed:

 a.    "There are no written or informal policies, customs or practices of DOC that

  would preclude timely release of Ms. Wormley from incarceration.  (Director

  Brown Dec. ¶ 7)."  Defendants' Statement of Undisputed Facts ("SMF") ¶ 28.

 b.    "During Director Brown's tenure, he caused staff to reorganize the Records

  Office, hired a new Chief, added and trained new staff members, and

  implemented computerized sentence calculation and other quality control

  mechanisms related to the release of inmates.  (Director Brown Dec. ¶ 8)."  SMF

  ¶ 29.

7.    Plaintiff requests the ability to depose Defendant Brown on these issues, which

relate directly to statements he makes in his declaration, attached as Exhibit E to the District

Defendants' Motion. Defendant Brown's statements are vague: they do not specify any particular policies, formal or informal; they do not specify when he implemented the actions he states he has implemented, why they have been implemented, what other policies were considered, or other information that is directly relevant to the issues in this case.

8.      Plaintiff further requests the ability to serve interrogatory requests and requests for document production related to the allegations in Defendant Brown's affidavit.

9.      Plaintiff believes that allowing a deposition of Defendant Brown on these issues, and the related interrogatories and document requests, will likely lead to the discovery of facts allowing her to oppose Defendants' Motion for Summary Judgment by offering facts in genuine issue, and that are directly relevant to Plaintiff's 42 U.S.C. § 1983 claims against the District Defendants, her claims against Defendants Brown and John and Jane Does 11–21 in their individual capacities, and her claims for punitive damages.

10.     Further, Plaintiff requests the opportunity to propound interrogatories specifically aimed at identifying the unidentified John or Jane Does 11-20. Plaintiff believes that allowing these interrogatories will allow her to identify and serve relevant parties who should be named in this action. This is directly relevant to the District Defendants' motion to dismiss Defendants John or Jane Does 11–20.

11.     Finally, to the extent Plaintiff is unable to present facts disputing those presented by the District Defendants, Plaintiff requests that she be able to conduct further discovery related to each of the Statements presented by the District Defendants' Statement of Material Facts.

12.     I believe that the information obtained, as outlined above, will raise genuine issues of material fact, in addition to those already made clear by Plaintiff's Opposition. The

3

District Defendants' Motion for Summary Judgment should therefore be denied pursuant to Rule 56(f).

13.    Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.  Executed on August 8, 2008.

_____

Christopher R. Hart

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| ELOISE T. WORMLEY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | **AFFIDAVIT OF CHRISTOPHER** |
| v. | ) | **R. HART** |
| | ) | |
| THE UNITED STATES OF AMERICA, et al., | ) | **Case No. 08 CV 0449 (CKK)** |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |

## AFFIDAVIT OF CHRISTOPHER R. HART

Comes now the Affiant, Christopher R. Hart, and states as follows:

1. I am an adult over the age of eighteen, with personal knowledge of the following facts.

2. I am an attorney at Williams & Connolly, LLP and counsel to the Plaintiff, Eloise Wormley.

3. Exhibit 1 is a true and accurate copy of the June 16, 2006 United States Marshals Service (USMS) Detainer issued to District of Columbia Central Detention Facility (CDF) regarding Ms. Wormley, as obtained from the D.C. Department of Corrections pursuant to a FOIA request.

4. Exhibit 2 is a true and accurate copy of a printout of a September 5, 2007 e-mail from United States Parole Commission Case Analyst Jordana Randall to David Taylor, an attorney at Williams & Connolly LLP.

5. Exhibit 3 is a true and accurate copy of D.C. Department of Corrections Program Statement 1010.1C, as obtained from the District of Columbia's website: http://doc.dc.gov/doc/cwp/view,a,3,q,638522.asp.

6. Exhibit 4 is a true and accurate copy of D.C. Department of Corrections Program Statement 4020.2, as obtained from the District of Columbia's website: http://doc.dc.gov/doc/cwp/view,a,3,q,638522.asp.

7. Exhibit 5 is a true and accurate copy of D.C. Department of Corrections Program Statement 4353.1B, as obtained from the District of Columbia Government website: http://doc.dc.gov/doc/cwp/view,a,3,q,638522.asp.

8. Exhibit 6 is a true and accurate copy of the March 16, 2007 USMS Form 41 issued to CDF regarding Ms. Wormley, as obtained from the D.C. Department of Corrections pursuant to a FOIA request.

9. Exhibit 7 is a true and accurate copy of the October 19, 2006 USMS Form 41 issued to CDF bearing a dated facsimile imprimatur of January 11, 2007 at 11:21am, and the transmission stamp "FR USM  TO DC JAIL," as obtained from the D.C. Department of Corrections pursuant to a FOIA request.

10. Exhibit 8 is a true and accurate copy of the June 5, 2006 United States Bureau of Prisons Notice of Escape regarding Ms. Wormley bearing a dated facsimile imprimatur of January 11, 2007 at 9:41am, and the transmission stamp "FR USM  TO DC JAIL," as obtained from the D.C. Department of Corrections pursuant to a FOIA request.

11. Exhibit 9 is a true and accurate copy of the December 6, 2006 facsimile from "Ms. Flythe," an employee of Corrections Corporation of America, to Defendant Donna Scott, an employee of USMS, as obtained from the D.C. Department of Corrections pursuant to a FOIA request.

12. Exhibit 10 is a true and accurate copy of the October 18, 2006 facsimile from Rollins Wayne Hunter, an employee of the D.C. Department of Corrections, to Defendant Donna Scott, an employee of USMS, as obtained from the D.C. Department of Corrections pursuant to a FOIA request.

13. Exhibit 11 is a true and accurate copy of USMS Directive 8.2 "Detainers," as obtained from USMS pursuant to a FOIA request.

14. Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.  Executed on August 8, 2008.

Christopher R. Hart

# EXHIBIT 1

JUN 16 2006 12:45 FR USM

U.S. Department of Justice
United States Marshals Service




# DETAINER
## BASED ON FEDERAL PAROLE VIOLATION WARRANT
United States Marshal

*(District)*

DISTRICT OF COLUMBIA

*(Return Address and Phone)*

Please type or print neatly:

TO: CDF

DATE: 06-16-06

SUBJECT: WORMLEY, ELOISE

AKA: ADAMS, THERESA

DOB/SSN: 02-04-54 // 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

REF. # DCDC: 226899

USMS #: 37096-007

CR #: PDID: 335255

JUN 16 PM 4:02

Please accept this Detainer against the above-named subject who is currently in your custody. The United States Parole Commission has issued a **Federal parole violation warrant** against the subject. Prior to the subject's release from your custody, please notify this office at once so that we may assume custody of the subject if necessary. If the subject is transferred from your custody to another detention facility, we request that you forward our Detainer to said facility at the time of transfer and advise this office as soon as possible. The notice and speedy trial requirements of the Interstate Agreement on Detainers; Act do NOT apply to this Detainer, which is based on a **Federal parole violation warrant** In accordance with U.S. Parole Commission regulations, please read or show the following to the subject:

**"YOU ARE HEREBY ADVISED THAT A DETAINER HAS BEEN FILED AGAINST YOU ON THE BASIS OF A WARRANT ISSUED BY THE U.S. PAROLE COMMISSION. IF YOU ARE SERVING A NEW SENTENCE OF CONFINEMENT FOR A CRIME COMMITTED WHILE ON PAROLE, YOU MAY SUBMIT TO THE U.S. PAROLE COMMISSION ANY INFORMATION YOU WOULD LIKE CONSIDERED BY THE PAROLE COMMISSION IN DISPOSING OF THE WARRANT. UPON RECEIPT OF SUCH INFORMATION, YOUR CASE WILL BE REVIEWED ON THE RECORD BY THE PAROLE COMMISSION."**

After reading or showing the above language to the subject, please execute the following:
**The foregoing was read to or by the subject and a copy of the Detainer and the charges upon which it is based was delivered to him on** _____ .
                                   *(date)*
Please acknowledge receipt of this Detainer. Please provide one copy of this Detainer to the subject and FAX one copy to this office at _____ .
                                   *FAX No.*

Signed: _____    Title: _____

| RECEIPT | |
|---|---|
| Date: | 6/16/06 |
| Signed: | S Christie Offith |
| By: | McCud Cohen |
| Title: | Legal Ast |

Very truly yours,

_____
*(Signature)*

**GEORGE WALSH**
U.S. Marshal
Requested by: SEAN MCLEOD

Form USM-16C
Rev. 04/05

# EXHIBIT 2

## Taylor, David

**From:**    Randall, Jordana (USPC) [Jordana.Randall@usdoj.gov]
**Sent:**    Wednesday, September 05, 2007 2:50 PM
**To:**      Taylor, David
**Subject:** Eloise Wormley 37096-007

Good Afternoon,

I have confirmed with the United States Marshals Service, the District of Columbia that a
Parole Commission detainer was filed in error.  The USPC does not have a file on this case and
Ms. Wormley is not under the Commission's jurisdiction.  If you have any other questions
please reply this message or contact me at the below listed number.

Jordana Randall
U.S. Parole Commission
Case Analyst
301-492-5821 ext.175
301-492-5525 fax
jordana.randall@usdoj.gov

# EXHIBIT 3



**DISTRICT OF COLUMBIA
DEPARTMENT OF CORRECTIONS**

# Program Statement

| | |
|---|---|
| **OPI:** | **DIR** |
| **Number:** | **1010.1C** |
| **Date:** | **February 15, 2008** |
| **Supersedes:** | **None** |
| **Subject:** | **Organization of the DC Department of Corrections** |

1. **PURPOSE AND SCOPE.** To establish the organization structure of the DC Department of Corrections (DCDC).

