## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| ELOISE T. WORMLEY, | ) |
| Plaintiff, | ) |
|  | ) |
|  | ) **REPLY TO OPPOSITION** |
| v. | ) |
|  | ) Case No. 1:08-cv-00449 (CKK) |
| THE UNITED STATES OF AMERICA, | ) |
| et al. | ) |
|  | ) |
|  | ) |

## REPLY TO DEFENDANT WASHINGTON HALFWAY HOMES' OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

In accordance with LCvR 7(d), Plaintiff Eloise T. Wormley hereby submits the

following Reply to Defendant Washington Halfway Homes' Opposition to Plaintiff's Motion for

Summary Judgment.

Respectfully submitted,

August 15, 2008                    /s/ Matthew J. Peed

Robin Jacobsohn (D.C. Bar no. 417407)
Christopher R. Hart (D.C. Bar no. 486577)
Mathew J. Peed (D.C. Bar no. 503328)

WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, D.C. 20005
(202) 434-5000 (tel)
(202) 434-5029 (fax)

Ivy A. Lange  (D.C. Bar No. 488147)
Washington Lawyers' Committee for Civil Rights &
Urban Affairs
11 Dupont  Circle, N.W., Suite 400
Washington, D.C.  20036
Tel 202-319-1000
Fax 202-319-1010

*Attorneys for Plaintiff*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ELOISE T. WORMLEY,<br><br>                  Plaintiff,<br><br>v.<br><br>THE UNITED STATES OF AMERICA,<br>et al. | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> )   **REPLY TO OPPOSITION**<br><br>Case No. 1:08-cv-00449 (CKK) |

**MEMORANDUM OF POINTS AND AUTHORITIES IN REPLY TO DEFENDANT WASHINGTON HALFWAY HOMES' OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

August 15, 2008

  /s/ Matthew J. Peed

Robin Jacobsohn (D.C. Bar no. 417407)
Christopher R. Hart (D.C. Bar no. 486577)
Mathew J. Peed (D.C. Bar no. 503328)

WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, D.C. 20005
(202) 434-5000 (tel)
(202) 434-5029 (fax)

Ivy A. Lange  (D.C. Bar No. 488147)
Washington Lawyers' Committee for Civil Rights &
Urban Affairs
11 Dupont  Circle, N.W., Suite 400
Washington, D.C.  20036
Tel 202-319-1000
Fax 202-319-1010

*Attorneys for Plaintiff*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ......................................................................................... iv

INTRODUCTION ...................................................................................................... 1

FACTS .................................................................................................................... 2

ARGUMENT ............................................................................................................ 5

I.    BY ANY MEASURE, WHH WAS NEGLIGENT IN ITS TREATMENT OF
      MS. WORMLEY. ............................................................................................... 5

      A.    WHH's Characterization of Ms. Wormley's Eviction Is Simple
            Fiction. ................................................................................................. 6

      B.    Even Under WHH's Characterization Of Events, WHH Acted
            Negligently. ......................................................................................... 10

      C.    The SOW and BOP Program Statements Are External Policy
            Mandates Establishing a Standard of Care for CCCs. ........................... 13

      D.    WHH Offers Nothing to Dispute its Duties as a Custodian. ................... 14

II.   WHH'S ACTIONS PROXIMATELY CAUSED MS. WORMLEY'S
      INJURIES. ........................................................................................................ 15

      A.    The USMS Detainer Was Not Issued in Response to Ms. Wormley's
            Probation Violation. ............................................................................. 15

      B.    The Issuance of the Detainer was Directly Related to Ms. Wormley's
            Inoperative Time. ................................................................................. 16

      C.    WHH Is Liable For Its Role in the Creation of the BOP Notice of
            Escape and the USMS Detainer, From Which All Other Documents
            Flowed. ................................................................................................ 17

III.  MS. WORMLEY WAS NOT CONTRIBUTORILY NEGLIGENT, AND
      NOTHING WHH PROFFERS SUGGESTS OTHERWISE. ................................ 20

      A.    Nothing Occurring Prior to Ms. Wormley's Release from D.C. General
            on June 2, 2006 Materially Affected Her Injury. ................................... 20

      B.    WHH's Sole Remaining Allegations Of Negligence Are Premised On
            Errors Of Fact. ..................................................................................... 21

IV.   NEGLIGENCE BY THE INSTITUTIONAL DEFENDANTS WAS HIGHLY
      FORSEEABLE,  NOT "HIGHLY EXTRAORDINARY." ..................................... 22

V.    THE ADMINISTRATIVE REMEDIES RELIED ON BY WHH ARE
      INAPPLICABLE TO PLAINTIFF'S CLAIM. ..................................................... 23

CONCLUSION ........................................................................................................ 23

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Watson v. District of Columbia*, 2005 WL 1903573 (D.D.C. 2005) .............................................23

## STATE CASES

*Clark v. District of Columbia*, 708 A.2d 632 (D.C.1997) ............................................................13

*D.C. v. Frick*, 291 A.2d 83 (D.C. 1972) ....................................................................................19

*Jones v. National R.R. Passenger Corp.*, 942 A.2d 110 (D.C. 2008)............................................13

*LeRoy Adventures, Inc. v. Cafritz Harbour Group, Inc.*, 640 A.2d 193 (D.C. 1994).....................9

*Pannu v. Jacobson*, 909 A.2d 178 (D.C. 2006) ..........................................................................15

## RULES AND STATUTES

42 U.S.C. § 1997...........................................................................................................................24

Fed. R. Civ. P. 56.........................................................................................................................4

## MISCELLANEOUS

Restatement (Second) of Torts, § 432...........................................................................................20

**<u>INTRODUCTION</u>**

Washington Halfway Homes ("WHH") has submitted an opposition to Plaintiff's motion for summary judgment that is replete with factual and legal errors and spurious charges of "new" theories. In fact, Plaintiff's claims and allegations against WHH have remained consistent both as to the duty WHH violated and as to the relationship between that violation and her injury. Specifically, Plaintiff alleges, and the undisputed evidence demonstrates, that WHH wrongfully refused to let Ms. Wormley return to WHH after she was temporarily transported to D.C. General Hospital for psychiatric treatment. That wrongful refusal thrust Ms. Wormley out of Bureau of Prisons (BOP) custody, leading to both an inaccurate BOP Notice of Escape and unnecessary inoperative time on her sentence. These errors, in turn, led to the issuance of the detainer that resulted in her overdetention.

By any measure, WHH's treatment of Ms. Wormley was outrageous. When WHH accepted Ms. Wormley into the Fairview under its contract with BOP, it knew that she suffered from particular vulnerabilities. WHH knew that she was homeless. It knew that she suffered from mood disorders and alcohol dependence. It knew, because the BOP told it, that Ms. Wormley needed special supervision and would potentially need the supportive environment of the halfway house beyond the two weeks she was required to be there. Despite knowing this, WHH case Ms. Wormley to the street late on a Friday night, refusing to allow her to return to its facility after her emergency treatment at the hospital. These actions violated BOP Program Statements, the BOP Statement of Work (SOW), WHH's custodial duties, and common decency, and WHH is liable for the fruits of this negligent act.

## FACTS

In light of the numerous factual errors in WHH's opposition, Plaintiff offers the following recitation to clarify the relevant—and undisputed—facts related to Plaintiff's claim against WHH.[1]

### *Ms. Wormley's admission to the Fairview and the initial escape report.*

Ms. Wormley was admitted to the Fairview on May 30, 2006 to complete the final two weeks of a federal sentence.  SMF ¶ 2.  On the morning of June 2, 2006, Ms. Wormley signed out of the Fairview to begin a job search.  SMF ¶ 3.  She was required to return to the Fairview by 2:30 p.m.  *Id*.  When Ms. Wormley did not return at 2:30 p.m., staff at the Fairview notified the BOP that she was in "escape" status.  SMF ¶ 8.

### *Ms. Wormley's arrival at WHH*

Ms. Wormley returned to the Fairview at or around 5:22 p.m., approximately three hours after her scheduled return time.  SMF ¶ 9.  Upon her return, Ms. Wormley was intoxicated and behaving erratically.   SMF ¶ 10.  When initially confronted for being late, she became very quiet; however, when asked to sign in, she began smashing items off counters, sobbing, and yelling.  Ex. 1 (CPEP records).  She eventually sat down at the request of Thomas Mills, a WHH employee.  *Id*.  She continued crying, however, and began swinging her fists at Mr. Mills, who restrained her.  *Id*.

### *Ms. Wormley's transport to CPEP for psychiatric treatment and release to WHH staff.*

---

[1] For purposes of this section, Plaintiff includes only (i) unopposed facts from her Statement of Material Facts ("SMF"), (ii) quotations and citations to documents submitted by Defendants, and (iii) records from Ms. Wormley's CPEP evaluation, the authenticity and reliability of which Defendants do not dispute.  The lone exception to these sources is the inclusion of the nominally-disputed SMF ¶ 18, and supporting affidavit, discussed in note 4, *infra*.

Ms. Wormley was not immediately discharged from the Fairview for this erratic and emotional behavior. Instead, law enforcement officers[2] "were called to bring her to CPEP." *Id.* The officers "escorted inmate Wormley to D.C. General Hospital for psychiatric treatment." Ex. 2 (BOP Notice of Escape). Notably, WHH did not release Ms. Wormley into the custody of police: Erinn Sykes, Ms. Wormley's case manager at the Fairview, actually "brought [Ms. Wormley] to CPEP." Ex. 1 (CPEP records).

CPEP physicians diagnosed Ms. Wormley with a mood disorder and administered psychotropic medication. SMF ¶ 12. After receiving treatment, Ms. Wormley "markedly calmed down" and was described by the CPEP psychiatrist as "calm and cooperative," "calm and collected," and "in no distress." *Id.* A CPEP psychiatrist spoke via telephone with Ms. Agnes Brown, administrator of the Fairview, to arrange Ms. Wormley's release. SMF ¶ 13. Ms. Brown told the psychiatrist that if CPEP did not admit Ms. Wormley "she could just be released on the street." *Id.* The CPEP psychiatrist did not follow Ms. Brown's instruction to release Ms. Wormley "on the street." SMF ¶ 14. Instead, Ms. Wormley was "discharged to the halfway house" and "released with the staff" of the Fairview. *Id.*

**Ms. Wormley's eviction from the Fairview.**

After her release from CPEP on the night of June 2, Ms. Wormley was transported back to the Fairview. SMF ¶ 15. Staff of the Fairview gave Ms. Wormley some of her belongings, ordered her to leave, and instructed her to turn herself into the U.S. Marshals on the following Monday, June 5, 2006. *Id.*; Ex. 4 (Incident and Investigation Report).

---

[2] There is confusion in the record as to which law enforcement agency transported Ms. Wormley to CPEP. The BOP Notice of Escape indicates that D.C. Metropolitan Police officers escorted Ms. Wormley. Ex. 2. Other documents suggest that the Federal Protective Service, which guards federal buildings, transported her. In any event, there is no dispute that USMS, the sole law enforcement agency responsible for maintaining custody of BOP inmates, *see* Ex. 3 (PS 7300.09), was not called by WHH.

*Ms. Wormley's attempts to turn herself into the USMS*

Ms. Wormley did not have a residence when she was told to leave the Fairview on the night of June 2, 2006. SMF ¶ 16.[3] Homeless, Ms. Wormley ultimately checked herself into the J.L. Young Shelter. SMF ¶ 17. Despite her challenges, Ms. Wormley endeavored to turn herself in to the USMS and DOC in the days following her eviction from the Fairview. SMF ¶ 18.[4] On June 5, 2006, Ms. Wormley visited the District of Columbia Superior Court and attempted to turn herself in to USMS. Ex. 5 (Wormley Affidavit). She was told that there was no warrant on file for her arrest and that she would have to turn herself in at the D.C. Department of Corrections Central Detention Facility (CDF). *Id.* Ms. Wormley went to CDF on June 5, 2006 and attempted to turn herself in; however, the facility was in a security lockdown at this time, and she was not able to turn herself in. *Id.*

---

[3] WHH does not include SMF ¶ 16 in its list of contested facts. *See* Counter-statement of Material Facts, at 2. However, in a footnote, Defendant states, "Plaintiff was not 'rendered' homeless but opted to go to a shelter in contravention to orders to turn herself in to the USMS." *Id.* at 1. This argument by Defendants does not rise to a genuine dispute that Ms. Wormley had no legal residence upon her release by the Fairview. Nor does it contradict SMF ¶ 15, which Defendants nowhere dispute, which states that WHH instructed Ms. Wormley to turn herself in to USMS on Monday, June 5, 2006, leaving her three nights for which to find shelter. *See also* Ex. 4 (Incident and Investigation Report) ("Ms. Wormley was not permitted to return to the Fairview and was instructed to turn herself into the US Marshals on June 5, 2006.")

[4] WHH nominally disputes SMF ¶ 18, which states that Ms. Wormley endeavored to turn herself in to USMS. However, WHH offers no evidence that Ms. Wormley did not attempt to turn herself in to USMS on June 5, 2006. Instead, WHH simply avers that Plaintiff offers no factual support for this claim. Defendants' view of the evidentiary burden on summary judgment is exactly backward. A party claiming relief may move for summary judgment "with or without supporting affidavits." Fed. R. Civ. P. 56(a). When properly presented with such a motion, "an *opposing* party may not rely merely on allegations or denials in its own pleading; rather, its response must—by affidavits or as otherwise provided in this rule—set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e)(1)(2) (emphasis added). As the opposing party on this issue, it is incumbent upon WHH to contest Ms. Wormley's claim that she diligently attempted to turn herself in to USMS on June 5, 2006. "If the opposing party does not so respond, summary judgment should, if appropriate, be entered against that party." *Id.* Nevertheless, because WHH has nominally disputed this fact, Plaintiff herewith submits an affidavit attesting to her attempts to turn herself in to USMS.

4

Ms. Wormley checked herself in at the Veterans Administration (VA) hospital for psychiatric treatment on June 7, 2006.  SMF ¶ 17.  This complied with the instructions of the discharging physician at CPEP, who specifically directed Ms. Wormley to follow up her treatment at the VA.  Ex. 1 (CPEP records).  Upon her arrival at the VA, Ms. Wormley informed VA staff that she needed to turn herself in to authorities, and sought the VA's assistance.  SMF ¶ 18; Ex. 9 (VA letter).  With the help of officials from the VA hospital, she contacted D.C. Metro Police on June 14, 2006, after she was released from the hospital.  SMF ¶ 18.  D.C. Police escorted Ms. Wormley to CDF, and on June 14th she submitted herself to DOC custody.  *Id.*

**The BOP Notice of Escape.**

On June 5, 2006, BOP issued a Notice of Escape for Ms. Wormley.  Ex. 2.  The Notice of Escape does not mention, and is not based upon, the initial report of escape report by WHH at or around 3 p.m. on June 2, 2006, when she was late returning from her job interviews. *Id.*  Rather, the Notice of Escape is explicitly based upon events occurring after Ms. Wormley's discharge from D.C. General Hospital later that night.  *Id.*  Specifically, the Notice of Escape is based upon Ms. Wormley's alleged failure by June 5, 2006 to return to WHH or turn herself in. *Id.*  ("As of this writing WORMLEY has yet to return to the facility and her whereabouts remain unknown. Therefore, WORMLEY should be considered an escaped federal prisoner.").  As such, the Notice of Escape is inconsistent with WHH's claim that Ms. Wormley was permanently removed from WHH and placed into federal law enforcement custody on June 2, 2006.

## ARGUMENT

## I.    BY ANY MEASURE, WHH WAS NEGLIGENT IN ITS TREATMENT OF MS. WORMLEY.

WHH does not contest the relevant facts about its actions on June 2, 2006.  Instead, it casts them in a fanciful light.  WHH implies that Ms. Wormley was somehow discharged from

the Fairview and "removed" by law enforcement officials for being violent and abusive, and that it therefore had no duty to permit her to return. This claim is doubly flawed. Although taken to D.C. General for treatment, Ms. Wormley was not "removed" from the custody of the Fairview: Fairview staff accompanied her to the hospital, and she was returned to them by hospital staff when she was discharged. The record indicates that her treatment was never intended to be a discharge, and WHH's arguments to the contrary reflect mere *post hoc* rationalizations. But even if one accepts WHH's mischaracterization of the events, WHH would still be liable for "remov[ing]" Ms. Wormley in the manner that it did. By ignoring the procedures governing violent incidents specified in the SOW, and by failing to deliver Ms. Wormley to the custody of the United States Marshalls Service (USMS), who alone had the ability and responsibility to ensure that Ms. Wormley remained in BOP custody, WHH is no less liable for negligence under its own characterization of events.

### A.    WHH's Characterization of Ms. Wormley's Eviction Is Simple Fiction.

WHH cannot dispute that it has an absolute obligation under the SOW and BOP Program Statements to "always" accept a returning inmate. The SOW states that community correction centers "shall allow any offender, who has been determined to have escaped by the contractor, to return to the facility." Ex.6 at 16.1(d). BOP Program Statement 7300.09 states: "Contractors shall be advised to accept an escaped inmate returning to the facility *always* and to call the CCM immediately for further direction. The USMS *shall* be called to pick up the inmate *immediately*, unless the CCM chooses to expunge the incident report and charge the inmate with another accountability code." Ex. 3, § 5.6.2(c)(6) (emphasis added). As these directives make clear, WHH had a duty to allow Ms. Wormley to return to the Fairview and to maintain BOP custody over her.

6

In order to avoid the clear import of these requirements, WHH portrays Ms. Wormley's trip to CPEP for psychiatric treatment as some kind of permanent discharge from the Fairview. Under its version of events, Ms. Wormley was "forcibly removed from [WHH] for posing a danger to herself and others." Def.'s Opp. at 4. WHH claims that Federal Protective Services absolved it of its custody of Ms. Wormley, *id.* at 6, and states that "there is no policy that requires this Defendant to permit the return of a resident who was removed from its custody and who was violent and abusive," *id.* at 4–5.

This portrayal is wholly unsupported by the evidence. The undisputed record demonstrates that the police were called—not to take permanent custody of Ms. Wormley, as if she were being remanded to prison[5]—but to "escort" Ms. Wormley to CPEP for psychiatric evaluation and treatment. *See* Ex. 1 (CPEP records) ("[Ms. Wormley] was restrained by staff and police was called to bring her to CPEP."); Ex. 2 (BOP Notice of Escape) ("D.C. Metro Police escorted inmate Wormley to D.C. General Hospital for psychiatric treatment."); Ex. 4 (Incident and Investigation report) ("After police arrived at the scene, Ms. Wormley was transferred to DC General Emergency Psychiatric Ward for evaluation."). Nor, in transporting her to CPEP, did the police interrupt WHH's custody over Ms. Wormley. As documented by CPEP records, Ms. Wormley "was brought to CPEP by her [WHH] case manager Ms. Erinn Sykes." Ex. 1 (CPEP records). Ms. Sykes filled out hospital documents for Ms. Wormley and provided detailed background information about Ms. Wormley's history and that night's episode. *Id*. And WHH did not simply drop Ms. Wormley off at CPEP, it maintained custody of her

---

[5] WHH knew, or should have known, that only USMS has the authority to secure inmates for remand to BOP, and that delivery of Ms. Wormley to any other law enforcement agency would not sever its custodial responsibilities or secure her effective remand into BOP custody. *See* Ex. 3 (PS 7300.09) (BOP "depends on the USMS to assume custody of CCC failures and others under Bureau control.")

through her discharge.  As CPEP records demonstrate, Ms. Wormley was discharged back to the halfway house at 8:20 p.m. and "released with the staff of the halfway house."  *Id*.  It is clear that WHH initially (and correctly) judged the altercation to be a psychiatric incident requiring medical intervention, not an unforgivable program violation requiring a remand into federal custody.

More importantly, it is clear that BOP, the sole agency with authority over Ms. Wormley's actual custodial status, viewed her transport to CPEP not as a discharge and remand into federal custody, but as a medical intervention having nothing to do with her custodial status. Despite describing the events of June 2, 2006, including Ms. Wormley's "disruptive" behavior and transport to CPEP, the Notice of Escape says nothing about these events disqualifying her from residence at the Fairview or resulting in her discharge from the Fairview.  Rather, the Notice explicitly confirms that Ms. Wormley was expected to return to the Fairview.  Ex. 1 ("She was released from the hospital but did not return to the CSC.") ("As of this writing, WORMLEY has yet to return to the facility…").  The Notice of Escape merely faults her for allegedly having failed to return to the Fairview after her hospital discharge (despite the fact that she did return and was turned away).

WHH offers not a hint of documentation supporting its claim that Ms. Wormley was permanently discharged from WHH at 5:22 p.m. on June 2, 2006 upon her "removal" by the officers, or that its obligation to permit her return under the SOW and BOP Program Statements was somehow absolved.  Instead, WHH merely offers the affidavit of Agnes Brown, administrator of the Fairview and the person responsible for telling CPEP physicians to release Ms. Wormley "on the street."  Ex. 1.  This short and self-serving affidavit fails to address a single material fact, much less raise a genuine issue of one.  Indeed, there is only one factual

claim in the affidavit.  Ms. Brown states:  "The Plaintiff was not removed from the facility on June 2, 2006 because she had escaped.  She was removed because she had assaulted and threatened members of the facility's staff."  Brown Aff. at ¶ 3.  This is an irrelevant assertion. Plaintiff has not alleged that she was taken to CPEP from WHH because she escaped, or that anything besides her behavior led to her removal.  She alleges that, once escorted to the hospital, treated, and discharged from the hospital on the night of June 2, WHH refused to allow her to return, and further failed to follow the procedures outlined in the SOW and BOP Program Statements.

The remaining assertions in the affidavit consist of Ms. Brown's own legal conclusions[6] about the applicability of policies regarding the return of escapees "removed by law enforcement personnel for acting in a violent or threatening manner."[7]  *Id*. at ¶4.  That is, of course, the very issue the Court is tasked to decide.  To the extent that the Court is inclined to consider outside guidance on the issue of whether BOP escape policies applied to Ms. Wormley's situation, there is a far more competent and objective source than Ms. Brown:  the BOP.  There can be no doubt that the BOP considered Ms. Wormley to be a returning escapee even after she was transported to CPEP and released from the hospital.  The Notice of Escape classifies Ms. Wormley as an escapee for failing to return to WHH in the period *following* her release from CPEP.  This

---

[6] The SOW is a uniform contract between community correction centers and the BOP, and as such its interpretation is generally a matter of law.  *See LeRoy Adventures, Inc. v. Cafritz Harbour Group, Inc.*, 640 A.2d 193, 201 (D.C. 1994) ("It is settled and often stated that contract interpretation is a question of law where the interpretation does not depend on extrinsic evidence.").

[7] The vagueness of Ms. Brown's conclusions renders them of questionable value even if they had any legal merit.  It is critically important, for example, to distinguish between an inmate taken permanently into the custody of the USMS as an arm of DOJ, on the one hand, and an inmate removed temporarily for security or health reasons by an unrelated law enforcement agency such as D.C. Metropolitan Police, which has no authority to affect the inmate's BOP status.  *See* Ex. 3 (PS 7300.09).  The Brown affidavit is opaque on this point.

classification, made with full knowledge of Ms. Wormley's violent episode and her "removal" from WHH by law enforcement officers, reflects BOP's determination that those events did not eliminate Ms. Wormley's duty to return to WHH or WHH's reciprocal duty to accept her.[8]

**B.    Even Under WHH's Characterization Of Events, WHH Acted Negligently.**

WHH does not improve its position in this case by arguing that the requirements of the SOW and Program Statements regarding escapees are inapplicable to Ms. Wormley because she was "removed" by Federal Protective Services. This argument merely exchanges one negligent violation (wrongfully refusing to let Ms. Wormley return) for other negligent violations (*e.g.*, wrongful imposition of sanctions).

Community correction centers, like other actors in the corrections spectrum, must appropriately balance important values such as community safety, the safety of offenders, and rehabilitation of offenders. By receiving inmates, a CCC voluntarily joins and accepts the mission of the BOP and commits to maintaining conditions conducive to security and rehabilitation as outlined in the SOW. Ex. 6 (SOW). Under the SOW's provisions, a contractor must implement "a comprehensive offender accountability program" and "a security inspection plan." *Id*. These plans must ensure "a safe and secure environment for both staff and offenders. The expected results are that continuous offender accountability and safety are maintained through a system of reasonable and accurate controls." *Id*.

---

[8] BOP's contemporaneous view is binding on WHH. Regardless of any hypothetical "discretion" over the re-admittance of "removed" inmates, WHH has no discretion under the SOW to act inconsistently with BOP's specific determinations in particular cases. The BOP, which was in communication with WHH at the time, understood that Ms. Wormley would receive treatment at CPEP and return to WHH. Ex. 2 (Notice of Escape). This understanding is conclusive as to WHH's duty to allow Ms. Wormley to return, regardless of WHH's discretion in the abstract.

As part of these "reasonable and accurate controls," sanctions are provided in the SOW for the discipline of inmates. The CCC must adhere to numerous investigatory and reporting requirements, including a formal hearing for serious offenses, before imposition of a program sanction. *Id*. at 47. The inmate has a right to be present at the hearing unless "circumstances do not allow for an in-person hearing, *e.g.*, permission cannot be obtained by the holding official or the offender is on escape status." *Id*.

When an offender is found to have committed a prohibited act, the CCC must recommend a sanction from a grid of possible options corresponding to different offense levels. There are four categories of offenses: Greatest (100 level), High (200 level), Moderate (300 level), and Low Moderate (400 level). Greatest (100 level) offenses include, *inter alia*: killing, assault, arson, firearm violations, rioting, and taking hostages. Available sanctions for these offenses range from (a) parole date rescission, (b) forfeiture of earned good time, (c) disciplinary transfers, (d) disciplinary segregation, (e) monetary restitution, (f) withholding of statutory good time, and (g) loss of privileges. High (200 level) offenses include, *inter alia*: escape, fighting, threatening another with bodily harm, extortion or blackmail, and sexual misconduct. The same range of sanctions is provided for 200 level offenses.

WHH asserts repeatedly in its opposition that it had no duty to allow Ms. Wormley to return because she had been (permanently) "forcibly removed" by Federal Protective Services after she attacked staff with her fists and "threatened to kill everybody." But characterizing the events this way raises numerous other examples of SOW violations by WHH. First, terminating Ms. Wormley from the Fairview and immediately discharging her, as WHH implicitly claims it

did,[9] effectively imposes an unapproved and inappropriately severe sanction.  Even 100-level

offenses, such as killing, do not contemplate immediate termination of a resident, but only allow

measures such as disciplinary transfer or segregation.  And all sanctions, including 100-level

sanctions, require a formal hearing before being imposed.  Immediate discharge, without a

hearing or investigation, for what is clearly an alcohol and mental health-related episode, violates

every explicit and implicit standard of the SOW's disciplinary structure.  This sanction,

occurring as it did outside the reporting and investigatory requirements of the SOW, left Ms.

Wormley outside of the custody and knowledge of the BOP, directly leading to the Notice of

Escape.

Additionally, WHH's argument is premised on the notion that when Ms. Wormley was

taken from the Fairview by law enforcement officers, it no longer had a custodial interest in her.

This argument, in turn, is premised on the ability of the law enforcement officers to discharge

WHH's custodial obligations, namely, to hold Ms. Wormley for, and deliver her to, the BOP.

But only the USMS has this authority, as specified in the BOP Community Corrections Manual.

*See* Ex.3(PS 7300.09).  Since WHH did not deliver Ms. Wormley to USMS, its claim that she

was being permanently removed from custody by an improper law enforcement agency, rather

than temporarily transferred for treatment (which any agency could do), represents another

violation of its legal requirements.

---

[9] Because Ms. Wormley returned to the Fairview shortly after she was removed for treatment,
nothing prevented her from resuming her program within the specified disciplinary procedures of
the SOW except the say-so of WHH.  If WHH maintains that Ms. Wormley returned from her
initial escape, was accepted back by WHH, became violent, and then, pursuant to WHH's
discretion, was not allowed to return to the program, it cannot avoid the implication that its
refusal to admit her is a sanction for her violent episode.

**C.     The SOW and BOP Program Statements Are External Policy Mandates Establishing a Standard of Care for CCCs.**

In its Opposition, WHH states that in the District of Columbia, "violation of internal policies does not rise to the level of negligence *per se*." Def.'s Opp. at 6. To be slightly more precise, "*unpublished* internal procedures 'cannot embody the standard of care under a negligence *per se* theory." *Jones v. National R.R. Passenger Corp.*, 942 A.2d 110 (D.C. 2008) (quoting *Clark v. District of Columbia*, 708 A.2d 632, 636 (D.C.1997)) (emphasis added). Precision aside, the reason for this rule is clear. As first announced by *Clark* and repeated by virtually every court applying the rule: "To hold otherwise would create the perverse incentive for the [Defendant] to write its internal operating procedures in such a manner as to impose minimal duties upon itself in order to limit civil liability rather than imposing safety requirements upon its personnel that may far exceed those followed by comparable institutions." *Clark*, 708 A.2d at 636.

In applying this rule to Plaintiff's motion, WHH glosses over a troublesome fact— Plaintiff has not sought to hold any agency accountable to purely *internal* policies. Rather, the policies and procedures cited by Plaintiff were promulgated by BOP specifically to hold private, *external* community corrections centers (CCCs) accountable—precisely the use Plaintiff employs.

The policies Plaintiff identifies as setting the applicable standard of care are found in BOP Program Statements (especially Program Statement 7300.09, titled "Community Corrections Manual") and the 144-page Statement of Work. Together these documents operate interdependently to create uniform national standards, oversight of those standards, and contractual enforcement of those standards. Program Statement 7310.04 ("Community Corrections Center Utilization and Transfer Procedure"), for example, sets forth policies

13

regarding the transfer of inmates into CCCs; the SOW, in turn, requires familiarity with and implementation of these requirements by CCCs. Ex. 6 (SOW) ("It is the Bureau's expectation that the contractor maintain and implement subsequent policy updates as they occur. This will require the contractor to routinely review policy statements to ensure they are utilizing the most current version."). Similarly, the SOW requires contracting CCCs to "comply with and implement any applicable changes to *BOP policy*, Department of Justice (DOJ) regulation, Congressional mandate, Federal law or E[xecutive] O[rder]." *Id.* (emphasis added). And the SOW includes powerful oversight provisions for BOP, including the right to make unannounced inspections and the requirement that CCCs cooperate with all BOP investigations, visits, inspections, and inquiries. *Id.* at 3.

There can be no doubt that these documents are intended to establish national standards of care—in the words of WHH's original motion, "legally and contractually binding" performance requirements[10] —for CCCs. As such, they represent prototypical agency regulations of external private actors, not unpublished internal policies, and in no way implicate the perverse incentive for lower standards that motivates the internal policy rule.

### D. WHH Offers Nothing to Dispute its Duties as a Custodian.

WHH falls back on its previous arguments about Ms. Wormley's "removal" from its custody to deny its culpability under common law notions of custodial care. As stated above, Ms. Wormley was not "removed" from WHH's custody; she was transported for mental health treatment, accompanied by her WHH case manager, and returned to WHH with WHH staff. WHH cannot possibly claim that it acted with "that degree of care which a reasonable prudent

---

[10] WHH was content to declare that the SOW is legally binding when it thought Plaintiff's claim related to the initial reporting of Ms. Wormley's escape. Having now realized that Plaintiff faults WHH for disobeying the SOW, not obeying it, it should not change its tune.

person would have exercised under the same or similar circumstances." *Pannu v. Jacobson*, 909 A.2d 178 (D.C. 2006). WHH left Ms. Wormley in a worse position than when it took her in, evicting her when a reasonable person would have simply waited for USMS to pick her up. Indeed, if one accepts WHH's claim that it "removed" Ms. Wormley because she was a threat to herself and others, releasing her to the street, where that threat would have no constraint, cannot possibly be viewed as a reasonably prudent course of action. WHH knew Ms. Wormley's vulnerabilities and its obligations as a custodian, and simply ignored them.

## II.    WHH'S ACTIONS PROXIMATELY CAUSED MS. WORMLEY'S INJURIES.

WHH's second argument consists of several paragraphs purporting to undermine Plaintiff's account of the origins and effects of the detainer, and charges that Plaintiff is asserting new arguments against WHH not found in the Complaint. The arguments propounded in this section are confused, and echo the fundamental misunderstandings of Plaintiff's claims that are found in WHH's motion to dismiss.

### A.    The USMS Detainer Was Not Issued in Response to Ms. Wormley's Probation Violation.

There is nothing new about Plaintiff's allegations regarding the origin of the detainer or how it relates to WHH's wrongdoing. They are plainly set forth in the Complaint. *See* Complaint ¶¶ 28–30.

WHH consistently misinterprets Plaintiff's claims about its wrongdoing when it confuses WHH's proper *initial* reporting of Ms. Wormley's failure to return on the afternoon of June 2, 2006, with its role in the events that are described in the BOP's June 5, 2006 Notice of Escape. That June 5 Notice does not even mention WHH's *initial* escape notification on the afternoon of June 2, and instead only charges Ms. Wormley with escape for her supposed failure to return to WHH *after she was released from the hospital later that night*. Plaintiff faults WHH both for

refusing to admit Ms. Wormley after she returned from the hospital, and for failing to inform

BOP that she had in fact returned. These errors resulted in the inaccurate and unnecessary BOP

Notice of Escape.

Regarding the detainer, WHH cannot claim that it was issued because Ms. Wormley

violated her D.C. Superior Court probation obligations. Def.'s Opp. at 8. Ms. Wormley's

probation violation occurred in 2005, when she was arrested on federal drug charges. The arrest

simultaneously constituted a Superior Court probation violation and led to a bench warrant from

Judge Craig Iscoe that remained outstanding during her federal sentence. Ms. Wormley was

taken into custody pursuant to that bench warrant on June 14, 2006, and a hearing was held on

the probation violation on June 21, 2006. Thus, on June 16, 2006, the day the detainer was

issued, Ms. Wormley was already in District of Columbia custody *for* her probation violation,

and did not need to be held by any other authority for issues related to them.

### B. The Issuance of the Detainer was Directly Related to Ms. Wormley's Inoperative Time.

WHH also evidences a confusion about the relationship between Ms. Wormley's

inoperative time and the detainer, and the role inoperative time plays in Plaintiff's allegations. It

accuses Plaintiff of offering "new arguments" about inoperative time, and charges that Ms.

Wormley's inoperative time is nowhere discussed in the Complaint. WHH's confusion on this

issue stems from its false dichotomy—that the detainer must have been issued either pursuant to

the Notice of Escape or to account for inoperative time. But these concepts are interrelated: any

inmate who escapes will inherently accrue inoperative time; and an escaped inmate who later

serves his or her inoperative time may thereby be cleared of the escape. Put differently, by

apprehending an escaped inmate, one *is* contemporaneously addressing the inmate's inoperative

time, and vice-versa. Thus, both concepts are relevant as explanations for the issuance and ongoing validity of detainers.

Contrary to WHH's accusations, this is exactly how inoperative time is discussed in the complaint. For example, Paragraph 34 of the Complaint discusses dates relevant both to Ms. Wormley's escape charge and her "remaining BOP sentencing obligations" (*i.e.*, her inoperative time). In so doing, it makes the very point WHH calls a recent invention—that independent of the resolution of her escape charge, Ms. Wormley's "remaining BOP sentence obligations" provided a federal purpose for the detainer until they "naturally terminate[d] on June 21, 2006." Complaint ¶ 34. Similar concepts are expressed in other paragraphs, including Paragraph 46, which states: "For every day after June 21, 2006, *the date upon which Ms. Wormley's federal sentence was exhausted,* USMS violated its directives by allowing an erroneously lodged and now exhausted detainer to remain on Ms. Wormley's file." Complaint, ¶ 46.[11]

It is also important to remember that inoperative time is not the only causal nexus between wrongful acts by WHH and the issuance of the detainer. In particular, it is evident from the Notice of Escape that WHH failed to inform BOP that Ms. Wormley had returned to WHH and was forced to leave.

## C.    WHH Is Liable For Its Role in the Creation of the BOP Notice of Escape and the USMS Detainer, From Which All Other Documents Flowed.

WHH discusses at length the District Defendants' affidavit of Kathy Souverain, Correctional Program Administrator at the Records Office of the D.C. Department Corrections,

---

[11] Although WHH notes that the precise term "inoperative time" is not mentioned in the complaint, the concept is addressed in multiple places. Moreover, no extended discussion of the concept was necessary until WHH argued that the resolution of Ms. Wormley's escape charge on June 16, 2006 somehow "cut off" its liability.

which largely tracks the Complaint.  Ms. Souverain stated that Ms. Wormley was placed "in transit hold pending federal designation," by USMS and that this transit hold was one of the direct causes of her overdetention.  Ms. Souverain also explained that Ms. Wormley was held for three days at CDF because DOC needed to obtain "release documents" "reflecting that she was released from the Notice of Escape charge from USMS."  Def.s' Opp. at 9.

WHH believes that the fact that Ms. Wormley was held pursuant to the "transit hold" is significant because there is "no evidence in the record that the 'transit hold' is attributable to WHH."  Def.'s Opp. at 9.  But that has no relevance to WHH's liability here.  WHH's emphasis on the transit hold may stem from a misapprehension of its date.  WHH states that it was issued for unknown reasons in response to the December 6, 2006 fax requesting that USMS take action on Ms. Wormley.  Def.'s Opp. at 9.  In fact, it was issued on October 19, 2006 as part of the original processing of Ms. Wormley's detainer.  *See* Ex. 7 (USM-41).  USMS notes from October 19th indicate that Ms. Wormley was transported to U.S. District Court for "processing and execution of the Bureau of Prisons Escape Notification."  Ex. 8  (USMS Notes).  The notes state that "BOP was notified of [Ms. Wormley's] arrest and federal designation was requested." *Id*.  As these documents indicate, the Form 41 "transit hold" is simply another flawed document created as direct consequence of the BOP Notice of Escape and USMS detainer, which are themselves the unfortunate result of WHH's misconduct on June 2 2006.  This form offers WHH nothing new to distance itself from Ms. Wormley's overdetention

As for the other topic of Ms. Souverain's affidavit—DOC's need to obtain "release documents" showing that Ms. Wormley had been released from the Notice of Escape—this defense addresses, at most, only the final three days at CDF of Ms. Wormley's five month overdention.   In any event, WHH draws three flawed conclusions from the District's purported

18

need.  First, WHH continues to suggest that its reporting of Ms. Wormley's escape in the afternoon of June 2, 2006, which is nowhere mentioned in the June 5 Notice of Escape, bears some relevance either to Ms. Wormley's status as an escapee or WHH's liability in this case.  It does not.  *See* Ex. 2 (Notice of Escape).

Second, WHH argues that it cannot be liable for the issuance of the Notice of Escape, because the start date on the Notice is June 6, four days after the June 2 eviction of Ms. Wormley from WHH.  This argument is unavailing, because it is undisputed that it was WHH that told Ms. Wormley to wait until Monday, June 5, 2005, to turn herself in.  SMF ¶ 15; Ex. 4 (Incident and Investigation report).  In any event, Ms. Wormley tried diligently to turn herself in to USMS officers at Superior Court and D.C. Jail, but received the answer at Superior Court that she could not be processed because USMS did not have a warrant for her arrest, and found no help at D.C. Jail, which was under lockdown.  Ex. 5.

Finally, WHH characterizes the Notice of Escape and the Form 41 "transit hold" as "two separate and independent causes of Plaintiff's over-detention."   Def.'s Opp. at 10.  Then, citing the doctrine of multiple sufficient causes, WHH argues that both documents must be attributable to WHH for it to be liable in negligence.[12]  WHH apparently misunderstands this doctrine, because, in fact, the opposite is true:  "If two forces are actively operating, one because of the actor's negligence, the other not because of any misconduct on his part, and each of itself is sufficient to bring about harm to another, the actor's negligence may be found to be a substantial factor in bringing it about."  *Restatement (Second) of Torts*, § 432 (1965).

---

[12] The only case WHH cites for this rule is *D.C. v. Frick*, 291 A.2d 83, 84 (D.C. 1972).  But nowhere in *Frick* is this doctrine discussed, and WHH appears to cite *Frick* only because it mentions, in passing and without endorsement, Restatement (Second) of Torts, § 432, WHH's only other authority.

III.    **MS. WORMLEY WAS NOT CONTRIBUTORILY NEGLIGENT, AND NOTHING WHH PROFFERS SUGGESTS OTHERWISE.**

Over several pages, WHH sets forth numerous alleged negligent acts by Ms. Wormley that it claims contributed to the her overdetention.  Starting with her failure to return to WHH after her employment search, WHH faults Ms. Wormley for, among other things, her attack on WHH staff, her probation violation, her failure to turn herself into USMS between June 2, 2006 and June 5, 2006 (which did not result in inoperative time), and her failure to turn herself in to USMS after June 6, 2006, (which did result in inoperative time).  These negligent acts, WHH asserts, bar Plaintiff's claim notwithstanding WHH's own negligence.

Unfortunately for WHH, its litany of negligence is severely flawed.  Several of its allegations or statements of fact are simply untrue.  Other allegations that WHH reports accurately did not, in fact, affect her status with BOP, and thus could not have contributed to her injury whether negligent or not.  Indeed, upon inspection, not a single claim of negligence offered by WHH against Ms. Wormley survives scrutiny as both true and relevant.

A.    **Nothing Occurring Prior to Ms. Wormley's Release from D.C. General on June 2, 2006 Materially Affected Her Injury.**

Asserting that the "opening line" of Plaintiff's injury "was written by Plaintiff herself," WHH begins its counter-narrative of negligence with Ms. Wormley's late return to WHH following her employment search on June 2, 2006.  Def's Opp. at 11.  WHH faults Ms. Wormley for arriving late, failing to maintain contact with WHH, having inadequate emergency numbers, becoming intoxicated and combative, attacking staff, and threatening to "kill everyone," ultimately leading to her removal from the Fairview by Federal Protective Services and her treatment at D.C. General's CPEP.  Def.'s Opp. at 11-12.

Although inclusive of such details as Plaintiff's alleged threat to "kill everybody," WHH notably fails to explain how these acts, or any allegedly negligent acts occurring prior to Ms.

20

Wormley's treatment at CPEP, contributed to her injury.  The fact is that none of the events prior to Ms. Wormley's treatment at CPEP contributed to Ms. Wormley's injury, because none of these events affected the BOP's view of Ms. Wormley's status or its conclusions in the Notice of Escape.  Rather, the Notice of Escape is premised explicitly on Ms. Wormley's alleged failure to return to WHH after she left the hospital, rendering the events occurring before this moment immaterial.  *See* Ex. 2 (Notice of Escape).   Thus, even if one assumes that Ms. Wormley acted negligently during this period, she could not have been contributorily negligent, because her actions contributed nothing to the Notice of Escape.

**B.    WHH's Sole Remaining Allegations Of Negligence Are Premised On Errors Of Fact.**

In addition to the events of June 2nd, WHH argues that Ms. Wormley acted negligently by failing to turn herself in to USMS in the days after her release from the Fairview. WHH notes that Ms. Wormley's inoperative time did not begin until June 6th, and that she thus would have had no inoperative time on her sentence for the period of June 2nd to June 5th had she turned herself in "when told to do so."  WHH argues that she was negligent for failing to do so, and that this negligence directly contributed to her harm.

WHH's argument is undone completely by two basic errors of fact.  First, WHH incorrectly claims that Plaintiff was told to turn herself in to USMS custody on June 2, 2006.  In fact, as clearly documented in Defendant's own exhibit (dated June 2nd), Ms. Wormley "was instructed to turn herself in to the US Marshals on *June 5, 2006*."  Ex. 4 at 5 (Incident and Investigation Report) (emphasis added).  WHH cannot claim that this is a disputed fact.  In addition to appearing in an exhibit authored by Defendants' employees, this fact was included as ¶ 15 of Plaintiff's Statement of Material Facts, to which WHH did not object.

Second, WHH mistakenly claims that Ms. Wormley took no efforts to turn herself in, despite being contacted by a USMS officer on June 5, 2005.  In fact, Plaintiff endeavored diligently to turn herself in to USMS according to the instructions provided to her by the USMS officer.  Ex. 5 (Wormley Affidavit).  These efforts were unsuccessful through no fault of Ms. Wormley's.  *Id*.  Moreover, Ms. Wormley sought assistance in turning herself in from staff at the Veterans Administration hospital, where Ms. Wormley had prudently sought treatment for her mental health issues.  *See* Ex. 9 (VA letter).  WHH offers no evidence to challenge this fact, which Ms. Wormley has consistently asserted, first in her Complaint, then in her Statement of Material Facts, and now through her affidavit.

Once these basic factual errors are corrected, WHH cannot claim that Ms. Wormley acted negligently after her eviction from the Fairview:  she diligently attempted to turn herself in to USMS on June 5, 2006, the day she was instructed to do so by WHH, and could therefore do nothing to prevent the issuance of the June 5th Notice of Escape or the accrual of the June 6th inoperative time.

## IV.    NEGLIGENCE BY THE INSTITUTIONAL DEFENDANTS WAS HIGHLY FORSEEABLE,  NOT "HIGHLY EXTRAORDINARY."

The essence of WHH's argument that the events leading to Ms. Wormey's overdetention were highly extraordinary consists of repeated emphasis on the word "multiple."  WHH alludes to  "multiple failures by multiple agencies," and states that a reasonable person would agree that "the multiple alleged failures and mishaps by multiple agencies were indeed extraordinary."  Def.'s Opp. at 16.  This response confuses what was sufficient for Ms. Wormley's overdetention, in light of all that had to go right, with what actually led to her overdetention.  It is not the case that everything need not go wrong to cause a misunderstanding resulting in overdetention; rather, everything must go right to prevent it.  In this instance, for example, multiple failures were not

22

required to ensure that Ms. Wormley would languish in jail; a single lost or ignored fax from

DOC to USMS could do that just as well. The unextraordinary nature of this negligence is

evident from the fact that this problem is not unique to Ms. Wormley, but has happened before,

in this district, with these defendants, involving these same instruments of a detainer and a parole

violator warrant. *See Watson v. District of Columbia*, 2005 WL 1903573 (D.D.C. 2005)

(Kessler, J.).

## V.    THE ADMINISTRATIVE REMEDIES RELIED ON BY WHH ARE INAPPLICABLE TO PLAINTIFF'S CLAIM.

For the reasons stated in Section VII of Plaintiff's Opposition to the District Defendants'

Motion to Dismiss, Ms. Wormley was not required to file a habeas petition and is not precluded

from bringing this action by the Prison Litigation Reform Act, 42 U.S.C. § 1997e(a). Those

arguments are incorporated here by reference.

## <u>CONCLUSION</u>

For the foregoing reasons, Plaintiff Eloise T. Wormley respectfully requests that

Defendant's Motion to Dismiss be denied, and that Plaintiff's Cross-motion for Summary

Judgment be granted.

Respectfully submitted,

August 15, 2008                          /s/ Matthew J. Peed

Robin Jacobsohn (D.C. Bar no. 417407)
Christopher R. Hart (D.C. Bar no. 486577)
Mathew J. Peed (D.C. Bar no. 503328)

WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, D.C. 20005
(202) 434-5000 (tel)
(202) 434-5029 (fax)

Ivy A. Lange  (D.C. Bar No. 488147)
Washington Lawyers' Committee for Civil Rights &
Urban Affairs
11 Dupont  Circle, N.W., Suite 400
Washington, D.C.  20036
Tel 202-319-1000
Fax 202-319-1010

*Attorneys for Plaintiff*

JOHN W VARDAMAN
PAUL MARTIN WOLFF
JOHN G. KESTER
WILLIAM E. McDANIELS
BRENDAN V. SULLIVAN, JR.
RICHARD M. COOPER
GERALD A. FEFFER
JERRY L. SHULMAN
ROBERT B. BARNETT
DAVID E. KENDALL
GREGORY B CRAIG
JOHN J. BUCKLEY, JR.
TERRENCE O'DONNELL
DOUGLAS R. MARVIN
JOHN K. VILLA
BARRY S. SIMON
KEVIN T. BAINE
STEPHEN L. URBANCZYK
PHILIP J. WARD
F. WHITTEN PETERS
JAMES A. BRUTON, III
PETER J. KAHN
LON S. BABBY
MICHAEL S. SUNDERMEYER
JAMES T. FULLER, III
BRUCE R. GENDERSON
CAROLYN H. WILLIAMS
P. LANE HEARD III

STEVEN R. KUNEY
GERSON A. ZWEIFACH
PAUL MOGIN
HOWARD W. GUTMAN
MARK S. LEVINSTEIN
VICTORIA RADD ROLLINS
DANIEL F. KATZ
WILLIAM R. MURRAY, JR.
EVA PETKO ESBER
STEPHEN D. RABER
DAVID C. KIERNAN
LON E. MUSSLEWHITE
ROBIN E. JACOBSOHN
HEIDI K. HUBBARD
GLENN J. PFADENHAUER
GEORGE A. BORDEN
ROBERT J. SHAUGHNESSY
DAVID S. BLATT
ARI S. ZYMELMAN
DANE H. BUTSWINKAS
LAURIE S. FULTON
DENNIS M. BLACK
PHILIP A. SECHLER
LYNDA SCHULER
PAUL K. DUEFFERT
K. HACKNEY WIEGMANN
ROBERT M. CARY
KEVIN M. HODGES

LAW OFFICES
**WILLIAMS & CONNOLLY LLP**
725 TWELFTH STREET, N.W.
WASHINGTON, D. C. 20005-5901
(202) 434-5000
FAX (202) 434-5029
www.wc.com

EDWARD BENNETT WILLIAMS (1920-1988)
PAUL R. CONNOLLY (1922-1978)

DAVID M. ZINN
JOSEPH G. PETROSINELLI
STEVEN M. FARINA
KEVIN M. DOWNEY
THOMAS G. HENTOFF
PAUL B. GAFFNEY
ROBERT A. VAN KIRK
MARGIE R. ZIEGLER
KENNETH C. SMURZYNSKI
JOHN E. SCHMIDTLEIN
CRAIG D. SINGER
JAMES L. TANNER, JR
J. ANDREW KEYES
GILBERT O. GREENMAN
M. ELAINE HORN
ENU MAINIGI
MICHAEL F. O'CONNOR
PAUL T. HOURIHAN
WILLIAM J. BACHMAN
MARGARET A. KEELEY
MEGAN E. HILLS
EDWARD J. BENNETT
TOBIN J. ROMERO
BETH A. LEVENE
THOMAS G. WARD
WILLIAM T. BURKE
LISA M. DUGGAN
JOHN E. JOINER

NICHOLAS J. BOYLE
ADAM L. PERLMAN
ANDREW W. RUDGE
DENEEN C. HOWELL
ALEX G. ROMAIN
DAVID A. FORKNER
JONATHAN M. LANDY
CHRISTOPHER N. MANNING
RYAN T. SCARBOROUGH
JENNIFER G. WICHT
STEPHEN D. ANDREWS
MALACHI B. JONES
THOMAS H. L. SELBY
KEVIN HARDY
EDWARD C. BARNIDGE
JOSEPH M. TERRY
AARON P. MAURER
JON R. FETTEROLF

OF COUNSEL
RAYMOND W. BERGAN
JEREMIAH C. COLLINS
DAVID POVICH
J. ALAN GALBRAITH
ROBERT P. WATKINS
MARY G. CLARK
STEVEN A. STEINBACH
JACQUELINE E. MAITLAND DAVIES

# TELECOPY

TO: Dept of mental Health (CPEP)

FIRM OR COMPANY: Dept of mental Health

TELECOPY NUMBER: 202-698-3171

FROM: Kathleen Jackson

TELEPHONE: 202-434-5290

DATE: 3/28/08

MATTER NUMBER: Medical Records Requests

NUMBER OF PAGES INCLUDING THIS PAGE: 3

IF THERE ARE ANY PROBLEMS RECEIVING THIS TRANSMISSION, PLEASE CALL (202) 434-5608 **IMMEDIATELY.** THANK YOU.

*This message is intended for the use of the individual or entity to which it is addressed and may contain information that is privileged, confidential and exempt from disclosure under applicable law. If the reader of this message is not the intended recipient or the employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by telephone and return the original message to us at the above address via the U.S. Postal Service.*

## AUTHORIZATION AND RELEASE FOR MEDICAL RECORDS

To:

    **D.C. General Hospital**
    **1900 Massachusetts Ave., SE**
    **Washington, D.C. 20003**

The undersigned individual hereby authorizes each listed above to release or discuss, upon presentation of this authorization, to Williams & Connolly LLP, 725 Twelfth Street, N.W., Washington, DC 20005, its attorneys, employees, agents and designees, including co-counsel, copies of any and all recorded information concerning ELOISE WORMLEY, including by way of example, but not limited to the following:

    all medical records, physicians' records, surgeons' records, x-rays, CAT scans, MRI films, photographs, and any other radiological, nuclear medicine, or radiation therapy films, pathology materials, slides, tissues, laboratory reports, discharge summaries, progress notes, consultations, prescriptions, pharmacy records, records of drug abuse and alcohol abuse, HIV/AIDS diagnosis or treatment, physicals and histories, nurses' notes, patient intake forms, correspondence, psychiatric records, psychological records, social worker's records, insurance records, consent for treatment, statements of account, bills, invoices, or any other papers concerning any treatment, examination, periods or stays of hospitalization, confinement, diagnosis or other information pertaining to and concerning the physical or mental condition of ELOISE WORMLEY.

The purpose for the release of the requested information is for use in a civil litigation brought by myself, my relatives, or my heirs. This authorization expires at the conclusion of this litigation.

THIS RELEASE AUTHORIZES THE COVERED ENTITY TO RELEASE *THE ENTIRE, UNREDACTED RECORDS* TO THE EXTENT NECESSARY FOR THE PURPOSE IN QUESTION, PURSUANT TO 45 CFR § 164.508 (HIPAA AUTHORIZATION REQUIREMENTS FOR RELEASE OF PROTECTED HEALTH INFORMATION), AND 42 CFR PART 2 (FEDERAL REQUIREMENTS FOR RELEASE OF ALCOHOL AND/OR DRUG ABUSE PROGRAM RECORDS)).

Except as specifically limited below, I understand that the information disclosed under this authorization and release of medical records may be redisclosed by the person(s) specified above and may no longer be subject to the same protection the information is given by the Covered Entity.

I understand that these medical records are confidential. I understand that by signing this authorization I am specifically allowing the release of any medical information requested to the entities or person(s) specified above, including any HIV/AIDS and sickle cell anemia diagnosis and treatment records that are specifically protected by the VA and/or state law or regulations. Drug and alcohol abuse information records are specifically protected by federal and/or state regulations and by signing this authorization I understand that I am also expressly allowing the release of any drug and/or alcohol information records to the entities or person(s) specified above. I also understand that by signing this authorization I am specifically authorizing the release of pharmacy and prescription information and records to the entity, entities or person(s) specified above that may be protected by state law or regulations. I also understand that by signing this authorization I am specifically authorizing the release of psychiatric records and psychological records, including the records of mental health counselors, to the entity, entities or person(s) specified above that may be protected by state law or regulations.

I understand that I may revoke this authorization at any time as explained by the Covered Entity in its Notice of Privacy Practices, except to the extent that action has already been taken in reliance upon this authorization and release of medical records. I also understand that I have the right to refuse to sign this authorization and release of medical records. I also understand that the Covered Entity may not condition the provision of treatment, payment or enrollment in the health plan or eligibility for benefits based on my refusal to sign this authorization expect when the release of information under this authorization is required for a health plan during initial enrollment for underwriting

purposes, my participation in a research study or when treatment is provided solely for the purpose of disclosing it to a third party such as a work-related physical done at my employer's request.

THE FOLLOWING APPLIES ONLY TO THE PARTY REQUESTING EITHER HIV/AIDS or SICKLE CELL INFORMATION FROM THE VETERANS ADMINISTRATION OR DRUG AND/OR ALCOHOL ABUSE/TREATMENT INFORMATION RECORDS FROM ANY SOURCE -- Prohibition on Redisclosure: This information has been disclosed to you from records protected by Federal confidentiality rules. The Federal rules prohibit you from making any further disclosure of this information unless further disclosure is expressly permitted by the written consent of the person to whom it pertains or as otherwise permitted by 42 CFR Part 2 or 38 CFR Part 1. A general authorization for the release of medical or other information is NOT sufficient for this purpose. The Federal rules also restrict any use of the information to criminally investigate or prosecute any alcohol or drug abuse patient or patient with sickle cell anemia or HIV infection.

You are hereby released from any and all liability in connection with the disclosure of records, documents, writings and physical evidence to the above designated entities or person(s). This authorization is continuing in nature and is to be given full force and effect to release any and all of the information described above after the date of this authorization until the end of the litigation referenced above. This authorization also includes the authority to copy and inspect any and all such information and to discuss the information with the above designated entity, entities or person(s). A copy of this authorization may be used in place of and with the same force and effect as the original.

ELOISE T. WORMLEY

_____
Name of Patient

Signature

**3 - 14 - 08**
_____
Date

February 4, 1954
_____
Date of Birth

577 – 74 – 0459
_____
Social Security Number

2303 Brook Drive, Apt. 104
Suitland, Maryland
_____
Address

2

Community Services Agency

COMPREHENSIVE PSYCHIATRIC

EMERGENCY PROGRAM

PSYCHIATRIST EVALUATION

Consumer Name: Eloise T. Wormley

DOB: 2-4-54.

---

Date: 6-2-06.     Time psychiatrist evaluation begun: 7-45 Pm.  24 hour clock

Initial Evaluation _must_ address items 1-5.  Follow-up evaluations using this form should address items as appropriate.

| 1. | History: Summary history and/or note any additional history not included previously. |
|----|----|
| 2. | Mental Status Exam: Reference previous documentation and pertinent positives as appropriate. |
| 3. | Formulation/Assessment: Organize summary of patient's current situation based on data collected including: ●Risk factors  ●psychiatric and medical problems  ●strengths/assets  ●Needs/problems  ●available supports |
| 4. | DSM IV Diagnosis: Axis I through Axis V. Enter the principle diagnosis first. |
| 5. | Disposition: Identified plans supported by the formulation and diagnosis. |

☐

I have reviewed the current CPEP Assessment Form and agree with its findings.

☐

I have reviewed the current CPEP Assessment Form and agree with its findings with the following additions/modifications.

Pt. is a 50 yr old AAF with H/o alcohol + crack/cocaine abuse, who was brought to CPEP by her care Manager, Ms Ermin Sykes (202)-396-8982 who wrote the FD-12. According to Ms. Sykes pt. had gone today to look for employment from the Halfway House (Fairway Halfway House) She came back late after the allowed time. She was intoxicated + when the staff at the halfway house confronted her for being late + asked her to sign in she became very quiet initially + then abruptly walked towards the nursing counter + smashed + knocked the stuff down from the counter. She was asked to give a breathalizer test which she initially refused + then broke down crying + yelling that " I am an alcoholic, I am never going to change". She finally sat down as requested by the employment placement personel at the Halfway House MR Thomas Mills (302-396-8982 Ext. 25-) but kept on crying + yelling the same thing over + over again. She started cursing the staff + pt. Hitting MR. Mills with fists

AZRA A. FAROOQUI.
Print Name

Azra A. Farooqui MD (PGY II)
Psychiatrist Signature/Title

1

Comprehensive Psychiatric Emergency Program
Initial Psychiatric Evaluation (continued)

She was restrained by the staff & police was called to bring her to CPEP. On arrival to CPEP pt. was very anxious, agitated, crying refusing to be interviewed. At CPEP after intramuscular antipsychotic medication pt. was able to calm down.

According to the information provided by the CM. & pt.'s prison record pt. was in Military (Nurse)

Pt. was given medication and ativan. Later she became calm and cooperative. Admits that she drank some alcohol today. Pt. denies any H/I ideation and is directible and is no acute distress. I spoke with Agnes Brown, administrator of fairview halfway home (202 396 8982) spoke with me on the phone and told me that if we don't admit her she could just be released on the street. I will however give her a long acting anti-psychotic. She already has oral anti-psychotic with her. She will be released with the staff of the halfway home. _____ is stopped to prevent any _____ treatment. Pt. has markedly

**Axis I**   Mood disorder NOS   296.9

**Axis II**   Deferred

**Axis III**   H/o seizures. (Alcohol)

**Axis IV**   Psychological

**Axis V**   41.

Calmed down after the med and is in no distress.

Ursula RN    Print Name

Psychiatrist Signature/Title

2

CONSUMER NAME _____

DOB: ___/___/___

Ecura: _____

| | | CHECK All that are present | DESCRIBE (If possible) |
|---|---|---|---|
| **MENTAL STATUS EXAMINATION**<br>Note: If memory impaired or age 70+ expand w/MMSE | PHYSICAL APPEARANCE | 0 Appropriate    0 Disheveled    0 Bizarre<br>0 Ungroomed    0 Well groomed    0 Not bathed | |
| | BEHAVIOR | 0 Cooperative    0 Withdrawn    0 Guarded<br>0 Hostile    0 Belligerent    0 Combative<br>0 Dramatic    0 Manipulative    0 Agitated | |
| | SPEECH | 0 WNL    0 Rapid    0 Slowed    0 Slurred<br>0 Clanging    0 Pressured    0 Sparse<br>0 Incoherent    0 Over-productive | |
| | THOUGHT PROCESS | 0 Goal Directed    0 Logical    0 Concrete    0 WNL<br>0 Abstraction Ability    0 Confused    0 Flight of Ideas<br>0 Tangential    0 Perseverance    0 Clang Associations<br>0 Loosening of Associations    0 Overly Circumstantial | |
| | THOUGHT CONTENT | Themes: 0 Appropriate    0 Paranoid    0 Blaming<br>Issues/Concerns: 0 Family/Marital Problems | |
| | INTELLIGENCE | 0 WNL    0 Below Average    0 Above Average | |
| | INSIGHT | 0 WNL    0 Poor    0 Good    0 Superficial | |
| | JUDGMENT | 0 WNL    0 Impulsive    0 Impaired | |
| | ATTENTION SPAN | 0 WNL    0 Distractible    0 Shortened | |
| | ORIENTATION | 0 Alert    0 Person    0 Place    0 Date<br>0 Delirious    0 Stuporous | |
| | MEMORY | Short Term    0 Intact    0 Impaired<br>Long Term    0 Intact    0 Impaired | |
| | MOOD | 0 WNL    0 Depressed    0 Anxious    0 Angry<br>0 Euphoric    0 Confused    0 Apathetic<br>0 Irritable    0 Fearful | |
| | AFFECT | 0 Appropriate    0 Constricted    0 Flat<br>0 Labile    0 Incongruent    0 Inappropriate | |
| | HALLUCINATIONS | 0 None    0 Auditory    0 Visual    0 Tactile<br>0 Olfactory    0 Command | 0 |
| | DELUSION | 0 None    0 Persecutory    0 Grandiose    0 Somatic<br>0 Jealous    0 Religious    0 Erotomanic | |
| | MOTOR ACTIVITY | 0 WNL    0 Retarded    0 Accelerated | |
| | SLEEP | 0 WNL    0 Increased    0 Decreased<br>0 Difficulty Falling Asleep    0 Early Morning Awakening<br>0 Difficulty Staying Asleep    0 Restless Sleep | |

_____    _____
Print Name

_____
Psychiatrist Signature/Title

3

| Suicidality: | ☐Low Risk ☐Moderate Risk ☐Pronounced Risk |
| | ☐Plan Present ☐Means Available ☐Command Auditory Hallucinations |
| | ☐Positive paste history (self) ☐Family History ☐Other (describe):_____ |

| Homicidality/ Violence Risk | ☐Low Risk ☐Moderate Risk ☐Pronounced Risk |
| | ☐Active Plan ☐Means Available ☐Command Auditory Hallucinations |
| | ☐Identified Target ☐Positive past history ☐Other (describe):_____ |

| Risk Behaviors: | ☐Labile ☐Self-Mutilating ☐Refusing foods/fluids |
| | ☐Walking in traffic ☐Inciting confrontations with others |
| | ☐Overdose ☐Intoxication ☐Other (describe):_____ |

**CONSUMER TREATMENT NEEDS AND RECOMMENDATIONS**

NEEDS/ PROBLEMS: All identified "Needs/Problems" must be included here and addressed below in the "Recommendations and Disposition"section according to the corresponding number.

1. _H₂O guard. Wellbeing_
2. _Alcohol use_
3. _No consistent follow_

Continue with additional needs/problems on progress note & address with corresponding number below as needed.

Strengths/Assets: _Verbal_

Prognosis: _Guarded / Fair_

RECOMMENDATIONS AND DISPOSITION: This field is driven by and determined by above identified "Needs/Problems" & must be completed so that numbered "Needs/Problems" correspond with "Recommendations & Disposition."

1. _Medicate as necessary_
2. _Discharge to halfway house_
3. _Follow up at VA Hospital._

Continue with additional Recommendations & Disposition on progress note to correspond with number of above noted identified Problems/Need.

Rationale for Disposition & Level of Treatment:

_Pt is calm and collected, directable, willing to take meds, No A/V/ deaths_

| Print Name: _Umar  RN_ | Psychiatrist Signature & Title: |

4

# Comprehensive Psychiatric Emergency Program

Commission on Mental Health Services – Washington, DC

**Continuation Form** · **Page number:**

Eloisse Woomly

Arrived at the

Federal prison – Fairview ½ way house
resident. Went jobs seeking. → came back
intoxicated 5.22 pm.

Walked to Counter. → questioned apt was
late. → Promethizo → quiet + then suddenly
walked towards Counter. Adm → BB Prom.
Breathlizer 0.72. (drunk.) I am an alcoholic, never
going to change, cursed staff, knocked stuff off
the counter. Finally sat down crying.

Raised fists. Employment placement
Thomas Mills. 202-396-8982. Ext. 25

Arrived on Tuesday. FCI Danbury, CT. Released
from prison. To be released back to community.
She is a resident of Washington DC.
Emergency Contact = ø

No drug of preference →
Fluoxetine 20 mg 1 cap. 9 AM.

**Patient name:**

Mood D/o. Anxiety + Psychiatri D/o.

Drug Dep.                    Crack Cocaine.

Fluphenazine 5 mg Tabs. 1 q HS.

threatened to kill everybody.

threats Shoot herself in head. Bullet's shallow
outside of gun.

Before prison.

Nurse in military            U.D.S – ve.

CM. Brian Sykes    202-396-8982
            Adm Agnis Brown:      Ext. 33.

Attempted distribution of cocaine.

Atty                    D Salotz.
CC-M        Bill Cummins – 301- 602- 1703.
        At the FBI Prs.

Patient name:

| DATE AND TIME | | RX. | DRUG ORDERS | DOCTOR'S SIGNATURE | NURSE'S SIGNATURE |
|---|---|---|---|---|---|
| START | STOP | | | | |
| 6/2/06 | | | Prolixin 5 mg '/m | | |
| | | | Ativan 2 mg /m | | |
| | | | Thiamine 100 mg | '/m | |
| 6/2/06 | | | 9⁰⁰pm Noted Valerie Harris RN | | |
| | | | | | |
| 6/2/06 | | | Prolixin dec 25 mg | /m | |
| | | | 9⁰⁰pm Noted Valerie Harris RN | | |
| 6/2/06 | 820 pm | | Discharge pt back to halfway | | |
| | | | home — Pt gives back | | |
| | | | bottle of prolixin pills | | |
| | | | she will follow up at VA Hospital | | |
| | | | Prolixin 5 mg po #5 pt has her own supply | | |
| 6/2/06 | | | 8⁵⁰pm Noted Valerie Harris RN | | |
| | | | | | |

(Continue on reverse side)

PATIENT'S IDENTIFICATION (For typed or written entries give: Name—last, first, middle; grade; rank; rate; hospital or medical facility)    Ecura #    WARD NO. CPEP

Eloise, Wormley

**DOCTOR'S ORDERS**
Medical Record

STANDARD FORM 508 (Rev. 8-88)
Prescribed by GSA/ICMR, FIRMR (41 CFR) 201-9.202-1



BP-S283.058 **NOTICE OF ESCAPED FEDERAL PRISONER** CDFRM
NOV 94

**U.S. DEPARTMENT OF JUSTICE** **FEDERAL BUREAU OF PRISONS**

| Institution Community Corrections Office Annapolis Junction, MD 20701 | | | Date 6/5/06 | | |
|---|---|---|---|---|---|
| Name WORMLEY, Eloise | | Number 37096-007 | Date of Birth 02-04-1954 | | age 52 |
| Sex Female | Race Black | Height 5'03" | Weight 185 lbs | Eyes Brown | Hair Black | Place of Birth D.C. |
| Citizenship U.S. | | Build: Medium | | Address: John Young Homeless Shelter; 2nd & D St NE Washington, D.C | | |
| Scars, Marks, Tattoos: Unknown | | | Occupation: not employed | | |
| Aliases: Tiny, Theresa Adams, Ting Wormley | | | F.B.I. No. 989916AA1 | SSN 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 | |
| Sentence: 12 months DC SRAA Split Sentence | | Offense: Att Distribution Of Cocaine | | Orig Arrest Location: DC | |
| FACILITY: Fairview CSC, 1430 G St., NE, Washington, D.C. 20002 | | | Violent Behavior: Yes No X Armed: unknown Consider Dangerous: Yes No X | | |

DETAILS OF ESCAPE: Fairview CSC staff report that on 06-02-2006 inmate Wormely was given a four hour pass to go on an employment search. When she returned to the CSC that evening she was intoxicated and began to threaten staff at the CSC, becoming extremely disruptive. D.C. Metro police escorted inmate Wormely to the D.C. General Hospital for mental health treatment. She was released form the hospital but, did not return to the CSC. She was located at the John Young Homeless Shelter where she was ordered to turn herself in to the U.S. Marshals, in Washington, D.C. As of this writing WORMLEY has yet to return to the facility and her whereabouts remain unknown. Therefore, WORMLEY should be considered an escaped federal prisoner.
Please notify this office immediately upon apprehension.
Facsimile number: (301) 317-3138.

none available

SUBJECT TO THE CONDITIONS OF TITLE 28, PART 7, SECTION 7.1 - 7.5 OF THE CODE OF FEDERAL REGULATIONS, A STANDING OFFER TO REWARD IS MADE FOR THE CAPTURE, OR ASSISTANCE IN, OR FURNISHING INFORMATION LEADING TO THE CAPTURE OF AN ESCAPED FEDERAL PRISONER. THIS REWARD SHALL NOT BE IN EXCESS OF $200 UNLESS SPECIFICALLY GRANTED BY THE DIRECTOR OF THE BUREAU OF PRISONS. IF APPREHENDED, OR IF YOU HAVE INFORMATION CONCERNING THE PRISONER, WIRE OR TELEPHONE COLLECT THE NEAREST OFFICE OF THE FEDERAL BUREAU OF INVESTIGATION (F.B.I.), OR CONTACT THE CHIEF EXECUTIVE OFFICER OF THIS FACILITY.
TELEPHONE NUMBER: (301) 317-3142      Randal White, CCM (A)

TOTAL P.01

** TOTAL PAGE.01 **



**U.S. Department of Justice**
Federal Bureau of Prisons

# Change
# Notice

**DIRECTIVE AFFECTED:** 7300.09
**CHANGE NOTICE NUMBER:** 02
**DATE:** 5/19/99

1.   **PURPOSE AND SCOPE.**   To add sections on the Cost of Incarceration Fee, Sexual Abuse/Assault Prevention and Intervention, and Volunteer Use in Community-Based Programs as well as to add the Tracking Juvenile Designations form to Chapter 5 of the Community Corrections Manual and to make a variety of other more minor changes to Chapters 5 and 6 as detailed below.

2.   **SUMMARY OF CHANGES IN CHAPTER 5**

   a.   In both Chapters 5 and 6, changes have been made in accordance with the Bureau's clear writing initiative.   Increased use of BOPNet GroupWise system for making official notifications has also been added throughout this change notice.

   b.   In section 5.1, paragraph 6, a designation is not done when requested by the U.S. Marshals Service if the sentence has been completed.

   c.   In section 5.1, paragraph 9, during the designation process, prior sentence computations are to be reviewed along with the 129s and Presentence Investigations.

   d.   In section 5.1, paragraph 12, if background information has not been completed, the inmate must be designated to at least a LOW security facility.

   e.   In section 5.1.2, community corrections staff must obtain a verbal report related to offense conduct and institutional adjustment from a state employee on state inmates being designated for service of a federal sentence.

   f.   In sections 5.1.3 and 5.1.4, directions on maintaining documentation regarding voluntary surrenders and appeals were

PS 7300.09
CN-2 5/19/99
Page 2

added.

g.  In section 5.2.2.b, when an inmate is rejected for CCC placement, the CCM must consider placement in U.S. Probation Office's electronically monitored home confinement program.

h.  In section 5.6.2.a.(2), minor changes were made regarding escape notification procedures.

i.  In section 5.6.2.a.(8), minor changes were made regarding maintenance and documentation of escape related information.

j.  In section 5.6.2.c(1), new information was added regarding coordination of apprehension efforts between the CCM, USMS, and contractor.

k.  In section 5.8, clarification is added to the VCCLEA procedures regarding prohibited acts.

l.  In section 5.8.3, a misconduct report on a VCCLEA violent or PLRA inmate may be referred to a DHO certified CCM staff member in offices with an unusually high number of incident reports.

m.  In section 5.11, information was added regarding the transfer of inmates and notification of victims and witnesses.

n.  In section 5.12.2, information was added regarding notification procedures for hospitalized inmates and general direction given related to precertification of treatment.

o.  In section 5.14.4.a, dollar amounts of court assessments were removed.

p.  Section 5.14.5, Cost of Incarceration Fee (COIF), was added.

q.  Section 5.16, reference to Sexual Abuse/Assault Prevention and Intervention procedures was added.

r.  Section 5.17, Use of Volunteers in Community-Based Programs, was added.

s.  Attachment 5-1, the CCM Designation Log, was revised.

t.  Attachment 5-1a, Tracking Juvenile Designations, was added.

3.  **SUMMARY OF CHANGES IN CHAPTER 6**

a.  In section 6.1.1.d, files for direct court commitments must now contain an inmate discipline record.

PS 7300.09
CN-2 5/19/99
Page 3

b.  In section 6.1.2.d, the files for condition of supervision placements must now contain a SENTRY Sentence Computation.

c.  In section 6.1.3.c, community confinement case files must now contain a SENTRY Sentence Computation.

d.  In section 6.1.4, intermittent confinement case files must now contain the Designation Request and the SENTRY Sentence Computation.

e.  In section 6.1.5, for institution transfer files, it is now stipulated that some material is a copy while other material should be the original document.

f.  Section 6.3, SENTRY Applications, has been reorganized.  In section c, inmate movement is loaded the same day or the next working day if the movement was after business hours.

g.  In section 6.3.7, the name of the Transitional Services Program has been changed to Community Transitional Drug Abuse Treatment.

h.  In section 6.4.1.a, for supervision violators, prior sentence computations must be reviewed to identify over-served time.

i.  In section 6.4.5.d, information on the award and deduction of Good Conduct Time was deleted.  Language requiring immediate entry of disallowance and sentence recalculation was added as well as a statement directing staff how to document institution actions.

j.  In section 6.4.5.e, the inmate and contractor must be notified of revised release dates.

k.  In section 6.4.6.a, language was added directing staff to update the sentence computation before an inmate is released and to add remarks explaining any discrepancy between actual and statutory release dates.

l.  In section 6.4.6.c, including a copy of the "satisfaction display," for all cases is now required.

m.  In section 6.4.6.d, the reason for early termination of supervision cases is now to be noted in the computation remarks section.

4.    **TABLE OF CHANGES**

     Remove                                    Insert

     Table of Contents pages 5-8    Table of Contents pages 5-8
     Chapter 5                                 Chapter 5
     Attachment 5-1                       Attachment 5-1
                                                   Attachment 5-1a
     Chapter 6                                 Chapter 6

5.    **ACTION.**   File this Change Notice in front of PS 7300.09, the
Community Corrections Manual.


                             /s/
                             Kathleen Hawk Sawyer
                             Director



**U.S. Department of Justice**
Federal Bureau of Prisons

# Change Notice

**DIRECTIVE AFFECTED:** 7300.0
**CHANGE NOTICE NUMBER:**    01
**DATE:**       7/22/98

1.   PURPOSE AND SCOPE.   To add procedures in Chapter 5 for discipline actions under the Violent Crime Control and Law Enforcement Act of 1994 (VCCLEA) and the Prison Litigation Reform Act of 1995 (PLRA) and make a minor change to Chapter 6 regarding file maintenance.

2.   SUMMARY OF CHANGES.

  a.   A section has been added to Chapter 5, **SPECIAL DISCIPLINE PROCEDURES FOR VCCLEA INMATES IN NON-FEDERAL FACILITIES.**   Special considerations apply to good conduct time applications for all Federal inmates:

- serving more than one year,
- housed in state and other long-term boarder contract facilities, and
- identified as receiving a sentence under the provisions of VCCLEA and/or PLRA.

The following two attachments have been added to Chapter 5:

- 5-3.a.    Notification to Inmates Sentenced under VCCLEA and/or PLRA

- 5-3.b.    Notification to Contract Facility Director/Warden of VCCLEA and/or PLRA Mandated Reporting Requirements for Prohibited Acts

  b.   In Chapter 6, under the File Maintenance and Disposal section, the requirement for the Judgement and Committment Order to be certified is removed for condition of supervision and community confinement placements.

PS 7300.09
CN-01 7/22/98
Page 2

3.  TABLE OF CHANGES

       Remove                              Insert

  Chapter 5 Pages 21 and 22      Chapter 5 Pages 21 - 22B
                                      Attachment 5-3a
                                      Attachment 5-3b
  Chapter 6 Pages 3 - 6          Chapter 6 Pages 3  - 6A

4.  ACTION.  File this Change Notice in front of PS 7300.09, the
Community Corrections Manual.


                                    /s/
                                Kathleen Hawk Sawyer
                                Director



**U.S. Department of Justice**
Federal Bureau of Prisons

# Change Notice

**DIRECTIVE AFFECTED:** 7300.09
**CHANGE NOTICE NUMBER:** 7300.09
**DATE:** 1/12/98

1.  PURPOSE AND SCOPE.  To highlight the most significant changes in the revised **Community Corrections Manual**.  The previous Manual was issued in 1991 and was updated by eight Change Notices.  This complete reissuance:

- removes information in the Preface to Chapter 1 and reorganizes Chapter 1,

- replaces Chapter 4 on Contracting,

- removes from Chapters 4 and 5 requirements for forms R-84 and I-12, since the FBI no longer requires those forms,

- makes changes to attachments and references to Program Statements in the Discipline section of Chapter 5 on Case Management,

- assigns responsibility for performing a full audit of the sentence computation prior to an inmate's transfer to a CCC to the institution Inmate Systems Manager in Chapter 6,

- replaces Chapter 7 on Financial Management,

- accomplishes the required conversion from WordPerfect 5.1 to WordPerfect 6.1., changes the numbering of the manual, and updates all references to Program Statements.

Other editorial improvements have been made throughout the Manual.

PS 7300.09
CN 7300.09 1/12/98
Page 2

2.  SUMMARY OF CHANGES IN CHAPTER 4

   a.  The Community Corrections Regional Administrator is given the option of waiving Pre-occupancy inspections for incumbent contractors.  This option will enhance cost containment procedures by reducing CC staff travel expenses.

   b.  The term mandays has been changed to inmate-days.

   c.  Duplicate contract files maintained by the Management Center Administrator are eliminated.

   d.  New inspection procedures and monitoring schedules for U.S. Marshals Service (USMS) "Piggyback" jail contracts are established.  Suitability inspections will be conducted with the USMS prior to inmate placements.  In addition, CC staff will participate in a joint monitoring with USMS staff once every three years.  A copy of all USMS monitoring reports will be maintained in the contract file.  This change will result in a significant cost savings to the Bureau.

   e.  Requests to exercise option years are to be submitted via electronic means.

   f.  The address of contact for FOI inquiries about existing contracts has been changed.

   g.  Requests for contract action for all new or replacement contracts should be received by the contracting officer 14 months prior to beginning performance.  This will give the contractor 120 days to begin performance rather than the current 60 days.

   h.  Accounting codes have been updated.

   i.  COS may now contact the CO by BOPNet GroupWise E-mail when inquiring about the status of a particular contract.

   j.  Pre-site inspection requests can now be requested via  BOPNet GroupWise e-mail.

   k.  Past performance is added as an evaluation criteria in the solicitation and under the Evaluation Panel's general instructions.

l.  The CCRA may postpone a full monitoring with justifiable cause; however this postponement should not exceed 30 days.  Additionally the CCM may request the CCRA to waive an interim review when determined to be in the best interest of the Bureau of Prisons.

m.  Documentation of contractor training initiated by the CCM need only be maintained in the local contract file thereby eliminating the need for MCA duplication.

n.  New procedures concerning the reporting and investigation of integrity issues in Bureau contract facilities are incorporated.

o.  References to FBI Form I-12, Wanted Flash Cancellation Notice and FBI Form R-84, Final Disposition Notice have been deleted from Attachment 4-7.

3.  SUMMARY OF CHANGES IN CHAPTER 5

a.  In the Discipline section, the CCC Prohibited Acts attachment has been deleted, and the Chapter now refers staff to three related tables in the Program Statement on **Inmate Discipline and Special Housing Units**.

b.  In the Central Inmate Monitoring System section, the requirement for CCMs to monitor uncommitted separation cases in their districts has been deleted.

c.  In the section on Referrals for Institution Transfer to CCCs, CCC referral log requirements have been clarified to indicate the log can reflect the "name of the referral CCC" or the CCC location code.

d.  References to FBI Form I-12, Wanted Flash Cancellation Notice and FBI Form R-84, Final Disposition Notice have been deleted from the Release Forms and Report Distribution section.

    e.  Reference to the procedure for immigration detainees with supervision
has been deleted from the section on Release Forms and Report Distribution.

4.  SUMMARY OF CHANGES IN CHAPTER 7

    a.  Descriptions of the budget process and budget reports are
streamlined.

    b.  The sections on budget projection and accruals contain new
procedures.  Some information in these areas is now located in the
**Community Corrections Technical Reference Manual.**

    c.  Travel and purchasing procedures are updated.

    d.  Accounting and contract codes are updated.  Most of the related
technical information is now in the **Community Corrections Technical
Reference Manual.**

    e.  All seven attachments are replaced by the **Region Annual Budget Plan**
and **CCM Budget Projections** attachments.

5.  ACTION.  File this Change Notice in front of the **Community Corrections
Manual.**


                              /s/
                         Kathleen M. Hawk
                         Director



**U.S. Department of Justice**
Federal Bureau of Prisons

# Program Statement

**OPI:** CCD
**NUMBER:** 7300.09
**DATE:** 1/12/98
**SUBJECT:** Community Corrections Manual

1.  PURPOSE AND SCOPE.  To operate community-based corrections for offenders who are reintegrating into communities and require more supervision than traditional probation or parole, or who need an alternative to incarceration.  Community corrections is also responsible for managing Federal offenders confined in non-Bureau facilities.  Most Bureau community corrections programs are implemented through contracts and agreements with private service providers and with state or local governments.

2.  PROGRAM OBJECTIVES.  The expected results of this program are:

   a.  A variety of community-based correctional services and programs will be available for offenders.

   b.  Contracts and budgets for community-based services and programs will be effectively managed.

   c.  Offenders in community programs will receive appropriate supervision.

   d.  The public will be protected from undue risk.

   e.  Offenders in community programs will be provided safe living environments.

   f. Eligible inmates in community programs will have opportunities for work experiences to develop positive skills, knowledge, and work habits.

g.  Inmates will be able to participate in specialized community programs such as drug, alcohol, and mental health counseling and services.

h.  Positive relationships, family values, and mutual support and nurturing will be promoted and reinforced among inmates, their spouses and their children.

i.  Eligible inmates will have the opportunity to develop and maintain supportive and nurturing relationships with their families through participation in their religious communities.

j.  Use of intermediate punishments will contribute to proactive management of the Bureau's population.

k.  Effective partnerships with governmental and private agencies, as well as the general public, will be established and maintained.

3.  STANDARDS REFERENCED.  Applicable standards are referenced in individual directives referenced in the Manual.

4.  DIRECTIVES AFFECTED

   a.  Directive Rescinded

      PS 7300.08     Community Corrections Manual (4/1/91)

   b.  Directives Referenced

      PS 1010.02     Staff Meetings (1/31/95)
      PS 1170.05     BOP Facts (9/4/96)
      PS 1210.14     Management Control and Program Review
                     (10/6/94)
      PS 1280.10     Justice Telecommunications System (JUST),
                     National Crime Information Center (NCIC), and
                     National Law Enforcement Telecommunications
                     System (NLETS), Users Guide (4/19/96)
      PS 1351.04     Release of Information (12/5/96)
      PS 1380.05     Special Investigative Supervisors Manual
                     (8/1/95)
      PS 1400.04     Contact with other Agencies and Organizations
                     (9/9/96)

PS 1480.03     News Media Contacts(10/7/94)
PS 1490.03     Victim and Witness Notification (12/14/94)
PS 3420.08     Standards of Employee Conduct (3/7/96)
PS 3906.16     Employee Development Manual (3/21/97)
PS 4100.03     BOP Acquisitions (9/16/96)
PS 4400.03     Property Management Manual (2/27/96)
PS 5040.04     FBI Forms, Submission to the FBI (3/3/94)
PS 5070.10     Responses to Judicial Recommendations and
               U.S. Attorney Reports (6/30/97)
PS 5100.06     Security Designation and Custody
               Classification Manual (6/7/96)
PS 5130.05     Detainers and the Interstate Agreement on
               Detainers (2/10/94)
PS 5140.28     Unescorted Transfers and Voluntary Surrenders
               (12/9/96)
PS 5160.03     Designation of State Institution for Service
               of Federal Sentence (9/29/94)
PS 5180.04     Central Inmate Monitoring System (8/16/96)
PS 5270.07     Inmate Discipline and Special Housing Units
               (12/29/87)
PS 5326.03     Marriages of Inmates (10/29/93)
PS 5330.10     Drug Abuse Programs Manual, Inmate (5/25/95)
PS 5380.03     Cost of Incarceration Fee (COIF) (6/2/95)
PS 5550.05     Escape from Extended Limits of Confinement
               (3/27/96)
PS 5553.05     Escapes/Deaths Notification (9/17/97)
PS 5800.07     Inmate Systems Management Manual (12/24/91)
PS 5800.11     Central File, Privacy Folder and Parole
               Commission Mini-Files (9/8/97)
PS 5873.05     Release Gratuities, Transportation, and
               Clothing (9/14/96)
PS 5880.28     Sentence Computation Manual (CCCA of 1984)
               (2/21/92)
PS 5880.30     Sentence Computation Manual.(Old Law, Pre-
               CCCA of 1984) (7/16/93)
PS 6000.05     Health Services Manual (9/15/96)
PS 6080.01     Autopsies, Authority to Order (5/27/94)
PS 7010.05     Interagency Agreement between the U.S. Bureau
               of Prisons (BOP) and U.S. Marshals Service
               (USMS) (12/6/93)
PS 7310.03     Community Corrections Center (CCC)
               Utilization and Transfer Procedure (3/25/96)

PS 7430.01        Drug Treatment Services, Community
                  Transitional for Inmates (1/20/95)

TRM 5301.01       SENTRY Education (6/1/94)
TRM 5801.01       SENTRY Sentence Monitoring (6/1/94)
TRM 5802.01       SENTRY General Use (6/1/94)
TRM 7000.01       Community Corrections (6/3/96)
TRM 4101.02       Procurement (6/18/97)

5.  ACTION.  Community corrections staff shall conduct operations
and programs in accordance with policies and procedures in this
Manual.


                        /s/
                        Kathleen M. Hawk
                        Director

**COMMUNITY CORRECTIONS MANUAL**

**TABLE OF CONTENTS**

**CHAPTER  1.    ORGANIZATION AND MISSION**

1.1  INTRODUCTION

1.2  MISSION

1.3  ORGANIZATION

1.4  STAFF POSITIONS

1.5  PROFESSIONALISM (Code of Ethics)


**CHAPTER  2.    PUBLIC RELATIONS**

2.1  FEDERAL FAMILY

      2.1.1     Federal Courts
      2.1.2     U.S. Probation Office
      2.1.3     Bureau Institutions
      2.1.4     U.S. Marshals Service
      2.1.5     U.S. Congress
      2.1.6     Other Criminal Justice Agencies

2.2  STATE, LOCAL AND PRIVATE AGENCIES

      2.2.1     Correction Agencies
      2.2.2     Law Enforcement/Criminal Justice
      2.2.3     Consulates

2.3  RELEASE OF INFORMATION

      2.3.1     Freedom of Information/Privacy Act
      2.3.2     Public Information
      2.3.3     Contacts with the News Media

2.4  RECRUITMENT/EQUAL EMPLOYMENT OPPORTUNITY

2.5  INFORMATION ABOUT BUREAU INSTITUTIONS

2.6  MCA OVERSIGHT OF LIAISON AND PUBLIC
     RELATIONS FUNCTIONS


**CHAPTER 3  PERSONNEL AND OFFICE MANAGEMENT**

PS 7300.09
1/12/98
Table of Contents, Page 2

3.1  STRATEGIC MANAGEMENT CYCLE

     3.1.1    Strategic Plans/Goals
     3.1.2    Management Assessment
     3.1.3    Management Indicators
     3.1.4    Program Reviews
     3.1.5    Operational Reviews

3.2  STAFF TRAINING

     3.2.1    Mid-level and Support Staff
     3.2.2    Training for New CCMs and CC Specialist Trainees
     3.2.3    Training for Student Interns
     3.2.4    Annual Training and Development Plans
     3.2.5    Updating Employee Training Records

3.3  STAFF CERTIFICATION

3.4  PERFORMANCE EVALUATION

3.5  SUPERVISION

3.6  TECHNICAL ASSISTANCE

3.7  THE JUSTICE TELECOMMUNICATION SYSTEM (JUST)

     3.7.1    Operation
     3.7.2    Security

3.8  EQUIPMENT/PROPERTY

3.9  INMATE LOCATOR SERVICE

3.10 OFFICE FILES/RECORDS

3.11 MEETINGS

ATTACHMENTS

3-1  Training Objectives for Community Corrections Specialist
     Trainees
3-2  Training Checklist for Community Corrections Specialist
     Trainees
3-3  Community Corrections Specialist Trainee Profile

PS 7300.09
1/12/98
Table of Contents, Page 3

**CHAPTER 4        CONTRACTING**

SECTION 4.1   GENERAL

    4.1.1     Purpose and Organization
    4.1.2     Types of Services Provided by Contract
    4.1.3     Negotiation/Contracting Authority
    4.1.4     Types of Contractual Binding Arrangements
    4.1.5     Public Information, Ethical Standards and
              Procurement Integrity

SECTION 4.2   PRE-SOLICITATION PHASE

    4.2.1     Determination of Need for Contract Services
    4.2.2     Request for Contract Action
    4.2.3     Submission Time frame
    4.2.4     Instructions for Completion of Request for
              Contract Action
    4.2.5     Community Corrections Manager Review
    4.2.6     Management Center Administrator Review
    4.2.7     Community Corrections Regional Administrator
              Review
    4.2.8     Community Corrections Administrator Review

SECTION 4.3   SOLICITATION PREPARATION

    4.3.1     Wage Determination - Service Contract Act
    4.3.2     Commerce Business Daily
    4.3.3     Standard Schedule of Events (Milestone)
    4.3.4     Issue Solicitation

SECTION 4.4   EVALUATION PROCESS

    4.4.1     Receipt of Proposals
    4.4.2     Preliminary Site Survey
    4.4.3     Evaluation Panel - For Competitive Proposals with
              Multiple Offerors
    4.4.4     Panel Findings
    4.4.5     Notification of Offerors not in the Competitive
              Range
    4.4.6     Negotiation with Offerors in the Competitive Range
    4.4.7     Pre-Award Fiscal Audit
    4.4.8     Contracting Officer Reviews Best and Final Offers
    4.4.9     Final Review and Award Selection
    4.4.10    Contracting Officer Review
    4.4.11    Preparation and Documentation of Files
    4.4.12    Award Contract

PS 7300.09
1/12/98
Table of Contents, Page 4

        4.4.13    Proof of Zoning
        4.4.14    Preoccupancy Visit
        4.4.15    Distribution of Contracts

SECTION 4.5    POST AWARD ADMINISTRATION

        4.5.1     General
        4.5.2     Monitoring Requests for Contract Action
        4.5.3     Management Oversight
        4.5.4     Contract Files
        4.5.5     Contract Program Monitoring
        4.5.6     Monitoring Instruments and Schedules
        4.5.7     Monitoring and Evaluation of Community Corrections
                  Center Contract Performance
        4.5.8     Contractor Training and Management/Technical
                  Assistance
        4.5.9     Automated Data Processing Requirements
        4.5.10    Modification of SOW/Contract
        4.5.11    Option Year Contracts
        4.5.12    Performance Problems
        4.5.13    Adverse Action Notices
        4.5.14    Terminations
        4.5.15    Contract Closure


ATTACHMENTS

4-1       Request for Contract Action
4-2       Milestones for Contract Award
4-3       Contract Oversight Specialist Preliminary Site
          Inspection Report
4-4       Regional Safety Specialist Preliminary Site
          Inspection Report
4-5       Preoccupancy Inspection
4-6       Monitoring Report Format
4-7       Community Corrections Center Full Monitoring Instrument
4-8       Community Corrections Center Interim Monitoring
          Instrument
4-9       Contract Jail Services Monitoring Instrument
4-10      Contract Long-Term Adult and Juvenile Monitoring
          Instrument
4-11      Contract Confinement Interim Monitoring Instrument
4-12      Allegations of Contract Staff Misconduct/Integrity
          Issues in Privately Operated Bureau of Prisons Contract
          Facilities
4-13      Contractor Evaluation Form(CEF)

PS 7300.09
1/12/98
Table of Contents, Page 5

**CHAPTER 5   CASE MANAGEMENT**

5.1   DESIGNATIONS

      5.1.1      Placement of Inmates with Mental Health Issues or Histories of Suicidal Behavior
      5.1.2      Early Designation for Inmates in State Custody
      5.1.3      Voluntary Surrenders
      5.1.4      Appeals
      5.1.5      Records and Documents

5.2   REFERRALS FOR INSTITUTION TRANSFER TO CCC

      5.2.1      Special Cases
      5.2.2      Procedures

5.3   DIRECT PLACEMENT OF OFFENDERS IN CCC

      5.3.1      Probation/Supervised Release
      5.3.2      Parolees/Mandatory Releasees
      5.3.3      Direct Court Commitments
      5.3.4      Community Confinement
      5.3.5      Intermittent Confinement
      5.3.6      CCC Placement as a Release Condition

5.4   CENTRAL INMATE MONITORING SYSTEM

5.5   REPORTING SIGNIFICANT INCIDENTS, EMERGENCIES, AND DEATHS

5.6   ESCAPES

      5.6.1      Definition and Application
      5.6.2      Procedures

5.7   DISCIPLINE/IN-PROGRAM FAILURES

      5.7.1      Community Corrections Center Staff
      5.7.2      Procedures Upon Admission to Center
      5.7.3      Discipline Hearing Officer
      5.7.4      Procedures CCM to Follow After Imposition of Sanctions
      5.7.5      SENTRY Transactions
      5.7.6      Appeals
      5.7.7      Training Plans/Agenda

PS 7300.09
1/12/98
Table of Contents, Page 6

5.8    SPECIAL DISCIPLINE PROCEDURES FOR VCCLEA Violent/PLRA
       INMATES IN NON-FEDERAL FACILITIES

       5.8.1     Identifying Sentences Imposed Pursuant to VCCLEA
                 and PLRA
       5.8.2     Notification of VCCLEA and PLRA Requirements
       5.8.3     Incident Reports

5.9    TRANSFER OF INMATES

       5.9.1     Authority and Approval
       5.9.2     Forms and SENTRY Procedures

5.10   PAROLE HEARING PROCEDURES

5.11   VICTIM AND WITNESS PROTECTION ACT OF 1982

5.12   MEDICAL SERVICES

       5.12.1    Entrance Medical Appraisal
       5.12.2    Routine Health Care
       5.12.3    Sensitive Medical Data (SMD)
       5.12.4    Mothers and Infants Together (MINT) Program

5.13   GENERAL CASE MANAGEMENT IN CONTRACT FACILITIES

       5.13.1    Offender Subsistence Collection
       5.13.2    Social Security Payment to Offenders
       5.13.3    Employment
       5.13.4    Authorized Absences
       5.13.5    Religious Activities
       5.13.6    Driving
       5.13.7    Marriage
       5.13.8    Electronic Communication Equipment
       5.13.9    Utilization of Offenders in Investigations

5.14   RELEASE PROCEDURES

       5.14.1    Release Schedule
       5.14.2    Release Forms and Report Distribution
       5.14.3    Fines/Assessments (Old Law Cases)
       5.14.4    Fines/Assessments (New Law Cases)
       5.14.5    Release Expenses

5.15   COST OF INCARCERATION FEE (COIF)

5.16 SEXUAL ABUSE/ASSAULT PREVENTION AND INTERVENTION

    5.16.1    Informing Inmates
    5.16.2    Training Contract Staff
    5.16.3    Reporting Requirements

5.17 USE OF VOLUNTEERS IN COMMUNITY-BASED PROGRAMS


ATTACHMENTS

5-1  CCM Designation Log
5-1a Tracking Juvenile Designations
5-2  Sample Teletype and EMS Formats
    a.   Sample Teletype Notice to USM of Escape
    b.   EMS Form 907 - Community Corrections Escape Report
    c.   Sample Teletype or Memo to USM Requesting Inmate
        Transfer to Closer Custody
    d.   EMS Form 908 - Community Corrections Apprehension
        Report
5-3a Notification to Inmates Sentenced Under VCCLEA and/or PLRA
5-3b Notification to Contract Facility Warden or Director of
    VCCLEA and/or PLRA Mandated Reporting Requirements for
    Prohibited Acts
5-4  Authorization to Operate a Motor Vehicle
5-5  Release Forms
    a.   Certificate of Parole
    b.   Parole Form 1-33
    c.   Drug/Alcohol Program Consent Form
    d.   Mandatory Release Statement
    e.   Notice of Release and Arrival
    f.   Program Terminal Report
5-6  Committed Fine Transfers to Non-Federal Facilities
5-7  Committed Fine Direct Commitments or Designations of Non-
    Federal Facilities


**CHAPTER 6  INMATE AND INFORMATION SYSTEMS MANAGEMENT**


6.1  FILE MAINTENANCE AND DISPOSAL

    6.1.1    Direct Court Commitments
    6.1.2    Condition of Supervision Placements (Public
            Law/Old Law Cases)
    6.1.3    Community Confinement (Sentencing Reform Act)
    6.1.4    Intermittent Confinement (Sentencing Reform Act)
    6.1.5    Institution Transfers

6.2  INMATE FILE ACCOUNTABILITY AND SECURITY

6.3   SENTRY APPLICATIONS

      6.3.1     Location Code
      6.3.2     Inmate Movement
      6.3.3     Admission and Release Codes
      6.3.4     Escape Codes
      6.3.5     Home Confinement Transfer
      6.3.6     COM Category
      6.3.7     Community Transitional Drug Abuse Treatment (TDAT)
      6.3.8     SENTRY Monitoring Data

6.4   **SENTRY SENTENCE MONITORING APPLICATIONS**

      6.4.1     SENTRY Sentence Computation Procedure for Direct
                Court Commitments, Condition of Supervision Cases,
                and Supervision Violators
      6.4.2     Sentence Computation Data Review for Institution
                Transfers
      6.4.3     Sentence Computation Data for Supervision Cases
      6.4.4     Sentence Computation for Probation or Supervised
                Release Violators
      6.4.5     Good Time Actions - Disciplinary Process
      6.4.6     Sentence Satisfaction Procedures

**CHAPTER 7        FISCAL MANAGEMENT**

7.1   BUDGET DEVELOPMENT OVERVIEW

7.2   AREAS OF RESPONSIBILITY

7.3   BUDGET PLANS AND REPORTS

      7.3.1     Spring Planning Submission
      7.3.2     Annual Budget Plans
      7.3.3     Budget Projection Process
      7.3.4     Monthly Budget Reports
      7.4.5     Tracking Contract Expenditures

7.4   ACCRUALS

7.5   CONTRACTOR BILLINGS

      7.5.1     Medical Payments
      7.5.2     Release Expenses

7.6   MANAGEMENT OF THE OPERATIONS BUDGET

      7.6.1     Annual Budget Plan for CCM/MCA Offices
      7.6.2     Travel
      7.6.3     Office Expenditures

7.7   ACCOUNTING AND CONTRACTING PROCEDURES AND CODES

7.7.1     Introduction
7.7.2     Monitoring Budget Activity
7.7.3     Programs
7.7.4     Codes

7.8  CONTRACT NUMBERS AND CODING

7.8.1     Contract and Purchase Order Numbers
7.8.2     Location Code

ATTACHMENTS

7-1  Region Annual Budget Plan
7-2  CCM Budget Projections

## CHAPTER 1 - MISSION AND ORGANIZATION

### 1.1  INTRODUCTION

Community corrections has grown in complexity and scope throughout the last decade.  One aspect of this growth is evidenced by the increase in Federal offenders housed in non-Federal facilities.  In addition, innovative programs such as community-based drug treatment and sanction centers have been established or expanded.

Staff members must be skilled in a number of areas to accommodate the various demands of the community corrections field.  Contract development and administration, inmate management, public relations, personnel management, financial management and project management are all areas in which staff must be proficient.

### 1.2 MISSION STATEMENT

The mission of community corrections is to provide programs and facilities for Federal offenders serving their sentences in non-Bureau facilities, and to play an instrumental role in designating Bureau and non-Bureau facilities for placement of offenders.  Community corrections staff:

- Develop and manage contract residential resources that provide:

    (1)  pre-release assistance for inmates who are nearing their release date,

    (2)  an option to institutional confinement for certain short-term offenders and,

    (3)  a structured environment for certain probationers, parolees, and supervised releasees who need more assistance and supervision than can be provided by community supervision.

- Develop and manage contract resources that provide secure confinement for:

    (1)  all sentenced Federal juvenile offenders,

    (2)  long-term Federal inmates confined in non-Federal institutions, and

    (3)  detention of Federal offenders serving short sentences.

- Develop and maintain working relationships with U.S. District Courts, the U.S. Marshals Service (USMS), the U.S. Parole Commission, U.S. Attorneys, and state and local

government agencies for processing offenders into, and out of, the Bureau.

- Provide inmate systems and case management services to offenders in non-Bureau facilities.

- Provide technical assistance to state and local criminal justice agencies and serve as general liaison between the Bureau and the public.

1.3  **ORGANIZATION**

The Community Corrections Branch (CCB) is under the authority of the Assistant Director, Community Corrections and Detention Division (CCDD).

COMMUNITY CORRECTIONS ORGANIZATIONAL CHART



1.4  **STAFF POSITIONS**

**Community Corrections Administrator.** The Administrator develops and coordinates policy and provides general oversight for all Community corrections activities.

**Community Corrections Regional Administrator (CCRA).** Under the direction of the Regional Directors, CCRAs are responsible for all community corrections functions, services and operations within their respective regions.

**Management Center Administrator (MCA).** Under the direction of the CCRA, the MCA is responsible for a Correctional Management Center (CMC), which generally comprises two to three community corrections field offices.

**Community Corrections Manager (CCM).** CCMs operate under the direction of the MCAs and are responsible for all functions, programs and services related to community corrections in their assigned judicial districts. CCMs are also responsible for providing supervision and guidance to staff assigned to the community corrections field offices.

**Community Corrections Contract Oversight Specialist (COS).** Contract Oversight Specialists oversee contract facilities through routine contact, correspondence review, announced and unannounced on-site monitorings and technical assistance visits.

**Community Corrections Trainee (Community Corrections Specialist Trainee).** The Trainee position is a developmental one, designed to prepare the incumbent for reassignment to a Community Corrections Manager or Contract Oversight Specialist position. Ordinarily, Trainee positions are found in CCM offices that are co-located with an MCA office.

**Community Corrections Regional Safety Specialist (CCRSS).** The CCRSSs are a technical experts on all matters related to Life-Safety Code requirements and other safety issues. The CCRSSs provide training and guidance in this area to community corrections and contract staff within their respective regions.

**Community Corrections Regional Inmate Systems Management Specialist (CCRISM).** The CCRISM provides technical assistance on matters related to Inmate Systems applications as well as trains and guides community corrections and contract staff within their respective region.

**Case Manager.**  The individual assigned to this position ordinarily has responsibility for all community corrections office case management functions including but not limited to designations, disciplinary reports, referrals and requests involving participation in community programs and special activities.

**Legal Instruments Examiner (LIE).**  This position is responsible for numerous inmate management functions including computing inmate sentences, updating SENTRY, and providing expertise regarding the structure and legality of offender sentences.

**Community Corrections Specialist.** This position may be created to accommodate an individual office's unique staffing needs.

**Community Corrections Administrative Assistant.**  The individual assigned to this position organizes and maintains daily office operations by providing clerical and administrative support to either the Region, MCA, or CCM office staff.  This position requires knowledge of fiscal management procedures, contract specifications, contractor bill certification, supply maintenance and travel voucher preparation.

**Transitional Services Manager (TSM).**  The TSM establishes and administers community-based substance abuse treatment services for inmates residing in the community.

**Transitional Services Specialist (TSS).**  The TSS, under the direction of the TSM or the CCRA, monitors the progress of offenders participating in drug treatment during the period of community programming.  The TSS may also process referrals, assist with budget oversight, monitor treatment providers, and serve as liaison to the Bureau's institutional drug treatment programs.

1.5  **PROFESSIONALISM (Code of Ethics)**

Community corrections staff are highly specialized professionals. All employees must maintain the highest standards of conduct and act in accordance with written requirements and guidelines as detailed in the Program Statement on **Standards of Employee Conduct.** Furthermore, staff conduct should build public confidence in the Bureau's ability to carry out its mission.

Accordingly, staff shall avoid not only misconduct, but also the appearance of misconduct.  Community corrections staff must be particularly sensitive in their relationships with contract service providers.  A cooperative, professional relationship between community corrections staff and contractors is expected, but staff must also ensure those relationships do not develop to the point that even the appearance of improper conduct or conflict of interest can be asserted.

# CHAPTER 2 - PUBLIC RELATIONS

## 2.1 **FEDERAL FAMILY**

A major duty of CCMs is to establish and maintain rapport with
Federal agencies including the Courts, the U.S. Probation
Service, the U.S. Marshals Service (USMS), the Federal Bureau of
Investigation (FBI), U.S. Attorneys Offices, Federal
institutions, and others.  CCMs must periodically visit these
agencies to provide general information on Bureau programs and
services and keep them abreast of Bureau activities. See the
Program Statement on **Contacts with other Agencies and
Organizations**.

### 2.1.1. **Federal Courts**

It is a **major responsibility** of CCMs to regularly advise
Federal courts of services and programs available to inmates and
of relevant changes in Bureau policies and procedures.  There are
a variety of ways to accomplish this high-priority task.  CCMs
are expected to schedule visits with members of the judiciary.
The CCM can coordinate with Chief U.S. Probation Officers (USPOs)
to attend district judges's meetings and arrange periodic
informal visits with judges and magistrates.  CCMs serve as a
link between judges and Federal Wardens by inviting and escorting
judges to Community Corrections Centers (CCCs) and Federal
institutions, and encouraging judicial participation in Bureau
conferences and activities.

### 2.1.2. **U.S. Probation Office**

It is essential that CCMs and COSs develop close working
relationships with USPOs in their assigned areas.  Joint
endeavors with probation offices include visits to, and monitor-
ing of contract programs, joint participation in training at
institutions and contractor training sessions, pre-release
meetings, CCC staff meetings, Bureau and probation training
conferences, etc.

CCMs should encourage USPOs to make use of CCC programs for
probationers, parolees and mandatory releasees who are having
difficulty functioning under supervision.

Also, CCMs are to encourage USPO support in utilizing CCCs as a
sentencing option for Federal court commitments.

Good working relationships with probation officers are also important in the areas of designations, the Transitional Services program, CCC/Comprehensive Sanction Center program improvement and accountability, CCC options for potential supervision cases, and for sharing information concerning the community adjustment of CCC residents.

### 2.1.3. **Bureau Institutions**

Close relationships must be maintained among community corrections staff, Wardens and their staff.  The community corrections office often serves as a basic link among Federal Courts, U.S. Probation Offices, and Bureau institutions.

CCMs serve as a knowledgeable resource to Bureau institutions concerning community corrections resources available to offenders.  CCMs should schedule regular visits to Bureau institutions in their geographical areas of responsibility.  Not only should CCMs attend inmate pre-release meetings, but also they should also schedule meetings with appropriate staff to keep them advised of contract resources, particular program initiatives, referral procedures, etc.  CCMs shall consult with Wardens in their districts about the possibility of providing training in community corrections during regularly scheduled institution training classes.

### 2.1.4. **U.S. Marshals Service**

The CCM staff must have close working relationships with the USMS.  The Bureau uses jails jointly with the USMS and depends on the USMS to secure and monitor jail contracts.  The Bureau also depends on the USMS to assume custody of CCC failures and others under Bureau control.  USMS cooperation in the designation process is essential for efficient operations.  The CCM (or designee) and USMS must have informal meetings on an ongoing basis. See the Program Statement on **Interagency Agreement Between the U.S. Bureau of Prisons (BOP) and the U.S. Marshals Service (USMS).**

### 2.1.5. **U.S. Congress**

CCMs may occasionally be called upon to arrange tours for members of Congress or their staff.  After the tour, the Chief of Congressional Affairs in the Central Office should be notified by telephone.  The Congressional Affairs Chief needs information on

the nature of any issues or questions arising during the tour and the purpose of the tour, so an appropriate thank you letter may be sent.  CCMs should keep their MCAs informed of congressional inquiries of any type.

### 2.1.6. Other Criminal Justice Agencies

CCMs must establish working relationships with other Federal criminal justice agencies, including the U.S. Attorney's Office, FBI, etc.

### 2.2. STATE, LOCAL & PRIVATE AGENCIES

The community corrections staff must be sensitive to the needs and concerns of the local community.  They must be aware of, and communicate with, state and local corrections agencies, law enforcement, and social services agencies. Moreover, they should participate in community advisory boards and local civic groups and be sensitive to the perspective of locally elected officials. See the Program Statement on **Contact with other Agencies and Organizations**.

### 2.2.1. Corrections Agencies

Community corrections staff may provide technical assistance to correctional agencies and programs upon request.  These agencies may be potential contracting resources for housing inmates.

### 2.2.2. Law Enforcement/Criminal Justice

CCMs represent the Bureau by attending meetings of local law enforcement criminal justice agencies and community boards and by participating in professional organizations and conferences. Membership in local law enforcement coordinating committees and other organizations of a criminal justice nature should be considered an essential part of the CCM's formal relationship with the local criminal justice community.

### 2.2.3. Consulates

Community corrections staff, especially those located near international borders, may have the need to consult with representatives of other countries regarding their citizens who are Federal inmates.

2.3.  **RELEASE OF INFORMATION**

2.3.1.  **Freedom of Information/Privacy Act**

CCMs must be familiar with the Privacy Act and the Freedom of Information Act because, as the Bureau's representatives, it is essential that they be aware of the kinds of information they may release.  CCMs shall also ensure that all staff in the community corrections office are familiar with the requirement of the Freedom of Information/Privacy Act.  See the Program Statement on the **Release of Information.**

The Public Information Inmate Data SENTRY transaction displays information that may be released to the public.  Generally (except in CIMS and juvenile cases), CCMs may release the following information to anyone, on residents of CCCs and confinement facilities:

a.  Name
b.  Register Number
c.  Place of Incarceration
d.  Age
e.  Race
f.  Conviction and sentencing data:  this information includes the offense of conviction, court of conviction, date of sentencing, length of sentence, amount of good time earned, parole eligibility date, parole release (presumptive or effective) date, and the date of expiration of sentence.
g.  **Past** movement via transfers or writs:  CCMs **may not** disclose which institution has been designated for an inmate prior to the inmate's actual arrival.
h.  Information concerning a Youth Corrections Act (YCA) incarceration may be released only after the CCM confirms that the YCA conviction has not been "set aside" or expunged.

2.3.2.  **Public Information**

CCMs may respond to inquiries using the releasable information described above or by giving general information regarding Bureau policy or institutions.  Specific questions about particular Bureau institutions or inmates confined in them should be referred to the Public Information Officer (PIO) at that institution.  If uncertainties exist, or for specific questions of an unusual or sensitive nature, the CCM should refer the inquiry to the MCA.  The MCA may respond or refer the inquiry to

the Regional Office PIO.  Although CCMs and MCAs are not PIOs, it is recommended they become familiar with public information issues and policy.

### 2.3.3. **Contacts with the News Media**

a.  Requests for Information

CCMs may only release public information as described above to the news media.  If an inquiry requiring a response outside the realm of public information is made by the media concerning a specific incident with an inmate or contract facility, the CCM should consult with the Regional PIO.  When public information is released to the news media, it must be documented in writing to the MCA with copies to the CCRA, Regional Director's office, and the Central Office PIO.  CCMs and MCAs should be familiar with the provisions of the Program Statement on **News Media Contacts.**

b.  Requests for Personal Interviews

A media request to interview an inmate at a contract facility must be approved by the facility Director.  The inmate must agree to the interview and sign a consent form (BP-S233) in advance. This form is retained at the facility and a copy is provided to the CCM.  The interviewer must abide by the rules of the contract facility.  The CCM must consult with the MCA regarding any interview request.  The Program Statement on **News Media Contacts** shall be used as a guide with particular attention paid to the following:

- Inmates must not receive compensation for any interview.

- If the inmate is a juvenile, the written consent of the parent or guardian is to be obtained.

- Judicial orders forbidding such interviews due to pending court action must be honored.

- The CCM and facility Director shall consider any probability for the interview to endanger the health or safety of the interviewer or cause serious unrest or disturb the good order of the facility.

### 2.4. **RECRUITMENT/EQUAL EMPLOYMENT OPPORTUNITY (EEO)**

Pamphlets and brochures on employment with the Bureau are available from the Regional and National Recruitment offices. CCMs should have a ready supply on hand.  When individuals are interested, the CCM should forward their names, addresses, and phone numbers to the Regional EEO Administrator and Recruiter.

CCMs should contact other criminal justice agencies (such as the USPOs) to share qualified applicant lists.  Resources for minority recruitment include, but are not limited to, such agencies as the Urban League, NAACP, and placement offices at colleges and universities.

A skill of primary importance to CCMs is the ability to establish and sustain a high level of rapport with the community.  In addition to attending meetings and performing other public relations duties, CCMs should develop effective public speaking skills.

## 2.5.  **INFORMATION ABOUT BUREAU INSTITUTIONS**

Periodically, the CCMs shall provide USMS and USPOs in their service areas with copies of "BOP Facts" from SENTRY for institutions where offenders from the service area are ordinarily placed.  See the Program Statement on **BOP Facts.**  As changes occur, institutions are required to update information including directions for self-surrender.  CCMs must ensure that USPOs and the USMS are informed of any significant changes.

## 2.6.  **MCA OVERSIGHT OF LIAISON AND PUBLIC RELATIONS FUNCTIONS**

During office visits, the MCA shall routinely evaluate this area to ensure that CCMs are maintaining on-going contacts, establishing good working relationships and disseminating accurate information on significant changes within the Bureau to appropriate agencies.  This may be done through telephone or in-person contacts with various members of these agencies as well as by questions directed to the CCM.

## CHAPTER 3 - PERSONNEL AND OFFICE MANAGEMENT

### 3.1.  STRATEGIC MANAGEMENT CYCLE

Managers at all levels in the Bureau are expected to manage their programs using the "strategic management cycle."  This is defined as a holistic approach incorporated into the Bureau's system of management.  Key components of this cycle available to TSMs, CCMs, MCAs and CCRAs are as follows:

- Strategic Plans/Goals
- Management Assessment
- Management Indicators
- Program Reviews
- Operational Reviews

These components are interdependent and, together, will assist the manager to gather, monitor, analyze, and synthesize information aimed at assessing their program and adjusting operations to achieve the desired and required results.

#### 3.1.1.  Strategic Plans/Goals

Staff at all levels are encouraged to have input into the national strategic planning process.  The Strategic Planner's Desk Guidebook is available on BOPDOCs to facilitate this input.

#### 3.1.2.  Management Assessments

Management Assessments are conducted every three years to provide managers an opportunity to identify and review management indicators, vital functions, and strategic issues.  The end product is the issuance of Program Review Guidelines for community corrections.  Separate guidelines are issued for TSMs, CCMs, MCAs, CCRAs and Central Office.  These may be updated quarterly.

#### 3.1.3.  Management Indicators

Management indicators assist program managers to monitor their program's vital functions.  They can be helpful in preparing for program and operational reviews and can be incorporated into strategic planning as a means of tracking goal progress and attainment.

3.1.4.  **Program Reviews**

Program reviews are conducted to determine:

- compliance with regulations,
- the adequacy of internal controls, and
- the effectiveness of operations.

They also indicate patterns, trends, interrelationships, cause and effect of problems, and innovative methods to improve operations.  The Community Corrections Section of the Program Review Division has assumed responsibility for all official program reviews of community corrections offices.

3.1.5.  **Operational Reviews**

An operational review is a self-evaluation program staff conduct under the CEO's authority.  It allows for a close evaluation of program strengths and weaknesses, as well as for any necessary corrective action.

The Regional Director ensures the review of the CCRA office occurs.  CCRAs ensure operational reviews of MCA and CCM offices are conducted.  The CCRA shall appoint a Reviewer-in-Charge (RIC) for each operational review.  Typically, the RIC is the MCA for the CCM office and the CCRA for the MCA office, although it is not uncommon for the MCA or CCM to review their own office operations.  Staff from the region or from Central Office may assist.  Program Review Guidelines shall be used when conducting operational reviews.

As the review authority, the Regional Director shall receive all operational review reports through the CCRA.  One copy of each report shall be forwarded to the Senior Deputy Assistant Director of the Program Review Division.  These reports are filed in the Community Corrections Section of the Program Review Division and shall be reviewed periodically by community corrections branch staff.

Reference should be made to the Program Statement on **Management Control and Program Review** and its accompanying **Technical Reference Manual** for specific operational review procedures and time frames as well as for more detailed information on other components of the "strategic management cycle."

3.2.   **STAFF TRAINING**

CCRAs, MCAs, CCMs and TSMs are responsible for establishing training and educational programs which upgrade the expertise of and prepare staff for progressively more responsible positions. All new CC staff without prior community corrections experience are required to complete the Community Corrections Cross Development Course within four months of entry on duty.  Each new community corrections staff member must also complete 16 hours of community corrections orientation within their first two weeks on the job.  Within one year of their selection to the position, CCMs, CCM Trainees, and Case Managers are required to pass the Case Management Cross Development course if they have not already done so.  These training standards and others can be found in the **Employee Development Manual.**

3.2.1.   **Mid-level and Support Staff**

   As with all staff, training shall be specific to the duties and responsibilities of the staff persons position while also providing a thorough understanding of the Bureau and its relationship with various government and community agencies.

   The TSM, if a supervisor, shall ensure the training received is appropriately documented in the employee's training record.

3.2.2.   **Training for New CCMs and CC Specialist Trainees (CCST)**

   a.   MCAs are responsible for implementing intensive one year training programs for new CCMs and CCSTs.  The MCA shall maintain training records on new CCMs and CCSTs and ensure that the training received is being documented in the respective training records.

   The new CCM and CCST training program shall include a comprehensive orientation to Community corrections and any other relevant training the individual needs.  The Training Objectives for Community Corrections Specialist Trainees and the Training Checklist for Community Corrections Specialist Trainees (**Attachments 3-1 and 3-2**) may be used for new CCMs and COSs if appropriate.

   b.   MCAs shall evaluate CCSTs and new CCMs monthly for one year or until all training objectives have been met.  The MCA who administers the training program to the CCST shall prepare narrative quarterly reports addressing the training objectives in **Attachment 3-1.**  The report, along with the Training Checklist for Community Corrections Specialist Trainees, shall be placed in

the employee's file.  At the end of each fiscal quarter, the MCA shall send a copy of the report and the Checklist to the CCRA and the Community Corrections Branch, Assistant Administrator of Operations.

At the conclusion of the training period, MCAs shall evaluate the CCST's performance and forward the evaluation with recommendations, to the CCRA.  The CCRA shall determine if training objectives have been met and whether any further personnel action (promotion, further training, reassignment) should be considered.  The CCRA shall forward a copy of this final report to the Assistant Administrator of Operations.

### 3.2.3.  **Training for Student Interns**

In offices where a paid student intern is assigned, the CCM (unless otherwise delegated by the CCRA) shall develop a comprehensive training plan which involves the intern in critical office functions.  The CCM shall evaluate the intern monthly and submit quarterly reports with recommendations to the MCA for review with a copy to the CCRA and Community Corrections Branch Assistant Administrator of Operations.  A full-time staff member shall review work performed by paid or unpaid student interns.

### 3.2.4.  **Annual Training and Development Plans**

CCRAs, MCAs, CCMs, and TSMs, if acting in a supervisory capacity, shall compile a Training and Development Plan (TDP) for use throughout the fiscal year including mandatory training, department goals and/or new technology, as well as the equipment necessary, to carry out the plan throughout the fiscal year.Training opportunities outside the Bureau should be considered and can be added as the TDP is updated throughout the year.

The TDP reflects the results of individual needs assessments culminating from each supervisor's annual review of each employee's training needs.  The Regional Employee Development Administrator is available for assistance in developing needs assessments and local or departmental TDPs.  Further information regarding needs assessments and TDPs is found in the **Employee Development Manual.**

### 3.2.5.  **Updating Employee Training Records**

Supervisors shall send a Request, Authorization, Agreement and Certification of Training form (SF-182) to the Regional Training Coordinator to ensure the employee's individual training record is updated.  Completed training shall be reviewed at the time of annual performance evaluations.

### 3.3.  **STAFF CERTIFICATION**

Community corrections staff perform a number of technical tasks in inmate monitoring.  Failure to follow proper procedures could result in infringement of inmate rights.  In order to ensure staff are knowledgeable in these matters, the CCM, Case Manager, Legal Instruments Examiner, and other locally identified staff shall be certified in Central Inmate Monitoring.  Recertification must occur every three years.

All staff who use JUST terminals and/or teletype machines must be certified.  Recertification is required every two years and must be maintained.

The CCM, COS and CCM Trainee shall receive Contracting Officer Technical Representative (COTR) certification.

### 3.4.  **PERFORMANCE EVALUATION**

Supervisors are required to complete quarterly performance logs, six-month progress reviews, and annual performance evaluations on each employee under their supervision.  The Regional Personnel Office shall provide scheduling and forms.  See the **Human Resource Management Manual**.

### 3.5.  **SUPERVISION**

- CCMs are responsible for supervising all staff in their community corrections office.  MCAs supervise their Administrative Assistants and CCMs, while the CCRA supervises MCAs, TSMs, and regional staff assigned to their office.  Either the TSM or CCRA supervises staff assigned to work with the Transitional Services Program.  This determination is made at the regional level.

- During the absence of the CCRA, MCA or CCM, an acting person should be designated, in writing, with distribution of the notice to appropriate staff to ensure the chain of command is maintained and the duties and responsibilities of these positions continue to be accomplished in an orderly manner. The responsibilities inherent in an acting position also serve to facilitate employee development.

## 3.6.  **TECHNICAL ASSISTANCE**

MCAs shall provide technical assistance to community corrections offices between operational reviews, as needed, to ensure previously noted deficiencies have been corrected, or satisfactory alternatives have been developed.  In addition, administrators shall assess CCM progress in implementing any new program initiative since the last review and thoroughly review any area of special concern.

During some technical assistance visits, the MCA shall monitor contract bill verifications for four randomly selected contracts to ensure procedures comply with requirements and to verify that offender inmate-days are correct.  The method of subsistence collection and waivers granted shall also be reviewed on these contracts.  A summary of the findings from this or any type of monitoring done shall be included in the technical assistance visit report which shall be forwarded to the CCM with a copy to the CCRA.

CCRA visits to their areas of responsibility shall include, but are not limited to, Management Center and Transitional Services Program offices.  Areas reviewed during these visits shall be documented and a copy of this report shall be forwarded to the respective office for response.

CCMs and Central Office staff may also be called upon to provide technical assistance to other Community corrections offices.

## 3.7.  **THE JUSTICE TELECOMMUNICATION SYSTEM (JUST)**

### 3.7.1.  **Operation**

a.  The U.S. Department of Justice Telecommunications System Manual and the Program Statement on **Justice Telecommunication System (JUST), National Crime Information Center (NCIC), and National Law Enforcement Telecommunications System (NLETS), Users Guide** provide instructions for operation and maintenance of appropriate logs.

b.  While JUST messages are required in many cases, their

PS 7300.09
1/12/98
Chapter 3, Page 7

use should be considered under the following circumstances:

- JUST messages are to be used **only** when mail, telephone, BOPNet, SENTRY, or fax alone will not suffice.

- The number of the recipients of each JUST message shall be kept to the essential minimum.

- "Out of service" and "in service" messages to all stations shall not be used.

- "All Stations" messages are to be routed through the MCA and approved by the CCRA.

c.   Machine operation problems are referred to the Office of Information Systems, Field Services Section at (202) 307-1406.

d.   Mnemonic Codes

- Bureau listings are provided in the Program Statement cited above.

- Department of Justice agencies (U.S. Marshals Service, U.S. Attorneys, etc.) are cited in the Department Manual.

- Mnemonic codes which identify where an inmate is housed shall be deleted from administrative messages that are maintained on file or are otherwise potentially available to others for review.

e.   All Community corrections offices shall maintain a NCIC/NLETS log for the recording of QH and QR inquiries.  This log is found in the Program Statement cited above.


3.7.2.  **Security**

Equipment shall be located in a secure area.  The CCM shall ensure all administrative message users are trained and certified.

3.8.   **EQUIPMENT/PROPERTY**

CCMs, MCAs, and CCRAs are Accountable Property Officers responsible for maintaining current inventories of all equipment/property assigned to their area.  The BOP-ID Number shall be permanently marked on each item of capitalized property. See the **Property Management Manual** for further information.

3.9.   **INMATE LOCATOR SERVICE**

Selected staff may handle routine inquiries about individual inmates by accessing SENTRY and then referring the caller accordingly.  Inquiries about Witness Security Inmates shall be referred to the Inmate Locator Service.  The CCM and MCA shall ensure that all staff are trained in the handling of inquiries about inmates and are familiar with the screening site procedures found in the Central Inmate Monitoring System.

The Locator Service operates Monday through Friday, 9:00 AM to 5:00 PM Eastern Standard Time.  The FTS number is 367-3126 and the commercial number is (202) 307-3126.  Telephone requests should be limited to five individuals or less.  Callers should have identifying data, such as a register number or a birth date. Requests for information on more than five persons should be made by mail.  Address these inquiries to the:

> Inmate Locator Service
> 320 First Street NW
> Washington DC 20534

3.10.   **OFFICE FILES/RECORDS**

Instructions for maintaining specific records and files pertaining to such areas as designations, Community Corrections Center referrals, contract administration, etc., are contained elsewhere in relevant sections of this Manual.  In addition, CCMs and TSMs are responsible for establishing and maintaining complete files on all other matters related to the office operation, i.e., property inventory, performance logs, correspondence, etc.  These files shall be organized by subject and maintained for at least two years or until the next scheduled Program Review has been completed.

Bureau policies and related forms are available to staff through BOPDOCS.  CCMs shall maintain other directives, manuals and reference materials such as regional instructions, legal reference books, copies of manuals, and instructions from other agencies necessary for the performance of their duties.  All staff should be trained in the use of BOPDOCS.

3.11.  **MEETINGS**

Supervisors are required to hold regularly scheduled meetings with subordinates, at least monthly, when the department consists of two or more subordinate staff.  See the Program Statement on **Staff Meetings**.

PS 7300.09
1/12/98
Attachment 3-1, Page 1

**TRAINING OBJECTIVES FOR COMMUNITY CORRECTIONS SPECIALIST TRAINEES**

The following training program shall be implemented for training Community Corrections Specialist Trainees (CCST) newly assigned to CC offices.  It is recommended for the training of new Community Corrections Managers (CCMs) and Contract Oversight Specialists (COSs) as well.

Although the Community Corrections Regional Administrator (CCRA) and Management Center Administrator (MCA) are ultimately responsible for ensuring this training program is appropriately administered, the program participant's immediate supervisor is the trainer.  Trainers are responsible for ensuring proper training and guidance are afforded the new CCM, COS, or CCST as well as for determining their proficiency in each training area.

The CCRA shall determine, with the appropriate input of the supervising MCA and CCM, when a CCST is eligible for promotion to a more responsible position.  Generally, the training program should be completed within 12 months; however, where appropriate, supervisory staff may accelerate or extend the training program after consultation with the CCRA and MCA.  The emphasis should be on completing the entire program in the allotted time rather than on completing tasks in the order listed.

**During the initial three months,** the new CCM/COS/CCST shall become familiar and/or proficient in the following areas:

1.  As soon as practical, the new CCM/COS/CCST shall be introduced to the principle individuals with whom he/she will be involved, including, but not limited to, the following:

    a.  Members of the Federal Court (ie., judges and probation staff).

    b.  Members of the U.S. Marshals Service, U.S. Attorneys Office, and other members of the Federal family within the service area of the assigned office, as deemed appropriate.

    c.  All heads of agencies with whom the office works on a contractual basis.  This includes CCC Directors, Wardens and Superintendents of State institutions, Sheriffs, Chiefs of Police, and other members of local law enforcement agencies as necessary.

    d.   Introduction to all Bureau staff with whom the assigned office is directly involved. This includes all executive staff within all institutions in the office service areas. A visit to the Regional Office should be arranged, if possible, in order to meet the Regional Director and any other staff with whom the new CCM/COS/CCST will be working.

    e.   Meeting with the Transitional Services Program staff and becoming familiar with their duties.

2.   The new CCM/COS/CCST shall immediately begin training in SENTRY and office management systems, and demonstrate proficiency in the following areas after the initial three month period:

- The ability to maintain the Inmate Information System within SENTRY.

- The ability to program inmate information into the SENTRY data base, and perform the necessary functions within the designation process, up to and including transmitting data to the Regional Designator for a final designation decision.

- The ability to release an inmate from SENTRY, following release from a contract facility.

- Proficiency in the use of basic SENTRY ISM and case management functions.

- Proficiency in the proper and efficient verification of billings from contractors.

- Familiarity with office operations including filing techniques, ordering of supplies, methods of preparing purchase requests, paying operation costs within the office, and maintenance of office equipment.

- The ability to create and maintain inmate files and dispose of them upon final release of the inmate.

- The methods of maintaining and disposing of contract files.

- An understanding of the Transitional Services Program (TSP), including familiarity with the TSP referral process, contract oversight, and case management functions.

**During the second three-month period**, the new CCM/COS/CCST shall be given a gradual increase in his/her level of responsibility. At the end of this period, the new CCM/COS/CCST shall demonstrate familiarity within the following areas:

- Proficiency in the Security Designations Systems.  Under the direction of the CCM, the new CCM/COS/CCST shall begin to submit designation requests to the Regional Designator.

- Proficiency and understanding of the contracting process. This shall include training in the Contract Location Profile System, Requests for Contract Action, and basic under-standing of the various types of contracts utilized in the service area, including those for the Transitional Services Program.

- Understand the role of the Contracting Officer and the role of the CC Branch Contract Specialist.

- The Central Inmate Monitoring System (CIMS) and the National Crime Information Center/National Law Enforcement Telecommunication System (NCIC/NLETS) shall be understood to the point that during this period, if required, testing shall be scheduled for certification.  Following certification, the new CCM/COS/CCST shall be allowed to submit CIMS data.

- The disciplinary process in contract facilities shall be presented and understood.

- The new CCM/COS/CCST shall become proficient in the application of Federal Travel Regulations and the submission of Travel Vouchers.

- Understand the proper procedures in the preparation of Time and Attendance Records.

- Develop familiarization with the Employee Performance Evaluation system.

- Begin to understand the yearly budget cycle and related responsibilities.  At the discretion of the trainer, the trainee may begin Cost Center Manager training.

**During the third three-month period**, the new CCM/COS/CCST shall begin to fully assume the responsibilities of the assigned position.  The new CCM/COS/CCST shall:

- Become fully involved in the contracting process, beginning with the original submission of the Request for Contract Action through final award of the contract.  The process for

obtaining COTR and Procurement Integrity Certifications shall begin.

- At a minimum, complete the monitoring of at least two CCCs and, if applicable, a state penitentiary and a local county jail.  The experienced CCM or MCA shall accompany the trainee on these monitorings.

- Be given signatory authority on all types of correspondence, with review by the experienced CCM or MCA before final mailing.

- Learn how to evaluate contract resources available in the service area and be able to determine if additional or fewer resources are needed.

- Be fully trained in case management procedures, as they pertain to Community corrections operations.

- Accompany the experienced CCM to institution pre-release meetings.

- Become actively involved in a contractor training session.

- Conduct solo visits to appropriate agencies at the experienced CCM's or MCA's direction in order to promote appropriate public relations.

- Receive training in financial management and budget projection.

**The fourth and final three-month period,** the training shall encompass and evaluate all of the training during the prior nine months.

During all phases of training, the supervisor shall maintain constant contact with the CCRA through the MCA regarding the progress of the new CCM/COS/CCST.

At the completion of each three-month period, the trainer shall submit a narrative evaluation of the CCST's progress with the Training Checklist. The MCA shall review and initial these evaluations and forward copies to the CCRA and Community Corrections Assistant Administrator of Operations.  These reports shall be reviewed and signed by the CCST.  Copies of all pertinent documents related to an individual's participation in this training program shall be kept on file by the supervisor for a minimum of two years after program completion.

All aspects of the training plan must be completed before a CCST may be considered for a more responsible position.  Time frames are presented as a guide, and deviance from them is permitted with justification.

PS 7300.09
1/12/98
Attachment 3-2, Page 1

**TRAINING CHECKLIST FOR COMMUNITY CORRECTIONS SPECIALIST TRAINEES**

This checklist is a guide to the training process.  It should be initialed only when it is felt the new CCM/COS/CCST is proficient in that specific area.


Name of Specialist Trainee       Name of Trainer


Location                          Date Training Began

**TRAINING TOPIC**                                **TRAINER   TRAINEE   DATE**

**DESIGNATION PROCEDURES**

Routine procedures...Steps to be taken before keying infor-mation into SENTRY.

Non-routine procedures...Des-ignations to short-term jails and CCCs.

Paperwork flow...Do not keep designation packet...Do not mail certified.

Designation Log...Importance of log...What needs to be included ..What is not necessary.

Time limitations...From USM desig-nation requests to submission to designator.

**CCC REFERRALS**

Source...Where referrals come from.

Referral form...Community-based Program Agreement form.


Log...Importance of referral log... What should be included.

PS 7300.09
1/12/98
Attachment 3-2, Page 2

**TRAINING TOPIC**                                **TRAINER      TRAINEE    DATE**

Procedures...Step-by-step explana-
tion...Receiving referral...Acceptance
date...Notifying institution...
Transfer documentation.

Special programs...Eligibility...
Purpose...Drug Transitional Services,
CSCs, ICCs, MINT, Home Confinement.

Special cases...3621(e) and 4046(c).

**CONTRACTING PROCEDURES**

Determination of need...CCC...Short-term
jail...Short and long-term juvenile
boarding...Long-term adult boarding...
Special programs.

Identification of source... Existing
contracts.

Contracting steps...Pre-solicitation
process...Time frames...Contract
solicitation/phase award.

**CONTRACT MONITORING**

Time frames...Major/Moderate/Minor use..
Instrument to use...Cover letter.

Contract profile report...Preparation
...How to utilize...Forms...Routing.
CCC monitoring vs. Jail inspections
vs. Juvenile Short and long-term
boarding vs. Long-term adult boarding.

PS 7300.09
1/12/98
Attachment 3-2, Page 3

NCIC/NLETS Requirements...Use...
Reporting...Fingerprinting...
Integrity issues.

**SENTENCE COMPUTATION**

ISM modules...Routine commitments...
Special cases (juvenile).

Supervision cases...Keying accurate
data...Monitoring through SENTRY.

Satisfaction of computation on
SENTRY.

**TRAINING TOPIC**                    **TRAINER     TRAINEE   DATE**

Certification of computation after
release of inmate.

**OFFICE MANAGEMENT**

**Office Budget**

Accruals...Expenditures...
Projections...Managing the "R" budget..
Travel...Office supplies.

**JUST System**

Operation...Security.

**Reports**

Accruals...Actuals...Quarterly
...Inmate-days...Escapes...Incident
...Integrity...Strategic Planning
...Operational Reviews.

**CONTRACT FILES**

Familiarization...What should and
should not be in the contract file.

PS 7300.09
1/12/98
Attachment 3-2, Page 4

**SENTRY FUNCTIONS**

Load data function...Release functions.

Regularly used transactions.

Use of SENTRY to aid in bill verification.

EMS System.

**PUBLIC RELATIONS**

**Federal Family**

U.S. Courts/Pre-trial Services

U.S. Probation

U.S. Attorney

Immigration & Naturalization Service

| TRAINING TOPIC | TRAINER | TRAINEE | DATE |
|---|---|---|---|
| U.S. Marshals | | | |
| Bureau Institutions | | | |

**State and Local Agencies**

Corrections

Law Enforcement/Criminal Justice

Contractors

**Contacts with the News Media**

FOIA/Privacy Act

_____

Date Training Objectives Accomplished:  1st Quarter          ,
2nd Quarter          , 3rd Quarter          , 4th Quarter          .

Anticipated Completion Date for All Training Objectives:          .

Date CC Cross Development Series Completed:          .

PS 7300.09
1/12/98
Attachment 3-2, Page 5

Date CIM Certification Completed:                    .

Date Cost Center Manager Training Completed (optional):            .

Date Basic Sentence Computation-Computer Assisted Module
Completed:           .

Date Case Management Cross Development Course Completed:            .

Date COTR Certification Received:              .

Trainer's Narrative Report Attached (check):
1st Quarter     , 2nd Quarter     , 3rd Quarter     , 4th Quarter
Initials of MCA Indicating Report Reviewed:  1st Quarter     , 2nd
Quarter     , 3rd Quarter     , 4th Quarter     .

Dates Report and Checklist mailed to CCRA and Central Office
Community Corrections Branch:          ,        ,        ,       .

MCA's Final Evaluation and Recommendation for Personnel Action:



        Signature:                          Date:

PS 7300.09
1/12/98
Attachment 3-2, Page 6

CCRA's Decision Regarding Personnel Action:

Signature:                           Date:

PS 7300.09
1/12/98
Attachment 3-3, Page 1

**COMMUNITY CORRECTIONS SPECIALIST TRAINEE PROFILE**


Name of Trainee                    Name of Trainer


Location                           Date Training Began

Completion of this form will assist staff in assigning Community
Corrections Specialist Trainees (CCSTs) to a desired office
location (an assignment of choice is not guaranteed as the needs
of the agency supersede the desires of the trainee).  This
profile is to be attached to the CCST Checklist for the 3rd
Quarter prior to routing and shall be made available to all CCRAs
as positions become vacant.  It may be updated at any time.
Please identify as follows:

        Desirable - 1, Neutral - 2, Undesirable - 3.

| NORTHEAST REGION LOCATIONS | MID-ATLANTIC REGION LOCATIONS |
|---|---|
| Boston, MA | Annapolis Junction, MD |
| New York, NY | Cincinnati, OH |
| Philadelphia, PA | Detroit, MI |
| Pittsburgh, PA | Raleigh, NC |
|  | Nashville, TN |

| SOUTHEAST REGION LOCATIONS | NORTH CENTRAL REGION LOCATIONS |
|---|---|
| Atlanta, GA | Kansas City, KS |
| Miami, FL | St. Louis, MO |
| Orlando, FL | Denver, CO |
| Montgomery, AL | Minneapolis, MN |
|  | Chicago, IL |

| SOUTH CENTRAL REGION LOCATIONS | WESTERN REGION LOCATIONS |
|---|---|
| Dallas, TX | Long Beach, CA |
| El Paso, TX | Sacramento, CA |
| Houston, TX | San Francisco, CA |
| San Antonio, TX | Seattle, WA |
| New Orleans, LA | Phoenix, AZ |
|  | Salt Lake City, UT |


SIGNATURE                          DATE

## CHAPTER 4 - CONTRACTING

4.1  **GENERAL**

### 4.1.1.  PURPOSE AND ORGANIZATION

The organization of this Chapter corresponds to the major phases and progression of the community corrections contracting process.  It brings into focus the separate and mutual responsibilities and the relationships in the contracting process of the Contract Oversight Specialist (COS), Community Corrections Manager (CCM), Community Corrections Regional Safety Specialist (RSS), Correctional Management Center Administrator (MCA), Community Corrections Regional Administrator (CCRA), Regional Comptroller (RC), Contracting Officer (CO) and the Community Corrections Administrator (CCA) in the Central Office.

This Chapter also depicts the order in which the different phases of the contracting process are to be accomplished and who is responsible for completing each phase.  These procedures apply to all types of agreements, including those with private sector firms and governmental agencies.

Community corrections is responsible for program areas in the contract process.  Under the CCM's supervision, the COS is ordinarily the first staff involved in the process.  The contributions of the COS will directly affect the timely accomplishment of necessary planning, placement, and administration of a contract under which Federally appropriated funds are obligated and expended.  The COS also has primary responsibility for gathering, interpreting, and transmitting information used in technical direction, inspection, and evaluation contractor performance.

The CO is responsible for the procurement areas of contracting as the government's authorized agent in dealing with contractors.  Only the CO has the authority to negotiate, award, modify, administer and terminate contracts.

The Contracting Officer's Technical Representative (COTR), ordinarily the CCM, and the CO are jointly responsible for ensuring services are performed in accordance with the terms of the contract.  The CCM's decisions are ordinarily based upon the information generated and provided by the COS in the execution of oversight duties and responsibilities.

The MCA, CCRA, and Assistant Administrator for Contracting (AAC) are the management staff responsible for reviewing and approving the COTR's request for all proposed contract actions.

In addition, the management staff are responsible for overall policy and contract budget development. The CCA or designee is the Source Selection Official (SSO) for all community based and juvenile contracts.  The Community Corrections and Detention Division Detention Branch will appoint an SSO for all secure adult and juvenile contracts.

### 4.1.2.  **TYPES OF SERVICES PROVIDED BY CONTRACT**

The Bureau contracts with commercial sources and enters into Intergovernment Agreements (IGA) with government sources for the following correctional and community corrections services:

#### 4.1.2.1.  Community Corrections Centers

Community Corrections Centers (CCCs) provide residential correctional programs near the home communities of inmates. Generally, CCCs provide programs to:

a.  inmates nearing release to facilitate the transition from confinement to the community;

b.  probationers, parolees, mandatory releases, or supervised releases (U.S. Probation Officer [USPO] referrals) who need a more structured environment than can be provided under regular supervision;

c.  community confinement cases as described in the Sentencing Guidelines; and

d.  direct court commitments serving short sentences.

Work release facilities are included in this category, whether the inmate is housed in a CCC or a jail setting.

#### 4.1.2.2.  Short-Term Jail Facilities

Occasionally, it is not in the best interest of the Bureau, the Court, or the inmate, to designate a Bureau facility as the place of confinement.  The Bureau uses jails for:  confinement of inmates designated to serve short sentences; CCC violators; or intermittent confinement cases, as described in the Sentencing Guidelines.  Normally, a local jail will not be designated for inmates with 45 days or more remaining to be served.  The majority of jails the Bureau uses are under contract with the U.S. Marshals Service (USMS), and the Bureau is an authorized user.  There are some jail contracts, however, that are exclusively contracted for by the Bureau.

PS 7300.09
1/12/98
Chapter 4, Page 3

### 4.1.2.3.  Long-Term Adult Boarding Facilities

Long-term adult boarding facilities are ordinarily state or county correctional facilities that provide a wide range of programs and security.  These facilities are primarily for inmates serving longer sentences than are served in a jail setting.

### 4.1.2.4.  Juvenile Facilities

The term "juvenile" is defined in Bureau policy and includes those under age 18 and those between the ages of 18 and 21 who are sentenced under the Federal Juvenile Justice and Delinquency Prevention Act.  Juveniles are ordinarily boarded in non-Federal facilities, both governmental and private.  Specific circumstances, such as a Court Order requiring CCC placement in an adult facility, must exist before a juvenile can be authorized for placement in a Bureau CCC.

The most common categories of juvenile facilities are:

a.    Juvenile Boarding Institution

This is a secure, institution-based facility for more serious juvenile inmates serving intermediate or long-term sentences, and may include training schools, reformatories, youth centers, etc.

b.    Juvenile Community-Based Facility

This is a minimum security community-based facility generally with full services, and regular access to the community.  Programs such as education may be conducted solely in the community.

### 4.1.2.5.  Special Programs

The Bureau can contract or enter into agreements for other specialized facilities and services, such as Comprehensive Sanction Centers (CSCs), Drug Transitional Services, and Home Confinement.  Other examples are contracts or agreements designed to meet specific mental or physical health concerns for inmates such as pregnancy, mental illness, or a proclivity to commit sex offenses.  Additionally, contracts for programs concerned with study and observation cases and drug treatment programs can be established.  Provisions to meet special programming requirements must be contained in the Bureau's solicitation for services/Statement of Work (SOW).

4.1.3. **NEGOTIATION/CONTRACTING AUTHORITY**

The Bureau has authority to award option-year contracts for CCC services.  The most common award is for five years (two-year base with three one-year option periods), for confinement of prisoners (18 U.S.C. 4002).  The CO must adhere to the Federal Acquisition Regulations (FAR), the Justice Acquisition Regulations (JAR), the BOP Acquisition Policy (BPAP), and the Competition in Contracting Act (CICA).

4.1.4. **TYPES OF CONTRACTUAL BINDING ARRANGEMENTS**

The CO shall determine the type of arrangement instrument based upon the requirements identified in the Request for Contract Action (RCA).  Each contract file shall be fully documented to explain why the chosen arrangement was selected.  There are basically four types of arrangements the Bureau uses:

4.1.4.1.  Contract (Firm-Fixed Unit Price Requirements, Indefinite Quantity)

The word "contract," in a broad sense, means a mutually binding legal relationship obligating the seller to furnish the services or the supplies and the buyer to pay for them. Therefore, the word contract can mean a purchase order (PO), or a contract.

This provides for a fixed-price per inmate, per day, during the life of the contract.  This contract type places a reasonable majority of risk and  responsibility for all costs and resulting profit and loss on the contractor.  It provides maximum incentive for the contractor to control costs, to perform effectively, and to impose minimum administrative burden upon the contract parties.  Ordinarily, the Bureau contracts for a two-year base period, to include three additional one-year options.  The decision to exercise an option is the Bureau's unilateral right.

4.1.4.2.  Purchase Order

A PO is a simplified small purchase procedure which may be appropriate in a variety of situations.  POs cannot exceed one year, nor may they extend beyond one fiscal year into the next. The two most common uses of a PO for Community corrections contracts are:

a.   Procuring services upon specified definitive terms and conditions, under which the aggregated amount does not exceed $100,000.  This is to be used in a one-time situation where one or more inmates are placed in a facility, but the Bureau does not anticipate using the facility again (single use).

b.   Purchase of recurring requirements, when requirements are not known in advance.  The amount shall not exceed $100,000.  The FAR prohibits the use of small purchase procedures in the acquisition of supplies and services initially estimated to exceed the small purchase limitation ($100,000).  Part 13.103 of the FAR indicates, "Requirements aggregating more than the small purchase limitation shall not be broken down into several purchases that are less than the limit merely to permit the use of small purchase procedures."

4.1.4.3.  Intergovernmental Agreement

An IGA is a bilateral agreement for services to be provided by a state or local government, at a reasonable price.  Ordinarily, it has an indefinite expiration date.  It does not require all the steps necessary in contracting with non-governmental entities.

The Bureau may be an authorized user of IGAs established by other Federal agencies, such as the USMS, U.S. Probation Service (USPS), and the Immigration and Naturalization Service (INS), when authorized by the agency contracting for the service.  This is commonly known as "piggybacking."

4.1.4.4.  Indefinite Quantity (Guaranteed Beds)

This provides a guaranteed minimum number of inmate-days within the contract period.  The Bureau contracts for a one-year base period to include four additional one-year options.  The decision to exercise an option year is the Bureau's unilateral right.

4.1.5.  **PUBLIC INFORMATION, ETHICAL STANDARDS, AND PROCUREMENT INTEGRITY**

The amount of information that may be disclosed about a contract depends on whether the information pertains to a contract which has been awarded or is in the pre-award stage.

4.1.5.1.   Information Concerning Proposed Contracts

Bureau personnel shall handle information concerning the Bureau's need for services to be performed under contract as sensitive information.  Extreme care shall be exercised to ensure no one receives information that could give any prospective offeror an advantage over another.  Bureau personnel shall avoid situations that give even the appearance someone may be receiving favorable treatment or obtaining special information concerning contract actions.

Sensitivity to these issues shall be emphasized in all stages of the contracting process.  Community corrections staff shall constantly safeguard against activities, social or otherwise, that might jeopardize their ability to perform their functions objectively, or which could be perceived as impairing their objectivity.  For example, no employee shall accept any gift, benefit or service, tangible or intangible, from any contractor, offeror, or related party (see 28 CFR 45 et Seq.).

Section 27 of the Office of Federal Procurement Policy Act (41 U.S.C. 423) provides, in part:

"During the conduct of any Federal agency procurement of property or services, no procurement official of such agency shall knowingly ... disclose any proprietary or source selection information regarding such procurement directly or indirectly to any person other than a person authorized by the head of such agency or the Contracting Officer to receive such information."

The CO must be informed promptly of all communications concerning solicitations Request for Proposals (RFPs) from prospective offerors or any other unauthorized individuals.  Community corrections staff shall refer all inquiries to the CO who will determine, with the assistance of Legal Counsel, the appropriate response.

The primary concern in releasing information is to protect the competitive environment, the offerors confidential business information, and ultimately, the contract award itself.

4.1.5.2.   Information Concerning Current Contracts

Once a contract has been awarded, a large portion of the file becomes releasable information (except for the items exempted by the Freedom of Information Act [FOIA] and Trade Secrets Act) through established FOIA request procedures.

Generally, trade secrets and financial information are exempt from release.  Individuals who request information about existing contracts shall be advised to submit their request in writing to:

Federal Bureau of Prisons
FOI/PA Office
320 First Street NW
HOLC Building, Room 738
Washington DC 20534

## 4.2: **PRE-SOLICITATION PHASE**

### 4.2.1. **DETERMINATION OF NEED FOR CONTRACT SERVICES**

Community corrections staff must be alert to the ongoing need for contract correctional services.  An important responsibility of the CCM and COS is to identify potential contract resources. The COS determines the need for new services not available through existing contracts; contracts for services in new geographical areas; and replaces, diminishes or modifies services for existing contracts.

Expiration of contracts, information received from Federal institution staff and USPOs, studies of population trends, and other data may dictate the need for additional contract resources within a given geographical area.  These resources may be needed for pre-release corrections, special services, or provide the court with a sentencing option.

Initial sources to consult are the national professional association directories, Division of Human Services Directory, USPOs, state and county correctional agencies, existing contract facilities and other interested offerors.

### 4.2.2. **REQUEST FOR CONTRACT ACTION (RCA)**

An RCA is a document that officially initiates a particular procurement action; it is sometimes called a Requisition or Purchase Request.  RCAs provide the basis for determining how procurements will be conducted and how contracts will be awarded. They contain  descriptions of the requirements, required authorizations, and necessary administrative details that enable the CO to prepare and issue solicitations and develop contract documents.  The SOW, an essential element of the procurement request, contains information which describes tasks to be accomplished or delivered.

The COS is responsible for identifying contract needs and submitting requests to the CCM for review and approval.  The CCM will ensure all RCAs exceeding $100,000 for competitively-let procurements have the required Advance Procurement Plan (APP) form(s) completed and attached in accordance with BOP/DOJ policy and procedures.  All RCAs are reviewed and approved by the MCA, CCRA, and CCA staff prior to being forwarded to the CO.  The Request for Contract Action (Attachment 4-1) form shall be completed for:

- all new and replacement Bureau contracts;
- IGAs the Bureau negotiated; and
- any modifications to Bureau contracts, excluding for exercising option years.

**Joint use agreements**.  The Bureau often uses arrangements established by other Federal agencies, such as the USMS, INS, USPS, etc.  These arrangements will ordinarily be IGAs.  The USMS headquarters office will send the appropriate CCM office a copy of each available USMS jail contract in which Bureau use is included.  When the USMS contracts are unavailable, or the contracts concern other agencies, the COS shall obtain a copy of the contract through the local office of the appropriate agency, and type on the face sheet of the agreement, using space number 7 "Appropriation Data," the following:  "BOP authorized user," the accounting classification code and estimated use.  If the COS knows when services will start, that information shall be included.

The COS shall make copies of the agreement and send them to the MCA and the CCRA.  If there are modifications to the agreements, such as a new inmate day rate, a copy of the amended agreement shall be obtained by the COS and forwarded through the CCM and MCA, to the pay station.

4.2.3.  **SUBMISSION TIME FRAME**

4.2.3.1.  Multi-Year/Option Year Bureau Contracts

For a new or replacement contract, the CO should receive the RCA 14 months prior to the performance date.

4.2.3.2.  Purchase Orders

For a new or replacement Bureau acquisition for services, whose aggregate use will not exceed $100,000, the CO should receive the RCA at least four months prior to the performance

date.  The preliminary site inspection report, which will follow
the same format as a CCC preliminary site report, and the SOW
must accompany the RCA.

### 4.2.3.3.  Bureau IGAs

The CO should receive RCAs for a new or replacement
agreement four months prior to the performance date.

### 4.2.3.4.  Exercise Option Year

A BOPNet GroupWise E-mail message requesting an option year
be exercised should be received at the Community Corrections
Branch four months prior to the performance date.  The CCRA, MCA,
CCB Contract Specialist, Technical Assistant, and Supervisory
Contract Specialist shall be forwarded a copy of the request.
The CCB will be responsible for forwarding the request to
Community Corrections Contracting.

### 4.2.3.5.  Modifications

The CO should receive all requests for a significant
modification of any Bureau arrangement as soon as community
corrections field staff become aware of the need to modify a
contract.

### 4.2.3.6.  Other

If a situation arises which requires immediate procurement
action, such as an unexpected court commitment, community
corrections staff, ordinarily the COS, shall immediately
telephone the CO to obtain instructions regarding the appropriate
procedures to be followed.  The COS shall follow up the
telephonic notification with a GroupWise E-mail to the CO, with
copies to the MCA, CCRA, and CCA.  An RCA shall be completed and
processed through regular channels.

### 4.2.4.  **INSTRUCTIONS FOR COMPLETION OF REQUEST FOR CONTRACT ACTION**

The following instructions should be followed in completing the
RCA:

### 4.2.4.1.  Type of Action

Check either a, b, or c.  Requests for new or replacement
contracts require:

- a description of the type of services,
- the geographic location wherein which the facility should be located, and
- the SOW under which the contractor will perform.

If one of the standard SOWs (CCC, Juvenile, CSC) is to be used, include the title of the SOW and the date of the current issue. When it is determined that portions of a standard SOW should be modified to adequately specify a particular requirement, these changes must be incorporated into the SOW and submitted with the RCA. A typed summary of the changes to the SOW must be submitted as an attachment to the RCA.

The COS shall develop a special and concise SOW when it is inappropriate to modify a standard SOW.

The contractor's name, contract number, and SENTRY location code must be provided for all requests to modify an existing contract. Requests to exercise an option year are considered contract modifications.

4.2.4.2.  Justification and Explanation

The CO must have as much information as possible regarding the nature of the requirement, this section must always include comments addressing the following issues.

For a **New or Replacement Contract** specify:

- The expiration date, including any extensions of the current contract, shall be included for a replacement contract.

- If multiple awards are desired, they should be outlined in this section. Multiple awards are desired when there exists geographical restrictions and different types of services are required using the same solicitation. The justification for multiple awards must be clearly defined and appropriately justified. For example, in a large metropolitan area, where estimates exceed 50 inmates for an average daily population, more than one contract may be preferred.

- If the request is not being submitted in a timely manner (specified months prior to performance date), an explanation must be included. Additional pages may be attached if necessary. Justifiable reasons might be for unanticipated services.

- If more than one basic type of service is to be provided, they should be outlined. The most common example is when work release and short-term jail services are provided in a single contract, ordinarily from the same location.

- The specific nature of any non-residential service (such as psychological services, drug counseling, community supervision services, release expenses such as transportation, gratuity, and clothing, etc.), should be discussed.

- If services are to be provided to one or both sexes or to a special group of offenders (sex offenders, handicapped, alcoholics, etc.), these should be addressed.

- Any special circumstances that might require special consideration or action by the CO (i.e., anticipated delays in zoning approval or issuance of permits), should be included in this section.

For **Contract Modification**, a detailed explanation and justification of the requested change(s) must be included. Examples of contract modifications include, but are not limited to:

- a change in, or addition of, a place of performance,
- change in billing address, or
- the implementation of a program such as home confinement with electronic monitoring.

Any changes must be within the general scope of the contract and in accordance with the FAR.

4.2.4.3. Period Services Will be Required

When working with intermittent requirements such as a PO, include the specific dates services are to begin and end. When working with a multi-year contract, include the date services should begin and estimate when services will end.

Ordinarily, the expiration date of services provided under an IGA should be indefinite. It must specifically state the terms upon which the parties may terminate the agreement (i.e., upon 90 days written notice).

4.2.4.4. Fiscal Data

a. Accounting Code

Identify the fiscal year (FP = FY 97 is "7," FY 98 is "8," and so on), Decision Unit ("T" or "D"), Cost Center (use #2 as the first digit for regional office), PMS, Project Code, and the Sub-Object Code. (See Chapter 7 for explanation of these codes.) When there are two types of services within a facility or contract (e.g., a jail with a work release unit and a detention unit), determine the **predominant** use and use one accounting code.

b.   Estimated Inmate-Days and Expenditures

Inmate-days and estimated costs are essential factors in the development of a contract.

Estimates must be based upon an analysis of information which includes:  SENTRY release data; input from the U.S. Probation and U.S. Attorney's office; past history; population trends over the last two to three years; and budgetary allowances.  Central Office research staff provide the Community Corrections Branch with data to assist in the analysis of estimating inmate-days.

Other issues that may affect inmate-days estimates and over-all expenditures are:  policy changes affecting placements; over crowding; a considerable drop in population in Bureau or state facilities; the need for two or more contracts in the same service area, operating under the same SOW; and new laws.  The sources of information and the analysis of the data shall be documented and a copy attached to the RCA.  At a minimum, this shall consist of written or telephonic documentation of Probation's needs and inmate-day use figures for the previous 24 months, if replacing an existing contract.

Yearly cost estimates should be based upon operating costs for the last year, plus anticipated cost increases, multiplied by the estimated number of inmate-days.  Additional requirements imposed upon a contractor by a modified or new SOW must also be considered when estimating the inmate-day rate.  The estimated per capita or inmate-day rate is the government's initial estimate in determining the fair and reasonable cost for the services being requested.

Accurate cost estimates are also necessary to assist the CO in determining the appropriate contracting procedures to be followed and can result in significant time savings.  When possible, attach the inmate-day rate of other contractors in the same geographic area and the number of beds these contractors provide to the RCA.

For the option-year requirements contracts, the base period is ordinarily for a 24-month period with three one-year option periods.  For Indefinite Quantity Contracts, the inmate-day and per capita costs for males and females must be separately identified when the requirement is for both sexes.

For POs, the aggregate cost estimate shall not exceed $100,000.  For IGAs, inmate-day and cost figures should reflect estimates for a 12-month period, rather than 24 months.  Inmate-days and cost figures provided on RCAs to exercise option years must reflect the identical figures contained in the initial contract award.

When the request is to change work requirements and a change in the per capita cost is not anticipated, indicate this fact by stating "no additional cost anticipated" under the Cost Estimate. If added costs are expected, the nature and extent of these costs must be justified; this action may require a resolicitation for a new contract and the loss of subsequent option years.

4.2.4.5.  Suggested Sources

CCM office staff shall list local prospective contractors with addresses, telephone numbers, and contact persons.  Efforts to identify multiple sources are extremely important because competition has proven to be cost-effective and, as a government agency, the Bureau is required by law to give all qualified contractors the opportunity to compete for Bureau contracts, when possible.

Always include the incumbent (indicate by an asterisk) and any other sources in the area.

Potential contractors who communicate a request to be placed on the solicitation mailing list should be advised to write to the Contracting Officer, Community Corrections Contracting, Central Office, specifying the specific location(s) and number of beds they are capable of providing, as well as requesting a solicitation mailing list application.

Since some contractors have expressed their desire to be included in all contract solicitations throughout the country, sole source contracts have been virtually eliminated.

For IGAs, identify the particular governmental entity (e.g. City, County, State agency).

4.2.4.6.  Existing Contracts

List all existing Bureau contracts within 50 miles. Indicate the contractor's:

- name,
- contract number,
- SENTRY location code(s),
- per-diem rate, and
- expiration date.

Requirements for a particular service area may be combined when it is determined to be in the Government's best interest.

4.2.4.7.  CCM Office Mailing Address

Include CCM's name, address, and telephone number for billing purposes.

4.2.4.8.  Signatures

This section of the RCA contains signature blocks and must be signed and dated as appropriate.  An RCA with original signatures must be received by the CO.  CCA staff will note the date the RCA is received by the CO prior to distributing copies to the appropriate field staff.

4.2.5.  **CCM REVIEW**

After the COS completes the RCA and attachments, the CCM shall review and approve the request before submission to the MCA. Special emphasis shall be given to the justification and explanation for the request and the attached documentation supporting the accuracy of the estimated inmate-days and costs.

4.2.6.  **MCA REVIEW**

The MCA shall review the content of the RCA and attachments for approval.  Special emphasis shall be given to the following:

- justification for need;
- inmate-day projections and the supporting attached documentation; and,
- fiscal data.

The MCA shall ensure all RCAs for procurements over $25,000 but less than $500,000 have the appropriate Individual acquisition Plan (IAP) form(s) attached.  For procurements actions of $500,000 or more the Advance Procurement Plan (APP) will be

completed by central office contracting staff. The RCA package
shall be mailed to the CCRA in a timely manner, ordinarily within
five working days of receipt.

### 4.2.7. **CCRA REVIEW**

The CCRA shall review, sign, and date the RCA package.  The
signature of the CCRA not only signifies review and approval of
the content, but also "commits" funds for the proposed contract.
The CCRA shall mail the RCA package to the Community Corrections
Branch in the Central Office in a timely manner, ordinarily
within five working days of receipt.

### 4.2.8. **CCA REVIEW**

CCA staff will review the RCA package prior to forwarding it to
the CO.  Special emphasis will be placed on inmate-day estimates
and the completion of required APP forms.  Upon verification, the
RCA package is forwarded to the Community Corrections Contracting
Section and ordinarily within seven working days after receipt by
CCA staff, copies of the RCA will be forwarded to field staff.
If changes are made to other documents in the RCA package, CCA
staff will forward copies with the completed RCA.

### 4.3: **SOLICITATION PREPARATION**

This section covers the major steps in the contract solicitation
process that are the COs responsibility.

### 4.3.1. **WAGE DETERMINATION - SERVICE CONTRACT ACT**

Sixty days prior to solicitation issuance, the CO must file a
Notice of Intention to enter into a Service Contract with the
Office of Special Wage Standards, Employment Standards
Administration, Department of Labor (DOL).  The wage
determination issued by DOL shall then become part of the
solicitation package or resulting contract.  Per the
DOL:  service contract personnel for CCCs are not ordinarily key
or professional staff; maintenance, food service, clerical, shift
or charge-of-quarters, and correctional staff are ordinarily
service employees.  Since the DOL has sole enforcement authority
and responsibility to ensure these standards are met by the
contractor, all inquiries Bureau staff receive should be referred
to the local DOL office.

PS 7300.09
1/12/98
Chapter 4, Page 16

4.3.2. **COMMERCE BUSINESS DAILY**

The CO must forward a synopsis of the requirement to the Commerce Business Daily (CBD) when the estimated amount exceeds $25,000. This notice must be published at least 15 working days prior to issuing a solicitation after allowing 10 days for receipt by mail. For purchases over $2,500 but less than $25,000, a synopsis of the requirements issued under a Request For Quotes (RFQs) may be published in the CBD to satisfy competition requirements, if sufficient sources of competition have not been identified.

4.3.4. **STANDARD SCHEDULE OF EVENTS**

The CO shall establish an estimated time schedule of events for the rest of the contracting cycle within 10 working days after forwarding the synopsis to the CBD (Attachment 4-2). Although copies of this schedule are not ordinarily distributed, the CCM or COS may telephonically or using BOPNet GroupWise E-mail, contact the CO to inquire about the status of a particular solicitation.

4.3.4. **ISSUE SOLICITATION**

After the 60 day DOL wage rate determination request cited above, and concurrent 25 working day CBD publicizing requirements have been met, a solicitation shall be prepared and mailed to all interested offerors requesting an original and three copies of the technical proposal and an original and four copies of the business proposal. A copy of the solicitation shall be mailed to the appropriate CCM and to the AAC. The CCM and COS should review the solicitation to ensure the requirements described in the RCA and attachments have been accurately addressed. Special emphasis should be placed on inmate-day requirements, geographic location, and requested modifications to the SOW. If discrepancies are identified, the CCA and CO should be notified immediately and the solicitation should be promptly amended.

Ordinarily, the solicitation shall provide for a period of 60 days for offerors to respond. The amount of time allowed shall be adjusted for any special or unique circumstances of the requirements.

4.4:  **EVALUATION PROCESS**

4.4.1.  **RECEIPT OF PROPOSALS**

Proposals shall be date and time stamped immediately upon receipt by the CO.  The CO shall review proposals for completeness, and store them in a secure place.

Within five working days of the closing date, the CO shall contact the Central Office Community Corrections Branch to determine which staff will chair the evaluation panel and to ensure copies of each technical proposal and a copy of the solicitation are provided to the members of the evaluation panel. The staff person assigned to chair the evaluation panel shall not have direct supervisory authority over, or be a member of the CCM office, from which the original contract request originated.

When there is only one offeror, the designated chairperson may perform an individual technical review rather than convening an evaluation panel.  The technical review will assess those items needing further clarification, as well as any deficiencies.  When only one offeror is to be evaluated, the chairperson may have direct supervisory authority over, or be a member of, the CCM office from which the original contract request originated.

It is the evaluation panel chairperson's responsibility to ensure compliance with evaluation process procedures and required time frames.

4.4.2.  **PRELIMINARY SITE SURVEY**

Upon receiving the proposal(s), the chairperson shall contact the appropriate CCRA who shall appoint the membership of the preliminary site inspection team.  Ordinarily the team will be composed of the COS located in the CCM office that will administer the contract and the RSS.  The chairperson shall contact the members of the inspection team via BOPNet GroupWise E-Mail, with copies routed to the CCRA, CCA, MCA, CCM, and CO, requesting the preliminary site surveys be conducted within 15 working days.  Within two working days, the chairperson shall review the offeror's proposals and forward copies of documents pertinent to the preliminary site survey (diagram/floor plan, proof of valid right-to-use, notification to public officials and the community) to all members of the inspection team, for review, prior to the team's on-site inspection(s).  All preliminary site inspections should be videotaped and forwarded to the panel chairperson for use by the evaluation panel.

The chairperson's message to committee members for preliminary
site inspection should also include a request that the inspection
team forward their travel information (date and time of arrival,
inspection, and departure) to the CO and panel chairperson in the
event they can attend/participate in the facility inspection(s).

Within five working days of the site visits, the COS and RSS
shall distribute their written reports (COS PRELIMINARY SITE
INSPECTION REPORT (Attachment 4-3) AND RSS PRELIMINARY SITE
INSPECTION REPORT (Attachment 4-4)) via BOPNet GroupWise E-Mail.
If the facility is not acceptable, the site report shall outline
rationale for this determination.

This report will cover the:

- age, condition and suitability of the structure,
- the location of the site, including availability of public
  transportation,
- fire safety compliance,
- overall sanitation and the need for repair and/or renovation
  of the building,
- community and any other information that might be relevant
  for the evaluation panel's consideration.

Preliminary site surveys are required for incumbents as well as
single offerors.

The CCRA may waive a pre-occupancy inspection for incumbent
contractors.  The first full inspection (60 to 90 days after
award) would serve as a dual pre-occupancy/full monitoring.  The
waiver should be in writing and documented in the contract file.

4.4.3.  **EVALUATION PANEL - FOR COMPETITIVE PROPOSALS WITH
        MULTIPLE OFFERORS**

4.4.3.1.  Meeting Time and Panel Composition

The chairperson, ordinarily the panel member from the
Central Office Community Corrections Branch, shall establish in
writing the composition of the panel to evaluate the proposals
and the time and date when it shall meet.  The panel shall
consist of the chairperson and at least two other Bureau staff,
at least one of whom shall work in Community corrections.  The
panel will generally consist of the chairperson, the CO, and a
staff person designated by the CCRA.  The panel chairperson shall
contact the CCRA, over the service area, and ascertain the name
of the designated panel member from the field.  The evaluation
should be completed within 25 working days of the receipt of
proposals.

The MCA and CCM office staff who will have supervisory authority or will be responsible for administering the contract may be members of the panel.

### 4.4.3.2.   Panel Proceedings

The evaluation panel members shall use the evaluation criteria identified in the solicitation, to include an evaluation of each contractors past performance, to evaluate all proposals. Impartiality and comprehensive evaluation by the panel is crucial to select the source whose proposal has illustrated the highest degree of realism and whose performance is expected to best meet stated government requirements.

Each member shall make an independent evaluation of every proposal using the evaluation checklist and scoring sheet.

Following the independent evaluation, the panel members shall hold discussions and arrive at a consensus.  The consensus finding shall be recorded on a separate score sheet.

### 4.4.3.3.   General Instructions

The proposal evaluation process consists of an assessment of both the proposal and the offerors ability (as conveyed by the proposal) to successfully accomplish the prospective contract within the specified evaluation criteria.  Each proposal must be judged by the same standards, factors, and subfactors specified in the solicitation.

### 4.4.3.4.   Determining the Competitive Range

To be acceptable, each proposal must describe a level of service that meets the minimum technical requirements of RFP and standards of the SOW.  If it appears that the proposals are unacceptable the evaluations should identify any areas that need clarification, areas that are deficient, and any requirement excesses. The notes regarding these issues will be used during negotiations with the offerors.

If the proposed program does not meet minimum standards without extensive revision, this fact must be noted in the evaluation narrative.  The written notes will support a recommendation to exclude the proposal from any further consideration for specific reasons, such as severe technical deficiencies, failure to address the SOW, parroting the SOW, or the need for a major rewrite.

After the panel has evaluated and scored the proposals, the panel may recommend a competitive range.  That is, the panel may determine a break exists between the high and low range of scores, and recommends the low group be removed from the competitive range.  For example, there are five offerors and the scores are 525, 625, 310, 570 and 385.  A natural break occurs at 525 and the panel could recommend the two lowest scoring offerors not be considered in the competitive range.  Reasons include:  a (complete) lack of understanding of the requirements of the RFP is indicated in a company's proposal or the proposed program could not be accepted without a substantial rewrite of the proposal.  In such situations, however, the panel still addresses the weaknesses and strengths of the proposals recommended for exclusion from the competitive range.

Although a deficient proposal usually may not be included in further discussions, it is the CO who must make the determination and establish the competitive range.  FAR 15.609 states, "The competitive range shall be determined on the basis of cost or price and other factors stated in the solicitation and shall include all proposals that have a reasonable chance of being selected for award."  This provides a broad area of consideration by the CO who ordinarily welcomes evaluators providing narrative information in this area.

If there is a close grouping of scores, it is best to recommend all offerors be kept in the competitive range.  For example, if the scoring was 515, 485, 390, 545, 410, it may be determined the scores are so close together they should all continue to be considered.

Panel members should avoid the words "responsive," "responsible," or "responsibility," when discussing an offeror's proposal.  These words have a special technical meaning in procurement and usually are not relevant to negotiated contracts. Rather than convey an offeror is "non-responsive," indicate the proposal has severe technical deficiencies and/or is unacceptable as submitted by failing to meet minimum requirements and no reasonable chance for award.

## 4.4.4.  PANEL FINDINGS

The panel chairperson will prepare a detailed narrative summary of the panel findings to include:

- identification of deficiencies;
- clarifications, or excesses identified in the evaluation process for each proposal; and
- a consensus score sheet.

This summary or evaluation of proposals should include all of the issues or areas that are deficient or need to be clarified during negotiations with the offeror.

Within five working days of the panel evaluation, the chairperson shall forward the original site inspections, score sheets, comments and worksheets, and proposals to the CO. The chairperson may maintain a copy of the panel documents and a copy of each proposal, for reference, until award of the contract. After contract award, all proposals are forwarded to the CO.

### 4.4.5. **NOTIFICATION OF OFFERORS NOT IN THE COMPETITIVE RANGE**

After receiving the panel findings, the CO shall establish the competitive range and promptly notify in writing all unsuccessful offerors of the reasons they were not selected. Examples of appropriate reasons include: technically unacceptable, falling outside the competitive range, etc.

A pre-award notice should include: the basis for the determination, in general terms, and a statement that a revision of the proposal shall not be considered.

### 4.4.6. **NEGOTIATION WITH OFFERORS IN THE COMPETITIVE RANGE**

The CO should either make an award without discussion based on the initial proposals or conduct written or oral discussions with all acceptable offerors. The latter can be accomplished when the requirements of FAR 15.610 are met and recommended by the SSO. If negotiations are to be conducted, the CO should advise the offerors of any areas that need clarification, or any deficiencies in the proposals. The CO shall conduct negotiations on the areas identified as deficient and provide the offerors an opportunity to satisfy the government's requirements. The CO shall attempt to resolve any contradictions, uncertainties, or ambiguities concerning technical matters or other terms and conditions of the proposal.

The CO should provide offerors a reasonable opportunity to submit any revision to cost or pricing, technical, or any other matters resulting from the discussions. During negotiations, the CO will forward the offeror's responses to CCA staff for review and response. At the conclusion of negotiations, the CO should request offerors to submit a "Best and Final Offer" to the government, ordinarily within two weeks, unless special circumstances warrant additional time.

PS 7300.09
1/12/98
Chapter 4, Page 22

Only the CO may discuss panel findings, costs, or negotiate with any offeror.  No one, other than the CO, shall hold discussions with offerors.

Offerors shall be advised they must clearly identify in writing what changes or additions have been made and where they are located within the proposal.  If during discussions substantive changes of the original proposals occur, the SSO may, if necessary, contact the panel chairperson and members, and convene a second evaluation panel.

### 4.4.7.  **PRE-AWARD FISCAL AUDIT**

If the reasonableness of the proposed contract cost cannot be determined from adequate competition, a cost price and/or analysis of the offeror's cost data by the CO may be necessary.  FAR Part 15 establishes dollar thresholds for determining when pre-award audits are required.  It is the CO's responsibility to arrange for all required audits.

If the dollar thresholds for requiring an audit are not met, reasonableness of cost may be determined through cost analysis.  When cost analysis is used, procedures prescribed in FAR Part 15 shall be followed and the file shall be fully documented.

### 4.4.8.  **CO REVIEWS BEST AND FINAL OFFERS**

Within five working days after receipt of Best and Final Offers, the CO shall score each proposal for cost and forward the package to the SSO for review.

### 4.4.9.  **FINAL REVIEW AND AWARD SELECTION**

The Central Office SSO shall conduct a final review of all proposals and provide the CO with a selection for award based upon the findings of the evaluation panel, clarification and deficiency correspondence, and Best and Final Offers.

The name of the awardee, a summary of the reasons for the selection and all paperwork received, shall be returned to the CO.

### 4.4.10. **CO REVIEW**

The CO shall review the action taken by the SSO and document the file for further processing.

PS 7300.09
1/12/98
Chapter 4, Page 23

### 4.4.11. PREPARATION AND DOCUMENTATION OF FILES

The CO shall prepare and document the solicitation file and establish a separate contract file for the contract proposed for award.  The contract file shall contain the information prescribed by FAR 4.803.

### 4.4.12. AWARD CONTRACT

When all requirements have been met, the CO shall execute the contract and advise the CCM and awardee by telephone of the award and performance period, reminding the contractor of the need for proof of zoning and life/safety compliance.  Ordinarily, the beginning of the contract performance period is 120 days after the date of award.

The CO shall electronically advise the CCA, CCRA, MCA, RSS, and CCM of the award, award date, and performance date and ensure a copy of the successful offeror's proposal is forwarded to the CCM who has supervisory authority over the contract.  The CO shall advise the COTR, typically the CCM, in writing, of their appointment as the COTR and describe the responsibilities of the appointment.  The CO, with the assistance of the Legal Counsel and the COTR, will determine if the contractor has sufficiently met local requirements prior to performance.

### 4.4.13. PROOF OF ZONING

At best and final, the contractor must provide the CO with satisfactory proof all zoning and local ordinance requirements necessary for operation and applicable to any proposed performance site(s) have been met.  Such proof shall be in writing and shall consist of documentation from necessary local officials stating the contract may be performed at the proposed site(s) in accordance with the current zoning and other requirements of the local jurisdiction.

For purposes of this provision, a "necessary local official" means an employee or elected person whose approval or concurrence as to the propriety of the use of the proposed site is required under any and all applicable laws of the city, town, village, or municipality in which the facility is located.

### 4.4.14. PREOCCUPANCY VISIT

Not later than 15 days prior to the date performance is scheduled to begin, the COS shall conduct a preoccupancy visit to ensure the contractor is ready to begin operations.  When the RSS has not identified major deficiencies during the preliminary

PS 7300.09
1/12/98
Chapter 4, Page 24

sitesurvey and upon receipt of a written determination from the RSS that his or her expertise is not required during the preoccupancy inspection, the CCRA may waive the RSS' participation.  Special emphasis shall be given to negotiated items during the preoccupancy review.  This review shall determine if the awardee is ready to accept offenders.

CCRAs may waive a preoccupancy inspection for incumbent contractors.  The decision to waive a preoccupancy inspection should be based upon a determination the awardee has met the minimum procurement/contractual requirements necessary to accept Federal offenders.  The waiver will be in writing from the CCRA and documented in the contract file.  The first full inspection (60 to 90 days after award) would serve as a dual pre-occupancy/full monitoring.

Immediately following the review, the COS shall prepare a report (Attachment 4-5) and forward it electronically to the CO with copies to the RSS, CCM, MCA, CCRA, and CCB Section Chief. Any major deviations found must be corrected before Federal offenders are placed in the facility.  The COS will follow through to ensure deviations are corrected.  (If the effective date of contract performance is the same date as contract award, a preoccupancy visit is not possible.)  When this occurs, the inspection will be performed within 30 days of award.  The findings of the visit will be outlined in the monitoring report letter format (see Attachment 4-6) and issued by the CCM to the contractor for a response.

## 4.4.15. **DISTRIBUTION OF CONTRACTS**

The CO shall forward a copy of the Contract Award Document (SF-26 or SF-33) to the contractor, CCA, CCRA, MCA, CCM, and RC pay station) within three working days after final contract award.

Along with the Contract Award Document, the CO shall also forward copies of each of the following documents to the COTR who has supervisory authority over the contract:

- the awardee's technical proposal;
- all solicitation amendments;
- clarification/deficiencies correspondence; and
- best and final offers (CO's letters and awardee's responses).

It is imperative the COTR and the COS familiarize themselves with:

- the contents of any amendments to the solicitation;
- correspondence received during the periods for clarification/deficiencies; and,
- best and final offers.

## 4.5.: POST AWARD ADMINISTRATION

### 4.5.1. GENERAL

Once a contract has been awarded, the contract administration phase begins.  Contract administration is any administrative activity undertaken by either the government or the contractor during the time from contract award to contract close out.  More specifically, the term refers to steps taken by the government representative(s) responsible for ensuring government and contractor compliance with the terms and conditions of the contract.  Such steps include:

- all performance (inspection) monitoring activities,
- modifications,
- actions pertaining to disputes,
- unsatisfactory contractor performance, and
- price redetermination.

Contract administration also includes problem solving activities necessitated by unforeseeable circumstances - changes, problems, and disagreements that arise following contract award.

### 4.5.2. MONITORING REQUESTS FOR CONTRACT ACTION

The CCM is responsible for ensuring RCAs are submitted in a timely and appropriate manner.  The CCM and MCA shall develop a record system to monitor the timely submission of RCAs for all Community corrections contracts.  Lists can be generated from the Contract Location Profile System (CLPS).  The CCRA shall ensure the MCA and the COTR have a system to alert them when requests are due.  The MCA and CCRA shall review all RCAs and attachments, except those to exercise option years, for accuracy and completeness.

### 4.5.3. MANAGEMENT OVERSIGHT

The COS shall provide the CCM with an annual schedule of full and interim monitorings of contract programs.  The MCA shall monitor full and interim reviews conducted by CCM offices for timeliness, professionalism, content, and procedural propriety.

The CCRA shall develop appropriate mechanisms to oversee the auditing functions of the MCA.

The COS annual schedule should also include the projected month(s) in which preliminary site and preoccupancy visits are anticipated for new or replacement contracts.  Since the RSS will ordinarily be involved in these site visits, providing him or her with a copy of this schedule can be beneficial for planning travel and meeting the milestones the CO established for contract award.

The CCRA may waive a full monitoring with justifiable cause; however, this waiver should not be more than 30 days.  Additionally, the CCM may make a request in writing through the MCA to the CCRA to waive an interim monitoring.  This waiver request will be based on a determination that it is in the best interest of the Bureau, and the contractor has demonstrated that they are fulfilling the conditions of the SOW with few deviations.

The monitoring of contract programs should be scheduled to maximize the time oversight staff are away from their office and thereby minimize the total cost of their travel.  The contract monitoring schedule provides oversight specialists with a significant amount of flexibility to accomplish these two critical goals.

### 4.5.4.  CONTRACT FILES

#### 4.5.4.1.  Official Contract File

The official contract file is maintained by the CO in the Central Office in accordance with the requirements of procurement statutes, policy, and procedure.  This file documents the basis for the acquisition and award, the assignment(s) of contract administration tasks, and any subsequent actions taken by the contracting office.

#### 4.5.4.2.  CCM Office Contract File

The COS shall maintain working files, commonly referred to as the "CCM Contract File" for each contract.  Occasionally, some contracts may have multiple locations.  Then, supplemental contract files shall be prepared for each location.  Each supplemental file need not contain the same basic contract information (proposals, SF-26, etc.), but should contain all relevant information pertaining to that particular location.

Additional files shall be used as necessary.

The contract file shall contain the following documents:

a.  Table of Contents or Index which clearly indicates where required information can be located in the file(s);

b.  A copy of the RCA, attachments and any modifications;

c.  A copy of the contract award document (SF-26 or SF-33) or PO, contractor's proposals (business and technical) and attachments, a copy of the solicitation (includes SOW) with amendments, clarification/deficiency correspondence, and best and final correspondence;

d.  Monitoring Instruments with "working papers," letter reports, contractor responses and close out letters;

e.  A historic chronological log of all activities, with regard to the contract on a continuous, systematic, routine basis, and correspondence;

f.  Life/Safety Reports, NCIC/NLETS checks, Pre-Occupancy Report, Preliminary Site Inspection, etc.;

g.  Fiscal Data (facility billings, medical billings, etc.); and,

h.  Automated Data Processing Contract Information.

A copy of the Public Voucher for Purchases and Services Other Than Personal (SF-1034) and original invoice information received from a contractor must be retained (archived) for historical purposes (see Section 4.5.15. CONTRACT CLOSURE).

4.5.5. **CONTRACT PROGRAM MONITORING**

Ordinarily, the CCM is the COTR (certified in accordance with DOJ and Bureau policy) and the COS acts as contract monitor.  On occasion, the Bureau may place a COS on-site to monitor contract compliance.  Then, the COS will typically be the COTR.  COS staff are responsible for monitoring contractor compliance with the requirements contained in the SOW.  COS staff must provide their supervisors and the CO with comprehensive and accurate information concerning a contractor's performance.  Bureau staff in the CCM office perform "technical direction" responsibilities for work performed under contracts.

4.5.5.1.  The term "technical direction" is defined to include, without limitation, the following:

a.  Government guidance of a contractor's efforts toward full compliance with the contract SOW;

b.  Redirecting the contract performance effort;

c.  Shifting work emphasis between areas or tasks;

d.  Filling in details;

e.  Otherwise accomplishing the actual scope of work;

f.  Supplying information to the contractor which assists in the interpretation of technical portions of the SOW;

g.  Receiving, reviewing, and inspecting reports and information provided by the contractor to the government under the contract; and

h.  Evaluating the performance and certifying all invoices for payment.

4.5.5.2.  Technical direction must be within the general scope of work stated in the contract.  The contract monitor does not have authority to issue any direction which:

a.  Constitutes an assignment of additional work outside the general scope of the contract.

b.  Constitutes a change as defined in the contract clause entitled "Changes."

c.  Changes any of the expressed terms, conditions, fixed price, or time for contract performance.  Only the CO shall, by written modification, authorize any such revisions.

### 4.5.6.  MONITORING INSTRUMENTS AND SCHEDULES

There are monitoring instruments and schedules for different types of contract services.  These instruments are designed to assist Bureau staff in making thorough program evaluations based on contract requirements as detailed in the SOWs.  The Bureau can only require compliance with items that are provided for in the contract, and may only make suggestions in other areas.

Contract monitorings are "inspections" or "reviews" as described below:

### 4.5.6.1. **CCCs**

a. The first full monitoring of all new CCC contract awards shall occur not less than 60 days nor more than 90 days after performance begins, all subsequent interim and full monitorings will follow regularly scheduled time frames as noted in Table 1:

**TABLE 1**

**MONITORING SCHEDULE FOR CCCs**

| TYPE OF FACILITY | ADP PRIOR SIX MONTHS | NUMBER OF FULL MONITORINGS | NUMBER OF INTERIMS BETWEEN FULLS |
|---|---|---|---|
| MINOR | 0 - 15 | 1 EVERY 18 MOS | 2 |
| MODERATE | 16 - 30 | 1 EVERY 12 MOS | 2 |
| MAJOR | 31 & OVER | 1 EVERY 12 MOS | 3 |

b. full monitoring of major-use (average daily population of 31 or more offenders the previous six months) and moderate-use CCCs (average daily population of between 16 and 30 offenders the previous six months) shall be conducted annually.

This inspection shall be a thorough, comprehensive review of the contractor's operation. It shall include a close examination of every facet of the contract's requirements.

Ordinarily, the inspection team shall consist of the CCM/COTR (Auditor-In-Charge), the COS, and any additional staff identified by the CCM, MCA, or CCRA. U.S. Probation staff should be invited to attend CCC full monitorings. "Working papers" are the handwritten notes, etc., and duplicated documents which shall form the basis of the Contract CCC Full Monitoring Instrument (Attachment 4-7). Although the majority of the items contained in this instrument are applicable for all CCCs, additions and/or deletions to this monitoring instrument may be necessary depending on the requirements contained in the SOW. The Auditor-in-Charge is responsible for ensuring the monitoring instrument adequately addresses the requirements contained in the SOW.

Because of the possibility of contract dispute or need to further explain the findings of monitorings, it is important all sections of the monitoring instrument be complete, comprehensive, and legible.  No blank spaces shall appear on the instrument. These papers shall be maintained in the CCM Contract File for the life of the contract.

Normally, the contractor is notified in advance of all regularly scheduled full monitorings.  This notification is commonly accompanied by a request to have the contractor forward, in advance of the monitoring, documentation that specific requirements of the contract are being met.  In addition, office logs, files of offenders and SENTRY data can be examined in advance and included in the contract monitoring working papers.

The monitoring report to the contractor shall be composed of findings extracted from the monitoring instrument and supported by the working papers.  The format of the report to the contractor shall follow the Monitoring Report Format (Attachment 4-6).

c.  Full monitorings of minor-use CCCs (average daily population of 15 or less offenders for the previous six months) should be conducted every 18 months.  They shall be performed exactly as outlined above in (b).

d.  The full monitorings of all CCCs shall be supplemented with unannounced interim review monitorings, ordinarily conducted by the COS.

Interim reviews of major-use CCCs shall be conducted at least three times between each full monitoring, and at least two times between each full monitoring of a moderate-use or a minor-use CCC.  Interim monitorings shall include, but are not limited to, an examination of findings noted in the prior monitoring or review, "spot checks" of historically problematic areas, and any other significant areas of concern.  Interim reviews are not intended to be as thorough and comprehensive as a full monitoring.

e.  Monitorings of contract facilities shall not be conducted exclusively during regular daytime working hours.  Many program activities occur during evening hours and inmate accountability and facility life safety precautions are important at all times.  Therefore, the monitor(s) must review operations of CCCs during all hours to observe programs, accountability procedures, and have opportunities to speak with a significant number of inmates and CCC staff.

f.  Findings of CCC full monitorings shall be recorded on the standard Monitoring Instrument.  Interim reviews shall be recorded on the standard CCC Interim Monitoring Instrument (Attachment 4-8).  Interim review reports to the contractor can be in letter form and do not have to follow the format for full monitoring reports as specified in Attachment 4-7.  Findings (if any) shall be clearly identified, with clear, concise, and appropriate corrective action outlined.  Unless the nature of findings dictate otherwise, interim review reports are not ordinarily as extensive as those for full monitorings.

g.  All reports shall be addressed to the contractor's authorized representative identified in the business proposal, or any other subsequently authorized contractor personnel, and shall require a response to areas found non-compliant (Findings) within 30 days of receipt, unless the issue(s) warrant a more immediate response.  The contractor's response must indicate all areas of non-compliance have been corrected or must include a plan, with acceptable timetables, to correct the findings identified.

h.  As soon as possible, but ordinarily within 10 working days of a full or interim monitoring, the COTR shall sign and forward the cover letter and attached monitoring report to the appropriate contractor representative.  Copies of the documents provided to the contractor will be mailed to the following Bureau staff:  MCA, CCRA, and CO through the CCA.

Supervisory reviews of monitoring reports, cover letters, etc., prior to their being mailed to the contractor, are at the discretion of the MCA and CCRA.

Copies of the CCM's report on joint use non-Bureau contracts (USMS, INS, or other "piggyback" contracts) shall not be forwarded to the Central Office Procurement and Property Branch.

i.  Upon receiving the contractor's response to the monitoring report, the COTR shall prepare and forward a response to the contractor in a timely manner.  Ordinarily, this response shall be mailed within five working days and "close out" the monitoring.  Monitorings are considered closed when the contractor's written response has indicated all findings have been corrected, or, acceptable plans with appropriate time frames have been outlined to correct findings.

A copy of the contractor's response to all monitoring reports shall be attached to the COTR's follow-up response and copies shall be distributed to Bureau staff as noted above in item h of this section.  Copies routed to the CCA shall be reviewed prior to routing to the CO for review and filing in the official contract file.

4.5.6.2.  **Contract Confinement Facilities**

 **BOP Contracts**

a.  Ordinarily all jail and long-term adult confinement facilities will be inspected prior to the contract being initiated and/or activated.

The contract "status" assignment code for these contracts will be active (A) unless the contract has expired or it has been terminated.  When in active status, the contract "inspection required" assignment code will be YES (Y) unless no Federal offenders are currently confined or expected to be confined at the facility over the next six months.

When inspections are required for active contract confinement facilities, they will be scheduled as noted below in Table 2:

**TABLE 2**

**MONITORING SCHEDULE FOR JAILS
AND LONG-TERM ADULT FACILITIES**

| TYPE OF FACILITY | ADP PRIOR SIX MONTHS | NUMBER OF FULL MONITORINGS | NUMBER OF INTERIMS BETWEEN FULLS |
|---|---|---|---|
| MINOR | 0 – 49 | 1 EVERY 12 MOS | 0 |
| MAJOR | 50 & OVER | 1 EVERY 12 MOS | 1 |

b.  Additional program oversight shall be initiated commensurate with larger Bureau populations.  Facilities with larger populations ordinarily have an on-site COS.  In those cases, the COS shall be the COTR and full monitoring teams may be comprised of Regional Office staff (i.e., Inmate Systems Manager, Correctional Services, Programs, etc.).

c.  When a facility has not been used for an extended period of time (six months or more), every effort should be made to visit/monitor the facility prior to the arrival of the next designated offender.  A visit/monitoring is mandatory for those inactive facilities within 30 days of the designated inmate's arrival or a U.S. Marshal's inspection report is required demonstrating the facility has been reviewed within the last 12 months.

d.  Contract juvenile facilities in use shall be monitored following the same type and frequency of review as outlined for a major, moderate, or minor use CCC, depending on use.

e.  A number of correctional systems process offenders through a "diagnostic" center or facility prior to the offenders initial designation to a permanent facility.  When used by the contract agency, diagnostic units, through which all offenders must be initially processed and evaluated, should be visited during each full monitoring, or at a minimum of once every 12 months.

f.  When a contract confinement facility also has a work release program which is the predominant use, the frequency of monitorings shall follow those outlined for CCCs.  The monitoring instrument however, should continue to be the appropriate confinement checklist.  During the monitorings of this type of program, the contractor's procedures to verify inmate employment and the system for general accountability of inmates while in the community shall be closely examined and addressed in the report.

g.  Contract confinement facility full monitorings shall be recorded on the appropriate standard monitoring checklist (see Attachment 4-9 and 4-10).  Interim reviews shall be recorded on the standard Contract Confinement Services Interim Monitoring Report form (Attachment 4-11).  Preparation of reports or letters and distribution of materials shall be handled the same as for contract CCCs.

**Non-Bureau Contracts**

a.  These are contracts where the Bureau is listed as an authorized user of another Federal agency's contract ("piggyback" agreements).  The USMS contracts are an example.

b.  Community corrections staff shall inspect all non-Bureau contract facilities for suitability prior to placing inmates in the facility.  The suitability inspection will be coordinated with the USMS.  In addition to the Bureau staff inspection, the CCM shall obtain a copy of the latest USMS monitoring report.

Some U.S. Marshal's rely on State inspections of contract jails, if this is the case, a copy of the State inspection should be obtained and maintained in the contract file.  Duly authorized State inspections of contract jails is an acceptable inspection for BOP purposes.  The suitability inspection shall be documented in the contract file.

c.  In addition to the suitability inspection, Community corrections staff shall participate in a Joint Monitoring with USMS staff, once every three years.  A copy of all USMS monitoring reports shall be maintained in the contract file. Larger non-Bureau contracts may require additional program oversight.  At the CCRA's discretion, Community Correction staff may accompany the USMS Jail Inspectors more frequently.

d.  If Community corrections staff learn of serious deficiencies at the facility, the concerns shall be communicated to the USMS office.  If deficiencies are not corrected, the Bureau may choose not to use the facility.  CCMs shall consult with their MCAs and CCRAs in these cases.  Community corrections staff should not correspond directly with the contractor.

4.5.7. **MONITORING AND EVALUATION OF CCC CONTRACT PERFORMANCE**

Monitoring a contractor's performance should be viewed as a daily, continuous, on-going, routine process and not limited to formal monitoring trips to the facility.  The COTR is responsible for completing the Contractor Evaluation Form (CEF) "Report Cards" (see **Attachment 4-13**).  The contractor's performance will be evaluated at least two times during the life of the contract. The first report card is required at the end of the two year base period with a follow-up to be completed at the beginning of the last option year when an RCA is submitted to the Central Office for a replacement contract.  Once each report card is completed, it is sent to the contractor for comment.  The contractor has 30 days to comment, rebut, and/or provide additional information to the COTR.  If the contractor disagrees with the rating, the information will be reviewed by the MCA, who will consider the comments made by the contractor and decide the final rating.  The MCAs decision must be in writing and completed within 15 days from receipt of the rebuttal statement.  The MCA is the final authority.  This contractor information will be used during the evaluation panel process.

The maintenance of chronological worksheets in each CCM Contract File emphasizes the importance of providing regularly scheduled and unscheduled oversight of a contractor's performance.

The solicitation, which includes the applicable SOW, contractor's business and technical proposals, all provisions of and amendments to the solicitation, and any subsequent changes agreed to during negotiations, Clarification & Deficiencies (C&Ds) and Best and Final Offer(s)(BAFO(s)), establishes the contract.

The SOW outlines the government's minimum requirements and takes precedence over any contradiction in the contractor's proposal. CCM office staff, ordinarily the COS, should carefully review all documents for indications of any possible "waivers" or "modifications" to SOW requirements that may have taken place during negotiations.

When monitoring CCCs, the following are examples of issues to keep in mind:

### 4.5.7.1. **Administration**

a. A review of the operations manual for the contractor's policies concerning use of force, conflicts of interest, handling funds, etc. should be accomplished.

b. The requirement contractors attend training meetings the Bureau sponsors does **not** mean that one contractor in an area is brought into another contractor's facility to view their forms, procedures, etc., as a means of training. It means the contractor shall attend Bureau-arranged training (normally held every 12-18 months) either region-wide, or by management center, at a central location.

c. Documentation is being maintained indicating facility staff meetings are being held monthly to foster communication, discuss problems, and ensure compliance with SOW requirements.

d. The contractor conducts internal audits annually with written findings and planned corrective actions forwarded to the COTR.

e. The contractor has documentation indicating searches of the facility and personal belongings of the residents are being conducted, at least once per month.

### 4.5.7.2. **Personnel**

a. The written job descriptions should be reviewed to determine if they accurately describe the current duties being performed by the respective employees and if the people in those positions meet minimum qualifications as outlined in the job

descriptions.  The contractor should provide the full name, date-of-birth, race, sex, and social security number, for all new or replacement staff, so integrity checks (NCIC/NLETS) can be performed prior to their working with Federal offenders.

b.  Additional background checks on contract staff need to be performed when necessary (i.e., fingerprints, local law enforcement checks, etc.).  Bureau staff must verify the information contained on the applications and resumes of CCC staff of Program Director level or higher.

c.  Staff integrity issues are critical.  The contractor should be training staff in this area frequently.  There should be a clear understanding by all contract staff as to what is and is not appropriate.

For specific procedures regarding the receipt, handling, and closure of CCC contract staff allegations of misconduct or other integrity issues in connection with privately operated contract CCC programs, see Attachment 4-12.

d.  Persons under any correctional supervision are prohibited from having anything to do with Federal offenders.  If the contractor wants to consider an individual for employment who has a prior criminal conviction(s), but is not presently under supervision, Bureau review and approval, on a case-by-case basis, must take place **before** an individual performs any services under the contract, to include having contact with Federal offenders.

e.  The facility staffing pattern must be monitored closely to ensure conformity with the terms of the contract.  Special emphasis should be placed on how long positions remain vacant and what steps the contractor is taking to hire new staff.

f.  Residents shall not perform work for the facility or be used in lieu of paid workers.

4.5.7.3.  **Facility**

a.  The facility's location should not have an adverse affect on the community or residents.

b.  Adequate space, aesthetics, and facility services should be examined.

c.  Continued compliance with all zoning, building and other codes must be ensured.

PS 7300.09
1/12/98
Chapter 4, Page 38

### 4.5.7.4. **Safety/Sanitation/Environmental Health**

a.  This area should be given careful inspection during monitoring visits.  Ensure bedding materials meet the applicable code(s).  Particular attention must be paid to sanitation, noting general cleanliness in all areas, the frequency inspections are made, and if a log of sanitation work assignments is kept and available for review.

b.  Evidence all inspections are occurring in a timely manner should be reviewed.

c.  The contractor shall be able to demonstrate and document the ability to conduct fire evacuation drills at the facility.

d.  Extension cords are not to be used in lieu of hard or permanent wiring.

e.  A written program is to be in effect and compliance is to be maintained concerning the storage, issuance, handling, and accountability of flammable liquids, hazardous chemicals, toxic, and caustic materials used within the facility.

### 4.5.7.5. **Referral and Intake Processing**

a.  The Federal Bureau of Investigation (FBI) will neither issue fingerprint cards to non-government facilities, nor will they accept cards from such facilities.  Since fingerprints are to be taken on all residents for identification purposes, the CCM office must provide fingerprint cards to the contractor.  The CCM office forwards cards for Direct Court Commitments to the FBI (or another government agency can do it if Bureau staff can make such an arrangement).  Centers operated by state correctional or parole agencies should forward fingerprint cards to the FBI in accordance with their own procedures.

Community corrections staff must assist private contractors in locating a resource to take fingerprints, or when necessary, the COS shall train contractor staff in the taking of fingerprints.  Other sources of possible fingerprint training are the USMS, local police, or other law enforcement agencies.  Contractor staff must accompany residents when prints are taken.  Photographs and fingerprints are required on all Federal offenders housed under a Bureau contract.

b.  All Judgment and Commitment Orders are being executed and distributed in accordance with Bureau policy.

c.  The confidentiality of case records is being maintained.

4.5.7.6. **Programs**

a. Examination of program components should be completed to ensure appropriate privilege and supervision requirements are followed.

b. Contractors must develop a network of community resources to meet the needs of Federal offenders assigned to their care. These resources must include a minimum of those listed in the SOW for the contract facility. CCMs should encourage the contractor to use volunteer groups and programs. It is the CCMs' responsibility to ensure procedures used to select and train volunteers follow the same standards of conduct and screening procedures that apply to paid employees.

c. Resident files maintained at the CCC should be closely reviewed to ensure each resident has a descriptive, written program plan.

Case notes should clearly address a resident's progress in:

- employment,
- housing,
- substance abuse counseling, and
- other transitional or treatment needs.

d. Program subsistence collection procedures should be reviewed. Special emphasis should be on:

- collecting appropriate amounts,
- following procedures to modify or waive the amount,
- internal control measures, and
- receipt and disposition of collected monies.

e. During all reviews, employment records of all Federal residents should be closely reviewed.

f. Substance Abuse

(1) Offenders with a condition of drug aftercare or history of substance abuse are required to be in drug counseling while at the center, rather than waiting until they are released from the CCC. Whenever possible, the resident should receive counseling from the same person and/or agency the USPO requires when released to supervision. The primary exception to this is when the CCC has a specialized drug counseling program or counselor that is an integral part of the contractor's program.

(2)    Contractors must meet with the USPO to develop a counseling program for the resident with drug aftercare as a condition of release.

If the contractor sets up a conference and the USPO does not attend, then the contractor's responsibility is met.

The CCM, however, should contact the USPO to discuss this issue since the USPS has agreed to assist our contractors in setting up counseling sessions.

(3)    Random urinalysis specimens should be taken at the rate of one for every 10 residents or less per month; between 11 and 20 residents, two tests are required per month; between 21 and 30 residents, three tests are required per month, and so on. The total number of residents upon which the rate should be based should not include USPS cases.  Residents with a drug aftercare condition or a history of drug abuse should provide four urinalysis specimens every month.

Residents who are members of disruptive groups shall be administered a random urinalysis at least once per month.

All urinalysis specimens shall be taken on an unannounced, surprise basis and tested for all drugs/substances noted in the PRIMARY TEST PANEL included in the SOW.

(4)    The COS is responsible for maintaining a file containing the monthly urinalysis specimen report contractors submit.  A tracking system should be developed to ensure the required number of urinalysis specimens are collected.

(5)    In the urinalysis specimen program, contractors are required to establish a procedure for the chain of custody from the point of receiving the bottles, through mailing samples to the laboratory.  The COS must check this procedure to ensure specimens are kept secure from all residents and other unauthorized persons.

(6)    The USPS is responsible for drug aftercare services (urinalysis, alcohol testing, and counseling) for supervision cases (those persons under supervision of the USPO).

g.  Staff must review the contractor's method and plan of issuing passes to determine:

- how soon after admission the first pass is issued;
- the length of time for a pass;
- if there is a graduated policy;

- who signs the passes; and
- accountability during the pass period, etc.

h.  The contractor is required to contact the USPO for comments on passes and furloughs that have been recommended for a resident.  If the USPO does not respond after reasonable attempts at communication, the contractor has met the requirement and should proceed with the next step.

These attempts to contact the USPO should be documented. The CCM should be alert to requests for furlough on Central Inmate Monitoring (CIM) cases, checking on separatees, and requesting clearance for any furlough outside the immediate area.

The inmate-day rate for residents in this status is ordinarily 50% of the regular inmate-day rate.

i.  The contractor should not reserve a bed for Home Confinement residents.

The CCM should ensure the USPO is involved in the decision to place an inmate on Home Confinement.  The rate for residents in this status is ordinarily 50% of the regular inmate-day rate.

j.  The COS is responsible for providing necessary Bureau forms to the contractor.  These forms can be obtained through normal ordering procedures.  In emergencies, forms can be obtained from a nearby Federal institution.

### 4.5.7.7.  **Discipline**

a.  Determine if current facility rules, regulations and sanctions are acceptable and have been approved by the CCM.

b.  Examine the discipline process and procedures to ensure they meet the requirements of the SOW.

### 4.5.7.8.  **Services**

a.  Ensure food services are in accordance within the Statement of Work and comply with all Federal, state and local regulations for nutritional, well-balanced meals.

b.  Examine availability of medical services and ensure 24-hour access to these services continues to exist.  Appropriate staff are to be trained in emergency first-aid and CPR.

### 4.5.7.9. **Records And Reports**

a.  The system should ensure privacy and eliminate confidentiality concerns.

b.  Appropriate records and reports are to be understood, completed, and forwarded by the contractor.

### 4.5.7.10. **Release Preparation**

a.  The contractor shall handle each release preparation case appropriately.

b.  The correct release documents shall be completed and forwarded in a timely manner.

c.  When release occurs, the contractor shall follow termination requirements as outlined.

### 4.5.7.11. **Escapes**

Escapees shall be promptly identified and the contractor shall make timely notifications.

### 4.5.7.12. **Serious Illness, Injury, or Death of a Resident**

The contractor shall handle any serious injuries or as specified in the SOW.  In all cases the CCM shall be promptly notified.

### 4.5.7.13. **Residents Under Supervision**

The contractor shall have a clear understanding of the implications of this legal status and differences in handling these cases.

### 4.5.7.14. **Research and Evaluation**

The contractor shall consult with its staff and the CCM before collecting data.  This information is very important for planning and analytical purposes.

### 4.5.8.  **CONTRACTOR TRAINING AND MANAGEMENT/TECHNICAL ASSISTANCE**

One of the Bureau's goals is to increase the quality of contract corrections provided to Federal inmates.  CCM office staff are responsible for providing on-going assistance in the training of contractor staff.  Assistance, however, in the form

of Bureau training never relieves the contractor from its legal
obligation of providing fully compliant contract performance
during the entire performance period.

    4.5.8.1.  Training

    a.  On-Site CCM Training.  At least annually, CCM office
staff shall hold either individual or group training sessions
with contract staff and provide an orientation to all newly
employed CCC staff at the contractor's facility, using Bureau or
outside resources.  Staff must be aware of any self-contained
training packages the Bureau produced.   Annual training shall
include:

    • discipline,
    • integrity,
    • accountability,
    • life/safety, and
    • other relevant issues.

    b.  Each region shall hold a contractor training conference
or forum, on a Region-wide or Management Center level, every 18
months.  This conference should focus on Management Center,
Regional and National Community corrections and other relevant
issues.  Resource staff and guest speakers might include Federal
Judges and Probation Officers, the Director, Assistant Director,
and Regional Director, the CCA, and representatives from the
Bureau Procurement and Property Branch.

    c.  If key contractor personnel leave their positions, their
replacements must receive training within 90 days at the
contractor's expense.  Key personnel are the foundation of a
model CCC operation.  Training programs help contract staff
better understand the Bureau's requirements and operations.

    d.  The CCM should document training given and to whom,
either by individual certificate or letter.  This documentation
lends credence to the contractor's knowledge of Bureau
requirements and may be useful if inmates initiate litigation.  A
copy of this training document shall be maintained in the CCM
Contract File.  If the training program used an agenda it should
be attached.  Be sure to document the use of any training
resources in the memo.

    e.  USPO Contacts.  One of the most important aspects of a
contract CCC is its relationship with the USPS.  It is the CCM's
responsibility to serve as a liaison between the CCC and the
local USPO.  The CCM will help in solving problems that occur
between the USPO and the CCC and in some situations will work out

a direct conflict between them.

4.5.8.2.  Management/Technical Assistance

Management/technical assistance is provided in the areas of staffing, facilities, and programs.

    a.  Staffing

        (1)  Identify available training opportunities.
        (2)  Arrange visits to Federal institutions for contract staff.
        (3)  Encourage contract staff participation in professional organizations.
        (4)  Emphasize the importance of CCC staff training and retention programs.

    b.  Facility

        Ensure the contractor meets Bureau requirements regarding safety, sanitation, permits, etc., in connection with the facility and services.

    c.  Program

        (1)  Make sure contract staff are aware of available state and local programs, such as mental health programs and employment training and assistance.

        (2)  Assist contractors to develop student intern programs that can aid in providing counseling services.

    d.  Reporting of Management/Technical Assistance

        CCM office staff shall report, in writing, to the MCA and CCRA, any management assistance they provide to any agency of the criminal justice system.

4.5.9.  **AUTOMATED DATA PROCESSING REQUIREMENTS**

The CLPS is an automated contract information system maintained in the SENTRY database.  This system provides technical and descriptive information about contracts and is used by all Bureau staff to locate facilities.  In addition, it provides community corrections staff with information on monitorings, contract expiration dates, quotas, etc.

Instructions for data submission and general use of the system are contained in the **Technical Reference Manual on SENTRY General Use.** It is essential that CCM office staff update the information whenever contract resources are added, deleted, inspected, or whenever the descriptive information is changed.

When USMS inspections of contract jails are made between Bureau inspections, staff shall update the system to reflect the audit.

### 4.5.10. MODIFICATION OF SOW/CONTRACT

Modifications may be made to the SOW when certain additions or deletions (within the scope of work of the existing contract) are necessary and adjustments in the price or services are not required. Modifications which are determined to be significant changes to the SOW or requirements of the original contract can jeopardize the remaining unexercised periods of performance contained in the originally awarded contract.

If the COS believes it is advantageous to the government to modify the contract, he or she must submit a RCA through the CCM, MCA, and to the CCRA, who forwards it to the CO through the CCA.

### 4.5.11. OPTION YEAR CONTRACTS

Once the COS determines the need for continued CCC services with an existing contract, the COTR shall submit an electronic request to the Community Corrections Branch, the CCRA, and the MCA, to exercise the next option year. The submission must be completed four months in advance of the end of the performance period.

For contracts in excess of $25,000 but less than $500,000, the COS shall submit an Individual Acquisition Plan (IAP) along with their request to exercise an option year.

For contracts over $500,000 CCB will complete and submit an APP directly to the CO.

### 4.5.12. PERFORMANCE PROBLEMS

Any problems regarding contractor performance must be thoroughly documented. Ordinarily, the contractor must be notified of the problem(s) and given an opportunity to take corrective action. This is characterized by the monitoring process, but may occur anytime circumstances warrant such notification/corrective action/follow-up measures.

## 4.5.13. ADVERSE ACTION NOTICES

While informal resolution is always preferred, failure to meet contract requirements require immediate attention and may, if not corrected, necessitate an adverse action notice from the CO or the COTR directing the contractor to cure the problem. Only the CO, with concurrence of legal staff, is authorized to issue an adverse action notice (Cure Notice).  Ordinarily, this notice is only issued when recommended by Community corrections. The COTR may take an adverse action by withholding an appropriate amount of funds from the contractor, under the Inspection of Service Clause, FAR 52.246-4.

Withholding

When a contractor fails to perform in accordance with the Statement of Work the COTR may withhold an appropriate amount of funds from the contractor.  In most cases, the performance problems have been brought to the attention of the contractor verbally, in monitoring reports, and through other correspondence.  A withholding of funds is usually the final action before a cure notice is issued by the contracting officer.

Before the COTR sends the withholding letter to the contractor, the circumstances should be discussed with the Central Office Community Corrections Contracting Sections Chief. If all concerned agree that the proposed withholding is appropriate the COTR may send the withholding letter to the contractor.

Cure Notice

The CCM (COTR) must submit the request for a Cure Notice in written memorandum and forward it, express mail, if necessary, through the MCA, CCRA and CCA, to the CO.  The request must be very specific, thoroughly descriptive, and cite specific provisions of the contract (chapter, page, and paragraph of the SOW, proposal, etc.).  A discussion outlining when the contractor was notified of the problem; how much time was allowed to correct the matter; and the state of the non-compliance with the terms of the contract, as it currently exists, must be included.

If a reviewer (MCA, CCRA, CCA, or legal staff) or the CO find the request unwarranted, a written explanation of the rationale and recommended course of action(s) shall be returned to the previous reviewer(s) and to the CCM, with the original request.  Copies of these documents shall be maintained in the respective office contract files.

After the CO issues a Cure Notice, and the specified time period lapses, an on-site inspection is typically required to evaluate whether the contractor has corrected the problem(s).  A written report of the findings of the inspection shall be provided to the CO through the MCA, CCRA, and CCA.  Failure on the part of the contractor to correct the problem(s) may result in termination of the contract.

4.5.14. **TERMINATIONS**

A recommendation for termination by the CCM shall be made only after an appropriate Cure Notice has been issued by the CO, and after legal staff and the CO have reviewed and concurred.  A termination is used after all other efforts have failed.  All termination requests the CCM submitted should be processed through and have the concurrence of the MCA, CCRA and the CCA prior to being forwarded to the CO.

4.5.15. **CONTRACT CLOSURE**

Upon expiration (or termination) of a contract, the CCM shall forward a BOPNet E-Mail message to the CO, with copies to the MCA, CCRA and CCA, that indicates:

a.  the contractor has completed services under the contract and all options have expired;

b.  the date and number of the final invoice and when it was received;

c.  when the invoice was certified and forwarded for payment;

d.  the amount of excess funds (ordinarily one month's accrual, if any) that need to be deobligated; and,

e.  the voucher number* and date (these will appear on the copy of the SF-1034 returned by the pay station).

[*This is the number assigned by the pay station before the voucher is forwarded to Treasury for payment.]

Following contract closure, all original documentation not a part of the official contract file should be mailed to the CO. All other contract documents maintained in the CCM Contract File may be destroyed.

PS 7300.09
10/28/04
Attachment 4-1, Page 1

REQUEST FOR CONTRACT ACTION (RCA)

(CO Use Only:  RCA NO:_____    RFP NO:_____)

1.    Type of Action Requested (Check One):

    a.  New ( )    b.  Replacement ( )    c.  Modification ( )

    If New or Replacement is checked, identify the following:
       Type of Services:


       Location - City:                State:
          County(s):

       Statement of Work (SOW):



       SOW page changes attached:  yes ( )    no ( )

    If Modification is checked, complete the following:

       Contractor Name:
       Contract Number:
       Location Code:

2.    Justification and Explanation for this request:




3.    Period services will be required:    - -    through    - -

4.    Fiscal Data

    a.  Accounting Code:  _ _ - _ - _ _ _ - _ _ _ - _ _ _ - _ _ _

PS 7300.09
10/28/04
Attachment 4-1, Page 2

   b.  Estimated Inmate-Days and Expenditures:

| Contract Period(s) | Inmate-days/Beds | | Cost Estimate | |
|---|---|---|---|---|
| | | | Per Capita | Per Period |
| Base Period | | | (Inmate-day) | |
| (Total) | | | | |
| __ - __ - __  through | M: | / | M: $ | $ |
| __ - __ - __ | F: | / | F: $ | $ |
| | Total: | / | Total: $ | |

| Contract Period(s) | Inmate-days/Beds | | Cost Estimate | |
|---|---|---|---|---|
| | | | Per Capita | Per Period |
| Option Year #1 | | | (Inmate-day) | |
| (Total) | | | | |
| __ - __ - __  through | M: | / | M: $ | $ |
| __ - __ - __ | F: | / | F: $ | $ |
| | Total: | / | Total: $ | |
| Option Year #2 | | | | |
| __ - __ - __  through | M: | / | M: $ | $ |
| __ - __ - __ | F: | / | F: $ | $ |
| | Total: | / | Total: $ | |
| Option Year #3 | | | | |
| __ - __ - __  through | M: | / | M: $ | $ |
| __ - __ - __ | F: | / | F: $ | $ |
| | Total: | / | Total: $ | |

5.  Suggested Sources:  Include complete address, contact person and telephone number for each source provided.  NOTE:  If this is a replacement requirement, asterisk the incumbent provider and include their Contract Number, Location Code, Per Diem rate and Expiration Date.

6.   List all existing Bureau of Prisons contracts providing similar services within 50 miles of the location identified for this request.  Include the contractor name, contract number, location code, per diem rate and expiration date for each contract listed.

7.   For billing purposes, provide the Community Corrections Manager's name, mailing address and telephone number below:

8.   Requested, Reviewed, and Approved by:          Date:

CCCOS:  _____     _____

  CCM:  _____     _____

  MCA:  _____     _____

 CCRA:  _____     _____

 CCAA:  _____     _____

Received by CC Contracting Section          _____

# MILESTONES FOR CONTRACT AWARD

RCA - Request for Contract Action

DOL - Department of Labor - Request for Wage Determination under service Contract Act

CBD - Commerce Business Daily - Advertising of Requirement

RFP - Request for Proposals

C&D - Clarifications and Deficiencies, Negotiation Process

B&F - Best and Final Offer

OPE - Office of Procurement Executive - DOJ





PS 7300.09
1/12/98
Attachment 4-3, Page 1

**CONTRACT OVERSIGHT SPECIALIST
PRELIMINARY SITE INSPECTION REPORT**


RFP #: _____     DATE OF INSPECTION: _____

OFFEROR: _____

SITE ADDRESS:   _____
                _____
                _____

OFFERORS REPRESENTATIVE(S) ON-SITE DURING INSPECTION (Name and
Title):
                _____   _____
                _____   _____
                _____   _____


SITE INSPECTION TEAM MEMBERS (Name, Position, and Office)

_____   _____   _____
_____   _____   _____
_____   _____   _____


This Preliminary Site Inspection was performed to evaluate the
offeror's facility in accordance with the solicitation's
evaluation criteria for facility and location and Statement of
Work (SOW).

**INTRODUCTORY COMMENTS**

Be definitive and cover such things as:

A.   If multiple-dwelling, how many units?  What will the other
units be used for, if not CCC purposes?  Is it multiple floors?
What's on other floors, if not intended for CCC purposes?  Were
they inspected?

B.   Who, if anyone, was present representing the offeror?  Who,
in addition to the COS, assisted in the inspection?  Is the RSS
report being mailed separately or is it included/attached?


C.   Were any plans given to you?  Did you view any?  Any
attached?  Did the offeror discuss his/her plans for the facility
or just walk around the building with you?  Do they have any idea
of how and in what way they plan to utilize the structure?

PS 7300.09
1/12/98
Attachment 4-3, Page 2

Facility Utilization:

   1.   How many residents can the facility accommodate?  Can the facility accommodate the residents/inmate-days for the Base and Option Years identified on this solicitation?

   2.   Is the area zoned for a CCC?  Or is the zoning such that a zoning variance will be required?  What source(s) provided you with this information?

   3.   Is the facility within one mile of public transportation?  (Describe what kind it is; if none exists, what plans, if any, were discussed or outlined to you for transporting CCC residents to the general area of employment opportunities?  How did you determine this area can be reached within one and one-half hours?)

   4.   Is the facility located in a high crime rate area?  (How did you determine this?  Cite all sources and the nature of their comments or actions; attach any and all documentation that supports your determinations.)

   5.   Is the facility accessible to the physically handicapped?  (If not, what plans, if any, were discussed or outlined to you for handicapped accessibility?)

PS 7300.09
1/12/98
Attachment 4-3, Page 3

6.    Discuss the facility's capability to provide for at least 60 square feet of personal living space per resident, through the final option year.  (Four square feet may be closet space, but this space may not include common areas, hallways, or bathrooms.  Does a local or state law or regulation require more space?  Actual measurements are required.)

7.    How many of the following are accessible to the resident population:  Wash Basins_____  Shower/Bathing Areas_____  Toilets_____.

8.    Is hot water thermostatically controlled not to exceed 120 degrees Fahrenheit?  (How determined?)

9.    Did you notice any pest or vermin?  Y or N (If "Y", describe.)

10.    How many washers and dryers does the facility have that are accessible to the residents?  Is there a commercial laundering facility within one mile of the facility?

11.    Do telephone facilities exist on the premises that would be accessible to the residents?  Y or N  (If "N", where is the nearest public phone?)

12.    How far from the facility is the nearest Fire Department or Fire Protection Service?

13.    How far from the facility is the nearest public medical facility that operates on a twenty-four hour per day basis? (Hospital? Clinic?)

14.    Can the facility accommodate both sexes?  Y or N  (If "Y", discuss the reasonable separation and supervision of the residents.)

PS 7300.09
1/12/98
Attachment 4-3, Page 4

15.  Is this facility specifically being designed for this contract?  Does it, or when renovated could it, have the capacity to house other than Federal offenders above the Bureau's estimated number of beds in this solicitation?


16.  Is there a kitchen and dining area capable of accommodating the estimated number of Federal offenders (normally 15 sq. ft. per person)?  (Describe the accommodations.)


17.  Describe the space for group meetings, visiting, indoor recreation, and counseling (normally 15 sq. ft. per person):  (Is it adequate to accommodate the population?)


18.  Describe the surrounding neighborhood:


19.  General Comments:




Distribution:   -Evaluation Panel Chairperson
                -CCM Office File
                -MCA
                -CCRA
                -CO

PS 7300.09
1/12/98
Attachment 4-4, Page 1

**REGIONAL SAFETY SPECIALIST
PRELIMINARY SITE INSPECTION REPORT**

Date of Report: _____

RFP#: _____     Date of Inspection: _____

Report Completed by:_____
Position:_____

Offeror: _____

Site Address:  _____
               _____
               _____

**INTRODUCTORY COMMENTS:**  Be definitive and cover such things as:

A.   The applicable edition of the Life Safety Code and Statement of Work (SOW) reference during this inspection.

B.   Type of structure, age, and general condition of the building.  Will major renovations be required to comply with NFPA-Life Safety Codes/SOW requirements?

C.   Were floor plans given to you?  Are any attached?  If present, did the offeror or his/her representative discuss their plans for the facility with you?

**DEFICIENCIES:**

Identify/describe what facility repairs, if any, must be accomplished to bring the structure into conformance with the NFPA-Life Safety Codes/SOW.

PS 7300.09
1/12/98
Attachment 4-4, Page 2

**RECOMMENDATIONS:**

**GENERAL COMMENTS:**

**DISTRIBUTION:** - Evaluation Panel Chairperson
- CCM Office File
- MCA
- CCRA

PS 7300.09
1/12/98
Attachment 4-5, Page 1

## PREOCCUPANCY INSPECTION

Contract #: _____    Award date: _____

Scheduled Performance Date: _____

Date Award Notification Received: _____

Date of Inspection: _____    Contract Location Code: _____

Facility Name and Address:          Contractor Name and Address:

_____        _____
_____        _____
_____        _____
_____        _____

Preoccupancy Inspection Team:       _____
                                    _____
                                    _____


INSTRUCTIONS:  This inspection is to determine if the contractor
has made required renovations to their facility and has the
essential resources to begin performance under the terms and
conditions of the contract.  Of particular importance are all
negotiated items that may have modified, waived, or clarified
requirements in the Statement of Work (SOW), or other provisions
of the contracts.

This is an internal, working document and does **NOT** go to the
contractor.  The findings and corrective action resulting from
this inspection are transmitted from the COTR (CCM) to the
contractor for correction.  Federal offenders should not be
placed in the facility if it is not ready to accept Federal
offenders, particularly if the deficiencies present a life safety
threat to the occupants.

1.   Introduction

     Ordinarily, the Contract Oversight Specialist (COS) and the
Regional Safety Specialist (RSS) will be performing all
preoccupancy inspections for CCC services.  Prior to performing a
preoccupancy inspection, a thorough review of the facility's

Preliminary Site Inspection findings (Attachment 4-3 and 4-4),
written negotiations, and a review of the SOW should be
accomplished.  For example, required renovation of the structure
to include a fire escape or the installation of a sprinkler
system during the Preliminary Site Inspection, should have been

PS 7300.09
1/12/98
Attachment 4-5, Page 2

clarified during negotiations (C&D's).  Unless you have received and reviewed this information, you cannot perform a proper preoccupancy inspection.

2.   Facility

a.   Following review of the Preliminary Site Inspection report and contract negotiation documents, list below what renovations/repairs/improvements, etc. the contractor has agreed to and should be completed to comply with the SOW/NFPA Life Safety requirements.  (Attach additional sheets if necessary.)

b.   What other items related to the facility needed to be installed or repaired?  (Installation of washers and dryers, telephones, additional sinks/toilets/showers, lockers/closets, remodeling of counseling or visiting rooms/areas, etc.)

c.   Review proof of zoning and other required licenses or permits.

d.   Verify the following standards:  air ventilation, lighting, square footage per resident, separate facilities (if co-correctional), handicap accessibility, space and furnishings for group meetings/visiting/recreation, and dining area.

e.   Verify pillow and mattress standards are met.

f.   Ensure written fire and evacuation plans, including diagrams, are posted in a conspicuous place.

g.   Review provisions for immediate fire department notification, if necessary.

3.   Administration

a.   Review the contractor's operations manual.

b.   Review the contractor's policy/procedures for funds accountability. (Receipt, disbursements, etc.)

c.   Review the contractor's policy prohibiting an employee from using their official position to secure privileges or advantages.

d.   Review the contractor's liability and property insurance policy to ensure coverage for the facility and equipment.

4.   Personnel

a.  Ensure the numbers and types of staff specified in the contract have been hired by the contractor.

b.  Have perspective staff names, social security numbers, dates-of-birth, race and sex been provided so NCIC/NLETS can be performed?

c.  Have you taken the fingerprints of the Facility Director and **all** other staff that have been hired by the contractor to perform services under this contract?

d.  Obtain copies of the Facility Director's employment application and resume.  BOP staff must verify the information contained in these documents (degrees, prior positions of employment, etc.).  Ensure the contractor has performed these same checks on all other contract staff.  Review documentation.

e.  Review the content of the initial orientation training to be provided to all new employees during their first week of employment.

f.  Compare each employee's qualifications against the job description for their position to ensure they meet the minimum qualifications for the job.

g.  Examine the contractor's work schedule to ensure it clearly defines the duty hours of each staff member.

h.  Ensure the contractor has advised all employees of the Standards of Conduct, and their notification has been documented.

5.  Intake/Programs

a.  Review policies and procedures for the referral and intake process.

b.  Examine the network of community resources and services the contractor is developing to assist offenders, particularly for employment purposes.

c.  Does the substance abuse counselor meet minimum qualifications.

d.  For substance abuse testing services, is the contractor ready to process samples (logs, bottles, alcolyzer, etc.)?

e.  Examine sign-out log to ensure the proper information is recorded.

    f.  Has the contractor provided for in-house recreation activities (such as, television, table games, exercise equipment, etc.)?

6.  Discipline

    a.  Has the contractor submitted their list of center rules and minor sanctions to the CCM for approval?

    b.  Ensure the contractor has the appropriate forms, and in a sufficient supply.  The contractor should be well-versed in exactly what steps and procedures are required in disciplinary proceedings.

7.  Services

    a.  Review the food service program.  Are the facilities ready to begin operations?  Menus have been reviewed and approved?

    b.  Have appropriate licenses and permits been obtained?

    c.  Is a written agreement with a local restaurant in place, (if applicable)?

    d.  Review the written arrangements ensuring the availability of 24-hour emergency medical care.

    e.  Have appropriate staff been trained in emergency first aid and CPR?

    f.  Does the contractor have basic first aid supplies on-site?

8.  Record System

    a.  Review the record and report system designed by the contractor to ensure it meets privacy standards.

    b.  Examine the resident's finances record sheets or log.  Is the appropriate information going to be collected?

9.  Escape

    a.  Have escape notification procedures been established?

10.  Research and Evaluation

PS 7300.09
1/12/98
Attachment 4-5, Page 5

    Examine the organized system of information collection,
storing, retrieval, reporting, and review.  Have center staff and
BOP staff been consulted in identifying information needs?

Inspection Team Certifications:

| Signature | Title | Date |
|-----------|-------|------|
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |

Distribution:  Original--CCM Office Contract File (Attached to a
copy of the letter sent to the contractor.)  Copy--Contracting
Officer via the CCM, MCA, CCRA, and CCA (Attached to a copy of
the letter sent to the contractor from the COTR (CCM).)

PS 7300.09
1/12/98
Attachment 4-6, Page 1

## MONITORING REPORT FORMAT

Contractor Name: _____

Contract Number: _____    Assignment Code: ____

### Background

- If first full monitoring, provide background information of award
- Contract quota and utilization over the past 6-12 months. Identify any trends in utilization (e.g., Federal, pretrial, state, home confinement, urban work camp, MINT etc.)
- Significant changes since last monitoring (modifications, staff changes, structural facility changes, etc.)

### Scope of Monitoring

- Type of monitoring (Full, Interim)
- Date(s) and time(s) staff were at the facility
- Any continuing concerns
- What were the findings of the previous full monitoring (if applicable)

### Findings

- Identification should be clear and concise and indicate the degree to which the program is deficient.
- Should include a reference to the requirement contained in the contract/SOW.
- Specify the corrective action to be taken and the date/number of days in which the contractor is to provide the CCM with a written response.

### Comments/Recommendations

- Strengths/Weaknesses


_____    _____
Signature - Community Corrections Manager/      Date
Contracting Officer's Technical Representative

PS 7300.09
1/12/98
Attachment 4-7, Page 1

## COMMUNITY CORRECTIONS CENTER
## FULL MONITORING INSTRUMENT

CONTRACTOR NAME:_____

CONTRACT NUMBER:_____ EXPIRATION DATE:_____

PLACE OF PERFORMANCE:_____
                          (Complete address)

_____

Date(s) & Type of Last Monitoring:_____

Type Use: _____  Major  _____  Moderate  _____  Minor

Average Daily Population Last Six Months: _____

Current Population:
     _____ Total _____ BOP _____ USPO _____ Pretrial _____ NonFederal

Bed Capacity for Federal Offenders:_____ Quota  _____ Max Cap

Other agencies this contractor performs services for are:

_____


Inspection Team: (Name & Job Title)

_____     _____

_____     _____


Prepared by:_____ Date:_____
                 (Name & Job Title)

Reviewed by:_____ Date:_____
                 (Name & Job Title)

**(Note:  This instrument requires "working papers" which clearly support how the findings in each area were determined.  Attach additional sheets as necessary for Discussion/Findings.)**
## Activity Sheet

(At a minimum, record the inspection team's specific date(s) and time(s) of arrival to and departure from the facility.  Feel free to add any additional information relevant to the inspection team's activities).

PS 7300.09
1/12/98
Attachment 4-7, Page 2

|                    | Arrival     | Departure   |
|--------------------|-------------|-------------|
| Team Member Name   | Date / Time | Date / Time |

Additional Information Relative to Team's Inspection Activity:

## ADMINISTRATION AND ORGANIZATION

_____ 1.  Does the contractor have documentation indicating their standing as a legal entity, or part of a legal entity?

_____ 2.  If a sole proprietorship, does the contractor have documentation indicating that legal measures have been taken to provide for continuity of service in the event of incapacitation, retirement, or death?

_____ 3.  Does the contractor have a written organizational chart that outlines the structure of authority, responsibility, and accountability within the contractor's facility and parent agency?

_____ 4.  Does the facility manager hold meetings at least monthly with facility staff to foster communication, establish policy, discuss problems, ensure compliance with requirements, and implement programs?

_____ 5.  Does the contractor maintain a current written operations manual that is available to staff, and reviewed at least annually?  Is it updated annually to reflect current policy?

_____ 6.  Does the contractor have a written system for disseminating new or revised policy and procedure to staff, volunteers, and if appropriate, to residents?

PS 7300.09
1/12/98
Attachment 4-7, Page 3

_____ 7.   Does the contractor conduct an internal audit of the program on at least an annual basis, using the SOW as a guide? Is a copy forwarded to the CCM?

_____ 8.   Does the contractor attend and participate in meetings/training sessions scheduled by Bureau of Prisons?

_____ 9.   Does the contractor have a written set of long-range goals which are reviewed and updated annually?

_____ 10.   Does the contractor have a written policy to prevent conflict of interest which specifically states that no employee may use his or her official position to secure privileges or advantages?

_____ 11.   Does the contractor have documentation of its tax exempt status, (if applicable)?

_____ 12.   Does the contractor have written policy and procedures for receipt, safeguarding, disbursement and recording of funds that comply with generally accepted accounting practices?

_____ 13.   Does the contractor have liability and property insurance for the facility and equipment?

_____ 14.   Does the contractor have written policy specifying that equal employment opportunities exist for all positions?

_____ 15.   Does the contractor ensure a resident is never in a position of control or authority over other residents?

_____ 16.   Does the contractor prohibit the use or possession of lethal weapons in the contract facility?

_____ 17.   If there have been instances of physical force used to control resident behavior, did the contractor send written reports to the CCM within 24 hours?  Was the contractor's decision to use it based on good judgment?

_____ 18.   Does the contractor conduct searches of the facility and personal belongings of residents, to include automobile searches, at a minimum of once per month?  Does the contractor conduct pat searches?  Do contractor staff only conduct strip searches with the approval of the director, and then, by the same gender staff and with two staff members present?  Is the basis for and results of the strip search documented?

_____ 19.   Are 75% of the services required in this contract provided by the contractor's staff?

PS 7300.09
1/12/98
Attachment 4-7, Page 4

_____20.   If accredited, does the contractor possess
documentation of this status?  If not accredited, does the
contractor plan to achieve this status?_____  When?_____

_____21.   Have any continuing or permanent deviations from the
provisions of the Statement of Work or proposal been submitted for
approval by the contractor through the CCM to the Contracting
Officer?

_____22.   Has the contractor provided for the translation of
facility rules, emergency diagrams, and other related documents
into a foreign language as required by the composition of the
resident population?

_____23.   Does the contractor ensure that residents are not used
for medical, pharmaceutical or cosmetic experiments?

   _____24.  Do contractor staff, especially key personnel, know
what SOW services are provided?

**Discussion/Findings**

PS 7300.09
1/12/98
Attachment 4-7, Page 5

**PERSONNEL**

_____ 1.   Does the facility have 24 hour per day fully dressed, wide-awake staff coverage by paid staff?

_____ 2.   Is the negotiated staffing pattern still in place? If population has significantly changed (+ or - 25%) has the original staff/inmate ratio been maintained?

_____ 3.   Does the contractor have written personnel policies which include:

        ___   staff training, development and retention
        ___   affirmative action
        ___   grievance & appeal procedures
        ___   orientation
        ___   employee performance evaluation
        ___   personnel records
        ___   hours of work
        ___   disciplinary procedures
        ___   terminations
        ___   resignations

_____ 4.   In addition to paid staff, are volunteers used at the discretion of the CCM, and subject to screening and standards of conduct identical to that for paid employees?

_____ 5.   Does the contractor have job descriptions for all staff positions performing services under this contract?  Does each job description accurately describe duties for the position and include, at a minimum, the job title, the responsibility of the position, and the required minimum education and experience?

_____ 6.   Does the contractor discriminate or exclude from employment women working in men's programs or men working in women's programs?

_____ 7.   Does the contractor have written policy providing for a probationary term followed by permanent status for new or promoted employees?

_____ 8.   Does the Center Director meet the minimum education and experience qualifications for that position as defined in the SOW?

_____ 9.   Does the contractor maintain a complete, confidential, and current personnel record for each staff member?

PS 7300.09
1/12/98
Attachment 4-7, Page 6

_____10.  Does the contractor evaluate each employee's performance on at least an annual basis?  Are the evaluations in writing, discussed with the employee, and signed by both the employee and the evaluator?

_____11.  Are new employees provided an initial orientation during their first week of employment?

_____12.  Are all key personnel full-time employees?  (Full-time employment is defined as forty hours per week.  Key personnel are defined as the facility manager, case manager, and counselor or staff in equivalent positions.  Any proposed changes of key personnel shall be submitted for approval through the CCM to the CO.)

_____13.  Does the contractor voucher potential employees through reference and employment checks prior to commencing employment duties?  Does the contractor require all proposed employees to provide complete details of any criminal conviction record?  Does the contractor notify proposed employees that a criminal records check may be processed by the CCM to verify employment applications?

_____14.  Does the staffing pattern of the facility concentrate program staff when most residents are available at the facility?  Does the contractor have a work schedule clearly defining the duty hours of each staff member?  If the contractor's facility also houses non-Federal residents, has the contractor maintained the percentage of each staff member's time devoted to Federal offenders as identified in their proposal?

15.  Does the contractor's standards of employee conduct include, at least, the following:

_____a.   the contractor shall not display favoritism or preferential treatment of one resident, or group of residents, over another;

_____b.   no contractor employee may deal with any resident except in a professional relationship that will support the approved goals of the center program; specifically, staff members must never accept for themselves or any member of their family, any personal gift, favor or service from a resident or from any resident's family or close associate, no matter how trivial the gift or service may seem; all staff are required to report to the center director any violation or attempted violation of these restrictions; in addition, no staff shall give any gifts, favors or services to residents, their families or close associates;

_____c.   no contractor employee shall enter into any business relationship with any resident or resident's family (e.g. selling, buying or trading personal property), or employ them in any capacity;

_____d.   other than incidentally, no contractor employee shall have any outside contact with a resident, ex-resident, resident's family or close associates, except for those activities which are an approved, integral part of the center program and a part of the employee's job description;

_____e.   contractor employees may not engage in any conduct which is criminal in nature or which would bring discredit upon the contractor or Bureau of Prisons; the contractor shall ensure that the conduct of all employees is above reproach; not only must employees avoid misconduct, but the appearance of misconduct as well;

_____f.   any violation or attempted violation of the restrictions referred to in this section on employee conduct shall be reported telephonically and in writing, including proposed action to be taken by the contractor, through the CCM to the CO?  Any failure to report a violation or take appropriate disciplinary action against contractor employees may subject the contractor to appropriate action, up to and including termination of the contract; and

_____g.   the contractor shall notify and train employees concerning the standards of conduct and document this notification in personnel files.

_____16.   Does the contractor observe the provisions of the Convict Labor Act? (Under the Act, residents are not permitted to perform work for the contractor, except that as part of the program, they may be required to maintain their respective living areas.  This includes sweeping and cleaning their immediate living area as well as recreation or day room areas, bathroom and shower areas, and passage and hallway areas.  "Extra Duty" could be imposed for minor rule infractions and could include such things as occasional lawn mowing or sanitation duties.  The intent of the statute is that inmates will not be used in lieu of paid workers.)

_____17.   The contractor may not employ any individual who is under supervision or jurisdiction of any parole, probation or correctional authority.  Are persons with previous criminal convictions, but who are not under supervision, employed by the contractor?  Has the Bureau of Prisons approved them?

PS 7300.09
1/12/98
Attachment 4-7, Page 8

**Discussion/Findings:**

## FACILITY

_____  1.  Is the contractor's facility in compliance with all applicable zoning ordinances?

_____  2.  Does the facility conform to all applicable building codes?  (The contractor's verification of compliance may be in the form of a license, letter and/or certificate from the appropriate local authority.)

_____  3.  Is the facility located within one mile of public transportation?  If not, does the contractor provide for transportation of residents for employment or program participation activities at no cost to the resident?

_____  4.  Is there any public concern or opposition to the contractor's program?  Has the contractor taken any steps to address this public concern or opposition? Is it having an adverse effect on the community or residents?

_____  5.  Is the facility located in an area where the commuting time to the general area of work is ordinarily no more than one and one-half hours each way via public transit?  Does the contractor arrange for transportation for indigent residents while seeking employment, at no cost to the resident?

_____  6.  Do the facility's sleeping quarters have adequate ventilation of outside or recirculated filtered air?

_____  7.  Do all areas in the facility have adequate lighting as defined in the SOW? (living/sleeping areas; grooming areas; kitchen storage areas).

_____  8.  Is the Contractor in compliance with the square footage requirements for resident sleeping areas as defined in the SOW and/or determined during contract negotiations? Is the facility in compliance with local, county, or state occupancy/maximum capacity requirements?

_____ 9.  Does the contractor ensure that residents are afforded a reasonable degree of privacy?  If co-correctional, does the facility provide for separate sleeping, bathing, and toilet facilities by sex?

_____10.  Is the contractor's facility and/or plans to accommodate the physically handicapped (staff, residents, visitors) in accordance with the awarded contract?

_____11.  Is private counseling space provided in the facility and, if so, is the space adequate?

_____12.  Are space and furnishings for activities such as group meetings, visits, and recreation provided in the facility and, if so, is the space adequate?

_____13.  Does the facility meet the SOW requirements governing the number of toilets, wash basins and showers for the resident population/quota?

_____14.  Do the showers and wash basins have hot and cold water? Is the hot water temperature thermostatically controlled at no more than 120 degrees Fahrenheit?

_____15.  Are laundry facilities available to all residents and are there an adequate number of washers and dryers for the resident population/quota if provided in-house? If no in-house laundry facilities are provided, are facilities available through a community establishment within one mile of the facility?

_____     Unless a resident chooses to launder his or her own belongings, is the cost of laundering resident's personal belongings provided by the contractor?

_____16.  Are telephone facilities on the premises accessible to residents?

**Discussion/Findings:**

PS 7300.09
1/12/98
Attachment 4-7, Page 10

### SAFETY/SANITATION/ENVIRONMENTAL HEALTH

_____ 1.  Does the contractor's facility meet requirements as defined in the current National Fire Protection Association (NFPA) 101, Life Safety Code?  (Note:  Applicable chapters of NFPA 101, as interpreted by Bureau of Prisons' representatives, will be applied during all facility inspections.  In addition to mandatory requirements, Chapters 16-21 of NFPA ordinarily apply to most facilities.  Verification of compliance may be in the form of a license, letter and/or certificate from an appropriate authority.)

_____ 2.  Does the facility comply with all local, state, and national health and safety codes?  If they conflict, is the most stringent met?

_____ 3.  Does the contractor provide for vermin and pest control?  Is routine trash and garbage removal taking place?

_____ 4.  Does the contractor provide for documented weekly sanitation and safety inspections of all internal and external areas and equipment?

_____ 5.  Do all resident mattresses, mattress pads, and pillows meet the Flammability Standard DOC-FF-472 or applicable State Code/Bulletin (e.g. California State Technical Bulletin 106) and Federal Flammability Standard 16 CFR 1632?

_____ 6.  Is there a housekeeping and maintenance plan in effect to ensure that the facility is kept clean and in good repair?

_____ 7.  Is each resident provided closet/locker space in the sleeping area for the storage of personal items?

_____ 8.  Upon arrival, is each resident issued one complete set of clean bed linens and towels?  Does the contractor provide for the exchange or laundering of these items on at least a weekly basis, at no cost to the resident?

_____ 9.  For indigent residents, does the contractor provide personal hygiene articles at no cost to the resident?

_____10.  Does the contractor permit residents to decorate their sleeping quarters with personal possessions, pictures, and posters without creating a fire hazard? (Offensive or obscene materials are prohibited.)

PS 7300.09
1/12/98
Attachment 4-7, Page 11

_____11. Does the contractor have adequate, written, updated fire evacuation and emergency plans posted in appropriate locations throughout the facility?

_____12. Are the plans kept updated and are CCC staff trained in the implementation of written emergency plans?

_____13. Are evacuation drills conducted at least monthly and during hours when a majority of residents are present in the facility?

14. Does the contractor arrange for and maintain documentation of the following tests and/or inspections:

_____a.   facility inspection by a representative of the local fire jurisdiction annually;

_____b.   inspection and test of the smoke and fire alarm system, and certification by an independent qualified source that the facility complies with the NFPA 101 Life Safety Code, at least annually; and

_____c.   inspection of all fire extinguishers on a quarterly basis, with hydro testing performed by an independent qualified source on the following basis:

> Class A (pressurized water) tested every five years;
> Class B ($CO^2$) tested every five years;
> Class ABC (dry chemical) tested every 12 years.

_____15. Is there a provision for immediate notification to a fire department in the event of a fire?

_____16. If required by the NFPA Life Safety Code, does the facility have a corridor smoke alarm **system** that will signal all residents and a manual pull station provided at a twenty-four hour supervised location.  (A **system** requires units be hardwired and tied into an enunciator panel at the twenty-four hour manned location.)

_____17. When was the facility last inspected by a BOP safety representative?  _____

**Discussion/Findings:**

PS 7300.09
1/12/98
Attachment 4-7, Page 12

## REFERRAL AND INTAKE PROCESSING

\_\_\_\_\_ 1.  Does the contractor have written policies and procedures governing offender referral and intake?

\_\_\_\_\_ 2.  Are all referrals processed through the CCM, and does the contractor consider Federal referrals only from the CCM?

\_\_\_\_\_ 3.  Does the contractor follow their criteria for rejecting referrals?  When a referral is unacceptable, is notification made in writing to the CCM citing the specific reasons for denial?

\_\_\_\_\_ 4.  Does the contractor discuss establishment of reporting dates with the CCM?  Is the notification of acceptance made in writing to the CCM, with a copy to the referring source?

\_\_\_\_\_ 5.  Does the contractor advise institution transfers of center rules and regulations at the time they are accepted for transfer?  Is the notification of center rules and regulations documented in the resident file with the signed written consent of the inmate?

\_\_\_\_\_ 6.  Do direct commitments and supervision cases sign a written consent to center rules and regulations at the time of intake processing?

\_\_\_\_\_ 7.  Are **all** residents advised that center director approval is required prior to entering into any contract?

\_\_\_\_\_ 8. Has the contractor developed an intake process with procedures that comply with contract requirements:

\_\_\_\_\_a.  Does the contractor immediately notify the CCM by telephone of the arrival of offenders?  (Should an offender arrive during evening hours, on weekends, or holidays, the CCM is to be notified during the next regularly scheduled working day.)

\_\_\_\_\_b.  Does the contractor send written notification of an offender's arrival to the appropriate USPO?

\_\_\_\_\_c.  For offenders who transfer to the CCC, does the contractor sign and return the Transfer Order (Return of Service) to the CCM?

_____d.   Does the contractor execute the Judgment and Commitment Order upon arrival of offenders committed directly from court to serve a sentence?  Do staff sign and date the original of the J & C and return it to the U.S. Marshal (USM) of the sentencing district, with a copy to the CCM, indicating the date the original was mailed to the USM?

_____e.   Does the contractor photograph offenders admitted to the center and maintain copies in accordance with the SOW requirements?

_____ 9.   Has the contractor developed procedures to ensure residents' fingerprints are taken for identification purposes?

_____a.   For other than institution transfers, does the contractor have a full set of prints taken and kept in the resident's file?

_____b.   If the contractor does not have staff trained in fingerprinting procedures, do they make arrangements with a local law enforcement agency;  do contractor staff accompany residents when prints are taken?

_____c.   If the center is operated by a state correctional or parole agency do they forward fingerprint cards to the Federal Bureau of Investigation in accordance with their own practices?

_____10.   Does the contractor complete an initial intake form for each resident which includes, unless prohibited by statute, at a minimum:  name, home address, date of birth, race or ethnic origin, sex, reason for referral, whom to notify in case of emergency, date information is gathered, name of referring source, special medical needs or problems, disposition of personal property in the event of transfer or death, personal physician (if any), legal status including jurisdiction, length and conditions of commitment, identifying numbers, and the signature of both the resident and staff taking the information? Is this form placed in the front section of the resident's file to facilitate easy access by staff?

_____11.   Do contractor staff practices and procedures ensure the confidentiality of case records?  Do operating practices and procedures adhere to applicable local, state, and Federal procedures and guidelines?  Prior to releasing information to employers and other third parties, is a release obtained from the resident?

PS 7300.09
1/12/98
Attachment 4-7, Page 14

\_\_\_\_\_12.  Have residents acknowledged other conditions of residence in a center program, which include but are not limited to, urine testing, subsistence collection, medical treatment, and an agreement to abide by posted regulations?  Is the **Conditions of Residential Community Programs** form signed by all residents?

**Discussion/Findings:**

## PROGRAMS

\_\_\_\_\_ 1.  Program Components:  are the offenders in the CCC classified into the appropriate program component? (Pre-Release; Community Corrections; Home Confinement).

**Resources:**

\_\_\_\_\_ 2.  Does the contractor develop and utilize a network of community resources and services, including referrals to other Federal, state and community agencies, in an attempt to fulfill each resident's specific program needs?

\_\_\_\_\_ 3.  Does the contractor's programs include individual counseling relative to the search for gainful employment, job training, academic and vocational training, establishment of family ties, consumerism, center behavior, substance abuse, post release residence, and community adjustment, as indicated by the individual's needs?

**Program Planning:**

\_\_\_\_\_ 4.  Within a resident's first two weeks, does the contractor complete an individual program plan which addresses all areas of resident needs and includes a time schedule for achievement?  Are all programs, services, and opportunities provided without discrimination based on race, creed, or national origin?

\_\_\_\_\_ 5.  Prior to developing the program plan for supervision cases, is the supervising authority (USPO, etc.) consulted and given the opportunity for input into the formulation of the plan?

PS 7300.09
1/12/98
Attachment 4-7, Page 15

_____ 6.  Is the program plan signed by the contractor and resident?  Is progress reviewed at least every two weeks by the contractor with the resident?  Is the outcome of each review chronologically documented in the resident's file and signed by taff and resident?  Are changes documented?  Do resident case notes have substance and clearly allow a monitor to determine resident progress or lack of it?  Are these notes the basis of the terminal report?

_____ 7.  If co-correctional, are males and females provided equal access to all services and programs?

**Resident Financial Responsibility:**

_____ 8.  Does the contractor collect 25 percent of each employed resident's weekly gross income, rounded down to a whole dollar amount?

_____ 9.  Does the contractor ensure individual subsistence collections do not exceed the weekly cumulative contract per diem rate (i.e., the daily rate x 7)?

_____10.  Does the contractor provide residents with receipts and  maintain collection records for audit purposes?  (Partial weeks of residence are prorated.)

_____11.  Are payments made at the conclusion of each week of residence? (except that payment for the last week may be required in advance.)

_____12.  Does the contractor reduce the monthly billing to the Bureau by the amount collected in subsistence?

_____13.  Unless granted a waiver by the CCM, are **all** residents held responsible for subsistence payments?

**Employment:**

_____14.  Does the contractor develop meaningful resident employment opportunities that match jobs to resident needs, aptitudes, desires and capabilities?

_____15.  To the extent needed, do contractor staff assist the resident in seeking employment?  Unless medically constrained, do residents secure full-time employment within fifteen working days?  Do proposed employment plans which are less than full-time have the approval of the CCC Director?

PS 7300.09
1/12/98
Attachment 4-7, Page 16

_____16.  Does the contractor require written approval for each resident's employment?  Does the contractor ensure the resident's employer is aware of the resident's legal status?  Is contractor approval required for any changes in a resident's employment?

_____17.  Does the contractor contact the resident's employment supervisor by telephone and in-person as required by the SOW?

_____18.  Is restriction from work used as a disciplinary sanction?

**Residence Development:**

_____19.  Does the contractor provide assistance to residents in locating housing/residence suitable for release purposes?

Is residence suitability verified by the contractor (and/or USPO) through an on-site visit and then submitted to the USPO for approval as a release residence (when supervision follows)?

**Substance Abuse:**

20.  Drug Aftercare Counseling/Urine Surveillance:

_____a.  For inmate residents who will have drug aftercare as a condition of supervision, does the contractor conduct a program planning conference within the first week of the resident's arrival?  Does the conference include the USPO, drug counselor, resident, and appropriate contractor staff?

_____b.  Is at least 30 minutes counseling provided weekly to inmate residents who will have drug aftercare counseling as a condition of their release supervision and/or have a known history of drug abuse, if not participating in the transitional drug services program?

_____c.  Does the substance abuse counselor (drugs and alcohol) have an advanced degree in behavioral sciences, or a bachelors degree in behavioral sciences and at least two years of substance abuse treatment experience or training?  (Para-professionals with appropriate training and experience may be utilized, provided they are under the direct supervision of a professional counselor.)  Are notes kept of all sessions?  If the counseling is provided by someone other than contractor staff, does the contractor maintain documentation (i.e., copies of paid invoices, etc.) to verify that services have been rendered?

PS 7300.09
1/12/98
Attachment 4-7, Page 17

_____d.   For urine testing, does the contractor utilize the laboratory under contract with the Bureau of Prisons or an acceptable alternative laboratory that meets **all** specifications as outlined in Attachment H, **Urine Testing Specifications?**

_____e.   Does the contractor maintain copies of paid invoices to verify that urinalysis services have been rendered? Is every urine sample tested for drugs found in the PRIMARY TEST PANEL?  (SOW attachment).

_____f.   Is all urine testing conducted on a "surprise", unscheduled basis in accordance with Attachment K, entitled **Standard Procedures For Collecting Urine Surveillance Samples**? Do staff keep the resident under direct supervision following request for a sample?

_____g.   If the resident is unable to provide a urine sample, do staff continue direct supervision for a two-hour period following the request for a sample?

_____h.   Are all residents who have a condition of drug aftercare, a known history of drug abuse, or suspected of illegal drug use required to provide urine samples at a minimum of four times per month?

_____i.   Are all confirmed disruptive group members tested every month for drugs and marijuana use?

_____j.   Are all other residents randomly tested at least at the rate of one for every ten residents per month?  When testing in greater numbers, is CCM approval obtained?

_____k.   Are urine samples collected in an approved container with same-sex contractor personnel visually observing production of the sample?  As soon as the sample has been collected, do staff secure the specimen in a locked container?

_____l.   To ensure the integrity and security of the process, does the contractor establish a chain of custody from the point of receiving the empty bottle supplies from the laboratory until the samples are mailed to the lab for analysis?

_____m.   Do procedures ensure no unauthorized persons or residents are involved in the handling of empty bottle supplies or the collecting, recording, mailing or processing of urine test samples?



PS 7300.09
1/12/98
Attachment 4-7, Page 18

_____n.   Does the contractor take disciplinary action on "stalls"?  Is drinking and ingestion of medication limited to essentials during the two hour waiting period?

_____o.   Are the minimum waiting periods between successive positive samples as outlined in Attachment L, **Detections Periods For Selected Drugs**, observed?

_____p.   When a positive finding cannot be explained, do contractor staff thoroughly investigate the positive urine test result to validate the positive finding?  Does the contractor report all unauthorized positive test results to the CCM the day received?  Do residents who have positive test results without justification receive a formal disciplinary report?

21.  Alcohol Testing:

_____a.   Does the contractor maintain a surveillance and counseling program to deter and detect introduction or use of alcohol in the facility?

_____b.   Does the contractor test at a minimum of one test for every ten residents on a weekly basis?  Are tests on a "surprise" basis?

_____c.   Does the contractor maintain a log of residents subjected to tests, the staff performing the test, test results, and a column to indicate if the resident refused to cooperate?

_____d.   Is a reliable testing instrument such as that used by the Bureau of Prisons (Alco-Sensor Model II or III, or comparable instrument or device) used for testing?

_____e.   Does the contractor ensure that staff using the instrument are familiar with its operation as outlined in the manufacturer's operating instructions?  Is an incident report prepared if a positive alcohol test results, charging the resident with using intoxicants?

_____f.   Do residents who refuse to submit to an alcohol test, either through word or action, receive an incident report?

_____g.   Is alcohol counseling provided to residents on an as-needed basis, with the counseling tailored to the individual's needs?  Are all counseling sessions documented in the resident's file?

PS 7300.09
1/12/98
Attachment 4-7, Page 19

## Special Supervision Conditions:

_____22.  Does the contractor confer with the USPO/CCM on policy and procedures for implementation of all special supervision conditions?

## Authorized Absences:

_____23.  Does the contractor ensure residents leave the facility only through sign-out, pass, furlough, or home confinement?

_____24.  At the time of intake, does the contractor contact the USPO in the appropriate jurisdiction(s) to determine if there are any objections to passes or furloughs at the location proposed by the resident?  If any subsequent changes in pass or furlough location occur, does the contractor obtain additional clearance from the USPO?

_____25.  Except for employment and other approved program activities (i.e., seeking employment, meals served through a local restaurant, attending religious services, etc.), are residents in the Community Corrections Component only permitted to leave the center with prior approval of the CCM?

_____26.  Does the contractor (or USPO) make an initial on-site visit of the proposed location where passes or furloughs are expected to take place?

_____27.  For purposes of accountability, are authorized absences randomly checked by the contractor to determine resident compliance with specified conditions?  Has the CCM been consulted regarding the frequency of these checks?

_____ 28.  Sign-Out Procedures:

_____a.  Does the contractor monitor and control access to the center's sign-in/out log, and determine the identity of any visitors?

_____b.  Does the contractor maintain procedures for locating and verifying the whereabouts of residents at all times? Do these procedures include separate formal sign-in/out log sheets for each resident?  Does each log sheet contain: resident's full name, register number, present legal status, time-out, destination, purpose, authorized return time, time-in, a section for special comments, and certification by staff's signature or initials?

_____c.  Ordinarily, are only pre-release component

PS 7300.09
1/12/98
Attachment 4-7, Page 20

residents who are employed, involved in an education or vocational training program, or are considered medically unable to work, absent from the center for social purposes?

_____d.   Other than for employment, are residents in the center by 9:00 P.M. each night?  (Specific exceptions require center director approval.)

_____e.   If the center does not have in-house recreational capabilities, are residents in the Community Corrections Component permitted to sign-out for up to one hour per day to the immediate vicinity of the facility for exercise/recreational activity?

29.  Passes:

_____a.   Are passes used to authorize overnight or weekend absences?  (A pass is limited to the local community, up to a 100 mile radius.)

_____b.   Ordinarily, are residents in the Community Corrections Component not eligible for passes?

_____c.   Do passes begin only after the resident's return to the center after work on Friday and extend to curfew on Sunday, or the equivalent should the resident have days off other than Saturday and Sunday?  (More than one pass during a given week requires the approval of the CCM.)

_____d.   Does the contractor ensure the Pass Request Form (Attachment N) is completed and signed by the resident?  Are these requests retained in the resident's case file?

_____e.   Are passes recommended only by a paid staff member and only approved and signed by the CCC director?  Is a record of pass approvals/denials maintained?

30.  Furloughs:

_____a.   Except for home confinement, are absences from the facility exceeding two consecutive overnight periods (except holidays) or 100 miles (except for employment) only authorized by furlough?  Is CCM written approval obtained?

_____b.   Does the contractor reserve a bed for a resident on furlough?

_____c.   Does the contractor ensure furloughs are not used to reward offenders or as an incentive to positive adjustment?

PS 7300.09
1/12/98
Attachment 4-7, Page 21

_____d.   Do furlough applications have the center director's recommendation?

_____e.   Does the recommendation include documentation the USPO does not object to the furlough?

_____f.   Does the contractor maintain a record of furloughs that includes the date and time of departure, the date and time of return, and notes regarding any contacts with the resident during the furlough period?

_____g.   Is the per diem rate for residents on furlough one-half the regular per diem rate?

31.   Home Confinement:

_____a.   Is placement on Home Confinement status ordinarily recommended when an inmate has secured employment, a place to live and has demonstrated that he/she no longer requires the level of accountability and services the CCC provides.

_____b.   Does the contractor's recommendation for approval of Home Confinement cases meet the following criteria:  the resident will derive no further significant benefit from continued CCC residence; the resident has developed a release plan that has been approved by the supervising United States Probation Officer; and, the resident is not considered to present a substantial threat to the community or the safety of others?

_____c.   Does the contractor forward a written recommendation outlining the plan and a completed copy of Attachment J, **Conditions of Home Confinement**, to the CCM for approval?

_____d.   Do residents telephonically contact the center staff each day except when they are required to report to the center or when they have been visited by center staff?

_____e.   Do contractors further verify that residents are following the conditions of Home Confinement through random phone calls each week? (or through the use of electronic monitoring devices)

_____f.   Do staff visit residents on Home Confinement at their homes and at their places of employment at least once each week?

PS 7300.09
1/12/98
Attachment 4-7, Page 22

_____g.   Do residents on Home Confinement, who are not on electronic monitoring, return to the center at least twice each week for routine progress reviews, counseling, urine testing and other required program participation?  Do residents on electronic monitoring return to the facility at least once each week?

_____h.   Do residents on Home Confinement maintain a 9:00 PM to 6:00 AM curfew each day? (unless an exception is recommended by the contractor and approved by the CCM.)

_____i.   Are drug and alcohol testing and counseling requirements applied to residents on Home Confinement?

_____j.   Does the contractor maintain documentation of all staff contacts with residents on Home Confinement?

_____k.   Does the contractor notify the CCM immediately of any misconduct or failure of a resident on Home Confinement to comply with Home Confinement Conditions?

_____l.   Does the contractor collect subsistence from a resident on Home Confinement? (the weekly subsistence collected shall not exceed the per diem rate established for Home Confinement times seven.)

_____m.   Are offenders on probation, parole, or under supervised release supervision placed on Home Confinement only when ordered by the Court or Parole Commission to (1) "reside in or participate in the program of a community corrections facility" **and** to (2) participate in a Home Confinement Program?

_____n.   Does the contractor ensure that Corrections Component residents are not placed on Home Confinement unless ordered by the Court?

_____o.   Is the per diem rate for residents on Home Confinement one-half the regular per diem rate?

32.  Driving:

_____a.   Do CCC residents operate motor vehicles only when recommended by the contractor and approved by the CCM?

_____b.   Has the resident provided proof of valid insurance, driver's license, vehicle licensing and registration to the contractor?  Does the contractor maintain copies of these documents? (If the state prohibits copying, the contractor should record the driver's license number and expiration date in the resident's file.)

PS 7300.09
1/12/98
Attachment 4-7, Page 23

_____c.    If the vehicle is the property of someone other than the resident, does the contractor have documented proof of valid insurance, vehicle licensing and registration, and a signed authorization (either notarized or witnessed by CCC staff) from the legal owner permitting the resident to use the vehicle?

_____d.    Does the contractor maintain the license number and a description of the vehicle on file?

33.    Marriage:

_____a.    Does the contractor refer an inmate resident's request for marriage to the CCM, with recommendations?

_____b.    Are marriage requests for residents under supervision forwarded to the USPO?

34.    Visiting:

_____a.    Is an area of the facility available for the purpose of resident visiting?

_____b.    Does the visiting area afford a reasonable amount of privacy as well as provide for adequate staff supervision?

35.    Recreation:

_____a.    Are in-house recreation activities (i.e. television viewing, table games, exercise equipment, etc.) made available to residents?

**Discussion/Findings:**

PS 7300.09
1/12/98
Attachment 4-7, Page 24

## DISCIPLINE

Determine if the contractor follows required disciplinary procedures.

No deviation is permitted

\_\_\_\_\_ 1.  Has the contractor provided a list of center rules and minor sanctions to the CCM for approval?

\_\_\_\_\_ 2.  Does the contractor provide each resident with a copy of BOP Prohibited Acts (Attachment A), approved center rules, written description of the disciplinary system within the center and time limits thereof?  Are they posted in a conspicuous place?  Is a receipt signed by the resident and placed in the resident's file?

\_\_\_\_\_ 3.  Other than Prohibited Acts in the "Greatest" category, does the contractor always attempt to informally resolve incidents by imposition of approved contractor minor sanctions?

\_\_\_\_\_ 4.  Are supervision cases subject to center rules?

\_\_\_\_\_ 5.  When a formal hearing by the CDC occurs, does the contractor take appropriate actions?

6.  Has the contractor demonstrated an understanding of major sanctions?  Are they appropriately recommended?

\_\_\_\_\_ 7.  Discuss the contractor's performance in following disciplinary procedures and time limits when informal resolution was not possible or appropriate:  (major sanctions)

**Discussion/Findings:**

PS 7300.09
1/12/98
Attachment 4-7, Page 25

**SERVICES**

### Food Services

_____ 1.  Do food services consist of meals that appear to be nutritional and well-balanced?

_____ 2.  Are all residents, regardless of employment or financial status, provided the opportunity for food services throughout their stay in the center at no cost?

_____ 3.  Does the contractor provide a food service program either by contractor preparation and serving in the facility, by providing food to the resident for preparation by the resident, or through a sub-contractual agreement with a food service provider (i.e., restaurant, caterer, etc.)?

_____ 4.  Are menus prepared and available to the residents?

_____ 5.  Does a registered dietician or licensed physician or nutritionist approve the nutritional value of the contractor's menu? (annually if fixed and semi-annually if menus are not fixed).

_____ 6.  Does the contractor make arrangements for special diets when required by a physician or dentist?

_____ 7.  Are provisions made to accommodate residents who work irregular hours and not available at mealtime?

_____ 8.  If the contractor provides food services in the facility, is an area separate from sleeping areas and adequate in size to accommodate the majority of the residents designated as a dining area?

_____ 9.  Is the dining area, regardless of the food service method utilized by the contractor, part of an establishment that serves alcoholic beverages?

_____10.  If the contractor prepares and serves meals in the facility, do all persons preparing food comply with Federal, state, and local health and sanitation codes?  (In the event of any conflict in these codes, the most stringent will apply.)

PS 7300.09
1/12/98
Attachment 4-7, Page 26

Does the contractor meet the following minimum requirements:

_____a.   Food is in sound condition, free from spoilage, filth, or other contamination and is safe for human consumption. Food is obtained from sources that comply with all laws relating to food and food labeling.

_____b.   Food containers are not stored under exposed or unprotected sewer lines or water lines, except automatic fire protection sprinkler heads that may be required by law.  The storage of food in toilet rooms or vestibules is prohibited.

_____c.   Potentially hazardous food is kept at an internal temperature of 40 degrees Fahrenheit or below, or at an internal temperature of one hundred forty degrees Fahrenheit or above during display and service, except that rare roast beef is held for service at a temperature of at least one hundred thirty degrees Fahrenheit.

_____d.   No person, while infected with a disease in a communicable form that can be transmitted by foods or who is a carrier of organisms that cause such a disease or while afflicted with a boil, an infected wound, or an acute respiratory infection, is working in a food service establishment in any capacity in which there is a likelihood of such person contaminating food or food-contact surfaces with pathogenic organisms or transmitting disease to other persons.

_____e.   Employees thoroughly wash their hands and the exposed portions of their arms with soap and warm water before starting work, during work as often as necessary to keep them clean, and after smoking, eating, drinking or using the toilet.

Employees keep their fingernails clean and trimmed.  Long hair or beards are tied up and covered with a hat, beard guard or put in a hairnet.

_____f.   Tableware is washed, rinsed, and sanitized after each use.

_____g.   Cleaned, sanitized equipment and utensils are handled in a way that protects them from contamination.  Spoons, knives and forks are touched only by their handles.  Cups, glasses, bowls, plates and similar items are handled without contact with inside surfaces or surfaces that contact the user's mouth.

PS 7300.09
1/12/98
Attachment 4-7, Page 27

_____h.   Garbage and refuse is kept in durable, easily cleanable, insect-proof and rodent-proof containers that do not leak and do not absorb liquids.

_____i.   Effective pest control measures are utilized to minimize the presence of rodents, flies, cockroaches, and other insects on the premises. The premises are kept in such condition as to prevent the harboring or feeding of insects or rodents.

11.   If the contractor provides meals to residents through arrangements with a local vendor (restaurant, caterer, etc.), do they have a copy of their agreement, which ensures the following:

_____a.   that the establishment is a full-service organization, capable of providing breakfast, lunch, and dinner meals; and,

_____b.   that the establishment has a valid state or local license, certificate or permit, as applicable, to operate, prepare and/or serve food and meets all state and/or local sanitation and health codes.

_____12.   Is appropriate space and equipment available for the proper storage and refrigeration of food supplies?

_____13.   Are dry food supplies stored off the floor in a clean, dry, ventilated room not subject to waste water backflow or other contamination?

_____14.   Are foods needing refrigeration stored at thirty-five to thirty-eight degrees Fahrenheit?  Is a thermometer conspicuously displayed inside the refrigerator?

_____15.   If the facility has a kitchen, is the kitchen and dining area ventilated, properly furnished, and clean?

_____16.   Does the contractor ensure food or prepared meals do not have poppy seeds as an ingredient?

_____17.   Are residents advised not to eat anything made with poppy seeds?

## Medical Services

_____18.   In an emergency, does the contractor obtain the necessary medical treatment required to conserve the resident's health and notify the CCM of treatment within twenty-four hours?

PS 7300.09
1/12/98
Attachment 4-7, Page 28

_____19.  If the resident cannot pay, does the contractor pay for such treatment and submit the paid invoice with the regular monthly billing for reimbursement by the government?

_____20.  Are written arrangements made with a licensed general hospital, private licensed physician or clinic to ensure that emergency medical service is available twenty-four hours a day?

_____21.  Does the contractor make arrangements for a medical examination of residents within twenty four hours of suspecting communicable or debilitating physical problems?  Does the contractor pay for the examination and submit the paid invoice with the regular monthly billing for reimbursement by the government?

_____22.  Except for transfers from a Federal institution, when an offender is admitted directly to the center does the contractor ensure that a physical examination is accomplished within five working days of arrival at the center?

_____23.  Is the examination a general office physical comparable to an insurance type physical, (i.e., routine laboratory studies - CBC, urinalysis, serological tests for syphilis, chest X-ray, Tine Test, etc.) that does not require hospitalization to complete the exam?

_____24.  Are the results of the evaluation appropriately documented and made a part of the resident file, with a copy of the exam's findings sent to the CCM?

_____25.  Does the contractor pay for the examination and submit a copy of the paid invoice with the regular monthly billing for reimbursement by the government?

_____26.  Does the contractor have basic first aid supplies, as provided in the American Red Cross First Aid Manual, on-site at all times?

_____27.  Is at least one staff member on each shift trained in emergency first aid and cardiopulmonary resuscitation (CPR)?

_____28.  Does the contractor have written policy and procedure regarding a resident's possession and use of prescribed medication and over-the-counter drugs?

**Discussion/Findings:**

PS 7300.09
1/12/98
Attachment 4-7, Page 29

## RECORDS AND REPORTS

1.  Does the contractor maintain a case record for each resident that includes all significant decisions and events relating to that resident, and at a minimum, the following information:

_____a.   initial intake information form

_____b.   case information from referral source, if available

_____c.   case history/social history

_____d.   medical record, when available

_____e.   individual program plan

\_\_\_\_\_f.   signed release of information and other consent forms

_____g.   evaluation and progress reports

_____h.   current employment data

\_\_\_\_\_i.   signed acknowledgment of receipt of program rules and disciplinary policy

_____j.   grievance and disciplinary record

_____k.   documented legal authority to accept resident

\_\_\_\_\_l.   referrals to other agencies

_____m.   terminal report

_____n.   record of resident finances

\_\_\_\_\_ 2.  In order to facilitate the planning, implementation, and evaluation of programs, are entries into the case records dated and signed by the staff member making the entry?

\_\_\_\_\_ 3.  On at least a quarterly basis, does the contractor perform an audit of case records to ensure that current and accurate material is being entered into the record?

_____ 4.  Does the contractor release information (other than contractor generated information) from the resident's file to the resident only with CCM approval?

_____ 5.  Does the contractor ensure that information is not released to any other individual(s) unless Attachment I, **Conditions of Residential Community Programs**, has been executed?

_____ 6.  Does the contractor provide appropriate safeguards to minimize the possibility of theft, loss or destruction of resident file records?

_____ 7.  Does the contractor ensure only authorized staff have access to resident records?

_____ 8.  Does the contractor complete the **Urine Sampling Program Report** (Attachment M) on a monthly basis and forward it to the CCM along with the monthly billing?  Does a copy of this report go to the Chief United States Probation Officer?

_____ 9.  Does the contractor maintain a chronological log for all residents tested under the urine testing program?

_____10.  Does the urinalysis log include specimen number, resident's name and number, date sample collected, staff member witnessing collection, reason for test, results and date received?

_____11.  Are these individual logs placed in the resident's file?

_____12.  When submitting a sample for testing, does the contractor complete the sampling ID slip and place it in the individual resident's file so the results can be compared with this slip when received from the laboratory?

_____13.  Does the contractor maintain a record of the following resident finances: wages and salaries, number of hours worked, amount and type of deductions (i.e.,Federal taxes, state taxes, social security contributions, etc.), savings, and amount of subsistence collected?

_____14.  Except for supervision cases, is the BP-ADMIN-193 (In-Transit Information) completed by the contractor and given to the U. S. Marshal, or other appropriate Federal authority, on all resident program failures?

**Discussions/Findings:**

PS 7300.09
1/12/98
Attachment 4-7, Page 31

## RELEASE PREPARATION

1.  At least six weeks prior to the release date, does the contractor present a release plan as follows:

_____a.   in parole cases - to USPO for approval, with a copy to the CCM;

_____b.   in mandatory release cases - although no government approval is necessary, a release plan is developed and sent to USPO, with a copy to the CCM;

_____c.   in expiration cases or supervised release cases - although no government approval is necessary, a release plan is developed and sent to the CCM.

_____ 2.  Do the plans include the verified specifics of the proposed residence, employment or training program, and family situation?

_____ 3.  If an approved plan cannot be developed by the release date in parole cases, does the contractor immediately notify the CCM and U.S. Parole Commission of the delay?  Does the contractor ensure the resident is not released until a plan is approved and parole certificates are received?

_____ 4.  Does the contractor understand the USPO may wish to comment on the adequacy of the release plan on other types of release cases, although approval is not required?  (mandatory release, expiration and supervision cases with a fixed term of center residence as a supervision condition)

_____ 5.  Does the contractor verify the correctness of each resident's release date with the CCM prior to each resident's release?

_____ 6.  Are release dates of any Federal prisoner retarded, advanced or otherwise changed without approval of the CCM or U.S. Parole Commission?

### Release Certificates:

_____ 7.  For mandatory release cases, does the contractor execute Mandatory Release Certificates at the time of the resident's release?

PS 7300.09
1/12/98
Attachment 4-7, Page 32

_____ 8.  For parole cases, after the USPO has formally accepted the proposed release plan, does the contractor immediately request parole certificates from the appropriate regional office of the U.S. Parole Commission, with a copy to the CCM?

_____ 9.  Does the contractor obtain the signature of the parolee on the certificate and execute formal discharge procedures?

_____10.  If a parolee refuses to sign the certificate, does the contractor understand the resident may not be released and the matter should be referred to the U. S. Parole Commission for resolution?

### Release Clothing, Funds, and Transportation:

_____11.  When necessary, does the contractor develop and submit an itemized plan for a resident's release clothing, funds, and transportation needs to the CCM for approval?

_____12.  If approved, does the contractor provide the releasee with funds, clothing, and make the necessary transportation arrangements for the resident?

_____13.  Is documentation (i.e., paid invoices, etc.) forwarded with the monthly billing for reimbursement by the government of CCM approved expenditures?

_____14.  At release, do staff ensure the releasee understands his status, the condition of any supervision required, and a resident who will be under supervision of a USPO must report to that office within seventy-two hours after release?

_____15.  Does the contractor ensure that residents take all of their personal property?

_____16.  When a resident is released during working hours, does the contractor immediately notify the CCM by telephone, or if the release occurs outside working hours, the next working day?

_____17.  Are terminal reports completed within three working days of the resident's release and include, in addition to the identifying data, a description of the resident's adjustment while under the care of the contractor, a prognosis for future adjustment, the amount of money in savings and/or contributions to dependents, and his/her release plans, including residence, employment and salary?

PS 7300.09
1/12/98
Attachment 4-7, Page 33

_____18.  Does the contractor follow required distribution: original to CCM, copy to appropriate U.S. Parole Commissioner and a copy to appropriate USPO?

**Release Documents:**

19.  Does the contractor complete the following documents and distribute them within three working days of the resident's release:

_____a.  Release Certificates (Parole, Special Parole Term, Mandatory Release): dated signature of releasee, and staff; Distribution: original to releasee, copies to appropriate Regional U.S. Parole Commission, USPO, and CCM.

_____b.  Notice of Release and Arrival:  Distribution: original to releasee, copies to appropriate Regional U.S. Parole Commission, USPO, and CCM.

**Property Disposition:**

_____20.  Does the contractor establish and maintain a system of accountability and method of disposition of residents personal property to be implemented in the event of a resident's death, escape, or transfer?

_____21.  Are inventories of resident property accomplished by no less than two staff, and both sign the completed inventory list?

_____22.  Is a resident's property immediately secured, and inventoried within eight hours of a resident's death, escape, or transfer?

_____23.  If a resident is being held in a local jail, is the individual identified as "to be notified in case of emergency" advised to pick up the resident's property?

**File Disposition:**

_____24.  Upon completion or termination of the resident's program, does the contractor forward the resident's file to the CCM? (The contractor may retain public information which can identify the former resident, copies of research data which have been depersonalized and copies of reports generated by the contractor.)

**Supervision Cases:**

PS 7300.09
1/12/98
Attachment 4-7, Page 34

_____25.  When the term of residence specified by the court has been completed, or when the center determines that the resident's program is completed or that participation in the center's program will produce no further significant benefits, do staff notify the USPO who will then make other arrangements for the residence, program, and welfare of the releasee?

_____26.  Are terminal reports completed by the contractor and forwarded to the USPO and CCM?

**Discussion/Findings:**

## ESCAPES

_____ 1.  Does the contractor notify the U.S. Marshal and CCM immediately upon identifying a resident as an escapee?

_____ 2.  Does the contractor understand that residents under supervision are not in the custody of the Attorney General (probationers, parolees, pre-trial defendants, mandatory releases, supervised releases) and cannot be considered escapees?

_____ 3.  Does the contractor understand that unauthorized absences of residents under supervision are to be immediately reported to the supervising authority? Is the CCM notified no later than the next business day?

**Discussion/Findings:**

## SERIOUS ILLNESS, INJURY, OR DEATH OF A RESIDENT

_____ 1.  Whenever a resident becomes seriously ill or requires emergency medical treatment, does the contractor immediately notify the CCM, USPO, and the resident's family or next of kin?

_____ 2.  In the event of an inmate resident's death, does the contractor immediately notify the CCM, USPO, and the resident's family or next of kin?

_____ 3.  Do center staff arrange for a fingerprint (right thumb or right index finger) to be taken, and date and sign the fingerprint card to ensure that positive identification has been made?

_____ 4.  Is the fingerprint card sent by certified mail to the CCM?

_____ 5.  If death is due to violence, accident surrounded by unusual or questionable circumstances, or sudden and the deceased was not under medical supervision, do center staff notify appropriate law enforcement officials of the local jurisdiction to review the case and examine the body?

_____ 6.  When there is no longer an official interest in the body, is it turned over to family members or next of kin?

_____ 7.  If the family declines the body or is unable to afford funeral expenses, does the contractor contact the CCM for disposal instructions?

_____ 8.  Is personal property of a deceased resident inventoried by next of kin?

**Discussion/Findings:**

## RESIDENTS UNDER SUPERVISION

_____1.  Does the contractor only accept persons described in this chapter when they have been approved for placement by the CCM?

_____2.  Does the contractor provide all services and programs cited in the Statement of Work for all persons described in this chapter, except as otherwise specified below:

_____a.  Do center staff in cooperation with the USPO develop an individual program plan for each resident?

PS 7300.09
1/12/98
Attachment 4-7, Page 36

_____b.   Does the contractor notify the USPO of medical problems of probationers, parolees, mandatory releases, supervised releases, and pre-trial defendants?  (Except for entrance physical exams, all medical and dental expenses for persons under supervision of a USPO  are the responsibility of the resident.)  Do the staff assist the resident in finding appropriate community resources?

_____c.   Is permission to drive approved by the center director and the supervising USPO?

_____d.   Are persons under supervision subject to center rules and minor sanctions?

_____e.   If a prohibited act is alleged to have been committed by a resident under supervision which would require a recommendation of a major sanction and a formal disciplinary hearing, do center staff forward reports of such misconduct with recommendations to the USPO for disposition? Is the original of the report forwarded to the USPO, with a copy to the CCM?

_____f.   Does the contractor ensure that persons under supervision are not placed in United States Marshal custody?

_____g.   Are unauthorized absences of persons described in this chapter reported immediately to the USPO, and the CCM is notified the next business day?

_____h.   Are costs of drug counseling and urine surveillance the administrative and fiscal responsibility of the USPO?  Does the contractor work closely with the supervising USPO to coordinate services?

_____i.   Are supervision cases subject to the same subsistence collection procedures as committed residents?

_____j.   When the term specified by the court has been satisfied, or the center director determines that a resident's program is completed or that participation in the center's program will produce no further significant benefits, do staff notify the USPO (with a copy to the CCM) requesting program termination?

_____k.   Is a terminal report completed by the contractor and forwarded to the USPO, with a copy to the CCM?

_____l.   Are residents identified in this chapter eligible for furloughs or home confinement?

PS 7300.09
1/12/98
Attachment 4-7, Page 37

_____m.   Are absences other than "sign-out" or pass approved by the supervising USPO, and documented?

_____n.   In the event of a death of a resident under supervision, does the contractor immediately notify the CCM and USPO?

**Discussion/Findings:**

### RESEARCH AND EVALUATION

_____ 1.   Does the contractor have an organized system of information collection, storing, retrieval, reporting, and review?

_____ 2.   Are contractor staff and the CCM considered instrumental in identifying information needs, and consulted when policies and procedures are being developed?

**Discussion/Findings:**

PS 7300.09
1/12/98
Attachment 4-7, Page 38

**LIST NAME AND POSITION OF
STAFF INTERVIEWED DURING
VISIT:**

**LIST NAME AND REGISTER NO.
OF RESIDENTS INTERVIEWED
DURING VISIT:
(Add Comments)**

**SUMMARY**

Indicate areas in which contract needs improvement and steps to
be taken to accomplish, including time frames for completion.
(Use additional sheets, if necessary.)

Finding              Corrective Action        Should failure to correct
                     Required                 finding result in
                                              adverse action (i.e.,
                                              cancellation of contract)?
                                              (Give reasons.)

PS 7300.09
1/12/98
Attachment 4-7, Page 39

## RESIDENT INTERVIEW WORKSHEET

This is a  guideline only.  It is not meant to be read to the resident word by word nor is it meant to be all inclusive.

1.    Are counseling staff available during the hours you are free from work?


2.    Do you have any problems getting to and from work.  What mode of transportation do you use?



3.    Do you have any problem getting clean bed linens, towels, etc.?  How often?  Are there facilities available to wash clothes?



4.    Do you have a program plan?  How was it worked out?  Do you review it regularly with a staff member?



5.    Have you participated in a fire drill?  If so, when?



6.    How did you get your job?  Is it the kind of job you think you should have?  If not, has a job change been discussed with staff?



7.    Do you have a drug aftercare condition?  If yes, what kind of program are you in?


      Have you met with the U.S. Probation Officer?


8.    What do you think about the food?


9.    Are disciplinary measures fair and equal?


10.   What is the purpose of you being placed in the CCC?


11.   Are you aware of any illegal activities or preferential treatment concerning staff and residents?

PS 7300.09
1/12/98
Attachment 4-7, Page 40

## USPO INTERVIEW WORKSHEET

1.    Program Planning:  Have you been invited to visit the center
to meet with staff and/or residents at the facility?


2.    Drugs and Alcohol:  For all persons with a condition of drug
aftercare, are you receiving advance notification of their
arrival?  Are planning conferences being held within two weeks
after the client's arrival?


      How often do you receive copies of the Urine Sampling
Reports and are they on time?


3.    Furloughs:  Are you being consulted in the case of
furloughs?  (Furloughs are not the same as passes.  This is a
formal procedure and is usually for 3 to 5 days.)


4.    Home Confinement:  Are you being consulted regarding
residents being placed on Home Confinement?


5.    Release Procedures:  Are you receiving parole plans six
weeks prior to a resident's release date?


      Are you satisfied with the quality of the plans?


      Are residents receiving adequate instructions at time of
release?


      Are you receiving Terminal Reports in a timely fashion?
Are they satisfactory?


      Are you receiving release certificates?


6.    Are residents benefiting by being released through this CCC?
How?


7.    What is your opinion regarding placement of direct court
commitments and persons under supervision in this center?

PS 7300.09
1/12/98
Attachment 4-7, Page 41

## CONTRACTOR INTERVIEW WORKSHEET

1.   Do you have any problems with your billings?

Are you receiving your payments on time?

2.   Are referral packets from CCMs satisfactory?  If not, list the institutions and the problem(s).

3.   Do you receive transfer packets from institutions prior to a resident's arrival?  Do they contain all the necessary documents?

4.   Do institutions give the Contractor notice of pending arrivals, including pertinent data such as method of transportation, departure and arrival time, etc.?

5.   Do residents receive funds for transfer to the facility? (How much?  Any problems?)

6.   For residents on medication:

a.   Are they given enough medical supplies and prescription medicine from the institution to last while in transfer to your facility?

b.   Are you receiving a 30-day supply for the residents from an institution?  List problem institutions and inmates.

7.   Are you having any problems with the Probation Office regarding commitments of Residents Under Supervision?

Are you receiving parole plan approvals in a timely fashion?

8.   Are you receiving cooperation from the U.S. Marshals Service?

9.   Other Comments:   (i.e., Problems with CCM communications, contract compliance, adverse publicity, etc.)

PS 7300.09
1/12/98
Attachment 4-8, Page 1

**COMMUNITY CORRECTIONS CENTER**
**INTERIM MONITORING INSTRUMENT**

1.   Date of Review: _____

2.   Date of Last Audit: _____    Type: _____

3.   Community Corrections Manager (Name, Location, Code):
     _____

4.   Facility (Name, Location, Code):
     _____
     _____

5.   Facility Director: _____

6.   Facility Operating Capacity: _____

7.   Total Facility Population:  _____

8.   Bureau of Prisons Population: _____

9.   _____ Major        _____ Moderate      _____ Minor Use

10.  Average Monthly Inmate-days Since Last Audit: _____
     Quota: _____

11.  Is This Facility Co-Correctional?  Yes: _____ No: _____

     If so, are Sleeping Areas Separated?  Yes: _____ No: _____

     Is There Supervision and Separation by Sex to Provide
Privacy and Protection?  Yes: _____ No: _____

12.  Comment on Areas Found Deficient During Last Audit (Attach
Extra Sheets, if Necessary):


13.  Comment on Life Safety Issues (Obtain Copy of Latest Fire
Marshal Inspection Report, if Appropriate):


14.  Comment on General Sanitation (Including Food Service
Program and Obtain Latest Copy of Food Service Establishment
Inspection Report, if Appropriate):

PS 7300.09
1/12/98
Attachment 4-8, Page 2

15.   Comment on Inmate Accountability:


16.   Comment on Employment Placement Program (% of Inmates
Working Full-Time, Part-Time, Supporting Documentation, etc.):


17.   Number of Escapes _____ and Number of Program Failures (Other
Than Escapes) _____ Since Last Inspection.


18.   Other Areas Considered Important to this Contract:


19.   Date by which Contractor is to Respond to Notice of
Deficiencies: _____


20.   Date of Next Audit: _____     Type: _____


_____     _____
            Prepared By/Job Title                Date


_____     _____
            Reviewed By/Job Title                Date

PS 7300.09
1/12/98
Attachment 4-9, Page 1

## CONTRACT JAIL SERVICES
## MONITORING INSTRUMENT

1.   Date of Inspection:          Scheduled: ( )   Unscheduled: ( )

2.   CCM (name, location, code):



3.   Facility (name location, code):



4.   Chief Executive Officer (name):

5.   Facility Operating Capacity:       Population on day of
     inspection:        ADP Last Six Months:

6.   Federal population on day of inspection:

|  | Federal Offenders |  |
| Federal Offenders | Serving Sentence in | |
| Awaiting Trial/Removal (USMS) | Facility (BOP) | |
| (1)  adult male | (6)  adult female | |
| (2)  adult female | (7)  YCA male | |
| (3)  JJA male | (8)  YCA female | |
| (4)  JJA | (9)  JJA male | |
| (5)  adult male | (10) JJA female | |
|     Total |      Total | |

7.   Is facility currently overcrowded?  ( ) Yes  ( ) No
     If yes, place an "X" beside offender type(s) above which are
overcrowded.

Refer to Chapter 4, Community Corrections Manual for monitoring
definition, elements, responsibilities, schedule, method, and
confidentiality of reports.

The purpose of the checklist is to remind the CCM of areas to
review in relation to the Statement of Work and to record the
findings.  It will become part of the contract file kept by the
CCM.

Those items marked with an asterisk (*) must be addressed in the
"Comments" at the end of each section.  The CCM will also address
any other area that he/she believes pertinent in the "Comments"
section at the end of this report.

PS 7300.09
1/12/98
Attachment 4-9, Page 2

Some of the items on this checklist will not apply in all
situations.  There is a column marked "N/A" - Not Applicable for
such situations.

## ADMINISTRATION AND OPERATIONS

|     |     | YES | NO | N/A |
|-----|-----|-----|-----|-----|
| 1. | Is the unit under the direction of a full time, professional administrator?....................... | ( ) | ( ) | ( ) |
| 2. | Is there a sufficient number of operating staff members to provide continuous 24-hour per day supervision?...................................... | ( ) | *( ) | ( ) |
| 3. | Does the facility have a policy manual which governs institutional operations?............... | ( ) | ( ) | ( ) |
| 4. | Does each staff member receive 40 hours of correctional training annually?.................. | ( ) | ( ) | ( ) |
| 5. | Is the staff guided by appropriate written orders (such as post orders, emergency plans, formal policies on key and tool control, etc.)?......................................... | ( ) | ( ) | ( ) |
| 6. | Do the policies for prisoner accountability insure that the security of the unit is maintained?...................................... | ( ) | *( ) | ( ) |
| 7. | Are unusual incidents, disciplinary infraction, and disturbance adequately recorded?............ | ( ) | *( ) | ( ) |
| 8. | Does the unit have a due process model, per Wolff v. McDonnell, policy for disciplinary actions?........................................ | ( ) | *( ) | ( ) |
| 9. | Are rules and regulations provided in writing for all prisoners?.............................. | ( ) | *( ) | ( ) |
| 10. | Is corporal punishment forbidden at this unit?.. | ( ) | *( ) | ( ) |
| 11. | Do prisoners have adequate access to legal materials?...................................... | ( ) | *( ) | ( ) |
| 12. | Are minimal visitation rights afforded to all prisoners?...................................... | ( ) | *( ) | ( ) |
| 13. | Is the correspondence policy in accord with the statement of work?.............................. | ( ) | *( ) | ( ) |

PS 7300.09
1/12/98
Attachment 4-9, Page 3

14.  Are prisoners segregated by age and sex?........( )  ( ) ( )

15.  Is discrimination prohibited on the basis of
     race, religion and national origin?.............( )  ( ) ( )

16.  Are adequate safety measures in effect with
     regard to fire, natural disaster, etc.?.........( )  ( ) ( )

17.  Does the unit satisfactorily safeguard against
     the introduction and production of contraband?..( )  ( ) ( )

18.  Does the unit maintain an acceptable level of
     sanitation?.....................................( )  ( ) ( )

19.  Are prisoner funds and property adequately
     accounted for?..................................( )  ( ) ( )

20.  Are vouchers accurate and in the proper
     format?.........................................( )  ( ) ( )

21.  Are communication between the unit and concerned
     Federal agencies satisfactory?..................( )  ( ) ( )

22.  Is the unit responsive and cooperative in its
     dealings with Federal agencies?.................( )  ( ) ( )

23.  If there are offenders committed under juvenile
     statutes (pre or post-commitment), and this is
     not strictly a juvenile facility, are they in
     entirely separate quarters?.....................( )  ( ) ( )

COMMENTS:

## BASIC SERVICES AND PROGRAMS

                                               YES  NO  N/A

1.  Are prisoners provided with adequate clothing
    and bedding?.....................................( )  ( ) ( )

2.  Are prisoners provided with the opportunity to
    shave and bath regularly?.......................( )  ( ) ( )

3.  Is a program of exercise and recreation, indoor
    and fresh air, available?.......................( )  ( ) ( )

PS 7300.09
1/12/98
Attachment 4-9, Page 4

4.   Are religious services/counseling available?...( )  ( ) ( )

5.   Does the facility provide three meals per day
     the Food Service standards exceed minimum          *
     nutritional standards of U.S.D.A.?..............( )  ( ) ( )

6.   Are menus checked by a dietitian?...............( )  ( ) ( )

7.   Is food served at the proper temperature, with
     attention given to variety and appearance.......( )  ( ) ( )

8.   Is there a formal classification program?.......( )  ( ) ( )

9.   Is basic medical service provided in               *
     accordance with the statement of work?..........( )  ( ) ( )

10.  Does unit have regular medical staff
     on duty at the facility on a regular
     basis (may be para-medic)?......................( )  ( ) ( )

11.  Are counseling and crisis intervention service
     provided?.......................................( )  ( ) ( )

12.  Are educational or vocational programs
     available?......................................( )  ( ) ( )

13.  Is Work/Study Release available for Federal
     offenders?......................................( )  ( ) ( )

COMMENTS:


### NARRATIVE


1.   USE OF THIS UNIT BY FEDERAL GOVERNMENT:

     MAJOR USE:   ( ) MODERATE USE:  ( )  MINOR USE:   ( )

2.   GOVERNMENT NEED TO CONTRACT WITH THIS UNIT:

     NECESSARY:  ( )  This is a single source supplier of
needed service in the area; or, other suppliers in the area are
unavailable to the Government or are clearly inferior.

PS 7300.09
1/12/98
Attachment 4-9, Page 5

DESIRABLE:  ( )  This service is superior or more conveniently located than other options which are available.

OPTIONAL:  ( )  This unit was selected over, or in addition to, other available units comparable in quality and convenience.  Loss of this unit would not create a major problem for the Government.

3.   OVERALL RATING ADJECTIVE:

SATISFACTORY:  ( )   There is no problem with this facility it is operating quite satisfactorily.  Any improvement needed would be minor.

UNSATISFACTORY: ( )   There is a problem with this facility it is not operating satisfactorily.  Improvement is definitely needed, as noted elsewhere in this report.

*UNACCEPTABLE:  ( )   There is a major problem with this facility.  The Government contracts  with it only to meet the needs of the U.S. Courts, while expending major efforts to find alternatives; or the Government plans to give cancellation notice if situation continues over a specified length of time.

4.   IF RATING IS "UNACCEPTABLE," COMMENT ON REASONS, OR REFER TO RELEVANT CHECKLIST ITEMS COMMENTED ON ELSEWHERE:



5.   IF RATING IS "UNACCEPTABLE," IS CANCELLATION BEING CONSIDERED?  IF NOT, COMMENT ON THE SITUATION AND ANY CONSTRAINTS WHICH PREVENT CANCELLATION:



6.   DOES THIS UNIT RECEIVE MANAGEMENT ASSISTANCE FUNDS FOR IMPROVEMENT OF CONDITIONS FOR/SERVICES TO FEDERAL OFFENDERS?



7.   IS THE UNIT IN NEED OF TECHNICAL ASSISTANCE?  IF "YES" COMMENT ON WHAT ASSISTANCE IS BEING PROVIDED, COULD BE PROVIDED, OR THE CONSTRAINTS UPON PROVIDING ASSISTANCE:

PS 7300.09
1/12/98
Attachment 4-9, Page 6

8.    NAME AND POSITION OF STAFF          NAME AND REGISTER NO. OF
      INTERVIEWED DURING VISIT:           PRISONERS INTERVIEWED
                                          DURING VISIT:


9.    ADDITIONAL COMMENTS:




      Community Corrections Manager /s/      Date


10.  Date of next scheduled inspection:

PS 7300.09
1/12/98
Attachment 4-10, Page 1

## CONTRACT LONG-TERM ADULT
## & JUVENILE MONITORING INSTRUMENT

1.   DATE OF INSPECTION: _____  SCHEDULED: ( )  UNSCHEDULED:  ( )

2.   CCM (name, location, code): _____
     _____

3.   FACILITY (name, location, code):_____
     _____

4.   CHIEF EXECUTIVE OFFICER   (name): _____

5.   FACILITY OPERATING CAPACITY: _____  POPULATION ON DAY OF
     INSPECTION: _____   ADP Last Six Months: _____

6.   FEDERAL POPULATION ON DAY OF INSPECTION: _____
          FEDERAL OFFENDERS             FEDERAL OFFENDERS
          AWAITING TRAIL/REMOVAL (USMS) SERVING SENTENCE IN
                                        FACILITY (BOP)

          (1) adult male    _____      (6) adult female    _____

          (2) adult female  _____      (7) YCA male        _____

          (3) JJA male      _____      (8) YCA female      _____

          (4) JJA female    _____      (9) JJA male        _____

          (5) adult male    _____      (10) JJA female     _____

7.   IS FACILITY CURRENTLY CROWDED?  YES ( ) NO ( )
     IF "YES" PLACE A (X) BESIDE OFFENDER TYPE(S) ABOVE
     WHICH ARE OVERCROWDED.

Refer to Chapter 4, Community Corrections Manual for Monitoring
Definition, Elements, Responsibilities, Schedule, Method, and
Confidentiality of Reports.

The purpose of the checklist is to remind the CCM of areas to
review in relation to the Statement of Work and to record the
findings.  It will become part of the contract file kept by the
CCM.

Those items marked with an asterisk (*) must be addressed in the
"Comments"at the end of each Section.  The CCM will also address
any other area that he/she believes pertinent in the "Comments"
section at the end of this report.

PS 7300.09
1/12/98
Attachment 4-10, Page 2

Some of the items on this checklist will not apply in all situations.  There is a column marked "NA" - Not Applicable for such situations.

## ADMINISTRATION

|  |  | YES | NO | N/A |
|---|---|---|---|---|

1.  Is this facility subject to inspection by state, county, or local regulating agency........( ) ( ) ( )

2.  Is the unit under the direction of a full time, professional administrator?................( ) ( ) ( )

3.  Does the facility have a policy manual which governs institutional operations?................( ) ( ) ( )

4.  Does each staff member receive 40 hours of correctional training annually?..................( ) ( ) ( )

5.  Is there an Affirmative Action Program in effect?.........................................( ) ( ) ( )

6.  If this is a juvenile facility, are there            *
    any adults confined here also?...................( ) ( ) ( )

7.  Does staff photograph or fingerprint juveniles
    (committed under Juvenile Justice Act) without        *
    consent of Judge?...............................( ) ( ) ( )
                                                          *
8.  Are prisoners segregated by age and sex?.........( ) ( ) ( )

9.  Is discrimination prohibited on the basis of race   *
    religion, and national origin?...................( ) ( ) ( )

10. Are prisoners provided with adequate clothing       *
    and bedding?.....................................( ) ( ) ( )

11. Are prisoners provided with opportunity to shave    *
    and bathe regularly?.............................( ) ( ) ( )

12. Is a program of exercise and recreation, indoor     *
    fresh air, available?............................( ) ( ) ( )
                                                          *
13. Are religious services/counseling available?.....( ) ( ) ( )

14. Are minimal visitation rights afforded to          *
    all prisoners?...................................( ) ( ) ( )

PS 7300.09
1/12/98
Attachment 4-10, Page 3

15. Is the correspondence policy in accord with the       *
    Statement of Work?..............................( ) ( ) ( )

16. Do prisoners have adequate access to legal          *
    materials?......................................( ) ( ) ( )

17. Are communications between the unit and concerned     *
    Federal agencies satisfactory?..................( ) ( ) ( )
                                              YES  NO  N/A

18. Is the unit responsive and cooperative in its
    dealings with Federal agencies?.................( ) ( ) ( )

COMMENTS:


### SANITATION

                                              YES  NO  N/A

1. Is the sanitation-hygiene of facility
   monitored by a state, country, or local
   regulatory agency?..............................( ) ( ) ( )

2. Does the facility maintain an acceptable level      *
   of sanitation?..................................( ) ( ) ( )

COMMENTS:


### DISCIPLINE

                                              YES  NO  N/A

1. Does the facility have a due process model,
   per Wolff v. McDonnell, policy for               *
   disciplinary action?............................( ) ( ) ( )

2. Are rules and regulations provided in written      *
   for all prisoners?..............................( ) ( ) ( )

3. Is corporal punishment forbidden at this          *
   facility?.......................................( ) ( ) ( )
                                                 *
4. Are there any inmate trustees?..................( ) ( ) ( )

PS 7300.09
1/12/98
Attachment 4-10, Page 4

5.  Are basic living levels of decency and humane          *
    treatment maintained in segregation unit?.......( ) ( ) ( )

6.  Is the same menu and frequency of meals
    provided to those inmates placed in segregation       *
    as provided to general population?..............( ) ( ) ( )

COMMENTS:




**MEDICAL**


                                               YES   NO N/A

1.  Is basic medical service provided in accordance       *
    with the statement of work?....................( )  ( ) ( )

2.  Does facility have regular medical staff on
    duty at the facility on a regular basis?.......( )  ( ) ( )

3.  Are there adequate procedures for                     *
    handling medical emergencies?..................( )  ( ) ( )

4.  Is there a hospital in the institution?........( )  ( ) ( )

5.  Is hospital or clinic equipment in good
    repair?........................................( )  ( ) ( )

6.  If institution has no hospital, have other
    arrangements been made for medical care
    and is it adequate?............................( )  ( ) ( )

7.  Are narcotic and non-narcotic drugs controlled        *
    properly?......................................( )  ( ) ( )

8.  Is inmate examined by medical personnel at
    admission?.....................................( )  ( ) ( )

9.  Are there procedures for proper maintenance
    and control of medical record?.................( )  ( ) ( )

10.  Does staff know proper procedure for billing
     for medical care not included in per diem
     cost?........................................( )  ( ) ( )

COMMENTS:


**FISCAL MANAGEMENT**

                                                  YES  NO N/A

1.  Does the facility prepare an annual written
    budget of anticipated revenues and
    expenditure?..................................( )  ( ) ( )

2.  Does the facility's fiscal process include an
    annual audit of the agency?...................( )  ( ) ( )

3.  Are prisoner funds and property adequately
    accounted for?................................( )  ( ) ( )

4.  Are vouchers accurate and in the proper
    format?.......................................( )  ( ) ( )
COMMENTS:


**CASE MANAGEMENT AND PROGRAMS**

                                                  YES  NO N/A
Programs

1.  Are counseling and crisis intervention
    services provided?............................( )  ( ) ( )

2.  Are vocational programs available?.............( )  ( ) ( )

3.  Does facility offer an adult Basic Education
    Program?......................................( )  ( ) ( )

4.  Does facility offer a GED program?.............( )  ( ) ( )

5.  Is staff following the proper procedures for:

        a.    Furlough?............................( )  ( ) ( )

PS 7300.09
1/12/98
Attachment 4-10, Page 6

    b.      Work Release?........................( ) ( ) ( )

    c.      Study Release?.......................( ) ( ) ( )

6.    Does staff have an understanding of all aspects
    of placement in CTC's?..........................( ) ( ) ( )

Classification/Progress
                                                  *

1.    Is there a formal classification program?......( ) ( ) ( )

2.    Is inmate progress reviewed at least once        *
    every 6 months?................................( ) ( ) ( )

3.    Is staff aware of what type of information
    should be in the following reports:

                                                  *
    a.      Classification Report?...............( ) ( ) ( )

                                                  *
    b.      Progress Report?.....................( ) ( ) ( )

4.    Does the facility grant Meritorious Good Time
    and is staff familiar with BOP policy         *
    pertaining to Meritorious Good Time?...........( ) ( ) ( )

Release                                           YES  NO  N/A

1.    Does staff understand procedures required in
    Statement of Work relating to inmates who have  *
    a committed fine?..............................( ) ( ) ( )

2.    Does staff understand procedures for resolving *
    detainer?......................................( ) ( ) ( )

3.    Upon release, does institution provide adequate
    clothing and transportation expenses to reach  *
    destinations?..................................( ) ( ) ( )

4.    Are there procedures for determining the
    appropriateness of release gratuity and    *
    the amount?....................................( ) ( ) ( )

5.    Are the appropriate release/discharge forms and *
    reports completed and distributed properly?....( ) ( ) ( )

PS 7300.09
1/12/98
Attachment 4-10, Page 7

Probation and Parole

1.  Does the staff understand the role of the U.S.
    Probation Officer and how to determine who is          *
    the appropriate USPO?..........................( )  ( ) ( )

2.  Does the staff understand how to obtain
    presentence reports and when to send report
    to the USPO?...................................( )  ( ) ( )

3.  Does staff understand procedures relating to         *
    the release plan and the USPO?.................( )  ( ) ( )

4.  Is staff aware of restrictions on release
    destinations of inmates going out on supervision
    (committing District of residence) and how to
    resolve this?..................................( )  ( ) ( )

5.  Does staff understand Parole Commission actions
    and procedures, i.e., continuances, institutional
    review hearing, continued to expirations,            *
    etc.?..........................................( )  ( ) ( )

6.  Does staff have all the required Parole Forms?.( )  ( ) ( )

Sentence/Record Information                         YES  NO  N/A

1.  Do staff have a complete understanding of
    items on the BP-5 "Sentence Computation
    Sheet?.........................................( )  ( ) ( )

    a.  Sentence and length?.......................( )  ( ) ( )

    b.  SGT?.......................................( )  ( ) ( )

    c.  MR date?...................................( )  ( ) ( )

    d.  Parole Eligibility date?..................( )  ( ) ( )

2.  If allowed by institution, does Federal inmate
    have a copy of his BP-5?.......................( )  ( ) ( )

3.  Does Inmate File contain the following:

    a.  J&C (If not, is it in a separate, secure
        place)?....................................( )  ( ) ( )

    b.  BP-5?......................................( )  ( ) ( )

PS 7300.09
1/12/98
Attachment 4-10, Page 8

    c.    PSI?.....................................( )  ( ) ( )

    d.    Classification Summary?...................( )  ( ) ( )

    e.    Progress Reports?.........................( )  ( ) ( )

    f.    Parole Application (if applicable)?.......( )  ( ) ( )

    g.    Disciplinary Records (if applicable)?.....( )  ( ) ( )

COMMENTS:


## SECURITY, CONTROL, & SAFETY

                                               YES  NO  N/A

1.    Is the staff guided by appropriate written
       orders (such as post orders, emergency plans,
       formal policies on key and tool control,
       etc.)?.......................................( )  ( ) ( )

2.    Is there a sufficient number of operating staff
       members to provide continuous 24-hour per day    *
       supervision?.................................( )  ( ) ( )

3.    Do the policies for prisoners accountability
       insure that the security of the unit is    *
       maintained?.................................( )  ( ) ( )

4.    Does the unit satisfactorily safeguard against    *
       the introduction and production of contraband?.( )  ( ) ( )

5.    Are unusual incidents, disciplinary infraction,
       and disturbances adequately recorded?..........( )  ( ) ( )

6.    Are adequate safety measures in effect with    *
       regard to fire, natural disaster, etc.?........( )  ( ) ( )

COMMENTS:

PS 7300.09
1/12/98
Attachment 4-10, Page 9

7.   NAME AND POSITION OF STAFF          NAME AND REGISTER NO. OF
     INTERVIEWED DURING VISIT:           PRISONERS INTERVIEWED
                                         DURING VISIT:

8.   ADDITIONAL COMMENTS:

**NARRATIVE**

1.   USE OF THIS UNIT BY FEDERAL GOVERNMENT:

     MAJOR USE:  ( )   MODERATE USE:  ( )   MINOR USE:  ( )

2.   GOVERNMENT NEED TO CONTRACT WITH THIS UNIT:

     NECESSARY:  ( ) -    This is a single source supplier of
needed service in the area; or, other suppliers in the area are
unavailable to the Government or are clearly inferior.

     DESIRABLE:  ( ) -    This service is superior or more
conveniently located than other options which are available.

     OPTIONAL:   ( ) -    This unit was selected over, or in
addition to, other available units comparable in quality and
convenience.  Loss of this unit would not create a major problem
for the Government.

3.   OVERALL RATING ADJECTIVE:

     SATISFACTORY:  ( ) - There is no problem with this
facility--it is operating quite satisfactorily.  Any improvement
needed would be minor.

     UNSATISFACTORY: ( ) - There is a problem with this
facility--it is not operating satisfactorily.  Improvement is
definitely needed, as noted elsewhere in this report.

PS 7300.09
1/12/98
Attachment 4-10, Page 10

UNACCEPTABLE: ( ) - There is a major problem with this facility.  The Government contracts with it only to meet the needs of the U.S. Courts, while expending major efforts to find alternatives; or the Government plans to give cancellation notice if situation continues over a specified length of time.

IF RATING IS "UNACCEPTABLE," COMMENT ON REASONS, OR REFER TO RELEVANT CHECKLIST ITEMS COMMENTED ON ELSEWHERE:

IF RATING IS "UNACCEPTABLE," IS CANCELLATION BEING CONSIDERED?

IF NOT, COMMENT ON THE SITUATION AND ANY CONSTRAINTS WHICH PREVENT CANCELLATION:

*"Unacceptable" is not meant to imply that any Constitutional standards have not been met.  It is simply a way of indicating the Bureau of Prisons has found major shortcomings in the facility or in its operations.


CCM Signature                          Date

4.  Management Center Administrator's Comments:



MCA Signature                          Date

Date of next scheduled inspection:

PS 7300.09
1/12/98
Attachment 4-11, Page 1

**CONTRACT CONFINEMENT**
**INTERIM MONITORING INSTRUMENT**

1.   Date of Review: _____

2.   Date of Last Audit: _____

3.   Community Corrections Manager (Name, Location, Code): _____

_____

4.   Facility (Name, Location, Code): _____

_____

5.   Facility Director: _____

6.   Facility Operating Capacity: ____

7.   Total Facility Population: _____

8.   Total BOP Population: ____, BOP Male: ____, BOP Female: ____

9.   (Check One) This is a Major ___ or Minor ___ use Facility.

10.  Average Monthly Inmate-days Since Last Monitoring: _____

11.  Is this Facility Co-Correctional? Yes: ___ No: ___

     If so, are Sleeping Areas Separated?  Yes: ___ No: ___ Is
     There Supervision and Separation by Sex to Provide Privacy
and Protection?  Yes: ___ No: ___

12.  Comment on Areas Found Deficient During Last Audit (Attach
Extra Sheet, if Appropriate):



13.  Comment on Life Safety Issues (Obtain Copy of Last Fire
Marshal Inspection Report, If Appropriate):



14.  Comment on General Sanitation (Including Food Service
Program and Obtain Latest Copy of Food Service Establishment
Inspection Report, If Appropriate):

PS 7300.09
1/12/98
Attachment 4-11, Page 2

15.   Comment on Inmate Accountability and Facility Security:


16.   Number of Escapes Since Last Audit: _____


17.   Does this Facility have a due Process Model, per Wolff vs.
McDonnell, Policy for Disciplinary Action (Explain):


18.   Comment on Whether staff Understand Release Procedures (When
to Contact USMS, INS, Gratuities, Obtaining Bus Tickets, etc.)


19.   Other Areas Considered Important to This Contract:


20.   Date by Which Contractor is to Respond to Notice of
Deficiencies:  _____


_____  _____
   Signature of Community Corrections Manager        Date


21.   Date of Next Audit: _____


_____  _____
Signature of Management Center Administrator        Date

PS 7300.09
1/12/98
Attachment 4-12, Page 1

### ALLEGATIONS OF CONTRACT STAFF MISCONDUCT/INTEGRITY ISSUES IN PRIVATELY OPERATED BUREAU OF PRISONS CONTRACT FACILITIES

The following procedures have been developed to more efficiently investigate allegations of contract staff misconduct/integrity issues in privately operated BOP contracts, while still preserving the best interest of the government.

1.   ACTION:  Contract Oversight Specialists (COS) and Community Corrections Managers (CCM) will review allegations of contract staff misconduct in connection with the Standards of Conduct in the contract.  These matters will be brought to the attention of the contractor and handled as any other violation of the contract's terms and conditions.  However, the Office of Internal Affairs (OIA) and the Office of Inspector General (OIG) must be informed of all misconduct allegations.  Timely reporting of all incidents and allegations is of paramount importance.

2.   PROCEDURES:

     A.  Any information alleging staff misconduct violations of state, local, or Federal law must be reported to the OIG/OIA.  In addition to the following, please refer to Program Statement 1210.11 Internal Affairs, Office of, for guidance.

     The CCM will notify OIA, without delay, of the  allegation followed by the SENTRY Electronic Mail System (EMS) notification (see attached form), with copies of the EMS and predicating documentation (memorandums, etc.) mailed or sent via fax within 24 hours to OIA.  A copy of the EMS notification will be sent to the staff member in the Community Corrections Branch - Contracting Section (CCB), Community Corrections and Detention Division, responsible for tracking community correction center (CCC) integrity issues.

     Frequently, staff become aware of unconfirmed information alleging violations of the Standards of Conduct from unreliable sources.  When this occurs, the COS or designated staff member will begin to gather preliminary data to assist in a determination whether a violation of the Standards of Conduct (or other contract requirements) may have occurred.  However, it is important to note that "subjects" of the allegation(s) should not be approached without OIA approval.  If the allegation is clearly determined to be insignificant and/or without merit, a memorandum or GroupWise e-mail documenting the results of the preliminary review shall be sent to OIA.

PS 7300.09
1/12/98
Attachment 4-12, Page 2

OIA will refer all misconduct allegations to OIG for screening and classification (OIA will refer criminal matters involving inmate physical abuse and sexual contact [which would constitute the prosecutable offense of deprivation of civil rights under 18 U.S.C. 242] with an inmate to the Department of Justice, Civil Rights Division (CRD), for prosecutorial consideration). OIG may decide to investigate a potential criminal violation or serious administrative infraction rather than deferring the matter to the BOP. If this should occur, the respective CCM will be notified and unless directed otherwise, no further local investigative action should be pursued.

Upon deferral, OIA will inform the CCM either not to proceed, pending further review, or to proceed with a local investigation. All blocks on the attached EMS form shall be completed unless obtaining the information would jeopardize an investigation. In this case, the form shall be appropriately noted.

If instructed to proceed with a local investigation, the COS or designated staff member will begin to gather information or evidence (newspaper articles, letters, police reports, telephonic verifications with state and/or local officials, interviews, etc.) that assist in a determination whether a violation of the Standards of Conduct (or other contract requirements) has occurred.

The CCM in consultation with OIA shall be responsible for directing, tracking, and ensuring all activities throughout the local investigation, including a final investigative report, are completed. Updates concerning an open investigation will be provided to the OIA, Community Corrections Regional Administrator (CCRA), Management Center Administrator (MCA), and CCB as new information is available, but no less than monthly. OIA is available for consultation at any point during the investigative process.

B. The CCM shall utilize all available resources to properly investigate the allegations. OIA, Regional Counsel and the Central Office may be utilized as resources. CCMs may assign the investigation of CCC staff to the COS or Case Manager.

A final investigation report shall be completed by the MCA and shall include an explanation of the complaint, a summary of the investigative steps utilized, and the factual conclusions reached by the investigator. This final report, along with copies of relevant affidavits, police reports, etc., shall be mailed to OIA with all documents compiled during the investigation (i.e., affidavits, working papers) shall be maintained and preserved in the CCM contract file.

C.    If the allegation is unfounded, the CCM contract file will be documented by memorandum to OIA requesting CLOSURE and indicating the information/evidence gathered from the investigation does not support further examination.  A copy of the memorandum, along with a copy of the actual investigative file, shall be sent to OIA for review.  (A copy of the memorandum ONLY shall be sent to CCB for the purpose of updating the status.)  OIA will notify the CCM when CLOSURE is made.  MCAs will review these issues during operational reviews.

D.    At the conclusion of the investigation where charges are sustained, the MCA will provide written direction to the CCM to pursue certain corrective contract compliance action through established (monitoring) procedures.

E.    A copy of the CCM's letter to the contractor directing contract compliance action shall be sent to OIA.

3.    RESEARCH

A.    Information concerning all integrity allegations will be entered into the OIA computer database.

- the number of integrity/misconduct allegations (sustained or unsubstantiated);
- the types of integrity/misconduct allegations (fraternizing, gambling, sex related, etc.)
- expenditures of resources (travel costs, interviews, inspections, other financial expenditures, etc.);
- annual trends within each CCM office area; and,
- suggestions on how to prevent the circumstances leading to the integrity issue.

Through these guidelines, it is anticipated the BOP can more effectively and efficiently utilize existing resources to satisfactorily resolve contract staff misconduct.

PS 7300.09
1/12/98
Attachment 4-12, Page 4

**REFERRAL OF STAFF MISCONDUCT INCIDENT IN CONTRACT FACILITY**

TYPE OF REPORT (CHECK ONE)

INITIAL _____        FOLLOW-UP _____

DATE OF REFERRAL:              TIME OF REFERRAL:

CCM OFFICE CODE:              REPORTED BY(NAME AND TITLE:):

CONTRACT FACILITY (CITY / STATE:  ASSIGNMENT CODE:

CONTRACT NUMBER:

DATE OF INCIDENT(S):          TIME OF INCIDENT(S)

PLACE OF INCIDENT(S):

ALLEGATION:

SOURCE OF ALLEGATIONS:


SUBJECT FULL NAME:            TITLE / POSITION:

DATE OF BIRTH:               SEX:

SOCIAL SECURITY NUMBER:       RACE:
*If multiple subjects, use additional pages

VICTIM(S), FULL NAME AND REGISTER NUMBERS:


SUMMARY OF INCIDENT (WHO, WHAT, WHEN, WHERE, WHY):



--------------------------------------------------------------
STATUS (OPEN / CLOSED) (DESCRIBE ANY ACTION TAKEN LOCALLY PRIOR
TO OIA REFERRAL.  ARE THERE ANY OTHER LOCAL, STATE, OR FEDERAL
AUTHORITIES INVOLVED?)

PS 7300.09
1/12/98
Attachment 4-13, Page 1

# CONTRACTOR EVALUATION FORM (CEF)

Information for Request for Proposal _____
(Complete if submitted for proposal only)

Evaluation Period:    [  ] Interim    [  ] Final Period          _____

(Complete if submitted for contract evaluation only)                    DATE

_____

1.    Offeror/Contractor Name              2.      RFP/Contract Number _____
      Address and Telephone #:
                                           3.      Contract Value (Base plus options):
                                                   _____

                                           4.      Contract Award Date: _____


                                                   Contract Completion Date: _____

_____

5.    Type of Contract:       (Circle all that apply)  --   [FFP]        [FPI]        [FP-EPA]


      [FPAF]    [CPFF-COMPLETION]    [CPFF-TERM]    [CPIF]    [CPAF]    [ID/IQ]


      [BOA]    [REQUIREMENTS]    [LABOR-HOUR]    [T&M]    [SBSA 8(a)]    [SBIR]


      [SEALED BID]    [NEGOTIATED]    [COMPETITIVE]    [NON-COMPETITIVE]

_____

6.    DESCRIPTION OF CONTRACT REQUIREMENTS:




7.      Rating:  Summarize offeror/contractor performance and circle in the column on the right the number which corresponds to the performance rating for each category.  See the attached Rating Guidelines to determine rating

PS 7300.09
1/12/98
Attachment 4-13, Page 2

scale.

_____

|        CONTRACT COMPLIANCE        |   COMMENTS:                    0

|
- Accuracy of Reports              |                                1
- Meet Staffing Criteria           |
- Food Service Program             |                                2
- Life Safety Standards            |
- Substance Abuse Program          |                                3
- Accountability                   |
- Technical Excellence             |                                4

|
|                                ++

_____

|
|        CUSTOMER SATISFACTION      |   COMMENTS:                    0

|
- Reliable                         |                                1
- Subsistence Collection           |
- Facility Design/Location     |                 2
- Facility maintenance & Repair    |
- Responsiveness to Technical Direction |                           3

|
|                                4

|
|                                ++

_____

|
|        BUSINESS RELATIONS         |   COMMENTS:                    0

|
- Effective Management             |                                1
- Business-Like Correspondence     |
- Current, Accurate and Complete Billings |                         2
- Responsive to Contract Requirements |
- Prompt Notification of Problems  |                                3
- Reasonable and Cooperative       |
- Flexible                         |                                4
- Pro-active                       |
- Effective Contractor-recommended Solutions  |                    ++
- Use of Small and Small Disadvantaged |
      Business Subcontracts        |

_____

# Mean Score (Add all ratings and divide by number of areas rated)    _____

_____

If applicable, did the contractor subcontract for any of the above services?


If so, did the contractor properly monitor subcontractor's performance?

PS 7300.09
1/12/98
Attachment 4-13, Page 3

8.      RATER:

Name:_____Signature:_____
Date: _____Period Rated:_____
Position/Title:_____Telephone #:_____
                                                                        Fax #:_____

If CEF is completed telephonically, furnish all information above for interviewees except signature and completed
information below for individual conducting interview.

Name:_____
Date: _____Period Rated:_____
Position/Title:_____Telephone#:_____
                                                                        Fax #:_____
_____

9.      Would you select this firm again?  Please provide a brief explanation:


_____

10.     (Applicable only for contract evaluations)     Contractor's Review:

        Were comments, rebuttals or additional information provided?  Attach if submitted.

                [YES]              [NO]
_____

11.     (Applicable only for contract evaluations)     Information on Contractor's Authorized Representative
        submitting comments, rebuttals or additional information:

Name:_____Signature:_____
Date: _____ Period
Rated:_____
Position/Title:_____ Telephone
#:_____
                                                                        Fax #:_____
_____

12.     (Applicable only for contract evaluations)     Agency Review:
        Were contractor comments reviewed at a level above the Contracting Officer?

                [YES]    [NO]     Attach comments.  Number of pages: _____

Name:_____Signature:_____
Date:_____Period
Rated:_____
Position:_____Telephone #:_____
                                                                        Fax #:_____
_____

13.     Contract Compliance    |    Customer Satisfaction        |    Business Relations

Revised Score: _____ | _____ Revised Score: _____ | _____ Revised Score: _____
_____

14.    Revised score (add all scores and divide by number of areas rated)    _____

15.    (Applicable only for contract evaluations)
       Contracting Officer Endorsement (Applicable only if contractor does not rebut rating and request
       review)

Name:_____Signature:_____
Date:_____ Period Rated:_____
Position:_____ Telephone #:_____
                                                 Fax #:_____

16.  Ratings: Summarize offeror/contractor performance and circle in the column on the right the number which
corresponds to the performance rating for each category.  See the attached Rating Guidelines to determine rating
scale.

_____

       CONTRACT COMPLIANCE                    COMMENTS:                        0

-Accuracy of Reports                                                          1
-Meets Staffing Criteria
-Food Service Program                                                         2
-Life Safety Standards
-Substance Abuse Program                                                      3
-Accountability
-Technical Excellence                                                        4

  ++
_____
       CUSTOMER                               COMMENTS:                        0
       SATISFACTION
                                                                              1
-Reliable
-Subsistence Collection                                                      2
-Facility Design/Location
-Facility Maintenance and Repair                                             3

-Responsiveness to Technical Direction                                       4

++
_____
                                                                              0

BUSINESS RELATIONS                    COMMENTS:                    1

-Effective Management
-Business-like Correspondence                                    2
-Current, Accurate and Complete Billings
-Responsive to Contract Requirements
-Prompt notification of Problems                                 3
-Reasonable and Cooperative
-Flexible
-Pro-active                                                      4
-Effective Contractor-recommended
    Solutions
-Use of Small and Small Disadvantaged
++
    Business Subcontracts
_____

MEAN SCORE (ADD ALL RATINGS AND DIVIDE BY NUMBER OF AREAS RATED)    _____
_____

IF APPLICABLE, DID THE CONTRACTOR SUBCONTRACT FOR ANY OF THE ABOVE SERVICES?

IF SO, DID THE CONTRACTOR PROPERLY MONITOR SUBCONTRACTOR'S PERFORMANCE?


### RATING GUIDELINES

Summarize contractor performance in each of the rating areas.  Assign each area a rating of **0** (unsatisfactory), **1** (poor), **2** (fair), **3** (good), **4** (excellent), or **++** (plus).  Use the following instructions as guidance in making these evaluations.  Ensure that this assessment is consistent with any other Agency assessments made (i.e., for payment of fee purposes).

Compact   Compliance                Customer   Satisfaction              Business Relations

-Accuracy of reports                 -Reliable                          -Effective management
-Meet staffing criteria              -Subsistence collection            -Businesslike correspondence
-Food service program                -Facility design/location         -Current, accurate and complete
-Life safety standards               -Facility maintenance and repair    billing
-Subsistence abuse program           -Responsiveness to technical      -Responsiveness to contract
-Accountability                         direction                         requirements
-Technical excellence                                                   -Prompt notification of problems
                                                                         -Reasonable/cooperative
                                                                         -Flexible
                                                                        -Pro-active
                                                                          -Effective contractor recommended
                                                                            solutions
                                                                          -Effective small/small disadvantaged
                                                                          business subcontracting program

**0.** Unsatisfactory    Nonconformances are compromising the achievement of contract requirements, despite use of agency resources.

Deficiencies are compromising the achievement of contract requirements, despite use of agency resources.

Response to inquiries, technical/service/administrative issues is not effective and responsive.

**1.** Poor    Nonconformances require major Agency resources to ensure achievement of contract requirements.

Deficiencies require major agency resources to ensure achievement of contract requirements.

Response to inquiries, technical/service/administrative issues is marginally effective and responsive.

**2.** Fair    Nonconformances require minor Agency resources to ensure achievement of contract requirements.

Deficiencies require minor agency resources to ensure achievement of contract requirements.

Response to inquiries, technical/service/administrative issues is somewhat effective and responsive.

**3.** Good    Nonconformances do not impact achievement of contract requirements.

Deficiencies do not impact achievement of contract requirements.

Response to inquiries, technical/service/administrative issues is usually effective and responsive.

**4.** Excellent    There are no quality problems.

There are no deficiencies.

Response to inquiries, technical/service/administrative issues is effective and responsive.

**++ PLUS**    The contractor has demonstrated an exceptional performance level in any of the above 4 categories that justifies adding a point to the score. It is expected that this rating will be used in those rare circumstances when contractor performance clearly exceeds the performance levels described as "Excellent."

PS 7300.09
CN-2 5/19/99
Chapter 5, Page 1

## CHAPTER 5. CASE MANAGEMENT

Case management is an integral part of community corrections. Community corrections staff perform many functions for offenders in contract facilities that would be performed by case/unit managers in federal institutions. Therefore, CCMs must have a working knowledge of case management practices and procedures.

5.1. **DESIGNATIONS**

Detailed instructions for completing the Inmate Load and Security Designation form (BP-S337.051) are contained in the **Security Designation and Custody Classification Manual.** In addition, the CCM shall be guided by the procedures outlined below.

As the first Bureau employees to be involved with federal inmates, CCMs must decide whether to designate a non-federal or federal facility. It is important for the CCM to review initial designation cases to determine whether they qualify for community-based programs.

Ordinarily, offenders with court recommendations to serve their sentences in a particular non-federal facility shall be placed there. Generally, these cases are reviewed biennially. State placement cases also require a biennial review.

After the designation is finalized, the CCM shall inform the U.S. Marshals Service (USMS) who has responsibility for transporting the inmate to the designated facility. When the case is a voluntary surrender, the USMS is to notify the inmate where and when to report. In these situations, local notification procedures may be established with the USMS and United States Probation Service (USPS).

The BP-S337 Remarks section should be used to comment on the nature of the offense, violent or unusual behavior, mental health or medical problems, escape history, threatening behavior toward national leaders, and criminal sexual behavior. If an item is scored in any portion of the form, a brief explanation should be included in the Remarks section of the BP-S337. If significant concerns are involved or there has been serious misconduct while in pre-trial status, it may be necessary to submit a separate memorandum via BOPNet GroupWise to the Designator briefly outlining the circumstances. Inmates with physical or mental health concerns shall be referred directly to the Central Office Medical Designator using appropriate comments in the Remarks section.

If the USMS requests designation and it is determined the
sentence has already been completed (i.e., satisfied by jail
credit), a designation shall not be done.  However, it is
necessary for community corrections staff to do a complete
sentence computation even if the J&C indicates "Time Served"; an
independent sentence computation will not suffice.  Once the
computation is completed it must also be satisfied (e.g., the
date, time, and method of actual release must be entered).

In the Remarks section of the sentence computation, the CCM shall
indicate that a sentence computation was completed on a released
USMS prisoner and list what documents were used to do the
sentence computation.  For example:  released USMS prisoner (129,
PSI, J&C).

During the initial designation process, community corrections
staff must perform an independent sentence computation using the
SENTRY "Independent Sentence Computation" transaction for each
inmate serving a sentence of one year or less.  Good judgment
shall be used to determine if this is needed for inmates serving
sentences over one year when it appears the inmate has less than
one year remaining.  Performing independent sentence computations
on such cases will help ensure proper consideration of jail time
credit during initial designation, thereby reducing the potential
for late releases.

All available 129s, PSIs, and prior sentence computations are to
be reviewed.  The CCM shall also complete an ARS history
transaction to determine whether an inmate spent any pre-trial
time in a Bureau institution.

After completing the independent sentence computation on cases
that meet the criteria and consulting with the LIE on jail credit
accuracy, the CCM shall place a note under the Remarks section of
the BP-S337 indicating the tentative release date (TRD) with
number of days jail time credit (JTC).  For example: TRD w/292
JTC= 06-22-95. This will alert the Designator and staff at the
institution of the short release date.  This information shall be
available to holdover facilities, the USMS, and other staff with
access to SENTRY.

When notifying the USMS of the designated institution, the CCM
should also highlight the short release date.  The USMS may have
to hold locally and eventually release the inmate if the date is
too close for transfer to the designated facility.  This decision
rests with the USMS.

If background information (pre or post sentence investigation)
has not been completed, the CCM shall conduct an NCIC/NLETS check

and annotate in the BP-S337 Remarks section.  The inmate must be designated to at least a LOW security level institution.

Due to strict requirements for medical confidentiality, knowledge regarding HIV-infected offenders shall be limited to staff with a need to know.  In order to maintain confidentiality, community corrections staff shall communicate this information to the medical designator in a separate memorandum via BOPNet.

   5.1.1.   **Placement of Inmates with Mental Health Issues or Histories of Suicidal Behavior**

To reduce the possibility of inmate suicides in contract detention facilities:

    a.  Each CCM or COS shall review their contract detention facilities regarding mental health and suicide prevention practices to determine their ability to deal with this population.  Ordinarily, jail-type facilities that have ACA accreditation or state certification have acceptable suicide prevention programs.  However, the Bureau cannot rely entirely on this information.  CCMs and/or COSs must base their conclusions upon sound correctional practice.  In addition to accreditation and certification, key factors to look for when conducting the survey include:

- suicide and mental health training for staff,
- heightened supervision for high-risk inmates,
- availability of emergency resuscitative equipment,
- availability of mental health professionals at the facility, and
- formal policies and procedures governing their practices.

    b.  During the designation process, sensitivity must be given to an inmate's prior mental health concerns or history of suicidal behavior.  If such a history exists, a Bureau institution, or a contract facility capable of dealing with this type of inmate, shall be designated.

    c.  It is critical that contract facilities contact CCM staff whenever an inmate shows evidence of suicidal tendencies, or demonstrates any unusual or dangerous behavior.  The CCM shall carefully review this information and consult with the MCA, the CCRA, and Bureau mental health staff, such as the regional psychology services administrator, to determine if the inmate should remain at the facility or be transferred.

5.1.2. **Early Designation for Inmates in State Custody**

When prisoners are within 30 days of release from state sentences and a federal term of incarceration is to follow, community corrections staff shall act upon requests for designations from the USMS. Community corrections staff shall contact a state employee for a verbal report on the inmate's offense conduct and institutional adjustment (to include incident report history) as it applies to the designation process. They must also confirm the scheduled release date before requesting designation. The USMS must provide documentation verifying the sentence is complete.

For procedures to follow for inmates with concurrent federal and state sentences, refer to the Program Statement on **Designation of State Institution for Service of Federal Sentence.**

5.1.3. **Voluntary Surrenders**

The courts allow some inmates to surrender voluntarily to designated facilities. If the court does not establish a date, the CCM shall contact the USMS to establish a surrender date. If the USMS does not establish a date, the CCM may do so. When the CCM becomes aware of a change in a date of voluntary surrender, he or she shall notify the regional designator and the Inmate Systems Manager (ISM) at the designated institution via BOPNet. Contract facilities shall be notified of surrender date changes by telephone or mail. Documentation of this notification must be maintained until the voluntary surrender has occurred. This documentation may be maintained by saving the BOPNet message in an electronic file, by a comment in the designation log, or another method the CCM deems appropriate. Self surrender dates for ICC designations should be established as close to the class start date as is practicable. For further information, refer to the Program Statement on **Unescorted Transfers and Voluntary Surrenders** and, in the case of voluntary surrender to an ICC, the **Intensive Confinement Center** Program Statement.

5.1.4. **Appeals**

If a CCM becomes aware that an inmate has been released on an appeal after an institution was designated for that inmate, the CCM shall notify the regional designator and the ISM at the designated federal institution by BOPNet. If a contract facility is the inmate's designated location, the CCM shall notify staff at that facility. Documentation of notification must be maintained until the appeal process is completed. The documentation may be noted in an electronic file or another CCM approved method.

**5.1.5.    Records and Documents**

a.  CCMs shall maintain a designation tracking system (see **Attachment 5-1, Designation Log**) that provides sufficient information to permit review of the designation process.  These records are to be maintained until the next Program or Operational Review.  If cases are not processed in a timely manner as noted in the **Security Designation and Custody Classification Manual**, the CCM shall clearly document the reasons.

b.  When federal institutions are designated, CCMs shall forward (by regular mail) within two working days, copies of Central Inmate Monitoring (CIM) documentation, if available, to the CIM coordinator and all copies of the PSI and other relevant information or documents to the ISM at the designated institutions.

c.  When non-federal contract facilities or Bureau institutions are designated, CCMs shall forward copies of the designation teletypes or memos and any other relevant information or documents (including PSIs) to the facilities within two working days.  If the CCM believes the inmate will arrive in less than five days, all documentation shall be sent by **overnight mail or facsimile** within one working day of the designation to the appropriate Bureau or contract facility.

d.  CCMs shall complete **Attachment 5-1a, Tracking Juvenile Designations**, for all federal juveniles sentenced on or after July 1, 1998, at the time of designation and with every subsequent change of facility.  This form shall be submitted to the Central Office CCB.

**5.2.    REFERRALS FOR INSTITUTION TRANSFER TO CCCs**

The Bureau's goal is to provide release preparation services to all inmates who have need of such services and who meet requirements for placement in the community.  Refer to the Program Statement on **Community Corrections Center (CCC) Utilization and Transfer Procedure** and the **Security Designation and Custody Classification Manual**.

Bureau institution staff submit standard referrals to CCMs for release preparation placement in CCCs.  CCC referral procedures allow the CCM to set an appropriate placement date within the range the referring institution requested.  CCMs should also review referrals to determine whether the inmate qualifies for

other community-based programs (home confinement, drug treatment, etc).

### 5.2.1. **Special Cases**

a.  Military prisoners who will release directly from Bureau institutions may be transferred to contract CCCs.  Other military prisoners, including military supervision cases, may not.

b.  State prisoners boarded in Bureau institutions are **not** eligible for placement in Bureau contract facilities.

### 5.2.2. **Procedures**

Upon receiving a completed CCC referral package, the CCM shall expedite one copy to the appropriate CCC, accompanied by a cover memorandum recommending a placement date and listing any special program requirements.  The CCM shall indicate a specific placement date based upon known resources.  A response from the CCC is expected after receipt of the referral package.  CCMs must monitor referrals to ensure this occurs.

a.  Acceptance.  When a CCC accepts an inmate, the CCM and CCC staff shall notify the institution.  CCMs shall add the destination assignment to the inmate's SENTRY record.  The effective date of the assignment will be the approved transfer date.  The scheduled transfer date should allow the institution at least 10 working days to process the release paperwork.  If the date is subsequently altered or canceled, CCMs must modify the effective date or delete the assignment **and** notify the institution.

b.  Rejection.  When a CCC does not accept an inmate, the CCC Director must write to the CCM outlining the reasons.  The CCM shall review the rejection to determine if it is justifiable and not based on a lack of information.  The CCM may want to discuss the rejection with the CCC Director for reconsideration.  When it is certain that placement cannot be made, the CCM must consider placement in another CCC or probation's electronically monitored home confinement program.  If the CCM is unable to place the inmate in the community, the institution shall be notified of reasons for the denial by BOPNet, the referral package shall be disposed of, and the CCC rejection letter shall be mailed to the institution.  The CCM shall enter the reason for denial using the appropriate SENTRY COM assignment.  The CCM shall maintain a record of rejections until the next Program or Operational Review.

c. Referral Log. Each CCM shall maintain a chronological log of CCC transfer referrals. Records shall be maintained until the next Program or Operational Review. The log must contain at least:

- Offender name and register number.
- Referral institution and date referral was received.
- Name of referral CCC (or 3-digit code) and date of referral to CCC.
- Date of CCC reply.
- Transfer date.
- Date institution notified (via DST waiting list).
- Comment section.

## 5.3. DIRECT PLACEMENT OF OFFENDERS IN CCCs

All direct placements, including supervision and direct court commitments, shall be subjected to the more restrictive Community Corrections Component of the CCC program, unless directed otherwise by judicial recommendation.

### 5.3.1. Probation/Supervised Release

a. Judges may require probationers to reside in or participate in a CCC program as a condition of supervision. If CCMs determine that space is available, they shall authorize CCCs to accept the offenders and the CCM or CCC Director shall notify the USPO.

b. The Bureau pays for probationers and supervised releasees in CCCs only when a court or U.S. Parole Commission order requires it as a condition of supervision; however, expenses for pretrial cases in CCCs, including alleged probation violators who may be required to reside in CCCs as a condition of release from jail, are the responsibility of probation or the pretrial agency.

### 5.3.2. Parole/Mandatory Releasees

The U.S. Parole Commission may require parolees and mandatory releasees to reside in CCCs as a condition of supervision. If the CCM determines space is available, they shall authorize CCCs to accept the offenders and the CCM or CCC Director shall notify the USPO.

### 5.3.3. Direct Court Commitments

Federal judges may recommend that CCCs be designated for inmates to serve short-term sentences (ordinarily less than one year).

PS 7300.09
CN-2 5/19/99
Chapter 5, Page 8

CCMs shall carry out such a recommendation if they determine that this designation is appropriate.  CCMs shall consult with MCAs in all situations of designation of community based facilities for periods exceeding one year.  If space is not available or if inmates are inappropriate for designation of CCCs, an appropriate designation shall be made.  The sentencing judge shall be notified in writing, with an explanation outlining the reasons for not satisfying the judicial recommendation regarding a specific institution or program as noted in the Program Statement on **Judicial Recommendations and U.S. Attorney Reports**.

### 5.3.4.  Community Confinement

**Title 18 U.S.C. § 3563(b) and United States Sentencing Guideline Section 5C1.1,** provide for residence in or participation in the program of a community corrections facility.  Inmates who are sentenced to community confinement reside in a CCC in lieu of some portion of the term of commitment required by the Sentencing Guidelines.  The judgment should specify "Community Confinement." The CCC referral package should contain the same information as specified in the referral package for Public Law placements.

### 5.3.5.  Intermittent Confinement

Offenders sentenced to Intermittent Confinement remain in Bureau custody during nights, weekends, or other time periods, in lieu of some portion of the term of commitment required by the Sentencing Guidelines.  This condition of probation is authorized in **Title 18 U.S.C. § 3563(b) and United States Sentencing Guideline Section 5C1.1.**  Usually, it is served in jail.  If no jail or institution is available, a CCC may be designated with the court's approval or upon the court's recommendation.  These commitments shall be handled like direct court commitments; the USMS must request designation for an Intermittent Confinement commitment after they receive the Judgment in a Criminal Case specifying commitment to the Bureau.  These commitments are subject to the same discipline, escape, and sentence computation procedures (see the **Sentence Computation Manual** for rules on awarding jail credit) as other Bureau inmates during the period of Intermittent Confinement.  They are probationers during other times.  If a CCC is designated, these cases are subject to the provisions of the Community Corrections Component.  These offenders should be treated as inmates to the greatest extent possible.  In the event of a serious disciplinary infraction the sentencing court should be notified.

### 5.3.6.  **CCC Placement as a Release Condition**

Offenders who are placed on supervised release or have a supervised release period stipulated to follow confinement in their Judgment in a Criminal Case may be required to reside in a CCC as a condition of supervised release for the time specified by the court.  The USPO may refer offenders serving a supervised release term in the community who require a more structured environment to the CCM for CCC placement.  When inmates are released directly from institutions with a court or U.S. Parole Commission ordered supervision release condition that they reside in a CCC, institution staff shall forward a referral package to the CCM and providing CIMS clearance when appropriate.  Refer to the Program Statement on **Community Corrections Center (CCC) Utilization and Transfer Procedure**.

### 5.4.  **CENTRAL INMATE MONITORING SYSTEM**

The Central Inmate Monitoring (CIM) System is a classification system the Bureau uses to monitor the transfer, temporary release, and community-based activities of inmates who present special concerns for management.  The CCM has clearance authority for all CIM assignments, except Witness Security cases, which are reviewed by the Central Office Inmate Monitoring Section.  Community corrections staff shall notify the "Review Authority" of clearances using EMS Form 404, Requesting Central Inmate Monitoring Clearance.  See the Program Statement on **Central Inmate Monitoring System** for additional information and guidance on who the appropriate "Review Authority" is in different cases.

As CIM "Coordinators" for inmates confined at contract facilities, CCMs have the same responsibility as the institutional CIM "Coordinators" for CIM cases in their areas.  CCMs are involved in the designation process and in providing case management services to inmates in the community.  They are the first to become involved with inmates when U.S. Marshals request a designation.  It is required that the CCM and case manager be certified in CIM procedures and complete CIM Certification every three years.

CIM areas unique to community corrections offices are:

  5.4.1.  Watching for local media and other information on potential CIM cases; keeping a daily log and a file with CIM material and sending material to the regional office, as appropriate; and keeping the file in a locked drawer if it is a Witness Security case so only those with a need to know have access.

5.4.2.  Identifying inmate management issues that may pose concerns during confinement or while in the community.

5.4.3.  Initiating requests for written documentation that substantiates CIM classification.  Forwarding information gathered on inmates to the CIM Coordinator at receiving institutions.

5.4.4.  Transmitting CIM information to the regional designator for consideration with designation requests.  Information about separatees and WITSEC inmates **must not** be included in the Remarks section of the designation request form, but shall be communicated by phone, SENTRY, or BOPNet.

5.4.5.  Ensuring that any inmate for whom a contract facility is designated is notified in writing, as promptly as possible, of the CIM classification and the basis for it.  The inmate shall sign for and receive a copy of the notification form.

5.4.6.  Preparing the packet on all inmates for whom contract facilities are designated and are identified as CIM cases, as outlined in the Program Statement on **Central Inmate Monitoring System.**  The CCM shall ensure that the files of **all** inmates so identified contain the 8½ x 11 inch white card stamped:  **"NOT TO BE TRANSFERRED OR PARTICIPATE IN COMMUNITY ACTIVITIES WITHOUT CIM CLEARANCE."**

5.4.7.  Ensuring that clearance for CIM cases approved for CCC transfer has been obtained before the inmate arrives at the facility.  This clearance is to be documented in the file, with a hard copy printed no earlier than one to seven days before an inmate's arrival.  Checking for prior CIM classification on public law cases is necessary.  If a prior separatee is at the CCC, the CCM must ensure the inmate's safety is not jeopardized.

5.4.8.  Monitoring of clearances for transfers or community activities outside the commuting area of the contract facilities by the CCM.

In reference to additional CIM clearance for CIM cases who are transferred from a CCC to a home confinement program, the CIM activity clearance for a CCC placement is from the time the inmate departs the institution through the time he or she is released from the CCC or other community programs.  There is no need for CIM clearance for inmates going from a CCC to home confinement if the home confinement location is within the same commuting area.  This also applies to inmates transferring from one contract facility to another under the same CCM office;

however, a review of the CIM status shall be conducted to ensure separatees are not placed at the same facility.

5.4.9.  Register numbers for uncommitted separatee(s)can be obtained from the regional designator.  See the Program Statement on **Central Inmate Monitoring System.**

5.4.10.  CCM authorization of CIM clearance when CCC inmates must be transferred.  Another unique responsibility is approving CIM inmates for furloughs outside the commuting area.  In separation/state boarder cases, the CCM approving the furlough shall complete the SENTRY clearance transaction using EMS Form 404, Requesting Central Inmate Monitoring Clearance.

5.5.  **REPORTING SIGNIFICANT INCIDENTS, EMERGENCIES AND DEATHS**

CCMs shall report and route unusual and serious incidents, assaults, deaths, disturbances, fires, natural disasters, weapons discharges, and adverse incidents that may result in significant publicity using the Report of Incident form.  Uses of force, restraints, or chemical agents shall also be reported on the Report of Incident form.  An After-Action Review Report (EMS Form 586) shall be prepared as necessary.  Each of these forms shall be routed to all listed on the bottom of the form and to the MCA, CCRA, and the Central Office COMM CORR mailbox.

The regional duty officer shall be notified when the occurrence is on a weekend or after normal business hours.  There will be circumstances when some of these incidents present regional or national sensitivities and require immediate or next day telephonic alert to respective staff in the regional and Central offices.  For example, if there is a probability for regional or national media attention to the incident, immediate telephonic reporting may be called for in addition to completing the Incident Report.

In the event of a significant escape, related incident, or death of an inmate in a contract facility, the CCM shall follow procedures outlined in the Program Statement on **Escapes/Deaths Notification.**  The CCM performs the same role as the chief executive officer.  In the event of an inmate death, CCC or jail staff shall take a rolled right thumb print and arrange for the death certificate to be completed.  These two documents shall be mailed to the CCM, who shall make sure both are placed in the Inmate Central File.  A copy of the death certificate shall be mailed to the Regional Health Services Administrator.

The CCM shall instruct contract facility staff to call the local coroner to review the case if the death is violent, accidental

with unusual or questionable circumstances, or sudden, when the deceased had not been under medical supervision. In all other cases, the CCM shall follow local law or practice in disposing of the body. If relatives claim the body, the Federal Government has authority to release it to them. If the relatives live at a distance, the government shall pay the cost of transporting the body and the expense of preparing it for shipment, including embalming, clothing, casket, and shipping container. If the body is not claimed by relatives, the government has authority to arrange and pay for local burial expenses. The regional contract specialist shall provide information on maximum allowable expenses. Price quotes shall be obtained from several morticians and provided to the contract specialist, who shall select the vendor and issue a purchase order.

When embalming or an autopsy is necessary, refer to the Program Statements on **Autopsies, Authority to Order** and the **Health Services Manual** for further information regarding religious practices. The regional chaplaincy administrator is to be contacted for guidance.

The CCM shall report all deaths immediately to the Regional Correctional Services Administrator by telephone, confirm by BOPNet and forward with copies of the Incident Report to the Correctional Services Administrator and National Health Systems Administrator in the Central Office, MCA, CCRA, and CCA.

The CCM must notify the sentencing U.S. district court judge by letter, with copies to the U.S. Attorney, Chief U.S. Probation Officer, and the Regional Director. The Program Statement on **Escapes/Deaths Notification** also explains special handling for WITSEC cases, notification procedures for family and friends, medical reports, and other information needed.

## 5.6.  ESCAPES

### 5.6.1.  Definition and Application

Any committed inmate who fails to report to a contract facility for admission, fails to remain at the approved place of employment or training during the hours specified by the terms of the employment or training program, fails to return to the facility at the prescribed time, or fails to return from any other approved absence at the time and place stipulated, may be placed on escape status after staff have completed and documented routine procedures to locate the inmate.

The federal escape statute only applies to those who escape from the custody of the Attorney General or Bureau. A person in a CCC

as a condition of probation, supervised release, or bond is there by order of the committing court and is not deemed to be in the custody of the Attorney General or the Bureau.  Probationers and those on bond who leave a CCC without permission cannot be prosecuted for escape, and should not be required to sign documents indicating they can be.  Having CCC staff add this statement to their forms or rules may prevent problems:

> **"A person who is residing in this CCC as a condition of probation, parole, supervised release, or bond is not in the custody of the Attorney General or Bureau of Prisons and thus cannot be prosecuted for escape if they leave the facility without permission.  However, any unauthorized departure from the facility by those on probation, parole, or bond will be immediately reported to appropriate court personnel."**

Any offender on probation or bond is considered to have absconded from supervision rather than escaped from custody.  **It is not necessary to complete the Escape Report, EMS Form 907, for absconders.**

5.6.2.  **Procedures**

    a.  Escape from a contract facility

        (1)  CCMs must ensure that all contract staff are familiar with escape reporting procedures.

        (2)  Contract staff must report escapes to CCMs immediately after the inmate is placed on escape status (no reporting delays are allowable for escapes from secure-type facilities).  Staff should not wait until regular working hours if the escape occurs in the evenings or on weekends.  The CCM shall ensure the CCC staff can contact CCM staff after hours.  This may include providing a beeper or cell phone number (with backup home number of a staff member), or providing the home phone numbers of at least two community corrections staff members.  CC Offices shall establish local procedures for immediate USMS notification.

        (3)  Upon notification of an escape during non-duty hours, the CCM shall determine the necessity to contact the regional duty officer, depending on the circumstances of the escape, but shall always report escapes from secure custody.  These requirements necessitate CCM staff being aware of the weekly

regional duty officer roster.  Escapes from contract
confinement facilities (jails, long-term institutions,
juvenile boarding facilities) must be reported
immediately.

(4)  The CCM shall complete the Community Corrections
Escape Report (EMS Form 907),  **(Attachment 5-2b)**.  The
following information may be of assistance in filling
out this form:

> ESCAPE FROM CUSTODY - Under this category, report
> an inmate whose whereabouts are unknown after
> contract staff have tried to locate the inmate at
> local jails, hospitals, job, and pass locations.

> ESCAPE DUE TO COMMUNITY ARREST - Under this
> category, report an inmate who is missing as a
> result of an arrest by a law enforcement
> authority.  The CCM is aware of the inmate's
> location and has initiated procedures to place a
> detainer in favor of the USMS with the USM having
> custody.  The CCM shall ask the USMS to notify the
> CCM when the detainer is executed.  In SENTRY
> these are identified as technical escapes.

>> Community Arrest/New Criminal Behavior - An
>> inmate is arrested for engaging in new
>> criminal behavior since assignment to a
>> community based program, such as when an
>> inmate is arrested and charged with a robbery
>> that occurred while signed out of the CCC.

>> Community Arrest/Old Criminal Behavior - An
>> inmate is arrested for criminal behavior that
>> occurred prior to assignment to a community
>> based program.  For example, the inmate is
>> arrested by an officer who recognizes him as
>> having a warrant pending since before this
>> incarceration.

The "Circumstances" section should include basic
information pertaining to the escape with facts related
to any new or old criminal behavior, injuries, and/or
media attention.  Note any public safety factors or
special management concerns as well as pertinent
background information on the inmate and offense not
detailed in the Inmate Load and Security Designation
form (BP-S337).  Facts pertaining to the CCC's

accountability procedures regarding the incident are to
be included.

Other areas in the Escape Report are self explanatory.
CCMs need to ensure this entire form is completely
filled out with accurate information pertaining to the
inmate's status.

(5)  The CCM must notify the FBI and USMS within the
district of the escape immediately of an escape.
Details of the escape and the identity of the escapee
must be furnished.  The Notice of Escaped Federal
Prisoner form (BP-S393.058) is to be used for this
notification.  In addition, the CCM needs to send a
message to the USMS authorizing them to apprehend and
detain the escaped federal prisoner.  For an escape due
to community arrest, the CCM **needs only** to send a JUST
message to the USMS to have a detainer placed on the
escapee.  Other notifications are not necessary.

(6)  When an inmate escapes, CCMs shall send a letter
via fax immediately (within the first working day) to
the sentencing judge(s) explaining the details of the
escape, including a copy of the BP-S393, followed by
original correspondence.  The U.S. Attorney and U.S.
Probation Office shall be faxed a copy of the letter to
the judge.  This procedure does not apply to escapes
due to community arrest.

(7)  CCMs shall update SENTRY to indicate changes in
release status, COM assignments, custody, good time,
and sentence computation.

(8)  CCMs shall maintain escape documentation,
including copies of the escape report, notifications,
and disciplinary information.  Disciplinary information
is filed in a separate disciplinary file.  This
documentation can be disposed of once a
Program/Operational Review has been conducted and the
individual has been apprehended.

(9)  The CCM shall purge file material already in the
Inmate Central File, include original escape
documentation with disciplinary reports and escape
notification, and send this to the parent institution
along with a terminal report after disciplinary
proceedings are completed.

(10)   The Bureau does not pay the contractor for the day of escape unless the contract specifies otherwise.

CCMs should be familiar with the procedures regarding escapes from community based programs found in the Program Statements on **Escape From Extended Limits of Confinement, Escape/Deaths Notification,** and **CCC Utilization and Transfer Procedure** as well as the **CCC Statement of Work.**

b.   Escape while in route from an institution to a CCC:

(1)   When an inmate on unescorted transfer fails to report to a CCC, the CCM shall report the inmate as an escapee via telephone and BOPNet GroupWise to the ISM at the sending institution.  The U.S. Marshal in the CCC district shall be notified of the escape.  The CCM shall also notify the Regional Director, Central Office, and the sending institution via BOPNet GroupWise of the escape.

(2)   Staff at the sending institution shall update SENTRY to indicate changes in release status and sentence computation as well as preparing an incident report and conducting a discipline hearing in absentia. Institution staff shall complete the Incident Report and make all notifications as required by the Program Statements on **Unescorted Transfers and Voluntary Surrenders, Escapes/Deaths Notification,** and **CCC Utilization and Transfer Procedure.**

c.   Apprehension or return to facility of contract facility inmate

(1) Apprehension of CCC failures is to be coordinated with the contractor and USMS to reduce the possibility of escape.  This can be accomplished by issuing the incident report when the USMS arrives to take custody or by asking the USMS to pick up a home confinement inmate at his or her residence.  The importance of immediate transfer must be stressed to the USMS when the CCM determines there is an escape risk or threat to the inmate and/or others.  In routine cases, apprehensions should be scheduled to occur during normal business hours as noted in the Program Statement on the **Interagency Agreement between the Bureau of Prisons and U. S. Marshals Service.**

(2)   Gather all information available related to the inmate's activities while on escape status.  This may

necessitate phone calls to the USMS, other arresting authority, or USPO.

(3)  Complete the Community Corrections Apprehension Report (EMS Form 908), (**Attachment 5-2d**).  This report should include information describing any new offenses committed and comments on whether injuries or media coverage resulted.  Apprehension reports must be completed on escapes due to community arrest when they are returned to federal custody.

(4)  Determine through the U.S. Attorney and/or the USMS if there will be federal escape prosecution.  If so, do not designate until after prosecution and sentencing and the USMS has formally requested designation.

(5)  Make the determination if local redesignation is appropriate, i.e. from a CCC to a local jail.  If so, follow routine inter-facility transfer procedures. After designation is made, the CCM shall send a JUST message **(Attachment 5-2c)** to the USMS to transfer the inmate to closer custody.

(6)  Contractors shall be advised to accept an escaped inmate returning to the facility always and to call the CCM immediately for further direction.  The USMS shall be called to pick up the inmate immediately, unless the CCM chooses to expunge the incident report and charge the inmate with another accountability code.

If there are no significant criminal charges and a transfer to a Bureau institution is the most appropriate course of action, regular transfer procedures shall be followed as with any other CCC failure.

(7)  If significant time has passed (weeks or more) from the date of escape and/or there have been significant criminal charges, the CCM shall do a new Inmate Load and Security Designation form (BP-S337).

(8)  The Program Statement on **Escape from Extended Limits of Confinement,** provides guidelines for giving full credit for time served while detained or arrested, gives procedures for when a state institution is designated for continued service of federal sentence, and explains situations where escape status is to be nullified.  Complex situations for which there appear

to be no clear policy guidelines must be referred to
the Regional Inmate Systems Administrator (RISA).

(9)  The CCM shall check quarterly to see if an escapee
has been apprehended via SENTRY, NCIC, and the USMS.
The results of this check shall be documented.

**5.7  DISCIPLINE/IN-PROGRAM FAILURES.**  This section applies to all
inmates in contract facilities which are required, by the terms
of their contract, to use a discipline system in which a Bureau
DHO takes final action.  For inmates identified as having
sentences affected by the Violent Crime Control and Law
Enforcement Act (VCCLEA) and the Prison Litigation Reform Act
(PLRA), also see Section 5.8,  SPECIAL DISCIPLINE PROCEDURES FOR
VCCLEA/PLRA INMATES IN NON-FEDERAL FACILITIES.

For those contract facilities which are not required to use
Bureau discipline procedures (generally local jails and state
Departments of Correction) the CCM must ensure the facilities use
and adhere to the concepts of due process as outlined in **Wolff v.
McDonnell.**

The Program Statement on **Inmate Discipline and Special Housing
Units** and prescribed procedures for inmate discipline as
contained in the contractors respective **Statement of Work** shall
be referenced.

The following Bureau forms are used during the community
corrections disciplinary process and can be found on BOPDOCs:

| | |
|---|---|
| BP-S494.073 | Checklist for Center Discipline Committee Certification; |
| BP-S205.073 | Incident Report (CCC's); |
| BP-S206.073 | Inmate's Rights at Center Discipline Committee Hearing (CCC's); |
| BP-S207.073 | Notice of Center Discipline Committee Hearing (CCC's); |
| BP-S495.073 | Waiver of Appearance (CCC's); |
| BP-S209.073 | Duties of Staff Representatives (CCC's); |
| BP-S208-073 | Center Disciplinary Committee Report (CCC's); |
| BP-S389.058 | Statutory Good Time Action Notice; |
| BP-S390.058 | Extra Good Time Recommendation; and |
| BP-S448.058 | Good Conduct Time Action Notice. |

The following tables are used during the community corrections
disciplinary process and can be found in the Program Statement on
**Inmate Discipline and Special Housing Units:**

| | |
|---|---|
| Table 3 | Prohibited Acts and Disciplinary Scale |

Table 4          Sanctions (Note:  Sanctions applies with the
                 exception that the VCCLEA/PLRA exemplary
                 compliance requirement does not apply to inmates
                 in contract facilities).

Table 5          Sanctions for Repetition of Prohibited Acts within
                 the Same Category

The Discipline Hearing Administrator (DHA) shall establish
procedures, within his or her respective region, for mailing
completed CDC packets for review and imposition of final action.

### 5.7.1.  **Community Corrections Center Staff**

The contractor shall comply with the Bureau of Prisons prescribed
policy and procedures for inmate discipline as contained in its
**Statement of Work.**  No deviation from this policy may be
permitted.

### 5.7.2.  **Procedures Upon Admission to Center**

The contractor shall furnish a copy of "Table 3-Prohibited Acts
and Disciplinary Scale," found in the Program Statement on **Inmate
Discipline and Special Housing Units**, the center's disciplinary
system, and the established rules of the facility to each new
offender upon arrival.  Copies of these documents shall be posted
at a prominent location accessible to all offenders.  The
offender's file shall contain a receipt, signed by the offender,
stating that the offender has received and understands the
contents of these documents.

### 5.7.3.  **Discipline Hearing Officer (DHO)**

Ordinarily, within three working days of receipt of the Center
Disciplinary Committee (CDC) Packet, the DHO shall review it for
compliance with the CDC discipline policy specified in this
Manual and **Wolff v. McDonnell.**  If there are any discrepancies in
the CDC packet, the DHO shall communicate directly with the CDC
Chairperson by telephone or written correspondence.  In order to
ensure that all phases of the discipline hearing record are
complete and the findings are based on facts, the procedures have
been followed, and that any delays are justified, the DHO shall
complete the Checklist for Center Discipline Committee
Certification form (BP-S494.073) and place it in the front of the
CDC packet.  The DHO shall also sign and date the CDC Report on
the top right side to certify compliance with disciplinary
requirements.  If the DHO is not satisfied that all criteria are
met, they will return the packets and point out errors and
omissions to be corrected.  If the DHO experiences recurring
problems, the CCM should be notified so the issue can be

addressed as a matter of contract compliance.  If
the DHO is satisfied that all criteria are met, he or she will
certify, impose final action, and sign and date the CDC report.
Additionally, the DHO will enter the incident report and charges
using the SENTRY transaction "Update Charges" as well as revise
the "Add Hearings/Findings" transaction immediately after final
action is taken and enter the SENTRY report number in the upper
right corner of the Checklist for CDC Certification.  The report
will be given an initial incident report status of "CDC".  If an
inmate has any prior discipline action, the DHO shall determine
if there are any executable suspended sanctions using the SENTRY
Sanctions Available to Execute.  The Update Changes transaction
should be done as soon as the packet is received from the CCC,
even if the case is to be returned for corrective action.  Doing
so provides an effective tracking system of reports under review.

The DHO shall maintain a log to record pertinent information on
each case reviewed.  At a minimum, the log shall include:

- the inmate name,
- register number,
- facility,
- date of CDC hearing,
- date received by DHO,
- date returned (if errors were discovered),
- date reply received,
- final action date,
- SENTRY entry date,
- SENTRY Incident Report number, and
- date forwarded to the CCM.

This information shall be available for review by the Discipline
Hearing Administrator and the Community Corrections
Administrator.

### 5.7.4.  **Procedures CCM to Follow After Imposition of Sanctions**

When the CCM receives the CDC packet from the DHO, he or she
shall review the CDC packet further to ensure that it has been
certified, sanctions imposed, signed and dated by the DHO as
required.  The DHO's sanction is final and subject only to the
CCM's review to ensure conformity with the provisions of the
community corrections discipline policy.

The CCM shall ensure the sentence is recomputed and/or initiate
the transfer, if appropriate, and ensure that any other sanctions
the DHO imposed are executed in accordance with directives.

The CCM shall notify facility staff in writing of decisions and provide a copy of the CDC report for the inmate within three working days, if possible, but no longer than five working days from date of receipt of the final disposition from the DHO. Part II of the Incident Report (investigation) may not be given to the inmate. Any exceptions to this notification procedure must be justified and documented. If the inmate's whereabouts are unknown, as in the case of an escapee, the report and all material shall be sent to the parent institution for inclusion in the Inmate Central File. If an inmate is in-transit, his or her copy is to be sent to the transfer destination with a note to deliver it to the inmate upon arrival. Whatever action is taken to provide an inmate with his or her copy of the CDC report, must also be documented on the CCM's copy.

The CCM shall forward a copy of the CDC report to the U.S. Parole Commission on all cases with a parole date.

The CCM shall maintain a copy of a complete CDC packet for 12 months or until the next program or operational review is conducted. In escape cases, a duplicate packet shall be maintained until it has been determined the inmate was returned to custody and the discipline process has been completed.

The CCM shall maintain a log to record pertinent information on each case processed. At a minimum, the log shall include:

- the inmate name,
- register number,
- facility,
- date of CDC hearing,
- date received from DHO,
- final action date,
- SENTRY Incident Report number, and
- the date a copy was sent to Inmate/CCC/USPC.

This information shall be available for review by the Discipline Hearing Administrator and the Community Corrections Administrator and shall be retained for at least two years.

Unless otherwise specified in the respective contract, state and local institutions and detention facilities may use their own discipline procedures as long as they comply with the due process requirements of **Wolff v. McDonnell.** These facilities may choose to use the procedures and forms for discipline in CCCs, providing the documents are modified to indicate the facility is other than a CCC. The CCM shall closely monitor these discipline systems to ensure continued compliance with **Wolff v. McDonnell** requirements.

### 5.7.5. **SENTRY Transactions**

The CCM shall complete and place in the inmate's file any of the following forms that are applicable:  Form BP-S389.058, Statutory Good Time Action Notice; Form BP-S390.058, Extra Good Time Recommendation; Form BP-S448.058, Good Conduct Time Action Notice.  The CCM shall forfeit and/or disallow any Good Time in SENTRY as directed by the DHO.

### 5.7.6. **Appeals**

An inmate in a community corrections facility or program may contest disciplinary action imposed by the CCC/CDC staff or the DHO by appealing through the Administrative Remedy Program.  When the inmate is advised of the disciplinary action, he or she shall also be advised of appeal procedures.

If the appeal involves only minor sanctions imposed by CCC/CDC staff, a Request for Administrative Remedy (EMS Form 229 - not available on BOPDOCS, paper only), may be used to appeal the action to the CCM.  Minor disciplinary sanctions are not entered into the SENTRY "Inmate Discipline Data System."  However, when a CCC/CDC minor sanction is appealed to the CCM via a Request for Administrative Remedy, the CCM must ensure that the appropriate data is entered into the SENTRY Administrative Remedy Module.

If the appeal involves final sanctions imposed by the DHO on an incident report (major or minor), the following shall determine the method to file an appeal:

- Request for Administrative Remedy form, filed with the respective Regional Director for inmates still assigned to a CCC.

- Letter to the Regional Director for inmates who have been removed from a CCC and placed in local jails or contract detention facilities and do not have access to the appropriate appeal form.

If the inmate is to be transferred to a federal institution, the inmate shall wait to use the Administrative Remedy procedure upon arrival at the institution.

### 5.7.7. **Training Plans/Agenda**

The DHA shall ensure inmate discipline training is provided for the contractor and CCM staff annually and any additional training as needed.  The training agenda shall focus on major problem areas identified during DHO review of the CDC packets.

The CCM shall continue to provide initial guidance and supplementary training to new staff or contractors between the regional-wide training conferences.  All discipline training provided to contractors shall be documented in the CCM contract file.

5.8. **SPECIAL DISCIPLINE PROCEDURES FOR VCCLEA VIOLENT/PLRA INMATES IN NON-FEDERAL FACILITIES**

The VCCLEA became effective on September 13, 1994, and applies to offenses that occurred on or after that date but prior to April 26, 1996.  The PLRA became effective on April 26, 1996, and applies to offenses that occurred on or after that date.

All CCC inmates sentenced on or after September 13, 1994, are subject to good time sanctions as outlined in the Program Statement on **Inmate Discipline and Special Housing Units**.  In particular, they are subject to mandatory disallowance sanctions for certain severity prohibited acts.  VCCLEA non-violent inmates are also impacted by this policy.

5.8.1. **Identifying Sentences Imposed Pursuant to VCCLEA and PLRA**

Community corrections staff shall identify inmates sentenced under the provisions of VCCLEA and/or PLRA for direct placement in state and long-term boarder contract facilities.  Identifying and loading appropriate SENTRY data is also necessary for these inmates.  Institution staff will have made this identification and the SENTRY applications already on all long-term boarders transferred to contract facilities from Bureau institutions.

5.8.2. **Notification of VCCLEA and PLRA Requirements**

    a.  To Inmates.  The CCM shall notify each VCCLEA violent and/or PLRA inmate serving a sentence of more than one year who is placed directly in a contract facility (initial designation, except Taft Correctional Institution or the Southwest Detention Facility) as a long-term boarder that, if he or she is found guilty of a prohibited act, disallowance and/or forfeiture of good conduct time shall be in accordance with Bureau policy. Inmates who transfer to contract facilities from Bureau institutions do not need to be notified.  See the Notification to Inmates Sentenced Under the VCCLEA and/or PLRA **(Attachment 5-3a.),** as a sample inmate notification letter.  The CCM shall also send a copy of the letter to the facility director or Warden.

    b.  To Contractors.  The CCM shall notify the appropriate state or long-term boarder contract facility director or Warden

that if a VCCLEA violent or PLRA inmate is found guilty at a discipline committee hearing of a prohibited act, they must send the CCM a copy of the disciplinary proceeding.  See the Notification to Contract Facility Director or Warden of VCCLEA and/or PLRA Mandated Reporting Requirements for Prohibited Acts **(Attachment 5-3b.),** as a sample of the facility notification letter.  This letter also requires the contractor to execute **Attachment 5-3a.**

5.8.3.  **Incident Reports**

The report on a VCCLEA violent or PLRA inmate who commits a prohibited act while housed in a state or long-term boarder contract facility, must be referred to the Discipline Hearing Administrator (DHA) or the designated Discipline Hearing Officer (DHO), or a CCM staff member who is DHO certified in offices with an unusually high number of incident reports.

a.  Contract facilities with DHO discipline process.  When an inmate, in a contract facility that already uses the DHO as the official taking final action, receives an incident report, the discipline committee shall recommend good time be disallowed as prescribed by VCCLEA and PLRA.  The discipline committee shall forward copies of all relevant documents to the DHO with a brief statement of reasons for the referral and any recommendation for appropriate disposition in accordance with the exemplary compliance standards.

The DHO must disallow good conduct time credit available for a VCCLEA violent or PLRA inmate, and the sanction shall not be suspended.  This is indicated in "Table 4-Sanctions" of the Program Statement on **Inmate Discipline and Special Housing Units,** also reference "Table 5-Sanctions for Repetition of Prohibited Acts within the Same Category."

b.  Contract facilities with an independent discipline process.  For inmates confined in state or other long-term boarder contract facilities with independent discipline procedures, the following procedures apply:

● The contract facility staff shall be asked to provide a complete discipline packet to the CCM for VCCLEA violent or PLRA inmates, who have been found guilty of committing a prohibited act.

● The CCM shall forward the packet to the DHA.  The DHA/O shall evaluate the discipline packet to insure that basic due process has been met according to **Wolff v. McDonnell.**  If the DHA/O finds that **Wolff v. McDonnell**

requirements have been met, he or she shall make the necessary SENTRY transaction for disallowance and/or forfeiture of good time and notify the CCM to make the necessary SENTRY transaction to the computation.

● The DHA/O shall return the packet to the CCM for distribution to the inmate and inclusion in the Inmate Central File.

## 5.9.  TRANSFER OF INMATES

### 5.9.1.  Authority and Approval

a.  Authority to transfer federal inmates between non-federal facilities and from non-federal facilities to federal institutions is delegated to CCMs.  General procedures are provided in the **Security Designation and Custody Classification Manual.**  When transferring inmates, care must be taken to obtain CIM clearance when necessary, and to inform regional staff of cases that may evoke publicity or require unusual handling.

b.  CCMs must obtain approval from the receiving facility (or other CCM if the receiving facility is in another service area) before ordering transfer of inmates to other non-federal facilities.  Ordinarily, CCMs must approve transfers from one facility to another within the same agency or state correctional system prior to the transfer. CCMs may authorize transfers from non-federal to federal institutions, but must consult with the regional designator.

c.  CCMs shall obtain CIM clearance before redesignation, after determining the inmate must be returned to the institution, and after consultation with the regional designator, if necessary.

### 5.9.2.  Forms and SENTRY Procedures

a.  The redesignation shall be completed as follows:

```
Register Number      : 12345-678
Name                 : Kilroy
Sex, Race, Age       :
Custody              :
ARS Status           :
Resident             :
Level                :
Facility Designated  : LOM
```

b.  Appropriate transfer codes must be used in accordance
with current directives.  A disciplinary transfer (Transfer
Code 309) requires this sanction to be imposed formally by
the DHO following a CDC hearing.

c.  CCMs shall use the SENTRY redesignation transaction to
authorize the transfer of CCC program failures to federal
institutions.  CCMs shall include appropriate comments
(program failure, etc.) in the Remarks section of the
redesignation screen and do not need to send BOPNet messages
to explain the redesignation unless there is insufficient
space in the Remarks section.  Redesignations appear on the
designated institution's daily log and will place inmates in
the "pipeline" for population management purposes.

d.  A Transfer Order (BP-S399.058) shall be provided to the
USMS.  When time constraints require expedience, CCMs may
provide transfer orders to the USMS via teletype, facsimile,
or SENTRY using EMS Form 417.  A signed, printed copy serves
as the original for the USMS, and copies may be routed to
the ISM at the receiving institution, the regional
designator, and the U.S. Parole Commission, if applicable.
A SENTRY-generated In-Transit Information Form should also
be provided to the USMS.  The CCM provides a copy to the
receiving facility.

e.  CCMs shall ensure that file material, including original
disciplinary reports and copies of communications to the
U.S. Parole Commission, are forwarded immediately to
redesignated institutions.  They shall notify institutions
of special circumstances that might affect an inmate's
release date.

f.  CCM staff shall remove inmates from EGT earning status
(SENTRY Sentence Monitoring) when they are removed from CCCs
and shall modify the sentence computation to reflect
forfeited or withheld statutory good time.

## 5.10.  **PAROLE HEARING PROCEDURES**

CCMs must establish procedures for U.S. Parole Commission
hearings on all eligible inmates.  CCMs must develop parole files
for inmates who are eligible for parole, prepare dockets, submit
lists of eligible inmates to the U.S. Parole Commission, and help
facilitate arrangements for hearings.  If the non-federal
institution does the docketing, the CCM must monitor the
procedure thoroughly.  One suggested method of monitoring would
be to use the SENTRY's Parole Date sentence computation function

to establish a parole waiting list in SENTRY, similar to federal institutions.

The U.S. Parole Commission must be notified whenever a CCC inmate with an effective parole date is arrested before the release date.

The U.S. Parole Commission must receive a mini-file on these inmates by the 10th of the month preceding the month of the examiners arrival for the hearings.  The files must include: parole application, sentence computation, PSI, and probation revocation report, if applicable.  If available, the following should also be sent: FBI arrest record (rap sheet), classification study, Report on Committed Offender (AO 235), and Report on Convicted Offender by United States Attorney (USA-792).

5.11.  **VICTIM AND WITNESS PROTECTION ACT OF 1982**

The Program Statement on **Victim and Witness Notification** is the primary document for procedures in this area.

Transferring institutions are to advise the party to be notified when the CCC acceptance date is established, but, no later than two weeks prior to the transfer.  If the transfer date moves up, the institution must renotify.  CCMs must ensure the BP-S323.014, Victim and Witness Notice showing this has been done is received prior to the transfer.  If the inmate is released prior to the date noted on the Victim and Witness Notice, or the date moves up, the CCM must renotify the victim or witness.

When an inmate's custody is extended beyond the scheduled release date; it is not necessary to renotify the victim or witness. CCMs shall notify the interested party if the inmate goes on furlough, dies, or is apprehended as an escapee.  Attachments to the Program Statement can be used for making notifications.  If the inmate escapes, the CCM shall make immediate notification by telephone.  CCMs shall ensure the SENTRY Daily Log transaction is used to monitor Victim/Witness Program cases placed in CCCs under their responsibility.

CCMs have the same approval responsibilities as Bureau Wardens under the Victim/Witness Program for federal inmates confined in long-term contract boarding facilities (state institutions) and for short-term direct court commitments to other non-federal facilities.

5.12.  **MEDICAL SERVICES**

  5.12.1.  **Entrance Medical Appraisal**

Inmates transferred from a federal to a non-federal facility must receive a medical evaluation and clearance at the federal institution prior to transfer.  Refer to the **Health Services Manual.**

Inmates committed directly to non-federal facilities, including CCCs, must receive entrance medical appraisals as required by the Statement of Work.  The Bureau pays for these physicals, including those of supervision cases, unless the contract specifies to the contrary.  In most cases, the requirement is for a general physical exam (comparable to an insurance-type physical) that does not require hospitalization to complete.

Contractors must ensure that the results are documented and that copies are placed in inmates' files and sent to CCMs.  The exams should be completed within five days of commitment.  The requirement for entrance physicals also applies to inmates required to reside in a CCC as a condition of supervision unless one is included in the referral packet.

All other medical and dental expenses for persons under supervision of the USPO are the inmate's responsibility.  See the **Statement of Work.**

  5.12.2.  **Routine Health Care**

Inmates in CCCs are expected to become financially self-sufficient and therefore, bear the cost of medical care.

Contractors must obtain CCM approval prior to authorizing non-emergency medical treatment for which the Bureau may be responsible.  In emergencies, contractors shall obtain the treatment required to preserve the inmate's health and shall inform the CCM as soon as possible.  CCMs shall determine whether the inmate has adequate resources to cover the cost of the treatment (medical insurance or adequate funds) or whether it should be borne by the Government.

CCMs shall inform the Office of Medical Designations and Transfers (OMDT), CCRA, and MCA immediately when an inmate is hospitalized or otherwise referred for in-patient emergency treatment or outpatient surgery for which the Government may be responsible.  It is a good practice to send a courtesy notification by BOPNet or fax to the Regional Health Services Administrator (RHSA).  All other medical expenses shall be

subject to the RHSA's approval.  When an inmate is placed
temporarily in a local hospital, SENTRY should reflect the ARS
code "Local Hosp."  The OMDT decides whether continued
hospitalization or transfer to an institution is appropriate.
CCM approval of payment for medical treatment is subject to the
following conditions:

    a.  CCMs may not authorize payment for an inmate who is
receiving Medicaid benefits, has medical insurance, or the
ability to pay.  Inmates who insist the Government is responsible
for medical care may be considered for transfer to an institution
for appropriate treatment.

    b.  Inmates who are veterans retain any eligibility they may
have for treatment at a Veteran's hospital.

    c.  CCMs may authorize admissions to hospitals for non-
emergency medical treatment only upon the OMDT's approval.

    d.  Generally, CCMs may authorize non-emergency medical care
for inmates in jails and non-federal long-term facilities
(including juveniles) when recommended by staff at these
facilities and when such treatment appears necessary.  If there
is a cost, the RHSA must pre-approve it.  Inmates in these
facilities may not pay for their own medical care.

    e.  CCMs may authorize non-emergency dental care (including
dentures and dental reconstruction) and vision correction
(eyeglasses) only upon the RHSA's approval.

    f.  When the RHSA must approve medical services, the CCM
must submit a completed EMS-213, Medical Treatment in Local
Community form to the RHSA.  When OMDT must pre-certify
treatment, the CCM shall follow current health services
procedures and direct any related questions to the OMDT via
BOPNet or telephone.

  5.12.3.  **Sensitive Medical Data (SMD)**

CCMs are authorized SENTRY access to SMD data only to retrieve
information on cases under their responsibility.  CCM offices
shall not delete or add any data to the SMD system.

  5.12.4.  **Mothers and Infants Together (MINT) Program**

A description of this program for pregnant federal inmates is
found in the Program Statement on **CCC Utilization and Transfer
Procedure**.  This policy contains information on associated
medical care costs and a "Sample Statement of Responsibility for

PS 7300.09
CN-2 5/19/99
Chapter 5, Page 30

MINT Referral," documenting who will have financial
responsibility for the baby.

## 5.13.  GENERAL CASE MANAGEMENT IN CONTRACT CCCs

### 5.13.1.  Offender Subsistence Collection

To promote financial responsibility and offset the cost of
incarceration, the Bureau requires inmates to make subsistence
payments to contractors.  Contractors shall collect 25% of each
employed inmate's weekly gross income not to exceed the daily
inmate-day rate.  Payments shall be rounded down to the nearest
dollar amount.  Offenders who have other means of financial
support (VA Benefits, Worker's Compensation, retirement income,
etc.) shall contribute an amount determined by the contractor and
approved by the CCM, to approximate 25% of their weekly income.

Contractors must collect the full subsistence due.  Partial weeks
of residence are prorated.  Contractors shall reduce the monthly
billing to the Bureau by the amount collected in subsistence.  An
inmate who fails to pay subsistence may have privileges withheld
or disciplinary action may be taken, including termination from
the program.  Unless otherwise indicated by the court,
supervision cases shall pay subsistence.

If the court indicates that subsistence should not be collected,
the CCM shall comply with the court's order.  If the court has
made it known that they do not consider it appropriate to collect
subsistence on a direct commitment, the CCM should treat this
like any other judicial recommendation, that is, look at the
merits of the case and make every effort to make a sound
decision.  If the CCM determines not to follow the court's
recommendation, a letter of explanation must be sent.  Absent a
court order, offenders are responsible for subsistence payments
as outlined in this section.

Pretrial defendants in a CCC are not restricted from paying
subsistence.  The CCM should ensure that contractors work closely
with the local pretrial services office to determine which, if
any, pretrial defendant(s) should pay.

The subsistence program applies to all offenders assigned to
community-based programs.

In **cases of extreme hardship**, CCMs may waive or modify
subsistence payments on a case-by-case basis, with the MCA's
concurrence.  Ordinarily, obligations including fines,
restitution, or court costs shall not be considered a factor when
granting waivers.  Extreme hardship is defined as a situation

when the offender has made every effort to establish a suitable
release plan, but, due to circumstances beyond his or her
control, has been unable to prior to release.  Examples of such
situations include homelessness, unemployment due to physical or
mental health reasons, unexpected or emergency critical health
care needs, or no community resources.

To be considered for a modification or waiver of subsistence, the
offender must submit to the contractor a written justification
along with a financial statement to include a listing of all
debts and assets.  The contractor shall forward the offender's
request to the CCM with its recommendation.  Subsistence shall be
waived/modified for inmates who have been assessed a Cost of
Incarceration Fee.  Refer to the Program Statement on **Cost of
Incarceration Fee**.

   5.13.2.  **Social Security Payments to Offenders**

Both **42 U.S.C. § 402** and implementing language in **20 CFR 404.468**
provide the following guidance on this issue:

> Convicted felons are not entitled to receive Social Security
> benefits for any part of any month of which the individual
> is confined.  For definitional purposes, confinement means
> as long as the individual is under a sentence of confinement
> and has not been released due to parole or pardon.  It
> should be noted that benefit payments to any other person
> who is entitled on the basis of the prisoner's wages and
> self-employment income are payable as though the prisoner
> were receiving benefits.

The Social Security Administration has held that the regulation
means offenders are not entitled to benefits if they are
transferred from an institution to a CCC, home confinement, or
any other program if their sentences are still running and they
have not been released from custody.

**Exception**:  Disability benefits may be allowed to individuals
participating in a vocational rehabilitation program that the
court and the Social Security Administration approves.

   5.13.3.  **Employment**

One of the most important purposes of CCC placement is employment
assistance.  Contractors are to ensure that offenders begin
working as soon as possible and must assist those who need help
in finding employment.  Most offenders are expected to be
employed within 15 working days of arrival at a CCC.

CCMs must encourage contractors to develop programs that increase
privileges for pre-release component offenders who are employed.
It is generally appropriate for contractors to require offenders
to be employed before allowing them to be absent from the CCC for
social purposes.  Contractors may take disciplinary sanctions
against offenders who are able, but unwilling, to hold
employment.

Bureau policy and the SOW require that employers be notified of
an inmate's legal status (that they have been convicted of a
federal offense).  This policy applies to supervision (public
law) cases also, but such cases are under the jurisdiction of the
court or U.S. Parole Commission and probation officers may
determine that an exception is appropriate.  CCMs must ensure
that contractors implement the policy in all other cases.
Notifications should be made prior to employment of the offender
if possible.

### 5.13.4.  **Authorized Absences**

Contractors may allow a pre-release component inmate to "sign
out" from the CCC until evening curfew, and go on pass for
weekends and holidays.  A furlough is required when the inmate
will be gone for more than a weekend (including holidays) and/or
the destination is more than 100 miles.  Furloughs require USPO
comment (both in the district the inmate will be visiting as well
as where the CCC is located, if not the same), CCM approval, and
CIM clearance if appropriate.  If repeated furloughs to the same
location are anticipated, a blanket USPO and CIM clearance may be
sufficient, with approval of the USPO and CIM coordinator.

Supervision cases are not eligible for furloughs.  The USPO shall
approve absences other than "sign-out" or "pass".

### 5.13.5.  **Religious Activities**

In meeting offenders' religious needs in CCCs, staff must
exercise flexibility.  If possible, offenders should be allowed
uninterrupted practice of religion, as was exercised prior to
incarceration.  Requests for religious activities should be
handled on a case-by-case basis.  The regional chaplaincy
administrator should be contacted for guidance when there are
unusual requests or concerns.

### 5.13.6.  **Driving**

Often it is appropriate to allow inmates to drive their own or
another person's vehicle to travel to work or for other
authorized purposes.  Inmate requests for driving privileges are

subject to contractor and CCM approval, under the following conditions:

   a.  Public transportation is not available or its use would be impractical considering time, distance, or cost.

   b.  The inmate has provided proof of driver's license, vehicle licensing, registration, and valid insurance (if required by the state) to the CCM via the contractor.  The contractor shall maintain copies of these documents (except for the driver's license, which many states prohibit copying).  The contractor shall record the driver's license number and expiration date in the inmate's file.

   c.  If the vehicle to be used is the property of a person other than the inmate, the contractor must have verified proof (e.g., copy of documents) of valid insurance, vehicle licensing and registration for the car, and a signed authorization (either notarized or witnessed by CCC staff) permitting the inmate to drive the car.

   d.  The contractor shall maintain the license number and a description of the vehicle on file.

   e.  Permission to drive for supervision cases must be approved by the CCC Director and the USPO, and must be appropriately documented.

   f.  The contractor shall use the form "Authorization To Operate A Motor Vehicle" **(Attachment 5-4)** when an inmate is applying for this privilege or a locally produced one which contains, at a minimum, that information found on Attachment 5-3.

### 5.13.7.  **Marriage**

Contractors shall refer committed inmates' requests for marriage to CCMs, with their recommendations.  The CCM shall process marriage requests in accordance with the Program Statement on **Marriages of Inmates,** which authorizes the CCM to approve requests to marry of federal inmates housed in non-federal facilities.  Marriage requests of offenders under supervision shall be forwarded to the USPO.

### 5.13.8.  **Electronic Communication Equipment**

With the advancement of technology and the use of beepers and cellular phones in the workplace, there is a need to monitor the use of this equipment by CCC offenders.  When CCC staff believes

that it is essential for an offender to use a beeper or cellular
phone in their work, the following procedures shall be used:

     a.  Inmates shall make a written request to the CCC Director
stating the specific need for the equipment.  The CCC Director
shall verify the need and forward the request for approval to the
CCM.  A copy of the request (approved or disapproved) shall be
returned to the CCC Director, with a copy to the inmate's file.

     b.  For supervision cases, the CCC Director shall make the
request to the USPO seeking approval/guidance.  A copy shall be
forwarded to the CCM for informational purposes.  The USPO's
response shall be placed in the offender's contractor file and
reviewed during routine monitorings.

### 5.13.9.  **Use of Inmates in Investigations**

Any person or agency requesting to use an inmate in any
investigation must be referred to the Office of Enforcement
Operations (OEO), Department of Justice, Washington DC for
approval, as these types of investigations are extremely
sensitive.  Information and procedures regarding requests from
investigative agencies or U.S. Attorneys to use inmates under
Bureau jurisdiction may be found in the **Special Investigative
Supervisors Manual**, Chapter 17 - Investigative Requests.  The CCM
shall contact the MCA or CCRA regarding information contained in
this Manual, or the Executive Assistant, Correctional Programs
Division, Central Office.

### 5.14.  **RELEASE PROCEDURES**

CCMs shall ensure the timely release of inmates from contract
CCCs and contract jails or boarding facilities.  CCMs must verify
release data, including credit for CCC good time.  CCMs shall
calculate release dates for direct court commitments and date
changes for institution transfers if additional or forfeited good
time occurs.  CCMs shall mail a copy of appropriate sentence
computation data to CCCs and boarding facilities of the inmate.
CCMs shall establish a system to monitor release dates and ensure
contract staff release inmates timely and accurately prepare
release paperwork.

The following schedules outline the steps and time limits
applicable to each type of release from confinement.  Reference
shall also be made to the **Inmate Systems Management Manual.**  CCMs
shall ensure that contract staff are aware of these schedules and
that contractors understand the different requirements for
release.  It is Bureau practice to release inmates who are not
supervision cases on the work day preceding a Saturday, Sunday,

or holiday if the release date falls on one of the days noted. This practice also applies to releases on parole unless the release date is the parole eligibility date.

5.14.1.   **Release Schedule**

a.   Parole.  Six weeks prior to parole date, contract staff submit a proposed parole plan to the USPO for investigation and approval.

Four weeks prior to parole date, contract staff submit a request for a parole certificate to the appropriate U.S. Parole Commission office, with the USPO approval attached.

b.   Mandatory Release.  Four to six weeks prior to mandatory release date, contract staff submit a proposed release plan to the USPO (Mandatory Release Statement (**Attachment 5-4d**).

c.   Supervision Cases. Contract staff submit release plans to the USPO when they determine release is appropriate, based on program progress or adjustment.

5.14.2.   **Release Forms and Report Distribution**

Parole certificates are mailed or faxed from the U.S. Parole Commission directly to the CCC.  The community corrections Legal Instruments Examiner shall ensure that the contractor lists the number of days remaining to be served and that any special conditions are noted on the reverse side of the parole certificate prior to the inmate being released from the CCC.  The contractor shall mail the signed parole certificate to the CCM for inclusion in the institutional file.  See **Attachments 5-5a through 5-5f.**

a.   Parole

(1)  Conditions of release are read to the inmate and the inmate's signature (witnessed and dated by a staff member) is obtained on each of the Parole Certificates and SPT Certificates, when applicable.  Each page of the certificates is signed individually, in pen, and is not carbonized.  Release on Parole is not effective without the inmate's signature.  Copies are distributed as follows:

(a)  Original to inmate.
(b)  Copy to USPO.
(c)  "Institution Copy" to CCM.
(d)  Copy to U.S. Parole Commission Office.

(2)  Notice of Release and Arrival - Distribute copies as above, plus one copy to the U.S. Attorney's office in the District of Sentencing.

b.  Mandatory Release.  Distribute copies of the appropriate paperwork as noted in section "a" above.

c.  Expiration.

(1)  Notice of Release and Arrival - Distribute the original to the USPO, with a copy to the CCM and to the U.S. Attorney in the district of sentencing.  The inmate is advised if probation or special parole supervision is to follow release.

**Note:**  "New law" cases are released on the expiration of their term less any time credited for applicable Good Conduct Time (GCT).  They are processed in accordance with established procedures for cases released by expiration.

(2)  Special Parole Term Certificates (if applicable) - See distribution of Parole Certificates.

d.  Supervision Cases.  The contractor coordinates release through the USPO and informs the CCM.

e.  Terminal Reports

(1)  The contractor prepares and forwards a Terminal Report to the CCM.  This is done after release from a CCC within the time frame specified in the applicable Statement of Work.  See **Attachment 5-5f** as an example of a Terminal Report.

(2)  Distribution: Original to CCM for forwarding to the institution file, copy to USPO, copy to U.S. Parole Commission Office (if applicable).

5.14.3.  **Fines/Assessments (Old Law Cases)**

A fine is a monetary penalty associated with an offense that is imposed as a part of a judgment.  The two types of fines are committed and non-committed fines.  See **Attachments 5-6 and 5-7**. A **committed fine** is paid or other arrangements are made for the handling of the fine prior to the inmate's release.  A **non-committed fine** is one where the status of payment of the fine would not affect the release date.  See the Program Statement on **Fines and Costs**.

5.14.4.  **Fines/Assessments (New Law Cases)**

Pursuant to **Title 18 U.S.C. § 3624(e):** "No prisoner shall be
released on supervision unless such prisoner agrees to adhere to
an installment schedule, not to exceed two years except in
special circumstances, to pay for any fine imposed for the
offense committed by such prisoner."

   a.  The court is required to impose an assessment on
convicted defendants for each felony and misdemeanor.  The
assessment is imposed for each count (offense) in the Judgment in
a Criminal Case.  Agents of the court collect the assessments.

   b.  The CCM shall indicate on the SENTRY Sentence
Computation Record the existence of assessments for direct court
commitments.  The information is recorded only if it is contained
in the Judgment in a Criminal Case.  Otherwise, it need not be
recorded and the CCM need not solicit the information from the
court.

   c.  The CCM ordinarily does not become involved with the
collection of assessments and is not required to determine
whether they have been paid.  However, if the Judgment in a
Criminal Case for a direct court commitment indicates that the
assessment was not paid at sentencing, and that the court wants
it collected prior to release and provides no special
instructions, the unpaid assessment must be treated as a
committed fine.  If the court, either in the Judgment in a
Criminal Case or by court order, requires that the fine be paid
by some other method that involves the Bureau, the CCM should
contact the Regional Inmate Systems Administrator for assistance.

5.14.5.  **Release Expenses**

Inmates serving long sentences in non-federal facilities
(primarily in state correctional facilities and juvenile
facilities) may receive a release gratuity, transportation to the
place of conviction or legal residence, and clothing.  An inmate
who has adequate personal funds or is released to another custody
should not usually receive a gratuity.  Because of the nature of
the program, inmates released from contract residential centers
shall not normally receive release gratuities.  See the Program
Statements on **Release Gratuities, Transportation, and Clothing**
and the **Interagency Agreement between the U.S. Bureau of Prisons
and the U.S. Marshals Service.**

   a.  The CCM shall determine the amount of the release
gratuity and clothing based on staff recommendations using a $100
limit as a base and seeking written approval from the CCRA

through the MCA should they determine a gratuity in excess of $100 is warranted. The Program Statement on **Release Gratuities, Transportation, and Clothing** shall be referenced for guidance on allowable amounts.

b. The CCM shall request the USMS to provide funds for release gratuities, clothing, and transportation, if funds are not available under the provisions of the contract with the non-federal facility (a gratuity clause should be included in the contract whenever possible). The CCM must advise the USMS in writing of an impending release date five days in advance to allow time for this to be accomplished.

c. When the Bureau is "piggy-backing" a USMS contract, the USMS will pay these expenses and the Bureau shall reimburse the USMS. Otherwise, reimbursements are made directly to those providers under contract directly with the Bureau. The USMS office making the disbursement will forward the appropriate standard form to the CCM. The CCM shall put this information on a SF-1034 form (Public Voucher for Purchases and Services Other Than Personal), sign it, and forward the SF 1034 to the regional office for processing.

## 5.15    COST OF INCARCERATION FEE (COIF)

CCMs are responsible for complying with the **Program Statement on Cost of Incarceration Fee** (COIF), which applies to prisoners who are convicted in U.S. District Courts, committed to the custody of the Attorney General, and serving a term of incarceration that began on or after January 1, 1995. This includes aliens and those confined to contract jails.

Note that the Cost of Incarceration Fee, which is imposed by the Bureau, is distinct from the Cost of Incarceration Fine, which is imposed by the courts. The Program Statement delineates the differences between these obligations. At no time will both be imposed on one inmate.

When appropriate, the CCM shall compute the fee, establish a payment schedule in accordance with the **COIF** Program Statement, and notify all direct court commitments under their jurisdiction who owe a COIF using the appropriate **COIF** Program Statement Attachment. Inmates who are institution transfers shall continue the installment plans established by their unit teams. In the case of an inmate owing a COIF who transfers to a CCC, the CCM is notified of the COIF balance by regional correctional programs staff immediately after they receive notification from the institution. Institution notification must be forwarded no later than two weeks prior to transfer.

Inmates who fail to make COIF payments may be removed from the CCC.  When an inmate releases from a CCC with an outstanding obligation, the CCM shall notify the regional comptroller, who will process the bill in accordance with the **Program Statement on Accounting for Cost of Incarceration Fee.**

Subsistence shall be waived for institution transfers whose COIF payments are greater than or equal to subsistence.  When COIF is less than the calculated subsistence obligations, the difference may be collected as subsistence.  Direct court commitments with a COIF are to have subsistence waived.

5.16.  **SEXUAL ABUSE/ASSAULT PREVENTION AND INTERVENTION**

CCMs shall ensure that contractors have procedures in place to prevent and address incidents of sexual abuse/assault.  This includes informing inmates, training contract staff, and following correct reporting procedures.  Specific requirements are found in the most recent **Community Corrections SOW.**  The Program Statement on **Sexual Abuse/Assault Prevention and Intervention Programs** can also be referenced.

5.16.1  **Informing Inmates**

Inmates transferring to a contract facility from a federal institution have already been educated on preventing and avoiding sexual abuse/assault.  Contractors must provide this education to all other federal inmates and document it in their files.  All inmates are to be advised during facility orientation who to contact regarding incidents of sexual abuse/assault.  These requirements shall be reviewed during facility monitorings.

5.16.2  **Training Contract Staff**

All contractors are responsible for ensuring their staff are trained in prevention, identification, and handling of sexual abuse/assault incidents.  This training shall be documented by the contractor and reviewed during facility monitorings.

At a minimum, all inmates claiming to be the victim of a sexual assault shall receive services addressing medical, mental health, social, and protective needs.

5.16.3  **Reporting Requirements**

Contractors shall report all incidents of sexual assaults to the CCM immediately.  The CCM shall ensure that the contractor notifies local law enforcement authorities and, in the case of

staff assault on a resident, the Office of Internal Affairs shall
be notified.  The SF-583, Report of Incident form, is to be
completed and routed for all reports of sexual assaults.

5.17.  **USE OF VOLUNTEERS IN COMMUNITY-BASED PROGRAMS**

Contractors operating under a SOW later than 1992 are required to
use volunteers to assist inmates directly in their transition to
the community.  All other contractors shall be encouraged to use
volunteers.

Volunteers are defined as private citizens who are at least 18
years old and provide gratuitous services to the facility.
Gratuitous services are those that are uncompensated and would
otherwise not be performed by a paid employee.  Volunteers
reinforce mainstream societal values conveyed daily by staff
through service in programs addressing areas such as marriage and
family enrichment, substance abuse, education, literacy,
spiritual growth, recreation, health education, fitness, and
vocational training.

Volunteers who provide services under the direct supervision of
paid contract staff do not need security background clearances.
Those who provide services without supervision must complete the
Application for Volunteer Service (BP-S580.053) and Release of
Information (OMB 3206-0007) forms and have NCIC, NLETS, and
fingerprint checks.  The contractor must forward this information
to the CCM for approval.  Responses must be received from the
NCIC, NLETS, and fingerprint checks before approval can be
granted for unsupervised volunteers.

Further information and guidance regarding these procedures can
be received from the regional volunteer administrator.

PS 7300.09
CN-2 5/19/99
Attachment 5-1

**CCM DESIGNATION LOG**
**MONTH/YEAR** _____

| Name | Jud. Reg # | USM Dist. | PSI Req. | PSI Rec'd | Des Req. | Des. Rec'd | Institution | Comments |
|------|-----------|-----------|----------|-----------|----------|------------|-------------|----------|
|      |           |           |          |           |          |            |             |          |
|      |           |           |          |           |          |            |             |          |
|      |           |           |          |           |          |            |             |          |
|      |           |           |          |           |          |            |             |          |
|      |           |           |          |           |          |            |             |          |
|      |           |           |          |           |          |            |             |          |
|      |           |           |          |           |          |            |             |          |
|      |           |           |          |           |          |            |             |          |
|      |           |           |          |           |          |            |             |          |
|      |           |           |          |           |          |            |             |          |
|      |           |           |          |           |          |            |             |          |
|      |           |           |          |           |          |            |             |          |
|      |           |           |          |           |          |            |             |          |
|      |           |           |          |           |          |            |             |          |

PS 7300.09
CN-2 5/19/99
Attachment 5-1a

**TRACKING JUVENILE DESIGNATIONS**

Name:                                    Register
                                         Number:

City and State of Residence:_____

Designated Facility:_____

**NOTE:** Complete the following questions for all juveniles sentenced on or after July 1, 1998.  This will be completed when the juvenile is first designated and every subsequent change of facility.  A copy shall be sent by WAN or FAX to the Central Office Community Corrections Branch.

1) Is the juvenile a foreign national?

        YES_____          NO_____

2) If the answer to question #1 is no, is the juvenile designated to a facility within 250 miles of the juvenile's residence?

        YES_____          NO_____

3) If the answer to question #2 is no, please check one of the following options:

        _____ a) There are no contract beds available within 250 miles of the juvenile's residence.

        _____ b) There are beds available within 250 miles of the juvenile's residence, but the security level is inappropriate.

        _____ c) There are beds available within 250 miles of the juvenile's residence, but programmatic needs require designation to another facility.

        _____ d) There are beds available within 250 miles of the juvenile's residence, but the sentencing court recommended another program.

        _____ e) There are beds available within 250 miles of the juvenile's residence, but other considerations require designation to another facility.  Please summarize:
_____
_____.

CCM:_____ DATE:_____.

PS 7300.09
1/12/98
Attachment 5-2, Page 1

## Sample Teletype and EMS Formats

a. Sample teletype notice to USM of escape

b. EMS Form 907 - Community Corrections Escape Report

c. Sample teletype or memo to USM requesting inmate transfer to closer custody.

d. EMS Form 908 - Community Corrections Apprehension Report

### Sample Teletype Notice to USM of Escape

TO:       United States Marshal, (insert District, City, State)

FROM:     Community Corrections Manager

CC:       United States Marshals Service, Washington, D. C.

          ATTN:     Enforcement Operations Division

RE:       Escaped Federal Prisoner.  This is your authority to
          apprehend the below named Federal prisoner.


Name:                          Reg. No.:

Institution/Contract Location:    FBI No.:

Date of Escape:                Time (am or pm):

Sentence Date:                 Sentence:

Offense:                       Release Date:

Circumstances:

PS 7300.09
1/12/98
Attachment 5-2, Page 3

**COMMUNITY CORRECTIONS ESCAPE REPORT**

**U.S. DEPARTMENT OF JUSTICE FEDERAL BUREAU OF PRISONS**



PS 7300.09
1/12/98
Attachment 5-2, Page 4

PS 7300.09
1/12/98
Attachment 5-2, Page 5

PS 7300.09
1/12/98
Attachment 5-2, Page 6

**Sample Teletype or Memo to U.S. Marshal Requesting Inmate
Transfer to Closer Custody**

TO:        United States Marshal (District)

FROM:      Community Corrections Manager

RE:        Inmate Name and Register Number


           This will serve as your authority to assume custody of
           the above BOP inmate, pending disciplinary action
           and/or determination of future removal.


           Present Location:


           Designated local detention facility:


           The BOP assumes fiscal responsibility for this inmate
           as long as he/she is located at the designated local
           detention facility or another facility approved by the
           CCM.


           Comments:

EMS 300109
10/28/04
Attachment 5-4, Page 1

EMS-908.073 **COMMUNITY CORRECTIONS APPREHENSION REPORT** CDFRM SENTRY EMS FEB 97
**U.S. DEPARTMENT OF JUSTICE**                    **FEDERAL BUREAU OF PRISONS**

Community Corrections Office            | Region
_____|_____

To: (Regional Director)                      | Date Submitted
_____|_____

From: (Name and Title)

_____
Name of Inmate                        | Register Number      | Date of Birth
_____|_____|_____

Type of Escape:
                    From Custody        Technical Escape (Arrest)
_____
Date of Apprehension or Return to BOP Custody  | Time of Apprehension
_____|_____

Apprehended by:

_____
Present Location

_____
Escape or Technical Escape occurred from (Loc. Code):

Facility Name and Address:

Type of Facility:     CCC                Long-Term Adult
                      Home Confinement   Short-Term Adult
                      Juvenile           Other (Specify)

Date of Escape:

CCM Office SENTRY Code that originally reported Escape:
_____
U.S.M. Notified: (If applicable)
                              Yes              No;
If Yes,  Date of Notification:                      Time:
_____
Circumstances (Use additional pages as needed):


_____

Routing: Region CEO; Region Corr. Serv.; Regional CCRA; MCA; PAR CEO; BOP Comm. Corr.; BOP Corr.Svc.; Sending (Parent)
Institution CEO and ISM; CCM's Office reporting original Escape.
Copy-Central File  (This form may be replicated via WP)

PS 7300.09
10/28/04
Attachment 5-4, Page 1

## AUTHORIZATION TO OPERATE A MOTOR VEHICLE

Name: _____     Reg. No. _____

Facility: _____

Driver's License: # _____     State _____     Exp Date:_____

License Address _____

Vehicle:  Year _____     Make _____     Model _____

Color _____     License Plate # _____

Registration # _____     Exp. Date. _____

Registered Owner: Name _____     Phone # _____

Address _____

Insurance Co. Name _____     Policy Exp. Date_____

Facility Staff Review:
____  Copies of required documents on file (ie. insurance and
      owner approval)
____  Car checked for absence of beeper/cellular phone
____  Resident understands rules and the right of CCC staff and
      BOP personnel to search the vehicle at any time
____  Public transportation not practical


_____          _____
Resident Signature                       Case Manager or Other

CCC Director approval _____
************************************************************************
Approved _____          Disapproved _____

Comments _____

_____

_____          _____
Community Corrections Manager                         Date

**RELEASE FORMS**

a.  Certificate of Parole

b.  Parole Form I-33[1]

c.  Drug/Alcohol Program Consent Form

d.  Mandatory Release Statement;  Parole Form I-10

e.  Notice of Release and Arrival;  Parole Form I-13

f.  Program Terminal Report


[1]  Parole Form I-33 is a multi-purpose release certificate that includes release provisions for:

    (1)  Court Designate Parole
    (2)  Mandatory Release
    (3)  Special Parole
    (4)  Mandatory Release to Special Parole


  **\* Note: Forms in Attachment 5-5 are not available
            electronically or on BOPDOCS**

### COMMITTED FINE TRANSFERS TO NON-FEDERAL FACILITIES

Community Corrections Managers (CCMs) have responsibility for
inmates transferred to contract community-based facilities and to
state institutions as boarders.  Regional Inmate Systems
Administrators (RISAs) have responsibility for inmates
transferred to state institutions for service of Federal
sentences concurrently with state sentences.

If an inmate has six months or more remaining to the release date
on the day the transfer takes place, the instructions in Appendix
2, Committed Fine Direct Commitments or Designations to Non-
Federal Facilities, in the Program Statement on **Fines and Costs**
shall apply.  (Also see Attachment 5-7 of this Community
Corrections Manual).  If less than six months remain, the
transferring institution shall complete the following steps prior
to the transfer:

   a.   Assist the inmate in completing the Financial Statement
        of Debtor.

   b.   Assist the inmate in completing the Application for a
        Determination of Ability to Pay Committed Fine and/or
        Costs portion of the BP-401 (58)/BP-RECORD-101.

   c.   The BP-395(58)/BP-RECORD-90 shall be completed and
        forwarded to the appropriate U.S. Attorneys along with
        the other forms mentioned above prior to the inmate's
        departure.

   d.   If the institution has any problems complying with
        these instructions, the ISM must explain the problems
        in a memorandum to the CCM or RISA so they will be
        aware of the status of the fine processing after the
        inmate has been transferred.

Before the inmate submits the BP-401(58)/BP-RECORD-101 to the
U.S. Magistrate, the CCM or RISA must review the inmate's
financial status based on the same information a warden would
use.  Based on the review, the CCM or RISA should form an opinion
as to the inmate's indigency status and furnish that opinion and
the reasons to the U.S. Magistrate in a memorandum.  Accompanying
the memorandum shall be the BP-401(58)/BP-RECORD-101, the
Financial Statement of Debtor, the Sentence Data Record, the pre
or post sentence report, and copies of any other documentation or
information used in arriving at the opinion.  The package must be
sent to the U.S. Magistrate no later than 21 calendar days prior
to the release date.

The CCM and RISA should make every effort possible to acquire
information about the inmate's financial status from the U.S.
Attorney of the sentencing district.

If the U.S. Magistrate makes a finding of indigency, and allows
the inmate to take the Oath of Indigent Prisoner, the inmate
shall be released on the date specified by the U.S. Magistrate.

The CCM or RISA is responsible for assuring the inmate makes all
appearances before the U.S. Magistrate that he/she may require.

If the U.S. Magistrate makes a finding of non-indigency, the CCM
or RISA shall follow the procedures as set forth in Section 9 of
the governing Program Statement on **Fines and Costs.**

PS 7300.09
10/28/04
Attachment 5-7, Page 1

## COMMITTED FINE DIRECT COURT COMMITMENTS OR
## DESIGNATIONS OF NON-FEDERAL FACILITIES

Community Corrections Managers (CCMs) have responsibility for inmates committed directly from court to contract community-based facilities and to state institutions as boarders.  Regional Inmate Systems Administrators (RISAs) have responsibility for inmates placed in state institutions for service of Federal sentences concurrently with state sentences.

Since this group of inmates is not committed to Federal institutions prior to commitment to non-Federal facilities, the CCM or RISA must initiate and follow through on all the procedures for processing the committed fine.  Therefore, the instructions in Section 5 of the Program Statement on **Fines and Costs** must be carefully followed.

Before the inmate submits the BP-401(58)/BP-RECORD-101 to the U.S. Magistrate, the CCM or RISA must review the inmate's financial status based on the same information a warden would use.  Based on the review, the CCM or RISA should form an opinion as to the inmate's indigency status and furnish that opinion and the reasons to the U.S. Magistrate in a memorandum.  Accompanying the memorandum shall be the BP-RECORD-101, the Financial Statement of Debtor, the Sentence Data Record, the pre or post sentence report, and copies of any other documentation or information used in arriving at the opinion.  The package must be sent to the U.S Magistrate no later than twenty-one calendar days prior to the release date.

The CCM and RISA should make every effort possible to acquire information about the inmate's financial status from the U.S. Attorney of the sentencing district.  If the U.S. Magistrate makes a finding of indigency, and allows the inmate to take the Oath of Indigent Prisoner, the inmate shall be released on the date specified by the U.S. Magistrate.

The CCM or RISA is responsible for assuring the inmate makes all appearances before the U.S. Magistrate that he/she may require.

If the U.S. Magistrate makes a finding of non-indigency, the CCM or RISA shall follow the procedures as set forth in Section 9 of the governing Program Statement on **Fines and Costs.**

# CHAPTER 6.   INMATE AND INFORMATION SYSTEMS MANAGEMENT

Community corrections staff are responsible for administering inmate systems and information systems procedures that are relevant to inmates in non-federal contract facilities.

Many of the procedures which apply to community corrections operations are found in the **Inmate Systems Management Manual** and **Sentence Computation Manuals** (Old Law and CCCA of 1984] as well as the Technical Reference Manuals **on SENTRY General Use, SENTRY Education**, and **SENTRY Sentence Monitoring.**   Staff shall use these manuals and the **Community Corrections Technical Reference Manual (TRM)** for general instruction.

Certain procedures may require modification for community corrections application, and others may not be relevant at all. Central Office Inmate Systems and Community Corrections Administrators and Information Systems staff shall make interpretations or modifications in procedures when necessary.

CCMs must establish and maintain official records for federal offenders in contract facilities.  Such records, including SENTRY information, are considered confidential and are protected within the scope of the Privacy Act and Freedom of Information Act.  See the Program Statement on **Release of Information.**

## 6.1.  **FILE MAINTENANCE AND DISPOSAL**

It is Bureau policy to maintain records for all offenders committed to the custody of the Attorney General and the Bureau. CCMs shall use files to record all aspects of an offender's confinement in the contract location for service of sentence or as a condition of supervision.  The **Inmate Systems Management Manual** contains instructions for Judgement and Commitment file creation, maintenance and disposal.  The Program Statement on **Central File, Privacy Folder, and Parole Mini-Files** contains instructions for file creation, maintenance, and security.

### 6.1.1.  **Direct Court Commitments**

Direct court commitments are cases when a U.S. District Court Judge or Magistrate Judge has imposed a short sentence of confinement with the recommendation that it be served in a contract CCC or a jail-type location.  Condition of supervision cases and supervision violators are included in this definition. CCC staff must receive approval from the regional director when considering these cases for CCC placement.  The required legal document for detainees is the certified Judgment and Commitment

Order (J&C). The CCM must ensure that contract staff execute the return of service on the J&C for each voluntary surrender case. The U.S. Marshals will normally execute the return of service for offenders in jail-type locations; however, CCMs must ensure the requirement has been completed. **(Title 18 U.S.C. §§ 4084 and 3621(c)).** See the **Inmate Systems Management Manual.**

After the J&C, return of service is executed, certified copies of the J&C are mailed to the U.S. Marshal in the sentencing district and the Community Corrections Office. The contractor must have an executed copy on file.

In accordance with the Program Statement, **FBI Forms, Submission to the FBI,** the CCM shall ensure that a full set of fingerprints is taken and submitted to the FBI for all commitments for service of sentence. The CCM shall determine whether a facility shall send the cards directly to the FBI or send them through the CCM. A print card shall also be forwarded to the CCM for placement in the J&C file. This shall be completed within the first five working days after arrival.

A standard six-position or two-position file shall be used. If a two-position file is used, the first three sections are placed on the left and the second three on the right side of the file. The **Inmate Systems Management Manual** requires that a J&C file be established for each sentenced inmate. The J&C file contains the documentation for the legal authority for the detention and custody of prisoners. The file created and maintained by community corrections for direct court commitments serves as a J&C file and the central file and must contain all documents and forms as set forth in the Inmate Systems Management Manual. Files shall normally consist of:

    a.    Source - U.S. Marshal:

        ● Request for Designation (Teletype or Memorandum).
        ● Executed and certified copy of Judgment and Commitment Order.
        ● USM-129 Detention Record.
        ● Voluntary Surrender Order.
        ● BP-S385 "Authorized Unescorted Commitment and Transfer" Identification Card, including a picture and a thumbprint.

    b.    Source - U.S. Probation:

        ● Pre-Sentence Report.
        ● Other Reports and Correspondence.

c.   Source - Contractor:

- Documentation of Acceptance.
- Record of Medical Examination (if a CCC is designated).
- Terminal Report.

d.   Source - Community Corrections Manager:

- Designation Teletype or Memorandum or SENTRY printout.
- Sentence Monitoring Computation and Good Time Record (SENTRY).
- Sentence Monitoring Update Computation Satisfaction Release Certification (SENTRY).
- Inmate Discipline Record.
- A sentence audit conducted in accordance with the requirements of the **Inmate Systems Management Manual.**

After an offender's release, files are maintained in the CCM office until shipped to a Federal Records Center.  **Shipments should occur at least annually,** or more frequently if volume warrants.  The schedule for returning and shipping files is set forth in the **Inmate Systems Management Manual.**

The CCM should contact regional inmate systems specialists or administrators for assistance when required.  A well-organized method for record retention and disposal is **critical** to facilitate retrieval if re-incarceration occurs.

 6.1.2.  **Condition of Supervision Placements** (Public Law/Old Law
         Cases)

Pursuant to the Provisions of **18 U.S.C. §§ 3651 and 4209,** Offenders Under Probation, Parole, or Mandatory Release Supervision may be referred for CCC placement (commonly referred to as public law cases).

The legal document required for probationers is an order issued by the U.S. District Court Judge mandating residence in a CCC as a condition of probation.  This may be set forth on the original J&C, or may be a modification order during the period of probation.  A copy of the J&C shall suffice.  However, if there is any doubt regarding the accuracy or authenticity of the court order, the order shall be verified with the appropriate authority.

The legal document for Parole and Mandatory Release supervision cases is the U.S. Parole Commission Notice of Action (NOA)

mandating residence in a CCC.  A parolee may be placed in a CCC
without the NOA on an emergency basis for up to four days,
provided they consent in writing to such placement (**Parole
Commission Manual**).  A NOA shall be required for placement in
excess of four days.  The CCM shall document the efforts to
obtain a NOA if it has not been received within four days.

The CCM must ensure the designated contractor has a copy of the
legal document stipulating CCC residence prior to placement.

A two-position file folder should be used and shall normally
consist of:

      a.    Source - U.S. Probation, District of Supervision:

            ● Copy of the Judgment and Probation/Commitment Order
or Modification Order.
            ● Pre-Sentence Investigation Report.
            ● U.S. Probation Program Plan.

      b.    Source - U.S. Parole Commission:

            ● U.S. Parole Commission Notice of Action Mandating
CCC Residence.

      c.    Source - Contractor:

            ● Record of Medical Examination (if a CCC is
designated).
            ● Documentation of Acceptance and Terminal Report.

      d.    Source - CCM

            ●SENTRY Sentence Computation.

After release, the CCC generated file shall be combined with the
CCM two-part file.  Files for probation and for conditions of
parole/mandatory release shall be mailed to the supervising USPO
unless the Chief USPO indicates in writing that the file is not
required.

### 6.1.3.  **Community Confinement (Sentencing Reform Act)**

Pursuant to the provisions of **18 U.S.C. §§ 3563(b)** and **3624(e)**,
Offenders, as Further Conditions of a Sentence of Probation or
Supervised Release, may be referred for placement in a CCC.

The CCM must ensure the designated contractor has a copy of the
legal document stipulating confinement in the facility.  The

legal document required for probationers is an order issued by
the U.S. District Court Judge mandating residence in a CCC.  This
may be set forth on the original J&C, or may be a modification
order during the period of probation supervision.  A copy of the
J&C shall suffice.  However, if there is any doubt regarding the
accuracy or authenticity of the court order, a phone call to the
appropriate authority is to be made.

A two-position file folder should be used and shall normally
consist of:

      a.    Source - U.S. Probation, District of Supervision:

          ● Copy of the Judgment and Probation/Commitment Order.
          ● Pre-Sentence Report.
          ● U.S. Probation Progress Plan.

      b.    Source - Designated Contractor:

          ● Record of Medical Examination (if a CCC is
          designated).
          ● Documentation of Acceptance and Terminal Report.

      c.    Source - CCM:

          ● SENTRY Sentence Computation.

After release, the CCC-generated file shall be combined with the
CCM two-part file.  Files for Community Confinement cases are
mailed to the referring USPO unless the Chief USPO has informed
the CCM in writing that the file is not required.

6.1.4.  **Intermittent Confinement (Sentencing Reform Act)**

Pursuant to the provisions of **18 U.S.C. § 3563(b),** Offenders, as
Further Conditions of a Sentence of Probation, may be sentenced
to "Intermittent Confinement."  Such commitment requires the
offender, during the first year of probation, to remain in Bureau
custody during nights, weekends, or other intervals, no more than
the lesser of one year or the authorized term of imprisonment for
the offense.  Normally, confinement will be in a detention/jail-
type facility.

The CCM must ensure the designated contractor has a copy of the
legal document stipulating "Intermittent Confinement" and
specifying when confinement shall occur.  The contractor shall
execute these J&Cs in the same way as for any other Bureau
commitment.

A two-position file folder should be used and shall normally

consist of:

    a.    Source - U.S. Marshal, District of Supervision:

        ● Certified copy of the Judgment and
        Probation/Commitment Order.
        ● Designation Request.
        ● Pre-Sentence Report (when available).
        ● U.S. Probation Program Plan.

    b.    Source - Contractor:

        ● Record of Medical Examination (if a CCC is
        designated).
        ● Documentation of Acceptance and Terminal Report.

    c.    Source - U.S. Marshal:

        ● Request for designation.

    d.    Source - CCM:

        ● SENTRY Sentence Computation.

After release, the CCC-generated file shall be combined with the
CCM two-part file.  Files for intermittent confinement cases are
archived in the same manner as direct court commitments.

  6.1.5.  **Institution Transfers**

The CCC referral and transfer process is in the Program Statement
on **CCC Utilization and Transfer Procedures.**

A two or six-position file folder is used and shall normally
consist of:

    a.    Source - Institution of Confinement:

        ● Institution Referral Packet.
        ● Copy of Release Documents.
        ● Unescorted furlough with travel schedule (should be
        received in advance).
        ● Transfer Order (executed by Contractor).
        ● BP-S385 "Authorized Unescorted Commitments and
        Transfers" Identification Card (one copy received by
        the CCC prior to the inmate's transfer to the CCC and
        returned to the CCM executed with the inmate's
        thumbprint).

    b.    Source - Contractor:

● Documentation of Acceptance.
● Original Correspondence Generated during
Confinement.
● Terminal Report.

c.   Source - Community Corrections Manager:

● Original Documents and Correspondence Generated
during Confinement.
● Sentence Monitoring Update Computation Satisfaction
Release Certification (SENTRY).

After release processing is complete, community corrections staff
shall purge the file of all materials that are already in the
inmate central file.  **Within 21 working days** following an
inmate's release, the CCM shall mail the file, with completed
release paperwork, to the referring institution's ISM.

## 6.2.  **INMATE FILE ACCOUNTABILITY AND SECURITY**

Community corrections offices are located in the community rather
than in an institution where there is substantially less risk of
file security compromise.  Therefore, the file security
procedures set forth in the Program Statement on **Central File,
Privacy Folders and Parole Commission Mini-Files** do not apply.
Inmate file security, however, must remain a high priority due to
the sensitive nature of the content - PSR's, CIM information,
etc.

The following security procedures are required:

  6.2.1.  Active files must be maintained in locked, fireproof
cabinets.

  6.2.2.  The CCM shall ensure that a file is maintained for all
offenders under his or her control.  This file shall be the only
vehicle for storing material during the offender's confinement in
the contract facility.

  6.2.3.  Files shall never be left unattended or handled in such
a way as to be accessible to unauthorized persons.

  6.2.4.  Files or file material are not to be removed from CCM
offices unless authorized by the CCM.  "Out-guides" are to be
used whenever a file is removed from the office.

6.2.5.  Requests by any agency outside the Bureau for any inmate file, active or inactive, are to be referred to the appropriate Regional Counsel for a decision.  The MCA and CCRA may implement additional inmate file security and accountability measures as warranted by the office location and structure.

6.3. **SENTRY APPLICATIONS**

SENTRY is an invaluable management tool at all levels. It provides statistical population data for budgetary decisions at the regional and national levels and aids in contractor bill verification locally. SENTRY information may also be used to identify the particular phase of a program in which an inmate is participating.  It cannot be emphasized enough to keep the data updated as this information is only valuable if it is current and accurate.

Assignments designed for community corrections are described in the **Community Corrections TRM.**  Other important functions are found in the **SENTRY General Use TRM.**  A few standard applications are discussed below:

6.3.1.  **Location Code**

There shall be a separate IIS Location Identifier Code (LOC CODE) for each contract location.  All offenders admitted to contract locations shall receive a location assignment (LOC) (e.g., 4XW). This includes INS parolees.  When an inmate who has been temporarily released from a facility is readmitted, SENTRY will readmit them to the previous location assignment.  These codes are created through the ADP contract information procedures.  **See Chapter 4 and Attachment 4-17** for additional information.

6.3.2.  **Inmate Movement**

Admissions, releases, and status changes (e.g.,transfer to home confinement) must be updated the day the activity occurs, or the next work day if occurring after normal business hours.

6.3.3.  **Admission and Release Codes**

Admission and release codes are standard and listed in the **SENTRY General Use TRM,** Part 2, Code Tables, as ARS category codes. Codes specific to community corrections may be found in the **Community Corrections TRM.**  Admission and release codes should coincide with the type of activity and correspond with appropriate COM assignments.

All INS parolees admitted to contract locations shall have the

ARS assignment A-INS.  All INS commitments have the community corrections (COM) assignment of **"CUBAN"** indicating a Mariel Cuban offender whose INS parolee status requires placement in a CCC. The SENTRY release code "INS REMOVE" is always used for INS parolees released from contract facilities.

CCMs must ensure support staff understand what codes to use and how to interpret them correctly.

### 6.3.4.  **Escape Codes**

The SENTRY release code ESCAPE is used for an escape from custody.  The codes ESC TECH N and ESC TECH O are used for technical escapes, where the N stands for new criminal behavior and the O for old criminal behavior.  For example, if an inmate attempts to obtain a driver's license (a legal activity) and the name check reveals an old warrant for which he or she is arrested and jailed, this is ESC TECH O.  On the other hand, if the inmate is stopped for speeding and an old warrant is located so he or she is jailed, this is ESC TECH N, since speeding is a new illegal activity.

### 6.3.5.  **Home Confinement Transfer**

When an inmate is placed on home confinement, the ARS status is changed.  However, transfer orders are required only when the inmate moves to a different location ("LOC").  Examples of when it is required include transfer from a contractor that does not provide the service to one that does or to U.S. Probation's home confinement program.  Then, the inmate is to be transferred from the current "LOC" and admitted to the new "LOC" - this changes the "ARS Date."  The inmate's WLS assignments should be checked before the transfer transaction, as these will have to be reentered using the SENTRY "Update Inmate Assignment" transaction.

### 6.3.6.  **COM Category**

Community corrections field staff shall ensure that the SENTRY COM category is complete and accurate.  Assignments related to type of commitment, aftercare needs of the offender, CCC denial category, ICC, CSC, Juvenile, and MINT are described in the **Community Corrections TRM.**

6.3.7   **Community Transitional Drug Abuse Treatment (TDAT)**

The CCRA shall determine which staff (CCM or TDAT Coordinator) are responsible for loading the SENTRY assignments for inmates in TDAT.  Refer to the Program Statement on **Community Transitional Drug Abuse Treatment** and the **Community Corrections TRM** for further direction on these assignments.

6.3.8.  **SENTRY Monitoring Data**

The SENTRY "General Census/Roster Display" transaction may be used in a variety of ways to monitor offenders, case management activity data accuracy, and administrative status.  Also, the Contract Location Profile System (CLP) provides data for monitoring contract activities and staff must update it each time some action - inspection, suspension, new contract, etc. - is taken on a contract.  CCMs, MCAs, and CCRAs must be familiar with the details of these and other SENTRY transactions to provide proper management oversight of these activities.

The **Community Corrections TRM** provides samples of SENTRY transactions as examples of monitoring techniques used to ensure the accuracy of SENTRY data during monthly SENTRY monitorings conducted by CCRAs.  Accurate data is important in the development of new community corrections initiatives, long range planning, and in the identification of internal weaknesses.

6.4.  **SENTRY SENTENCE MONITORING APPLICATIONS**

Sentence computation is the mathematical method of determining release dates, parole eligibility dates, etc., for offenders serving sentences.  SENTRY sentence modules have been automated to the extent that, except for complex computations, the Legal Instruments Examiner need only key accurate data to obtain correct results.  CCM's must ensure an accurate computation data record is in SENTRY and on file for all offenders under their responsibility.  Reference the **SENTRY Sentence Monitoring TRM**.

6.4.1.  **SENTRY Sentence Computation Procedure for Direct Court Commitments, Condition of Supervision Cases, and Supervision Violators.**

a.  Prior to calculation of any sentence, computation data and documents must be assembled and reviewed.  The necessary information and documentation includes but is not limited to the J&C Order, USM-129 Detention Record, and the PSI.  If the inmate was in a federal pretrial facility, the SENTRY ARS history should also be reviewed.  For violators, prior sentence computations must be reviewed to identify any over-served time which is

creditable toward the new term.

b.  After review of computation data, the sentence should be computed using the sentence monitoring computation transactions. The regional inmate systems specialist or administrator should be consulted for assistance on complex computations (i.e., long-term boarders and juveniles).

c.  An audit for accuracy is conducted after the computation is completed.  The original paper copy, a SENTRY printout, shall be placed in the inmate's file, and copies shall be sent to the contractor, inmate, and U.S. Parole Commission, if applicable. The official computation in the file must be signed and dated by the individual completing it and the staff member performing the audit.  See the **Inmate Systems Management Manual**.  Documentation of distribution of copies is to be maintained in the file.

d.  The sentence computation must be completed within the time frames specified in the **Inmate Systems Management Manual**. The amount of jail credit must be reviewed immediately upon placement to ensure that a late release does not occur.

### 6.4.2.  **Sentence Computation Data Review for Institution Transfers**

a.  The institution Inmate Systems Manager shall perform a full audit of the sentence computation comparable to a release audit prior to an inmate's transfer to a CCC.  However, the SENTRY sentence computation record for all institution transfers shall be reviewed upon arrival to ensure that:

- the computation is complete;
- CCC good time (if applicable) earning status is correct;
- no committed fines or costs have been overlooked; and
- there are no outstanding disciplinary actions.

The file must be documented to show that these items were checked.

b.  A transfer audit as described in the **Inmate Systems Management Manual** is to be completed for long-term boarders transferring from federal institutions or to another CCM office's responsibility.

6.4.3.  **Sentence Computation Data for Supervision Cases**

The sentence monitoring module shall be used to calculate and
provide a paper copy computation data record for supervision
cases.  This will provide release data and allow automatic
retrieval of release data rosters from SENTRY along with data for
inmates serving sentences.  This process is now mandatory for all
supervision cases.  Release dates are to be tracked using the
sentence monitoring module or the SENTRY "Population Monitoring
Census/Roster Generalized Retrieval" transaction.

6.4.4.  **Sentence Computation for Probation or Supervised
        Release Violators**

The original file should be requested from the releasing
institution and combined with the violator file for all
supervised release violators committed directly to a CCC or local
jail.  The original sentence computation for supervised release
violators must be reviewed for over-served time.  Sentences are
computed in accordance with the **Sentence Computation Manuals (Old
Law and CCCA 1984).**

6.4.5.  **Good Time Actions - Disciplinary Process**

     a.  The "Sentence Monitoring Status/Update Statutory Good
Time" transaction should be used to determine how much SGT is
available for forfeiture based on the severity and frequency of
the Prohibited Act.

     b.  After the amount that can be forfeited is determined,
the same transaction, the Sentence Monitoring Status/Update
Statutory Good Time, shall be used to forfeit the SGT and
automatically calculate the sentence.  The appropriate contractor
shall be advised of the new projected release date.

     c.  The CCM must document SGT forfeiture on the Statutory
Good Time Action Notice form (BP-S389), place it in the inmate's
file, and record it appropriately in SENTRY.  (The CCM signs as
IDC chair.)

     d.  When the DHO sanction is received, the disallowance is
to be keyed into SENTRY immediately and the sentence recalculated
for a new release date.  The disallowance/forfeiture of Good
Conduct Time shall be documented on the Good Conduct Time Action
Notice (BP-S448), and placed in the inmate's file.  The SENTRY
"Inmate Discipline Data Record" shall be used to document any
institution actions.

e.  If the offender is still in a contract location, release documents must be updated to reflect the revised release date and the inmate and contractor must be notified.

f.  If an inmate is placed in custody at a federal institution prior to the Statutory Good Time or Good Conduct Time action, the ISM at both the holding and designated institutions must be notified that the computation requires an update.  This notification must be written (BOPNet is appropriate) indicating how much time was forfeited or disallowed and what the new release date will be.  If the release date is near, the notification and follow-up (mailed documentation) must be prompt.

6.4.6.  **Sentence Satisfaction Procedures**

a.  Before an offender has completed the term of incarceration and has been released from custody, the SENTRY Sentence Computation must be updated using the sentence satisfaction transaction.  The inmate shall then be released in SENTRY.  If the statutory release date and actual release date are not the same, the computation remarks should be updated to explain the difference.

b.  After the computation has been satisfied, and the prior commitment transaction has been completed, a copy of the Sentence Monitoring Update Computation Satisfaction display is printed and placed in the file.  The following statement must be annotated or stamped on the paper copy to certify the release of all "old law" cases:

> "In accordance with **18 U.S.C.** § **4163**, this document certifies that the within-noted inmate has been released as shown above."


(Signature of CCM or designee)
**Community Corrections Manager     Date**

c.  The documented (paper copy) certification must become part of the Inmate Central File.  When the CCM mails the offender's file to the parent institution, the Updated Computation Satisfaction certification must be contained in it. A copy of the "satisfaction display," is to be included in all cases.

d.  When persons under supervision abscond or are terminated early from a CCC, their sentence computation should be satisfied

and made a prior commitment, effective the date they abscond.  In these cases, the computation remarks section should be updated to reflect the reasons for early termination from the program.

> Note:    When a CCM office is scheduled to move (e.g., room, building, city, or opening or closing), the CCM shall notify the Chief, SENTRY Field Services, Office of Information Systems, Central Office, in writing, at least 90 days in advance.

CHAPTER 7. **FISCAL MANAGEMENT**

## 7.1. BUDGET DEVELOPMENT OVERVIEW

The Bureau's budget development phase begins approximately 18 months before the start of the fiscal year.  During this time, management identifies initiatives (major projects and new programs) to be included in the Bureau's budget request.  Once the Director has approved the initiatives, their projected cost is added to the prior year's budget.  This results in the Bureau's proposed operating budget for that fiscal year.

It is imperative that CCMs and MCAs prepare sound, realistic projections to ensure funds are provided for the accomplishment of program goals and objectives.  Usually in March, the Community Corrections Branch (CCB) requests that CCRAs submit their budget projections for the fiscal year 18 months away.  Field staff then begin the process of identifying budget requirements.  The CCRA analyzes all data from the field and submits it to the Central Office CCB for submission to the Budget Development Branch in the Bureau's Administration Division.

The Budget Development Branch compiles budget figures from all Bureau components along with detailed narrative descriptions and justifications of Bureau programs and initiatives into a document known as the Spring Planning Submission.  This is forwarded to the Department of Justice (DOJ) to be included as a line item in the Congressional Budget.  After review by Office of Management and Budget (OMB), the Budget Development Branch prepares the budget for final review by the President and submits it to Congress.

When an appropriations bill is passed by Congress and signed by the President, the allotment procedure begins.  The Central Office Budget Execution Branch distributes funding for the Region's fiscal year allocation.

## 7.2.  AREAS OF RESPONSIBILITY

Community corrections is responsible for the following budget areas:

- Contract Community Corrections Centers - Program T1;

- Contract Confinement - Program D with its' three parts: jails D1, long-term adult boarders D2, and juveniles D3;

- Community Corrections Management - Program R1; and

- Transitional Services - Program 2021.

The Central Office CCB, in conjunction with the Budget Execution Branch, is responsible for the initial allocation and transfer of funds between regions and programs.  Program T1 and D funds are occasionally moved from one program to the other.  Funds **may not** be transferred between programs without written approval of the Central Office CCB.  For the purposes of management, Program R1 is always kept separate. R1 funds normally cannot be transferred to the T1 or D programs.

CCMs submit estimated annual expenditures for each of their contracts.  They are responsible for projecting future budget needs, estimating inmate-days and annual costs for contracts and for monitoring budget expenditures.  These budget projections are then submitted to the MCA.  The CCM is ultimately responsible for the management of Program T1 and D monies in conjunction with the Regional Comptroller

The MCAs have oversight responsibility for CCM tracking of budget allocations and expenditures and for reviewing the budget projections submitted by the CCM.  The MCA consolidates these budget requests and submits them to the CCRA.  MCAs are also responsible for the Community Corrections Management Center budget, Program R1, which funds CCM office training, travel, and supplies.  The Central Office has no involvement with the Community Corrections Management Center budget.

Each CCRA makes a request for their region's upcoming fiscal year to the Central Office based on budget projections received from the MCAs.  After the CCRA receives their allocation, funds are distributed to the MCAs.  The MCA then disburses funds to each CCM office.

## 7.3. **BUDGET PLANS AND REPORTS**

### 7.3.1. **Spring Planning Submission**

   The budget process, also known as Spring Call, begins in late February or early March, 18 months in advance of the fiscal year. At this time, projections, program initiatives, and workload data pertaining to contract confinement needs two years into the future are identified and compiled by the CCB.  A narrative is then submitted to the Budget Development Branch.

   The Budget Development Branch prepares this information for inclusion in the Bureau's funding request to Congress.  Before

Congress receives this request, DOJ and OMB review it closely and may require additional information to support the request before it is reviewed by Congress.  Both the House and the Senate review the Bureau's budget request and may decide to change requested amounts prior to passing it to the President for final approval.  The budget projection process must begin well in advance of when the funds are actually needed as this process takes over a year.

7.3.2.  **Annual Budget Plans**

A Community Corrections annual budget plan is required to prepare and identify budget needs for the next fiscal year.  Each CCRA is required to submit a completed annual budget plan to the CCB by July 15 of each year.

One section of the annual plan gives projections for Contract CCCs (T1) and another section gives projections for total contract confinement (D), including jails (D1), long-term adult boarders (D2) and juveniles (D3).  Each section includes inmate-days and the per capita cost used to arrive at the requested budget, plus a narrative on any program or other change affecting the budget.

The CCB submits an operating plan by region and program based on established funding levels provided by the Budget Execution Branch. Budget Execution uses this to allocate funding by the appropriate program and object class codes to the Regional office.  The CCB then informs the CCRA of his or her allocation for the upcoming fiscal year.

7.3.3.  **Budget Projection Process**

The budget projection process is essentially the same when formulating both the spring planning submission and the annual budget plan.  The main difference is that the spring call goes to the Bureau Budget Development Branch for use in requesting funds from Congress while the annual budget plan goes to the Bureau Budget Execution Branch after the funds have been granted by Congress. Budget Execution uses the annual budget plan to distribute funds to each region.

A general description of the process community corrections staff use to project future fiscal needs is described below:

(a)  CCMs submit budget projections to the MCA on **Attachment 7-2, CCM Budget Projections**, using the **Budget Projection Justification Worksheet** for each contract.  This worksheet is found in the **Community Corrections Technical Reference Manual**. Working papers are also submitted to the MCA and are filed with these Attachments.

To accomplish this, CCMs calculate their projections taking
into account the number of offenders to be serviced, average
length of stay, and per capita rate for both contract
confinement and community corrections centers budgets for
each contract.  Details on trends, unique situations, and
additional variables affecting one or both of these programs
also must be taken into consideration.  A narrative
explanation is required for any significant factors
considered or changes made from the Spring Call figures
submitted a year earlier.

(b)  The MCA verifies the calculations and the process the
CCM used to prepare projections.  This is accomplished using
the Verification section of **Attachment 7-2, CCM Budget
Projections**.  The MCA also compares the actual costs and
total inmate-days used during the current year to ensure the
CCM's budget projections are sound.  The MCA then
consolidates all field data for their Management Center and
submits a budget request to the CCRA.

(c) Next, the CCRA reviews the budget information received
from each MCA and analyzes all justifications for any
increase or decrease.  Once completed, the CCRA consolidates
the budget data from the Management Centers and submits
their regional request to the CCB for review using
**Attachment 7-1, Region Annual Budget Plan**.

### 7.3.4.  **Monthly Budget Reports**

In order to monitor the community corrections budget on a
national level, CCRAs submit the following two monthly budget
summary reports found in BOPDOCs, via BOPNET Groupwise, by the
25th of each month to the CCB:

- Monthly Contract CCC Budget Summary (EMS Form 904).
  This form is used to report Program T1 figures.

- Monthly Contract Confinement Budget Summary (EMS Form
  903).  This form is used to report Program D figures.

Both forms require budget information pertaining to
expenditures, inmate-days and per capita costs for all contracts
within the region.  This information is recorded in the following
two categories:

- Actual for the last month:  entered in this area are
  the corrected figures for the previous reporting month.
  The figures (expenditures, inmate-days, per capita
  costs) are the total amounts obtained from all the

contract bills processed and accrued for that month.

- Cumulative for the year:  entered in this area are the total figures (expenditures, inmate-days, per capita costs) for the year, plus, the actual amount for the last month.  Accrued bills that have been processed will be adjusted and entered into the yearly total.

### 7.3.5. **Tracking Contract Expenditures**

The Central Office CCB allots CCRAs a budget for each fiscal year in Programs T1 and D.  CCRAs allocate funds to each Management Center for their field offices to track contract expenditures.

CCMs must use the spreadsheet issued by the Central Office, CCB Operations Section to record, monitor, and track expenditures by contract and totals by CCCs (T1) and Confinement (D).  MCAs maintain oversight of the tracking of these expenditures.  CCRAs must be kept appraised of any circumstances in which there is a significant surplus or deficit in funds.  CCRAs will review and make a determination on the appropriate action to be taken.

### 7.4. **ACCRUALS**

In accordance with current accounting policy, at the beginning of each fiscal year, CCMs submit annual accruals for each contract to Financial Management to be distributed across the next twelve months as appropriate.  CCMs make allotments to each contract based on their annual disbursement received from the MCA.  The following instructions for this process are to be followed:

1.   At the beginning of each fiscal year, the CCM office will submit an annual accrual for each contract facility based on their annual budget request submitted in June. The annual accruals are submitted to financial management through the MCA and CCRA.  If the estimated monthly expenditures are projected to be stagnant throughout the fiscal year, this figure can simply be divided by 12. However, known variables, such as option year per capita changes or projected population changes, must have an individualized accrual for each of the 12 months calculated and submitted.

2.   If at anytime during the fiscal year the CCM office expects a significant change in the originally submitted accrual, they shall submit an amended accrual through the MCA and CCRA to the Regional Comptroller.

3.  By the 25th of each month, each region must submit the actual expenditures for the previous month to the Operations Section in the CCB.

Policy requires that "accruals" be as accurate as possible. Accurate projections result in accurate accruals. Therefore, it is essential that staff perform legitimate, detailed projections each year for each contract, track accruals against expenditures monthly, and make adjustments as necessary.

## 7.5. CONTRACTOR BILLINGS

An invoice is the bill or written request of payment the contractor provides for services rendered. Payments are based on a proper invoice and satisfactory performance of contract terms. The MCA and CCRA must monitor bill processing closely to ensure CCMs follow proper procedures and process bills in a timely manner. Specific procedures related to bill verification and certification are found in the **Community Corrections Technical Reference Manual**.

CCMs must certify that services presented for payment have been rendered. This must be done within five working days following receipt of an accurate bill. All bills are date-stamped with the date received and are reviewed promptly to determine if they are accurate. Incorrect billings shall be returned to the contractor for correction. The CCM shall maintain documentation to show the date bills are received as well as the date bills are returned to the contractor for corrections.

When billings are determined to be accurate, the CCM approves payment by signing the voucher (SF-1034) and forwarding it along with a copy of the billing to the CCRA within 5 days of receipt. The CCRA then initials or signs the voucher and forwards it to the Office of Financial Management.

If the contractor collects 25% of subsistence from the resident, the CCM must ensure the billing calculations reflect the amount of these collections and that the Bureau receives credit for them. Further information regarding subsistence is found in Chapter 5.

### 7.5.1. Medical Payments

Inmates in CCCs are expected to become financially self-sufficient and therefore, bear the cost of medical care. Refer to Chapter 5 for further information.

The Bureau shall, however, accept financial responsibility for inmates housed in contract detention facilities or CCC inmates with unusual circumstances. The CCM must consult with the

Regional Health Services Administrator (RHSA) prior to approving services.  The MCA and CCRA must be made aware of any unusual circumstances.

Outside hospital, surgical, prescription and dental costs of offenders housed in contract facilities are charged to FMS Cost Center 225 (Outside Medical Service), Program B.  This Cost Center is managed by Bureau of Prisons Medical Services. Community corrections staff do not obligate or expend funds from this Cost Center.  Outside medical costs are not included in the basic daily contract rate.

### 7.5.2.  **Release Expenses**

Non-subsistence costs, such as release expenses, which are not included in the contract rate may be paid by the contractor and reimbursed by the Bureau.  The appropriate sub-object code is listed separately on the contractor's invoice when processing the bills.  For example, if the U.S. Marshals Service pays for a Bureau inmate serving a sentence in a jail, a SF-1080 is submitted to the CCM for processing.

See the Program Statements on **Interagency Agreement Between the Bureau of Prisons and U.S. Marshals Service**; and **Release Gratuities, Transportation, & Clothing**, as well as Chapter 5 of this manual for further information.

### 7.6. **MANAGEMENT OF THE OPERATIONS BUDGET**

The MCA is responsible for managing and tracking Program R1, Operations Budget.  CCRAs track R1, review and consolidate the MCA/CCM requests, and submit their budget requests for regional operating expenses to their Regional Comptroller.  CCRAs distribute R1 funds to the MCA who manages the R1 Program expenditures for the Management Center district.

### 7.6.1.  **Annual Budget Plan for CCM/MCA Offices**

CCRAs shall advise their CCMs/MCAs when to submit an annual budget plan for the approaching fiscal year.  This budget is for the operation of the CCM/MCA office and is finalized through the Regional Comptroller.  Information on travel, office equipment, supplies and other office operating expenses such as copier rental, telephone, etc., is included.  The CCM/MCA shall include all equipment purchases for the Fiscal Year (furniture, office machines, etc.) in this projection.

7.6.2.  **Travel**

The MCA and CCM project and plan travel on a monthly, as well as annual basis.  Based upon the annual allotment, the CCRA allocates a specific amount of money for travel to each MCA.

In all cases, care must be exercised in planning and/or approving travel to ensure the travel is prudent, required as part of the traveling employee's responsibilities, and incorporates the most economic and advantageous method and time of travel.

The Regional Director authorizes all travel.  A travel authorization is issued to travelers before each actual trip outside a 50-mile radius. The appropriate accounting classification and the estimated amount of the travel must be stated on all travel authorizations.  The CCRA forwards all travel authorizations to Financial Management.

Ordinarily, each MCA, CCM, and COS will use the government issued credit card for travel purposes.  Within five working days of travel completion, the travel voucher must be submitted to Financial Management.  Vouchers claiming reimbursement costs for official travel are submitted to the MCA/CCRA for approval using the form authorized by Financial Management.  Staff shall submit the original travel authorization with lodging receipts and any other receipts deemed appropriate.  These attachments shall accompany the travel voucher submitted to the MCA/CCRA for approval and further payment processing.

Local travel within a 50-mile radius incurred by MCAs, CCMs and COSs using privately owned vehicles (POVs) in and around official duty stations (i.e., visits to a local contract facility, USM, USPO, etc.) is claimed on the Miscellaneous Expenses (SF-1164) and does not require a travel authorization.  Receipts for parking, tolls, etc., should be provided if available.  Metered parking used should be noted.

7.6.3.  **Office Expenditures**

Office supplies, printed stationery, Post Office Box rental, telephone costs, etc., relating to CC office operations may be purchased with the government credit card.  All expenditures, both anticipated and actual, for CCM and MCA offices are routed through the CCRA who is the Cost Center Manager for community corrections budgets.

Major capitalized equipment needs require the submission of a Request for Purchase Form (BP-S101.041) and a Major Equipment

Justification Form (BP-S135.041) to the CCRA.  Minor equipment
needs (non-capitalized) require only the Request for Purchase form
and, if approved by the CCRA, are forwarded to the Regional
Procurement Officer for issuance of a Purchase Order, BP-ACCT-81.

   Day-to-day purchases must be made with the government credit
card.  Exceptions to this rule and complete details on the use of
the credit card are found in the Program Statement on **Bureau of
Prisons Acquisitions (subpart 13.601-70)** and the **Procurement
Technical Reference Manual**.  In general, the procedure for using
the card begins with the purchaser determining if the needed item
is available from a mandatory source.  Once mandatory sources have
been screened, the purchaser locates a vendor and verifies the
price.  Vendor selection is made on the basis of the best price or
value to the government and may be accomplished either by telephone
or in person.

   All purchase orders, requests for purchase, and invoices require
an account class code as found in Financial Management regulations.
Upon receipt of an invoice and verification of services and/or
supplies received, the CCM or MCA shall stamp and sign approval of
charges claimed and forward the forms to the CCRA for further
processing and payment.  Payment can only be made after approval of
a valid invoice.  Payment cannot be issued based on receipt of a
statement.

## 7.7. **ACCOUNTING AND CONTRACTING PROCEDURES AND CODES:**

### 7.7.1. **Introduction**

   The Appropriation Bill is an authorization by a Congressional Act
for an agency to make payments from the U.S. Treasury for specified
purposes.  The two main appropriations administered by the Bureau
are:

        the Salaries and Expenses (S&E) Appropriation, a "one-year
        appropriation" available for incurring obligations only during
        a specified fiscal year.  Most community corrections funding
        is contained in this appropriation, with some coming from the
        Violent Crime Reduction Program (VCRP); and

        the Buildings and Facilities (B&F) Appropriation, a
        "no-year appropriation" available for incurring obligations
        for an indefinite period of time.

   Specific codes are used to track the Bureau's expenditures of
Congressionally- appropriated funds.  These codes are entered into
the Financial Management System (FMIS) which is the vehicle used to
keep track of the appropriation and expenditure of funds by various
units and programs within the Bureau.

7.7.2. **Monitoring Budget Activity**

It is important to monitor the FMIS reports and check on any significant discrepancies between the FMIS figures and the CCRA figures.  CCRAs cross check their tracking systems (the three programs described below) against FMIS official figures on a quarterly basis.

7.7.3. **Programs**

Program Codes are used to identify functions or activities conducted by the Bureau with funds specifically allocated for that activity or function.  The Program Code is a single letter. Program Codes used in community corrections (and described at the beginning of this chapter) are:

> Contract Community Correction Centers = T1
> Contract Confinement = D
> Community Corrections Management = R1
> Transitional Services = 2021

7.7.4. **Codes**

Each of the programs above also has a YRegDoc number which is a 10-digit (or 12-digit in Program Review) code placed on all funding or obligating documents such as contracts, Purchase Orders, and invoices.  The codes are later entered into the FMIS.

The **Community Corrections Technical Reference Manual** contains a description of what each part of the accounting classification code means and how it is used by community corrections staff.  It is the responsibility of the CCRA, MCA and CCM to ensure these codes are accurate.  To assist, the following lists should be obtained from the Regional Office of Financial Management on a regular basis:

> 1. Bureau of Prisons FMIS/FMS Institution Codes,
> 2. Key to Classification Level Codes,
> 3. Program Area Codes,
> 4. Key to FMIS/FMS Sub-Object Codes.

7.8. **CONTRACT NUMBERS AND CODING**

7.8.1. **Contract Numbers and Purchase Orders**

Each obligating document must have a document control number which is a two-part entry.  This is a YRegDoc number and an AccountClass code.  This remains with the contract, without

regard to fiscal year, for the life time of the contract, or until the contract is canceled or allowed to expire.  Purchase orders, on the other hand, are valid for one fiscal year or less and only for the fiscal year in which issued.

Refer to the **Community Corrections Technical Reference Manual** for examples.

7.8.2.  **Location Code**

In addition to the contract number, each separate contract location is assigned a three digit identification code by the CCRA.  This location code remains with the unit, and will remain even when the contract is inactive and no longer used by the Government.  **This code cannot be used again.**

PS 7300.09
10/28/04
Attachment 7-1, Page 1

**REGION ANNUAL BUDGET PLAN**
**for FY _____**

Submitted by:

**I.   T BUDGET - COMMUNITY CORRECTIONS CENTERS**

    A.  Best Estimate for Current Year Expenditures:

    _____  Inmate-days X _____  Per Capita Cost = _____

    B.  FY _____  Request:

    _____  Inmate-days X _____  Per Capita Cost = _____

    C.  Justification for increase or decrease:


**II.  D BUDGET - CONTRACT CONFINEMENT**

    A.  Best Estimate for Current Year Expenditures:

    _____  Inmate-days X _____  Per Capita Cost = _____

    B.  FY _____  Request:

        Jail
    _____  Inmate-days X _____  Per Capita Cost = _____

        Long Term Boarder
    _____  Inmate-days X _____  Per Capita Cost = _____

        Juvenile
    _____  Inmate-days X _____  Per Capita Cost = _____

        Total
    _____  Inmate-days X _____  Per Capita Cost = _____

    C.  Justification for increase or decrease:

PS 7300.09
1/12/98
Attachment 7-2, Page 1

## CCM BUDGET PROJECTIONS
### For fiscal year __

| CCM Office: | |
|---|---|
| Facility: | Facility Code: |

| | | |
|---|---|---|
| A | Number of Inmates to be serviced | |
| B | Average length of stay | |
| C | Per Capita Rate | |

| | | |
|---|---|---|
| D | Total Cost | |

VERIFICATION OF INFORMATION

| 1. | Inmate-days for the year | | 2. | ADP | |
|---|---|---|---|---|---|
| 3. | Adjustment made:  Y/N | | 4. | Reviewed Per Capita Cost:  Y/N | |
| 5. | Total Cost | | $ | | |

Worksheet reviewed by:_____
                        Management Center Administrator

Name of Contract Facility Reporting Escape:   Reynolds & Associates T/A Washington Halfway Homes

Name of Escapee:   Eloise Wormley                                     Reg. #:   37096-007

Date/Time of Escape:   6-2-06      3pm

DOB:   2-4-1954                    Race:   Black                Sex :   Female

SNN:   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                                      WGT:   185

Offense:   Attempt Disp Cocaine

Sentence:   6 Month                Date of Sentence:   12-15-05

PRD:                              Security Level:

Is inmate a well figure? (Local, state, nation):   no          If yes, describe:

CMC:                              Assignment:

Signed out to address:   1333H STN.W WDC

1275 K STN.W WDC

Phone:   202-289-5888      202-408-1119      Emergency contact:   Charisse Monroe

Address/Phone:   119 D ST. N.W. WDC      202-639-8969

History of Violence:   no      If yes, describe:

Know crime of violent act committed in the local area recently or in relations to the escape:      no      If yes,

describe :

Any reason to believe escapee might be armed:      no

Description of Circumstances:      On June 2,2006 At appoximately 8:42am Eloise Wormley

37096-007  sign out the facility for job seeking at 1275 K ST.N.W WDC and

1333H ST N.W WDC  and  had  a  due back time at 2:30 pm  . And failed to return to the facility

Date/Time of notification to BOP:   June 2, 2006  3:05 PM

CCM Staff Notified:      CONTACT  BOP DUTY  OFFICERS  LEFT  MESSAGE

USM Notified:

Completed by:      Altimese R Hall    /    Charger Quarter
[Name & Title]

U.S. DEPARTMENT OF JUSTICE          FEDERAL BUREAU OF PRISONS

Part I – Incident

**1. Name of Center**

WASHINGTON HALFWAY HOMES – 2AG

| 2. Name of Inmate | 3. Register Number | 4. Date of Incident | 5. Time |
|---|---|---|---|
| Eloise Wormley | 37096-007 | June 2, 2006 | 3:00pm |

| 6. Place of Incident | 7. Assignment | 8. Quarters |
|---|---|---|
| Community | Pre-Release | 103 |

| 9. Incident | 10. Code |
|---|---|
| Escape | 200 |

11. Description of Incident (Date __6-2-06__ and Time __3:00pm__ Staff became aware of incident)


On June 2, 2006 at 8:42am Resident Eloise Wormley (register# 37096-007) signed out to seek employment at Cosi's located at 1333 H St NW and 1275 K St NW Washington, DC with a return time of 2:30pm. When Ms. Wormley did not return at the designated time staff contacted these locations; however staff was unable to determine if Ms. Wormley had made it to either destination. Staff was unable to reach Ms. Wormley's emergency contact Charisse Monroe because the telephone number. Locator calls were placed to area hospitals and police precincts to no avail Ms. Wormley was placed on escape and dropped from the Fairview count at 3:00pm.

| 12. Signature of Reporting Employee | 13. Name and Title (printed) | a. Date and Time |
|---|---|---|
| *Chriss Collins* | Chriss Collins Charge of Quarters | 6-2-06  3:00pm |

| 14. Incident Report Delivered to Inmate by | 15. Date Delivered | 16. Time Delivered |
|---|---|---|
| Held in Absentia | | |

(Continued below)

BP-S205.073
U.S. DEPARTMENT OF JUSTICE                    FEDERAL BUREAU OF PRISONS

Part I – Incident

**1. Name of Center**

WASHINGTON HALFWAY HOMES-2AG

| 2. Name of Inmate | 3. Register Number | 4. Date of Incident | 5. Time |
|---|---|---|---|
| Wormley, Eloise | 37096-007 | June 2, 2006 | 5:22pm |

| 6. Place of Incident | 7. Assignment | 8. Quarters |
|---|---|---|
| FAIRVIEW CCC | CCC | Room 103 |

| 9. Incident | 10. Code |
|---|---|
| Using intoxicants (Alcohol) | 222 |

11. Description of Incident (Date _6/2/06 and Time ____5:22 pm Staff became aware of incident)

**On June 2, 2006 at approximately 8:42 am BOP resident Wormley, Eloise #37096-007 signed out for job search at 1333 H street NW and 1275 K street NW Washington DC with a due back time of 2:30 pm. At 3:00 pm Wormley was placed on escape and BOP was notified. At 5:22 pm Wormley returned to the facility, she did not call for an extension. Upon her return Wormley was given a breathalyzer with a result of .272. A second breathalyzer was not given because Wormley became combative and uncooperative. She was removed from the facility by Federal Police.**

| 12. Signature of Reporting Employee | 13. Name and Title (printed) | a. Date and Time |
|---|---|---|
| *Chriss Collins* | Chriss Collins /CHARGE QUARTERS | 6/2/06  7:00pm |
| 14. Incident Report Delivered to Inmate by | 15. Date Delivered | 16. Time Delivered |

U.S. DEPARTMENT OF JUSTICE           FEDERAL BUREAU OF PRISONS

Part I – Incident

**1. Name of Center**
WASHINGTON HALFWAY HOMES – 2AG

| 2. Name of Inmate | 3. Register Number | 4. Date of Incident | 5. Time |
|---|---|---|---|
| Eloise Wormley | 37096-007 | 6-2-06 | **5:22 pm** |

| 6. Place of Incident | 7. Component | 8 Quarters |
|---|---|---|
| Fairview | Pre-release | Room 103 |

| 9. Incident | 10. Code |
|---|---|
| Assaulting any person (includes sexual assault) or an armed assault on the institution's secure perimeter. | 101 |

**11. Description of Incident:**

On 6/02/06 at approximately 5:22 pm, Ms Wormley returned to the facility after having been placed on escape for failing to return at the time required. Upon entering the facility, staff noted that resident appeared to be intoxicated. She was signed in and breathylized. After her first test she started alternately screaming at staff that she was an alcoholic, cursing and crying, and knocking paperwork and books off of the Control Room counter. I asked her to stop several times, but she continued to become more violent I held her by the wrists and sat her down in a chair to try and restrain her with the help of one of our contractors. We released her after getting her assurances that she was calm. She stood up and started throwing punches at both of us, and threatened to kill us. We restrained her again and held her while the police were called and finally arrived. They had to restrain her with handcuffs.

| 12. Signature of Reporting Employee | 12. Name and Title (printed) | 13. a. Date and Time |
|---|---|---|
| *Thomas A. Mills* | Thomas A. Mills<br>Employment Placement Specialist | 6/2/06   5:22 pm |

| 14. Incident Report Delivered to Inmate by | 5. Date Delivered | 16. Time Delivered |
|---|---|---|
| N/A Held in | absentia. | |

(Continued below)

## PART II - INVESTIGATION

17. Inmate's Statement and Attitude

Held in Absentia

18. Other Facts About the Incident

Around 5pm Ms. Wormley returned to the facility intoxicated after being breathlyzed; she became belligerent swearing at staff and threatening bodily injury to staff and residents. Ms. Wormley began to psychically assault staff with her fists and had to be restrained by staff until the police arrived to assist the situation. After police arrived on the scene, Ms. Wormley was transferred to DC General Emergency Psychiatric Ward for evaluation. She was given a 5mg injection of Fluphenazine to calm her down, after she was evaluated psychiatric staff decided to release her. Ms. Wormley was not permitted to return to Fairview and was instructed to turn herself into the US Marshals on June 5, 2006.

19. Investigator's Comments and Conclusions

Ms. Wormley was aware of facility rules and regulations in regards to her returning at her designated time. It is clear that she had other intentions when she signed out of the facility for job seeking; she is guilty of Escape and should be reprimanded accordingly.

20. Action Recommended

Ms. Wormley should to be returned to federal custody and charged with Escape.

Refer to the CDC

| Signature | Title | Date |
|---|---|---|
| Erinn Sykes | Case Manager | June 2, 2006 |

(This form may be replicated via WP)
replicated by R&A/WHH 10/01
U.S. DEPARTMENT OF JUSTICE                FEDERAL BUREAU OF PRISONS

| Name of Inmate | Register Number | Hearing Date |
|---|---|---|
| Eloise Wormley | 37096-007 | June 5, 2006 |
| Date of Incident | Date of Incident Report | Prohibited Act(s) Code |
| June 2, 2006 | June 2, 2006 | 200 |

Summary of Charge(s)
Escape

**I. NOTICE OF CHARGE(S)**

A. Advance written notice of charges (copy of incident report) was given to inmate on

_____ at _____ by Held in Absentia
   Date           Time

  B. The CDC Hearing was held on _6-5-06____ at _3:00pm___
                               Date         Time

C. The inmate was advised of his rights before this CDC by ___N/A_____
   On _____ and a copy of the advisement of rights form is attached.
       Date

**II. STAFF REPRESENTATIVE**
  A. Inmate waived right to staff representative: (Yes/No) N/A
  B. Inmate requested staff representative and ___N/A_____ appeared.
  C. Requested staff representative declined or could not appear but inmate was advised of option to postpone hearing to obtain another staff representative with the result that: N/A

**III. PRESENTATION OF EVIDENCE**
  A. Inmate has been advised of his right to present a statement or to remain silent, to present documents, including written statements of unavailable witnesses, and for relevant and material witnesses to appear in his behalf at the hearing. Inmate admits/denies the charge(s). Held in Absentia
  B. Summary of Inmate Statement:

  C. Witnesses:
    1. The inmate requested witnesses: (Yes/No/) N/A
    2. The following persons were called as witnesses at this hearing and appeared: N/A
    3. A summary of testimony of each is attached: (Yes/No) N/A
    4. The following persons requested were not called for the reason (s) given: N/A

    5. Unavailable witnesses were requested to submit written statements and those statements were considered: (Yes/No) N/A
  D. Documentary Evidence: In addition to the Incident Report and Investigation, the committee considered the following documents: Ms. Wormley's sign in sign out sheet reflects that Ms. Wormley signed out at 8:42 am but she did not return at 2:30 pm.
  E. Confidential information was considered by the CDC and not provided to inmate (Yes/No) N/A

FINDINGS OF THE COMMITTEE

X. a. The act was committed as charged.

ٯ b. The following act was committed.

ٯ c. No prohibited act was committed: _____

Expunge according to your Statement of Work

V. SPECIFIC EVIDENCE RELIED ON TO SUPPORT FINDINGS

Ms. Wormley returned to the facility at 5:22pm after having been place on escaped for failing to return at the required time 2:30pm. Ms. Wormley was breathlyzed, she became out of control, screaming and cursing at staff stating that she was an alcoholic. Ms. Wormley then became very violent and had to be restrained until the police arrived. She was then placed in handcuffs and escorted from the facility.

VI. SANCTION RECOMMENDATION

The CDC recommended that Ms. Wormley be returned to federal custody and forfeiture of earned statutory good time or non-vested good conduct time up to 50% or up to 60 days, whichever is less, and or terminate or disallow extra good time .

VII. REASON FOR SANCTION RECOMMENDATION

After being placed on Escape and returning to the facility almost three hours late Ms. Wormley was intoxicated and violent. Ms Wormley is a danger to herself and others; which was intensified by her drinking and taking her psychotropic medication.

VIII. APPEAL RIGHTS  YES

II. DISCIPLINE COMMITTEE

| Chairperson Marvo-Mayers Holder | Member | Member |
|---|---|---|

I. ACTION BY DHO

| | Typed Name/Signature – DHO | DATE |
|---|---|---|

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| ELOISE T. WORMLEY, | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:08-cv-00449 (CKK) |
| | ) | |
| THE UNITED STATES OF AMERICA, | ) | |
| et al. | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |

**AFFIDAVIT OF ELOISE T. WORMLEY**

Comes now the affiant, Eloise T. Wormley, and states as follows:

1. I am an adult over the age of eighteen with personal knowledge of the foregoing facts and the plaintiff in this action.

2. On June 5, 2006, I spoke with an officer of the United States Marshals Service (USMS) by telephone at the John L. Young Shelter, in Washington, DC, where I was residing.

3. The USMS officer instructed me to turn myself in to USMS at the District of Columbia Superior Court ("Superior Court"), located at 500 Indiana Ave NW # 3500, Washington, DC 20001.

3. That same day, June 5, 2006, I traveled to the Superior Court to turn myself in to USMS. I was informed by a USMS officer that I could not be processed at this location and that I would have to go to the District of Columbia Central Detention Facility ("D.C. Jail.") to turn myself in to USMS.

4. That same day, June 5, 2006, I traveled to D.C. Jail to turn myself in to USMS custody. Upon my arrival, I discovered that D.C. Jail was in "lockdown" mode and that no one was available to assist me.

6. Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on August _15_, 2008.

_Eloise T. Wormley_
Eloise T. Wormley

STATEMENT  OF  WORK

(SOW)


COMMUNITY CORRECTIONS CENTER

(CCC)

August 2000

**<u>As Revised by CCB</u>:**

Revision 1 - December 2000
Revision 2 - August 2001
Revision 3 - November 2001
Revision 4 - May 2002
Revision 5 - October 2003
Revision 6 - May 2004
Revision 7 - May 2005
Revision 8 - December 2005

# TABLE OF CONTENTS

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . .1
CHAPTER 1
        Administration and Organization  . . . . . . . . . . . . 6
CHAPTER 2
        Personnel  . . . . . . . . . . . . . . . . . . . . . 12
CHAPTER 3
        Facility . . . . . . . . . . . . . . . . . . . . . . 25
CHAPTER 4
        Life/Safety  . . . . . . . . . . . . . . . . . . . . 30
CHAPTER 5
        Sanitation & Environment . . . . . . . . . . . . . . 34
CHAPTER 6
        Electrical Safety  . . . . . . . . . . . . . . . . . 36
CHAPTER 7
        Hazardous Materials  . . . . . . . . . . . . . . . . 38
CHAPTER 8
        Pest Control &  Waste Management . . . . . . . . . . 41
CHAPTER 9
        Referral and Intake Processing . . . . . . . . . . . 42
CHAPTER 10
        Programs . . . . . . . . . . . . . . . . . . . . . . 47
CHAPTER 11
        Discipline . . . . . . . . . . . . . . . . . . . . . 74
CHAPTER 12
        Administrative Remedy  . . . . . . . . . . . . . . . 85
CHAPTER 13
        Food & Medical Services  . . . . . . . . . . . . . . 86
CHAPTER 14
        Records and Reports  . . . . . . . . . . . . . . . . 93
CHAPTER 15
        Release Preparation  . . . . . . . . . . . . . . . . 96
CHAPTER 16
        Escape Procedures  . . . . . . . . . . . . . . . . . 99
CHAPTER 17
        Serious Illness, Injury, or Death. . . . . . . . . . 101
CHAPTER 18
        USPO Cases . . . . . . . . . . . . . . . . . . . . . 102
CHAPTER 19
        Research and Evaluation  . . . . . . . . . . . . . . 104
CHAPTER 20
        BOP Inspections  . . . . . . . . . . . . . . . . . . 105
CHAPTER 21
        Cost Reimbursements  . . . . . . . . . . . . . . . . 111
CHAPTER 22
        Sexual Abuse Intervention  . . . . . . . . . . . . . 112

## List of Attachments

REQUEST FOR CONTRACT STAFF BACKGROUND INVESTIGATION   Attachment A

INITIAL INTAKE FORM . . . . . . . . . . . . . . . .   Attachment B

CASE NOTES  . . . . . . . . . . . . . . . . . . . .   Attachment C

URINALYSIS PROCEDURES . . . . . . . . . . . . . . .   Attachment D

PROHIBITED ACTS AND DISCIPLINARY SEVERITY SCALE . .   Attachment E

EXPLANATION OF TERMS  . . . . . . . . . . . . . . .   Attachment F

Table of Contents, Page iii

LIST OF BOP FORMS
(provided by CCM)

NAME OF FORM                                    Chapter Reference

ADMINISTRATIVE REMEDY FORMS . . . . . . . . . . . . . . . . 12

APPLICATION FOR VOLUNTEER SERVICE . . . . . . . . . . . . . 2

AUTHORIZATION TO OPERATE A MOTOR VEHICLE  . . . . . . . . . 10

CENTER DISCIPLINE COMMITTEE (CDC) REPORT (CCC'S)  . . . . . 11

COMMUNITY BASED PROGRAM AGREEMENT . . . . . . . . . . . . . 9

CONDITIONS OF HOME CONFINEMENT . . . . . . . . . . . . . . 10

DUTIES OF STAFF REPRESENTATIVES (CCC'S) . . . . . . . . . . 11

FURLOUGH APPLICATION - APPROVAL AND RECORD  . . . . . . . . 10

FURLOUGH QUESTIONNAIRE - OUT OF SENTENCING DISTRICT . . . . 10

HOME CONFINEMENT AND COMMUNITY CONTROL AGREEMENT . . . . . . 10

INCIDENT REPORT (CCC'S) . . . . . . . . . . . . . . . . . . 11

INMATE RIGHTS AT CENTER DISCIPLINE COMMITTEE HEARING  . . . 11

NOTICE OF CENTER DISCIPLINE COMMITTEE HEARING (CCC'S) . . . 11

PASS REQUEST AND APPROVAL . . . . . . . . . . . . . . . . . 10

QUESTIONNAIRE - SENTENCING DISTRICT . . . . . . . . . . . . 10

URINE SAMPLING PROGRAM (CCC'S)  . . . . . . . . . . . . . . 10

WAIVER OF APPEARANCE (CCC'S)  . . . . . . . . . . . . . . . 11

LIST OF BOP PROGRAM STATEMENTS
(Referenced in the Statement of Work)

Program Statement                          Referenced Chapter

PS 1330.13      Administrative Remedy Program...................12

PS 1351.05      Release of Information.......................... 1

PS 1480.05      News Media Contacts............................ 1

PS 3735.04      Drug Free Workplace............................ 2

PS 5380.06      Cost of Incarceration Fee (COIF)...............10

PS 5800.13      Inmate Systems Management Manual...............15

PS 6060.08      Urine Surveillance and Testing Program.........10

PS 6590.07      Alcohol Surveillance and Testing Program........10

PS 7310.04      Community Corrections Center (CCC)............. 9
                Utilization and Transfer Procedure

PS 7320.01      Home Confinement...............................10

PS 7570.02      Contract Staff Integrity for Privately.......... 2
                Operated Community Corrections Residential
                Facilities

Program Statements may be found on the Bureau of Prisons Internet Home Page, http://www.bop.gov/.

The policy statements numbers listed above were current at the time of this SOW revision, however, it is the Bureau's expectation that the contractor maintain and implement subsequent policy updates as they occur.  This will require the contractor to routinely review policy statements to ensure they are utilizing the most current version.

Table of Contents, Page v

CONTRACTOR REQUIRED TRAINING
(Referenced in the Statement of Work)

| Training | Chapter Referenced |
|---|---|
| Staff annually review (with documentation) Contractor's Operations Manual | 1 |
| 20 hours of staff Annual Training with required topics | 2 |
| New staff orientation during the first week of employment with required topics | 2 |
| A minimum of one Key Staff will attend BOP Regional training as offered | 2 |
| Staff acknowledge receipt and understanding of Contractor's Employee Standards of Conduct | 2 |
| The contractor shall develop and implement a comprehensive staff training program addressing the facility's sexual abuse/assault/misconduct prevention and intervention program. | 2 |
| The contractor shall provide a brief orientation program for all volunteers and provide specific written guidance in the format of a "Volunteer Manual". | 2 |
| The contractor shall train all staff in emergency procedures within one week of their initial employment.  In addition, the contractor shall include emergency training in annual refresher training. | 4 |
| The contractor shall train all staff in the proper handling and use of all hazardous, toxic, caustic, and flammable materials within two weeks of their initial employment or whenever a new hazard is introduced into their work area and annually thereafter. | 7 |
| The contractor shall train staff on the proper techniques for offender pat, room, vehicle, and common area searches.  This training shall be conducted within the first week of employment and annually thereafter. | |

10

Table of Contents, Page vi

STAFF TRAINING REQUIREMENTS CONTINUED

Training                                             Chapter Referenced

The rules of conduct and sanctions for
resident discipline infractions shall be
defined in writing and communicated to all staff.       11

Staff must be familiar with the Administrative
Remedy Program Statement.                               12

# INTRODUCTION

The Bureau of Prisons (BOP) provides community-based residential and nonresidential correctional services through contractual agreements with state, county and city governments and private corrections contractors. These contractors provide services which include employment and residence development and other self-improvement opportunities to assist federal offenders in becoming law-abiding citizens.

1.  OBJECTIVE. The objective is to establish a Community Corrections Center (CCC) that provides comprehensive community-based services for offenders, i.e., offenders who are in the custody of the BOP, United States Attorney General, or under the supervision of the United States Probation Office (USPO).

2.  STATEMENT OF WORK (SOW). The SOW sets forth the contract performance requirements for the management and operation of a CCC for federal offenders. The contractor shall ensure that the CCC operates in a manner consistent with the mission of the BOP. The mission is to protect society by confining offenders in the controlled environments of prisons and community-based facilities that are safe, humane, cost efficient and appropriately secure, that provide work and other self-improvement opportunities to assist offenders in becoming law-abiding citizens.

3.  PLACEMENT OF OFFENDERS. Only the Community Corrections Manager (CCM) can approve a federal offender's placement at a CCC.

4.  CONTRACTOR'S RESPONSIBILITY. The contractor shall furnish all personnel, management, equipment, supplies and services necessary for performance of all aspects of the contract. Unless explicitly stated otherwise, the contractor is responsible for all costs associated with and incurred as part of providing the services outlined in this contract.

5.  BOP'S PHILOSOPHICAL BASE. The BOP can successfully carry out its mission because its operations are firmly grounded in a set of common values and functional goals. A clear vision of the BOP's organizational and individualized responsibilities exist among employees. The BOP, as an organization, has a "culture" — a set of values and shared attitudes that guide staff's actions. These values are a source of pride and professionalism to all employees, as they see them reflected in safe, humane and cost effective operations, and in the fair treatment of offenders. The following values are important for contract employees to understand, because they describe some of the major portions of the BOP's culture.

- Sound Correctional Management — The BOP maintains effective security and control of its offenders in CCC facilities utilizing the least restrictive means necessary. This approach is the essential foundation of all sound correctional management programs.

- Correctional Workers First — All BOP employees share with contract employees a common role as correctional workers and a mutual responsibility for maintaining safe and secure facilities and for modeling society's mainstream values and norms to offenders.

- Promotes Integrity — The BOP firmly adheres to a set of values that promotes honesty, integrity, and professionalism in order to ensure public confidence in its programs. These values also include the agency's prudent use of its allocated resources.

- Recognizes the Dignity of All — Recognizing the inherent dignity of all human beings and their potential for change, the BOP treats offenders fairly, is responsive to their needs, and affords them opportunities for self-improvement to facilitate successful re-entry into the community. The BOP recognizes that offenders are incarcerated as punishment, not for punishment.

- Community Relations — The BOP recognizes and facilitates the integral role of the community in accomplishing the BOP's mission. The BOP also works cooperatively with other law enforcement agencies, the Courts, and other components of the Government. BOP staff visit regularly with CCC contract employees to exchange information on areas of mutual concern. CCCs have proven to be invaluable in maintaining a productive link between the institution and the community in which it is located.

- High Standards — The BOP requires high standards of staff integrity, safety, security, sanitation, and discipline, which promotes a physically and emotionally sound environment for both staff and offenders.

- One of the most important things a contract employee can do — for offenders and for society — is to motivate offenders to take advantage of self-improvement opportunities while confined. Contract employees also have an important responsibility to provide a model of mainstream values and standards to offenders in their daily lives and their work in the community. These elements — helping and motivating — call for a caring attitude toward offenders, one that sensibly meshes with the BOP's responsibility to protect society with the joint role the BOP has with the community and offender during the reentry process.

Contract employees need to be firm but fair, humane but careful, in their interactions with offenders.  It is possible to maintain security without compromising humane offender care.

Corrections is an important part of the rehabilitative process — offering the programs and services that can help offenders when they return to the community.  Offenders should be provided information on these programs, presented in a way that encourages and motivates them to participate.

The CCC has an obligation to provide offenders with an opportunity to acquire the "tools" for self-improvement and law-abiding behavior upon release.  Offenders must participate in maintaining family and community ties, through correspondence, visitation and planning for eventual release through participation in pre-release classes and other programs.  They have the obligation to honor their debts and begin payment while confined.  Each offender is personally responsible for taking advantage of available CCC programs.

These are important guiding principles for contract employees. They provide direction for decisions that carry out the BOP's mission.  They also are the foundation of many expectations that the BOP will place on contract employees throughout performance of the contract.

6.  CONTRACT PERFORMANCE.  All services and programs shall comply with the SOW; the U.S. Constitution; all applicable federal, state and local laws and regulations; applicable Presidential Executive Orders (E.O.); all applicable case law; and Court Orders.  Should a conflict exist between any of the aforementioned standards, the most stringent shall apply.  When a conflict exists and a conclusion cannot be made as to which standard is more stringent, the BOP shall determine the appropriate standard.  The contractor shall comply with and implement any applicable changes to BOP policy, Department of Justice (DOJ) regulation, Congressional mandate, Federal law or E.O.

Should the BOP invoke such changes, the contractor retains rights and remedies to equitable adjustment under the terms and conditions of the contract.

BOP reserves the right to enter into negotiations with the contractor to change the conditions or procedures in this SOW and contract.

BOP reserves the right to have various staff monitor contract performance.  The BOP reserves the right to conduct announced and

unannounced inspections of any part of the facility at any time and by any method to assess contract compliance. The BOP may investigate any incident pertaining to the performance of this contract. The contractor shall comply and cooperate with the BOP on all investigations, monitoring visits, inspections and inquiries.

The contractor shall report all criminal activity related to the performance of this contract to the appropriate law enforcement investigative agency, e.g., Federal Bureau of Investigation, United States Marshals Service, state and local authorities, and immediately notify the CCM of the report. The contractor shall immediately report to the CCM any person or agency requesting to use an offender in any investigation.

The contractor shall submit any request for contract changes through the CCM to the Contracting Officer (CO) for approval.

Should electronic media, e.g., the Internet, be used by the contractor, the contractor shall manage the information in accordance with Federal law, regulations and policies of the U.S. Department of Justice and BOP. Offenders may have supervised access to the Internet while in the facility.

The BOP Internet web page (http://www.bop.gov/) is available to the contractor as a resource for information.

7. SCOPE OF WORK. The contractor shall comply with all requirements in this SOW and other reference documents as indicated. The technical proposal is incorporated into the contract unless otherwise stated in the contract or defined by the CCM.

The contractor has affirmative responsibility to ensure proper management and oversight of their program. Absentee ownership shall not mitigate program integrity, responsiveness or responsibility.

The contractor shall protect, defend, indemnify, save and hold harmless the United States Government, the BOP and its employees or agents, from and against any and all claims, demands, expenses, causes of action, judgements and liability arising out of, or in connection with, any negligent acts or omissions of the contractor, its agents, subcontractors, employees, assignees or any one for whom the contractor may be responsible.

The contractor shall also be liable for any and all costs, expenses and attorneys fees incurred as a result of any such claim, demand, cause of action, judgement or liability, including

those costs, expenses and attorneys fees incurred by the United States Government, the BOP and its employees or agents. The contractor's liability shall not be limited by any provision or limits of insurance set forth in the resulting contract.

In awarding the contract, the Government does not assume any liability to third parties, nor will the Government reimburse the contractor for its liabilities to third parties, with respect to loss due to death, bodily injury, or damage to property resulting in any way from the performance of the contract or any subcontract under this contract.

The contractor shall be responsible for all litigation, including the cost of litigation, brought against it, its employees or agents for alleged acts or omissions. The CO shall be notified in writing of all litigation pertaining to this contract and provided copies of any pleadings filed or said litigation within five working days of the filing. The contractor shall provide the CCM copies of all documents. The contractor shall cooperate with Government legal staff and/or the United States Attorney regarding any requests pertaining to federal or contractor litigation.

The contractor shall develop operational policies and procedures that follow the requirements contained in this SOW and to generally accepted correctional practice as defined by the COTR.

Except as otherwise provided for in this SOW, all federal offenders shall receive the same treatment and services.

CHAPTER 1 - Administration and Organization

The contractor shall maintain a current written operations manual that is available to all staff.  It shall describe the purpose, philosophy, programs, services, policies and procedures of the facility, and be updated on an as-needed basis.  The operations manual shall address each chapter of the SOW.  Staff shall have a general understanding of the operations manual.  The operations manual shall contain all certifying tests, zoning and "permit to use" documents for the facility.  The contractor must operate in accordance with the manual.  The operations manual shall not circumvent the SOW requirements.  The operations manual is a separate manual from the technical proposal.  Staff shall at least annually review the operations manual which the contractor shall document.  The operations manual shall be available for review by the BOP during inspections of the facility.

The contractor shall report, through the CCM, to the CO any deviation from the requirements of this SOW.  The CCM will interpret the requirements of this SOW.

The contractor shall develop a written mission statement, long-range goals, and objectives, which shall be available for review by the BOP during inspection of the facility.

1.  AMERICAN CORRECTIONAL ASSOCIATION (ACA).  The BOP encourages the contractor to acquire certification in accordance with the most current edition(s) of the ACA <u>Standards for Adult Community Residential Services</u>.

If the facility is not ACA accredited, the contractor shall use the most recent edition(s) of the ACA <u>Standards for Adult Community Residential Services</u> as a guide in developing the operations manual.

The contractor shall advise the CCM in writing of their intent to seek ACA accreditation.

2.  PERFORMANCE.  The contractor shall maintain a current contingency plan to ensure continuity of service should unforseen circumstances occur, such as employee work actions or strikes, natural disasters, or terrorist activities, etc.  The plan must be available to the BOP for inspection upon request.

The contractor shall provide at least 75 percent of the contract requirements by using employees compensated directly by the contractor.  This means the contractor cannot subcontract more than 25 percent of the contract requirements.  The intent is to create a uniform composition of services under the control and

supervision of the facility director.  The contractor shall submit all proposed subcontracts to the BOP for approval when the contractor intends to seek the services of a subcontractor, e.g., food service or facility maintenance.

The contractor shall under no circumstances allow an offender to be in a position of control or authority over another offender, contract or subcontractor employee.

The contractor shall not use or allow offenders to be used for medical, pharmaceutical, or cosmetic experiments.

3.  INFORMATION.  The contractor shall comply with the requirements of the Freedom of Information Act 5 U.S.C. §552, Privacy Act, 5 U.S.C. §552a. and 28 CFR part 16, <u>Production or Disclosure of Material or Information</u> and Bureau Program Statement, Release of Information.  The contractor shall seek the CCM's approval before releasing BOP records in response to a request for information.  All documents produced as a result of this contract shall become the property of the BOP.

The contractor shall have written policy and procedures for staff managing information.

   a.  Government Contacts.  The contractor shall post and display in a conspicuous location a listing of the names, addresses, and telephone numbers of the responsible Community Corrections Regional Administrator (CCRA), Management Center Administrator (MCA), Transitional Drug Abuse Treatment Coordinator (TDAT-C), CCM, Regional Director, and Chief USPO.

   b.  Congress.  The contractor shall immediately notify the CCM when a request, e.g., information or tour of the facility, is made by a member of the United States Congress to the contractor.

   c.  News Media.  The contractor shall notify the CCM when a request or contact is made by any media representative, i.e., a person whose principal employment is to gather or report news for a newspaper, magazine, national or international news service, or radio or television news program.  These requests or contacts may include, but are not limited to, interviews, visits or impromptu questions with staff or offenders.  Contractors may reference the Bureau Program Statement, News Media Contacts.

The contractor shall coordinate all public information issues with the CCM and clear, in advance, all press statements and releases.

The contractor shall ensure employees agree to use appropriate disclaimers clearly stating that the employees' opinions do not necessarily reflect the position of the BOP or DOJ in any public presentations they make or articles they may write that relate to any aspect of the contractor's performance in this contract.

d.  Documentation.  The contractor shall document that all requirements of this SOW are being met.  The contractor has the affirmative responsibility to prove the requirements are being met.

The contractor shall maintain documentation showing their standing as a legal entity, or part of a legal entity, and shall maintain documentation indicating legal measures have been taken to provide continuity of service in case of incapacitation, retirement, or death of the contractor.

The contractor shall maintain documentation of their tax exempt status, if applicable.

The contractor shall have valid liability and property insurance for the facility and equipment, with documentation available for review.

e.  Meetings.  The facility director shall conduct staff meetings at least monthly to foster communication, establish policy, discuss problems, ensure compliance with SOW requirements, and accomplish program objectives.  The contractor shall distribute new or revised policy and procedure to staff, volunteers, and if appropriate, offenders.  The contractor shall document these meetings with written minutes.  This documentation shall be made available to the BOP for inspection upon request.

f.  Equipment.  The contractor shall have a working fax and telephone capabilities for staff use only.  Additionally, the contractor will have a secure computer with Internet and software capabilities for communicating with the CCM office.

g.  Translation.  The contractor shall provide for the translation of facility rules, emergency diagrams, and other related documents into a foreign language as required by the composition of the offender population.

4.  Community Outreach.  The contractor shall have written policy and procedures (to include documenting their efforts) for a public information program which offers ongoing, positive communication between the facility and the local community, elected officials, law enforcement and citizens.

In addition to community outreach, the contractor will establish a Community Relations Advisory Board (CRAB) that shall meet at least quarterly each calendar year.  The CCM and MCA shall be standing members on the CRAB.

CRAB is a means of mutual communication and support between the CCC and its local communities.  While such CRAB have no formal advisory function to the CCC, its purpose is to serve as a two-way communication link between CCC and community leadership, and to advance public education, understanding, and advocacy for issues concerning CCC.

CRAB's benefit the CCC and the community by:

- increasing public awareness of and education about the mission of the CCC and the BOP,
- determining the availability of community services for the CCC,
- coordinating CCC operations with local law enforcement activities,
- assessing the impact of the CCC on the community, and
- increasing the CSC's involvement in community affairs and services.

The contractor shall develop bylaws that contain a clear statement of the CRAB's objectives, define (and limit) the CRAB's role in the internal affairs of the facility, provide a structure for CRAB operations, define who may be a member, explain how members are selected, and set term lengths for each officer.

CRAB members may work closely with local law enforcement, government, business, civic, education and training, health care, pre-release, and religious agencies and organizations.

Initially, the facility director may select CRAB members.  The facility director shall base his or her assessment of the individual's potential to develop opportunities for mutual assistance and support.  The subsequent selection process shall be addressed in the CRAB's bylaws.

Consideration shall be given to citizens representing:

- local and federal law enforcement;
- city, county, or township government;
- business and civic organizations (Chamber of Commerce, Lions, Rotary, Kiwanis);
- council of churches;
- community residents and neighbors;
- school boards; health care organizations; and

- media groups.

5.  QUALITY CONTROL.  The contractor shall develop a quality control plan, i.e., an internal system for monitoring programs through inspections or reviews conducted by the facility director or other staff.  The contractor shall provide a written summary of QCP results to the CCM quarterly.

A quality control plan (QCP) is a written group of activities designed to ensure a standard of excellence.  Quality control plans can be viewed as a system or process for monitoring program outcomes through inspections or reviews.  These plans are intended to provide the responsible program manager with key information to help measure the quality of work performed.  The successful development and implementation of a QCP should allow program managers to operate within acceptable quality levels.

A QCP should clearly identify the following:

- the specific program outcome to be monitored (e.g., CCC referrals - timeliness, responsiveness, completeness of individual program plans - timeliness, accuracy of accountability methods),

- the method (e.g., review of roster runs, files, logs) and frequency (e.g., weekly, monthly, quarterly) of conducting and reporting inspections, and

- the staff responsible for completing the inspections.

Program managers should have their QCP reviewed and approved by their supervisors, to include any revisions.  Policy changes, QCP inspection reports, operational and/or program review reports, and staff turnovers could indicate a need for QCP revisions.

Similar to a QCP, a quality assurance plan (QAP) is a written group of activities designed to ensure a level of excellence.  A QAP is intended to provide responsible program administrators with key information to help measure the quality of work performed by a program manager and staff under their supervision.  The successful development and implementation of a QAP should provide administrators with an assurance that programs under their responsibility are meeting their objectives.

Similar to a QCP, the QAP should clearly identify the elements (e.g., specific outcome; method and frequency of conducting and reporting; and, staff responsibilities) of the plan.  An administrator's QAP should be based on the premise that program managers, and not the administrator, have primary responsibility

for the management and quality control of program outcomes.  An administrator's QAP is not a substitute for quality control by the program manager.  As a result, the method and frequency of conducting and reporting QAP inspections should rely primarily on a review of QCP inspection reports.  A review of QCP reports, coupled with independent sampling, provides the basis for QAP reports.

6.  FISCAL RESPONSIBILITIES.  The contractor shall operate according to an annual written budget of anticipated revenues and expenditures.  The contractor shall have policy and procedures for the receipt, safeguarding, disbursement, and recording of funds that comply with generally accepted accounting practices.

## CHAPTER 2 - Personnel

1.   STAFF COVERAGE.  The contractor shall have trained, paid staff, dressed and awake, on the premises to provide 24 hour coverage, seven days a week that provides for safe and secure supervision of all federal offenders, and that provides for the orderly running of the CCC.

The contractor shall staff at least one 7-day post, 24 hours a day, dedicated only to the supervision of federal offenders. This 7-day post cannot be covered by another position such as a case manager or facility director.  The intent is that this post will devote 100 percent of it's time supervising offenders. The contractor shall also provide key personnel in accordance with the number of offenders residing in a facility (see Key Personnel).

Housing configurations, e.g., several buildings, require the contractor to determine the number of staff needed to safely and securely supervise the federal offenders.  A staff/offender ratio shall be submitted in the technical proposal based upon the layout of the proposed facility and the estimated number of federal offenders in the Request for Proposal (RFP).

The contractor shall maintain the staff/offender ratio (i.e., number and type of staff, specified in the contract, proportionate to the offender population) throughout the performance of the contract unless otherwise indicated by the CCM.

   a.  Staffing Pattern.  The contractor shall concentrate staff when most offenders are available for program activities, normally during the evening hours.

The contractor shall submit, in the technical proposal, a sample of a weekly work schedule by position clearly defining the duty-hours of each position (for the Bureau of Prison's contract if other than federal offenders are housed).  The sample schedule shall indicate which positions are full-time and which are part-time.  In addition, the work schedule will identify if the positions are devoted to federal offender supervision and/or program activities.  The intent is to ensure that the contractor adequately staffs for both program activities and offender supervision.

   **NOTE:  If the contractor's facility also houses non-federal offenders, the contractor shall specify what percentage of each position's time will be devoted to the federal contract.**

b.  Staff/Offender Ratio.  The contractor is always responsible for the appropriate supervision of federal offenders and the orderly running of the CCC.  The staff/offender ratio established in the contract, contributes to the contractor's ability to safely and securely operate the CCC.  The contractor shall notify the CCM of any unforseen circumstance which may affect the safety, security or orderly running of the CCC.  Accordingly, the CCM may determine that an adjustment to the staff/offender ratio is warranted.  The contractor shall comply with any change(s) to the ratio as directed by the CCM.

1)  Population Changes.  If the average monthly population (AMP) changes from the BOP's original projection for three consecutive months, the staff/offender ratio may be changed in accordance to the following:

a)  If the AMP exceeds the original estimate by 25 percent for three consecutive months, the contractor shall add qualified staff consistent with the original staff/offender ratio.

b)  If the AMP is 25 percent below the original estimate for three consecutive months, the contractor may reduce staff consistent with the original staff/offender ratio, as long as the contractor continues to provide safe and secure supervision of federal offender.

c.  Key Personnel. All key personnel are full-time employees. They work on-site at the facility.  Key personnel at major use contracts (31 offenders or more) shall devote 100 percent of their working time to the federal contract.  The intent is to ensure that key personnel work exclusively with federal offenders when the contractor also provides services to other offenders such as local or state offenders.  The contractor shall identify to the CCM key personnel employed at the facility.

1)  Full-time employment is 40 hours per week on-site.

2)  A major-use contract shall staff at least three key personnel positions.  They are the facility director, case manager, and employment placement specialist (EPS).  The EPS is required only at major use facilities.

3)  Moderate and minor use contracts shall have at least two key personnel positions.  They are the facility director and case manager or an equivalent position.

4) In those facilities where a BOP Mothers and Infants Nurturing Together (MINT) program also exists, the MINT

coordinator position will also be considered a key personnel position.

The CCM must approve changes of key personnel before they are employed in a key personnel position.

The contractor shall staff all key personnel positions throughout the performance of the contract.  The contractor shall notify the CCM in writing if key personnel vacate a position permanently and indicate when a replacement will be made.  The notification shall occur within five working days after the vacancy.  The number of case manager positions may be determined by the contractor must be adequate to perform the tasks associated with the position and commensurate with the inmate workload of the population without being pulled to perform duties assigned to other positions.

   d. Training.  The contractor shall develop an employee training program in addition to any BOP provided training.

      1)  Contractor Training.

         a)  Annual Refresher Training.  The contractor shall provide staff with at least 20 hours of annual refresher training relating to the operation of the CCC.  The contractor shall document the training topics, date, time and participants.  The training shall at least cover the following:

● Discipline procedures for offenders
● Emergency Plans;
● Staff integrity and ethics;
● Accountability and security procedures;
● Life, safety and emergency procedures;
● Offender searches;
● Signs of suicide and suicide precautions;
● Use of force regulations and tactics;
● CDC Report writing;
● Universal precautions;
● Interpersonal relations and communication skills;
● Social and cultural life styles of the offender population;
● Prevention, identification, and handling of sexual abuse/assault incidents and
● Basic first aid.

         b) Orientation.  The contractor shall provide an orientation for all new employees during their first week of employment.  Topics must include at least, a discussion of sexual abuse/assault prevention and intervention and Employee "Standards of Conduct."  The contractor shall document the employees'

participation, certifying date, time and completion in their personnel file.

    2) BOP Training.  At least one key personnel staff member will attend and participate in the BOP regional training meeting, which is ordinarily scheduled every two years. The contractor is responsible for all costs associated with attending this training.

2.  ORGANIZATIONAL CHART.  The contractor shall maintain a narrative description and diagramed organizational chart outlining the structure of authority, responsibility, and accountability of both the facility and company.  The intent is to gain an understanding of the "chain-of-command" between the governing board, chairperson of the board, chief executive officer, president, authorized negotiator, facility director to include key personnel, and other staff who will be directly supervising the federal offenders.

The contractor shall be responsible to the Government for acts and omissions of employees, and of subcontractors and their employees.

Subject to existing laws, regulations and other provisions of this contract, illegal or undocumented aliens shall not be employed by the contractor.  The contractor shall ensure this provision is expressly incorporated into any and all subcontracts or subordinate agreements issued in support of this contract.

3.  PERSONNEL RECORDS.  The contractor shall maintain a complete, private, and current personnel file for each employee.  The contractor shall ensure the files are readily available for BOP review upon request.

The contractor shall have a written personnel manual that describes policies and procedures covering at a minimum the following areas:

- Staff coverage
- Staff training
- Staff discipline
- Staff retention
- Organizational chart
- Staff orientation
- Staff development

- Personnel records
- Recruitment
- Separation from work
- Performance evaluation
- Standards of Conduct
- Volunteers
- Resignation

Note:  The contractor shall develop a retention program designed to minimize employee turnover.

The personnel manual is a separate manual from the operations manual.

   a.  Affirmative Action.  The contractor shall have a written policy specifying that equal employment opportunities exist for all positions.  Full consideration shall be given to the recruitment, hiring, placement, retention, training, and advancement, of women, members of minority groups, disabled veterans, and qualified individuals with disabilities who, with or without reasonable accommodation, can perform the essential functions of the job in question.  The contractor shall not discriminate against individuals based on race, color, religion, sex, national origin, physical or mental disability, age, retaliation, or sexual orientation.  In addition, the contractor shall not prevent women from working in male offender programs or men from working in female offender programs.

   b.  Employee Evaluation.  The contractor shall develop written policies and procedures for an annual written performance review of each employee based on defined criteria.  The results are discussed with the employee, and the review is signed by the employee and evaluator.

   c.  Newly Hired Employees.  The contractor shall have written policy providing for a probationary term followed by permanent status for newly hired or newly promoted employees.

   d.  Job Descriptions.  The contractor shall establish job descriptions for all staff positions performing services under this contract.  Each job description shall accurately describe duties for the position and include, at a minimum, a job title, the minimum education and experience qualifications required, and specific duties and responsibilities.

The minimum education and experience qualifications for the position of facility director (facility manager, CCC supervisor, center director and all other similar titles) shall be a four year degree in a social or behavioral science program from an accredited college or university and two years of work experience in a related field, with one of the years in a supervisory position.  Work experience may be substituted for academic studies exchanging one year of work experience in a related field for one year of academic education.  Total work experience needed in lieu of the combination of education and work experience is six years, with one of the years in a supervisory position.

   e.  Social Security Card.  The contractor shall ensure each employee and any subcontractor, has a social security card issued by the U.S. Social Security Administration, and is a United

States citizen or a person lawfully admitted into the United States as a permanent resident.

4.  BACKGROUND INFORMATION.  Contract employees must be approved by the CCM before they may work with federal offenders.

The contractor shall submit a person's name and relevant information to the CCM for a fingerprint and background check only after the contractor has determined that this person is appropriate for employment and that this person will work with federal offenders.

The contractor shall secure from a person (i.e., a person who the contractor employs or intends to employ and who will be working with federal offenders) a signed consent form using Attachment A, REQUEST FOR CONTRACT STAFF BACKGROUND INVESTIGATION.  The contractor shall then submit to the CCM the relevant information, including the signed consent form.  This begins the fingerprint and background checks.  The contractor shall not submit any person which the contractor does not employ or intend to employ.

The contractor shall require this person to provide complete details of any conviction record or current charges for any violation of law.  The information will be used to determine the person's fitness for working with federal offenders.

The information shall include full name, all aliases used, date of birth, state of birth, sex, race, social security number, and previous cities and state(s) of residence.  The contractor shall notify this person that a National Crime Information Center/National Law Enforcement Telecommunication System (NCIC/NLETS), fingerprint, criminal records and other appropriate background checks will be processed by the BOP to verify this information.  The intent is to screen applicants to determine their acceptability to work with federal offenders.

This person shall not begin working with federal offenders before clearance is obtained from the CCM.  The CCM may grant the person temporary clearance to work with federal offenders after the NCIC/NLETS check is conducted if the results of the check are appropriate.

The final approval or disapproval by the CCM will follow the CCM's receipt of the fingerprint and/or other background checks. The contractor shall understand that the granting of final approval shall not occur until after the CCM receives a response(s) from the fingerprint or other background checks and these checks prove to be appropriate.

This action does not prevent, preclude, or bar the withdrawal or termination of any prior clearance or approval by the CCM at any time during the term of the contract.

The CCM will ordinarily approve a person to work with federal offenders in accordance with guidelines established in the current version of the BOP Program Statement, <u>Contract Staff Integrity for Privately Operated Community Corrections Residential Facilities</u>.

The contractor shall verify training and experience of all staff. This includes credentials for all professional staff. The contractor shall document the verification in the personnel file and make it available during inspections.

The contractor shall voucher potential employees through reference and employment checks. The contractor shall document information regarding reference and employment checks in the employee's personnel file.

5.  CONTRACTOR'S EMPLOYEE STANDARDS OF CONDUCT. The contractor shall develop and use written policy, procedures and practice, herein called Contractor's Employee Standards of Conduct, for employee conduct, ethics and responsibility. The contractor shall notify its employees of the contractor's Employee Standards of Conduct.

The contractor shall require all employees to sign an acknowledgment that they have received and understand the contractor's Employee Standards of Conduct. The acknowledgment shall indicate that the contractor will require all employees to cooperate fully by providing all pertinent information which they may have to any investigative authority. Full cooperation includes truthfully responding to all questions and providing a signed affidavit, if requested. The contractor shall retain a signed copy of this acknowledgment in each of its employees' personnel files.

Attorneys may not be present or involved in administrative investigations. Attorney involvement includes, but is not limited to; presence during interviews, review of employee affidavits, and receipt of investigative summaries or documents from the investigative authority. If at any time an investigation uncovers evidence of criminal behavior, the investigation process will immediately stop and appropriate law enforcement officials will be notified.

Investigative authorities include, but are not limited to, investigations conducted by the Department of Justice, (e.g., the

Federal Bureau of Investigation, U.S. Marshals Service, Office of the Inspector General, Office of Professional Responsibility, BOP Office of Internal Affairs, BOP Special Investigative Agent, BOP Special Investigative Supervisor, Equal Employment Opportunity Investigator) and others (e.g., Department of Labor, Office of Personnel Management, U.S. General Accounting Office), or any other agent or agency the COTR authorizes or directs to conduct an investigation.

    a.  At a minimum, the Contractor's Standards of Employee Conduct shall require employees to conduct themselves in accordance with the following standards:

The contractor shall require its employees to conduct themselves professionally and in a manner that creates and maintains respect for the CCC, BOP, the Department of Justice (DOJ), and the U.S. Government.

The contractor shall require its employees to avoid any action that might result in, or create the appearance of, adversely affecting the confidence of the public in the integrity of the CCC, BOP, DOJ and U.S. Government.

The contractor shall require its employees to uphold all ethical rules governing their professions, including complying with applicable licensing authority rules, unless they conflict with legal laws.

The contractor shall prohibit its employees from using or possessing illegal drugs or narcotics.  The contractor shall prohibit its employees from abusing any drugs or narcotics.  The contractor shall prohibit its employees from using alcoholic beverages and being under the influence of alcohol while on duty, present in the facility, or immediately before reporting for duty.  The contractor shall indicate to contractor's employees that when a contractor's employee's blood alcohol content level is 0.02 percent or greater he or she will be considered to be under the influence of alcohol.

The contractor shall prohibit its employees from showing partiality toward, or become emotionally, physically, sexually, or financially involved with offenders, former offenders, or the families of offenders or former offenders.  Chaplains, psychologists, and psychiatrists may continue a previously established therapeutic relationship with a former offender in accordance with their respective codes of professional conduct and responsibility.

The contractor shall prohibit its employees from engaging in, or allowing another person to engage in, sexual behavior with an offender.  The contractor shall indicate to its employees that regardless of whether force is used or threatened, there can be no "consensual sex" between contractor's employees and offenders.

The contractor shall prohibit its employees from offering or giving an offender or a former offender or any member of an offender's family, or to any person known to be associated with an offender or former offender, any article, favor, or service, which is not authorized in the performance of the contractor's employee's duties.  The contractor shall prohibit its employees from accepting any gift, personal service, or favor from an offender or former offender or from anyone known to be associated with or related to an offender or former offender.  The contractor's Standards of Employee Conduct, will clearly state that this staff prohibition includes any involvement with an offender's family members or any known associates of an offender.

The contractor shall prohibit its employees from showing favoritism or give preferential treatment to one offender, or a group of offenders, over another offender.

The contractor shall prohibit its employees from using profane, obscene, or otherwise abusive language when communicating with offenders, fellow employees, or others.  The contractor shall require its employees to conduct themselves in a manner that is not demeaning to offenders, fellow employees, or others.

The contractor shall require its employees to remain fully alert and attentive during duty hours.

The contractor shall prohibit its employees from having any outside contact with an offender, ex-offender, offender's family or close associates, for a period of one year from the last day of the offender's sentence or supervision, whichever is later, except those activities that are an approved, integral part of the CCC program and a part of the its employee's job description.

The contractor shall prohibit its employees from engaging in any conduct that is criminal in nature or which would bring discredit upon the CCC, BOP, DOJ or U.S. Government.  The contractor shall require its employees to conduct themselves in a manner that is above reproach.  The contractor shall require its employees to obey, not only the letter of the law, but also the spirit of the law while engaged in personal or official activities.  The contractor shall require its employees charged with, arrested for, or convicted of any felony or misdemeanor, to immediately inform and provide a written report to the facility director.

The facility director shall immediately report the incident to the COTR. Traffic violations resulting in fines less than $150 are exempt from this reporting requirement.

The contractor shall prohibit its employees from using brutality, physical violence, or intimidation toward offenders, or use any unauthorized or inappropriate force.

The contractor shall prohibit its employees from engaging in inappropriate supervisor/subordinate relationships, to include but not limited to, emotional, sexual, financial or physical.

The contractor shall prohibit its employees from possessing lethal weapons or weapons which may inflict personal injury, to include pepper spray or other self-defense type of chemical agents, in the facility or while on duty. The contractor shall also prohibit contractor's employees from storing lethal weapons or weapons which may inflict personal injury, to include pepper spray or other self-defense type of chemical agents, in vehicles under their control parked on or adjacent to the facility. Offenders shall not possess or use any of these items at any time.

The contractor shall prohibit any of its employees who are suspected of violating the contractor's Employee Standard of Conduct from contact with federal offenders until a disposition is made by the COTR.

  b. The contractor shall not conduct an investigation of any misconduct allegation without the COTR's approval. This includes questioning the subject of a misconduct allegation. The contractor shall advise all employees that they are subject to Government investigation if an allegation is made concerning any matter affecting the interests of the Government.

  c. The contractor shall report any allegation, violation or attempted violation of the contractor's Employee Standards of Conduct immediately by telephone to the COTR. The contractor shall subsequently report in writing to the COTR, within one calendar day (or next business day) after becoming aware of the incident. The contractor shall not restrict any contractor's employee or offender from reporting misconduct directly to the BOP. The contractor shall not retaliate against any contractor's employee or offender who reports misconduct.

Following the investigation(s) and if allegations are sustained, the contractor shall indicate, in writing, to the COTR the contractor's proposed plan of corrective action for the COTR's approval. The COTR has the right to determine if the

contractor's employee may continue to work with federal offenders.

Following the investigation(s), a summary of the investigative findings may be disclosed by the Bureau to the contractor's authorized negotiator.

Failure to report a violation of the contractor's Employee Standards of Conduct or to take appropriate action against a contractor's employee may subject the contractor to appropriate action, up to and including termination of the contract.

   d.  The contractor shall not employ any individual who is under the supervision or jurisdiction of any parole, probation or correctional authority.  Persons with previous criminal convictions who are not under supervision may be considered for employment.  However, the COTR reserves the right of approval in such cases.  Consideration will be given to such factors as criminal history, time elapsed since conviction(s), and subsequent adjustment in the community.

   e.  The contractor shall have a written policy to prevent conflicts of interest that specifically states that no contractor's employee may use his or her official position working with federal offenders to secure privileges or advantages in the facility or in the community.

   f.  The contractor shall operate a facility which provides the highest degree of safety for offenders and contractor's employees.  The contractor shall specifically define when contractor's employees may use force against offenders.  The contractor shall prohibit contractor's employees from using excessive force to control a situation.  The contractor shall immediately report any instance of the use of force to the COTR, by the most expeditious means available, e.g. telephone.  The contractor shall submit in writing, within one calendar day after the incident, a written report to the COTR.

6.  SEXUAL ABUSE INFORMATION.  The contractor has the responsibility to provide a working environment that is free from sexual harassment and intimidation in accordance with Title VII of the Civil Rights Act of 1964, as amended.  Sexual abuse/assault/misconduct is verbal or physical conduct of a sexual nature directed toward an offender or employee by another offender, employee, or volunteer of the facility.

The contractor shall ensure that policy prohibits sexual abuse/assault/misconduct by employees against federal offenders

or other employees.  Sexual misconduct is illegal and a violation
of federal law.

The contractor shall develop and implement a comprehensive staff
training program addressing the facility's sexual
abuse/assault/misconduct prevention and intervention program.
Written policy, procedure, and practice shall provide that all
staff receive such training during employee orientation and on an
annual basis as part of the facility's in-service training plan.

7.  DRUG FREE WORKPLACE.  The contractor will implement and
follow Bureau Program Statement 3735.04, Drug Free Workplace.
This program provides a mechanism for employee assistance and
employee education regarding the dangers of drug abuse.

8.  VOLUNTEERS.  The BOP encourages the use of volunteers.
Contractors may use volunteers to provide a variety of programs,
such as marriage and family enrichment, substance abuse
education, literacy, spiritual growth, recreation, health
education, fitness, vocational training and many others.  While
providing these valuable services, volunteers reinforce the
societal values conveyed daily by staff.  Direct volunteer
assistance is useful to an offender's successful community
reintegration.

Volunteers are private citizens or students, age 18 or older, who
provide a variety of unpaid services that would not otherwise be
performed by a paid employee.

Volunteers who provide services in a CCC under the direct
observation and supervision of paid staff will not need to
undergo any security background clearances.

Volunteers at a CCC who provide services without any direct
supervision must submit to the same background checks as paid
staff.  In addition, the contractor shall have the volunteer
complete the BOP form entitled APPLICATION FOR VOLUNTEER SERVICE
to the CCM.  The contractor shall report the number of volunteers
quarterly to the CCM.

The contractor shall provide a brief orientation program for all
volunteers and provide specific written guidance in the format of
a "Volunteers Manual."

9.  STAFF AND VOLUNTEER ROSTERS:  The contractor will submit a
typed, alphabetical staff roster each month, to be included with
the monthly billing.  This roster must include the employee's
complete name, title, full or part-time status, and date of hire.

Volunteers should be listed separately, indicating the type of volunteer work being done, i.e., AA, NA, or religious.

## CHAPTER 3 - Facility

The facility shall comply with applicable local, state, and national health, safety, environmental laws, regulations, and Executive Orders, and building codes.  In the event local, state, and national codes conflict, the most stringent will apply.  The contractor shall adhere to the requirements of: the Architectural Barriers Act of 1968 as amended; Rehabilitation Act of 1973 as amended and sections 502 and 504; Americans With Disabilities Act (ADA) of 1990 as amended (an alternate location off-site may be proposed for housing offenders with disabilities if it meets the ADA); Uniform Federal Accessibility Standards (UFAS); the National Fire Codes published by the National Fire Protection Association with special emphasis on the 101 Life Safety Code; Occupational Safety and Health Act of 1970 as amended;  U.S. Food and Drug Administration, U.S. Public Health Service, Food Code; Occupational Safety and Health Administration's (OSHA) General Industry Standards; American National Standards Institute (ANSI) A-117.1, as determined by the local building inspector general; Building Official Code Administrators (BOCA) section 404.1 entitled Minimum Plumbing Facilities; American Society of Heating, Refrigerating and Air Conditioning Engineers (ASHRAE) Published Standards & Guidelines; American Society of Sanitary Engineering  Standards; Uniform Plumbing Code; 16 CFR §1632, Standard for the Flammability of Mattresses and Mattress Pads (FF 4-72, Amended); Current Edition; Flammability Standard DOC-FF-472; California State Technical Bulletin 106; NFPA Codes 1, 10, 13, 13R, 25, 70, 96, and 101; and any other codes or regulations indicated in the SOW.

The contractor shall maintain copies of all required environmental permits and registrations or letters from permitting authorities indicating that the facility is in compliance or is specifically exempt from the standard in question.  The contractor shall make these documents available on-site and to the BOP upon request.

1.   SITE & FLOOR PLANS.  Each technical proposal shall include a legible and accurate copy of the site and floor plan for the proposed facility in accordance with the requirements in this section.  Each technical proposal shall also include an accurate photograph, taken within 120 days of proposal submission, showing the front and back outside view of the facility.

The contractor shall submit to the CCM for approval any request to change the site or floor plan from what was approved in the contract.  The contractor will maintain and make available an accurate site and floor plan on-site at all times for the

inspection of the BOP.  These plans shall meet the requirements
stated in this section.

   a.  Site.  The contractor shall submit half size prints for
site plans (Scale of original document: Minimum 1" = 100 feet)
showing:

   • The location of buildings, roads, fences, parking lots,
walkways, and adjacent buildings, identifying their function.

   b.  Floor.  The contractor shall submit half-size prints for
architectural floor plans of each building (Scale of original
document: 1/8" = 1 foot) showing:

   • Layout, name and function of all rooms;
   • Bed location, number of bed(s) in each room;
   • Show unencumbered space area per occupant and indicate square
     footage;
   • Location of fire suppression equipment;
   • Total gross square footage of entire facility;
   • Total gross square footage of each room;
   • Area of safe refuge; and
   • All building entries and exits.

The contractor shall also identify in the floor plans the exact
location and dimensions of sleeping room(s), counseling room(s),
lavatories, dining room(s), fire exits, and kitchen(s).

2.  LOCATION.  The contractor shall locate the facility within
one mile of public transportation, or the contractor shall
provide transportation for offenders to seek employment, work,
and participate in program activities at no cost to the offender.
Transportation will be made available 7 days a week.

The contractor shall locate the facility in an area where the
commuting time to the general area of work is ordinarily no more
than one and one-half hours each way via public or contractor
provided transportation.

The contractor shall arrange for transportation for indigent
offenders seeking employment or who are required to attend
substance abuse treatment at no cost to the offender.
Transporting of offenders in a staff members private vehicle
should only be done in unusual circumstances.  The staff member
must be licensed and insured in accordance with state laws.

The facility shall not be part of a building in which other
business(s) share space which could be construed as a conflict of
interest to the mission of a community based correctional

facility.  For example, it would be inappropriate to share space
with a business which serves alcohol.  If the facility is of
joint use, the provider shall describe the nature of the business
occupying all contiguous space.  The Bureau reserves the right to
have the final decision in determining potential conflict of
interest.  The BOP strictly prohibits the use or possession of
alcohol in the contract facility.  The contractor shall ensure
the building is appropriately zoned.  The contractor shall
maintain a permit from the local or state enforcement body or
authorized representative having jurisdiction to operate.  The
contractor shall make these documents available on-site and to
the BOP upon request.

The contractor shall ensure the facility is not located in an
area where public concern or opposition would have an adverse
effect on the community or residents.  The contractor shall
identify nearby (e.g., within a half-mile radius) facilities
whose closeness to the CCC may raise public concern, including,
but not limited to, schools, day-care centers, and other
residential facilities.

3.  PLANT REQUIREMENTS.

   a.  Air Circulation.  The facility's sleeping rooms shall have
adequate ventilation of outside or recirculated filtered air.
The contractor will provide the BOP with third party
documentation determining if adequate natural or mechanical
ventilation is present.

   b.  Lighting.  All personal living and sleeping areas in the
facility will meet the lighting requirements as set forth in the
most current and subsequent issues of the ACA Standards for Adult
Community Residential Services.

   c.  Space.  A minimum of 25 continuous square feet of
unencumbered space per occupant in the sleeping rooms shall be
provided.  The contractor shall ensure that the square footage
area is not obstructed by any object, e.g., bed, furniture, or
fixed building structure, and allows a reasonable person enough
space to freely move about.  The sleeping room area shall provide
reasonable privacy to the offender; however, it shall be
accessible to staff at all times.  Areas such as day rooms,
closets, bathrooms, TV rooms, dining rooms, or halls shall not be
considered as sleeping rooms.

The contractor shall provide each offender with a bed and one
closet or locker which provides for adequate space and is
adjacent to or located in their sleeping area for the storage of
personal items.  Adequate space means an area which provides a

reasonable person enough room to store personal clothes and
hygiene articles.  The contractor will provide offenders with a
means (i.e., padlock) to secure their property.  The contractor
shall always have instant access to all closets and lockers for
reasons of security and safety.

Co-correctional facilities shall provide for separate sleeping,
bathing, and toilet areas by gender.  The contractor shall ensure
there is separation of offenders by gender.  If the facility is
co-correctional, the contractor shall indicate separate sleeping,
bathing, and toilet areas by gender on the architectural floor
plans and shall have a written plan outlining procedures to
maintain separation by gender.

The contractor shall provide appropriate space and furnishings
for private counseling sessions, group meetings, visits, and
recreation.

The contractor shall indicate in their technical proposal that
the proposed facility meets the Architectural Barriers Act of
1968 and the Rehabilitation Act of 1973.

All new government contracts must meet the Architectural Barriers
Act of 1968, which requires that certain buildings owned,
occupied, (leased) or financed by the Federal Government be
designed, constructed or renovated so as to be accessible to and
useable by physically disabled people.  The Uniform Federal
Accessible Standards (UFAS) are the technical guidelines to
comply with the ABA.

The Rehabilitation Act of 1973, prohibits federal agencies and
their grantees and contractors from discriminating against people
based on disability in employment, programs, and activities.
Under this Act are two applicable Sections, 502 and 504.  Section
502 established the Architectural and Transportation Barriers
Compliance Board (ATBCB) to ensure enforcement of the
Architectural Barriers Act of 1968, and accessibility standards
for federally owned, occupied, or leased buildings or facilities.
Section 504 prohibits discrimination against qualified
individuals with disabilities in federally funded programs and
activities.  The Justice Department's Civil Rights Division is
responsible for ensuring compliance with this Section.

  d. Lavatory.  The facility shall have at least one operable
toilet for every ten offenders, one shower (or bathing area) for
every eight offenders, and one wash basin for every six
offenders.  If the facility is co-correctional, the contractor

shall provide the same lavatory accommodations for the females, separate from the males.

Showers and wash basins shall have hot and cold water.  Hot water temperature shall be thermostatically controlled so the water does not exceed 120° Fahrenheit (49° Celsius), except for food service equipment.  Temperature control devices shall be inaccessible to offenders and unauthorized personnel.

e.  Laundry.  Laundry facilities shall be available to all offenders.  The contractor shall provide one operable washer and dryer for every 16 offenders in the facility or through a community establishment within one mile of the facility. Residents are responsible for the cost of laundering their personal clothing items.  The contractor will provide indigent residents with laundry tokens (or equivalent) and detergent until they receive their first paycheck. The contractor shall provide laundering services for facility provided linens at no cost to federal offenders.

f.  Telephone.  The contractor shall provide the offenders telephone service which is accessible on the facility's premises. The use of pay telephones is acceptable.  The contractor will provide at least one telephone for every 10 offenders.

g.  Room Temperature.  The contractor will maintain the facility temperature at a level appropriate for the season in accordance with EPA standards.

h.  General.  The site of performance shall not operate as a hotel or motel.  Apartment type complexes will be reviewed on an individual basis for suitability.  If apartment type complex is allowed and there are other occupants in the complex, the proposing contractor must make notification to the occupants of their intent to operate a CCC within the same complex.

The interior of the contract facility shall be a non-smoking area and signs shall be conspicuously posted indicating this requirement.  The contractor may designate smoking areas outside the contract facility 10 to 25 feet away from all entrances and exits or that comply with local restrictions, whichever is more stringent.

I.  Drinking Fountains.  The contractor shall provide drinking fountains in the facility in accordance with BOCA, ADA, and the Clean Water Act.  The facility shall have at least one drinking fountain for every 100 occupants.  Facilities that are "apartment" style, with a kitchen in each unit, do not need additional drinking fountains.

## CHAPTER 4 - Life/Safety

Any structure used to house federal offenders must meet specific fire and safety standards before it can be approved by the BOP. In applying these standards, the safety and welfare of both staff and offenders must be considered. The contractor shall maintain an acceptable level of fire and life safety by complying with the most current edition of applicable fire safety codes, standards and regulations of the National Fire Protection Association (NFPA).

The contractor shall comply with the most current version of the following NFPA codes and standards:

- NFPA 1:      Fire Prevention Code
- NFPA 10:     Standard for Portable Fire Extinguishers
- NFPA 13:     Standard for the Installation of Sprinkler Systems
- NFPA 13R:    Standard for the Installation of Sprinkler Systems in Residential Occupancies up to and including Four Stories in Height
- NFPA 25:     Standard for the Inspection, Testing, and Maintenance of Water-Based Fire Protection Systems
- NFPA 70:     National Electric Code
- NFPA 72:     National Fire Alarm Code
- NFPA 96:     Standard for Ventilation Control and Fire Protection of Commercial Cooking Operations
- NFPA 101:    Life Safety Code
- NFPA 260:    Standard Methods of Tests and Classification System for Cigarette Ignition Resistance of Components of Upholstered Furniture
- NFPA 261:    Standard Method of Test for Determining Resistance of Mock-Up Upholstered Furniture Material Assemblies to Ignition by Smoldering Cigarettes
- NFPA 701:    Standard Methods of Fire Tests for Flame Propagation of Textiles and Films

BOP reserves the right to act as the Authority Having Jurisdiction (AHJ) with respect to the interpretation, enforcement, and exceptions of the NFPA requirements. All applicable NFPA requirements are mandatory.

The contractor shall also comply with the most current version of the following California State Technical Information Bulletins, published by the California Bureau of Home Furnishings and Thermal Insulation: Bulletins: 106, 116, 117, 121 and 133. The BOP reserves the right to act as the AHJ with respect to the interpretation, enforcement, and waivers of these requirements.

1.  INSPECTION.  The contractor shall maintain a current independent third party certification that all buildings used to house federal offenders are in compliance with NFPA 101.  In addition, the contractor shall have each building inspected annually by a local or state AHJ.  Inspection reports shall be retained and made available to the BOP to indicate the inspections were completed in a timely and appropriate manner.

2.  FIRE EVACUATION AND EMERGENCY PLANS.  The contractor shall maintain current written emergency plans.  The contractor shall train all staff in emergency procedures within one week of their initial employment.  In addition, the contractor shall include emergency training in annual refresher training for all staff. The contractor shall document all training by having staff sign a training log.

The plans shall describe the procedures to follow in emergency situations, and be updated on an as-needed basis.  The contractor shall submit to the CCM a current copy of the emergency plans after contract award and before the notice to proceed performance is given by the CO.  The contractor shall forward any subsequent changes or updates to the emergency plans to the CCM.  The intent is that both the CCM and the contractor will have a set of current procedures to use if an emergency occurs.

The contractor shall ensure all emergency contact telephone numbers and addresses are up-to-date and valid.

The plans shall identify potential emergency situations such as a fire or major emergency (including man-made and natural disasters) and outline appropriate action which ensures offender accountability and safety.  At a minimum, the plans shall include instructions for the following:

- Immediate notification to the fire department;
- Facility and community search for missing offenders;
- Automated information backup procedures (if needed);
- Utility services interruption, i.e., water, gas, power;
- Evacuation in case of fire;
- Procedures in the event of man-made or natural disasters;
- Evacuation routes and procedures;
- Immediate notification of community emergency response teams;
- Notification of authorities, including internal and external; and
- Control or extinguishment of a fire.

   a.  Diagrammed Evacuation Routes and Drills.  The contractor shall post diagrammed evacuation routes at a conspicuous location

on every floor or level of the facility.  The contractor shall
not use the site and floor plan for this requirement.  The
diagram shall meet NFPA requirements.

A diagramed emergency evacuation route shall identify "You Are
Here" location and be compatible with the floor plan.  This
diagram shall also show the exterior areas around the facility
and indicate outside areas of the facility used as assembly
points or other areas of safe refuge during an emergency
evacuation or drill.

The diagram shall include the location of building exits, fire
extinguishers, pull-stations, fire hose cabinets, and first aid
supplies.  It will also show areas of safe refuge from inclement
weather.

The contractor shall review all emergency and evacuation
procedures, including diagramed evacuation routes, with each new
offender upon arrival.

The contractor shall conduct an evacuation drill at a minimum of
one drill during each shift each quarter ( a minimum of 3
drills).  The contractor shall document each drill which will
include how the evacuation alarms were activated, date and time
of the drill, amount of time taken to evacuate the building,
evacuation path used, number of staff and offenders
participating, and comments.

   c.  Fire Alarm Systems.  All buildings used to house federal
offenders must be equipped with an automatic fire detection and
alarm system designed, installed, tested, and maintained in
accordance with NFPA.  The system design must incorporate hard
wired smoke detectors in all sleeping rooms, corridors, and
common areas.  The alarm system must be hard wired into an
annunciator panel, located at a central control point under 24-
hour staff supervision.

   d.  Fire Extinguishers.  Buildings used to house federal
offenders must be equipped with an adequate number of portable
fire extinguisher that are sized, located, installed, tested, and
maintained in accordance with NFPA.  At least one extinguisher
must be provided on each level of the building.

3.  FURNISHINGS.  Combustible and flammable fuel load sources
shall be kept to a minimum to prevent the possible spread of
fire.  The contractor's furnishings shall meet the standard test
requirements in the California State Technical Information
Bulletins.

All mattresses, mattress pads, and pillows throughout the facility shall meet the <u>Flammability Standard DOC-FF-472</u> or <u>Federal Flammability Standard 16 CFR §1632</u>.  The contractor shall maintain documented compliance of this requirement.

Interior furnishings such as window covers, curtains, sofas, chairs, etc., shall meet the requirement of all NFPA standards. These are to be considered minimum requirements.

The contractor shall maintain documentation of compliance with NFPA standards.

NOTE: These requirements apply to the entire structure, even when federal offenders occupy only a portion of the facility.  An exception is when the area housing federal offenders is separated from other areas of the building by a two-hour fire wall which meets the approval of the AHJ.

CHAPTER 5 - Sanitation & Environment

1.   SANITATION.  An aggressive, well-defined sanitation and housekeeping plan is of utmost importance for the protection of health and well-being.  In addition, proper sanitation throughout the facility complements fire and pest control efforts.  All too often, failure to maintain an aggressive program results in preventable accidents, injuries, and personal liability.

The contractor shall maintain a written sanitation and housekeeping plan which provides for the upkeep of the facility. The plan shall be made available to the BOP upon inspection.

The housekeeping plan shall assign specific duties and responsibilities to staff and offenders.  The plan shall address the following:

• The contractor shall ensure the facility and surrounding area are kept clean and in good repair at all times.

• Sidewalks leading from the exits shall always be clear of materials, debris, ice, and snow.

• The contractor shall document weekly sanitation and safety inspections of all internal and external areas and equipment. Documentation shall indicate corrective action to be taken on discrepancies found during these inspections.  The action will be done in a timely manner and will documented and made available for BOP inspection upon request.

• Waste containers shall be of noncombustible or other approved materials.

• Filters on furnaces and ventilation systems are to be exchanged and kept clean per manufacturer's requirement.  The contractor shall not allow the ventilation system ducts and vents to accumulate excessive dust and dirt build-up.

• The contractor shall equitably assign general housekeeping chores of common areas to all offenders.

The contractor shall maintain a high standard of sanitation and environmental health throughout the facility.  Offenders are not permitted to perform work for the contractor, except as part of the sanitation and housekeeping plan.  The contractor may require offenders to maintain high sanitation in their living areas. This includes sweeping and cleaning their sleeping areas, recreation or day rooms, bathrooms and showers, passages and hallway areas.  "Extra Duty" to clean an area of the facility

could be imposed for minor rule infractions in accordance to the chapter on discipline.  The contractor will not use offenders in lieu of paid workers.

2.  ENVIRONMENT.  The contractor shall establish an appropriate recycling program to include, at a minimum, aluminum cans and newspapers, or to meet applicable local recycling requirements.

CHAPTER 6 - Electrical Safety

The contractor shall comply with all local, state, and national electric codes to include National Electric Code (NEC) and OSHA standards.  In the event local, state, and national codes conflict, the most stringent will apply.

Prior to the preoccupancy inspection, the successful contractor will provide documents of an independent inspection of the electrical system by a certified contractor.

1.  GROUND FAULT CIRCUIT INTERRUPTER (GFCI).  The contractor shall use GFCIs on all 110 Volt, single phase outlets in the kitchen and bathroom areas within 180 centimeters (5.9 feet) of a water source.  GFCI wiring shall be 14 gauge with ground. Standard wiring is usually 12 gauge with ground.

2.  PANEL BOX.  Electrical panel box covers shall contain an accurate directory.  The directory shall reference the disconnecting means of electrical equipment, such as the breaker switch, and indicate the area which it controls.

3.  EXTENSION CORDS.  The contractor shall not use extension cords in lieu of hard or permanent wiring.  Permissible, temporary extension cords must have surge protectors.

4.  RECEPTACLES.  Wiring and receptacles must be grounded.  Two-wire outlets may not be used.

5.  FLOOR SPACE HEATERS.   Floor space heaters that are cool to the touch and utilize an automatic shutoff if overturned, may be used.

6.  FANS.  Appropriate guard grids on oscillating or floor fans shall be in place.

7.  ELECTRIC SAFETY.  The following electrical safety standards shall apply:

  a.  Damaged or frayed wiring cannot be taped or spliced.  The use of electrical tape to repair cut or damaged cords or cables is prohibited.  Cords and cables must be repaired by the proper means, e.g., use of heat shrink tubing, re-installation of cords or cables to equipment.  Bare wire may not be exposed.

  b.  Empty light fixture or fuse sockets may not be exposed or unprotected.  Missing knock-outs, circuit breakers, or other openings in electrical equipment must be enclosed to prevent exposure to live or energized ports.

c.  The use of multi-outlet electrical adapter plugs is prohibited.

d.  Damaged plate covers, switches, and outlets must be replaced.

e.  Hot water "stingers" are unsafe from the standpoint of fire safety.  The contractor shall not use or allow the use of these devices in the CCC.

CHAPTER 7 - Hazardous Materials

The contractor shall establish and use a written plan for the storage, issuance, handling, and accountability of flammable liquids, hazardous chemicals, toxic, and caustic materials used within the facility.  **Hygiene items are exempt from the Hazardous Communication program.  Aerosol spray cans are not considered to be pressurized containers**.

The contractor will also address universal precautions in regards to blood and body fluids.  All body fluids are to be considered as potentially infectious.

The Environmental Protection Agency (EPA) and OSHA establish standards for the proper handling and use of toxic, caustic, and flammable materials.  When using hazardous materials at the facility, the contractor shall provide protective clothing at no cost to the offender in accordance with the Material Safety Data Sheets (MSDS).

Activities which are implemented, in whole or in part, with federal funds must comply with applicable legislation and regulations established to protect the human or physical environment and to ensure public opportunities for review.  The contractor shall remain in compliance with federal statutes during the performance of the contract, including but not limited to the Clean Air Act, Clean Water Act, Endangered Species Act, Resource Conservation and Recovery Act, and other applicable laws, regulations, and requirements.

The contractor shall be responsible for and shall indemnify and hold the Government harmless for any and all spills, releases, emission, and discharges of any toxic or hazardous substance, any pollutant, or any waste, whether sudden or gradual, caused by or arising under the performance of the contract or any substance, material, equipment, or facility utilized therefore.  For the purposes of any environmental statute or regulation, the contractor shall be considered the "operator" for any facility utilized in the performance of the contract, and shall indemnify and hold the Government harmless for the failure to adhere to any applicable law or regulation established to protect the human or physical environment.  The contractor shall be responsible in the same manner as above regardless of whether activities leading to or causing a spill, release, emission or discharge is performed by the contractor, its agent or designee, an offender, visitor, or any third party.

If the contractor spills or releases any substance into the environment, the contractor shall immediately report the incident

to the CO through the CCM.  The liability for the spill or release of such substances rests solely with the contractor and its agent.

At no time shall the contractor dispose of hazardous, toxic or caustic substances by unsafe methods.  Unsafe methods include spreading or pouring it onto the ground, dumping in a lake, river or stream, and flushing into sewers.

1.  TRAINING.  The contractor shall train all staff in the proper handling and use of all hazardous, toxic, caustic, and flammable materials within two weeks of their initial employment or whenever a new hazard is introduced into their work area and annually thereafter.

All offenders shall receive training during intake screening.  If controlled materials are issued to an offender for authorized use, the offender shall sign an acknowledgment specifying they understand the proper use of the material as well as its potential health hazards.  The contractor shall document all training.  Training shall include:

• Methods that may be used to detect the presence or release of hazardous materials in the facility;

• The potential health hazards of chemical spills in the work area;

• The measures employees and offenders can take to protect themselves from these hazards, including procedures such as universal precautions and personal protective equipment;

• The details of the hazard plan developed by the contractor, including an explanation of the labeling system and the MSDS, and how employees and offenders can obtain and use the appropriate information regarding hazardous materials.

2.  MSDS.  When using an identified hazardous material, the contractor shall obtain and maintain the MSDS (OSHA-174 Form or its equivalent) for that material.  MSDSs shall be maintained and readily accessible to staff and offenders.  The MSDS lists information about the storage, use, and disposal of the material, and those requirements shall be followed.

Staff shall review annually the MSDS to ensure that it is current.  Staff shall document this review and make it available to the BOP upon inspection.

3.  MANAGEMENT.  The contractor shall provide a method of
accountability and supervision for chemicals and hazardous
materials.  Employees shall continually demonstrate to offenders
the proper use of these materials.  Offender personal hygiene
items are exempt from this requirement.

> NOTE:  Flammable materials such as gasoline, kerosine,
> propane, and paint thinner are stored outside of the
> main facility, unless otherwise indicated by the AHJ.

The contractor shall provide a level of supervision required for
chemicals and hazardous materials determined by the level of
hazard labeling.  The MSDS will outline the precautions to be
used for each chemical.

The contractor shall use good judgement when making decisions
regarding the use and storage of chemicals and hazardous
materials.  The intent is to manage chemicals and hazardous
materials in accordance with governing regulations while
providing a safe environment for both offenders and staff
members.

CHAPTER 8 - Pest Control &  Waste Management

1.  PEST CONTROL.  The contractor shall provide for vermin and
pest control and disposal.  Control and accountability of
pesticides and rodenticides are mandatory.

The contractor shall place screens in good condition on all open
windows and doors throughout the contract facility to include
food preparation and dining areas. Screens are not required on
exit doors.

2.  WASTE REMOVAL.  The contractor shall provide noncombustible
containers in such sizes and quantities needed to be sufficient
for trash collection.

Remove trash at least daily from inside of the facility.  The
contractor shall ensure that all garbage is removed from the
facility property to ensure sanitation and to prevent
accumulation, odors and pest control problems.  The contractor is
responsible for all trash removal.

CHAPTER 9 - Referral and Intake Processing

The contractor shall have written policy and procedures governing offender referral and intake processing.

The contractor shall accept only offenders who are referred by the CCM. Acceptance of a federal offender not referred by the CCM may result in non-payment and jeopardize the contractor's performance under this contract.

1. REFERRALS. The contractor shall consider all offenders for placement at the facility and should be able to manage any offender referred by the CCM. The CCM will forward a referral packet to the contractor requesting a specific placement date. Within five calendar days of receipt of the referral packet, the contractor shall notify the CCM in writing of a placement date.

> NOTE: To expedite the referral process, the contractor shall telephonically discuss with the CCM any referral considered to be unacceptable. If the CCM concurs that the contractor cannot accept the referral, the contractor will document the reason for denial of the referral in writing and forward this documentation to the CCM within 24 hours of the telephonic conversation.

   a. Acceptance. The contractor shall e-mail (or fax) the acceptance letter to the CCM confirming the reporting date. If the reporting date differs from referral packet, the contractor must obtain concurrence from the CCM before notifying the referring agent of the acceptance.

       1) Transferring from a BOP institution. The contractor will send the acceptance letter, subsistence collection agreements, and CCC rules and regulations to the offender in care of the Unit Manager as indicated in the referral packet.

       2) Supervision case. The contractor will send the acceptance letter, subsistence collection agreements, and CCC rules and regulations directly to the offender with copies to USPO.

2. ADMISSION. The contractor shall develop an intake process. Immediately upon an offender's arrival, staff shall interview the offender to determine if there are non-medical reasons for housing the offender away from the facility's offender population. Staff shall conduct the interview in private away from other offenders. Staff shall evaluate both the general physical appearance and emotional condition of the offender and shall ask questions pertaining to both physical and mental health

conditions.  It is particularly important for the intake staff to
ask the resident about medication (do they have any prescribed
medication from the institution, how much, and are they in
compliance with taking meds) and confirm the answer with the
medical referral form.  The contractor is to ensure prescribed
medication is controlled and distributed in accordance with the
facilities written policy on an offender's prescribed medication.
In addition, the interview shall inform the offender about the
CCC rules and regulations such as a contact person regarding
incidents of sexual abuse/assault, discipline, curfew, visiting.

When an offender is indigent, the contractor shall provide
personal hygiene articles at no cost to the offender.  Examples
include, soap, deodorant, toothbrush, toothpaste or powder, comb,
and toilet paper.  If the contractor accepts women, the
contractor shall also provide feminine hygiene products.

Upon arrival, the contractor shall issue each offender one
complete set of clean bed linens and towels.  The contractor
shall provide for the exchange or laundering of these items on a
weekly basis, at no cost to the offender.

In addition, staff shall review available documents, e.g.,
Judgement/Commitment Order from the sentencing Court, criminal
records, presentence investigation reports, for any indication
that an offender has a history of sexually aggressive, violent or
escape behavior.  The contractor shall report these behaviors to
the CCM.

   a.  Notification.  When an offender reports to the CCC for
admission, the contractor shall immediately notify the CCM using
e-mail, fax, or telephone.  This includes arrivals during the
evening hours, weekend, or holidays.  The CCM may specify the
means for immediate notification.  The contractor shall also send
written notification to the CCM within one calendar day.  If the
reporting offender is a supervision case, the contractor shall,
in addition, notify the appropriate USPO.  These notification
procedures are in accordance with BOP Program Statement,
Community Corrections Center Utilization and Transfer Procedures.

Should an offender not arrive within two hours of the designated
time, the contractor shall immediately notify the CCM that the
offender failed to report to the CCC.  Accountability is
paramount.  Any committed offender who fails to report to a
contract facility for admission shall be placed on escape status.

     NOTE:  The federal escape statute applies only to those
     who escape from the custody of the Attorney General or
     BOP.  An offender housed at a CCC as a condition of

supervision is ordinarily deemed not to be in the
custody of the Attorney General or the BOP.  These
offenders may be considered to have absconded rather
than escaped.  To prevent confusion, the contractor
shall immediately report all offenders who fail to
report to the CCC for admission to the CCM.
Determination of escape or abscond status rests with
the BOP.

b.  Documentation.  The contractor will process all required
documents and return them to the CCM within one calendar day of
the offender's arrival.  The contractor will maintain copies of
all processed documents in the offender's file.

1)  Transfer Orders.  For institution transfers, the
contractor shall sign and return the Transfer Order (Return of
Service) to the CCM within one calendar days of the offender's
arrival.

2)  Judgment/Commitment Order.  The contractor shall execute
the Order upon arrival of offenders placed in BOP custody as a
condition of probation.  Staff must execute the certified Orders,
and return one to the CCM and one to the U.S. Marshal (USM) of
the sentencing district.

3)  Fingerprints.  The contractor shall fingerprint all
offenders.  If the contractor does not have staff trained in
fingerprinting procedures, arrangements may be made with a local
law enforcement agency.  In this case, staff shall accompany the
offender when prints are taken.  Staff may contact the CCM for
assistance in arranging for fingerprints.

CCCs operated by state correctional or parole agencies shall
forward fingerprint cards to the CCM.  However, the CCM may
authorize the agency to send the cards directly to the FBI.

a)  For institution transfers (BOP cases), the contractor
shall execute the Authorized Unescorted Commitment & Transfers
Identification Card by fingerprinting the offender's thumb in the
designated spot.  The contractor shall forward the executed card
to the CCM within one calendar day of the offender's arrival. It
is critical that staff compare the new thumb print with the thumb
print on the card to verify the identity of the offender.
Identification is also done by comparing the offender with the
photo on the card and questioning the offender about their name,
date of birth, offense, and register number.

b)  The contractor shall take one set of fingerprints for USPO cases immediately upon arrival.  The set of prints on USPO offenders cases will be kept in the offender's file at the CCC.

4)  Intake Screening Form.  The contractor shall complete Attachment B, INITIAL INTAKE FORM, for each offender and place it in the offender's file.

5)  Photograph.  The contractor shall photograph each offender admitted to the center and retain the photograph in the offender's file and furnish the CCM a copy.  The offender will be re-photographed if there is a significant change to his/her appearance during the CCC stay.  This will provide for a recent, clear means of identification, which is especially useful in subsequent matters of investigation, discipline, or escape.

6)  Conditions of Residential Community Programs.  Each offender must sign the BOP form COMMUNITY BASED PROGRAM AGREEMENT.  If an offender is transferred from a federal institution, this form should already be in the file, signed by the offender.  If the form is absent from the file, the contractor shall have the offender sign the form and place it in the offender's file.  This requirement is applicable to all offenders.  The contractor shall forward a copy of the form to the CCM.

7)  Medical Screening.  USPO cases committed directly to the facility, shall receive a medical examination within five calendar days after arrival (institutional transfers are excluded).  This examination is completed to identify any medical or mental health conditions the offender may be suffering and needs medical attention.  Special emphasis should be given to chronic health conditions such as diabetes, hypertension, etc., infectious diseases such as TB, HIV, hepatitis, etc., and any mental health problems.  However, if an offender is suspected of having an infectious or debilitating health problem during the CCC initial screening, the contractor shall arrange for an immediate medical examination within one calendar day after arrival.

The examination is to determine any urgent medical or mental health care needs, restrictions from work, and freedom from infectious disease.  The contractor shall notify the CCM of those offenders with immediate mental or medical health needs and infectious disease.  The results shall be documented and sent to the CCM with a copy to the offender's file.

NOTE:  The complete health examination shall include
relevant diagnostic procedures.  All offenders should
be tested for TB (PPD test and, if positive - a chest
x-ray), and any other infectious/communicable diseases
if clinically indicated.

CHAPTER 10 - Programs  CCC

CCCs provide the terms and conditions to meet the statutory purposes of sentencing, including promoting respect for law, providing just punishment for the offense, achieving general deterrence, and protecting the public from further crimes by the defendant.

1.  SECURITY AND ACCOUNTABILITY.  The contractor shall provide written policy and procedures on offender accountability and security inspections.

The contractor shall have a comprehensive offender accountability program that ensures every offender is accounted for while in the facility or on home confinement.  The contractor shall have a security inspection plan that provides a safe and secure environment for both staff and offenders.  The expected results are that continuous offender accountability and safety are maintained through a system of reasonable and accurate controls. The contractor's program shall control the introduction of contraband; insure the facility's safety, security, and good order; prevent escapes; maintain sanitary standards; and eliminate fire and safety hazards.

The contractor shall be able to locate and verify the whereabouts of offenders at all times.  Written procedures shall be established to guide staff in meeting this requirement.  The contractor will contact the offender either telephonically or in-person at random times at work, home, or at authorized destinations to maintain accountability throughout the sign-out time(s).  This should occur at a frequency that ensures accountability and should be commensurate with the accountability needs of each individual offender.  **The contractor may request the CCM to approve fewer daily contacts if it is in the best interest of offender accountability and program objectives.  The CCM has the authority to increase or decrease the number of required accountability checks.**

a.  Sign-in/Sign-out.  The contractor shall monitor offender movement into and out of the facility.  The monitoring of offender movement, particularly during the evening and night hours, serves to protect offenders, staff, and the public.

The contractor shall authorize an offender to leave the facility through sign-out procedures only for an approved program activity such as seeking employment, working, counseling, visiting, or recreation (see Authorized Absences).

The contractor will identify and document all individuals entering or exiting the facility by using a sign-in/sign-out log.

In the event of an emergency evacuation, the contractor shall continue offender accountability as outlined in the contractor's emergency plans.

The contractor shall maintain, monitor, and control access to a visitor's sign-in/sign-out log. The log must provide information concerning the visitor's name, organization, times in/out, and purpose. The contractor may use an automated system to accomplish this requirement.

A log sheet shall be maintained in each offender's file to document movement. It shall contain: offender's full name, register number, type of offender, time-out, destination, purpose, authorized return time, time-in, a section for special comments, and certification by staff's initials for each entry. The intent is to provide a chronological record of the offender's movement.

The sign-in/sign-out sheet alone is invalid for overnight release or distances of more than 100 miles. In these circumstances, the contractor shall follow the requirements for passes or furloughs.

Offenders shall return to the facility from employment before signing out to participate in another approved program activity. However, the facility director may make an exception when travel time or distance is excessive, or when the offender is working unexpected overtime. These instances are on a case-by-case basis. The intent is to balance the offender's approved program objectives with the offender's requirement to return to the facility. Accountability is paramount. Ordinarily, an offender should not routinely sign-out for more than 12 consecutive hours daily without returning to the facility. Any unusual circumstances that may warrant this must be approved by the CCM.

Ordinarily, only pre-release offenders who are employed, involved in educational or vocational training programs, or considered medically unable to work may be absent from the center for social purposes. Other than for employment or programming, an offender must be in the center from 9:00 P.M. to 6:00 A.M., unless exceptions are made by the facility director on a case-by-case basis. The facility curfew shall always be 9:00 P.M., unless otherwise indicated by the CCM.

Recreational activities are ordinarily provided in the facility and may include television viewing, table games, and exercise equipment. However, if in-house recreation is not possible,

alternative recreation will be made available in the community at
a specified location, with a written plan submitted to the CCM
for approval.  The alternate plan must list a specific location
within a reasonable distance of the CCC that is not in an area
that does not support the mission of the BOP.  Offenders,
including those in the community corrections component, may sign-
out for up to one hour per day (excluding travel to and from) to
the alternate recreation location.  The sole purpose shall be for
exercise or recreational activity.

   b.  Report of Incident.  The contractor shall report
immediately to the CCM, by telephone, all unusual or serious
incidents.  Serious incidents include, but are not limited to the
following: escapes, "standard of conduct" violations, spill of
hazardous materials, disturbances, gang activities, work-place
violence, civil disturbances or protests, staff use of force,
assaults on staff or offenders, fights, fires, suicide attempts,
deaths, hunger strikes, natural disasters, adverse weather (e.g.,
hurricanes, floods, significant ice or snow storms, heat waves,
tornadoes), injuries, any law enforcement visits, bomb threats,
significant environmental problems that impact facility
operations, transportation accidents, offender victim contacts,
offender strip searches, adverse incidents that may result in
significant publicity, any arrest and/or detainment of offenders
by law enforcement authorities.  Immediately following CCM
notification, the contractor shall fax a report detailing the
incident which includes, but is not limited to, the following:

- Type of incident, date and time;
- Person(s) involved (if offender, include register number);
- Notifications (who, date and time);
- Any media attention; and
- Brief summary of incident.

In addition, the contractor shall immediately notify the CCM when
an offender shows evidence of suicidal tendencies, or unusual or
dangerous behavior.  If the contractor is in doubt, they shall
contact the CCM.

2.  SEARCHES AND CONTRABAND.  The contractor shall have written
policy and procedures for searches to control contraband and its
disposition.  The policy shall identify items which are
considered contraband at the facility.  This policy shall be made
available to all staff and offenders.

The contractor shall conduct searches of the facility and
personal belongings of offenders (including offenders' vehicles)
as needed, but at least once per month.  These facility searches

shall be documented in a log.  The log will be made available to BOP upon request.

If any unknown substance resembling narcotics is found, the contractor shall use a <u>Narcotic Identification Kit</u> to determine the identity.  The contractor shall maintain a supply of <u>Narcotic Identification Kits</u> (purchased commercially) to determine the identity of the unknown substances.  Staff shall be proficient in using the <u>Narcotic Identification Kit</u> and shall ordinarily be responsible for testing unknown substances.  The contractor shall maintain these commercially available kits at the facility to meet this requirement.

The contractor shall train staff on the proper techniques for offender pat, room, vehicle, and common area searches.  This training shall be conducted within the first week that the employee is hired and annually thereafter.

When staff believe an offender is attempting to introduce contraband into the facility, they shall conduct a pat search of the offender.  A strip search may be conducted only after the facility director has approved the search.  If a strip search is necessary, two staff shall conduct the search.  Staff shall be of the same gender as the offender.  The contractor shall document the basis for and results of the strip search.

Staff shall conduct random pat searches of offenders as necessary.  These searches need not be documented.  However, they should be appropriate and conducted in accordance with the contractor's policy on searches.

3.  PROGRAM COMPONENTS.  The components are community corrections, pre-release, and home confinement.  The contractor shall initially place all federal offenders in the community corrections component, unless directed otherwise by the Courts or the CCM.

The facility director may reassign offenders from the community corrections component to the pre-release component if they are successfully demonstrating responsibility, successfully programing and there is no pre-existing direction from the Court or CCM.

> **NOTE: Offenders are expected to be employed within 15 calendars days of arrival to the facility (unless disabled, ill, or aged). Obtaining employment is part of successful programing.**

All offenders, regardless of component, will be provided the same general program resources, however, the privileges and supervision requirements will range from restrictive to least restrictive.  The contractor shall have a thorough understanding of the components and subsequent requirements for each component assignment.

   a.  Community Corrections Component.  The community corrections component is the most restrictive.  Except for employment, program needs and community service ordered by the Court, an offender is restricted to the CCC.

Passes, furloughs or other absences from the facility require advance approval of the CCM.  Recreational activities are ordinarily provided in the facility.  However, if in-house recreation is not possible, then alternate recreation will be made available in the community through limited and clearly defined sign-out procedure.

Offenders normally remain in this component until they have demonstrated the responsibility necessary to function in the community.  When an offender is appropriate for the pre-release component and if the offender is not directed to remain in the community corrections component by the Court or CCM, CCC staff shall reassign the offenders to the pre-release component.

   b.  Pre-Release Component.  The pre-release component is designed to assist offenders making the transition from an institution to the community or as a program resource while under supervision.  The contractor shall develop programs that increase privileges, such as volunteer community service.  It is generally appropriate to require offenders to be employed before allowing them to be absent from the CCC for social purposes.  Offenders in the pre-release component generally have more access to the community and family members through weekend and evening passes in accordance with the Authorized Absences section.

   c.  Home Confinement Component.  The home confinement component is authorized by the CCM according to an offender's needs (see Home Confinement).  The contractor shall make maximum use of this component by referring all eligible and appropriate candidates to the CCM for review.  Eligible and appropriate candidates are defined in the current version of BOP Program Statement, Home Confinement.

Offenders in this program component are permitted to reside at home and be gainfully employed.  The contractor shall conduct a monthly review (documenting the offender file) of the telephone bills of an offender in this component to ensure that no service

is in place that would circumvent the accountability program. The contractor shall indicate that the current telephone bill is appropriate when making the home confinement referral to the CCM.

Compliance with the conditions of home confinement may be monitored by electronic monitoring equipment approved by the CCM, or by regular telephone or in person contacts by contract staff. If electronic equipment is proposed, the contractor shall clearly indicate that the equipment is offered at no additional cost to the BOP and costs are not reflected in the cost of the contract.

4.  AUTHORIZED ABSENCES.  Authorized absences are an integral part of the facility's program.  The intent is to reintegrate the offender into community life which includes strengthening of relationships with relatives, friends, and employers.  The facility will emphasize increasing levels of individual responsibility.  Offenders should be given gradual increased responsibility in the community, based on their ability to accept responsibility.  During authorized absences, the contractor is still responsible for accountability of the resident.  The contractor shall have written procedures for accountability of residents to include authorized absences for job searches, work, religious services, programming activities, social passes, furloughs, and placement on home confinement.

The offender's absence from the facility is to achieve specific programing objectives to include seeking employment, strengthening family ties, engaging in religious activities, education, recreation, and counseling.  The contractor approves these program activities as long as the public interest is served.

If an offender's place of employment is more than 100 miles from the facility or travel time compromises the established curfew, the contractor shall consult with the CCM to make special arrangements for that offender.  These request are considered on a case-by-case basis, and the CCM is authorized to modify the requirements to meet specific needs.

> **NOTE:  Unless authorized by the CCM, the contractor shall not permit an offender in the <u>community corrections component</u> to leave the facility except for employment and other approved program activities, i.e., substance abuse treatment, seeking employment, meals served outside of the facility in accordance with the contract/agreement, participating in the facility recreation program, attending religious services.**

a. Pass.  A pass is used for overnight or weekend absence, ordinarily to the release residence.  The requested pass location must be visited and approved by contractor staff prior to a pass being approved.  Contractor staff should consult US Probation to ascertain if there are any known reasons to preclude the requested location as an approved pass site.  Overnight or weekend absences are limited to the local community (up to a 100 mile radius).

For purposes of accountability, the contractor shall make and document random checks to determine compliance with the conditions of the pass.  These checks may be made telephonically or in-person unless otherwise specified by the CCM.  This should occur at least twice a day.  The intent is to set a frequency that provides for appropriate offender accountability.  The contractor may request the CCM to approve fewer daily contacts if it is in the best interest of offender accountability and program objectives.  The CCM has the authority to increase or decrease the number of required accountability checks.

An overnight or weekend pass may be approved when an offender is successfully programming, i.e., the offender is meeting their program plan goals and has obtained gainful employment (employment may not be a factor for the disabled, ill, or aged). The offender's component assignment may preclude the offender from using an overnight or weekend pass.  The facility director or assistant shall contact the CCM for direction when a pass approval is questionable.

The offender requests a pass by completing and signing the BOP form entitled PASS REQUEST AND APPROVAL.  The facility director or assistant may approve these passes, unless otherwise specified by the CCM.  Passes may be recommended only by a paid staff member and not a volunteer.  The approval or denial is noted on this form, and it is retained in the offender's file.

The pass shall begin the last day of an offender's scheduled work week and extend for 2 days up to curfew.  However, an extended pass may be approved for a long weekend when a legal holiday falls on the preceding Friday or the following Monday.  More than one pass during a given week, not to include special religious passes, requires a furlough request and CCM approval.

b. Furlough.  Only the CCM approves furloughs.  The CCM ordinarily will not grant a furlough to an offender who is convicted of or has a history of a serious crime against another person, is not successfully programing in the facility and/or whose presence in the community could attract undue public

attention, create unusual concern, or depreciate the seriousness of the offense.

Except for home confinement, absences from the facility exceeding two consecutive overnight periods (except holidays) or 100 miles must be authorized by furlough. Offenders in the community corrections component are not ordinarily eligible for furloughs.

The furlough program is intended to help the offender attain correctional goals. A furlough is not a right but a privilege granted to an offender under prescribed conditions. It is not a reward for good behavior, nor is it a means to shorten a criminal sentence.

Furloughs may be recommended to achieve program goals and activities not ordinarily possible by sign-out or pass. The furlough usually ranges from three to five days in length but under special circumstances may be longer. A furlough shall not exceed thirty days.

Examples of activities for which furloughs might be appropriate include visiting a critically ill relative or attending the funeral of a relative, obtaining necessary medical treatment not otherwise available, developing employment or release plans, or other activities thought to be necessary for an offender's successful community adjustment.

    a)  Application. Before approving the furlough application, staff shall verify that a furlough is indicated. Staff will contact the family member or person being visited and determine if a furlough is warranted and if the offender is welcome in that home. This communication must be documented and placed in the file.

Prior to the offender's first furlough, the BOP form FURLOUGH QUESTIONNAIRE - SENTENCING DISTRICT shall be forwarded to the Chief USPO in the district of sentencing. The BOP form FURLOUGH QUESTIONNAIRE - OUT OF SENTENCING DISTRICT, will be forwarded to the Chief USPO in the district to be visited. This procedure need only be completed for the first furlough to that location. When the sentencing district and the receiving district are the same, the form QUESTIONNAIRE - SENTENCING DISTRICT shall be used.

    NOTE: When an offender sentenced in the District of Columbia (DC) Superior Court desires to visit another judicial district, the contractor shall contact the CCM for direction.

If forms are not returned within two weeks,  staff shall contact
the appropriate USPO(s) to determine the status of the request.
If the form(s) is/are not returned within one week after this
contact,  staff may proceed to process the application.  If
repeated furloughs to the same location are anticipated, a
blanket USPO clearance may be utilized.

      b) Approval.  Furlough approval is made on the BOP form
FURLOUGH APPLICATION - APPROVAL AND RECORD.  Four copies
(original plus three copies) of the furlough approval and record
shall be completed and distributed, after the CCM's signature, as
indicated on the bottom of the form.

A separate furlough application shall be executed for each
furlough occurrence.

The contractor's recommendation with written justification shall
be sent to the CCM for approval along with the BOP form FURLOUGH
APPLICATION - APPROVAL AND RECORD and appropriate questionnaires.

CCMs will consider approval of furloughs only when they are
recommended by the facility director (or acting).  The offender
must sign the form.  The recommendation shall include
documentation that the USPO does not object to the furlough.

The contractor shall maintain a record of furloughs including the
date and time of departure, the date and time of return, random
accountability checks, and notes regarding the offender's
adjustment during the furlough period.

The per diem rate for offenders on furlough shall be one-half the
regular per diem rate.  The contractor will reserve a bed for
offenders on furlough.

5.  HOME CONFINEMENT.  Home confinement is the least restrictive
component.  The offender is required to remain in the home during
specified hours, between 9:00 PM and 6:00 AM, or as otherwise
instructed.  Home confinement is administered in accordance with
the most recent version of Program Statement, Home Confinement.
The contractor shall follow the referral instructions in the Home
Confinement program statement.  The information for offenders
being referred to home confinement from a CCC includes the
following:

  • Offender name & register number;
  • Release date, method;
  • Recommended by, CCC address;
  • Rationale for recommendation;
  • Recommended range of home confinement, or date;

- If parole, list last U.S. Parole Commission action & date;
- Financial obligations;
- List detainers or pending charges;
- Specify release needs;
- Current case note; and
- Appropriate forms, i.e., CONDITIONS OF HOME CONFINEMENT;
COMMUNITY BASED PROGRAM AGREEMENT; and HOME CONFINEMENT AND
COMMUNITY CONTROL AGREEMENT.

The following conditions will apply concerning Home Confinement:

- Contractors are not required to provide meals, medical treatment, clothing or incidentals, laundry services, or other subsistence items to residents on Home Confinement.

- Contractors shall maintain documentation of all staff contacts with residents on Home Confinement.

- The contractor shall notify the CCM immediately of any misconduct or failure of a resident on Home Confinement to comply with Home Confinement Conditions.

- The contractor is not required to reserve a bed at the center for a resident on Home Confinement.

- The per diem rate for residents on Home Confinement shall be one-half the regular per diem rate.  (In the event one-half the per diem rate does not divide evenly, round the cents column, i.e., $35.222=$35.22 rounded down or $42.537=$42.54 rounded up.)

- The contractor shall collect subsistence from a resident on Home Confinement at a rate of 25% of their gross income. The weekly subsistence collected shall not exceed the per diem rate established for Home Confinement times seven.

- Home confinement days are calculated as a full inmate day for contract purposes (one home confinement day equals one inmate day).  Only the per diem rate is one-half the regular per diem rate.

The CCM may require additional documentation from the contractor when making a home confinement determination.  Only the CCM (or acting) may approve home confinement.  A contractor shall recommend home confinement when it appears the offender will derive no further significant benefit from facility residency. Before home confinement is considered, the offender must develop an acceptable release plan that has been approved by the supervising USPO.  The contractor shall forward a written

recommendation outlining the plan and appropriate BOP forms to
the CCM for approval.  The contractor shall not place an offender
on home confinement until the offender has agreed to the
conditions and signed the forms, and approval has been received
from the CCM.

Compliance with the conditions of home confinement may be
monitored by electronic monitoring equipment approved by the CCM,
or by regular telephone or in-person contacts by staff.

6.   RESOURCES.  The contractor shall develop and utilize a
network of community resources and services, including referrals
to other federal, state and community agencies, to fulfill each
offender's specific program needs.  The contractor must be able
to demonstrate this is a viable network that is routinely used to
assist offenders.  This is especially relevant when there are
mental health concerns.  The contractor shall maintain a current
list of community resources (name, address and telephone number)
and a description of the service each resource provides, and
shall document their working relationship with the network
components.

7.   INDIVIDUAL ORIENTATION, PROGRAM PLANNING AND PROGRESS.  The
contractor shall have written policy and procedures on offender
orientation and case management.

The contractor shall provide all programs, services, and
opportunities without discrimination based on race, color,
religion, sex, national origin, physical or mental disability,
age, retaliation, or sexual orientation.

The facility director shall ensure that each offender receives an
orientation about the facility rules and accountability
requirements (see Escape Procedures).  In addition, the
orientation program shall provide the offender with an awareness
of the following:

- Facility's program opportunities;
- Components and what they mean;
- Facility's disciplinary system;
- Universal precautions;
- Sexual abuse/assault intervention;
- Human Immunodeficiency Virus (HIV) and Hepatitis B & C
  prevention (e.g., risks regarding sexual behavior and drug
  abuse);
- Suicide prevention; and
- Medication requirements, to include over-the counter and
  prescribed medication and expectations of medication
  compliance.

The contractor shall establish an orientation checklist.  Staff shall have the offender sign and date this document and shall place the original in the offender's file.

Orientation normally will last one week or until the offender has demonstrated to CCC staff an understanding of the programs.

> NOTE:  All offenders, unless otherwise indicated by the Courts or CCM, shall initially be placed in the community corrections component (includes both BOP and USPO cases).

During an offender's first two weeks at the CCC, the contractor shall complete an individualized program plan that addresses all of the offender's needs and includes a time table for achievement of these goals.  Ordinarily the offender will only sign-out for employment or verifiable employment interviews while the program plan is being developed.  If an offender is gainfully employed, the contractor will make the appropriate on-site checks during this time.  The contractor will be responsible for completing offender relocation requests, addressing the Chief United States Probation Officer in the Judicial District where the offender wants to relocate.  Relocation requirements should first be discussed with the CCM.

The contractor shall consult with the USPO when developing program plans for USPO cases.  The program plan shall be signed by the contractor and offender, and when applicable, the supervising authority.

Institution transfers (BOP cases only) who are subject to the VIOLENT CRIME CONTROL AND LAW ENFORCEMENT ACT (VCCLEA) notification provision should have been notified in writing of their status before leaving the BOP institution.  In the event they were not notified, the following notification statement shall be written or typed in the plan:

> ***Offender is subject to notification under 18 U.S.C. §4042(b), (Yes/No), due to the offenders (indicate whether):***
>
> ***(1)  conviction for a drug trafficking crime***
> ***(2)  current conviction for a crime of violence***
> ***(3)  past conviction for a crime of violence***

If an inmate disagrees, i.e., "Yes," they may use the Administrative Remedy procedure to contest the VCCLEA notification requirement.

The offender is to be provided with, and must sign for, a copy of the plan. If the offender refuses, staff witnessing the refusal shall place a signed statement to this effect with the plan. Staff shall sign and place a copy of the plan in the offender's file with a copy to the CCM.

The case manager and offender shall review and sign progress reviews at least every two weeks. This will be documented with case notes. The contractor has some discretion in creating standardized case notes that are unique to the facility. These notes shall at a minimum indicate the required information listed on Attachment C, CASE NOTES. The outcome of each review will be documented in the offender's file. Place the original signature copy in the offender's file. Case notes shall have substance and should clearly indicate an offender's progress or lack of it. The case notes must be used as the basis for the terminal report.

8. OFFENDER'S FINANCIAL RESPONSIBILITY. The Bureau expects each sentenced inmate to meet his or her legitimate financial obligations. To provide for the continuity of the Bureau's institution policy concerning the Inmate Financial Responsibility Program, the contractor shall establish a program to meet the following:

- All sentenced inmates with financial obligations will develop, with staff assistance, a financial plan to meet those obligations.
- Each financial plan will be monitored effectively to ensure satisfactory progress is being made.
- Appropriate consequences will be incurred for inmates who refuse to participate in the program or fail to comply with their financial plan.

The financial plan developed will include the following obligations, ordinarily in the order listed:

(1)  Special Assessments
(2)  Court-ordered restitution
(3)  Fines and court costs
(4)  State or local court obligations
(5)  Other federal government obligations

The contractor shall develop a working relationship or point-of contact (the Courts and United States Attorneys' offices) to assist residents in making payments and shall record the inmate's progress toward meeting those obligations. The contractor shall provide pertinent addresses to residents concerning payment of Court ordered financial obligations.

   - Cost of Incarceration (COIF).  The contractor shall contact the CCM for direction on all cases concerning COIF.

The contractor shall post the most recent version of the BOP program statement entitled <u>Cost of Incarceration Fee (COIF)</u> in the CCC for all offenders to read.  The contractor shall comply with the requirements of COIF under the direction of the CCM.

   - Subsistence.  To promote financial responsibility the BOP requires offenders to make weekly subsistence payments to the contractor.  The contractor shall collect 25 percent of each employed offender's gross income (calculated for a week) not to exceed the total dollar amount of the contract's daily per-diem rate totaled for one week.

> For example, if an offender's gross pay is $100 for one week, 25 percent would be $25.  Which seems to be a collectable subsistence amount.  However, the contractor must consider the contract's per-diem rate totaled for the week to determine the dollar amount which can be collected as subsistence.  In this example the contract's daily per-diem rate is $3.  Multiplying $3 seven times (seven represents 7 days in one week) yields $21 dollars.  This is the dollar amount that can be collected as subsistence by the contractor.  Even though $25 is 25 percent of the offender's weekly gross pay, only $21 can be collected because of the contract's per-diem rate.

Regardless of when an offender collects a pay check (weekly, bi-weekly, or monthly), subsistence payments may be made to coincide with their payday.  The contractor shall document all exchanges of monies between offenders and staff.

The contractor shall round down all subsistence payments collected from offenders, to the nearest whole dollar amount.

Partial weeks of CCC residency are prorated.

> For Example:  If an offender earns $8.50 an hour and works a forty-hour work week and earn a weekly gross salary of $340, the offender normally owes 25 percent of $340, or $85 in subsistence for the week.  However if the same offender only resides in the CCC for three days, then the offender must pay a portion of the $85. In this case, the contractor divides 7 (representing a 7 day week) into $85. Rounding down, the result is $12 which is the offender's prorated daily amount.  Since the contractor will collect for 3 days, the offender

owes $36 (3 days X $12 = $36).  That is if $36 does not
exceed the contract's per-diem rate totaled for the
three days.

**NOTE: Prorated amounts should only apply during the arrival and
departure week.  The week begins on Monday.  Pass, furlough or
home confinement does not release the offender from subsistence
responsibilities.  If the last weeks subsistence has been
collected from an offender who is subsequently returned to
custody as a program failure, that subsistence must be returned
to him/her.**

An offender who fails to pay subsistence payments is subject to
disciplinary action, including termination from the program.
Unless otherwise indicated by the Court, BOP or USPO, all USPO
cases shall pay subsistence.

The contractor is responsible for collecting the full subsistence
amount due.  Contractors shall reduce the monthly billing to the
BOP by the amount collected in subsistence and indicate this on
the bill.  Subsistence not collected or shown as a deduction from
the billing by the contractor, may be deducted by the BOP from
the monthly billing.

The contractor shall provide the offender with receipts for
subsistence payments.  The receipt shall indicate the amount
collected, gross income, and time period covered.  The contractor
shall provide a collection record with every monthly bill.
Copies of all pay stubs and collection receipts shall be kept in
the offender's file.

Offenders who have other means of financial support, e.g., sale
of property, Veteran's Administration (VA) benefits, worker's
compensation, retirement income, or Social Security shall
contribute an amount determined by the contractor and approved by
the CCM.  The amount should be approximately 25 percent of their
determined weekly income.

In cases of extreme hardship, the contractor may request the CCM
to waive or modify subsistence payments.  This is on a
case-by-case basis and will only be considered when the
contractor supports a waiver.  The contractor will consider the
offender's debts, assets, employment status and spending history
before submitting a written request to the CCM.  The contractor
must consider that subsistence is analogous to rent or a mortgage
payment.  The contractor shall consider that an ability to
maintain residency is a fundamental social skill essential to the
offender's future success in the community.  The contractor shall
also consider that the offender's future success in the community

is a basic program objective of CCC residency.  Offenders are
expected and should be able to meet this basic financial
obligation while participating in the CCC program.

The contractor shall document:

- Wages and salaries,
- Number of hours worked,
- Savings and debts,
- Original plan to manage money and subsequent changes,
- Amount and type of deductions as indicated in the plan, and
- Amount of subsistence collected.

The contractor shall give an offender a receipt for any
contractor collected funds.  The contractor shall develop and use
an offender subsistence agreement form which communicates the
offender's obligation and responsibility to pay subsistence and
other financial obligations outlined in the SOW.

> **NOTE:  The CCM is authorized to modify the subsistence
> payment schedule and amount.**

9.  EMPLOYMENT.  The contractor shall develop and provide an
employment assistance program.

All offenders are expected to be employed 40 hours per week (or
the equivalent) within 15 calendar days from completion of the
facility orientation program (or be involved in other full-time
equivalent positive pursuits such as furthering education, etc.).
The contractor at all major use facilities (31 offenders or more)
shall employ an EPS.  The EPS shall provide offenders with
employment assistance in accordance with, but not limited to the
following:

- Job/placement develop resources both in the CCC and in the
community;

- Employment information assistance using computer-based
technology and resources which include career assistance software
and on-line resources, i.e., Internet, such as America's Job Bank
(Note: The EPS shall have direct access to the Internet to meet
this requirement.)  Offenders using the Internet while at the
CCC, must be supervised by staff.  Offender Internet use outside
the facility requires CCM approval.

- Portfolio development, resume writing, proper dress and
interview techniques training;

- Individual and group counseling, case management, and post-release follow-up relative to employment within the community, to include the area where the offender plans to live following release;

- Employment job fairs either on-site or in partnership with other organizations such as community colleges; and

- To maximize job retention, every effort should be made to match an offender's skill levels to an actual job placement.  For example, an experienced heavy equipment operator may not be appropriately employed as a short order cook at minimum wage.

The EPS is encouraged to communicate with the BOP Inmate Placement Administrator, post contract award, to obtain pertinent and developing information in this area.  The EPS may obtain the contact number to follow-up on this recommendation.

The contractor shall develop a system of accountability for offenders while they are seeking employment.  Indigent offenders should be provided with transportation or public transportation vouchers and a nominal amount of money or a pre-paid telephone calling card so they have the ability to contact the CCC in the event of an emergency while seeking employment.

If a 40 hour employment (or equivalent) is not obtained in the 15 calendar days after completion of the orientation program, the contractor shall fax the CCM with a biweekly status report of the efforts to assist the offender in obtaining employment and maintain a copy in the offender file.

Any proposed employment plan that is less than 40 hours (or equivalent) requires the approval of the CCM and must be fully documented.  An example of employment less than 40 hours (or equivalent) is when an offender is unable to obtain full-time employment or the offender's employment is supplemented by volunteering in the community.  The contractor shall require the offender to provide an itinerary and a point of contact for each job search appointment away from the facility.

The contractor shall maintain a log which indicates the offender's name, register number, date of arrival, and date of employment.  If non-employment has been approved by the CCM, the log shall indicate this status in the date of the employment column.  The log shall document efforts to assist residents find employment.

   a.  Approval and Verification.  Each offender's employment requires the contractor's written approval.  The contractor will

ensure thorough documentation that the offender's employer is
aware of the offender's legal status prior to the first workday.
When written correspondence is utilized, it shall be delivered by
the contractor or via U.S. mail, not hand delivered by the
offender.  Any changes in an offender's employment shall require
advance approval by the contractor.

For each job an offender acquires, the contractor shall verify
employment by a random, on-site visit during the first seven
calendar days, and document the visit in case notes to include
date and the title of the person contacted.  The contractor shall
request the employer to notify the contractor if the offender
does not report to work as scheduled, is terminated or quits.  A
telephone number and contact person at the CCC shall be provided
to the employer to report such incidents.  Thereafter, at least
monthly, the offender's employment supervisor shall be contacted
by phone or site visits to substantiate attendance and discuss
any problems which may have arisen.  The contractor shall
complete additional contacts as necessary.  All contacts
concerning an offender's employment shall be documented in the
case notes.  The CCM may modify this requirement.

All offenders (BOP and USPO cases) are subject to these
requirements.  The contractor shall report any deviation to the
CCM.  Any modifications of these requirements for USPO cases, may
be approved by the CCC director or assistant with USPO
concurrence.  Documentation will be maintained in the offender
file.

   b.  Restriction.  Restriction from work shall not be used as a
disciplinary sanction.  Informal resolution shall not impede or
control an offender's ability to work.

   c.  Electronic technology.  With the use of beepers, cellular
phones and computer equipment in the work place, there is a need
to monitor the legitimate use of this equipment.  When CCC staff
believe it is essential for an offender to maintain a beeper,
PDA, cellular telephone or computer equipment (with Internet
access) in the performance of his or her work or while the
offender is off the job-site, i.e., at the CCC to include inside
the offender's vehicle, the following procedures shall be
followed: (A pager, cell phone, caller ID, or other type of
electronic equipment shall not be used for accountability
purposes.)

   ● The offender will make a written request to the facility
director stating the specific need and use for the electronic
communication equipment.  The facility director will verify the
legitimate need and forward the request for approval to the CCM.

A copy of the request indicating approval or disapproval will be returned to the facility director. The contractor shall document this action in the offender's file. This approval authority may be delegated by the CCM to the facility director.

● For USPO cases, the facility director will make the request to the USPO. A copy of the request will be forwarded to the CCM for informational purposes. The USPO's response to the request will be placed in the offender's file. This approval authority may be delegated by the USPO to the facility director (or acting).

10. RESIDENCE DEVELOPMENT. The contractor will assist offenders in locating suitable housing. In the case when an offender will be released from the facility and continue some type of USPO supervision, the contractor will verify the proposed address and forward written comments regarding its suitability to the USPO for approval within 30 days of the offenders anticipated release.

11. DRUG AND ALCOHOL SURVEILLANCE PROGRAM. The contractor must establish a surveillance program to deter and to detect the illegal introduction of drugs and alcohol in its facility. This surveillance program shall be in accordance with current BOP Program Statements, Urine Surveillance and Testing Program and Alcohol Surveillance and Testing Program.

 a. Drug Abuse Treatment. Offenders who have participated in institution residential drug abuse treatment are required to participated in Transitional Drug Abuse Treatment (TDAT). An inmate with a documented drug abuse problem who did not participate in RDAP may also be required to participate in TDAT.

The Regional Transitional Drug Abuse Treatment Coordinator will determine which offenders shall participate in drug abuse treatment and the frequency of such services. Drug abuse treatment will be provided by contract drug abuse contractors identified by the T-DATC. The T-DATC provides oversight to contract drug abuse treatment contractors.

The CCC will be notified of an offenders participation in TDAT by the T-DATC via a TDAT Authorization. The TDAT Authorization will contain the contract drug abuse contractor's name, address and telephone number. The CCC staff have an obligation to ensure the offender contacts the agency within 10 working days of arriving at the CCC or withing 10 days of receipt of receiving the TDAT Authorization to schedule an appointment. The CCC shall work with the contract drug abuse treatment agency to ensure offenders are attending all subsequent appointments. The CCC staff is encouraged to develop a partnership with the drug

abuse treatment contractor in order to ensure inmate accountability and public safety are maintained.  This may be accomplished through on-site visits, regular scheduled meetings, telephone contact or inviting the treatment provider to participate on the Community Relation Board.

   b.  Urine Surveillance.

   1)  Frequency.  The contractor shall randomly test at least 5 percent of all the BOP cases monthly. (With a minimum of one test.)

In addition, offenders with a condition of drug aftercare, known to have a history of drug abuse, or who are suspected of illegal drug use shall be tested four times a month.  Testing in greater numbers requires the approval of the CCM.

     Note: USPO cases are not included in this requirement.
     However, if the contractor believes a USPO offender is
     abusing drugs, the contractor shall refer the suspected
     offender to the USPO for testing and/or administrative
     action.  The contractor shall only test BOP cases,
     unless otherwise indicated by the CCM.

   2)  Lab.  The contractor will use a laboratory which meets the requirements of 42 CFR Part 493, entitled Laboratory Requirements to engage in urine drug testing for federal offenders.  The contractor shall maintain certification documents and evidence that the lab meets all specifications in Attachment D for inspection by the BOP.

The urinalysis lab shall detect and identify drugs and/or metabolites by basic screen at the minimal levels shown in Attachment D.

A positive written report from the lab for any of the drugs listed in Attachment D indicates that the particular drug has been identified by an initial screening test and then confirmed by a different laboratory procedure.

If a lab detects and identifies other drugs or substances during the initial screening, the contractor shall take appropriate action.  The contractor may then decide whether to request confirmation.

Retesting at the offender's request is not permitted.

Urinalysis costs are the responsibility of the contractor.  The USPO may use the contractors urinalysis program established for

the BOP; however, costs of urinalysis for USPO cases are the
responsibility of the USPO.  The contractor shall maintain proof
(copies of paid invoices, canceled checks, lab reports) to verify
services have been rendered.

   3)  Testing.  All urine testing shall be conducted on a
"surprise," unscheduled basis in accordance with Attachment D.
To eliminate the possibility of a diluted or adulterated sample,
staff shall keep the offender under direct supervision following
a request for a sample.  If the offender is unable to provide the
sample, staff shall continue the direct supervision for a two-
hour period following the request for the sample.

Staff of the same sex as the offender tested shall directly
supervise the giving of the urine sample.  If an offender is
unwilling to provide a urine sample within two hours of a
request, staff shall file an incident report.  No waiting period
or extra time need be allowed for an offender who directly and
specifically refuses to provide a urine sample.  To eliminate the
possibility of diluted or adulterated samples, staff shall keep
the offender under direct visual supervision during this two-hour
period, or until a complete sample is furnished.  To assist the
offender in giving the sample, staff shall offer the offender
eight ounces of water at the beginning of the two-hour time
period.  An offender is presumed to be unwilling if the offender
fails to provide a urine sample within the allotted time period.
An offender may rebut this presumption during the disciplinary
process.

As soon as the sample has been collected, the staff shall secure
the specimen for analysis, placing it in a locked container.  To
ensure the integrity and security of the process, the contractor
shall establish a chain-of-custody procedure from the point of
receiving the empty bottle supplies from the laboratory until the
samples are mailed to the lab for analysis.  No unauthorized
persons or offenders may be involved in the handling of supplies
or the collecting, recording, mailing, or processing of test
results under any circumstances.

   4)  Positive tests.  A sample is positive when a urinalysis
shows the presence of a controlled substance or its metabolite.
For an incident report charging use of a particular drug to be
justified, the minimum waiting period between successive positive
samples as outlined in Attachment D must be observed.  In
addition, waiting periods also apply to offenders who initially
arrive at the facility.

When a positive finding cannot be explained, CCC staff shall
thoroughly investigate the positive urine test result to validate

the positive finding.  The contractor shall report all
unauthorized positive test results to the CCM on the day
received.  Positive test results without justification shall be
the basis for a formal disciplinary report.

All urine testing shall be recorded on a log entitled Urine
Sampling Program and maintained in the facility at all times.
The log shall indicate those offenders subjected to the test, the
staff performing the test, the date and time the test was
administered, the test results, type of test and a column to
indicate if the offender refused to cooperate.  In addition, the
contractor shall submit a completed BOP form URINE SAMPLING
PROGRAM (CCC'S) with each monthly bill.  This form reports
information for each month.

   c.  Alcohol Testing.  Offenders shall be tested every time they
return to the facility.  Costs for alcohol testing are the
responsibility of the contractor.

The contractor shall maintain a log documenting offenders tested,
the staff performing the test, the date and time the test was
administered, the test results, type of test and a column to
indicate if the offender refused to cooperate.

A reliable testing instrument such as the one used by the BOP
(Alco-Sensor Model II, III or IV), or comparable instrument or
device, shall be used for testing.  Calibration checks shall be
performed on the Alco-Sensor at least monthly according to
procedures outlined by the manufacturer.  These checks shall be
documented in the test log.

The contractor will ensure staff using the instrument are
familiar with its operation as outlined in the manufacturer's
operating instructions.  If a positive alcohol test results, .02
or higher (Alco Sensor Models), a second confirmation test must
be completed 15 minutes later.  If confirmation is received, an
incident report shall be prepared charging the offender with
using intoxicants.

Offenders who refuse to submit to an alcohol test, either through
word or action, shall receive an incident report.

12.  MENTAL HEALTH.  The contractor shall develop and utilize a
network of and points-of-contact with mental health resources and
services, including referrals to other federal, state, and
community agencies, to ensure basic mental health treatment for
offenders with mental health needs.  The contractor shall
document the community mental health resources.  Cost for mental
health treatment is the responsibility of the offender unless the

offender has no insurance or is unable to pay.  In these
instances, the BOP will pay with advance approval from the CCM or
when emergency treatment is required.

The contractor shall provide space to accommodate outside
clinical/mental health professionals that will provide
specialized treatment and programming related services for
inmates with a diagnosis of mental illness.  Further, the
contractor shall coordinate with the clinical/mental health
treatment provider to ensure that the treatment provider is
included in all aspects of programming for inmates with mental
illness.

13.    PARENTING/FAMILY.    Many offenders are parents or will
become parents.  Successful completion of any treatment or
rehabilitation program must acknowledge this and address
parenting.  The contractor shall provide a program geared toward
the enhancement of parenting skills, with special emphasis placed
on those in a primary care giver role. This program shall provide
essential information regarding child development, the effects of
separation on children, discipline, planning activities and
playing with children, interacting with foster parents, school
systems and childcare, marriage enrichment and spiritual
development.  The program should serve as a forum for offenders
to discuss problems and receive support.  Individual and family
counseling shall be made available to all residents, as needed.

14.    SPECIALIZED FEMALE PROGRAM.    Many women offenders are in
need of specialized recovery programs from addictions (to include
chemicals, alcohol and food) and negative relationships.  The
contractor shall provide a program for women offenders that
addresses the recovery process and aftercare programs through
group and individual services provided in-house or through
community resources.  The program shall facilitate the recovery
process by addressing the following:

A.    ***ABUSE:***  A substantial proportion of women offenders have a
      history of abuse which includes sexual, emotional and
      physical abuse imposed by parents, friends, spouses or
      significant others.  A safe, healthy, non-judgmental
      environment must be provided by caring, supportive staff.
      Staff shall be sensitive to and trained in dealing with
      issues of abuse.  Counseling staff shall incorporate abuse
      issues into the offender's individual counseling sessions.
      Providers are encouraged to arrange for participation in
      community support groups to assist residents in dealing with
      abuse issues as well as to provide important aftercare
      resources.  Therapy groups shall be structured to deal with

abuse issues.  A state licensed psychologist or psychiatrist shall be available for therapy as needed.

B.   ***VOCATIONAL:***  The contractor shall assist women in planning their time outside the facility.  Rigid expectations for immediate employment may not be realistic in all cases and may lead to program failures.  Other forms of community involvement may be more helpful and realistic at this point such as a high school equivalency program, a remedial reading program, or a position as a volunteer at a community agency.  To meet these goals, the contractor shall have a vocational counselor dedicated to the resident and vocational services required and/or available (however, this may be a collateral duty for an EPS or case manager).  At least one individual vocational session shall be provided per week to discuss vocational plans and assess progress.  Each woman shall be required to make weekly schedules and adhere to them.  The Vocational Counselor shall approve and monitor these schedules.  The Vocational Counselor shall assist each woman in developing a monthly budget and monitoring its progress.  A post treatment budget will also be prepared.

C.   ***COUNSELING:***  In order for women to make necessary behavior changes which foster a positive transition to society, the issue of criminality must be addressed.  Criminal lifestyles are supported by particular thought processes and behavior patterns when certain environmental factors present themselves to the developing personality over a period of years.  The subject of criminality is best dealt with in a group setting.  Educational material shall be presented and discussed and the group should examine individual behavior when it exemplifies criminal thinking and behavior. Recovery from a criminal lifestyle requires years of ongoing efforts.  The first step in a recovery process is an awareness and recognition of the problem.

15.  LIFE SKILLS TRAINING.  Many offenders lack the necessary day-to-day life skills to make a successful reentry as a productive member of society.  In order to assist offenders obtain these skills, the contractor will provide programs totaling a minimum of 12 hours which will teach a person ways to enhance his/her lifestyles.  Although participation is mandatory for all offenders for at least 30 days, programs may be tailored for individual needs.  Individual exemptions from this requirement may be made to the CCM for approval.  Exemption requests will clearly outline the reason for the exemption listing the offenders applicable historic data such as education and work experience.

The contractor will include at least the following in the
program:

- Abuse
- Vocational
- Job Readiness
- Money Management
- Wellness

16.  CULTURAL DIVERSITY PROGRAMS.  The offender population is
made up of a diverse population to include various races,
religions and cultural backgrounds.  In order to promote cultural
understanding and acceptance, the contractor shall provide
educational and special programs to address cultural differences.
Such programs will be developed in accordance with the cultural
diversity of the offender population in the facility.

17.  SPECIAL SUPERVISION CONDITIONS.  Courts or the Parole
Commission may require offenders to become involved in specific
programs upon release from the CCC or in some instances, while
confined at the CCC, e.g., mental health aftercare, alcohol
treatment, community service obligation.  The contractor will
confer with the USPO and CCM on policy and procedures for
implementation of all special supervision conditions.

In the case of special conditions, the contractor shall propose a
plan of treatment to the CCM for approval.  CCM approved costs
may be included as a line item on the monthly billing for
reimbursement.

18.  DRIVING.  The CCM approves driving privileges for a BOP
offender.  This approval authority may be delegated by the CCM to
the facility director.  The USPO approves USPO offenders to drive
unless otherwise specified by the USPO.

Ordinarily, offenders may operate motor vehicles for employment
purposes and when public transportation is unavailable and the
appropriate approval is documented in the offender's file.
Offenders approved for driving must adhere to state and local
motor vehicle regulations, and must always operate the vehicle
safely.  The offender's file, both BOP and USPO, shall contain
all supporting documentation used to determine if the offender is
appropriate to drive.

If the CCM is approving driving privileges, the contractor shall
submit all relevant information on the BOP form entitled
AUTHORIZATION TO OPERATE A MOTOR VEHICLE to the CCM.

If the facility director is approving driving privileges, the contractor shall document all relevant information on the BOP form entitled AUTHORIZATION TO OPERATE A MOTOR VEHICLE in the offender's file.

The offender must adhere to the following conditions:

• The offender must provide proof of valid insurance, (at least liability or the minimum state requirement), a driver's license, vehicle licensing and registration to the contractor.  The contractor shall maintain copies of these documents in the offender's file except for the driver's license, which many states prohibit copying. The contractor shall record the driver's license number and expiration date in the offender's file.

• If the vehicle to be used is the property of a person other than the offender, the contractor must have documented proof of valid insurance, vehicle licensing and registration, and a signed authorization (either notarized or witnessed by CCC staff) to use the vehicle obtained from the legal owner.

• The contractor shall maintain the license number and a description of the vehicle on file along with copies of the above referenced documentation.

The contractor shall document the approval in the offender's file.

19.  MARRIAGE.  The contractor shall refer a BOP offender's request for marriage to the CCM, with the contractor's recommendations.  Marriage requests for offenders under supervision shall be forwarded to the USPO.

20.  VISITING.  An area of the facility shall be available for visiting.  The visiting area should afford a reasonable amount of privacy as well as provide for adequate staff supervision.

21.  RELIGIOUS ACTIVITIES.  All offenders shall have access to religious services.  In meeting special needs, CCC staff must exercise flexibility and utilize existing community resources. To the extent possible, offenders should be able to continue religious practices as exercised prior to confinement.  Each request for religious activities shall be handled on a case-by-case basis, and the CCM shall be contacted for guidance when there are unusual requests or concerns.

To the extent possible, offenders participating in the institution Life Connections Program shall be allowed to attend the religious program and sanctuary with whom they were matched

while in the institution.  In those instances where this is not possible, the contractor must consult the CCM for guidance. Additionally, offenders who abuse the privilege must be reported to the CCM.  The contractor will support the Life Connections Program and will maintain and report statistics concerning offender activities in the program as requested by the Bureau.

The contractor shall have a system of accountability for offenders participating in religious activities.

# CHAPTER 11 - Discipline

So that offenders may live in a safe and orderly environment, it is necessary for the contractor to impose discipline on those offenders whose behavior is not in compliance with the rules.

The contractor shall provide written policy and procedures for offender discipline. The contractor shall establish facility rules of conduct and sanctions, and procedures for violations of the rules of conduct, to include informal resolution. The contractor shall submit to the BOP all minor rules and sanctions, which the contractor has created, for approval.

The contractor shall use the prohibited acts in Attachment E and may add other approved minor rules as necessary for the safe and secure operation of the facility. If additional minor rules are added by the contractor, the contractor shall associate available sanction(s) to impose for the violation of each added rule. When determining a sanction, the contractor shall ensure the sanction is commensurate and appropriate to the violation.

The rules of conduct and sanctions shall be defined in writing and communicated to all offenders and staff. The contractor shall carry out disciplinary procedures within appropriate time limits, promptly and with respect for the offenders.

There is a wide range of sanctions a contractor may impose or recommend for violations of facility rules of conduct. The majority of these are minor in nature and an informal resolution, e.g., reprimand, loss of television or other privileges, may resolve the issue. The contractor is encouraged to resolve all incidents at the lowest level which corrects the offender's misconduct and utilize progressive discipline as appropriate. Care must be taken that the recommendation of the sanction disciplinary transfer is not used inappropriately. However, regional variances may occur, therefore, the contractor needs to ensure they are familiar with and follow the Regional Management Team's instructions for the application of discipline.

The disciplinary requirements in this SOW apply to BOP offenders. USPO offenders participating in the CCC must adhere to the facility rules of conduct. If a USPO offender commits an offense which warrants disciplinary sanction the contractor shall contact the USPO for guidance.

1. GENERAL. The contractor shall take disciplinary action at such times and to the degree necessary to regulate an offender's behavior within BOP's prohibited acts and rules of conduct to promote a safe and orderly facility environment. The contractor

shall control offender behavior in a completely impartial and consistent manner.  Disciplinary action may not be capricious or retaliatory.  The contractor may not impose or allow imposition of corporal punishment of any kind.

a.  The contractor shall use the following BOP discipline forms (provided by the CCM):

- CENTER DISCIPLINE COMMITTEE (CDC) REPORT (CCC'S) is used by the CDC to summarize the action taken by the CDC.

- DUTIES OF STAFF REPRESENTATIVES (CCC'S) is used to outline the responsibilities of an employee who is available to assist the offender if the offender desires by speaking to witnesses and by presenting favorable evidence to the CDC on the merits of the charge(s) or in extenuation or mitigation of the charge(s).

- INCIDENT REPORT (CCC'S) is used to document the offender's misconduct (summary of the offense committed and prohibited act code).  The document must be legible.

- INMATE RIGHTS AT CENTER DISCIPLINE COMMITTEE HEARING is used to notify the offender of their rights before the CDC and allows the offender to waive the 24-hour notice prior to appearing before the CDC.

- NOTICE OF CENTER DISCIPLINE COMMITTEE HEARING (CCC'S) is used to notify the offender of date and time of the CDC.

- WAIVER OF APPEARANCE (CCC'S) is used to notify the offender of their right to appear before the CDC and allows the offender to waive their appearance before the CDC.

b.  Categories.  There are four categories of prohibited acts (see Attachment E) - Greatest (100 level), High (200 level), Moderate (300 level), and Low Moderate (400 level).  Specific sanctions are authorized for each category.  Imposition of a sanction requires that the offender first is found to have committed a prohibited act.  The following guideline indicates the available sanctions to impose if an offender is found to have committed a prohibited act:

1)  Greatest Category Offenses (100 level codes).  The CDC shall refer all 100 level codes to the DHO.  The contractor shall immediately notify the CCM of all 100 level code violations.

2)  High Category Offenses (200 level codes).  The CDC may impose and execute one or more of sanctions G through M, except for a VCCLEA offender rated as violent or for a PRISON LITIGATION

REFORM ACT (PLRA) offender.  All high category offense charges
for a VCCLEA offender rated as violent and for a PLRA offender
must be referred to the DHO.

   3) Moderate Category Offenses (300 level codes).  The CDC may
impose one or more sanctions G through N, but may suspend any
sanction or sanctions imposed.  The CDC ordinarily shall refer to
the DHO a moderate category charge for a VCCLEA offender rated as
violent or for a PLRA offender if the offender had been found to
have committed a moderate category offense during the offender's
current anniversary year.  Current anniversary year means the
twelve month period of time for which an offender may be eligible
to earn good conduct time.  The CDC shall consult with the CCM
for specific information.  The CDC must thoroughly document in
writing the reasons why the charge for such an offender was not
referred to the DHO.

   4)  Low Moderate Category Offenses (400 level codes).  The
CDC may impose one or more sanctions G through P, but may suspend
any sanction or sanctions imposed.  The CDC ordinarily shall
refer to the DHO a low moderate category charge for a VCCLEA
offender rated as violent or for a PLRA offender if the offender
had been found to have committed two low moderate category
offense during the offender's current anniversary year.  Current
anniversary year means the twelve month period of time for which
an offender may be eligible to earn good conduct time.  The CDC
shall consult with the CCM for specific information.  The CDC
must thoroughly document in writing the reasons why the charge
for such an offender was not referred to the DHO.

   c.  Aiding.  Aiding another person to commit any of these
offenses, attempting to commit any of these offenses, and making
plans to commit any of these offenses, in all categories of
severity, shall be considered the same as a commission of the
offense itself.  In these cases, the letter "A" is combined with
the offense code.  For example, planning an escape would be
considered as Escape and coded 102A.  Likewise, attempting the
adulteration of any food or drink would be coded 209A.

   d.   Suspensions of Any Sanction.  Suspensions of any sanction
cannot exceed six months.  Revocation and execution of a
suspended sanction require that the offender first is found to
have committed any subsequent prohibited act.  The CDC may
execute, suspend, or revoke and execute suspensions of sanctions
G through P.  Revocations and execution of suspensions may be
made only at the level which originally imposed the sanction.

2.  PROCEDURES UPON ADMISSION TO CCC.  The contractor shall
develop and have a pamphlet, i.e., summary of the disciplinary

system to include BOP prohibited acts and contractor's rules of
conduct, to give to offenders when they first arrive at the CCC.
This shall be given to each offender as part of the orientation
program.  A signed receipt is to be obtained from each offender
acknowledging that a copy of the pamphlet was received and is to
be place in the offender's file.

The contractor shall to the extent reasonably available, have a
qualified staff member or translator to help offenders who have a
language or literacy problem obtain an understanding of the BOP
rules on discipline.  When a significant portion of the offender
population speaks a language other than English, the pamphlet is
to be made available in that language.  The contractor shall post
copies of the rules at a prominent location, accessible to all
offenders.

3.    TYPES OF DISCIPLINARY ACTION.

   a.   Informal Resolution.  The contractor may resolve misconduct
through an informal resolution process.  Informal resolution of
misconduct is preferred and shall always be considered before
taking formal disciplinary action.  The contractor can only
informally resolve 300 and 400 level codes.

The contractor shall expunge the incident report if informal
resolution is accomplished from the offender's file.

A record of any informal resolution in the 300 or 400 level codes
(whether between the offender and the writer of the report, the
offender and the CDC) is to be maintained by the facility
director for twelve months.  The record is to reflect the
offender's name, register number, subject of the informal
resolution, and the agreed upon disposition.  This procedure
should enable the facility director, and others as necessary, to
monitor the informal resolution process.

   NOTE:  Staff may suspend disciplinary proceedings for a
   period not to exceed two calendar weeks while informal
   resolution is undertaken and accomplished.  If informal
   resolution is unsuccessful, staff may reinstate
   disciplinary proceedings at the same stage at which
   they were suspended.  The time requirements then begin
   running again, at the same point at which they were
   suspended.

   b.   Formal Hearings Before the CDC.  The contractor shall have
the CDC hear all 200 level code violations.  A prohibited act in
the 100 level codes requires the CDC to convene and refer it to
the DHO.  The CDC shall also refer a prohibited act in the 200,

300 and 400 level codes when the prohibited act has been committed by a VCCLEA offender rated as violent or by a PLRA offender as outlined in this chapter.  The CDC shall make a disposition on all 200 level codes, except VCCLEA offenders rated as violent or by a PLRA offender, and all 300 and 400 level codes not informally resolved or required to be referred to the DHO due to VCCLEA and PLRA status. The CDC cannot impose sanctions A through F in Attachment E.

When a referral is made to the DHO, the CDC will recommend one or more of the sanctions commensurate to the prohibited acts outlined in Attachment E.  Only those sanctions can be recommended.

4.  BOP INCIDENT REPORT (CCC'S).  Staff shall produce an incident report on all major violations that are not subject to informal resolution.  The BOP encourages informal resolution (requiring consent of both parties) of incidents involving violations of regulations.  However, when staff have a reasonable belief that a violation of regulations has been committed by an offender, and when staff considers an informal resolution of the incident inappropriate or unsuccessful, staff shall prepare an incident report.  Reporting staff will complete Part I of the incident report.

> Note:  When a volunteer observes a violation, that person will submit a written description of the incident and a staff member shall complete the BOP incident report.  In addition, staff may complete an incident report from information on a police report. The charge may be translated into terms of the prohibited acts.  A telephone report from an approved laboratory of a positive urinalysis is sufficient evidence to write a report; however, documentary confirmation must be obtained before the formal hearing.

The entire language of the prohibited act(s) does not have to be copied.  Only the relevant portion need be used.  For example, "destroying government property, code no. 218" "possessing narcotics, code no. 113" would be acceptable listings for appropriate charges.

The description of the incident should contain the details of the activity which is being reported.  All facts about the incident which are known by the employee and which are not confidential should be recorded.  If there is anything unusual about the offender's behavior, this would be noted.  The reporting employee should also list those persons (staff, offenders, others) present

at the scene, and the disposition of any physical evidenced (weapons, property, etc.) which the employee may have personally handled.  The report is also to reflect any immediate action taken during the incident, including the notification of law enforcement.  The reporting employee shall sign the report and indicate his or her title in the appropriate blocks.  The date and time of the report being signed should be entered.  The incident report should then be forwarded to the appropriate investigating officer for disposition.

Staff shall give each offender charged with violating a BOP prohibited act a written copy of the charge(s) against the offender, ordinarily within 24 hours of the time staff became aware of the offender's involvement in the incident.  This is accomplished by providing the offender a copy of PART I of the incident report.  The staff member shall note the date and time the offender received a copy of the incident report.

5.  SPECIAL REPORT WRITING INSTRUCTIONS.  Because of national data collection requirements, the contractor shall obtain guidance when one of the following violations occur:

- Code 100 - Killing
- Code 101 - Assaulting any Person (Serious)...
- Code 107 - Taking Hostages
- Code 203 - Threatening Another with Bodily Harm...
- Code 205 - Engaging in Sexual Acts
- Code 206 - Making Sexual Proposals or Threats to Another
- Code 224 - Assaulting any Person (Less Serious)..

6.  INVESTIGATION.  Staff shall conduct the investigation promptly unless circumstances beyond the control of the investigating officer intervene.  The facility director shall appoint an investigating officer ordinarily within 24 hours of the time the violation is reported.  Staff writing the report may not investigate the report.  The investigation is initiated and ordinarily completed within 24 hours of this appointment. If the investigation cannot be completed in three days, the contractor shall document the reasons and notify the CCM.

  a.  BOP Forms.  The investigating officer shall give the following forms to the offender for signature.  The investigating officer is responsible for attaching these completed forms to the incident report and providing the offender with copies.

- INMATE RIGHTS AT CENTER DISCIPLINE COMMITTEE HEARING
- NOTICE OF CENTER DISCIPLINE COMMITTEE HEARING (CCC'S)
- WAIVER OF APPEARANCE (CCC'S)
- DUTIES OF STAFF REPRESENTATIVES (CCC'S)

The investigator shall advise the offender of the right to remain
silent at all stages of the disciplinary process but that the
offender's silence may be used to draw an adverse inference
against the offender at any stage of the disciplinary process.
The investigator shall also inform the offender that the
offender's silence alone may not be used to support a finding
that the offender had committed a prohibited act.  The
investigator shall read the charge(s) to the offender and ask for
the offender's statement concerning the incident unless it
appears likely that the incident may be the subject of criminal
prosecution.  Note: the investigating officer may informally
resolve all 300 and 400 level codes.

   b.  Outside Investigations.  When it appears likely that the
incident is subject to criminal prosecution, the investigating
officer shall suspend the investigation and notify the CCM for
guidance.  Staff may not question the offender until the Federal
Bureau of Investigation or other investigative agency interviews
have been completed or until the agency responsible for the
criminal investigation advises that staff questioning may occur.

   c.  Investigation By The Contractor.  The investigating officer
shall thoroughly investigate the incident and shall record all
steps and actions taken on PART III of the incident report.  Once
completed, PART III shall be forwarded with all relevant material
to the CDC.  The offender does not receive a copy of PART III.

When the offender did not receive a copy of the incident report
at the beginning of the investigation, the reason(s) for this
should be stated in the investigative portion of the incident
report.  Document the fact that the offender has been advised of
the right to remain silent in the investigative portion of the
incident report.  Comments about the offender's attitude may be
included with the offender's statement on the charge(s).

To the extent practicable, the offender's statements offering a
rationale for his or her conduct or for the charges against him
or her should be investigated.

The investigating officer should talk to those persons with
direct and relevant information, and summarize their statements.
The disposition of evidence should be recorded.  Often, the
investigating officer will want to talk to the reporting employee
to obtain a report firsthand and to clarify any question(s) the
investigating officer may have.  Under comments and conclusions,
the investigating officer may include their:

- Comments on the offender's prior record and behavior,
- Analysis of any conflict between witnesses, and

- Conclusions of what in fact happened.

1)  Confidential Informant.  When a discipline decision will be based on confidential informant information, the contractor shall seek the guidance of the CCM for appropriate use and documentation.

7.  STAFF REPRESENTATION.  The offender may request a staff representative.  The contractor shall ensure that the offender has a staff representative if requested by the offender.  The offender may not use an attorney as a representative.  The staff representative may review the investigation to ensure the offender's rights have not been violated.  However, the staff representative is advised the offender may not get a copy of the investigation or may not have knowledge of sensitive information. The staff representative shall be available to assist the offender if the offender desires by speaking to witnesses and by presenting favorable evidence to the CDC on the merits of the charge(s) or in extenuation or mitigation of the charge(s).  The CDC shall arrange for the presence of the staff representative selected by the offender.

8.  WITNESSES.  The offender or their representative may request witnesses from inside or outside the CCC, where their presence at the hearing would not pose a serious threat to the security of the witness or the CCC.  The investigating officer will notify the requested witnesses of the formal hearing.  The reporting employee and other adverse witnesses need not be called if their knowledge of the incident is adequately summarized in the incident report, investigation, or other material supplied to the CDC.  Witnesses whose testimony would be repetitious or irrelevant need not be called; written statements of unavailable witnesses will be accepted in place of "live" testimony. However, there must be good reason for failure to call a witness in person, and the reason shall be documented.

9.  FORMAL HEARING.  If an incident cannot be resolved informally, and the offender is a BOP case, the contractor shall proceed with a formal CDC hearing.

If the offender is being held locally (within a 50 mile radius), the CDC will make arrangements for an in-person hearing, unless the offender waives the in-person hearing.  If circumstances do not allow for in-person hearing, e.g., permission cannot be obtained by the holding official or the offender is on escape status, the CDC will conduct the hearing in absentia and notify the CCM.  Remote hearings shall not diminish the offenders rights at CDC.

The contractor shall delegate to one or more staff members the
authority and duty to hold a formal hearing upon completion of
the investigation.  In order to ensure impartiality, the
appropriate staff member(s) (hereinafter usually referred to as
the CDC) may not be the reporting or investigating officer or a
witness to the incident, or play any significant part in having
the charges referred to the CDC.

However, a staff member witnessing an incident may serve on the
CDC where virtually every staff member in the facility witnesses
the incident in whole or in part.  If the CDC finds at the formal
hearing that an offender has committed a prohibited act, the CDC
may impose dispositions and sanctions.  When an alleged violation
of BOP rules is serious and warrants consideration for other than
what the CDC may impose, the CDC shall refer the charges to the
DHO.  The CDC must refer all 100 level codes to the DHO.  The
following minimum standards apply to formal hearings in all CCCs.

Each offender so charged is entitled to a formal hearing before
the CDC, ordinarily held within three work days from the time
staff became aware of the offender's involvement in the incident.
This three work day period excludes the day staff became aware of
the offender's involvement in the incident, weekends, and
holidays.

    For example, if staff become aware of an offender's
    involvement in the incident on a Tuesday and provide
    the offender with a copy of the report on Tuesday, the
    three work day period starts the following day,
    Wednesday.  The CDC hearing must ordinarily be held by
    Friday.

The offender is entitled to be present at the formal hearing
except during deliberations of the decision maker(s) or when
security would be jeopardized by the offender's presence.  The
CDC shall clearly document in the record of the hearing reasons
for excluding an offender from the hearing.  An offender may
waive the right to be present at the CDC hearing provided that
the waiver is documented by staff.

The offender is entitled to make a statement and to present
documentary evidence in the offender's own behalf.

The CDC will convene and formally refer all 100 level codes to
the DHO.

In regards to 200, 300 and 400 level codes, the CDC shall
consider all evidence presented at the hearing and shall make a
decision based on at least some facts, and if there is

conflicting evidence, it must be based on the greater weight of the evidence.  All sanctions must be commensurate with the prohibited act.  The contractor shall consider the requirements of this chapter regarding a VCCLEA offender rated as violent or PLRA offender.

Accordingly, the CDC shall take one of the following actions:

• Informally resolve the incident;

• Find that the offender did not commit the prohibited act charged or a similar prohibited act if reflected in the incident report;

• Find that the offender committed the prohibited act charged and/or a similar prohibited act if reflected in the incident report and impose sanctions (G thru P, commensurate with the prohibited act); or

• Find that the offender committed the prohibited act charged and/or a similar prohibited act if reflected in the incident report and refer the packet to the DHO to impose sanctions, (A thru P, commensurate with the prohibited act).

The CDC cannot impose sanctions A thru F listed in Attachment E. If any of these sanctions are appropriate for the violation for the prohibited act committed, the CDC will refer the incident to the DHO.

> NOTE:  The phrase "some facts" refers to facts indicating the offender did commit the prohibited act. The phase "greater weight of the evidence" refers to the merits of the evidence, not to its quantity nor to the number of witnesses testifying.

If the CDC finds a prohibited act was committed, the chairperson, shall complete the PART II of the incident report and BOP form NOTICE CENTER DISCIPLINE COMMITTEE (CDC) REPORT.  A verbatim record is not required.  These documents are certification of those persons serving on the CDC and the CDC proceedings.  The names of other CDC members, if any, participating in the hearing are to be noted in Part II of the incident report in the space provided.  The evidence relied upon, the decision, and the reasons for the recommendations shall be written out in specific terms, unless doing so would jeopardize center or individual security.  Under "evidence relied upon," there must be reference to the specific facts the CDC relied upon and not mere reference to the incident report that contains those facts.

When sanctions are recommended to the DHO, staff shall, immediately after the hearing, forward the completed CDC packet to the CCM with copies placed in the offender's file.  The CCM will review the CDC packet for accuracy and tracking purposes then forward to the DHO.

The CDC packet shall consist of:

- INCIDENT REPORT (CCC'S);
- CENTER DISCIPLINE COMMITTEE REPORT;
- INMATE RIGHTS AT CENTER DISCIPLINE COMMITTEE HEARING;
- NOTICE OF CENTER DISCIPLINE COMMITTEE HEARING (CCC'S);
- WAIVER OF APPEARANCE (CCC'S);
- DUTIES OF STAFF REPRESENTATIVES (CCC'S); and
- Other pertinent information related to the proceedings.

The CDC shall give the offender a written copy of the decision and disposition and advise they may appeal the decision through the Administrative Remedy Process.

In the event the CDC finds that no prohibited act was committed, the CDC will indicate it on the incident report, PART II.  A copy shall be provided to the offender.  All other material shall be expunged by staff.  If the finding (the offender committed the act) is overturned on appeal, the CCM will notify the contractor with advisement.  If the DHO requires additional action in the proceedings, the CDC will comply.

The requirement for expunging the disciplinary hearing material does not preclude maintaining for research purpose copies of disciplinary actions resulting in "not guilty" finding in a master file for one year, separate from the offender's file.

The DHO will advise the CCM of the hearing decision.  The CCM will advise the contractor and offender and will again advise the offender of his/her right to appeal the decision directly to the Regional Office through the Administrative Remedy Process.

CHAPTER 12 - Administrative Remedy

The contractor shall establish a written grievance procedure and make it available to all offenders.

The contractor shall comply with the most recent version of the BOP program statement entitled <u>Administrative Remedy Program</u>. The contractor shall stock and provide offenders with BOP ADMINISTRATIVE REMEDY FORMS to accommodate any claims directly related to BOP matters, e.g., disciplinary decisions or component assignment.

## CHAPTER 13 - Food & Medical Services

1.   FOOD SERVICES OPERATIONS.  The contractor shall comply with the most recent copy of the FDA, U.S. Department of Public Health, Food Code.

The contractor shall ensure that food provided to the offenders is safe and does not become a vehicle in a disease outbreak or in the transmission of communicable disease.  The contractor shall, to the extent possible, ensure that food is unadulterated, prepared in a clean environment, and honestly presented.

The contractor's food service dining area, either in-house or contracted out, shall not be part of an establishment that serves alcoholic beverages.

The contractor shall require any person who serves, prepares or handles food to have a prior physical examination and possess a valid Food handlers license, if applicable.

The contractor shall provide meals to offenders who work irregular hours and are not available at regularly scheduled meal times.

The contractors shall not prepare anything made with poppy seeds. Since poppy seeds could appear in a urinalysis and suggest the use of narcotics, the contractor shall advise offenders in writing not to eat poppy seeds.  The offender must acknowledge this notice by signing an acknowledgment of this information. The contractor shall document this acknowledgment in the offender's file.

Provisions.  All offenders, regardless of employment or financial status, shall be provided the opportunity for food services (3 meals per day).  On weekends (to include extended weekends when a federal holiday falls on the Friday preceding or the Monday following a weekend), the contractor may provide a brunch instead of a breakfast and lunch (supper is still required).  Under no circumstances will the offender be required to pay for these services.  The contractor shall include these costs in the per-diem rate.

The contractor shall provide a food service program either by contractor preparation and serving on-site or through an off-site food service provider.  If the contractor wishes to change the delivery from on-site to an off-site, or visa versa, they must request approval through the COTR to the CO.

a.  Menus.  All menus must be approved by a Registered Dietician (RD).  A RD is defined as a person who has completed academic and experience requirements established by the Commission on Dietetic Registration, the crediting agency for the American Dietetic Association (ADA).  All fixed menus will be reviewed and approved by a RD at least once during each cycle. The contractor shall maintain a copy of the RD's current credentials and the certified menus for inspection by the BOP.

An RD shall annually review and approve the nutritional value of the menu, if fixed and semi-annually if not fixed.  All the meals shall meet the recommended dietary allowances and the dietary guidelines as set by the current version of the ADA.  The contractor shall maintain a copy of the RD's current credentials and the certified menus for inspection by the BOP.

1) Menus shall be prepared and be posted in a conspicuous place for offender's viewing.

2) Special Menus or Diets.  The contractor shall provide meals which meet diets required by confirmed religious preference, physician or dentist.

b.  Vendor or Food Service Provider.  The contractor providing meals to offenders through arrangements with a local vendor or food service provider, shall provide a copy of their agreement and ensure the following:

- The contractor shall be responsible for the person in charge as defined in the FDA, U.S. Department of Public Health, Food Code.  This responsibility cannot be delegated.

- The contractor shall comply with the requirements in the FDA, U.S. Department of Public Health, Food Code.  The contractor shall show evidence the establishment meets all state and/or local sanitation and health codes, and complies with the FDA, U.S. Department of Public health, Food Code.

- The contractor shall show evidence the vendor or food services provider is a full-service organization, capable of providing breakfast, lunch, and dinner, and identify the person operating as the person in charge on behalf of the vendor or food service provider.  In addition, the contractor shall identify the person who legally owns and operates the vending company or food service.

● The contractor shall show evidence the owner is a permit holder.  Permit means the document issued by the regulatory authority that authorizes a person to operate a food establishment.  The contractor shall maintain a valid copy of the permit.

   c.  On-site food service by the contractor.

● When food services are provided in the facility, the contractor shall have adequate space to provide for food preparation and service and provide an eating and seating area, i.e., at least 15 square feet per person, for all who dine at the same time.  The area shall be separated from sleeping quarters and will be well ventilated, properly furnished, and clean.

● When the contractor prepares and serves meals in the facility, the contractor shall comply with the requirements of the FDA, U.S. Department of Public Health, <u>Food Code</u>.  In addition, all persons preparing food shall comply with federal, state, and local health and sanitation codes.  In the event of any conflict in these codes, the most stringent will apply.  The contractor shall identify the person in charge of food preparation to the COTR.

● The contractor shall comply with NFPA, as it relates to fire extinguishing systems over cooking services.  They shall be equipped with automatic shut-off devices for when the fire extinguishing system is activated.  Fuse links are to be changed and the system tested in accordance with the manufacturers' recommendation.

● Grease filters are to be kept clean and should be made of stainless steel for safety reasons.

   d.  Refuse.  Refuse is solid waste not carried by water through the sewage system.

● Garbage and refuse shall be kept in durable insect and rodent-proof containers which do not leak or absorb liquids.  Garbage and refuse shall be disposed of often enough to prevent the development of odor and other conditions that attract or harbor insects and rodents.

   e.  Liquid Waste.  The contractor shall prevent backflow or back siphonage in accordance with the FDA, U.S. Department of Public Health, <u>Food Code</u>.  The system shall meet <u>American Society of Sanitary Engineering</u> (ASSE) standards for construction, installation, maintenance, inspection, and testing for that specific application and type.

2.  MEDICAL SERVICES.  The contractor shall provide offenders an opportunity to access medical care and treatment.  The intent is to assist the offender in maintaining the continuity of medical care and treatment in accordance with the requirements of this SOW.

The contractor shall provide on-site emergency first aid and crisis intervention to include a first aid kit, trained staff in basic first aid, and policy that outlines steps that employees take in case of an emergency. The contents of the first aid kit shall meet and be maintained by the standards set by the American Red Cross.

The contractor shall ensure that all staff are certified in cardiopulmonary resuscitation (CPR).  In addition, the contractor shall provide that staff are trained to respond to health-related situations to include universal precautions and suicide prevention.

The contractor shall have written policy and procedure regarding the control and distribution of an offender's prescribed medication.  The written policy shall be submitted to the CCM for review.

The CCC will ensure offender medications are stored in an environment absent of extreme temperature, humidity, and according to the medication labeling, e.g., refrigeration required.  The CCC staff will provide the inmate with proper access to the medication.

The contractor shall develop and use a consent form which gives the contractor access to an offender's medical information if the offender becomes hospitalized and is physically unable to provide this consent.  This consent will be in writing and meet all local standards, laws and regulations unique to the contractor's place of performance.  This consent shall be secured by the contractor during the intake screening process and filed in the offender's file.

1.  EXPENSES. Prior to any healthcare treatment being provided, other than emergency treatment, the contractor must receive pre-approval for the treatment from the CCM who will coordinate approval with the Regional Health Services Administrator (HSA). In addition to requesting pre-approval for treatment of services, the contractor must determine if the offender has insurance or other resources to pay the treatment. The contractor must also make every effort to obtain no-cost healthcare treatment for the offender through local social service agencies.

All requests for non-emergent healthcare treatment approval will include: a description of the type of treatment being requested; an estimated cost for the treatment; a statement of the offender's ability to pay for the treatment through private health insurance or other financial resources; a description of the contractor's efforts to secure treatment through local social services if necessary, e.g. the inmate is not able to pay for the treatment; and a discussion of whether the contractor will or will not be financially able to pay for the treatment and then be reimbursed by the government.

The contractor is expected to compensate the healthcare provider for treatment of services. The contractor shall forward the invoice for the healthcare provider to the CCM. The CCM will forward the invoice through the Regional Management Team to the Regional Health Services Administrator for approval and payment to the contractor.

If other than emergency medical treatment is provided without pre-approval or discussions on how  the healthcare treatment will be paid for by Bureau staff, then the costs may **not** be reimbursed by the Bureau and could become the responsibility of the contractor.

   a.  Emergency.  In an emergency, the contractor shall obtain the necessary emergency medical treatment required to preserve the offender's life.  The contractor shall immediately notify the CCM of emergency treatment.

If at any time an offender appears to have a communicable or debilitating physical problem, the contractor shall notify the CCM for approval to make arrangements for an examination.  An exception to this requirement is Medical Screening upon the offender's initial arrival to the facility.

     1)  Payment.  If the offender cannot pay or if the emergency treatment is not covered by the offender's insurance, the contractor shall pay and submit the paid invoice with the regular monthly billing to the CCM.  The Government will reimburse the contractor for all emergency medical treatment for BOP offenders.

2.  PRE-ARRANGED TREATMENT.  The contractor shall have a written arrangement with a licensed general hospital, private licensed physician or clinic to ensure emergency medical service is available 24 hours a day.

3.  EXAMINATION OF OFFENDERS COMMITTED DIRECTLY TO THE CCC. USPO cases committed directly to the facility, shall be screened to identify any medical/mental health conditions from which the

offender is suffering and needs medical attention.  The offender
will receive a complete physical/mental health examination to
detect any health problems.  Special emphasis should be given to
chronic health conditions such as diabetes, hypertension, etc.,
infectious diseases such as TB, HIV, hepatitis, etc., and any
mental health problems.  However, if an offender is suspected of
having an infectious or debilitating health problem through the
initial screening process, the contractor shall arrange for an
immediate medical examination within one calendar day after
arrival.

The examination is to determine any urgent medical or mental
health care needs, restrictions from work, and freedom from
infectious disease.  The contractor shall notify the CCM of those
offenders with immediate mental or medical health needs and
infectious disease.  The results shall be documented and sent to
the CCM with copies to the offender's file.  These procedures are
for the protection of the patient and other offenders and staff.

The complete health examination shall include relevant diagnostic
procedures.  All offenders should be tested for TB (PPD test and
if positive, a chest x-ray), and any other
infectious/communicable diseases if clinically indicated.

Health examinations for offenders committed directly to a CCC,
will be paid by the contractor who will then request
reimbursement from the government by listing health exam expenses
as a line item on the next monthly billing.  Supporting
documentation must accompany the reimbursement request.

If indicated by the CCM, the offender's medical examination may
include a blood test for DNA classification in accordance with
the current Program Statement on DNA Testing.  Test kits will be
provided by the government at no charge to the contractor or
medical facility.

4.  INFECTIOUS DISEASE.  The facility director has a need to know
of institution transfers with positive human immunodeficiency
virus (HIV) or hepatitis B virus (HBV) status for purposes of
pre-release management and access to care.  In instances of
notification, the contractor shall take precautions to ensure
that only authorized persons with a legitimate need to know are
allowed access to the information in accordance with the Privacy
Act of 1974.

The contractor shall observe universal precautions.  This method
of infection control requires all employees to assume that all
human blood and specified human body fluids are infectious for
HIV, HBV, and other blood borne pathogens.  Where differentiation

of types of body fluids is difficult or impossible, all body
fluids are to be considered as potentially infectious.

CHAPTER 14 - Records and Reports

The contractor shall provide that records are safeguarded from unauthorized and improper disclosure and that when any part of the information system is computerized, security ensures confidentiality. The contractor shall provide access to the Government concerning the performance of this contract.

Several sections of this SOW require the contractor to maintain records on offenders, which is considered to be part of the inmate's central file. Other documents are unique to contract performance and are the property of the BOP. The contractor shall not establish a separate system of records without prior approval of the CCM. All records related to contract performance shall be retained in a retrievable format for the duration of the contract. Except as otherwise expressly provided in this SOW, the contractor shall, upon completion or termination of the resulting contract, transmit to the BOP any records and/or documents related to performance of the contract.

1. OFFENDER FILE. The contractor shall maintain a file on each offender that includes all significant decisions and events relating to the offender, and at least the following information:

- Initial intake information form,
- Case information from referral source, if available,
- Case history/social history,
- Medical record, when available,
- Individual program plan,
- Signed release of information (to include medical) & other consent forms,
- Evaluation and case notes,
- Current employment data,
- Signed acknowledgment of receipt of facility rules,
- Signed acknowledgment of receipt of disciplinary policy,
- Grievance and disciplinary record,
- Documented legal authority to accept resident,
- Referrals to other agencies,
- Terminal report, and
- Record of resident finances.

In order to facilitate the planning, implementation, and evaluation of programs, documents entered into the files shall be dated and signed by the staff member making the entry.

The contractor shall provide a method to account for each file and to ensure documents are filed in a timely manner.

2. OTHER RECORDS.

a.  Urine Report.  The contractor shall complete the BOP form URINE SAMPLING PROGRAM (CCC'S) on a monthly basis and forward it to the CCM along with the monthly billing.  The contractor shall also send a copy of this report to the Chief USPO.

The contractor shall maintain a chronological log for all offenders tested under the urine testing program.  The log shall include specimen number, resident's name and number, date sample collected, staff member witnessing collection, reason for test, results and date received.  These individual logs shall be placed in the offender's file.

When submitting a sample for testing, the contractor shall complete the sampling ID slip and place it in the individual offender's file.  Written sample results will be compared with this slip when received from the laboratory.

b.  Bill.  The contractor shall provide the CCM with a monthly bill and a report of each offender's finances to include wages and salaries, number of hours worked, amount and type of deductions, e.g., federal taxes, state taxes, social security contributions.  In addition the report shall include information regarding savings, amount of subsistence collected, and any financial obligations, i.e., restitution, COIF, fine payments, Court ordered child support paid by the offender.

The contractor shall send invoices to arrive in the CCM office by the 10th of the month.  The CCM may require earlier submission.

c.  Logs.  The contractor shall control and monitor access to all logs.

1)  Visitor Log.  The contractor shall maintain a log for all visitors to indicate; name, organization, time in/out, and purpose of visit.

2)  Employment.  The contractor shall maintain a written log of an offender's employment, and/or unemployment.  The log will list all offenders by name and register number.  It will indicate date of arrival, date employed.  The contractor shall document an offender's file when the offender does not obtain employment 15 calendar days from their arrival.

3)  Sign IN/OUT.  The contractor shall maintain a sign in/out log as indicated in the Sign-Out Procedures.

4)  Search Log.  The contractor shall maintain a log to indicate searches of the facility.

5)  Urine Sample Testing Log.  The contractor shall maintain a log to indicate urine samples taken from offenders.

6)  Alcohol Testing Log.  The contractor shall maintain a log to indicate alcohol tests taken from offenders.

7) Other logs as directed by the CCM.

3.  CONFIDENTIALITY.  The Privacy Act and Freedom of Information Act (FOIA) sets forth a series of requirements governing federal agency record keeping practices intended to safeguard individuals against invasions of personal privacy.  The determination of what information may be released requires staff to have a basic understanding of both the FOIA and the Privacy Act.  Staff also should be aware that the Privacy Act establishes criminal penalties and civil liabilities for unauthorized disclosures. The contractor shall not release any BOP document to an offender or anyone else without the approval of the CCM.

The contractor shall not release information to any individual unless the subject of the request has provided written consent and the CCM has approved.

BOP documents that are sought by subpoena, Court order, or other Court demands are subject to the approval of the Attorney General or his or her designee before they may be produced.  The guidelines are set forth in 28 CFR §16, subpart B.  Accordingly, if a contractor receives such demands they shall notify and consult with the CCM for advice regarding proper handling of the demand.

In order to release information to an offender's employer and other third parties, the contractor will obtain a release form from the offender.  Likewise, offenders shall acknowledge other conditions of residence in a center program which include, but are not limited to, urine testing, subsistence collection, medical treatment, and an agreement to abide by posted regulations.

• **Pre-Sentence Report** - Particular care must be taken to protect the Pre-sentence Report and third party disclosure.  This document is the property of the US Courts and copies may not be provided to anyone, even the offender, without permission from the Court.  It must be returned to the BOP upon release, termination, escape, or death of an offender.  Some Judicial Districts have imposed even more strict requirements concerning release of the PSR.  Contractors must consult their CCM and follow local Bureau instructions for safeguarding the PSR. Please direct questions to the CCM.

CHAPTER 15  -  Release Preparation

The contractor shall ensure timely and appropriate releases of offenders from custody.  The contractor shall provide written procedures for releasing offenders at the end of their sentence, but not limited to, the following:

- Verification of identity;
- Verification of release papers;
- Completion of release arrangements;
- Notification of the USPO, if required;
- Return of personal effects such as medication;
- Check to see that no facility property leaves the facility;
- Arrangements for completion of any pending action;
- Arrangements for community follow up if required;
- Instruction on forwarding of mail; and
- Obtain forwarding address and telephone number.

1.  RELEASES.  The contractor shall provide written procedures for establishing a formal release plan for offenders and execute appropriate release certificates.  The plan shall include the offender's verified residence and employment or training program.

The contractor shall consult with the CCM on each offender's release to verify the actions required of the contractor.

Offenders shall be released by 9:00 A.M.  By 10:00 A.M. of the same day, the contractor shall telephonically notify the CCM of offenders released from the CCC.  The contractor must make contact with a live person.  Leaving a recorded message is unacceptable.  Releases outside this requirement must be coordinated with the CCM.

   a.  Types of Releases.  For a discussion of release types, refer to Program Statement 5800.13, Inmate Systems Management Manual, Chapter 11.

   b.  Release Planning.  With the exception of FULL TERM RELEASE with no supervision to follow, staff at least six weeks before a release date submit a proposed release plan to the USPO for investigation and approval.

At least six weeks before a parole release date, staff shall submit a request for a parole certificate to the U.S. Parole Commission, with the USPO approval attached.

Parole certificates are mailed or faxed from the U.S. Parole Commission directly to the CCC.  The contractor shall consult with the CCM to ensure that the number of days remaining to be

served is accurate and that any special conditions are noted on the reverse side of the parole certificate prior to the offender being released from the CCC.  The contractor shall mail the signed parole certificate to the CCM.

> NOTE:  Conditions of release are read to the offender and the offender's signature (witnessed and dated by a staff member) is obtained on each of the parole certificates and SPT certificates, when applicable. Each page of the certificate is signed individually, in pen, and is not carbonized.  Release on parole is not effective without the offender's signature.  Copies are distributed as follows:(a) original to offender;(b) copy to USPO; (c) "institution copy" to CCM; and (d) copy to U.S. Parole Commission Office.

If an offender is releasing to some type of supervision, the contractor must advise the offender to report to the USPO within 72 hours of release from the CCC.

2.  RELEASE DOCUMENTS.  The contractor shall verify all release documents with the CCM five days prior to release.  The contractor shall ensure all releasing documents have original signatures, are dated and appropriately distributed.  The contractor is responsible, but not limited to the following:

- Parole Certificate,
- Mandatory Release Certificate,
- Special Parole Term Certificate,
- Conditions of Supervision,
- Notice of Release and Arrival, or
- Notice to the U.S. Attorney of Release of Inmate with Criminal fine.

3.  RELEASE CLOTHING, FUNDS, AND TRANSPORTATION.  The BOP provides release clothing, funds and transportation at the time an offender is transferred from an institution to a CCC.

In unusual circumstances, due to the location of the CCC or the conditions of an offender's confinement in a CCC, the need may arise for the contractor to provide release clothing, funds, and transportation for a releasee.  When these rare occasions arise, the contractor shall develop and submit an itemized plan for an offender's release clothing, funds, and transportation needs to the CCM for approval prior to release.  If approved, the contractor will provide the release funds, clothing, and make the necessary transportation arrangements for the offender. Documentation, e.g., paid invoices, shall be forwarded with the monthly billing.  The contractor will be reimbursed by the

Government for CCM approved release clothing, funds, and
transportation.

4.   TERMINAL REPORT.  The contractor shall complete a terminal
report on all releasing offenders within five working days of
release.  It shall follow the Case Notes format and shall
include, in addition, the following:

- A description of adjustment;
- A prognosis for future adjustment,
- Suggestions on how the offender could have been
  better prepared for his/her placement in the CCC,
- Final status of offender's money, i.e.,
  obligation payments, savings; and
- Release plans, including: (a) residence,
  (b) employment and (c) salary.

Distribution:  original to CCM, copy to the USPC (if applicable),
and a copy to the appropriate USPO.

5.   PROPERTY.  The contractor shall establish and maintain
procedures to dispose of an offenders' personal property in event
of death, escape or transfer.  Inventory must be accomplished by
no less than two staff, each of whom will sign and complete an
inventory list.  Property shall be immediately secured and
inventoried prior to the end of the work shift.  Personal
property left behind by an escapee shall be considered
voluntarily abandoned.  The contractor shall contact the CCM for
instructions.  If an offender is being held in a local jail,
whoever was listed to be notified on the intake screening form
will be advised to pick up the property after the property is
released by the investigating officers, if applicable.

6.   FILES.  Upon completion or termination of the offender's
program, the contractor shall forward the file, to include all
contractor generated documents, to the CCM along with the
terminal report within five calendar days of the offenders
release.  The contractor may dispose of the CCC referral packet,
which must be shredded.  The contractor may retain public
information which can identify the former offenders, copies of
research data which have been depersonalized and copies of
reports generated by the contractor.

CHAPTER 16  -  Escape Procedures

Accountability procedures begin when an offender arrives at the CCC. A CCC is commonly called a "halfway house" which indicates the offender is not in prison, nor has total freedom in the community.  Rather, the CCC is halfway between prison and the community.  Residency in the CCC is a major adjustment for the offender and it will be very difficult.  The contractor shall develop programs that will assist the offender in meeting the challenges residency in a CCC will present.

The contractor shall develop and use a program that communicates the importance of offender accountability.  This lecture/presentation shall be given during the offender's admission and orientation period, ordinarily during the first two weeks.

At a minimum, the presentation will include information about decision making; accepting the consequence of the decisions; personal accountability; personal management of challenges presented to the offender during CCC residency; resource person(s) who will assist the offender in meeting these challenges; consequence of escapes; sign-in/sign-out procedures, pass and furlough procedures; component assignment; and appropriate behavior both in the community and CCC.

1.  ESCAPE.

   a.  Definition.  An escape occurs when an offender fails to remain in custody by:  not reporting to the facility for admission at the scheduled time; fails to remain at the approved place of employment or training during the hours specified by the terms of the employment or training/treatment program; fails to return to the facility at the time prescribed; fails to return from an authorized furlough or pass at the time and place stipulated; fails to abide by the residence, employment or curfew conditions of home confinement; is arrested; or otherwise leaves without permission from staff.

Offenders under supervision (USPO cases) are not in the custody of the BOP and cannot be considered escapees.  These offenders are referred to as "absconders."  When they are deemed missing or escaped, the contractor shall immediately (or as coordinated locally with the supervising authority) report to the supervising authority, i.e., USPO.  The contractor shall notify the CCM of USPO absconders the same day as the event.

   b.  Staff Action.  The contractor shall provide written procedures that ensure that all staff understand and

appropriately report an escape.  These procedures will
specifically instruct staff when an offender is considered
missing, i.e., not at their approved location.  These procedures
shall include instructions to determine if the offender is in the
facility, at the pass location, or at the residence (if on home
confinement), or on escape status.  The instructions shall
include procedures to reasonably attempt to locate the offender
which may include going to the pass location or residence.

The contractor shall develop a step-by-step procedure that covers
the following: internal notification; a thorough search of all
areas inside the facility; telephone contacts where the offender
has signed-out; and telephone inquires to determine if the
offender has been arrested or injured.  This should ordinarily
take less than 20 minutes.  If all efforts to locate the offender
have failed, the **facility Director** shall consider the offender as
ESCAPED and **immediately notify the CCM**.  The contractor shall
prepare an incident report and conduct a discipline hearing in
the offender's absence.

   c.  Fiscal Impact.  The BOP does not pay the contractor for the
day of escape.

   d.  Preventive Measures.  The contractor shall notify the CCM
anytime an offender's behavior or poor programming makes them an
escape risk.  The contractor shall train staff to recognize
observed aberrant behaviors and report these instances.
Offenders with Public Safety Factors or any special needs case
exhibiting unusual behavior requires closer attention and
reporting to the CCM.  Some indicators may include frequent
tardiness, misconduct, or continued disrespect toward peers and
staff.  The intent is to apply intervention measures to prevent
the offender from escaping.

If an offender receives an incident report that may cause program
failure, the contractor shall contact the CCM prior to issuing
the report.  The CCM will consider coordinating the issuance of
the report with the USM's apprehension of the offender.

The contractor shall allow any offender, who has been determined
to have escaped by the contractor, to return to the facility.  In
this instance, the contractor shall immediately notify the CCM so
that an appropriate action plan can be determined.

CHAPTER 17 - Serious Illness, Injury, or Death

The contractor shall notify the CCM when an offender becomes
seriously ill, requires emergency medical treatment or dies.  The
CCM will notify the offender's family or next of kin.

Immediately upon the death of an offender, the contractor shall
assemble and advise the CCM of the following information
concerning the deceased offender:

    (1)  Name, register number, date of birth;
    (2)  Offense and sentence;
    (3)  Date, time, and location of death;
    (4)  Apparent cause of death;
    (5)  Investigative steps being taken, if necessary;
    (6)  Name and address of survivor or designee;
    (7)  Notifications made;
    (8)  Status of autopsy request; and
    (9)  Brief medical history related to death.

The contractor shall arrange for the fingerprinting of the thumb
of the right hand to be taken, and staff shall date and sign the
fingerprint card to ensure positive identification has been made.
The fingerprint card shall then be sent by certified mail to the
CCM.

If death is due to violence, accident surrounded by unusual or
questionable circumstances, or if death is sudden and the
deceased was not under medical supervision, staff shall notify
appropriate law enforcement officials of the local jurisdiction.
The purpose of this notification is to review the case and
examine the body, if necessary.

When there is no longer an official interest in the body, it may
be turned over to family members or next of kin.  Should the
family decline the body or be unable to afford funeral expenses,
the contractor shall contact the CCM for disposal instructions.

Personal property of a deceased offender will be inventoried and
forwarded to the person to be notified in case of emergency on
the intake screening form.

## CHAPTER 18  -  USPO Cases

Ordinarily, USPOs are responsible for the overall supervision of offenders who are placed in a CCC as a condition of pre-trial, probation, parole, mandatory release, or supervised release supervision.

The contractor shall not accept persons described in this chapter unless they have been approved for placement by the CCM.

The contractor shall provide all services and programs cited in the SOW for all persons described in this chapter, except as specified below:

• Driving - Permission to drive must be approved by the facility director and the supervising USPO.

• Discipline - Persons under supervision as described in this chapter are subject to facility rules and minor sanction. However, if an act is alleged to have been committed by an offender under supervision that would require a recommendation of a major sanction, a formal discipline hearing is not required. Rather, staff shall forward the original report of misconduct with recommendations to the USPO for disposition.  The contractor shall forward a copy to the CCM.

• Intake - Staff, in cooperation with the USPO, shall develop an individual program plan for each offender.

• Financial Obligation - Offenders under supervision shall pay subsistence.  The contractor shall immediately notify the CCM if the Court indicates that subsistence should not be collected on USPO cases.

• Medical Services - The contractor shall notify the USPO of medical problems of probationers, parolees, mandatory releasees and supervised releasees.  All medical and dental expenses for persons under supervision of a USPO are the responsibility of the offender.  Staff should assist the offender in finding appropriate community resources.

• Marriage - Offenders under supervision shall submit requests for marriage to the USPO.

The contractor may not request persons under supervision be placed in USM custody.

• Any unauthorized absence of persons described in this chapter shall be reported immediately to the USPO.  If the unauthorized

absence occurs after regular business hours, the CCM shall be notified the next calendar day or as directed by the CCM.

• Drug counseling and urine and alcohol surveillance are the administrative and fiscal responsibility of the USPO.  The contractor shall work closely with the supervising USPO to coordinate services.

• Financial Responsibility - Supervision cases are subject to the same financial responsibility procedures as BOP offenders, including subsistence collection.

• Release - When the term specified by the Court has been satisfied, or the facility director determines an offender's program is completed or participation will produce no further significant benefits, staff shall notify the USPO and request termination.  The contractor will copy the CCM with this action. A terminal report shall be completed by the contractor and forwarded to the USPO and the CCM.  The contractor shall ensure the CCM has been properly notified of all requests for program termination and received terminal reports before release.

• Offenders identified in this chapter are not eligible for furloughs or home confinement.  Absences other than "sign-out" shall be approved by the supervising USPO, and documented by the contractor.

• Death - In the event of death, the contractor shall immediately notify the USPO and CCM.  The USPO is responsible for disposal of the body and any administrative follow-up procedures.

• Basic mental health treatment for offenders under supervision is the financial responsibility of the supervising authority if the resident is uninsured or is unable to pay. Note: Initial medical screening is paid by the BOP.

CHAPTER 19  -  Research and Evaluation

The BOP does not operate CCC facilities using BOP staff and is
therefore dependent upon data generated and maintained by the
contractor for research and evaluation purposes.

The contractor may be requested to participate in "pilot testing"
of new and innovative BOP program initiatives on an as-needed
basis.

The contractor shall be responsive to all BOP surveys or
questionnaires in a timely manner.

CHAPTER 20 - BOP Inspections

The objective of BOP inspections are to ensure that the contractor is in compliance with applicable laws, regulations, policies, contract requirements, and that fraud, waste, abuse, mismanagement, and illegal acts are prevented, detected, and reported.  Once a contract has been awarded, inspections are conducted.

The contractor will receive feedback to inspections in the form of monitoring reports or direct correspondence.  This feedback may assign deficiencies which the contractor shall remedy.  A deficiency is determined when evidence indicates that the contractor has failed to meet the performance requirements of the contract.  The evidence that supports a deficiency will be factually sufficient to lead a knowledgeable, reasonable person who is not an expert in the program area to the same conclusion as the reviewer.

The BOP reserves the right to determine the resources, e.g., number and type of staff, number of working days necessary to perform all inspections and monitoring visits as defined in this chapter.

1.  PREOCCUPANCY VISIT.  After contract award, but before the CO issues the "notice to proceed" the BOP may conduct a preoccupancy visit at the facility.  During this visit, the BOP will determine the contractor's ability to begin performance by inspecting, at a minimum, all emergency plans, life/safety and zoning issues for compliance to the SOW.

The contractor shall be in compliance with all aspects of the contract to include emergency plans, life/safety and zoning issues before the CO will issue the "notice to proceed."

  a.  Emergency Plans.  After contract award, but before the CO issues the notice to proceed, the contractor shall submit to the CCM a complete written copy of the facility's emergency plans as required in the SOW.

  b.  Life/Safety Issues.  After contract award, but before the CO issues the notice to proceed, the contractor shall be in compliance with all life safety issues as required by the SOW, unless otherwise indicated by the CCM.

  c.  Zoning.  The contractor shall submit, upon request by the BOP, satisfactory proof that all zoning and local ordinance requirements have been met which are necessary for operation and applicable to any proposed performance site(s).  Such proof shall

be in writing and shall consist of documentation from necessary local officials stating the contract may be performed at the proposed site(s) in accordance with the current zoning and other requirement of the local jurisdiction.

"Necessary local official" means an employee or elected person whose approval or concurrence as to the propriety of the use of the proposed site is required under any and all applicable laws of the state, county, city, town, village, or municipality in which the facility is located.

2.   OTHER VISITS.  The contractor shall except and accommodate visit(s) or inspection(s) by the BOP, or an investigative authority as indicated in the SOW, at anytime during the life of the contract.  Other visits may occur for the purpose of training or to resolve general contract issues.

3.   FULL MONITORING.  A full monitoring is a comprehensive inspection and review of all aspects of the contractor's operation and facility.  The first full monitoring ordinarily occurs 60-90 days from the date performance began.  Ordinarily, the contractor is given notice of an upcoming full monitoring in advance.  A full monitoring may take several days and will produce a monitoring report.

A monitoring report contains all the deficiencies that are a serious contract violation as determined by the reviewer.  The report also outlines appropriate corrective action.  The contractor shall respond to the CCM within 30 days of receipt of the report (unless otherwise directed by the CCM).  The contractor's response shall address all suggestions, advised items, discrepancies, deficiencies, and significant findings, and specify a plan of action for correction.  The contractor shall also indicate a realistic time frame/date when each correction will be completed.  This in no way releases the contractor from performing the requirements of the contract.

If the CCM makes any recommendation to modify procedures and practices of the facility operations or physical structure, the contractor shall respond in writing indicating their intent to adapt or accept the recommendation or comment.

If the CCM directs the contractor to modify procedures and practices of the facility operation in accordance with the requirements outlined in the SOW, the contractor shall respond in writing indicating their compliance.

4.   INTERIM MONITORING.  An interim monitoring is an unannounced on-site examination of deficiencies noted in a prior monitoring.

Ordinarily, the interim monitoring inspects, but is not limited to, those areas which are problematic. It is ordinarily brief and is not intended to be as lengthy and comprehensive as a full monitoring. Subsequent to an interim monitoring, the contractor will receive a letter acknowledging the interim monitoring from the CCM. The letter will also indicate all areas found non-compliant. The contractor shall respond in accordance with the requirements in the full monitoring section of the SOW.

5. CONTRACTOR EVALUATION FORM (CEF). The CEF is an annual assessment conducted by the COTR. The rating period represents 12 months of contract performance and ordinarily is conducted at the end of each performance period as identified on the Contract Award document. Upon review and approval by the Regional Management Team, the COTR sends the CEF to the CO who reviews the document then provides it to the contractor for comments. The contractor will have 15 working days to make comment and return the form to the CO.

1. **Ratings.** The CEF transmits an adjectival rating based on an assessment of the contractor's performance. The assessment must include and incorporate the findings of the interim and full monitoring reviews performed during the rating period specified. Consideration may also be given to other documented interactions with the contractor. i.e., written correspondence. The assessment must discuss the strengths and weaknesses of the contractor performance during the specified time period.

   a. **Rating Period.** The rating period represents 12 months of contract performance as identified on the contract award document. The rating is due at the end of each performance period. If the contract has a two year base period, a rating is due at the mid-way point and at the end of the base period and at the end of each subsequent option year. A CEF is also completed at contract expiration or termination.

   b. **Assessment.** The COTR assesses the contractor's performance in six areas:

- Accountability
- Programs
- Community Relations
- Site Validity and Suitability
- Personnel
- Communications/Responsiveness

   (1) **Accountability.** This factor addresses if the contractor has maintained offender accountability in accordance with their offender accountability plan for ensuring offenders are

accurately accounted for while (1) in the facility; (2) at work
assignments; (3) in all other activities outside the facility;
and (4) under home confinement?  Has the approach been tailored
to the geographic area?  Have there been any patterns or
unresolved breaches of accountability during the rating period?

(2) **Programs.**  Does the contractor have a process for
assessing the individual needs of each offender to assist with
their reentry into the community?  How effective has the process
been this rating period in assisting offenders in finding
employment, housing, and developing skills to prepare and prevent
the offender from returning to a criminal lifestyle (to include,
but not limited to, money management, parenting, and family
reunification)?  How effective and extensive is the community
resources network?

(3) **Community Relations.**  Does the contractor have a process
for educating and interacting with the local community in order
to acquire and maintain public support?  What efforts have been
made during this rating period to foster positive community
relations?  Discuss the workings and make-up of the Community
Relations Board.

(4) **Site Validity and Suitability.**  During this rating
period, has the contractor complied with all applicable local,
state, national health, safety, environmental laws, regulations,
Executive Orders, and building codes?  Are zoning and occupancy
permits still valid?

(5) **Personnel.**  How effective has the contractor been in
ensuring adequate staff have been recruited, trained, and
retained?  Have staff met the annual training requirements?  Are
new staff receiving orientation within SOW guidelines?  Have new
staff received and signed for integrity guidelines?  Have there
been patterns or unresolved integrity issues during this rating
period?

(**6**) **Communications/Responsiveness.**  During the specified
rating period, has the contractor provided for open lines of
communications about and rapid response to Bureau needs,
requirements, and directions?

c.  **Adjectival Ratings.**  Based on the written narrative, an
adjectival rating will be determined.  The COTR must assign one
of the following ratings to each Factor:

***Very Good***:  Contractor's performance meets or exceeds the
requirements of the contract.  One or more significant strengths

exist.  Weaknesses may exist, but none are considered significant and are easily correctable.

***Acceptable***:  Contractor's performance meets the contracts minimum requirements.  They have demonstrated they have acceptable solutions for meeting the needs and objectives of the program.  Strengths and weaknesses may exist.  The weaknesses are correctable.

***Poor***:  Contractor's performance does not meet the requirements of the contract.  Their performance has shown they have poor solutions for meeting the needs and objectives of the program.  Weaknesses outweigh any strengths that may exist.  The weaknesses are difficult to correct.

***Unacceptable***:  Contractor's performance fails to meet the requirements of the contract.  Their performance shows they have an unacceptable solution for meeting the needs and objectives of the program.  There are numerous weaknesses.  The weaknesses will be very difficult to correct or are not correctable.

   d.  **Calculating the Overall Adjectival Rating**

      (1)  Determine if there is a majority of adjectival ratings used for each of the six factors.  The majority rating will be the overall rating (i.e., four acceptable ratings and two very good ratings will result in an overall rating of acceptable).

      (2)  If there is a tie in the overall adjectival rating, the COTR will write a justification explaining why he/she made the final rating determination.

      (3)  If the contractor has been terminated for performance related issues during the rating period the adjectival rating will be "Unacceptable."

2.  **RESPONSIBILITIES.**

   a.  **COTR.**  The COTR and RMT must concur on the overall adjectival CEF rating.  The COTR will prepare the CEF and forward it electronically to the RMT for review.  After approval by the RMT, the RMT and COTR will sign the CEF electronically and forward it to the CO.  The CO will complete a review of the form and, if necessary, may request the COTR to clarify information on

the CEF.  COTR clarifications will need to be routed through the RMT prior to being forwarded to the contracting officer.  The responsible CCM office will maintain a copy of the finalized CEF

packet for their contract file.  The form should be forwarded to the contracting officer within 30 days after the end of the rating period.

The CO will forward the CEF to the contractor for their review and comments.  The contractor will be allowed 30 calendar days to respond.  Upon receipt of the contractors comments, the CO will determine if a different rating is warranted.  Changes in ratings will be communicated by the CO to the contractor and COTR within 5 business days.

6.  RESPONSIBILITIES OF THE CONTRACTOR.  The contractor shall respond to all inspections, i.e., monitoring reports, CEFs and CCM inquiries within the appropriate time frame.

The contractor shall take appropriate actions to correct deficiencies and improve operations, and ensure that adequate administrative controls and monitoring systems are in place to prevent the deficiency from recurring.

7.  REPEAT DEFICIENCIES.  A repeat deficiency is a serious issue. Therefore, the authorized negotiator shall provide a separate response to the CCM, with a copy to the CO, specifically addressing the repeat deficiency.  This is in addition to the facility director's response to the CCM.  The authorized negotiator must describe the measures and internal controls to be implemented to ensure that the problem will not occur again, as well as explain why the problem was not corrected from the prior review.  The authorized negotiator's response is due no later than five calendar days after receipt of the report.

CHAPTER 21 - Cost Reimbursements

In the event an offeror changes their proposed site during the negotiation process after the BOP has inspected the facility, the offeror shall be required to reimburse the BOP for all reasonable costs associated with the re-inspection of the new proposed site(s) due to the offeror's change in proposed facility, if applicable.  Failure to reimburse the BOP within ten calendar days of written notification shall result in elimination from consideration for award of the contract.

When a contractor fails to respond to an inspection report or repeatedly fails to correct documented deficiencies, the BOP may increase the number of its inspections, and thus charge the contractor for the reasonable costs associated with these visits. If the BOP must repeatedly visit facilities above and beyond the routinely scheduled activity of monitoring and training, the contractor shall be required to reimburse the BOP for all reasonable costs associated with providing technical assistance, training and oversight required to improve contractor performance to a satisfactory level.  These costs shall be deducted from the monthly billing to the Government.

In addition, the contractor shall be subject to Government withholding, when and if they have been found to be in non-compliance with the conditions of the contract.  Once the contractor has been informed of a problem, and does not comply within the specified time, they will be notified of pending withholdings and the basis for the withholdings by CCM.

The BOP will schedule a preoccupancy inspection following contract award and before performance.  If the BOP must repeatedly inspect the place of performance (facility and location) due to the contractor's failure to complete necessary facility repairs or renovations, or failure to meet minimum programmatic requirements so that performance may begin, the contractor shall be required to reimburse the BOP for all reasonable costs associated with a second (or subsequent) preoccupancy inspection.  These costs shall be deducted from the monthly billing to the Government.

The requirements of this chapter do not modify nor waive the rights of the BOP to terminate a contract for default under the terms and conditions of the contract.

CHAPTER 22 - Sexual Abuse Intervention

1.  GENERAL DEFINITIONS.  Sexual abuse/assault impacts offenders and employees and the orderly running of the facility.  Sexual abuse/assault/misconduct is defined as verbal or physical conduct of a sexual nature directed toward an offender by another offender, staff member, agent or volunteer of the facility, or private organization.  Sexual misconduct by staff against an offender shall be prohibited by policy.  Sexual misconduct, as it relates to an offender, is a sexual advance, welcome or not, by an offender, staff member, agent or volunteer of the facility. There is no such thing as consensual sex between staff and inmates.  It is illegal and a violation of federal law.

2.  RESPONSIBILITIES.  The contractor shall develop and implement a comprehensive staff training program addressing the facility's sexual abuse/assault prevention and intervention program. Written policy, procedure, and practice shall provide that all staff receive such training during pre-service training and on an annual basis as part of the facility's in-service training plan.

The contractor shall develop and make available to all offenders an education program which addresses the subject of sexual abuse/assault.  The content of the educational program must include topics such as recognizing behaviors that are inappropriate, harassing, or assaultive; how to seek protection; privacy rights; medical and psychological programs for victims of abuse; how to confidentially report sensitive issues to facility staff, the BOP, the Office of Inspector General, and local law enforcement.

The contractor shall immediately report all sexual misconduct allegations to the CCM.

The contractor shall establish a local intervention protocol that offers the offender immediate protection from the assailant.

The contractor shall have in place procedures which assure a medical examination and counseling by a clinical psychologist within 24 hours of an incident.

# Request for Contract Staff Background Investigation

Facility:_____     Location Code: _____

*Please type all information*

| LAST NAME | FIRST NAME | MIDDLE NAME OR INITIAL | OTHER NAMES USED |
|---|---|---|---|
|  |  |  |  |

| POSITION OR JOB TITLE | ANTICIPATED HIRE DATE | CRIMINAL HISTORY, IF APPLICABLE | |
|---|---|---|---|
|  |  |  | |

| SEX | RACE | HAIR | EYES | HGT | WGT | DOB |
|---|---|---|---|---|---|---|
|  |  |  |  |  |  |  |

| DRIVERS LICENSE - STATE & NUMBER | SOCIAL SECURITY NUMBER | CITY AND STATE OF BIRTH |
|---|---|---|
|  |  |  |

| OTHER STATES LIVED OR WORKED IN | | |
|---|---|---|
|  |  |  |
|  |  |  |

*If this is a Key Staff Member, a copy of the applicants application and resume must be attached. Upon Conditional Approval, a sealed transcript must be sent directly to the CCM office from any schools, colleges or universities identified on the application which substantiate the individuals qualifications to fulfill the position.*

**Applicants Acknowledgment:**

I authorize the release to the Federal Bureau of Prisons of any information generated as a result of a national Crime Information Center/National Law Enforcement Telecommunications System (NCIC/NLETS) criminal history check on me, or any other information necessary to determine my suitability for work with federal offenders.

I also authorize the Federal Bureau of Prisons to disclose to the facility director or the contractor's "authorized negotiator" all information generated as a result of a National Crime Information Center/National Law Enforcement Telecommunications System (NCIC/NLETS) criminal history check on me, or any other information necessary to determine my suitability for work with federal residents at the above noted facility.

I understand that all my records are protected under federal privacy regulations and cannot be disclosed without my written consent unless otherwise provided for in the regulations. I also understand that I may revoke this consent at any time except to extent that action has been taken in reliance on it. In any event, this consent will cease to be effective after my employment.

_____
Signature of Applicant                                          Date

_____
Printed Name and Signature of Witness (Program Director)          Date

```
┌─────────────────────────────┐        ┌─────────────────────────────┐
│                             │        │                             │
│        Photocopy            │        │        Photocopy            │
│    (If permitted by law)    │        │                             │
│      Drivers License        │        │   Social Security Card      │
│        in this Box          │        │        in this Box          │
│                             │        │                             │
└─────────────────────────────┘        └─────────────────────────────┘
```

## INITIAL INTAKE FORM

**U.S. DEPARTMENT OF JUSTICE**                              **FEDERAL BUREAU OF PRISONS**

**Facility Name and Address:**

**Contract staff Completing the Interview (Print):**

| **Name of Offender:** | **Register Number:** | | | |
|---|---|---|---|---|
| **Offender Home Address:** | **DOB:** | **SSN:** | **Race:** | **Sex:** |
| **Religion:** | **Date and Time of Arrival:** | | | |

**1. NOTIFICATION IN CASE OF EMERGENCY/DEATH (Offender Completes):**

In an emergency or death, I direct that my _____ , whose name and
                                      (relationship)

address is _____
         (Name)     (Street)     (City)        (State)     (Telephone Number)

be notified.

**Name and Telephone Number of Personal Physician:**

**Special Medical/Mental Health Needs:** To include medications issued at the institution, medication left, prescribed medications to be controlled by facility, medication compliance, etc.

**Disposition of Personal Property:**

**Personal and Release Needs:**

**2.  STATUS (Contract staff Completes):**

**Component Assigned:**    Community Corrections    Pre-Release    Home Confinement
**Type of Case (BOP or USPO):**
**(BOP cases are in custody and subject to removal to a BOP institution)**

**Case Manager Assigned:**

**3.  SIGNATURES (Contract staff and Offender Completes):**

| | | | |
|---|---|---|---|
| **Contract staff Signature** | **Date & Time** | **Offender Signature** | **Date and Time** |

Record Copy - Facility Director; Copy - CCM

(This form may be replicated via Computer)

# CASE NOTES

SECTION A

A.1  Identify the offender by name and register number.
A.2  List type case,  BOP or USPO case.
A.3  List offender's assigned component, community corrections, pre-release, or home confinement and special instructions, if any.
A.4  Indicate offender's release date and how verified.
A.5  Identify, if applicable, if written notice of VCCLEA and PLRA was done.


SECTION B - Facility adjustment (brief summary)

B.1  Program plans and time tables;
B.2  Employment, include job search progress;
B.3  Educational/vocational participation;
B.4  Program participation list both current and completed, also indicate when and by whom the pre-release or home confinement component was approved;
B.5  Disciplinary actions, chronologically list all actions at the CCC (informal resolutions are not to be included);
B.6  Physical and mental health, including any significant mental or physical health problems, prescribed medication compliance, and any corrective action taken;
B.7  Financial responsibility plan and current status; and
B.8  Passes/Furlough (chronologically list all and summarize offender's success).


SECTION C  Release planning:

C.1  When appropriate, staff shall request that the offender to provide a specific release plan that includes address and employment;
C.2  Staff shall identify available release resources and any particular problem that may be present in release planning.

**Have both offender and contract staff sign and date the notes.**

URINALYSIS PROCEDURES

URINALYSIS TESTING SPECIFICATIONS

The laboratory must comply with all specifications contained herein and all applicable local, state, and federal law as indicated in 42 CFR Part 493.

Urine samples submitted for testing shall contain the laboratory's required minimum amount of urine, ordinarily 25 milliliters.

If necessary because of litigation, the laboratory must provide a qualified expert witness to testify as to laboratory procedures employed as well as to accuracy and reliability of test results. Additionally, the laboratory must be able to prove chain of custody.

The laboratory must demonstrate a satisfactory intrinsic quality control program and must participate in at least one proficiency testing program conducted by local, state, or federal agencies, or professional groups, and must have demonstrated satisfactory performance in that proficiency testing program for at least the last two years. The laboratory shall provide results of proficiency testing to the contractor, at least annually. CCMs will review these findings during monitoring visits.

Specifications of Methodology.

Sensitivity. The laboratory shall have the capability to detect and identify certain drugs and metabolites by basic screen at minimal levels, or lower, as indicated in the PRIMARY TEST PANEL.

Basic Screening Procedures. All primary initial screen tests will be with Enzyme Multiplied Immunoassay Technique (EMIT)/FDA Approved Methodology Testing as indicated, with the SPECIAL test initial screen being EMIT/FDA Approved Methodology Testing as indicated under the SPECIAL test group. All testing will be performed according to manufactures specifications for all requests and instruments, as in FDA approved package inserts or appropriate manufacturer accreditation body which has reviewed and accepted the laboratories modified protocol.

Confirmation of Positive Tests. The approved methods of confirmation of specimens testing positive are listed in both the Primary and SPECIAL test panels above. Confirmation tests must be done on all initial positives. Authorized confirmation methodologies include Thin Layer Chromatography (TLC), High Performance Thin Layer Chromatography (HPTLC), and GC/MS test methodology. No substitutions can be made to the methods. The positive rate of all samples is estimated to be between 6 percent and 7 percent.

Other Requirements. The laboratory must perform the test within 48 hours of receipt. The laboratory will telephonically notify the contractor facility of positive results within 24 hours of the time the test was performed. Urine specimens testing positive must be retained by the laboratory for minimum of 30 days for possible retesting, if requested.

<u>URINALYSIS PROCEDURES</u>
## Primary Screen Panel

| DRUG/SUBSTANCE CONFIRMATION | SCREEN METHOD | SCREEN LEVEL | CONFIRMATION METHOD | CUTOFF |
|---|---|---|---|---|
| Amphetamines Amphetamine Methamphetamine | **Enzyme Multiplied Immunoassay Technique** or a Certified Comparable Testing Technology | 1000 ng/ml | **Gas Chromatography** or a Certified Comparable Testing Technology | 300 ng/ml |
| Barbiturates Amobarbital Butabarbital Butalbital Pentobarbital Phenobarbital Secobarbital | **Enzyme Multiplied Immunoassay Technique** or a Certified Comparable Testing Technology | 300 ng/ml | **Gas Chromatography / Mass Spectrometry** or a Certified Comparable Testing Technology | 300 ng/ml |
| Benzodiazepines | **Enzyme Multiplied Immunoassay Technique** or a Certified Comparable Testing Technology | 300 ng/ml | **Gas Chromatography** or a Certified Comparable Testing Technology | 200 ng/ml |
| Cannabinoids (THC/Marijuana) | **Enzyme Multiplied Immunoassay Technique** or a Certified Comparable Testing Technology | 50 ng/ml | **High Performance Thin Layer Chromatography** or a Certified Comparable Testing Technology | 50 ng/ml |
| Cocaine Benzoylecgonine | **Enzyme Multiplied Immunoassay Technique** or a Certified Comparable Testing Technology | 300 ng/ml | **Gas Chromatography** or a Certified Comparable Testing Technology | 300 ng/ml |
| Methadone | **Enzyme Multiplied Immunoassay Technique** or a Certified Comparable Testing Technology | 300 ng/ml | **Gas Chromatography** or a Certified Comparable Testing Technology | 300 ng/ml |
| Opiates Codeine Hydromorphone Morphine | **Enzyme Multiplied Immunoassay Technique** or a Certified Comparable Testing Technology | 300 ng/ml | **Gas Chromatography** or a Certified Comparable Testing Technology | 300 ng/ml |
| Phencyclidine | **Enzyme Multiplied Immunoassay Technique** or a Certified Comparable Testing Technology | 25 ng/ml | **Gas Chromatography** or a Certified Comparable Testing Technology | 25 ng/ml |

<u>URINALYSIS PROCEDURES</u>

**<u>STANDARD PROCEDURES FOR COLLECTING URINE SURVEILLANCE SAMPLES</u>**

1.   To the extent possible, urine samples should be collected in one or two centralized areas of the facility, (e.g., facility director's office or other private office), by contract staff who are thoroughly familiar with the procedures specified below.

2.   Offenders shall be thoroughly searched to detect any device designed to provide a urine substitute or possible contaminant and shall thoroughly wash their hands prior to providing the sample.

3.   When the offender reports for testing contract staff shall:
   * Make a positive picture identification of the offender;
   * Collect the sample from the offender;
   * Assign the sample a urine sample identification number;
   * Label the urine bottle with that number and the date, and;
   * Record the number next to the offender's name on the lab slip.

4.   Bottles shall be kept under direct contract staff observation and control at all times, both before and after the offender furnishes the urine sample.

5.   Two report form lines are provided for each urine sample on the lab form. Ordinarily, to be submitted for testing, bottles shall be full (i.e., 60cc or 2 oz).  Once a sufficient sample is provided, contract staff shall ensure that the urine sample identification number on the bottle corresponds to the number assigned to that offender on the lab slip.  Contract staff shall then document this verification by initialing the lab slip entry for that offender.  Until the lab form is revised to provide a column specifically for initials, initials should be placed in the right most portion of the medication column.

6.   The offender shall then be asked to verify the numbers on the bottle and the lab slip and to initial the lab slip to indicate his/her verification.  A cover sheet should be used which will permit the offender to view only his/her entries on the lab slip.  If the offender refuses, a second contract staff member should make this verification and initial the form.

7.   After samples are collected they shall be maintained under direct contract staff observation until moved to a locked area where they may be stored until mailing. This area should be designated by the Urine facility director and shall be accessible to a very limited number of contract staff.  Under no circumstances shall offenders have access to this area.

8.   All samples shall be mailed to the testing laboratory no later than 72 hours after collection, (excluding holidays).

9.   When a positive result is received, and an incident report written, a photocopy of both the slip returned by the lab and the slip listing the offender's name and urine sample identification number (retained at the facility) shall be attached to the incident report and made a part of the disciplinary record.  Other offender names will be blocked out of the photocopy.

<u>URINALYSIS PROCEDURES</u>

**<u>DETECTION PERIODS FOR SELECTED DRUGS</u>**

The time periods below are estimates of the maximum lengths of time, after last use, that a person's urine would be positive for a particular drug.  These periods also represent the <u>minimum</u> waiting periods between samples on which successive disciplinary actions for the same drug ordinarily may be based.  For example, ordinarily at least 30 days must elapse between urine collection dates before disciplinary action may be taken for a second THC positive.  The offender could, however, be retested within this 30 day period and disciplinary action could be based on positive results for drugs other than THC.

| | |
|---|---|
| 3 days | Amphetamines |
| | Methamphetamine |
| | Cocaine |
| | Cocaine Metabolite |
| 5 days | Methadone |
| | Methadone Metabolite |
| 6 days | Morphine |
| | Codeine |
| | Opiates |
| | Meperidine (Demorol) |
| | Pentazocine (Talwin) |
| | Propoxyphene (Darvon) |
| 11 days | Barbiturates |
| | Phencyclidine (PCP) |
| 14 days | Phenobarbital |
| 30 days | THC |

## PROHIBITED ACTS AND DISCIPLINARY SEVERITY SCALE
## GREATEST CATEGORY

The CDC shall refer all Greatest Severity Prohibited Acts to the DHO with recommendations as to an appropriate disposition.

| CODE | PROHIBITED ACTS | SANCTIONS |
|------|-----------------|-----------|
| 100 | Killing | A. Recommend parole date rescission or retardation. |
| 101 | Assaulting any person  (includes sexual assault) or an armed assault on the institution's secure perimeter (a charge for assaulting any person at this level is to be used only when serious physical injury has been attempted or carried out by an inmate) | B. Forfeit earned statutory good time or non-vested good conduct time (up to 100%) and/or terminate or disallow extra good time (an extra good time or good conduct time sanction may not be suspended). |
| 102 | Escape from escort; escape from a secure institution (low, medium, and high security level and administrative institutions); or escape from a minimum institution <u>with</u> violence | B.1 Disallow ordinarily between 50 and 75% (27-41 days) of good conduct time credit available for year (a good conduct time sanction may not be suspended). |
| 103 | Setting a fire (charged with this act in this category only when found to pose a threat to life or a threat of serious  bodily harm or in furtherance of a prohibited act of Greatest Severity, e.g. in furtherance of a riot or escape; otherwise the charge is properly classified Code 218, or 329) | C. Disciplinary Transfer (recommend). |
| | | D. Disciplinary segregation (up to 60 days). |
| | | E. Make monetary restitution. |
| | | F. Withhold statutory good time (Note - can be in addition to A through E - cannot be the only sanction executed). |
| | | G. Loss of privileges (Note - can be in addition to A through E - cannot be the only sanction executed). |

## GREATEST CATEGORY (Contd.)

| CODE | PROHIBITED ACTS | SANCTIONS |
|------|-----------------|-----------|

**104** Possession, manufacture, or introduction of a gun, firearm, weapon, sharpened instrument, knife, dangerous chemical, explosive or any ammunition — **Sanctions A-G**

**105** Rioting

**106** Encouraging others to riot

**107** Taking hostage(s)

**108** Possession, manufacture, or introduction of a hazardous tool (Tools most likely to be used in an escape or escape attempt or to serve as weapons capable of doing serious bodily harm to others; or those hazardous to institutional security or personal safety; e.g., hack-saw blade)

**109** (Not to be used)

**110** Refusing to provide a urine sample or to take part in other drug-abuse testing

**111** Introduction of any narcotics, marijuana, drugs, or related paraphernalia not prescribed for the individual by the medical staff

**112** Use of any narcotics, marijuana, drugs, or related paraphernalia not prescribed for the individual by the medical staff

**113** Possession of any narcotics, marijuana, drugs, or related paraphernalia not prescribed for the individual by the medical staff

**197** Use of the telephone to further criminal activity.

<u>GREATEST CATEGORY (Contd.)</u>

| CODE | PROHIBITED ACTS | SANCTIONS |
|------|-----------------|-----------|
| 198 | Interfering with a staff member in the performance of duties.  (<u>Conduct must be of the Greatest Severity nature</u>.)  This charge is to be used only when another charge of greatest severity is not applicable. | Sanctions A-G |
| 199 | Conduct which disrupts or interferes with the security or orderly running of the institution or the Bureau of Prisons.  (<u>Conduct must be of the Greatest Severity nature</u>.) This charge is to be used only when another charge of greatest severity is not applicable. | |

## HIGH CATEGORY

| CODE | PROHIBITED ACTS | | SANCTIONS |
|------|-----------------|---|-----------|
| 200 | Escape from unescorted Community Programs and activities and Open Institutions (minimum) and from outside secure institutions--<u>without</u> violence. | A. | Recommend parole date rescission or retardation. |
| 201 | Fighting with another person | B. | Forfeit earned statutory good time or non-vested good conduct time up to 50% or up to 60 days, whichever is less, and/or terminate or disallow extra good time (an extra good time or good conduct time sanction may not be suspended) |
| 202 | (Note to be used) | | |
| 203 | Threatening another with bodily harm or any other offense | | |
| 204 | Extortion, blackmail, protection: Demanding or receiving money or anything of value in return for protection against others, to avoid bodily harm, or under threat of informing | | |
| 205 | Engaging in sexual acts | B.1 | Disallow ordinarily between 25 and 50% (14-27 days) of good conduct time credit available for year (a good conduct time sanction may not be suspended). |
| 206 | Making sexual proposals or threats to another | | |
| 207 | Wearing a disguise or a mask | | |
| 208 | Possession of any unauthorized locking device, or lock pick, or tampering with or blocking any lock device (includes keys), or destroying, altering, interfering with, improperly using, or damaging any security device, mechanism, or procedure | C. | Disciplinary Transfer (recommend). |
| | | D. | Disciplinary segregation (up to 30 days). |
| 209 | Adulteration of any food or drink | E. | Make monetary restitution. |
| 210 | (Not to be used) | F. | Withhold statutory good time |
| 211 | Possessing any officer's or staff clothing | | |

### HIGH CATEGORY (Contd.)

| CODE | PROHIBITED ACTS | SANCTIONS |
|------|-----------------|-----------|
| 212 | Engaging in, or encouraging a group demonstration | G. Loss of privileges: commissary, movies, recreation, etc. |
| 213 | Encouraging others to refuse to work, or to participate in a work stoppage | H. Change housing (quarters) |
| 214 | (Not to be used) | I. Remove from program and/or group activity |
| 215 | Introduction of alcohol into BOP facility | |
| 216 | Giving or offering an official or staff member a bribe, or anything of value | J. Loss of job |
| 217 | Giving money to, or receiving money from, any person for purposes of introducing contraband or for any other illegal or prohibited purposes | K. Impound inmate's personal property |
| | | L. Confiscate contraband |
| 218 | Destroying, altering, or damaging government property, or the property of another person, having a value in excess of $100.00 or destroying, altering, damaging life-safety devices (e.g., fire alarm) regardless of financial value | M. Restrict to quarters |
| 219 | Stealing (theft; this includes data obtained through the unauthorized use of a communications facility, or through the unauthorized access to disks, tapes, or computer printouts or other automated equipment on which data is stored.) | |

220   Demonstrating, practicing, or using             Sanctions A-M
      martial arts, boxing (except for use of a
      punching bag), wrestling, or other forms
      of physical encounter, or military
      exercises or drill (except for drill
      authorized and conducted by staff)

221   Being in an unauthorized area with a
      person of the opposite sex without staff
      permission

222   Making, possessing, or using intoxicants

223   Refusing to breathe into a breathalyser
      or take part in other testing for use of
      alcohol

224   Assaulting any person (charged with this
      act only when less serious physical
      injury or contact has been attempted or
      carried out by an inmate)

297   Use of the telephone for abuses other
      than criminal activity (e.g.,
      circumventing telephone monitoring
      procedures, possession and/or use of
      another inmate's PIN number; third-party
      calling; third-party billing; using
      credit card numbers to place telephone
      calls; conference calling; talking in
      code).

298   Interfering with a staff member in the
      performance of duties.  (Conduct must be
      of the High Severity nature.)  This
      charge is to be used only when another
      charge of the high severity is not
      applicable.

299   Conduct which disrupts or interferes with
      the security or orderly running of the
      institution or the Bureau of Prisons.
      (Conduct must be of the High Severity
      nature.)  This charge is to be used only
      when another charge of high severity is
      not applicable.


                      MODERATE CATEGORY

CODE    PROHIBITED ACTS                         SANCTIONS
300     Indecent Exposure                       A.    Recommend parole date

301    (Not to be used)

302    Misuse of authorized medication

303    Possession of money or currency, unless specifically authorized, or in excess of the amount authorized

304    Loaning of property or anything of valve for profit or increased return

305    Possession of anything not authorized for retention or receipt by the inmate, and not issued to him through regular channels

306    Refusing to work, or to accept a program assignment

307    Refusing to obey an order of any staff member (May be categorized and charged in terms of greater severity, according to the nature of the order being disobeyed; e.g., failure to obey an order which furthers a riot would be charged as 105, Rioting; refusing to obey an order which furthers a fight would be charged as 201, Fighting; refusing to provide a urine sample when ordered would be charged as Code 110)

308    Violating a condition of a furlough

309    Violating a condition of a community program

310    Unexcused absence from work or any assignment

311    Failing to perform work as instructed by the supervisor

312    Insolence towards a staff member

rescission or retardation.

B.    Forfeit earned statutory good time or non-vested good conduct time up to 25% or up to 30 days, whichever is less, and/or terminate or disallow extra good time (an extra good time or good conduct time sanction may not be suspended).

B.1    Disallow ordinarily up to 25% (1-14 days) of good conduct time credit available for year (a good conduct time  sanction may not be suspended).

C.    Disciplinary Transfer (recommend).

D.    Disciplinary segregation (up to 15 days).

E.    Make monetary restitution.

F.    Withhold statutory good time

## MODERATE CATEGORY (Contd.)

| CODE | PROHIBITED ACTS | | SANCTIONS |
|------|-----------------|---|-----------|
| 313 | Lying or providing a false statement to a staff member. | G. | Loss of privileges: commissary, movies, recreation, etc. |
| 314 | Counterfeiting, forging or unauthorized reproduction of any document, article of identification, money, security, or official paper. (May be categorized in terms of greater severity according to the nature of the item being reproduced; e.g., counterfeiting release papers to effect escape, Code 102 or Code 200) | H. | Change housing (quarters). |
| | | I. | Remove from program and/or group activity. |
| 315 | Participating in an unauthorized meeting or gathering | J. | Loss of job. |
| | | K. | Impound inmate's personal property. |
| 316 | Being in an unauthorized area | L. | Confiscate contraband. |
| 317 | Failure to follow safety or sanitation regulations | M. | Restrict to quarters. |
| | | N. | Extra duty. |
| 318 | Using any equipment or machinery which is not specifically authorized | | |
| 319 | Using any equipment or machinery contrary to instructions or posted safety standards | | |
| 320 | Failing to stand count | | |
| 321 | Interfering with the taking of count | | |
| 322 | (Not to be used) | | |
| 323 | (Not to be used) | | |
| 324 | Gambling | | |
| 325 | Preparing or conducting a gambling pool | | |
| 326 | Possession of gambling paraphernalia | | |
| 327 | Unauthorized contacts with the public | | |
| 328 | Giving money or anything of value to, or accepting money or anything of value from: another inmate, or any other person without staff authorization | | |

<u>MODERATE CATEGORY</u> (Contd.)

| CODE | PROHIBITED ACTS | SANCTIONS |
|------|-----------------|-----------|

329    Destroying, altering or damaging          Sanctions A-N
       government property, or the property of
       another person, having a value of $100.00
       or less

330    Being unsanitary or untidy; failing to
       keep one's person and one's quarters in
       accordance with posted standards

331    Possession, manufacture, or introduction
       of a non-hazardous tool or other
       non-hazardous contraband (Tool not likely
       to be used in an escape or escape
       attempt, or to serve as a weapon capable
       of doing serious bodily harm to others,
       or not hazardous to institutional
       security or personal safety; Other
       non-hazardous contraband includes such
       items as food or cosmetics)

332    Smoking where prohibited

397    Use of the telephone for abuses other
       than criminal activity (e.g., conference
       calling, possession and/or use of another
       inmate's PIN number, three-way calling,
       providing false information for
       preparation of a telephone list).

398    Interfering with a staff member in the
       performance of duties.  (<u>Conduct must be
       of the Moderate Severity nature</u>.)  This
       charge is to be used only when another
       charge of moderate severity is not
       applicable.

399    Conduct which disrupts or interferes with
       the security or orderly running of the
       institution or the Bureau of Prisons.
       (<u>Conduct must be of the Moderate Severity
       nature</u>).  This charge is to be used only
       when another charge of moderate severity
       is not applicable.

## LOW MODERATE CATEGORY

| CODE | PROHIBITED ACTS | SANCTIONS |
|------|-----------------|-----------|

**400**  Possession of property belonging to another person

**401**  Possessing unauthorized amount of otherwise authorized clothing

**402**  Malingering, feigning illness

**403**  Not to be used

**404**  Using abusive or obscene language

**405**  Tattooing or self-mutilation

**406**  Unauthorized use of mail  (Restriction, or loss for a specific period of time, of these privileges may often be an appropriate sanction G)(May be categorized and charged in terms of greater severity, according to the nature of the unauthorized use; e.g., the mail is used for planning, facilitating, committing an armed assault on the institution's secure perimeter, would be charged as Code 101, Assault)

**407**  Conduct with a visitor in violation of Bureau regulations (Restriction, or loss for a specific period of time, of these privileges may often be an appropriate sanction G)

**B.1**  Disallow ordinarily up to 12.5% (1-7 days) of good conduct time credit available for year (to be used only where inmate found to have committed a second violation of the same prohibited act within 6 months); Disallow ordinarily up to 25% (1-14 days) of good conduct time credit available for year (to be used only where inmate found to have committed a third violation of the same prohibited act within 6 months) (a good conduct time sanction may not be suspended).

**E.**  Make monetary restitution.

**F.**  Withhold statutory good time.

**G.**  Loss of privileges: commissary, movies, recreation, etc.

**H.**  Change housing (quarters).

**I.**  Remove from program and/or group activity.

## LOW MODERATE CATEGORY (Contd.)

| CODE | PROHIBITED ACTS | | SANCTIONS |
|------|-----------------|---|-----------|
| 408 | Conducting a business | J. | Loss of job. |
| 409 | Unauthorized physical contact (e.g., kissing, embracing) | K. | Impound inmate's personal property. |
| 497 | Use of the telephone for abuses other than criminal activity (e.g., exceeding the 15-minute time limit for telephone calls; using the telephone in an unauthorized area; placing of an unauthorized individual on the telephone list). | L. | Confiscate contraband. |
| | | M. | Restrict to quarters. |
| | | N. | Extra duty. |
| | | O. | Reprimand. |
| 498 | Interfering with a staff member in the performance of duties. Conduct must be of the Low Mode-rate Severity nature.)  This charge is to be used only when another charge of low moderate severity if not applicable. | P. | Warning. |
| 499 | Conduct which disrupts or interferes with the security or orderly running of the institution or the Bureau of Prisons. (Conduct must be of the Low Moderate severity nature.)  This charge is to be used only when another charge of low moderate severity is not applicable. | | |

NOTE:  Aiding another person to commit any of these offenses, attempting to commit any of these offenses, and making plans to commit any of these offenses, in all categories of severity, shall be considered the same as a commission of the offenses itself.]

When the prohibited act is interfering with a staff member in the performance of duties (Code 198, 298, 398, or 498), or Conduct Which Disrupts (Code 199, 299, 399, or 499), the DHO or CDC, in its findings, should indicate a specific finding of the severity level of the conduct, and a comparison to an offense (or offenses) in that severity level which the DHO or CDC finds is most comparable.

Example: "We find the act of _____to be of High severity, most comparable to prohibited act Engaging in a Group Demonstration."

Sanction B.1 may be imposed on the Low Moderate category only where the inmate has committed the same low moderate prohibited act more than one time within a six-month period except for a VCCLEA inmate rated as violent or a PLRA offender.

## EXPLANATION OF TERMS

AVERAGE MONTHLY POPULATION (AMP) - The contractor adds the days invoiced on the monthly bill for three consecutive months and divides by three to determine the AMP.

BUREAU OF PRISONS (BOP) - A component of the Department of Justice responsible for federal offenders sentenced to a term of imprisonment.

BOP INTERNET HOME PAGE - www.bop.gov

CALIFORNIA TECHNICAL BULLETINS - The California Bureau of Home Furnishings and Thermal Insulation enforces California statutes and regulations governing upholstered furniture, bedding, and thermal insulation industries.

The bulletins referenced in the SOW are published by the California Bureau of Home Furnishings and Thermal Insulation.  The Bureau of Home Furnishings and Thermal Insulation bulletins are available by contacting the following address: 3485 Orange Grove AVE; North Highlands, California, 95660; (916) 574-2041.

COMMUNITY CORRECTIONS CENTER (CCC) -  The location in which the Contractor's programs are operated; also called facility, center, community treatment center (CTC), or a halfway house.  A CCC is considered a penal or correctional facility.

COMMUNITY CORRECTIONS MANAGER (CCM) -  The BOP employee responsible for all functions, programs and services related to Community Corrections within a judicial district(s).

COMMUNITY CORRECTIONS MANAGEMENT CENTER ADMINISTRATOR (MCA) -  The BOP employee who supervises the CCM.  The MCA exercises responsibility for Community Corrections operations and programs within a geographical area originally covering more than one CCM office.

COMMUNITY CORRECTIONS REGIONAL ADMINISTRATOR (CCRA) -  The BOP employee responsible for all Community Corrections functions, services and operations within a region.

COMMUNITY CORRECTIONS REGIONAL SAFETY SPECIALIST (CCRSS) - a BOP staff member responsible for contract compliance with county, city, state, federal and national safety policies.

COMPREHENSIVE SANCTIONS CENTER (CSC) -  The location in which the Contractor's programs are operated; also called facility or a halfway house. A CSC is considered a penal or correctional facility.

CONTRABAND - Contraband will be considered anything not authorized for retention by the facility rules and regulations or not issued by authorized staff.

CONTRACT AWARD - The date the Contracting Officer signs the contract.

CONTRACT EMPLOYEE - Contract employee means individuals hired by the contract to perform the services required by the SOW.  The terms contract employee, employee, staff and contract staff are used interchangeably throughout this document.

CONTRACT OVERSIGHT SPECIALIST (COS) -  The BOP employee who, under the direction of the CCM, inspects and monitors contract compliance.

CONTRACTING OFFICER (CO) - A BOP employee with the authority to enter into, administer, negotiate, award, cancel and/or terminate contracts, and make related determinations and findings on behalf of the United States Government.

CONTRACTING OFFICER'S TECHNICAL REPRESENTATIVE (COTR) -  A BOP employee ordinarily a CCM, designated in writing by a CO to act as an authorized representative in monitoring and administering a contract.  Acts as technical liaison between the Contractor and the CO.  (See Section G of the solicitation for an expanded outline of these authorities and responsibilities.)

CONTRACTOR - The individual, partnership, corporation or other legal entity who has been awarded a contract by the BOP.  ("contractor employees," "staff," "provider" and "contractor" are used interchangeably throughout this document.)  All staff from the Chief Executive Officer (CEO) level to line staff are included.

DISABILITY - Person with a disability has a permanent physical or mental impairment that substantially limits one or more major life activities; has a record of such an impairment;  or is perceived as having such an impairment.

DISCIPLINE HEARING OFFICER (DHO) - A BOP employee responsible for conducting fact-finding hearings covering alleged acts of misconduct and violations of prohibited acts including those acts which could result in criminal charges.

EMERGENCY - Any significant disruption (e.g., adverse weather, bomb threat, disturbances, escape, fire, hostage, work or food strike, etc) of normal facility procedures, policy or activity.

ELECTRONIC MONITORING EQUIPMENT -  Equipment which monitors a federal offender's compliance with the CCC Electronic Monitoring Program's conditions.  The program has a system of accounting for an offender at all times, including verification of activities, reporting of tardiness and/or absences from required services or activities, as well as other program violations.

HOME CONFINEMENT - Home Confinement is a generic term used to cover all circumstances in which a federal offender is required to remain at home during non-working hours of the day.

INDIGENT - Indigent is a condition an offender experiences when they are physically or mentally disabled and impoverished to the point that they are temporarily unable to earn money.  Participation in the CCC should remedy this situation and assist the offender in becoming self-sufficient.

INMATE - (see resident)

INVESTIGATING OFFICER.  Refers to the disciplinary process.  The term Investigating Officer refers to an employee of supervisory level who conducts the investigation concerning alleged charge(s) of offender misconduct.  The Investigating Officer may not be the employee reporting the incident, or one who was involved in the incident in question.

LIFE CONNECTIONS PROGRAM - A program to foster personal growth and responsibility and to right the relationships among the victim, the community and the inmate.  The program will use the inmate's faith commitment to bring reconciliation and restoration.  Participants will be helped to take responsibility for their criminal behavior.  Faith groups in the community at the inmate's release destination will be asked to volunteer as support groups for the inmate participants upon release to a CCC.

NFPA, NATIONAL FIRE PROTECTION ASSOCIATION - The National Fire Protection Association (NFPA), headquartered in Quincy, Massachusetts, USA, is an international, nonprofit, membership organization founded in 1896 to protect people, their property and the environment from destructive fire.  The mission of NFPA, which was organized in 1896, is to reduce the burden of fire on the quality of life by advocating scientifically based consensus codes and standards, research and education for fire and related safety issues.

The codes referenced in the SOW are available by contacting NFPA at the following address: 1 Batterymarch Park Quincy, MA 02269-9101 USA Telephone: (617) 770-3000 Fax:(617)770-0700; Customer Sales Department at 800-344-3555; Internet Home Page: NFPA.ORG

OSHA, OCCUPATIONAL SAFETY & HEALTH ADMINISTRATION - regulates occupational safety and health standard which requires conditions, or the adoption or use of one or more practices, means, methods, operations, or processes, reasonably necessary or appropriate to provide safe or healthful employment and places of employment.

OFFENDER - (see resident)

OFFEROR - The individual, partnership, corporation or other legal entity who submits a proposal in response to the BOP's needs outlined in a solicitation.

PROGRAM STATEMENT (P.S.) - A BOP written directive that establishes policy procedures in a given area.  (Available on BOP Internet web page.)

PRELIMINARY SITE INSPECTION - One BOP scheduled, on-site inspection of the offeror's facility and location (place of performance) for evaluating the proposed site.

PREOCCUPANCY INSPECTION - One BOP scheduled, on-site inspection of the Contractor's place of performance to ensure facility repairs or renovations have been completed and minimum programmatic requirements have been met so performance may begin.

PRE-TRIAL DEFENDANT - ordinarily means a person awaiting trial, being tried, or awaiting a verdict.  The term "pre-trial inmate" also includes a person awaiting sentence after having pleaded or been found guilty when the BOP has not received notification of conviction.

PRE-TRIAL SERVICES OFFICER (PSO) - An officer of the federal court responsible for supervising federal defendants, before trial or sentencing, as directed by the federal court.  PSOs are more common in large metropolitan areas. U.S. Probation Officers (USPOs) function in the capacity of a PSO in most judicial districts.  The terms USPO and PSO may be used interchangeably throughout this document about pre-trial service defendant responsibilities.

PRISON LITIGATION REFORM ACT (PLRA) - For the purpose of this SOW, the CCM will identify PLRA case to the contractor with specific instructions.  Specific requirements are outlined in the chapters on Programs and Discipline.

REASONABLE COSTS - The costs of travel (airfare, rental car, etc.) and per diem allowances for United States Government travel, as set forth in the federal Travel Regulations.

REGIONAL TRANSITIONAL DRUG ABUSE TREATMENT COORDINATOR (REGIONAL T-DATC) - The BOP employee who is responsible for placing offenders in Transitional Drug Abuse Treatment (TDAT), procuring treatment, monitoring treatment providers, certifying bills, ensuring quality control, and performing liaison activities among federal institutional programs, U.S. Probation, and contract community treatment providers.

REGISTERED DIETICIAN (RD) - RD means that a person has completed academic and experience requirements established by the Commission on Dietetic Registration, the credentialing agency for American Dietetic Association (ADA).

RESIDENT - federal inmate, inmate, prisoner or offender.  The terms resident, inmate, prisoner and offender are used interchangeably throughout this document.

ROUTINE MONITORING -  The BOP's scheduled and unscheduled, on-site inspection visits to the Contractor's facility to evaluate performance.

Facilities with an average daily population of federal offenders of 15 or fewer, there will be at least one full monitoring and at least two unannounced interim monitoring visits every 18 months.

Facilities with 16 to 30 federal offenders will have at least one full monitoring and at least two unannounced interim monitoring visits every 12 months.

Facilities with 31 or more federal offenders will have at least one full and three unannounced interim monitoring visits every twelve months.

TYPES OF OFFENDERS - The BOP places several types of offenders in a CCC. There are many variables which determine the type and how an offender is placed and programed in a CCC. To avoid confusion, the contractor should consider two broader categories, BOP and USPO cases. It is important to understand which case the offender is assigned because of the differences in programing. The CCM will provide direction in this regard.

Confinement of all BOP cases are reimbursable. Confinement of USPO cases are reimbursable except pre-trial defendants. The CCM can answer questions regarding reimbursable offenders.

   a.  Condition of Supervision Placement.  Offenders under conditions of probation or supervision by the Court, or parole or mandatory release supervision by the U.S. Parole Commission may be ordered to reside in a CCC for a period of time.  These placements are USPO cases.

   b.  Community Confinement.  Community Confinement offender is under custody and a BOP case who resides in a CCC and participates in gainful employment, employment search efforts, community service, vocational training, treatment, educational programs, or similar facility approved programs as a condition of supervised release or probation.

   c.  Intermittent Confinement.  Intermittent Confinement offender is under custody and a BOP case who resides in a CCC during nights, weekends, or other intervals.

   d.  Institution Transfers.   Institution transfer is a BOP case who has transferred from a federal institution and is completing the last portion of their sentence.

UNIVERSAL PRECAUTIONS - as defined by Centers for Disease Control and Prevention (CDC), Department of Health and Human Services, are a set of precautions designed to prevent transmission of human immunodeficiency virus (HIV), hepatitis B virus (HBV), and other blood borne pathogens when providing first aid or health
care.  Under universal precautions, blood and certain body fluids of all patients are considered potentially infectious for HIV,
HBV and other blood borne pathogens.

U.S. PROBATION OFFICER (USPO) - An officer of the United States District Court responsible for supervising USPO federal offenders.

VIOLENT CRIME CONTROL AND LAW ENFORCEMENT ACT (VCCLEA) - For the purpose of this SOW, the CCM will identify VCCLEA case to the contractor with specific instructions.  Specific requirements are outlined in the chapters on Programs and Discipline.

U.S. Department of Justice
United States Marshals Service

**PRISONER REMAND OR ORDER TO DELIVER AND
RECEIPT FOR UNITED STATES PRISONERS**

### UNITED STATES MARSHAL
### District of COLUMBIA

TO: CDF                                        DATE: 10-19-06
*(Name & Title)*

THE FOLLOWING NAMED UNITED STATES PRISONER(S): ☐ are herewith remanded to your custody
☐ are to be delivered to representative presenting and signing this order

1) WORMLEY,ELOISE                    4) PLACE IN TRANSIT HOLD PENDING FEDERAL

2) DCDC: 226899                      5) DESIGNATION

3)                                   6)

| RECEIPT |
| --- |
| THE ABOVE NAMED PRISONERS WERE RECEIVED: |
| BY: |
| TITLE: |
| DISTRICT OR ORGANIZATION ADDRESS: |

GEORGE WALSH
*United States Marshal*

DAVID BALDWIN
*BY: Deputy United States Marshal*

**DOC 000177**

*(PRIOR EDITIONS MAY BE USED)*

Form USM-41
Rev. 11/83 (Supersedes USM-40, Short Form)

United States Marshals Service
LIMITED OFFICIAL USE
Subject Report for WORMLEY,ELOISE (FID 1178136)



---

NCIC Status
*** All NCIC entries are subject to NCIC management audit & validation ***

| Seq. # | NCIC Number | Caution |
|--------|-------------|---------|
| 1 | W380600728 | Yes |

Date Entered : 06/07/2006
Date Cleared : 06/21/2006

Caution and Medical Conditions

| Seq. # | Code | Description |
|--------|------|-------------|
| 1 | 25 | Escape Risk |

Case Number: 0616-0607-1734-A
         Case Status: CLOSED
         Originating District: 016 - DC   DISTRICT COURT (Warrants)
         Charge Information
                  Agency: USMS
                  Part of Task Force: CAPITAL AREA TASK FORCE
                  Charge: 4901, ESCAPE - HWH WALKAWAY
                  Warrant Date: 06/05/2006
                  Date Received: 06/06/2006
                  OCDE: No
         Original Charge Information
                  Charge: 3530, COCAINE - SELL
                  Offense Date: 12/05/2005
                  Agency: LOC
                  Agency Name: MPD
                  Contact/Phone: ████████████/ BOP / 301-317-3142
                  Remarks: BUREAU OF PRISONS ESCAPE NOTIFICATION - ORIG OFF - ESCAPE
         Suspense Information
                  Sequence# 0
                  Renewal Date: 10/19/2006
                  Days Suspended: 120
                  Date Suspended: 06/21/2006
                  Reason Suspended: LODGED DETAINER
         Original Agency Notified: N
         Detained in District: 016
                  Prison: DC JAIL
                  Number: 379096-007
                  Remarks: DETAINER LODGED ON 06/16/2006
                           W/ THE DC JAIL
         Close Information
                  Date Closed: 10/22/2006
                  Date Executed: 10/19/2006
                  Execution Code: DET LODGED; CUSTODY TAKEN
         Arrested in District: 016
         Closing Task Force: CATF - CAPITAL AREA TASK FORCE
         To Be Prosecuted: N
                  Close Summary: SUBJ WAS RELEASED TO A BUREAU OF PRISONS
                           DETAINER AND WAS ORDERED UP TO US DIST
                           COURT FOR PROCESSING AND EXECUTION OF  THE BUREAU OF PRISONS
                           ESCAPE        NOTIFICATION THE BOP WAS NOTIFIED OF  ARREST AND
                           FEDERAL DESIGNATION WAS      REQUESTED ████████

---

USMS 000005



**DEPARTMENT OF VETERANS AFFAIRS**
**Medical Center**
**50 Irving Street N.W.**
**Washington, D.C. 20422**

In Reply Refer To:

June 14, 2006

To Whom It May Concern,

     This letter is to verify that Ms. Eloise Wormley was admitted to the inpatient unit of the VA Medical Center on June 7, 2006. She was treated by Dr. Alan Kogan for her depression and substance abuse issues. She has been stabilized on her medication and is ready for discharge at this time. Ms. Wormley is aware of her legal issues. She has worked with the social worker during this admission to turn herself in at time of discharge. The VA Police have been notified of her bench warrant and are going to assist her with turning herself in to the local authorities. The VA recommends that Ms. Wormley participate in the Substance Abuse Rehabilitation Program (SARP) after she released. She is motivated for treatment and determined to change her lifestyle. Thank you for considering these issues when determining her disposition.

Sincerely,

Nikole Smatis Jones, LICSW
Inpatient Social Worker
VA Medical Center Washington, DC.
(2020 745-8000 ext 5669

ETW 0060