UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____

ELOISE T. WORMLEY,                       )
                                         )
                 Plaintiff,              )
         v.                              )
                                         )      Civil Action No. 08-0449 (RCL)
                                         )
UNITED STATES OF AMERICA, *et al.*,      )
                                         )
                 Defendants.             )
_____  )

## MEMORANDUM OPINION

        Before the Court are dispositive motions filed by four discrete groups of defendants.

Plaintiff asserts that various defendants are liable for injuries she suffered in connection with her

five-month overdetention.  Defendant Reynolds & Associates, doing business as Washington

Halfway Homes ("WHH"), moves [21] to dismiss plaintiff's negligence claim.  (Plaintiff

responds with a cross motion [27] for summary judgment against WHH.)  Defendants associated

with the federal government move [53] to dismiss (or, in the alternative, for summary judgment

on) plaintiff's constitutional and common-law tort claims.  Defendants associated with the

District of Columbia move [38] to dismiss  (or, in the alternative, for summary judgment on)

plaintiff's claims under 42 U.S.C. § 1983 and common-law tort.  Defendants associated with

Corrections Corporation of America (CCA) move to dismiss [14] plaintiff's claims under 42

U.S.C. § 1983 and common-law tort.

        For the reasons explained herein, the Court will (1) deny WHH's motion to dismiss (and

deny plaintiff's cross-motion), (2) grant in part and deny in part federal defendants' motion; (3)

deny without prejudice District defendants' motion and stay discovery as to District defendants, and (4) deny CCA defendants' motion to dismiss.

## I.  FACTUAL BACKGROUND

On December 15, 2005, plaintiff was sentenced to twelve months imprisonment (six of them suspended) by a D.C. Superior Court judge.  (WHH's Reply Ex. 13 [43-7] (J. & C. Dec. 15, 2005).)  On May 30, 2006, plaintiff was transferred from a prison facility to Fairview Halfway House in D.C. (operated by WHH) so that she could seek employment while awaiting the expiration of her sentence (set for June 12, 2006).  (Pl.'s Opp'n to WHH's Mot. [27] at 2, Ex. 10 [27-14] ("Institutional Referral for CCC Placement," Mar. 3, 2006).)  On the morning of Friday, June 2, plaintiff checked out of Fairview to look for a job, saying that she would be back by 2:30 p.m.  (WHH Mot. Ex. 2 [21-4].)  When plaintiff did not return by 3:00 p.m., Fairview personnel, following institutional policy, reported her to the federal Bureau of Prisons (BOP) as "escaped." (*Id*.)  Plaintiff did return to Fairview at about 5:22 p.m., but she appeared intoxicated and was combative toward Fairview staff.  (*Id*.)  Plaintiff was then transported to D.C. General Hospital.[1] When she returned to Fairview later that evening, she was denied re-entry to the facility and instructed to turn herself in to the United States Marshals Service ("USMS") on Monday, June 5. (*Id*.)  Plaintiff stayed at a D.C. homeless shelter for the weekend.  (Pl.'s Opp'n [27] to WHH's Mot. at 3.)

---

[1]It is unclear who transported plaintiff to the hospital.  WHH maintains that it was "Federal Protective Services" (WHH's Mot. Ex. 2 [21-3]), while the BOP's Notice of Escape stated that it was "D.C. Metro Police" (Pl.'s Reply in Support of Cross-Mot. for Summary Judgment Ex. 2 [50-3]).  Plaintiff, on the other hand, contends that she was brought to the hospital by Fairview staff and that the police were there only to "escort."  (Pl.'s Reply [50].)

On Monday, June 5, defendant Randal White, a BOP official, acted upon the communication from Fairview by issuing a "Notice of Escaped Federal Prisoner" (hereinafter "Notice of Escape"). (Pl.'s Reply in Support of Cross-Mot. for Summary Judgment Ex. 2 [50-3] (Notice of Escape).) The notice stated that after plaintiff was taken to the hospital on June 2 "she ha[d] yet to return to the facility and her whereabouts remain[ed] unknown." (*Id.*) On June 6 plaintiff, a veteran, checked herself into a VA hospital. (Pl.'s Opp'n [27] to WHH's Mot. at 3.) With the assistance of hospital staff and D.C. Metropolitan Police, plaintiff turned herself in at the D.C. Central Detention Facility ("CDF") on June 14, at which point she resumed service of her six-month Superior Court sentence. (*Id*. at 4.) CDF is operated by the D.C. Department of Corrections ("DOC").

On June 16, defendant Sean McLeod of USMS issued a "Detainer Based On Federal Parole Violation Warrant" to CDF for plaintiff. (Pl.'s Opp'n to Fed. Defs.' Mot. Ex. 3 [59-5] [hereinafter "Detainer"].) The Detainer instructed CDF that

> [t]he United States Parole Commission has issued a **Federal parole violation warrant** against [plaintiff]. Prior to [plaintiff]'s release from [CDF] custody, please notify [USMS] at once so [USMS] may assume custody of the subject if necessary.

(*Id.*) Plaintiff was not then on parole, nor had she ever been on parole. No such warrant existed.[2]

On June 21, plaintiff's six-month sentence expired (adjusting for escaped time and credit). However, plaintiff then went directly before another Superior Court judge for violating a civil protection order in an unrelated matter. (WHH's Reply Ex. 13 [43-7].) Plaintiff was

---

[2]Federal defendants admit as much when they argue that the issuance of the parole violation detainer—rather than some form relating to her escape—was "a mere mistake in form." (Fed. Defs.' Mot. [53] at 20.)

sentenced to another 135 days for the violation (*id.*), at which point she was apparently transferred to D.C.'s Correctional Treatment Facility ("CTF") to serve that sentence.[3] CTF is run under the auspices of DOC, but DOC contracts the facility's operation and management to Corrections Corporation of America ("CCA").

On October 18, DOC sent defendant Donna Scott of USMS a fax regarding plaintiff which read, "This inmate's sentence will expire on 10-21-2006. Please execute the U.S.M.S. Detainer dated 6-16-06 with a come-up on 10-19-06." (WHH's Reply Ex. 14 [43-8].) On October 19, unidentified USMS officers brought plaintiff to the Prettyman United States Courthouse in D.C. where she was fingerprinted and then, apparently, returned to CTF. (Pl.'s Opp'n [59] to Fed. Defs.' Mot. at 8.) Defendant Baldwin that same day faxed CDF a "Prisoner Remand or Order to Deliver and Receipt for United States Prisoners" (known as a "USM-41") instructing DOC to "place [plaintiff] in transit hold pending federal designation." (Pl.'s Opp'n to District Defs.' Mot. Ex. 7 [46-10].) When plaintiff's 135-day sentence expired on October 21, she was not released from CTF. She would remain in custody, for no apparent legitimate reason, for almost five more months.