2. **POLICY.** It is DOC policy to administer and manage the DC Department of Corrections (DOC) and the Central Detention Facility (CDF) in a professional and responsible manner consistent with legal requirements of the District of Columbia Government.

3. **AUTHORITY**

   a. DC Code § 1-301.111 Authority of the Attorney General, DC

   b. DC Code § 24.211.02 Powers: Promulgation of Rules

   c. DC Code § 2-139 Merit Personnel Act, DC

   d. DC Code § 24-101 Transfer of Prison System to Federal Authority

   e. District Personnel Manual      Chapters 1 through 39

   f. Compensation Collective Bargaining Agreement between the District of Columbia Government and the Labor Organizations Representing Compensation Units 1 and 2 effective through Fiscal Year 2010

   g. Collective Bargaining Agreement between District of Columbia Department of Corrections and Fraternal Order of Police Department of Corrections Labor Committee

4. **DIRECTIVES AFFECTED**

   a. Directives Rescinded

      DO 1010.3                    Official Designation of Department Institutions and Facilities (1/2/91)

b.    Directives Referenced for Administration of DOC

1)    PS 1110.2 Directives Management System

2)    PS 1270.1 Victims Information and Notification Everyday (VINE)

3)    PS 1300.1 Freedom of Information (FOIA)

4)    PS 1300.2 Consent to Release of Information

5)    PS 1300.3 Health Information Privacy

6)    PS 1310.3 Volunteer Program

7)    PS 1310.4 Citizens Advisory and Resource Committee

8)    PS 1311.1 Research Activity

9)    PS 1340.2 Media Relationship

10)   PS 1441.1 Lawsuits Against Individual Employees

11)   PS 2000.1 Fiscal Management

12)   PS 2330.1 Property Management

13)   PS 2420.2 Information Security Program

14)   PS 3700.2 Employee Training and Staff

15)   PS 3040.6 Personnel Security and Suitability

16)   PS 3800.2 Accommodations for Persons with Disabilities

17)   PS 6050.4 Mandatory Employee Drug/Alcohol Testing

18)   PS 3300.1 Code of Ethics and Employee Conduct

19)   PS 4020.1 Orientation (Inmates)

20)   PS 4020.2 Admissions and Intake

21)   PS 4060.2 Inmate Record

22)   PS 6000.1 Medical Management

23)   PS 7500.1 Physical Plant

5. **PROGRAM OBJECTIVES.**  The expected result of this program are:

   a.  Authority, responsibility and accountability for all major functions within DOC are defined.

   b.  The agency is administered and personnel are managed in a professional, responsible and ethical manner that is consistent with legal requirements.

   c.  Employees and persons who provide contract and volunteer services are physically and professionally qualified to perform the duties of their specific position.

6. **STANDARDS REFERENCED**

   a.  American Correctional Association (ACA) 2nd Edition Standards for Administration of Correctional Agencies: 2-C0-1A-12 and 2-C0-1A-13.

   b.  American Correctional Association (ACA) 4th Edition Performance Based Standards for Adult Local Detention Facilities: 4-ALDF-7A-01, 4-ALDF-7A-02, 4-ALDF-7B-01, 4-ALDF-7B-02, 4-ALDF-7D-01, 4-ALDF-7D-02, 4-ALDF-7D-03, 4-ALDF-7D-04, 4-ALDF-7D-05, 4-ALDF-7D-14 and 4-ALDF-7E-01 through 4-ALDF-7E-04.

7. **ADMINISTRATION AND MANAGEMENT**

   a.  Pursuant to DC Code § 24.211.02 Powers; promulgation of rules:

   (a) Said Department of Corrections under the general direction and supervision of the Mayor of the District of Columbia shall have charge of the management and regulation of the Workhouse at Occoquan in the State of Virginia, the Reformatory at Lorton in the State of Virginia, and the Washington Asylum and Jail, and be responsible for the safekeeping, care, protection, instruction, and discipline of all persons committed to such institutions. The Department of Corrections with the approval of the Council of the District of Columbia shall have power to promulgate rules and regulations for the government of such institutions and to establish and conduct industries, farms, and other activities, to classify the inmates, and to provide for their proper treatment, care, rehabilitation, and reformation.

   b.  However pursuant to DC Code § 24-101 Transfer of Prison System to Federal Authority:

   (g) (1) Transfer of Functions.  (A) Notwithstanding any other provision of law, to the extent the Bureau of Prisons assumes functions of the Department of Corrections under this subchapter, the Department is no longer responsible for such § § 24-211.01 and 24-211.02, that apply with respect to such functions are no longer applicable.

c.     DOC therefore maintains custody and control of pretrial offenders, sentenced misdemeanants, sentenced felons awaiting federal transfer, US Marshal-holds and other in-transit prisoners.

d.     District of Columbia Government agencies are administered pursuant to the District Personnel Manual (DPM). The DPM system is the official medium for the DC Department of Human Resources (DCHR) for issuing DC personnel regulations, implementing guidance and procedures, instructions and related material on District-wide personnel programs. This manual is available in the DOC Human Resources Division and on-line to employees. This manual includes at a minimum:

     1)   An affirmative action program

     2)   An equal employment opportunity program

     3)   Personnel position classification, selection, retention, and promotion of all personnel on the basis of merit and specified qualifications

     4)   Employee rights, work hours, compensation, benefits and retirement

     5)   Code of conduct and ethics

     6)   Rules and probationary employment

     7)   Provisions of the Americans with Disability Act (ADA)

     8)   Sexual harassment policy

     9)   Employee grievance and appeal

     10) Employee Records

     11) Employee development, performance management, incentive awards and labor relations

     12) Infection control plan

     13) Employee disciplinary procedures

     14) Volunteer Services

c.     In addition, DOC maintains more agency/facility-specific policies and procedures as required.

8. **MISSION SATEMENT.**  The mission statement of the DC Department of Corrections is:

> The District of Columbia Department of Corrections (DCDC) is a team of highly trained, dedicated corrections professionals committed to maintaining the safety, security and order of the facility for inmates, staff, visitors and the community in a humane environment for pretrial detainees, misdemeanants and felons awaiting designation and transfer.

> Through the use of sound correctional management principles, DOC provides programs and services for offenders that facilitate their successful reintegration into the community and provide accountability for victim's rights.

9. **OFFICE OF THE DIRECTOR.**  The Director provides overall leadership and formulates measurable goals and objectives to carry out the mission and philosophy of DOC. The Director's Office represents the agency on compliance and legislative matters before the general public, Mayor, D.C. City Council and the Congress. The Office of the Director consists of:

   a.   *The Office of the General Counsel (OGC)* – The Office of the General Counsel provides legal advice and guidance to the Director and DOC staff in the performance of their duties.  The OGC serves as the primary liaison with the courts and other legal entities.

   b.   *Internal Controls, Compliance and Accreditation -*  Formulates written policies and procedures describing all facets of agency administration and operation and ensures sufficient management controls through compliance with policies, regulations and standards, inspections, program evaluations, corrective action.

   c.   *The Office of Public Information (PIO)* – Serves as the primary point of contact for the media and release of public, emergency and non-emergency information concerning DOC and in conjunction with the human resources division, coordinates activities that contribute to the community.

   d.   *The Office of Internal Affairs (IA)* – Conducts pre-employment background investigations of potential employees, investigates allegations of fraud, abuse and unlawful conduct and criminal activity at DOC facilities, investigates escapes and absconds and supports law enforcement entities in the apprehension of inmates, and investigates all matters pertaining to allegations of sexual abuse or sexual misconduct in accordance with the 2003 Prison Rape Elimination Act.

e.   *Risk Management* – Identifies, assesses, and prioritizes operational risks. Coordinates development of risk management and mitigation strategies for the Agency. Maintains up to date Agency Risk Management plans.

10.  **OFFICE OF THE DEPUTY DIRECTOR.**  The Deputy Director oversees day-to-day operations of DOC correctional system, ensures coordinated service delivery, and initiates system wide changes.  This includes three major functions:

a.   *Administration and Management* in the areas of contract administration, human resources management, medical management, management of information and technology, fiscal management and employee training and development.

b.   *Operations* for the management of correctional facilities to include but not be limited to environmental and physical plant safety, and prisoner care and custody.

c.   *Program Activities and Services* for inmates to include opportunities for self-improvement and treatment, community release and transition services and community involvement through religious and volunteer programs.

11.  **WARDEN.**  The Warden is responsible for the day-to-day operation of the Central Detention Facility to include inmate security and custody, inmate population management, transportation, case management, inmate records management, food services, environmental safety, health services and facilities management.

Devon Brown
Director

Attachment A          Organization Chart

# EXHIBIT 4



# DISTRICT OF COLUMBIA
# DEPARTMENT OF CORRECTIONS

# Program Statement

**OPI:** RECORDS
**Number:** 4020.2
**Date:** September 15, 2000
**Subject:** Admissions Process

1. **PURPOSE AND SCOPE.** To establish procedures for a standardized identification and admission process for inmates committed to the D. C. Department of Corrections (DCDC).