On December 6, 2006, CCA—operators of CTF—sent defendant Scott a fax regarding plaintiff: "[Plaintiff]'s sentence was complete on 10/21/06. Please execute her warrant." (WHH's Reply Ex. 15 [43-9].) It seems that no activity resulted from this fax. On January 11,

---

[3]The record is unclear as to whether plaintiff's 135-day sentence began at CTF. But what is clear—and all that is relevant, for purposes of this litigation—is that plaintiff was held at CTF on the first full day of her overdetention (October 22, 2006).

2007, a USMS official faxed the October 19, 2006 USM-41 to CDF.[4]  The purpose of this

communication is unclear.  On March 15, 2007, USMS faxed DOC a new USM-41 instructing

DOC to "lift USMS detainer dated 06-16-2006."  (Pl.'s Opp'n to District Defs.' Mot. Ex. 6 [46-

9].)  Plaintiff was apparently transferred from CTF to CDF the next day.  (*Id.* at 5.)  On March

19, 2007, USMS faxed "DC Jail Records" informing them that plaintiff was "released from her

escape charge on 6/21/06, the day she came into DC Jail custody for a Superior Court matter,

violation of a protection order."  (WHH's Reply Ex. 16 [43-10].)  Plaintiff was finally released

from custody that day, March 19, 2007.


## II.  STANDARDS FOR DISMISSAL AND SUMMARY JUDGMENT

### A.      Standard for Dismissal

On a motion to dismiss for failure to state a claim upon which relief can be granted

pursuant to Federal Rule of Civil Procedure 12(b)(6), this Court will dismiss a claim if the

plaintiff fails to plead "enough facts to state a claim for relief that is plausible on its face."  *Bell*

*Atlantic Corp. v. Twombly*, 127 S. Ct. 1955, 1974 (2007) (abrogating the prior standard which

required appearance, beyond a doubt, that plaintiff can prove no set of facts in support of his

claim that would entitle him to relief).  The Court must construe the allegations and facts in the

complaint in the light most favorable to the plaintiff, and the plaintiff will have the benefit of all

inferences that can be derived from the facts alleged.  *Barr v. Clinton*, 370 F.3d 1196, 1199 (D.C.

Cir. 2004) (citing *Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994)).

---

[4]The "To:" line on the fax reads "Jail" (WHH's Reply Ex. 15 [43-9]); the Court assumes that this refers to CDF, the facility directly maintained by DC.  Plaintiff's Complaint alleges that the June 5, 2006 "Notice of Escape" was also faxed.  Complaint ¶55.

However, the Court is not required to accept plaintiffs' unsupported inferences, nor "legal conclusions cast in the form of factual allegations." *Kowal*, 16 F.3d at 1276.

Federal defendants also move to dismiss on jurisdictional grounds pursuant to Rules 12(b)(1), (b)(2), (b)(4), and (b)(5).  Rule 12(b)(1) allows for dismissal for lack of subject-matter jurisdiction, Rule 12(b)(2) for lack of personal jurisdiction, Rule 12(b)(4) for insufficient process, and Rule 12(b)(5) for insufficient service of process.

B.      **Standard for Summary Judgment**

Summary judgment should be granted when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The party seeking summary judgment bears the initial burden of production as to the absence of genuine issues of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  A genuine issue of material fact exists if the evidence, viewed in the light most favorable to the nonmoving party, "is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  But a genuine issue requires more than "a scintilla of evidence" supporting the nonmoving party; "there must be evidence on which the jury could reasonably find" for the nonmoving party.  *Id.* at 252.

### III.  WHH'S MOTION TO DISMISS

Plaintiff asserts one claim, negligence, against defendant WHH.  Plaintiff alleges that WHH breached its duty of care by not allowing her to return to the Fairview facility after her

combative behavior on June 2, 2006.  WHH moves [21] to dismiss, claiming that (1) it had no

duty to let plaintiff return under the circumstances and (2) even if there did exist a duty, WHH's

alleged negligence did not cause plaintiff's injury.  Neither of WHH's arguments support

dismissal of plaintiff's negligence claim.

Plaintiff does state a claim that is plausible on its face.  On the issue of duty, WHH may

eventually establish that it did not have a duty to allow plaintiff to return to the facility after her

behavior.  However, at this early stage in the litigation, plaintiff's claim to the contrary is still

*plausible*.  Plaintiff has submitted various WHH manuals and procedures that she alleges

demonstrate the existence of a duty.  (Pl.'s Opp'n [27] to WHH's Mot. Exs. 3 ("BOP Community

Corrections Manual" as related to contractors) & 6 ("Statement of Work").)  It is plausible that

WHH had a duty to allow plaintiff to re-enter; that is sufficient to defeat WHH's motion.

Similarly, WHH has not shown that it is implausible that its actions contributed to plaintiff's

injury (i.e., her overdetention).  The Notice of Escape issued by BOP prominently mentions the

fact that Wormley did not re-enter Fairview on the evening of May 2.  It is plausible that, had

WHH allowed her to re-enter, the Notice of Escape would not have been filed, the improper

Detainer would not have issued, and plaintiff might have been spared her ordeal.  At this point,

that plausible scenario is all that is needed to defeat WHH's motion to dismiss.

Plaintiff responded to WHH's motion with a Cross Motion [29] for Summary Judgment.

However, plaintiff's motion never gets off the ground; as the previous paragraph demonstrates,

this scenario is littered with unresolved issues of material fact (for example, whether WHH's

internal policies establish a duty to allow individuals in plaintiff's position to re-enter the

facility).  The absence of genuine issues of material fact is a prerequisite for summary judgment.

Accordingly, plaintiff's cross motion shall be denied.

## IV. FEDERAL DEFENDANTS' MOTION TO DISMISS/ MOTION FOR SUMMARY JUDGMENT

Plaintiff asserts numerous claims against the federal defendants (the United States of America, BOP Director Harley Lappin, BOP employee White, and USMS employees McLeod, Baldwin, and Scott). Plaintiff brings a variety of constitutional claims against the BOP and USMS employees under *Bivens v. Six Unknown Named Agents*, 403 U.S. 388 (1971). She also asserts claims of false imprisonment and negligence against the United States under the Federal Tort Claims Act (FTCA). For the reasons explained below, the Court will dismiss the *Bivens* claims but not the FTCA claims.