2. **PROGRAM OBJECTIVES.** The expected results of this program are:

   **a.** The DCDC will have legal commitment documents on each inmate committed to DCDC custody.

   **b.** All commitment documentation will be accurate and complete.

3. **DIRECTIVES REFERENCED.** PS 4353.1A  Inmate Transfer and Release (9/15/00)

4. **AUTHORITY.**  D.C. Code § 24-442

5. **STANDARDS REFERENCED**

   **a.** American Correctional Association (ACA) 3rd Edition Standards for Adult Local Detention Facilities: 3-ALDF-1F-04, 3-ALDF-1F-07, 3-ALDF-1F-08, and 3-ALDF-4A-01.

   **b.** American Correctional Association 3rd Edition Standards for Adult Correctional Institutions:  3-4272.

   **c.** American Correctional Association 3rd Edition Standards for Adult Community Residential Services:  3-ACRS-4A-01,  3-ACRS-4A-03

6. **RESPONSIBILITIES**

   **a.** The Warden shall ensure adequate coverage in the Receiving & Discharge (R&D) Control Unit to implement this Program Statement.

b. The Supervisory Legal Instruments Examiner (SLIE) shall ensure a Legal Instruments Examiner (LIE) is assigned to the R&D Control Unit daily from 11:30 a.m. until the last bus arrives each evening to receive, review, and identify commitment documents and issue DCDC numbers.

c. The SLIE shall provide oversight for the LIE assigned to the R&D Control Unit to ensure the LIE is actively working with the R&D staff when inmates are being processed into R&D.

## 7.  EXPLANATION OF TERMS RELEVANT TO THE ADMISSIONS PROCESS

a. **Commitment Documents:** The papers that give DCDC the right to take a person into custody and detain him or her.  There are number of various types which are discussed below.

b. **Commitment Orders:**  Legal documents issued by D. C. Superior Court and U.S. District Court setting forth the case number, charge, the bond amount (if set), the Judge's, Commissioner's or Magistrate's signature and court seal. U. S. District Court commitments may contain the signature of the Clerk or Deputy Clerk. Attachments 1 and 2 are examples.

c. **Commitment of Inmate Returned from Escape:**  Commitment of an individual who has escaped from the DCDC.  A recommit sheet (Attachment 11) is prepared by the R&D Control Unit for these cases.

d. **Commitment on Writ of Habeas Corpus:**  An order to produce an inmate to the U.S. District or D.C. Superior Court.  There are two kinds of writs:

(1)  Writ of Ad Prosequendum (Attachment 3): Inmate produced for prosecution.

(2)  Writ of Testificandum (Attachment 4): Inmate produced to testify as a witness.

e. **Court Return:**  An inmate returning to the facility from court on the same day that he or she left.  There are instances when an inmate is removed from the D.C. Superior Court or U.S. District Court for an appearance in another jurisdiction.  This inmate is classified as a "court return" if he or she returns on the same day.

f. **Detainer:**  A notification filed with the Records Office that advises the facility that an inmate is wanted in connection with the commission of an offense in another jurisdiction and a warrant is on file for his or her arrest or service of sentence.

g. **Inmate Remand** Order (US Marshal's Forms 40 & 41, Attachments 6 and 7, respectively):  Documents issued by the U.S. Marshals to detain intransit inmates for safekeeping for other jurisdictions pending further transfer.

**h.  Inmate (Prisoner) Return Form:**  A document utilized to return inmates to D.C. Jail following scheduled court proceedings.

**i.  Inter-Institutional Transfer (IIT):**  The transfer of inmates between the Central Detention Facility (CDF) CCA/CTF, Halfway Houses, Contract Facilities and Lorton Facilities.  Transfers occur on a daily basis and for various reasons.

**j.  Intransit:**  An inmate committed by a Deputy U.S. Marshal from any jurisdiction other than the District of Columbia for overnight housing or for less than one working day.  In some cases, an intransit  inmate may stay over a weekend and/or a holiday.

**k.  Judgment and Commitment/Probation Order (J&C)** (Attachment 2)**:**  A legal document issued by D.C. Superior Court and/or by U.S. District Court setting forth the sentence and ordering the defendant committed to custody or placing the defendant on probation.

**l.  Magistrate Commitment:**  A pretrial commitment issued by the U.S. District Court for U.S. District Court and D.C. Superior Court cases.

**m.  Movement Sheet:**  A document used to record all inmate movements to or from the facility.  This document is also used to document the inmate population count.

**n.  New Inmate:**  An inmate committed from Court with commitment documentation and/or J&C order.

**o.  Parole Violation Warrant:**  A document issued by the U.S. Parole Commission (attachment 8) (or the D.C. Board of Parole, Attachment 9) that authorizes the arrest of a parole violator.  A  recommit sheet is prepared by the R&D Control Unit.  If the parole violator warrant is the only commitment document to detain the inmate, staff shall ensure the warrant is executed by the arresting officer.

**p.  Recommitment :**  An inmate incarcerated in the DCDC as a parole violator, work release violator, escapee, removal from a community correctional center, or a return from study case who has previously been in a DCDC facility.  An inmate returned from another state or federal facility may also be classified as a recommitment (or recommit).

**q.  Recommit Sheet:**  A document prepared by the R&D Control Unit to be used when committing an inmate who is a recommitment.

**r.  Youth Rehabilitation Act  (YRA) Study Commitment:**  A D.C. Superior Court commitment document ordering the observation and study of a youth defendant pursuant to Title 24, section 801 *et seq.* of the D.C. Code (YRA of 1985).  The DCDC performs this study.

8.    **COMMITMENT PROCEDURES**

    a. **Receiving and Identifying Commitment Documents**

       (1) Newly committed inmates received into the CDF shall be accompanied by one or more of the following documents:

         ?? Commitment Pending Disposition…………………….……Attachment #1

         ?? Judgment and Commitment/Probation Order………….Attachment #2

         ?? Writ of Habeas Corpus Ad Procequedum………….….Attachment #3

         ?? Writ of Habeas Corpus Ad Testificandum……….…….Attachment #4

         ?? Order for Return of Fugitive Waiver
            (from nearby jurisdictions)……………………….….. Attachment #5

         ?? Order to Return Fugitive Upon Waiver …… ………….Attachment #6

         ?? U. S. Marshals Forms 40 ………..………………… Attachment #7

         ?? U. S. Marshal Form 41 …………….….…………….Attachment #8

         ?? U. S. Parole Commission Parole Violation Warrant...Attachment #9

         ?? D.  C. Parole Commission Parole Violation Warrant...Attachment #10

         ?? Escape Report ………………………………………. Attachment #11

         ?? Recommit Sheet………………………………….. Attachment #12

       (2) The LIE shall properly examine and interpret the above documents. A D.C. or U. S. Parole Violator Warrant and/or an Escape Report shall be researched for validity to ensure legality of confinement by telephoning the SLIE at the Record Office at the CDF to assure that the warrant is current.

       (3) The LIE assigned to the R&D Control Unit shall receive and thoroughly review for completeness all related commitment documents of inmates who are committed into the CDF.

       (4) The LIE shall check commitment documents for the following:

         ?? Inmate Name

         ?? Date of Birth

         ?? Gender

??   Type of Commitment

??   Date of  the Commitment Document

??   Case Number

??   Bond Status and/or Sentence (if any)

??   Signature of committing official

??   Court Seal

(5) The LIE assigned to the Admission and Identification (A&I) Section shall ensure receipt of the following items with each commitment document/order received:

??   Face Sheet #1….. .Attachment  #13

??   Fingerprint Card…Attachment #14

??   Photograph………Attachment #15

**b.   Issuance of DCDC Number**

(1) A six digit register number is assigned to each inmate committed to the DCDC.  A consecutive numbering system is used to assign a number to each new commitment.  The DCDC number is consecutively recorded in the Number Log Book.

(2) The same number is always assigned to an individual inmate, regardless of the number of repeat commitments.

(3) The LIE shall utilize the computer system to check for a prior issued DCDC number before issuing a new DCDC number.

(4) If no number has been assigned previously, the next number in the Number Log Book is assigned and that assignment shall be entered in the Number Log Book.

**c.    Receipt of Inmates**

(1) Upon receipt of commitment documents/orders, the LIE assigned to the R&D Control Unit shall review the documents and ensure a date/time stamp is affixed.

(2) The LIE shall determine if the inmate should be assigned his or her old DCDC number or issued a new DCDC number by comparing data on committing documents or orders with data from the computer system.

(3) The LIE shall enter the inmate's name and the PDID (Police Department Identification) number as reflected on committing documents or orders in the computer system to determine if a matching name and date of birth is listed. If so, the corresponding DCDC number listed shall be assigned to the inmate.

   ?? It is essential that the LIE cross reference (check) the various spelling of the names on all committing documents against the computer system and noting in the file that a different name that appears in the computer system.

   ?? The LIE shall utilize the computer system manual for detailed instructions on codes and data entry transactions.

(4) If the LIE is able to retrieve a DCDC number by utilizing the name and PDID number and the computer terminal reflects the record inactive, the inmate shall be assigned the DCDC number retrieved from the computer system. If the DCDC number retrieved from the computer system comes up "No Record Found" this number shall still be assigned to the inmate.

(5) If the LIE is unable to obtain a matching DCDC number from the computer system, the LIE shall assign the inmate a new DCDC number.

(6) After the LIE identifies the committed inmate's DCDC number, the DCDC number shall be recorded on the inmate's commitment documents/order and contact the R&D Processing Unit to give them the assigned DCDC number.