### A. Personal Jurisdiction Exists Over All Federal Defendants Except White

Federal defendants argue under Federal Rule of Civil Procedure 12(b)(2), (b)(4), and (b)(5) that this Court lacks personal jurisdiction over non–D.C. residents Lappin, White, McLeod, Baldwin, and Scott.[5] The Court finds that personal jurisdiction does exist over Lappin, McLeod, Baldwin, and Scott because (1) they are covered by the D.C. longarm statute and (2) this Court's exercise of jurisdiction comports with constitutional due process. However, this Court's jurisdiction does not extend to White because he falls outside the longarm statute.

---

[5]Defendant does not directly argue that Scott in a nonresident, but instead argues that because a Maryland address was listed on the affidavit of service, it can be inferred that Scott's abode or dwelling place is in Maryland. (*See* Defs.' Mot. [53] at 8 n.2 (citing Fed. R. Civ. P. 4(e)(2) (allowing service by "leaving a copy of each at the individual's dwelling or usual place of abode")).) Plaintiff does not rebut this argument, so the Court will treat it as conceded.

For this Court's personal jurisdiction over nonresident defendants to lie, jurisdiction must be proper under both the D.C. longarm statute and the constitutional requirements of due process. *GTE New Media Services, Inc. v. BellSouth Corp.*, 199 F.3d 1343, 1347 (D.C. Cir. 2000). The longarm statute, D.C. Code § 13-423(a), lists a number of circumstances under which a court can exercise jurisdiction over a nonresident. One such circumstance is when the plaintiff alleges that the nonresident "caus[ed] tortious injury in the District of Columbia by an act or omission in the District of Columbia." *Id.* § 13-423(a)(3). This describes plaintiff's allegations against defendants Lappin, McLeod, Baldwin, and Scott, all of whom allegedly committed their tortious acts while within the District of Columbia. Jurisdiction over these four defendants also comports with the requirements of constitutional due process; the allegations that defendants committed the tortious acts while physically in the forum is sufficient. Defendants argue that minimum contacts cannot "aris[e] from federal employment or supervisory roles." But the authority defendants cite for this point concerns overly expansive "minimum contacts" arising solely as a result of federal government supervisory responsibilities. *See Claasen v. Brown*, 1996 WL 79490, *2 (D.D.C. 1996) (Kessler, J.) (noting Supreme Court precedent that "an individual is not vulnerable to being sued in any district solely by virtue of being employed by the federal government or by virtue of supervising or training personnel on a nationwide basis") (*cited in* Defs.' Mot. [53] at 7). These four federal defendants do not warrant such concerns. They have contacts with the forum outside their mere supervisory roles: they were physically within the District when they took the alleged actions. Therefore, because jurisdiction is proper under both the longarm statute and constitutional due process, the Court may exercise personal jurisdiction

over Lappin, McLeod, Baldwin, and Scott.[6]

This Court may not, however, exercise jurisdiction over White.  White neither lived nor worked in the District during the relevant period.  (*See* Defs. Mot. [53] Ex. 2 (White Decl.); Defs.' Reply [64] Ex. 1 (White Decl.).)  The longarm statute does allow jurisdiction over a nonresident defendant alleged to have "caus[ed] tortious injury in the District of Columbia by an act or omission outside the District of Columbia," but only "if he regularly does or solicits business, engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed, or services rendered, in the District of Columbia."  *Id.* at (a)(4).  When dealing with this provision in particular, it should be remembered "that (a)(4) of the D.C. long-arm statute may indeed stop short of the outer limit of the constitutional space," *Crane v. Carr*, 814 F.2d 758, 762 (D.C. Cir. 1987).  White's declaration establishes that he does not have any of the enumerated connections with the District listed in the longarm statute.  Because White falls outside the longarm statute, the Court need not decide whether he has minimum contacts with the District as required by constitutional due process; jurisdiction would be improper no

---

[6]In the alternative, jurisdiction over defendants McLeod and Baldwin is proper because both were served within the District of Columbia (*See* McLeod Aff. of Service [13]; Baldwin Aff. of Service [12]).  *See Burnham v. Superior Court of California*, 495 U.S. 604, 610 (1990) ("Among the most firmly established principles of personal jurisdiction in American tradition is that the courts of a State have jurisdiction over nonresidents who are physically present in the State.").

Plaintiff argues that jurisdiction over Lappin, who waived service, can be justified in this manner as well, but the Court is not convinced.  Plaintiff mailed the waiver to Lappin's work address within the District.  Plaintiff argues that because, when a waiver is filed, the Federal Rules of Civil Procedure "apply as if a summons and complaint had been served at the time of filing the waiver," Fed. R. Civ. P. 4(d)(4), the Court should consider Lappin to have been served in the District.  The Court declines to do so because (a) the Rule does not specify the effect that waiver has on the *place* of service and (b) the Rules go on to note that "[w]aiving service of a summons does not waive any objection to personal jurisdiction or to venue," *id.* at 4(d)(5).

matter the conclusion.  Plaintiff has requested additional discovery to plumb other ways that White could be roped back into the longarm statute, but the Court does not believe such discovery to be appropriate or necessary in this case.  Based on White's declarations, the Court cannot exercise personal jurisdiction over him and all claims against him shall be dismissed.[7]

**B.      *Bivens* Claims**

Plaintiff asserts a number of constitutional claims against Federal defendants in their individual capacities[8] under *Bivens v. Six Unknown Named Agents*, 403 U.S. 388 (1971).  In *Bivens*, the plaintiff alleged that federal agents made a warrantless search of his apartment in violation of the Fourth Amendment and then arrested him for alleged narcotics violations.  The plaintiff sought money damages to compensate him for the constitutional injury he had suffered. *Bivens* allows damages to be awarded for constitutional violations by federal officials.  *Id*.  Such remedies are not available in every case.  To the contrary, *Bivens* remedies have been extended to a limited number of scenarios, and in many cases "special factors" counsel against further extension.  *Id.* at 396.  The Court here declines to extend a *Bivens* remedy to plaintiff's injuries.

Plaintiff here makes five specific *Bivens* claims: (i) overdetention in violation of the Fifth

---

[7]Although claims against White are dismissed here for lack of jurisdiction, those claims are also discussed below to establish two alternate grounds for dismissal: (1) lack of an available *Bivens* remedy and (2) qualified immunity.

[8]The Complaint indicates that McLeod, White, Baldwin, Scott, and Lappin are named in their official and individual capacities.  (Complaint ¶¶10–14.)  However, suits for monetary damages—like this one—cannot be brought against federal officials in their official capacities unless sovereign immunity is waived.  *See Clark v. Library of Congress*, 750 F.2d 89, 103 (D.C. Cir. 1984) (Sovereign immunity . . . bar[s] suits for money damages against officials in their *official* capacity absent a specific waiver by the government.").  So the claims against federal defendants in their official capacities must be dismissed, leaving the individual-capacity claims.