(7) In the event inmates are committed and the computer system is inoperable, the LIE shall issue temporary DCDC numbers, beginning with 900000, which are found in the back of the Number Log Book. As soon as the computer system is operable, replace each inmate's temporary number with a permanent register number following the above procedures

(8) The LIE assigned to the A&I (Admissions and Identification) Section shall correct any DCDC numbers which have been incorrectly assigned to a inmate. The number change form (Attachment #12) shall be completed and distributed on all number changes.

**d.  Receiving Parole Violators and Escapees**

(1) Parole Violators -- The U.S. District Court Marshal has assumed responsibility for notifying the U.S. Parole Commission when assuming

custody of parole violators and executing violator warrants.  These cases are committed to DCDC custody on the basis of  a Marshal's Forms 40 and 41 pending parole revocation and designation.  These cases are committed to DCDC custody on the basis of a Marshal's Forms 40 and 41 pending parole revocation.

(2)  Escapees -- All inmates being committed as return from abscond/escape status shall be accompanied by an escape report. The validity of such reports must be determined by the Records Office LIE assigned to the R&D Control Unit prior to accepting the inmates into the DCDC.

**e.  Admission of Inmates to Serve Court Ordered Weekend Sentence**.

An individual who reports to D.C. Jail to begin service of his/her weekend sentence for  the first time shall be identified by the LIE assigned to the R&D Control Unit.  The LIE  shall obtain the original judgment and commitment from the Records Office.

After the first time, the weekender reports to the CDF and the R&D Officer signs him or her in on the clipboard.

Odie Washington
Director

**Attachments**
   **Nos. 1-15 As Stated in PS**

# EXHIBIT 5



# DISTRICT OF COLUMBIA
# DEPARTMENT OF CORRECTIONS

# Program Statement

| | |
|---|---|
| **OPI:** | **WARDEN** |
| **Number:** | **PS 4353.1B** |
| **Supersedes:** | **PS 4353.1A (9/15/2000)** |
| **Date:** | **February 29, 2008** |
| **Subject:** | **Admission, Transfer and Release, Inmates** |

1. **PURPOSE AND SCOPE.** To provide guidelines for admission, transfer and release processes for inmates within the DC Department of Corrections (DOC).

2. **POLICY.** It is DOC policy to:

   a. Prior to accepting custody of an inmate, staff determines that the inmate is legally committed to the facility.

   b. Provide an admissions process that shall include recording basic personal information, fingerprinting and photographing, custody classification and medical, dental and mental health screening

   c. Ensure inmates are appropriately released at the end of their term and that upon release, inmates held for 30 days or more shall receive information about community resources prior to release.

3. **NOTICE OF NON-DISCRIMINATION**

   a. In accordance with the D.C. Human Rights Act of 1977, as amended, D.C. Official Code §2.1401.01 et seq., (Act) the District of Columbia does not discriminate on the basis of race, color, religion, national origin, sex, age, marital status, personal appearance, sexual orientation, gender identity or expression, familial status, family responsibilities, matriculation, political affiliation, genetic information, disability, source of income, or place of residence or business.  Sexual harassment is a form of sex discrimination that is also prohibited by the Act.  Discrimination in violation of the Act will not be tolerated.  Violators will be subject to disciplinary action.

   b. DOC prohibits discrimination against inmates based on race, religion, national origin, gender, sexual orientation or disability when making administrative decisions in providing access to programs.

c.     When both males and females are housed in the same facility, all available services and programs are comparable.  Neither gender is denied opportunities on the basis of its smaller number in the population.

d.     Inmates with disabilities, including temporary disabilities, are housed in a manner that provides for their safety and security.  Housing used by inmates with disabilities, including temporary disabilities, is designed for their use and provides for integration with other inmates.  Programs and service areas are accessible to inmate with disabilities who reside in the facility. Discrimination on the basis of disability is prohibited in the provision of services, programs and activities.

4.     **OBJECTIVES**

a.     The inmate and his/her property are immediately searched upon arrival at the facility.

b.     Admissions as described in this directive.

c.     Inmates are separated from the general population during the admission process and are assigned to initial holding settings according to their immediate security needs, physical and mental condition, and other considerations.

d.     Pursuant to *PS 4050.1 Inmate Property*, there is an itemized inventory of all personal property of newly admitted inmates and secure storage of inmate property, including money and other valuables. The inmate is given a receipt for personal property.

e.     Prior to placing and inmate in the general population, the inmate is given the opportunity to shower and is issued clean clothing.

f.     Inmates shall be appropriately released at the end of their term.

5.     **AUTHORITY**

6.     **DIRECTIVES AFFECTED**

a.     Directives Rescinded

1)  PS 4040.1B          Security Inmate Photos (12/20/06)

2)  PS 4090.2           Intake Screening (7/1/04)

3)  PS 4923.6           Mandatory Release (6/4/01)

    4)   DO 4351.2A        Sentence Expiration Procedure of Residents
                                     Confined in St. Elizabeth's Hospital (2/6/76)

    5)   PS 4353.1A        Inmate Transfers and Releases

    6)   CN-1               Inmate Releases and Transfers

    7)   PS 4360.2          Parole

b.    Directives Referenced

    1)   PS 4220.1              Inmate Gratuity

    2)   PS 4050.1              Inmate Property

7.   **STANDARDS REFERENCED**

American Correctional Association (ACA) 4th Standards for Adult Local Detention Facilities:  4-ALDF-2A-19, 4-ALDF-2A-19, 4-ALDF-2A-20, 4-ALDF-2A-21, 4-ALDF-2A-22, 4-ALDF-2A-33, 4-ALDF-5B-13 and 4-ALDF-5B-18.

8.   **INTAKE – R&D CONTROL.**  The surrender of an inmate from custody of the US Marshals Service (USMS) or the DOC Warrant Squad begins the admissions process of all individuals committed to the DC Detention Facility (CDF).

a.    Prior to accepting custody of the inmate, R&D Control Officers shall observe and if the inmate has visible injuries or appears to require medical attention require paperwork that documents the circumstances of the injury and whether medical attention was provided.

b.    If applicable or one conditions in ¶ a. are satisfied, the R&D Control Officers shall review all commitment documents to ensure the inmate is being legally committed.  Commitment document at the CDF are as follows:

    1)   Commitment Pending Disposition

    2)   Judgment and Commitment/Probation Order

    3)   Writ of Habeas Corpus Ad Prosequedum

    4)   Writ of Habeas Corpus Ad Testificandum

    5)   Order for Return of Fugitive Waiver (from nearby jurisdictions)

    6)   Order to Return Fugitive Upon Waiver

    7)   U. S. Marshals Forms 40

    8)   U. S. Marshal Form 41

    9)   U. S. Parole Commission Parole Violation Warrant

    10) D. C. Parole Commission Parole Violation Warrant

    11) Escape Report

    12) Recommit Sheet

c.    *Legal Documents Review.* R&D Control Unit shall receive, time/date stamp and thoroughly review each commitment document to ensure the following information is contained therein.

    1)   Inmate's Name

    2)   Date of Birth

    3)   Gender

    4)   Type of Commitment

    5)   Date of the Commitment Document

    6)   Case Number

    7)   Bond Status and/or Sentence (if any)

    8)   Signature of committing official

    9)   Court Seal

d.    *Booking Screen.* R&D Control Officers shall enter in the JACCS Booking Screen the inmate's personal information (last name, first name, middle name, affix, birth date, gender, and race) and reported social security number.

e.    *Gender Identification*

    1)   R&D staff shall review commitment documents for gender assignment.

    2)   Staff shall also observe the inmate's physical appearance and when there is uncertainty as to the inmate's biological gender staff shall question the inmate in a professional manner for verification.

    3)   Staff shall notify a supervisor if further confirmation appears warranted.

The supervisor shall have the inmate escorted to the medical unit for a physical examination and gender determination. Upon medical determination of gender, staff shall escort the inmate to the appropriate R&D unit to complete the intake process.

4) R&D staff shall accurately record the inmate's determined biological gender in JACCS and document the incident consistent with *PS 1280.2 Reporting and Notification Procedures for Significant Incidents and Extraordinary Occurrences*.

f. R&D Control Officers shall then enter the inmate's PDID # into the JACCS Booking Screen.

g. JACCS will conduct a query to determine if the inmate has a DCDC number assigned and if no matching data is found, JACCS will assign the inmate a new DCDC number.

h. If inmates are committed and the computer system is inoperable, the R&D Control Officer shall issue temporary DCDC numbers in the Number Log Book beginning with 900000.

i. As soon as the computer system is operable, replace each inmate's temporary number with a permanent register number following the above procedures.

j. The R&D Control Officer shall correct any DCDC numbers which have been incorrectly assigned to an inmate. The number change form (Attachment #12) shall be completed and distributed on all number changes.

k. R&D Control Officers shall generate the and forward the following documents to Records Office

1) Inmate Social Data card (Face Sheet 1),

2) Inmate Property form,

3) MPD generated fingerprint (or the DOC acquired fingerprint card),

4) Wing Card with photo, and

5) Commitment documents.