Amendment; (ii) denial of procedural due process (related to issuance of the Notice of Escape,

the Detainer, and plaintiff's subsequent processing); (iii) unlawful search and seizure (throughout

her processing/overdetention); (iv) "deliberate indifference" by USMS official Scott in violation

of the Eighth Amendment; and (v) supervisory liability for BOP Director Lappin related to the

actions of his BOP subordinates.   Defendants make three arguments for dismissal: (1) the statute

of limitations expired before plaintiff initiated her action; (2) a *Bivens* remedy should not be

extended to plaintiff's circumstances; and (3) the defendants are protected by qualified immunity.

The Court rejects defendants' statute of limitations argument, but agrees that a *Bivens* remedy

should not be extended to plaintiff's injuries.   In the alternative, qualified immunity would also

shield each federal defendant from liability.


      1.     *Applicable Statutes of Limitations Do Not Bar Plaintiff's Claims*

      Defendants assert that plaintiff's *Bivens* claims should be barred by a one-year statute of

limitations.   Defendants' argument has two parts.   First, defendants argue that it is appropriate for

*Bivens* claims to be governed by the same statute of limitations as an analogous state-law claim.

Defendants then argue that plaintiff's claims are thereby time-barred.   The Court agrees with

defendants on the limitation period, but because some limitation periods were tolled while

plaintiff was incarcerated the Court finds that only one component of plaintiff's *Bivens*

claims—the due process claim stemming from issuance of the Notice of Escape—is time-barred.

      "When a federal action contains no statute of limitations, courts will ordinarily look to

analogous provisions in state law as a source of a federal limitations period."   *Doe v. U.S. Dep't*

*of Justice*, 753 F.2d 1092, 1114 (D.C. Cir. 1985).   This Circuit has endorsed that approach in the

*Bivens* context.  *See id.*  The Court agrees with defendants that the proper limitation period for

plaintiff's claims is one year.  Plaintiff's overdetention *Bivens* claims are analogous to false

imprisonment.  The Fourth Amendment search and seizure claim is analogous to false arrest.  To

the extent that plaintiff's claims stem from false statements in the Notice of Escape, they are

analogous to libel or defamation.  In the District of Columbia, false imprisonment, false arrest,

and libel are all subject to a one-year statute of limitations from the time the right to maintain the

action accrues.  D.C. Code § 12-301(4).  Accordingly, it is appropriate to apply a one-year

limitation period to plaintiff's *Bivens* claims.

Defendants argue that because at least some of the acts underlying plaintiff's claims

occurred more than one year before plaintiff initiated this action on March 14, 2008, the claims

are barred.  Defendant counters that the limitation period was tolled during her imprisonment,

beginning only when she was released from custody on March 19, 2007.  D.C. law allows that

"when a person entitled to maintain an action is, at the time the right of action accrues[,] . . .

imprisoned[,] he or his proper representative may bring action within the time limited after" the

imprisonment ends.  D.C. Code § 12-302.  The earliest act complained of in plaintiff's *Bivens*

claims—the issuance of the Notice of Escape—occurred on June 5, 2006, after she had been

turned away from Fairview.  Plaintiff turned herself in to CDF on June 14, 2006, and was

continuously imprisoned thereafter until her release on March 19, 2007.  For all of the alleged

injuries that occurred during her incarceration—i.e., the issuance of the Detainer and all

subsequent processing or overdetention of plaintiff—the statute of limitations was tolled

pursuant to D.C. law.

The only question that remains is whether the limitations period was tolled for plaintiff's

13

claims related to the Notice of Escape.  Plaintiff argues that her injury resulting from this act did

not begin—and therefore her cause of action did not accrue—until her *improper* imprisonment

began on October 22, 2006.  This is true for plaintiff's overdetention claim, which alleges that

the Notice of Escape proximately caused her overdetention.  Thus the limitation period for

plaintiff's Notice-related overdetention claim was tolled until plaintiff's March 19, 2007 release.

But plaintiff's due process claim alleges that her rights were violated when the Notice of Escape

was issued without proper process.  That injury occurred at the moment the Notice was issued

(June 5, 2006).  At that time plaintiff had already "escaped" from the halfway house and had not

yet turned herself in to authorities; she was therefore not hindered from bringing suit at that time.

The tolling statute operates only if plaintiff is imprisoned "at the time the right of action

accrues."  D.C. Code § 12-302; *see also Fernandors v. Dist. of Columbia*, 382 F. Supp. 2d 63, 68

(D.D.C. 2005) (Bates, J.) ("In order to toll the limitations period, plaintiff's tort action must have

accrued at the time of his imprisonment.").  Because plaintiff was not imprisoned on June 5—the

day the Notice of Escape was issued—the limitation period was not tolled during her subsequent

incarceration.  The fact that plaintiff was technically classified as an escapee on June 5 does not

affect that conclusion.  *See Dist. of Columbia v. Tinker*, 691 A.2d 57, 65 (D.C. 1997)

("[R]egardless of the validity of [the prisoner's] initial release from custody . . . , the fact remains

that at that instant his disability of imprisonment was removed.").  Accordingly, plaintiff's due

process claims stemming from the Notice of Escape are barred by the one-year statute of

limitations.[9]

---

[9]This statute of limitations ground is merely an alternate ground upon which this claim
could be dismissed.

14

2.      *A Bivens Remedy Should Not Be Created For Plaintiff's Injuries*

Defendants assert that because alternative remedies are available to plaintiff, the Court

should not create a *Bivens* remedy for plaintiff's injury.  In accordance with this Circuit's

precedent, the Court agrees.

Courts "have discretion in some circumstances to create a remedy against federal officials

for constitutional violations, but [they] must decline to exercise that discretion where 'special

factors counsel[] hesitation' in doing so."  *Wilson v. Libby*, 535 F.3d 697, 704 (D.C. Cir. 2008)

(citing *Bivens*, 403 U.S. at 396; *Spagnola v. Mathis*, 859 F.2d 223, 226 (D.C. Cir. 1988) (en

banc)).  The existence of a comprehensive remedial scheme can be one such factor.  *Wilson*, 535

F.3d at 705.  The "comprehensiveness" of a remedial scheme is not determined by the

completeness of the remedy afforded, but rather it "relate[s] to the question of who should decide

whether such a remedy should be provided."  *Id*. (quoting *Bivens*, 403 U.S. at 380).  If it appears

that the remedy provided by statute was intended by Congress to be sufficient, a court should stay

its *Bivens* hand.