9. **R&D PROCESSING**

a. *Physical Description Screen.* R&D Processing Officers shall enter the inmate's height, weight, eye color, hair color, complexion, build, length of

hair, if the inmate has facial hair, has eyeglasses and is right or left handed.

b.   *Social Screen.*  R&D Processing Officers shall interview the inmate and enter:

1)   The inmate's home address (address, city, state and zip code).  When applicable, staff shall enter "No fixed address" in line 1 of the address field.  Staff shall not leave this field blank, and

2)   The inmate's Spouse/emergency contact information (address, city, state and zip code) and telephone number.

c.   *Photograph.*  R&D Processing Officers shall photograph and store the inmate's electronic image in JACCS.

d.   *Fingerprint.*  Staff shall retrieve the inmate's fingerprints from the Automated Fingerprint Identification System (AFIS).  If no fingerprint is available in AFIS, DOC staff shall fingerprint the inmate and forward the fingerprint card to the Records Office for reading and identification.

e.   *X-Ray.*  Inmates receive a chest x-ray to test for tuberculosis.

f.   R&D Processing Officers shall require the inmate to shower, exchange the inmate's personal clothing for institutional clothing, attach the JACCS generated armband ID, issue a bedroll (sheets and blanket), a hygiene kit and an information handbook.

## 10.  WEEKENDERS

a.   The Records Officer shall review the Judgment and Commitment and enter JACCS data to include the PDID for DCDC # assignment.

b.   Records Office shall forward the list with weekender's name, DCDC, Time/date of sentence to R&D Control and Tower.

c.   Upon arrival to serve the sentence R&D Control shall check ID against list, notifies Records Office if discrepancy

d.   Weekenders are housed in Intake Unit to serve their sentence.

## 11.  MEDICAL SCREENING

a.   The inmate shall be escorted from R&D Processing to medical for screening to include a determination if there are medical reasons for housing the inmate away from the general population or for restricting work assignments.

b.   Staff shall place recorded results of the intake medical screening in the inmate's medical file.

12. **HOUSING**

a.   The Compliance Team will assign the newly inmate to an Intake housing unit  unless it is determined the inmate should be otherwise placed on Administrative Segregation in a Special Management unit.  Special Management would generally include but may not be limited to;

1)   A court ordered alert or placement,

2)   Alerts recorded in JACCS during a prior term of confinement,

3)   The inmate requests protective custody or is involuntarily placed in protective custody for safety reasons,

4)   The inmate is evaluated as extremely dangerous or an escape risk that justifies Special Handling status,

5)   The newly committed inmate is allegedly involved in a high profile crimes,

6)   Juveniles (who are being tried as adults),

7)   Persons with mental health or related disabilities, and

8)   Female inmates and wheel chair bound inmates are immediately transferred to the Correctional Treatment Facility after medical/dental/ mental health screening

a.   Any inmate who is placed on Administrative Segregation shall be afforded a housing hearing pursuant to *PM 5300.1 Disciplinary and Administrative Housing Hearings.*

13. **INTAKE PROCESS.**  Case Managers shall conduct intake screenings within one business day of the inmate's admission.

a.   All reasonable efforts are made to ensure that the inmate's privacy is maintained during the interview.

b.   The interviewer shall also review the inmate record, JACCS, WALES, PRISM, COURTVIEW, JUSTICE and NCIC and make a decision whether the inmate is suitable for placement in general population.

c.    To ensure that inmates with separation orders are not housed together, the Case Manager shall check the location of all separatees in the JACCS System to identify any separatees that may be currently housed in the institution.  The Case Manager shall enter each separatee's name and DCDC number in the newly admitted inmate's JACCS <mark>Separations</mark> Screening.

d.    *JACCS Data Entry*.  Case Managers shall enter data into the following JACCS screens upon completion of the interview.

   1)    *Booking Screen*.  Personal Information (ethnicity, marital status) and interview the inmate to determine that the SSN in JACCS is as the inmate reported or make corrections.

   2)    *Social Screen*.  Review the JACCS  *Social* screen and interview the inmate regarding accuracy of the inmate's home address and spousal/ emergency contact information and when needed, make corrections.

   3)    *Employment Screen*.  The case manager shall query and enter in the JACCS *Employment* screen the inmate's driver's license information if known or is otherwise available.

## 14.  INTER-INSTITUTIONAL TRANSFERS

a.    The Inter-Institutional Transfer Order (IIT) (Attachment 1) shall be used by all DOC institutions whenever an inmate is transferred from one location to another.

b.    The IIT is usually prepared by a Records Office Legal Instruments Examiner LIE.  R&D Control shall prepare the IIT if the Records Office is closed.

c.    All inmates being transferred to the same institution shall be listed on the same IIT.

d.    The IIT Order shall contain the following information:

   1)    Action Date - the effective date of the transfer.

   2)    Time - Time of transfer.

   3)    Name - Inmate's name including all aliases or AKA(s).

   4)    DCDC Number - Inmate's DCDC number.

   5)    Move to Code - the location code indicating where the inmate is being transferred.

6) Destination - the name of the place where the inmate is being transferred.

7) Reason Code - the code which indicates the reason for the transfer, e.g., serve sentence, administrative, or medical.

8) Reason/Specific Instructions - the specific reason for the transfer, including brief details. Detainers and alerts for such things as medical problems, suicide risks and the like should be noted also.

9) Custody Status - any special circumstances or concerns relative to custody, e.g., protective custody, separation order, special handling.

10) Signing Authority - the institution Warden may delegate the authority to sign the IIT. This authority may be re-delegated to Record Office personnel or the Correctional Supervisor only.

## 15. RELEASE FROM DOC CUSTODY

a. The DOC CDF Receiving and Discharge Unit shall complete the release process for all inmates housed at CDF, CTF, and medical outposts.

b. Inmates released from court shall be processed at the Medical Holding Unit at DC General Hospital.

c. DOC shall notify St. Elizabeth's Hospital the mandatory release date of each inmate housed in the hospital.  Approximately thirty (30) days before the MR date, St. Elizabeth Hospital's Superintendent shall initiate action to effect the commitment of the inmate to the hospital.

## 16. RELEASE CLEARANCE

a. Records Office Legal Instruments Examiners shall obtain and review printouts from NCIC, COURT VIEW, WALES and JACCS must be generated to determine if there are any outstanding charges preventing release, prior to an inmate's release from the custody of the DOC.

b. The Legal Instruments Examiner shall review source documents in the inmate's institutional record because data available through the criminal court computerized check may not be current based upon a one to two day delay in the updating data from court proceedings.

c. Any release clearances required due to additional agreements with other criminal justice partners must also be completed.

d. The Legal Instruments Examiner must complete the Release Clearance before the Release Authorization Form is prepared.

17. **RELEASE AUTHORIZATION**

a.  The Release Authorization Form (Attachment __) for inmates being released from CDF and MHU shall only be prepared by the Central Detention Facility's Records Office Legal Instruments Examiners. Community Correctional Centers shall prepare the Release Authorization for persons released from a CCC.

b.  The Records Office staff shall prepare, review and certify the release. Two signatures are required on a release authorization certifying that the release has been cross checked and found accurate.

c.  Records Office personnel will complete Part I the Release Authorization form (Items 1-14) as follows:

    1)  Inmate's name - Including all aliases or AKAs.

    2)  DCDC Number- Inmate's DCDC number.

    3)  Institution - the institution from which the inmate is being released.

    4)  Date - The date the release form is prepared.

    5)  Release Date - the date released from custody is effective and verified by the LIE.

    6)  Release Type – The Face Sheet 1 and 2 (if applicable), pretrial commitment order(s), and release orders are reviewed and compared to ensure consistency and to determine the prescribed manner in which the inmate is to be released, i.e., court order, expiration, time served.

    7)  Release Authority – One of four jurisdictions authorizing the inmate to be released, i.e. D.C. Superior Court, U.S. District Court, United States Parole Commission, or the Federal Bureau of Prisons.

    8)  Release in Custody of - This is only used when an inmate is to be placed in the custody of another authority, e.g., federal, state or local authority or when an appropriate court of the District of Columbia orders the release from custody to an agency, organization, individual, or self custody.

    9)  Detainers – A check shall be made and indication provided as to whether a detainer/outstanding warrant is known to exist, and the authority issuing any detainer.

    10) Certification - The LIE preparing the release authorization form must certify the release to be correct by affixing his or her name printed and

his or her signature. The LIE reviewing the form shall certify the accuracy of the information by affixing his or her signature. The completed document shall be forwarded to R&D Control Unit of faxed to the appropriate contract halfway house for completion of the R&D Control or Halfway House Staff section of the form.

11) Name/Title - the name and title of the person certifying the release.

12) Signature - The signature of the person who certifies the release

13) Date - Date signed.

14) Special Instruction - any special instructions which affect the release, e.g., time of pick-up, protective custody, separation orders.

15) Photo – Affix inmates photograph, if not in JACCS.

16) Photograph - Inmate photograph must be attached.

d.  Records Office shall forward to R&D the signed/certified Release Authorization Form along with any other release documentation.

e.  R& D Processing Officer shall:

1)  Print the inmate identification card and attach it to the inmate's release information package for issuance from R&D or MHU as is appropriate.

2)  The identification card will not generate if any of the data elements have not been completed.  R&D shall review the JACCS screens to determine the discrepancy, enter required data and print the card.

3)  If JACCS is not operating R&D Control shall manually prepare release documents and attach a copy of the inmate's photo from the Wing Card to the Release Authorization card and photocopy these documents for issuance to the inmate as photo identification.

f.  Records Officer staff shall also enter required data in Lotus Notes that triggers a release notice to R&D Control and Pharmacy.

g.  Pharmacy shall responds in Notes with "Yes" or "No" regarding medication. If yes – R&D/MHU shall hold inmate pending issuance.

h.  R&D Control Officers shall use the wing card photograph and AFIS in order to verify the inmate's identity.