As the D.C. Circuit observed in *Wilson v. Libby*, since *Bivens* the Supreme Court has

recognized two additional contexts where a *Bivens* remedy is appropriate: employment

discrimination in violation of the Due Process Clause, *see Davis v. Passman*, 442 U.S. 228

(1979), and certain Eighth Amendment violations by prison officials, *see Carlson v. Green*, 446

U.S. 14 (1980).  *Wilson*, 535 F.3d at 705.  However,

> "in most instances[, the Court has] found a Bivens remedy unjustified." *Wilkie v.
> Robbins*, [127 S. Ct. 2588, 2597 (2007)].  Indeed, in its "more recent decisions[,
> the Supreme Court has] responded cautiously to suggestions that *Bivens* remedies
> be extended into new contexts." [*Schweiker v. Chilicky*, 487 U.S. 412, 421
> (1988).]

15

*Id.* at 705.  The Circuit went on to note that even in the absence of a comprehensive scheme,

courts can still decline to create new *Bivens* remedies:

> In *Wilkie*, there was no comprehensive scheme demonstrating "that Congress expected the Judiciary to stay its *Bivens* hand," but the Court declined to imply a *Bivens* remedy nonetheless.  [*Wilkie*, 127 S. Ct.] at 2600.  The Court held that a remedy for allegedly harassing conduct of government officials would "come better, if at all, through legislation [because] 'Congress is in a far better position than a court to evaluate the impact of a new species of litigation' against those who act on the public's behalf."  *Id.* at 2604–05.  Thus, the Court again made clear that there is no "automatic entitlement" to a *Bivens* remedy regardless of "what other means there may be to vindicate a protected interest."  *Id.* at 2597.

*Id.* at 706.

Here, defendants argue that two statutory remedies—habeas corpus and the Privacy

Act—counsel against extension of *Bivens* to plaintiff's injuries.  Those schemes offer weak

remedy, to be sure, but some remedy nonetheless.  Plaintiff's habeas remedy, of course, was only

available to her during the time of her incarceration—but she gives no reason why she did not

pursue a habeas remedy at that time.  It would seem perverse to enable plaintiff to obtain money

damages because she chose not to pursue habeas remedy while incarcerated.  To the extent that

plaintiff alleges that false or misleading information was used in issuance of the "Notice of

Escape" or the Detainer, plaintiff could conceivably pursue remedy through the Privacy Act.

The existence of these remedial schemes, buttressed forcefully by the Court of Appeals'

and the Supreme Court's warnings against overextension of *Bivens* remedies, leads the Court to

decide against creating a *Bivens* remedy for plaintiff's injuries.  The Court is wary, for example,

of establishing overdetention as an act for which monetary damages are available from federal

officials.  This seems to be a situation where Congress might be better equipped to weigh the

long-term effects of various possible remedial schemes and choose the best option.[10]  As for plaintiff's due process claims, again, the Court is reticent to fashion a judge-made remedy for errors in the processing and issuance of paperwork.  Nor will the Court create a remedy for plaintiff's deliberate indifference claims, for the same reason: it would constitute an overextension of *Bivens*.

Plaintiff's Fourth Amendment claim should be addressed separately because certain Fourth Amendment claims were explicitly approved in *Bivens*.  However, plaintiff fails to actually articulate a Fourth Amendment violation here.  Plaintiff alleges that she was subjected to unlawful search and seizure in violation of the Fourth Amendment when she was fingerprinted and processed by USMS officers at the Prettyman United States Courthouse on October 19, 2006.  But at that time plaintiff was lawfully detained, serving her 135-day sentence ending October 21, 2006.  As defendants note, "'[t]he Fourth Amendment prohibition against unreasonable search and seizure applies only where identifying physical characteristics, such as fingerprints, are obtained as a result of unlawful detention of a suspect . . . .'" (Defs.' Reply at 8 (quoting *U.S. v. Dionisio*, 410 U.S. 1, 4 (1973)).)  Here, plaintiff was lawfully detained when she was processed on October 19, so that incident did not constitute a Fourth Amendment violation.

3.   *Individual Federal Defendants Are Protected By Qualified Immunity*

---

[10]Plaintiffs do point to one district court decision from another Circuit which stated that "[a] person subjected to illegal incarceration may bring a *Bivens* claim."  *See Lemarr v. John Doe Marshal(s) U.S. Marshals Service*, No. L-05-167, 2008 WL 2078159 (S.D. Tex. 2008) (Alvarez, J.).  But neither *Lemarr* nor the authority it cited considered whether alternative remedial schemes counseled against the creation of a *Bivens* remedy.  That fact severely limits *Lemarr*'s persuasive weight in this case.

In the alternative, defendants contend that plaintiff fails to state a claim upon which relief can be granted because the federal defendants are shielded by qualified immunity.  In assessing claims of qualified immunity courts have the option of using the two-step test set forth in *Saucier v. Katz*, 533 U.S. 194 (2001).  Step One asks, "Taken in the light most favorable to the party asserting the injury, do the facts alleged show the [official's] conduct violated a constitutional right?"  *Id.* at 201.  If not, then the inquiry ends.  But if so, then Step Two asks "whether the right was clearly established.  This [Step Two] inquiry, it is vital to note, must be undertaken in light of the specific context of the case, not as a broad general proposition."  *Id.*  For Step 2, "[t]he relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted."  *Id.* at 202.  If the questions in both Step One and Step Two are answered in the affirmative, then the official is not protected by qualified immunity.

In *Pearson v. Callahan* the Supreme Court held that the two *Saucier* steps need not always be conducted in sequence, deciding that "[t]he judges of the district courts and the courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand."  *Pearson v. Callahan*, 129 S. Ct. 808, 818 (2009).  Accordingly, this Court exercises its discretion as to the sequence of the inquiry in assessing each of plaintiff's five claims.

> i.      *Overdetention in Violation of the Fifth Amendment*

Plaintiff alleges that she was overdetained in violation of the Fifth Amendment and that her constitutional injury was caused by defendants McLeod, Baldwin, and Scott.  Arguing for

qualified immunity, defendants first contend that because some courts consider overdetention a Fifth Amendment violation and others an Eighth Amendment violation, the unconstitutionality of overdetention is not clearly established.  (*See* Mot. at 24 (citing *Lemarr v. John Doe Marshal(s) U.S. Marshals Service*, No. L-05-167, 2008 WL 2078159 (S.D. Tex. 2008) (Alvarez, J.).)  But assuming defendants are correct as to the legal conflict, defendants do not assert that overdetention is not in *some way* unconstitutional.  The qualified immunity inquiry does not turn on the categorization of the constitutional injury.  So long as a defendant's alleged conduct violated *some* clearly established constitutional right, that defendant is not entitled to qualified immunity.  Here, none of the federal defendants actually overdetained plaintiff; she alleges rather that they *caused* her overdetention at CTF and CDF.