18. **RELEASE ACTION.** Once positive identification has been confirmed, the R&D Control Officer shall complete the *Release Action* section of the Release Authorization Form (Items 15 through 19).

    a.    Identified by R&D Control - the signature of the Correctional Officer who has positively identified the inmate being released.

    b.    Release To - the name of the authorized agent or person receiving custody as indicated below.

    c.    Transported By - The Senior Transport Officer transporting the inmate.

    d.    Date of Release - the date the inmate is actually released from DOC custody.

    e.    Time of Release - the time the inmate is released from DOC custody.

    f.    The "Receipt of Agent taking custody" section of the Release Authorization form shall be completed as follows:

    g.    Name/Title - the name and title of the agent taking custody.

    h.    Signature - the signature of the agent taking custody along with proper photo identification required, e.g., badge number, attorney bar number.

    i.    Date - the date the authorized agent receives custody of the inmate.

    j.    Location - the agency official taking custody represents and the agency's telephone number.

19. **COMMUNITY RELEASE INFORMATION PACKAGE.** R&D Control, MHU or CCC staff shall provide inmates with a Discharge/Release Planning community resource guide.

20. **DOC IDENTIFICATION CARD**

    a.    Inmates released from CDF and MHU shall be issued a photo identification card upon release from custody by a court order, mandatory release from custody or upon halfway house placement (Attachment A). This directive shall not apply to inmates who are being transferred to another correctional facility or placed into the custody of another jurisdiction.

    b.    The ID card shall be effective for 60 days from release. DOC shall not renew issuance of the ID card.

    c.    The inmate may use the ID card for personal identification.

    d.    Prior to expiration of the ID card, inmates who are District of Columbia residents may use the ID card to make application to DC Reentry Program initiatives and to make application to the DC Department of Motor Vehicles for a non-driver ID.

21. **TRANSPORTATION.**  Inmates are issued a Metro bus token or farecard.

22. **PROPERTY.**  DOC shall return the inmate's remaining personal property pursuant to PS 4050.1 Inmate Property.

23. **MEDICATION.**  Inmates shall receive medication sufficient for seven (7) days. Inmates shall receive HIV medication sufficient for thirty (30) days.

24. **PERSONAL FUNDS.**  If the inmate is released prior to 1:00 pm, the inmate may obtain any funds in his/her personal account from Inmate Finance. The inmate may return the next day for the funds if Inmate Finance is closed.

25. **GRATUITY.  I**nmates approved for gratuity assistance may obtain the funds from Inmate Finance if released prior to 1:00 pm, Monday through Friday.  The inmate may return the next day for the funds if Inmate Finance is closed.

Devon Brown
Director

# EXHIBIT 6

**U.S. Department of Justice**
**United States Marshals Service**

**PRISONER REMAND OR ORDER TO DELIVER AND**
**RECEIPT FOR UNITED STATES PRISONERS**

**UNITED STATES MARSHAL**
**District of COLUMBIA**

*Released*
*02·02·2006*

**TO:** *CDF*

_____

(Name & Title)

**DATE:** 03-15-07

**THE FOLLOWING NAMED UNITED STATES PRISONER(S):** ☐ are herewith remanded to your custody

☐ are to be delivered to representative presenting and signing this order

1) WORMLEY, ELOISE

2) DCDC: 226899

3)_____

4) PLEASE LIFT USMS DETAINER DATED

5) 06-16-2006

6)_____

**RECEIPT**

THE ABOVE NAMED PRISONERS WERE RECEIVED:

BY: _____

TITLE: _____

DISTRICT OR ORGANIZATION ADDRESS:

_____

_____

GEORGE WALSH
*United States Marshal*

DAVID BALDWIN
*BY: Deputy United States Marshal*

**DOC 000175**

(PRIOR EDITIONS MAY BE USED)

Form USM-41
Rev. 11/83 (Supersedes USM-40, Short Form)

# EXHIBIT 7

**U.S. Department of Justice**
**United States Marshals Service**

# PRISONER REMAND OR ORDER TO DELIVER AND
# RECEIPT FOR UNITED STATES PRISONERS

### UNITED STATES MARSHAL
### District of COLUMBIA

TO: **CDF** _____  DATE: **10-19-06** _____
     *(Name & Title)*

THE FOLLOWING NAMED UNITED STATES PRISONER(S): ☐ are herewith remanded to your custody
☐ are to be delivered to representative presenting and signing this order

| | |
|---|---|
| 1) WORMLEY, ELOISE _____ | 4) PLACE IN TRANSIT HOLD PENDING FEDERAL |
| 2) DCDC: 226899 _____ | 5) DESIGNATION _____ |
| 3) _____ | 6) _____ |

---

### RECEIPT

THE ABOVE NAMED PRISONERS WERE RECEIVED:

BY: _____

TITLE: _____

DISTRICT OR ORGANIZATION ADDRESS:

_____

_____

**GEORGE WALSH** _____
*United States Marshal*

**DAVID BALDWIN** _____
*BY: Deputy United States Marshal*

**DOC 000177**

*(PRIOR EDITIONS MAY BE USED)*

Form USM-41
Rev. 11/83 (Supersedes USM-40, Short Form)

# EXHIBIT 8

EP-8153.058 NOTICE OF ESCAPED FEDERAL PRISONER CDFRM
NOV 9A

**U.S. DEPARTMENT OF JUSTICE**        **FEDERAL BUREAU OF PRISONS**

| Institution Community Corrections Office<br>Annapolis Junction, MD 20701 | | Date<br>6/5/06 | | |
|---|---|---|---|---|
| Name<br>WORMLEY, Eloise | Number<br>37096-007 | Date of Birth<br>02-04-1954 | | age<br>52 |
| Sex<br>Female | Race<br>Black | Height<br>5'03" | Weight<br>185 lbs | Eyes<br>Brown | Hair<br>Black | Place of Birth<br>D.C. |

| Citizenship<br>U.S. | Build: Medium | Address:<br>John Young Homeless Shelter;<br>2nd & D St NE<br>Washington, D.C |
|---|---|---|
| Scars, Marks, Tattoos: Unknown | | Occupation: not employed |
| Aliases: Tiny, Theresa Adams, Ting<br>Wormley | F.B.I. No.<br>989916AA1 | SSN<br>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 |
| Sentence: 12 months DC<br>SRAA Split Sentence | Offense: Att<br>Distribution Of Cocaine | Orig Arrest Location:<br>DC |
| FACILITY: Fairview CSC,<br>1430 G St., NE,<br>Washington, D.C. 20002 | Violent Behavior: Yes__ No X<br>Armed: unknown<br>Consider Dangerous: Yes__ No X |

DETAILS OF ESCAPE: Fairview CSC staff report that on 06-02-2006 inmate
Wormely was given a four hour pass to go on an employment search. When
she returned to the CSC that evening she was intoxicated and began to
threaten staff at the CSC, becoming extremely disruptive. D.C. Metro
police escorted inmate Wormely to the D.C. General Hospital for mental
health treatment. She was released form the hospital but, did not return
to the CSC. She was located at the John Young Homeless Shelter where she
was ordered to turn herself in to the U.S. Marshals, in Washington, D.C.
As of this writing WORMLEY has yet to return to the facility and her
whereabouts remain unknown. Therefore, WORMLEY should be considered an
escaped federal prisoner.
Please notify this office immediately upon apprehension.
Facsimile number: (301) 317-3138.

                                                **none available**

**SUBJECT TO THE CONDITIONS OF TITLE 28, PART 7, SECTION 7.1 - 7.5 OF THE CODE OF
FEDERAL REGULATIONS, A STANDING OFFER TO REWARD IS MADE FOR THE CAPTURE,
OR ASSISTANCE IN, OR FURNISHING INFORMATION LEADING TO THE CAPTURE OF AN
ESCAPED FEDERAL PRISONER. THIS REWARD SHALL NOT BE IN EXCESS OF $200 UNLESS
SPECIFICALLY GRANTED BY THE DIRECTOR OF THE BUREAU OF PRISONS. IF
APPREHENDED, OR IF YOU HAVE INFORMATION CONCERNING THE PRISONER, WIRE OR
TELEPHONE COLLECT THE NEAREST OFFICE OF THE FEDERAL BUREAU OF
INVESTIGATION (F.B.I.), OR CONTACT THE CHIEF EXECUTIVE OFFICER OF THIS
FACILITY.**
TELEPHONE NUMBER: (301) 317-3142      Randal White, CCM (A)

TOTAL P.01

** TOTAL PAGE.01 **

# EXHIBIT 9

Transmission Report

Date/Time                    12- 6-06; 4:33
Local ID                         2026983232
Local Name                   records office
Company Logo

# This document was confirmed.
## (reduced sample and details below)
## Document Size   Letter-S

Corrections Corporation of America
Correctional Treatment Facility

**FAX**

1901 E. Street S.E.
Washington, D.C. 2003

Telephone no. (202) 547-7822 ext. 1218 or 2219
Fax no.         (202) 698-3281

**RECORD OFFICE**

TO: Mr. Donna Scott

From: Ms Flythe

Phone number: (202) 353-9728

Date: December 6, 2006

Re: Execute Warrant

Pages Including cover sheet: 4

Comment: That remote's sentence was complete
on 10/21/06. Please execute her warrant.