Plaintiff alleges that defendant McLeod caused her to be unconstitutionally overdetained by "illegally issuing an invalid detainer for a parole violation warrant and violating their [sic] reporting and notice duties to [plaintiff] and other federal agencies."  (Compl. ¶67.)  Saucier Step One asks whether McLeod's conduct violated plaintiff's constitutional right against overdetention.  Given that CTF personnel cited the Detainer as the reason plaintiff was not released, this question can be answered in the affirmative (although this determination is limited to the facts of this case).  However, under *Saucier* Step Two, which asks whether a reasonable officer in McLeod's position would know that he was violating plaintiff's right against overdetention, the answer here must be "no."  McLeod is entitled to qualified immunity because he could not have known that his issuance of the Detainer—erroneous though it may have been—would result in plaintiff's overdetention.  The Detainer did not give CTF or CDF authority

19

to detain plaintiff past the end of her sentence.[11]  As it stated on its face, it directed CDF to notify

USMS prior to releasing plaintiff "so that [USMS] can assume custody of [plaintiff] if

necessary."  (Pl.'s Opp'n [59] Ex. 3.)  Because McLeod could not have known that he was

causing a constitutional violation, he is shielded by qualified immunity.

Defendants Baldwin's and Scott's actions are much closer to the overdetention violation.

Plaintiff claims that Baldwin, in processing plaintiff's "come-up" on October 19, 2006 (two days

before the beginning of plaintiff's overdetention), "despite clear warning signs that [plaintiff's]

case deserved attention, . . . failed to discover that [plaintiff] had completed her sentencing

obligations to the BOP and should have been cleared for release."  (Opp'n at 18.)  Plaintiff

claims that Scott, who coordinated plaintiff's October 19 processing and corresponded with CTF

and CDF, "never arranged for [plaintiff] to appear before a court or participate in any hearing or

[sic] any kind regarding her custody status, [and] did not determine [plaintiff's] lawful date of

release or whether a valid, lawful detainer existed for her arrest by USMS."  (Opp'n at 18.)  The

court is baffled as to the purpose of this come-up if not to process plaintiff pursuant to the

"parole violation warrant" referenced in the Detainer.  The undisputed fact that there was no such

underlying warrant should have been discovered during the come-up, and defendants Baldwin

and Scott have no excuse for this oversight.  However, like McLeod, it cannot be said that

---

[11]Plaintiff even argues this elsewhere in this litigation.  (*See* Pl.'s Opp'n [46] to District
Defs.' Mot. at 11–12 ("[T]he detainer issued here was a request by USMS to detain [plaintiff]
merely for purposes of notifying USMS of an upcoming release date, thereby allowing USMS to
assume custody over her; it did not authorize the District Defendants to hold her beyond her
legitimate period of confinement.").)  Even if a detainer does give an institution authority to
detain an inmate past the end of his sentence if necessary—the record is unclear on this
point—there would still be no reason for McLeod to know that by issuing the Detainer he was
necessarily *causing* unlawful overdetention.

reasonable officers in Baldwin's and Scott's position would have known that their actions would lead to plaintiff's overdetention.  The fact remains that the Detainer gave CTF and CDF no apparent authority to continue to hold plaintiff past the expiration of her sentence.  Accordingly, Baldwin and Scott are also protected by qualified immunity.

ii.    *Procedural Due Process Under the Fifth Amendment*

Plaintiff alleges that the federal defendants violated her constitutional right to due process in connection with (1) issuance of the Notice of Escape, (2) issuance of the Detainer, and (3) her right to a hearing during her detention.  Because the Court concludes that none of plaintiffs allegations, if proven, would form constitutional violations on the part of the federal defendants (*Saucier* Step One), defendants are entitled to qualified immunity.

Plaintiff claims that McLeod violated her right to due process because he did not ensure that plaintiff received notice of the charges against her.  However, it does not appear that McLeod ever had any obligation to give such notice.  The Detainer itself indicates that plaintiff's custodian—DOC (or perhaps CCA, but definitely not USMS)—was to give notice and a copy of the Detainer to plaintiff.  (Opp'n Ex. 3.)  If notice was not given, it was as a result of an error of the part of DOC or CCA, not McLeod.

Plaintiff claims that all federal defendants deprived plaintiff of procedural safeguards during her 149-day overdetention.  (Compl. ¶75.)  Plaintiff gets no more specific than alleging that hearings did not occur after plaintiff's legitimate sentence ended on October 21, 2006. (Opp'n at 19–20.)  Plaintiff does not specify why any federal defendant was responsible for

21

ensuring such a hearing took place.[12]  Even if plaintiff is correct that she had a constitutional

right to a hearing, her allegations, even if proved, would not establish that one or more of the

federal defendants violated that right, or that any of the federal defendants should have known

they were doing so at the time.

Plaintiff claims that White violated her due process rights by issuing a Notice of Escape

"based upon the constitutionally inadequate procedures of the Fairview [halfway house] in

categorizing plaintiff as an escapee."  (Compl. ¶76.)  Plaintiff contends that White should not

have issued the Notice of Escape without a written statement of facts or an informal investigation

into the veracity of Fairview's claims.  (Opp'n at 21.)  Plaintiff cites no law supporting such a

requirement in this context, arguing instead that due-process law should be extended from other

prisoner situations.  Follow the *Saucier* procedure, the Court first determines whether the

conduct alleged forms a constitutional violation; this Court, having not been provided authority

indicating that more process is needed prior to a Notice of Escape, concludes that it does not.

But even if this Court *did* conclude that more process was necessary, defendant White would still

be entitled to qualified immunity because, at the time of his actions, the law requiring extended

process was not clearly established.[13]

### iii.    *Deliberate Indifference as to Constitutional Violations*

Plaintiff's final constitutional claims allege "deliberate indifference" by defendants

---

[12]Plaintiff's motion does detail the duties owed once a parolee is taken into federal
custody (*see* Pl.'s Opp'n [59] at 20), but plaintiff was never taken into USMS custody.

[13]This is merely an alternate ground for dismissal.  The primary ground for dismissal
against White is lack of jurisdiction.