Thanks
Ms. Flythe

Total Pages Scanned    : 5' Total Pages Confirmed : 5'

| No. | Doc | Remote Station | Start Time | Duration | Pages | Mode | Comments | Results |
|---|---|---|---|---|---|---|---|---|
| 1 | 098 | 3530728 | 12- 6-06; 4:30PM | 2'09" | 5/ 5 | EC | | CP 14400 |

Notes **
  Error Correct          RE: Resend              PD: Polled by Remote     MB: Receive to Mailbox
  Broadcast Send         MP: Multi-Poll          PG: Polling a Remote     PI: Power Interruption
Completed                RM: Receive to Memory   DR: Document Removed     TM: Terminated by user
  Local Scan             LP: Local Print         FO: Forced Output        WT: Waiting Transfer

**Corrections Corporation of America**
**Correctional Treatment Facility**



# FAX

**1901 E. Street S.E.**
**Washington, D.C. 2003**

**Telephone no. (202) 547-7822 ext. 2218 or 2219**
**Fax no.       (202) 698-3281**

## RECORD OFFICE

**TO:** Mr Donna Scott

**From:** M J. Flythe

**Phone number:** (202) 353-0728

**Date:** December 6, 2006

**Re:** Execute Warrant

**Pages including cover sheet:** 4

**Comment:** This inmate's sentence was complete on 10/21/06. Please execute her warrant.

Thanks,
Mr. Flythe

DOC 000182

# EXHIBIT 10



# CASE MANAGEMENT SERVICES
## 1901 E Street, SE
## Washington, DC 20003
## Telephone No. 202-547-7822
## Fax No. 202-698-9841

## FACSIMILE TRANSMITTAL SHEET

TO: Donna Scott          DATE: 10-18-2006

FAX NUMBER: (202) 353-0728     Total No. of pages Including cover (3)

FROM: Rollins Wayne Hunter/Legal Instruments Examiner

SUBJECT: Inmate Eloise T. Wormley / DCDC#226-899

✓ URGENT
◊ FOR REVIEW
◊ PLEASE REPLY

NOTES/COMMENTS This inmate's sentence will expire on 10-21-2006. Please execute the U.S.M.S. Detainer dated 6-16-06 by doing a come-up on 10-19-06. Thanks

DOC 000171

DOC 000172

Message Confirmation Report

OCT-18-2006 12:06 PM WED

WorkCentre M20 Series
Machine ID :
Serial Number : RYU434316.......
Fax Number :

| | | |
|---|---|---|
| Name/Number | : | 3530725 |
| Page | : | 3 |
| Start Time | : | OCT-18-2006 12:05PM WED |
| Elapsed Time | : | 00'52" |
| Mode | : | STD ECM |
| Results | : | O.K |

DC DOC
District of Columbia Department of Corrections

CASE MANAGEMENT SERVICES
1901 E Street, SE
Washington, DC 20003
Telephone No. 202-547-7822
Fax No. 202-698-9841

**FACSIMILE TRANSMITTAL SHEET**

TO: Donna Scott DATE: 10-18-2006

FAX NUMBER: (202) 353-0728 Total No. of pages Including cover (3)

FROM: Rollins Wayne Hunter / Legal Instruments Examiner

SUBJECT: Inmate Eloise T. Wormley DCDC# 226-899

✓ URGENT
◊ FOR REVIEW
◊ PLEASE REPLY

NOTES/COMMENTS This inmate's sentence will expire on 10-21-2006. Please execute the U.S.M.S. Detainer dated 6-16-06 by doing a come-up on 10-19-06. Thanks

DOC 000173

# Message Confirmation Report

OCT-18-2006 12:07 PM WED

WorkCentre M20 Series
Machine ID :
Serial Number : RYU434316.......
Fax Number :

| | | |
|---|---|---|
| Name/Number | : | 3530728 |
| Page | : | 3 |
| Start Time | : | OCT-18-2006 12:06PM WED |
| Elapsed Time | : | 01'10" |
| Mode | : | STD ECM |
| Results | : | O.K |

---

CASE MANAGEMENT SERVICES
1901 E Street, SE
Washington, DC 20003
Telephone No. 202-547-7822
Fax No. 202-698-9841

**FACSIMILE TRANSMITTAL SHEET**

TO: Donna Scott DATE: 10-18-2006

FAX NUMBER: (202) 353-0728 Total No. of pages including cover (3)

FROM: Rollins Wayne Hunter / Legal Instruments Examiner

SUBJECT: Inmate Eloise T. Wormley DCDC#226-899

✓ URGENT
◊ FOR REVIEW
◊ PLEASE REPLY

NOTES/COMMENTS
This inmate's sentence will expire on 10-21-2006. Please execute the U.S.M.S. Detainer dated 6-16-06 by doing a come-up on 10-19-06. Thanks

# EXHIBIT 11

Directives Home Page >> Topics >>Fugitive Investigations



# USMS Directives

**FUGITIVE INVESTIGATIONS**

*Criminal Investigations*

## 8.2 DETAINERS

### Detainers Based upon Warrants for Arrest And/or Escape Violations

**A.**  **Purpose:**  This directive sets forth United States Marshals Service (USMS) policy concerning the filing and management of detainers based upon warrants for arrest and/or escape violations.

**B.**  **Authority:**  The Director's authority to direct and supervise all activities of the USMS is set forth in 28 USC 561(g) and 28 CFR 0.111.  The authority of the USMS to "execute all lawful writs, process, and orders issued under the authority of the United States" is set forth in 28 USC 566(c).  See also the Interstate Agreement on Detainers, Pub.L. 91-538, §§ 1-9, Dec. 9, 1970, 84 Stat. 1397-1403 and 18 USC 751 (the Escape and Rescue statute).

**C.**  **Policy**

    1.    **When to File:**  The USMS shall lodge detainers against prisoners in the custody of other Federal, state, or local law enforcement agencies or correctional institutions when:

        a.    There is an outstanding Federal warrant for arrest for the prisoner for which the USMS has primary apprehension responsibility pursuant to Department of Justice policy or applicable memoranda of understanding; or

        b.    The subject is an escaped Federal prisoner in the custody of state or local authorities; or

        c.    Other circumstances exist which necessitate the filing of a detainer to lawfully prevent the release of a prisoner, and to enable the lawful assumption of custody of the prisoner by the USMS.

    2.    **When Not to File**

        a.    State and Local Fugitives (Task Force Cases)

            (1)    The USMS shall not file detainers for state or local fugitives under investigation by a fugitive task force. When task force investigations result in the location of a state or local fugitive in Federal, state, or local custody, the state or local agency with primary apprehension responsibility will be notified and requested to lodge a detainer, when appropriate.

            (2)    Districts shall not file detainers based solely upon violations of 18 USC 1073 (Unlawful Flight to Avoid Prosecution or Confinement (UFAP or UFAC)) unless a Supervisory Assistant U.S. Attorney certifies, in writing, that the case will be prosecuted in U.S. District Court. In lieu of filing a detainer based upon a UFAP or UFAC violation, the appropriate law enforcement authorities will file a detainer based upon the state or local charges underlying the UFAP or UFAC.

        b.    Non-USMS Fugitives

**USMS 000034**

(1)     The USMS is not required to file detainers, or assume custody of prisoners prior to a remand by a Federal court when the basis for the detainer is a Federal warrant for arrest for which another law enforcement agency has primary apprehension responsibility.  Responsibility for filing detainers rests with the agency with primary apprehension responsibility.

(2)     Workload permitting, districts may at their own discretion, file detainers within their own district on behalf of other Federal agencies. However, districts opting to file detainers for other Federal agencies may not obligate other districts to do so on their behalf.

3.     **Detainers Filed by the USMS with the USMS:**  The USMS shall lodge detainers against prisoners in its own custody only under the following circumstances:

a.     Charges in Multiple Districts:  A detainer should be filed and the concerned U.S. Attorney's Offices should be notified and asked to request that a writ of habeas corpus be issued for the prisoner when the subject of the detainer is in USMS custody for charges in one judicial district, and a Federal warrant for arrest is outstanding in another district in connection with a separate case; or

b.     U.S. Parole Warrants:  The U.S. Parole Commission has requested that a detainer be filed based upon an outstanding Federal parole warrant and the subject of the detainer is in USMS custody in connection with an unresolved criminal case (prior to adjudication of guilt); or

c.     Other Cases as Directed:  When otherwise directed by a Federal court or the USMS Investigative Services Division.

4.     **Interstate Agreement on Detainers Notice and Speedy Trial Provisions:**  Detainers lodged against sentenced prisoners that are based upon pending criminal charges that have not yet been tried are subject to the notice and speedy trial provisions of the Interstate Agreement on Detainers (IADA, Pub.L. 91-538, §§ 1-9, Dec. 9, 1970, 84 Stat. 1397-1403). Failure to meet the requirements of the IADA can result in the dismissal of the pending criminal charges with prejudice. Accordingly, it is essential that the proper detainer forms and procedures be used.

5.     **Special Circumstances**

a.     Violations of Probation and Conditions of Supervised Release:  If a warrant for arrest is issued for a violation of probation or violation of conditions of supervised release, and the subject of the warrant is already in USMS custody in the same district in connection with a different case, execute the warrant and the produce the subject for an initial appearance on the violation. Exercise care to ensure that if the subject is afforded bail on the violation, that he or she is not released from custody unless and until the bail conditions on the original case are also met.

b.     Escape Cases Where No Warrant for Arrest is Outstanding:  For escape cases in which no prosecution is anticipated and a warrant for arrest is not issued (such as halfway house escapes), once the USMS assumes custody of the escapee, the district of arrest pending designation will hold the prisoner in custody. In the absence of a warrant for arrest, the authority to apprehend an escaped Federal prisoner stems from 18 USC 751 as well as the judgment & commitment, court order, or other order directing that the prisoner be remanded to the custody of the Attorney General. In the absence of a warrant for arrest, complaint, or indictment charging the escape, neither an initial appearance or removal hearing is required.