Lappin and Scott. "While . . . deliberate indifference entails something more than mere negligence, the cases are also clear that it is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Farmer v. Brennan*, 511 U.S. 825, 835 (1970). The more accurate standard for deliberate indifference is that of recklessness. *Id.* at 836 ("It is . . . fair to say that acting or failing to act with deliberate indifference to a substantial risk of serious harm to a prisoner is the equivalent of recklessly disregarding that risk.").

At the outset, defendants argue that no case establishes that "deliberate indifference" exists in the *Bivens* context in cases that do not involve inmate health and safety. (Reply at 12 (citing *Farmer*, 511 U.S. at 834 (1994).) *Farmer*, an Eighth Amendment case, did place one limit on the extent of deliberate indifference claims, stating that they would be inappropriate in cases "where the decisions of prison officials are typically made in haste, under pressure, and frequently without the luxury of a second chance." *Farmer*, 511 U.S. at 835 (internal quotations and citations omitted). This is not such a case. Defendants cite no other case supporting its limitation on the deliberate indifference standard, and the Court declines to adopt such a limitation here.

Thus the question is whether plaintiff has properly alleged deliberate indifference. As for defendant Scott, plaintiff alleges that on December 6, 2006, Scott received notice (in the form of the fax from CCA) that plaintiff's sentence expired on October 21, 2006. (Compl. ¶54.) The fax also requested that USMS execute its parole violation warrant for plaintiff (which did not exist). (WHH's Reply Ex. 15 [43-9].) Plaintiff claims that this fax provided Scott with notice of plaintiff's overdetention. (Compl. ¶92.) In the Court's view, these facts do not establish Scott's

23

recklessness with relation to plaintiff's continued overdetention.  Had Scott investigated

plaintiff's status—which she may well have—it would have revealed that plaintiff was being

held subject to the USM-41 "in-transit hold" since her sentence expired on October 21

(approximately 46 days).  In the Court's experience, such in-transit holds are generally

considered valid for 30 to 45 days.[14]  It cannot be said that Scott, upon encountering a prisoner

who had been held on an in-transit hold for 46 days, should have known that the prisoner's rights

were about to be violated.  Accordingly, plaintiff has failed to make out a claim against Scott for

deliberate indifference.

As for defendant Lappin, plaintiff alleges that Lappin failed to "train and/or supervise

BOP employees responsible for ensuring the timely release of detainees and inmates," thus

contributing to plaintiff's overdetention.  (Compl. ¶100.)  Plaintiff claims that the publicity

surrounding the class action litigation *Bynum, et al. v. District of Columbia*, No. 02-956

(D.D.C.), which began in 2002 and settled in 2006, put Lappin on notice of the need to train and

supervise employees on the dangers of overdetention in CDF and CTF.  But CDF and CTF are

run under the auspices of DOC, not BOP.  The most that can be reasonably said about BOP's

involvement in plaintiff's overdetention—and all that plaintiff argues—is that BOP issued the

"Notice of Escape."  Plaintiff seems to somehow be arguing that due to CTF and CDF's past

overdetentions, BOP Director Lappin somehow should have known to give his personnel more

training in the issuing of Notices of Escape.  This argument is unconvincing, and it fails to

---

[14]In her Opposition [46] to District Defendants' Motion to Dismiss, plaintiff cites DOC guidelines which seem to indicate that USM-41 "intransit holds" should only justify custody overnight, for less than one working day, or in some cases over a weekend or holiday.  (*See* Pl.'s Opp'n [46] at 13.)  However, plaintiff provides no evidence or other reason why USMS should interpret in-transit holds as justifying commitment only for such short periods.

properly allege deliberate indifference.

### C.      FTCA Claims

Plaintiff asserts claims of negligence and false imprisonment against the United States under the Federal Tort Claims Act (FTCA).  Defendants argue that to the extent that these claims are related to the investigatory, supervisory, or training responsibilities of the various federal defendants, they should be dismissed because they are barred by the "discretionary function exception" to the FTCA.  The Court disagrees and will not dismiss plaintiff's FTCA claims.

The FTCA allows the United States to be held liable

> for injury . . . caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

28 U.S.C. § 1346(b)(1).  The FTCA's discretionary function exception excludes

> [a]ny claim . . . based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.

28 U.S.C. § 2680(a).  Defendants argue that this exception precludes plaintiff's FTCA claims. The Court need not spend much time on defendants' argument, however, because plaintiff alleges that the United States, through its employees' acts, has violated plaintiff's constitutional rights.  Other circuits have clearly held that whatever the breadth of a government employee's discretion, that discretion does not include violating constitutional rights.  *See, e.g., Thames Shipyard & Repair Co. v. United States*, 350 F.3d 247, 254 (1st Cir. 2003) ("[C]ourts have read the Supreme Court's discretionary function cases as denying protection to actions that are

unauthorized because they are unconstitutional . . . ."); *Medina v. United States*, 259 F.3d 220, 225 (4th Cir. 2001) (noting that in determining the bounds of the discretionary function exception, "we begin with the principle that federal officials do not possess discretion to violate constitutional rights or federal statutes") (internal quotation marks and citations omitted); *Pooler v. United States*, 787 F.2d 868, 871 (3rd Cir. 1986) ("[I]f the complaint were that agents of the government in the course of an investigation had violated constitutional rights or federal statutes, . . . federal officials do not possess discretion to commit such violations."); *Myers & Myers, Inc. v. U.S. Postal Serv.*, 527 F.2d 1252, 1261 (2d Cir. 1975) ("It is, of course, a tautology that a federal official cannot have discretion to behave unconstitutionally . . . ."). This Circuit has indicated similar sentiments. *See Red Lake Band of Chippewa Indians v. United States*, 800 F.2d 1187, (D.C. Cir. 1986) ("[A] decision cannot be shielded from liability if the decisionmaker is acting without actual authority. A government official has no discretion to violate the binding laws, regulations, or policies that define the extent of his official powers."). Because plaintiff alleges that government employees violated her constitutional rights, her FTCA claims do not fall within the discretionary function exception. Because this is defendants' only argument for dismissal of plaintiff's FTCA claims, defendants' motion will be denied.

## V. DISTRICT DEFENDANTS' MOTION TO DISMISS

Plaintiff asserts constitutional claims against the District of Columbia, DOC Director Brown, and DOC officers or employees (collectively "District defendants") under 42 U.S.C. § 1983 and common-law tort. District defendants move to dismiss [38] or, in the alternative, for summary judgment [39]. Because of a separate class action in this Court, however, the Court

26

elects to stay all claims as to District defendants.