D.     **Procedures**

1.     **Tracking via the Warrant Information Network:** Track detainers based upon warrants for arrest or escape notices in the Warrant Information Network (WIN). Once a detainer is filed, suspend active cases in WIN. Close cases in WIN (usually by using the "detainer lodged/custody

**USMS 000035**

taken" code) once the USMS assumes custody of the prisoner based upon the detainer (or the process underlying the detainer).[1]

2. **Department of Homeland Security, Bureau of Immigration and Customs Enforcement Detainer Files:** Maintain USMS records of detainers based upon Federal warrants for arrest and escape notices in the same manner as district fugitive investigative files.

3. **Exhaustion of Detainer:** Do not file detainers, or allow detainers to remain on file, unless a lawful basis exists for the USMS to assume custody of the subject of the detainer. Accordingly, once the warrant for arrest for the prisoner has been executed, or escape status of the prisoner has been terminated, lift the detainer. If a new basis for the lodging of a detainer exists (such as an order of detention, order setting conditions of release, or other court order), the appropriate office will file a new detainer.

4. **Purging of Detainer Files:** Review and update detainer files at least every 6 months.

5. **Place of Filing:** The USMS district in which the prisoner is in Federal, state, or local custody will file detainers. The originating district is responsible for tracking the detainer in WIN.

6. **Form of Detainer:** USMS personnel shall use the official USM-16 series of detainer forms or those generated by the Warrant Information Network (when they become available) in accordance with the procedures set forth below:

   a.   Use the USM-16A to file detainer lodged against unsentenced prisoners based upon a federal warrant.

   b.   Use the USM-16B to file detainers based upon Federal Judgment and Commitment orders and maintain separately from warrant detainers unless the detainer is lodged against an escaped Federal prisoner and no warrant for arrest has been issued for the escape.

   c.   Use the USM-16C to file detainers based upon warrants for arrest issued by the U.S. Parole Commission.

   d.   Use the USM-16D to file detainers based upon violations of probation and/or supervised release.

   e.   Use the USM-16E is used to file detainers against unsentenced prisoners who are brought into federal custody, but need to remain in custody pending further criminal proceedings.

   f.   Use the USM-17A, is to be used against a sentenced state prisoner who is the subject of a federal arrest warrant and who is required to be advised of his/her rights under the interstate Agreement on Detainers Act. to the concerned U.S. Attorney's offices.

   g.   Use the USM-17B, is to be used against sentenced federal prisoners.  Although the Interstate Agreement on Detainers Act does not apply to sentenced federal prisoners, these prisoners still need to be advised of their right to a speedy federal trial under 18 USC 3161.

7. **Notification of U.S. Attorney's Office, U.S. Parole Commission, or Other Concerned Agency:** Once a detainer based upon an untried offense is filed, notify the case Assistant U.S. Attorney of the place of confinement of the prisoner and the date the detainer was filed, and provide a copy of the detainer to him or her. Also notify the case agent (if the USMS is not the originating case agency). Notify and provide a copy of the detainer to the U.S. Parole Commission and/or probation officer for violations of parole. For violations of probation, notify the concerned U.S. Probation Officer. In escape cases, notify the Bureau of Prisons. In all cases, promptly notify the originating USMS office when the subject of a USMS detainer comes into USMS custody.

**USMS 000036**

E.    **Definitions**

1.    **Detainer:**  a written request from one law enforcement or correctional agency (the requesting agency) to another having custody of a prisoner (the holding agency), requesting the holding agency detain the prisoner for surrender to the requesting agency, upon the release of the prisoner by the holding agency.

2.    **Certificate of Inmate Status:**  a certificate of the appropriate official having custody of a prisoner, stating the term of commitment under which the prisoner is being held, the time already served, the time remaining to be served on the sentence, the amount of good time earned, the time of parole eligibility of the prisoner, and any decision of the State parole agency relating to the prisoner; (see Interstate Agreement on Detainers, Pub.L. 91-538, §§ 1-9, Dec. 9, 1970, 84 Stat. 1397-1403).

_____
[1]Detainers based upon judgment & commitment orders (other than escapes), orders of detention, orders setting conditions of release, or other process which is not fugitive-related shall be tracked using the "detainer lodged" field of the Prisoner Tracking System (PTS).

**USMS 000037**

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| ELOISE T. WORMLEY, | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) **OPPOSITION TO MOTION TO** |
| | ) **DISMISS** |
| THE UNITED STATES OF AMERICA, | ) |
| et al. | ) **CASE NO. 1:08-cv-00449 (CKK)** |
| | ) |
| | ) |

**STATEMENT OF MATERIAL FACTS AS TO WHICH THERE IS A GENUINE ISSUE
IN SUPPORT OF PLAINTIFF'S OPPOSITION TO THE DISTRICT DEFENDANTS'
MOTION TO DISMISS**

Pursuant to Local Civil Rules 7(h) and 56.1, Plaintiff, Eloise T. Wormley, submits the following Statement of Material Facts as to Which There Is a Genuine Issue, in response to the District Defendants' Motion to Dismiss.

1. Although there is no dispute that the Corrections Corporation of America ("CCA") manages the Correctional Treatment Facility ("CTF"), the District Defendants omit that CCA manages CTF under its contract with the District of Columbia Department of Corrections ("DOC"). *See* District Defendants' Statement of Material Facts ("SMF") ¶ 1.

2. Ms. Wormley disputes the District Defendants' assertion that "[s]o long as a detainer is lodged against an inmate, the District cannot release an inmate," as not being a statement of material fact but an incorrect statement of law. The District Defendants may not present a conclusory and incorrect legal statement as if it were an undisputed issue of material fact. *See* SMF ¶ 4.

3. Ms. Wormley disputes that she "was still subject to the parole detainer lodged against her in June 2006 by the U.S. Marshal Service in execution of a parole violation warrant."

Ms. Wormley was not subject to the United States Marshal Service ("USMS") detainer because the relevant dictates of the detainer had already been fulfilled and it ceased to be an operative instrument. In addition, the detainer is not a commitment order or a warrant and did not give the District Defendants authority to detain Ms. Wormley. In addition, it was never based on a federal parole violator warrant because no such warrant ever existed. Ex. 2. *See* SMF ¶ 7.

4. Ms. Wormley disputes that the detainer was based on a federal parole violator warrant because no such warrant ever existed. Ex. 2. *See* SMF ¶ 8.

5. Ms. Wormley disputes that "[s]o long as the 'transit hold' was lodged against [her], the District DOC Records Office had no authority to release [her]." This is not a statement of fact but an incorrect statement of law. The District Defendants may not present a conclusory and incorrect legal statement as if it were an undisputed issue of material fact. *See* SMF ¶ 10.

6. Ms. Wormley disputes that she escaped from custody "during the interim between October 19, 2006 . . . and . . . March 16, 2007." As this same paragraph in the District Defendants' Statement of Material Facts makes clear, the purported escape occurred on June 2, 2006. Ms. Wormley further disputes that "release documents were needed to effectuate her sentence computation and release" as a result of the escape, and asserts instead that the District was legally required to release her on March 16, 2006. In addition, this is not a statement of fact but an incorrect statement of law. The District Defendants may not present a conclusory and incorrect legal statement as if it were an undisputed issue of material fact. *See* SMF ¶ 12.

7. Ms. Wormley disputes that "[i]t was not until March 19, 2007 that the D.C. DOC Record's Office received release documents from the U.S. Marshal Service clearing Ms. Wormley's outstanding charges." There was in fact no legal justification for keeping Ms. Wormley detained at any point past October 21, 2006, and she was "cleared" of all charges by that point. In addition, Ms. Wormley disputes the relevance of this fax because she should have been released well before March 19, 2007. *See* SMF 13.

8. Ms. Wormley disputes the relevance of SMF ¶¶15–22, as the Prison Litigation Reform Act is not in any way relevant to Ms. Wormley's claims.

9. Ms. Wormley disputes the relevance of SMF ¶¶ 24–27, as whether Defendant Brown's direct knowledge of or animus toward Ms. Wormley is not dispositive of any claim against him or the other District Defendants. In addition, Ms. Wormley states that she cannot fully dispute these facts because she has not had an opportunity for discovery.

10. Ms. Wormley disputes that there are "no written or informal policies, customs, or practices of DOC that would preclude timely release of Ms. Wormley from incarceration," since the District Defendants had been on notice that inmates such as Ms. Wormley were at an extreme risk of overdetention, and that their failure to take affirmative action to address that risk would perpetuate it. *See* SMF ¶ 28.

11. Ms. Wormley disputes the relevance of Defendant Brown's actions regarding DOC, since as presented they are vague, presenting neither the specific actions, dates for such actions, alternatives considered, or reasons for those specific actions. *See* SMF ¶ 29.

August 8, 2008                        /s/ Christopher R. Hart

Robin E. Jacobsohn (D.C. Bar no. 417307)
Christopher R. Hart (D.C. Bar no. 486577)
Mathew J. Peed (D.C. Bar no. 503328)
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, D.C. 20005
(202) 434-5000


Ivy A. Lange  (D.C. Bar No. 488147)

Washington Lawyers' Committee for Civil Rights &
Urban Affairs
11 Dupont  Circle, N.W., Suite 400
Washington, D.C.  20036
Tel 202-319-1000
Fax 202-319-1010


*Attorneys for Plaintiff*