As District defendants note, plaintiff is covered by the class certification in *Barnes v. District of Columbia*.  Order [33], Civ. No. 06-315 (D.D.C. Mar. 26, 2007) (defining the "Overdetention Class" as each person overdetained by the District of Columbia from September 1, 2005 forward).  District defendants request that the Court stay plaintiff's discovery request so as not to interfere with the *Barnes* litigation (*see* District Defs.' Reply [57] at 13), and the Court will grant that request.  Also to avoid interference with *Barnes*, the Court will deny District defendants' motion to dismiss without prejudice as to its being refiled at a later date.

## VI.  CCA DEFENDANTS' MOTION TO DISMISS

Plaintiff asserts claims against CCA, Officer Tutwiler, and CCA employees (collectively "CCA defendants") under both 42 U.S.C. § 1983 and common-law negligence and false imprisonment theories.  CCA defendants move to dismiss all claims.[15]

### A.    Section 1983 Claims Cannot Be Dismissed

Plaintiff's § 1983 claims, brought against CCA defendants under the theory that CCA was performing a traditional governmental function and its employees were acting under color of state law, cannot be dismissed.  Plaintiff's various § 1983 allegations all relate to her underlying claim that she was overdetained at CTF.

CCA defendants make three main arguments for dismissal of the § 1983 claims.  First, they argue the claims are foreclosed by *Correctional Services Corp. v. Malesko*, 534 U.S. 61

---

[15]CCA defendants' initial motion [14] mistakenly asserted that they faced no federal claims.  Their Reply corrected that error.  The Court will therefore construe the motion as seeking dismissal of both the federal and common-law claims.

(2001).  But because *Malesko* only foreclosed suits against private correctional corporations acting under color of federal law—not under state law, as is alleged here—this argument fails.[16] CCA defendants then argue that a provision of the Prison Litigation Reform Act—42 U.S.C. § 1997e(a)—prohibits such litigation when the plaintiff has failed to exhaust available administrative remedies.  But this too fails.  The provision states that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."  42 U.S.C. § 1997e(a).  Even if this provision does cover the substance of plaintiff's overdetention claim, it does not cover plaintiff herself.  Plaintiff brought this claim not while she was "confined in" any prison, but rather after she had been released; likewise, at that time she was not a "prisoner" under the definition in the statute, *see* 42 U.S.C. § 1997e(h) ("[T]he term 'prisoner' means any person incarcerated or detained in any facility . . . .").

CCA defendants' final argument for dismissal of the § 1983 claims against them is that CCA and its employees had no legal right to release plaintiff.  Defendants cite D.C. law, which specifies that "[a]n inmate confined in the CTF shall be deemed to be at all times in the legal custody of the Department of Corrections. Only the Department of Corrections shall have authority to transfer or assign inmates into or out of the CTF."  D.C. Code § 24-261.03(a).  Thus, defendants argue, they had no legal right or ability to provide plaintiff the relief she requested.  However, as plaintiff notes, this argument is called into question by provisions in the contract

---

[16]*Malesko* held that *Bivens v. Six Unknown Federal Narcotics Agents*, 403 U.S. 388 (1971), did not extend to suits against private correctional corporations.  It did not affect the reach of 42 U.S.C. § 1983, under which these claims are brought.

between D.C. and CCA which specify that "'if the Operator [CCA] believes that an inmate has been erroneously assigned to the CTF or warrants transfer, it may request his or her transfer in accordance with DOC policies and practice.'"  (Defs.' Opp'n [24] at 8 (quoting Ex. 1).)  This provision does not resolve the issue of whether defendants could have remedied plaintiff's situation, but it does render plausible plaintiff's claims that defendants could have—and perhaps should have—informed DOC of plaintiff's inquiries regarding her incarceration, an act which possibly could have resulted in her release.  This is enough for plaintiff's § 1983 claims to survive defendants' motion to dismiss.

**B.      Common-Law Claims (Negligence and False Imprisonment) Cannot Be Dismissed**

Plaintiff's common-law claims will not be dismissed here either.  Again, to survive defendants' motion to dismiss, plaintiff need only make a claim for relief that is plausible on its face.  Plaintiff has done so here, and defendants' motion will be denied.

Plaintiff's negligence claim alleges that CCA defendants breached their duty to plaintiff by failing to respond to her inquiries about the reasons for her incarceration and failing to inform DOC of her pleas, which plaintiff claims could have shortened or prevented her ordeal.  Plaintiff claims that her physical custody by CCA was sufficient to give rise to a duty of care (Pl.'s Opp'n to CCA Defs.' Mot. at 5 (citing Restatement (2d) of Torts § 314A(4) ("One who is required by law to take or voluntarily takes the custody of another under circumstances such as to deprive the other of his normal opportunities for protection is under a similar duty [to take reasonable action to protect them against unreasonable risk of physical harm] to the other."))) and that CCA defendants' failure to look into her status or respond to her inquiry breached that duty and caused plaintiff's injury.  Her false imprisonment claim alleges that the prima facie elements of the claim are met;

29

that is, that plaintiff was (1) detained against her will (2) unlawfully, *see Faniel v. Chesapeake & Potomac Tel. Co.*, 404 A.2d 147, 150 (D.C. 1979).

Defendants contest both the negligence and false imprisonment claims with the same argument they used for the § 1983 claims—that they had no legal authority to release plaintiff. However, again, plaintiff plausibly claims that defendants did have authority to respond to plaintiff's inquiries, investigate her claims, and inform DOC of her situation, which may have prevented at least some of her overdetention. The Court need not at this stage determine whether CCA defendants in fact owed a duty to plaintiff or whether plaintiff was in fact unlawfully detained. Plaintiff does state a claim that could *plausibly* entitle her to relief. Accordingly, plaintiff's common-law claims against CCA defendants cannot be dismissed.

Finally, with regard to the negligence claim in particular, plaintiff argues that *McAllister v. District of Columbia*, 653 A.2d 849, 852 (D.C. 1995), which granted summary judgment for the correctional defendant after finding that the plaintiff failed to establish the existence a duty. Contrary to defendants' assertions, that case in no way mandates that this claim be dismissed. All that plaintiff must do at this stage—faced with defendants' Motion to Dismiss—is state a claim for relief that is plausible on its face. Plaintiff's claim—that the ordinary duty of care, together with Officer Tutwiler's offers of assistance, support the existence of a duty—is sufficient to defeat defendants' motion.

## CONCLUSION

For the foregoing reasons, the Court will deny WHH's motion (and deny plaintiff's cross-motion), grant in part and deny in part federal defendants' motion, deny without prejudice

30

District defendants' motion and stay discovery as to District defendants, and deny CCA

defendants' motion.

A separate order shall issue this date.


Signed by Royce C. Lamberth, Chief Judge, on February 24, 2009.